1  PATRICK M. RYAN (SBN 203215)
   *pryan@bzbm.com*
2  STEPHEN C. STEINBERG (SBN 230656)
   *ssteinberg@bzbm.com*
3  CHAD E. DEVEAUX (SBN 215482)
   *cdeveaux@bzbm.com*
4  CHRISTOPHER W. GRIBBLE (SBN 285337)
   *cgribble@bzbm.com*
5  P. CASEY MATHEWS (SBN 311838)
   *cmathews@bzbm.com*
6  BARTKO ZANKEL BUNZEL & MILLER
   A Professional Law Corporation
7  One Embarcadero Center, Suite 800
   San Francisco, California 94111
8  Telephone:    (415) 956-1900
   Facsimile:    (415) 956-1152
9

10 Attorneys for Plaintiffs NICKY LAATZ and NICKY
   LAATZ CREATIONS UK LTD.

11

12              UNITED STATES DISTRICT COURT

13      NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

14

15 NICKY LAATZ and NICKY LAATZ          Case No. 5:22-cv-04844-BLF
   CREATIONS UK LTD.,
16                                       **PLAINTIFFS' REPLY IN SUPPORT OF**
                  Plaintiffs,            **PLAINTIFFS' MOTION FOR PARTIAL**
17                                       **SUMMARY JUDGMENT**
           v.
18                                       Date:        January 19, 2023
   ZAZZLE, INC. and MOHAMED             Time:        9:00 a.m.
19 ALKHATIB,                            Courtroom:   3
                                        Judge:       Hon. Beth Labson Freeman
20                Defendants.
                                        Trial Date:  None Set
21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ...................................................................................................1

II.   EVIDENTIARY OBJECTIONS ...........................................................................2

III.  SUMMARY JUDGMENT SHOULD BE GRANTED BECAUSE THE ONLY ISSUES
      PRESENTED ARE LEGAL AND THERE ARE NO FACTUAL DISPUTES ................3

      A.    Nicky Laatz Is Entitled to Summary Judgment on Her Contract Claim..................3

            1.    Defendants' Contract Preemption Argument Is Frivolous ...........................3

            2.    Defendants Are Liable for Breach Even if the Infringement Claim Fails .....4

            3.    The Terms of the Blooming Elegant License Are Not Disputed..................4

            4.    Defendants Are Bound By the Terms of the License ...................................5

            5.    Defendants' Admissions Establish Breach of the License Contract.............7

            6.    Zazzle and Alkhatib Are *Both* Liable for Breach of Contract ......................8

      B.    Nicky Laatz is Entitled to Summary Judgment on Her Fraud Claims......................9

      C.    Zazzle Infringed Nicky Laatz's Valid Copyrights.....................................................9

            1.    A Copyright Examiner's Legal Opinions Have No Legal Force................10

            2.    *Adobe* Proves Nicky Laatz's Copyrights Are Valid ...................................11

            3.    The Copyrights Are Not the Product of Fraud............................................12

            4.    Defendants Admit They Copied Laatz's Copyrighted Font Software.........13

      D.    Zazzle Admits it Used the "Blooming Elegant" Mark in Commerce Without
            Permission, But Fails to Meet the Requirements for Nominative Fair Use.............13

      E.    Nicky Laatz Had No Reason to Suspect Defendants' Wrongful Actions ...............14

IV.   CONCLUSION....................................................................................................15

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Federal Cases**

4

*Adobe Sys., Inc. v. S. Software, Inc*,
5    1998 WL 104303 (N.D. Cal. Feb. 2, 1998) .......................................1, 11, 12, 13

6
*Albert v. Embassy of Music*,
7    2020 WL 4284830 (N.D. Cal. July 27, 2020) ......................................................2

8
*Altera Corp. v. Clear Logic, Inc.*,
9    424 F.3d 1079 (9th Cir. 2005) ............................................................................3

10   *Assessment Tech. of WI, LLC v. WIREdata, Inc.*,
11   350 F.3d 640 (7th Cir. 2003) ..............................................................................4

12   *Boyds Coll., Ltd. v. Bearington Coll., Inc.*,
13   365 F. Supp. 2d 612 (M.D. Pa. 2005).................................................................10

14   *Cairns v. Franklin Mint Co.*,
     292 F.3d 1139 (9th Cir. 2002) ...........................................................................13
15
16   *Center for Sierra Nev. Cons. v. U.S. Forest Serv.*,
     832 F. Supp. 2d 1138 (E.D. Cal. 2011) .......................................................10, 11
17
18   *Chambers v. Miss.*,
     410 U.S. 284 (1973)............................................................................................3

19
*Computerland Corp. v. Microland Computer Corp.*,
20   586 F. Supp. 22 (N.D. Cal. 1984).......................................................................9

21   *Daniher v. Pixar Anim. Studios*,
22   2022 WL 1470480 (N.D. Cal. May 10, 2022).....................................................3

23   *Deakins Holding PTE Ltd. v. NewNet Inv. Grp. LLC*,
24   2015 WL 468972 (C.D. Cal. Feb. 4, 2015) ........................................................2

25   *Decker Coal Co. v. Pehringer*,
     8 F.4th 1123 (9th Cir. 2021) ............................................................................10
26
27   *Energy Intel. Group, Inc. v. Jeffries, LLC*,
     101 F. Supp. 3d 332 (S.D.N.Y. 2015) ................................................................8
28

*Erlich v. Menezes*,
   21 Cal.4th 543 (1999) ........................................................................................4

*Gold Value Int'l Textile, Inc. v. Sanctuary Clothing, LLC*,
   925 F.3d 1140 (9th Cir. 2019) ..............................................................10, 11, 12

*Herkenrath v. Move, Inc.*,
   2018 WL 10705782 (C.D. Cal. Aug. 21, 2018) .............................................5, 6

*ITC Textile, Ltd. v. Wal-Mart Stores, Inc.*,
   2012 WL 468065 (C.D. Cal. Feb. 14, 2012) ...................................................4

*Josephs v. Pac. Bell*,
   443 F.3d 1050 (9th Cir. 2006) ........................................................................2

*Klinger v. Modesto Fruit Co.*,
   107 Cal. App. 97 (1930) .................................................................................9

*In re Lares*,
   188 F.3d 1166 (9th Cir. 1999) ........................................................................2

*Live Face on Web v. eCommerce Software, Inc.*,
   2008 WL 11336178 (C.D. Cal. June 16, 2008)..............................................10

*Lopez v. Terra's Kitchen, LLC*,
   331 F. Supp. 3d 1092 (S.D. Cal. 2018)...........................................................5

*Meridian Project Sys., Inc. v. Hardin Const. Co., LLC*,
   426 F. Supp. 2d 1101 (E.D. Cal. 2006) ...........................................................3

*Mformation Tech., Inc. v. Res. in Motion Ltd.*,
   2010 WL 702447 (N.D. Cal. Feb. 25, 2010) ...................................................7

*Nguyen v. Barnes & Noble, Inc.*,
   763 F.3d 1171 (9th Cir. 2014) .....................................................................5, 7

*Northwest Home Designing Inc. v. Sound Built Homes Inc.*,
   776 F.Supp.2d 1210 (W.D. Wash. 2011) ........................................................3

*Oracle USA Inc. v. Rimini Street, Inc.*,
   6 F. Supp. 3d 1108 (D. Nev. 2014)............................................................8, 13

*Petrella v. MGM*,
   572 U.S. 663 (2014)........................................................................................14

*Phoenix Sols. Inc. v. Wells Fargo Bank, N.A.*,
   254 F.R.D. 568 (N.D. Cal. 2008).................................................................2

*Roches v. Cnty. of Santa Clara*,
   2018 WL 3344647 (N.D. Cal. July 9, 2018) ............................................14

*Roldan v. Callahan & Blaine*,
   219 Cal. App. 4th 87 (2013) .....................................................................7

*Silverman v. Move Inc.*,
   2019 WL 2579343 (N.D. Cal. June 24, 2019)...........................................6

*Standard Innovation Corp. v. Lelo (Shanghai) Trading Co.*,
   2015 WL 6828317 (N.D. Cal. Nov. 6, 2015) (Labson Freeman, J.)..................2

*Starz Ent't, LLC v. MGM Dom. TV Dist., LLC*,
   39 F.4th 1236 (9th Cir. 2022) ...........................................................14, 15

*Starz Ent't, LLC v. MGM Dom. TV Dist., LLC*,
   510 F. Supp. 3d 878 (C.D. Cal. 2021) ...............................................14, 15

*Swift v. Zynga Game Network, Inc.*,
   805 F. Supp. 2d 904 (N.D. Cal. 2011) ......................................................5

*Tacori Ent. v. Nerces Fine Jewelry*,
   2013 WL 12113229 (C.D. Cal. Sept. 20, 2013) ........................................3

*Telecom Asset Mgmt., LLC v. FiberLight, LLC*,
   730 F.App'x 443 (9th Cir. 2018)...............................................................2

*Therapeutic Res. Fac. v. NBTY, Inc.*,
   488 F. Supp. 2d 991 (E.D. Cal. 2007) ......................................................8

*Ticketmaster LLC, v. Prestige Ent't, Inc.*,
   306 F. Supp. 3d 1164 (C.D. Cal. Jan. 31, 2018).......................................9

*Toytrackerz LLC v. Am. Plastic Equip., Inc.*,
   2006 WL 8440878 (D. Kan. Aug. 30, 2006) ............................................4

*UAB "Planner5D" v. Facebook, Inc.*,
   534 F. Supp. 3d 1126 (N.D. Cal. 2021).................................................11

*United Tactical Sys., LLC v. Real Action Paintball, Inc.*,
   2014 WL 6788310 (N.D. Cal. Dec. 2, 2014)......................................13, 14

*Williams v. Boorstin*,
    663 F.2d 109 (D.C. Cir. 1980).............................................................................11

**Court Rules**

Federal Rules of Civil Procedure 12(b)(6) ...............................................................2

Federal Rules of Evidence
    408.....................................................................................................................2
    804(b)(3) ...........................................................................................................3

**Federal Regulations**

37 C.F.R.§ 202.5 .........................................................................................................11

57 Federal Regulation
    6201-01 (February 12, 1992) .........................................................................11

## I.     INTRODUCTION

Rather than presenting viable defenses for their misconduct, Defendants employ a blame-the-victim strategy, arguing Nicky Laatz should have treated Zazzle's request for a perpetual server license as notice they may later steal her font software. Defendants therefore expect her to have discovered their misconduct as soon as Defendant Alkhatib purchased a single-seat license, even though she had no reason to know that he had obtained the font software for Zazzle to put it on its servers. They posit she was duty bound to surveil each of the thousands of people who bought her single-seat licenses to ensure that each licensee followed the terms and because she did not do so her claims are time-barred. The discovery rule does not require such paranoia. She only had to investigate if she had an actual reason to suspect a breach.

Defendants' other arguments, based on legal and factual misunderstandings, appear designed to manufacture factual disputes where there are none. First, Defendants falsely claim Creative Market hid the License Terms "in obscure corners of [its] website." Opp. at 25:6. But Creative Market required Alkhatib to accept the Terms of Service and License Terms when he created a user account, and prominently linked to the License FAQ, which explained it was limited to one user and prominently linked to the full License Terms, on the Blooming Elegant webpage. Moreover, the email transmitting the font software to Alkhatib—which he had to open and read to download the software—also included a link to the License FAQ that in turn linked to the License terms. Defendants also falsely claim the webpage's language rendered the clear licensing terms ambiguous because they were contradictory. This too is wrong because the terms of the license are consistent with the webpage's language.

Defendants go on to claim Nicky Laatz does not own valid copyright registrations because she purportedly deceived the Copyright Examiner. But the evidence shows she disclosed the font data was generated with the assistance of a font generating program. Consistent with the Copyright Register's governing regulations, the Examiner approved her registrations after Nicky Laatz confirmed she "hand-coded the designs and instructions in the font data." The undisputed evidence shows it is the custom and practice in the font industry to hand-code font software with the assistance of font generating software, and the *Adobe* decision held this type of hand-coding is copyrightable. The Copyright Office has registered thousands of fonts that were created using such software.

1    Defendants' arguments are not bolstered by the improper incorporation of their motion to

2    dismiss briefing into this motion (Opp. at 1:8-9), a direct violation of this Court's Standing Order,

3    section IV.D. *Standard Innovation Corp. v. Lelo (Shanghai) Trading Co.*, 2015 WL 6828317, at *2 n.3

4    (N.D. Cal. Nov. 6, 2015) ("filings … may not incorporate additional materials by reference.") (Labson

5    Freeman, J.). Nicky Laatz briefly touches upon Defendants' Rule 12(b)(6) motion arguments here and

6    asks the Court to advance the hearing on such motion to correspond with the present one.

7    **II.    EVIDENTIARY OBJECTIONS**

8        Defendants seek to exclude their own admissions of wrongdoing under Federal Rule of

9    Evidence ("FRE") 408. But one cannot make evidence inadmissible by unilaterally designating it as

10   settlement discussions. Rule 408 applies only to offers of compromise and settlement negotiations

11   "once a controversy exists." *Deakins Holding PTE Ltd. v. NewNet Inv. Grp. LLC*, 2015 WL 468972, at

12   *8, n.4 (C.D. Cal. Feb. 4, 2015). "A controversy exists 'when a dispute has arisen and when a claim has

13   been made arising out of it.'" *Josephs v. Pac. Bell*, 443 F.3d 1050, 1064 (9th Cir. 2006). The rule does

14   not apply to the prelitigation business communications at issue here. *Telecom Asset Mgmt., LLC v.*

15   *FiberLight, LLC*, 730 F. App'x 443, 445 (9th Cir. 2018) (discussions constituting "an attempt to resolve

16   the parties' dispute before taking it to court" were not settlement offers protected by Rule 408).

17       Further, a "bilateral … expectation of confidentiality" is required to trigger Rule 408 protection.

18   *Phoenix Sols. Inc. v. Wells Fargo Bank, N.A.*, 254 F.R.D. 568, 583-84 (N.D. Cal. 2008). Neither

19   Plaintiffs nor Defendants objectively manifested any intent to enter into settlement discussions prior to

20   Zazzle's January 27, 2022 letter, which unilaterally claimed it was "for settlement purposes only."

21   Suppl. Steinberg Decl., ¶¶ 2-7, Exs. 20-21. This shows that when Zazzle wanted to invoke Rule 408, it

22   did so. This proves the earlier communications were not protected because the maxim "*expressio unius*

23   *est exclusio alterius*" dictates "specific[ally] mention[ing]" that "one thing" shall receive special

24   treatment "implies the exclusion" of such treatment to "another." *In re Lares*, 188 F.3d 1166, 1169 (9th

25   Cir. 1999). Even the *one* labeled letter is not necessarily protected because "[t]he use of a settlement-

26   related header or disclaimer on a communication does not necessarily signal the initiation of settlement

27   negotiations without some corresponding agreement … by the opposing party." *Albert v. Embassy of*

28   *Music*, 2020 WL 4284830, at *6 (N.D. Cal. July 27, 2020). Thus, Zazzle's subjective unexpressed

1   understanding, claiming it "intended and understood" the parties' communications were "settlement

2   discussions," is insufficient.

3          In addition, Zazzle's objections to Rachma's statements, cited in Mr. Olexa's Declaration, fail

4   because each constitutes statements against interest by an unavailable witness. Admissibility as a

5   statement against interest has three requirements: (1) the declarant is unavailable, (2) a reasonable

6   person would not have made the statement if it were untrue because it would subject them to criminal

7   liability, and (3) the statement is supported by corroborating circumstances. FRE 804(b)(3); *Chambers*

8   *v. Miss.*, 410 U.S. 284, 298-99 (1973); *see also* Olexa Decl. (Dkt. 27-30) ¶¶ 1, 2.

9   **III.    SUMMARY JUDGMENT SHOULD BE GRANTED BECAUSE THE ONLY ISSUES**
        **PRESENTED ARE LEGAL AND THERE ARE NO FACTUAL DISPUTES**
10

11          **A.      Nicky Laatz Is Entitled to Summary Judgment on Her Contract Claim**

12                   **1.      Defendants' Contract Preemption Argument Is Frivolous**

13          Defendants claim the Copyright Act preempts the contract claim. Not so. In *Altera Corp. v.*

14   *Clear Logic, Inc.*, 424 F.3d 1079 (9th Cir. 2005), "[t]he Ninth Circuit … held that the Copyright Act

15   does not preempt the enforcement of contractual rights." *Northwest Home Designing Inc. v. Sound*

16   *Built Homes Inc.*, 776 F.Supp.2d 1210, 1216 (W.D. Wash. 2011). Cases recognizing this are legion.

17   *E.g.*, *Tacori Ent. v. Nerces Fine Jewelry*, 2013 WL 12113229, at *8 (C.D. Cal. Sept. 20, 2013);

18   *Meridian Project Sys., Inc. v. Hardin Const. Co., LLC*, 426 F. Supp. 2d 1101, 1108 (E.D. Cal. 2006).

19   Defendants first address *Altera* and its progeny in the motion to dismiss reply, arguing these cases were

20   wrongly decided because "the reasoning of those [judges] contradicts the plain language of the

21   Copyright Act." Dkt. 50 at 7:28-8:1. They also falsely imply this Court held in *Daniher v. Pixar Anim.*

22   *Studios*, 2022 WL 1470480 (N.D. Cal. May 10, 2022) that contract claims were preempted because

23   "the scope of the contract" did not go beyond copyrights. Dkt. 50 at 7:7-10. But this Court found only

24   that an "unjust enrichment" claim was preempted. 2022 WL 1470480 at *4. Unlike contract claims,

25   "unjust enrichment" does not require "an[y] element other than the unauthorized use of the copyrighted

26   work." *Northwest*, 776 F.Supp.2d at 1216. But here Defendants breached contract rights that differ

27   from "rights under the Copyright Act."

28

2.      **Defendants Are Liable for Breach Even if the Infringement Claim Fails**

Nicky Laatz is entitled to summary judgment on her contract claims even if her infringement claim fails. A "federally registered [copyright] is not an element of … state law [contract or fraud] claims." *Toytrackerz LLC v. Am. Plastic Equip., Inc.*, 2006 WL 8440878, at *2 (D. Kan. Aug. 30, 2006). As Judge Posner held, "[t]he scope of copyright [protection] is given by federal law, but the scope of contractual protection is … whatever the parties to the contract agreed to." *Assessment Tech. of WI, LLC v. WIREdata, Inc.*, 350 F.3d 640, 646 (7th Cir. 2003). This is because "when two parties make a contract, they agree upon the rules and regulations which will govern their relationship" and "in essence create a mini-universe for themselves ... in which they define their respective obligations." *Erlich v. Menezes*, 21 Cal.4th 543, 558 (1999). For this reason, a "breach of contract" action alleging the defendant "used [a] Plaintiff's [intellectual property] without compensation" is "completely separate and distinct from the elements of copyright infringement." *ITC Textile, Ltd. v. Wal-Mart Stores, Inc.*, 2012 WL 468065, at *3 (C.D. Cal. Feb. 14, 2012). Regardless, Defendants breached the license, which the software's use to a single user, Alkhatib, by uploading it to Zazzle's servers.

3.      **The Terms of the Blooming Elegant License Are Not Disputed**

Defendants wrongly claim the Blooming Elegant product webpage "deceptively and misleadingly advertised the license as permitting 'commercial' and 'unlimited' use." *See* Opp. at 24:16-17. They conveniently omit that the webpage shows the License FAQ prominently linked near the top of the page just after stating "COMMERCIAL USE ALLOWED- The Standard License on Creative Market allows Commercial Use of fonts and add-ons :) Unlimited Sales, Unlimited Projects *with only a few exceptions* - See https://creativemarket.com/licenses." Alkhatib Decl. Ex. 1 (emphasis added) (Dkt. 49-4). The full License Terms were prominently linked at the top of the FAQ. N. Laatz Decl. Ex. 4 (Dkt. 27-24). It is undisputed that, consistent with the webpage, the Blooming Elegant License permitted Alkhatib to use the font software for commercial use and to design "an unlimited number of projects and End Products for Sale (one seat per license)," ***provided that he was the only user, did not make the fonts available on a shared drive (e.g. a server), did not permit an end user to use the fonts separately from the end product, and did not share or otherwise redistribute the fonts in any tool, template, or otherwise not incorporated into an end product.*** *Id.* Ex. 3 ¶¶ 2, 5-6 & Ex. 4. Thus,

1   consistent with the webpage, the license permits licensees to use the font software for commercial use

2   and to design in "an unlimited number of projects and End Products for Sale (one seat per license)." *Id.*

3   Ex. 3 ¶¶ 2, 5-6.

4         **4.     Defendants Are Bound By the Terms of the License**

5         Defendants claim they are not bound by the license's express limitations because Creative

6   Market's website did not require Alkhatib to "click" to accept those terms. Opp. at 24:10-12, 25:3-14.

7   While they fail to use the correct terminology, Defendants appear to suggest the license is

8   "browsewrap" "contained within a link … stating that a user assents to various terms" simply "by using

9   the website." *Herkenrath v. Move, Inc*., 2018 WL 10705782, at *3 (C.D. Cal. Aug. 21, 2018). But a

10  contract is not "browsewrap" when the user "is provided with an opportunity to review the terms of

11  service in the form of a hyperlink" immediately next to "an 'I Accept' button and then clicks that

12  button." *Lopez v. Terra's Kitchen, LLC*, 331 F. Supp. 3d 1092, 1098 (S.D. Cal. 2018). This constitutes

13  an enforceable "modified clickwrap" contract because it "provided [the user] with sufficient notice of

14  the contractual terms" and by clicking the button, the user "assented" to those terms. *Swift v. Zynga*

15  *Game Network, Inc*., 805 F. Supp. 2d 904, 912 (N.D. Cal. 2011). This is because the defining

16  characteristic of a "browsewrap" agreement is that "no affirmative action is required by the website

17  user to agree to the terms of a contract other than his or her use of the website." *Nguyen v. Barnes &*

18  *Noble, Inc.*, 763 F.3d 1171, 1176 (9th Cir. 2014).

19        Here, when a prospective licensee, like Alkhatib, sought to purchase a license on Creative

20  Market, he had to set up a user account. When setting up the account, Alkhatib was presented with a

21  conspicuous link to the terms of service ("TOS") right above an acceptance button reading "Create

22  Account," which stated "By creating an account, you agree to our terms and privacy policy." Supp. N.

23  Laatz Decl., Ex. 6. By clicking this button, Alkhatib "assented" to the TOS, which included a link and

24  agreement to the License Terms, as the TOS stated: "By creating an account … you agree you have

25  read, understood, and agree to be bound by the terms and conditions of these Terms of Service,

26  including the License Terms ("Terms"), which constitute a binding agreement between us." *Id.* Ex. 5.

27  "License Terms" in the foregoing was a link to the License Terms themselves. Thus, when Alkhatib

28  clicked the "Create Account" button, he agreed to the License Terms. *See Swift*, 805 F. Supp. 2d at 912.

1    Even if the license was not a modified clickwrap, it would still not be "browsewrap" because, as

2    this Court recognized, that label only applies when the communications take place solely on the

3    Internet and the alleged contract is formed entirely "through an unwitting consumer's use of a website."

4    *Silverman v. Move Inc*., 2019 WL 2579343, at \*11 (N.D. Cal. June 24, 2019). When any other

5    confirming communication is involved which links to the terms of use, "the browsewrap caselaw" is

6    "an ill fit." *Id.* In reaching this conclusion, the Court followed *Herkenrath* that rejected the plaintiffs'

7    argument that an agreement initiated over the Internet was "browsewrap" because the plaintiffs

8    received an "Order Confirmation *email*," which "provided a link … to a webpage containing the

9    [contract's terms]." *Herkenrath,* 2018 WL 10705782, at \*3 (emphasis in original). It was irrelevant that

10   the plaintiffs "did not click on any of the links contained in the Order Confirmation email" because

11   "[i]gnoring or failing to review terms and conditions is not … a legally valid excuse." *Id.* This Court

12   adopted the same rule, finding the "browsewrap" designation only applies when an Internet user "has

13   no means of knowing what she is agreeing to." *Silverman*, 2019 WL 2579343, at \*11. This is because

14   when a later email includes a link to the terms, the user "had at least inquiry notice of [the terms],"

15   triggering a duty to read, and the user cannot avoid this by invoking "browsewrap" caselaw. *Id.*

16   Here, as in *Herkenrath*, after submitting an "Order," Defendants received an email, which

17   Alkhatib admits "was emailed to [him] on the day of the purchase," with a link to the License FAQ,

18   which linked to the full License Terms. *See Herkenrath,* 2018 WL 10705782, at \*3; Alkhatib Decl.

19   (Dkt. 49-3) ¶ 6, Ex. 4 (Dkt. 49-7). Moreover, unlike in *Herkenrath*, the email to Alkhatib was not

20   simply an "Order Confirmation *email*," i.e., a receipt. This email transmitted the link to download the

21   font software. *See id.* Thus, Alkhatib had to open and read it. Moreover, Alkhatib purchased three other

22   standard licenses for font software on the same day, so he actually received four emails linking to the

23   License FAQ, which linked to the full License Terms. Supp. Steinberg Decl. ¶ 3, Ex. 20. These facts

24   make this case stronger than *Herkenrath*, where the plaintiff merely received an email *receipt*, but

25   claimed to never have opened and read the email. As such, the "browsewrap" caselaw is not applicable.

26   Further, a party cannot avoid contract terms linked in an "Order Confirmation *email*" by

27   "failing to review" the linked "terms." *Herkenrath*, 2018 WL 10705782, at \*3. This is because the law

28   "presumes that everyone" who assents to a contract "has read it thoroughly, whether or not that is true."

*Roldan v. Callahan & Blaine*, 219 Cal. App. 4th 87, 93 (2013). Even if the license was browsewrap, Defendants are bound because browsewrap terms are still enforceable when the parties were "fully aware of the terms." *Nguyen,* 763 F.3d at 1176.

The undisputed facts show Zazzle knew the license did not cover its planned use. First, on November 2, 2016, McGhie wrote to Nicky Laatz: "Saw your Blooming Elegant Font Trio and believe that our Designers would love it! ***We noticed tha****t you offer* free personal use options, but ***weren't able to find any options that address non-personal use***. Do you offer a license in perpetuity for server-based use?" N. Laatz Decl. Ex. 1 (emphasis added). This proves that Zazzle had reviewed the available licenses for the Blooming Elegant Trio and knew they did not include a "server" option. It is also undisputed that the only available license was the Standard License. Supp. N. Laatz Decl. ¶¶ 10-15.

### 5. Defendants' Admissions Establish Breach of the License Contract

Defendants admit uploading the software "on[to] Zazzle's servers" and that it "resides … on Zazzle's servers." Li Decl. ¶ 3. This proves they breached the "one seat license" which "cover[ed] one user"—Alkhatib. It permitted *only* that "one user" to download the software "on up to two computers" to be used *only* on "one computer … at a time." N. Laatz Decl. Ex. 4 (Dkt. 27-24). That "one" user may not "mak[e] the [fonts] available on a digital asset management system, shared drive, or the like for the purposes of sharing or transferring the [fonts], and [the user] must not permit an end user of the end product to extract the [fonts] and use [them] separately from the End Product." *Id.* Ex. 3 (Dkt. 27-23). "Derivative works" are also covered. *Id.* As such, the license protects both the font software and the fonts themselves and includes far greater protections than the Copyright Act.

Defendants' uploading of the fonts and software onto Zazzle's "server**s**"—plural—violates the license's single-user limitation. *See* Opp. at 4:7-12 (emphasis added). A "'server' is a computer in a network that … provid[es] resources to other computers in the network." *Mformation Tech., Inc. v. Res. in Motion Ltd.*, 2010 WL 702447, at *7 (N.D. Cal. Feb. 25, 2010). Thus, by definition, uploading software onto even *one* server (let alone multiple servers) links the software to myriad computers—the server itself and all the other computers on its "network." *See id.* Even if Zazzle's servers were linked to only *one* computer each (which they surely were not), by uploading the software onto multiple servers linked to scores of computers, Zazzle far exceeded the single-seat license.

*Oracle USA Inc. v. Rimini Street, Inc.*, 6 F. Supp. 3d 1108 (D. Nev. 2014), which held that copying software onto a server is a breach of a single-user license, makes Defendants' breach clear. There, the defendant "copied Oracle's … software" onto its servers, but claimed it did not breach the license, because "copying … was expressly authorized by the … License." *Id.* at 1115-16. The court rejected this excuse because "the plain language of the … License provide[d] that only a single copy of [the software] may be downloaded" and "installed on one computer only, and used by one person," the copying of the software onto a server was "well above the single [authorized] copy." *Id.* at 1117.

Defendants claim *Oracle* recognizes a single-breach exception. Dkt. 50 at 11:13-19. Not so. *Oracle* held that because the defendant breached the license's terms because it permitted the software to "be installed on *one computer only*" and "used by one person." 6 F.Supp.3d at 1117 (emphasis in original). Here, Defendants' breach is even clearer because the license prohibits uploading the software onto a *server*, stating the user may not "mak[e] the [fonts] available on a digital asset management system, shared drive, or the like … ." N. Laatz Decl. Ex. 3 (Dkt. 27-23).

Defendants imply they did not breach the single-seat license because "Zazzle purchased [the] license," which should cover all employees. Dkt. 49 at 4, 13. But it is settled law that an employer who buys a "single user [license]" permitting an "individual employee" to download a plaintiff's copyright-protected material from the "Internet" has "infringed on [the plaintiff's] rights," if the employer allows "other employees who were unauthorized users … [to] access[] the [material]." *Therapeutic Res. Fac. v. NBTY, Inc.*, 488 F. Supp. 2d 991, 993, 995 (E.D. Cal. 2007); *accord Energy Intel. Group, Inc. v. Jeffries, LLC*, 101 F. Supp. 3d 332, 335-36, 340 (S.D.N.Y. 2015). Zazzle also claims that it did not actually "distribute" the software to its millions of users, so it was not a violation to give them access to the fonts. But this does not save Zazzle, as it should not have had the software on its servers in the first place, which enabled it to give access to its millions of users. Moreover, the license states that all of the terms apply to derivative works, which include what Zazzle claims to have provided to its users. *See* Decl. of S. Sandler ("Sandler Decl.) ¶¶ 26-27.

### 6. Zazzle and Alkhatib Are *Both* Liable for Breach of Contract

Defendants claim Alkhatib is not a party to the license because "an agent acting on behalf of a *disclosed principal* cannot be held personally liable on the contract." Opp. at 23:20-21 (emphasis

1   added). This rests on the false claim that Alkhatib disclosed his agency. When an agent executes a

2   contract for a principal "without disclosing [his or her] agency," the other party may sue **both** the agent

3   and the principal. *Klinger v. Modesto Fruit Co.*, 107 Cal. App. 97, 99, 101 (1930). Defendants claim

4   this rule does not apply because Alkhatib represented in the purchase process that he did so "on

5   Zazzle's behalf." Dkt. 50 at 13:22-26. This is wrong because the undisputed evidence proves Alkhatib

6   did nothing to disclose that he was acting as Zazzle's agent when he executed the license. Nicky Laatz

7   was not provided with Alkhatib's email address nor the fact that he paid with a Zazzle credit card, and

8   he did not include "Zazzle" in the name field for the license. Supp. N. Laatz Decl. ¶¶ 20-26.

9         **B.**    **Nicky Laatz is Entitled to Summary Judgment on Her Fraud Claims**

10         Defendants falsely claim Nicky Laatz's fraud count lacks a "misrepresentation or

11   misstatement." Opp. at 13:5-6. Not so. *Ticketmaster LLC, v. Prestige Ent't, Inc.*, 306 F. Supp. 3d 1164

12   (C.D. Cal. Jan. 31, 2018) held a defendant is guilty of fraudulent misrepresentation when it assents to a

13   contract over the Internet intending to breach the terms. There, the defendants agreed to Ticketmaster's

14   Terms of Use ("TOU") when contracting to use its website. *Id.* at 1169. Judge Wright held that

15   "assent[ing] to the TOU" while harboring the intent to breach them constitutes fraudulent

16   misrepresentation. *Id.* Defendants wrongly claim *Ticketmaster*'s holding is limited to cases where a

17   defendant "assented" to TOUs prohibiting the use of bots while intending "to utilize 'bots'" on "the

18   company's website." Dkt. 50 at 12:12-14. But Judge Wright simply held the defendants made "a

19   promise without any intention of performing it" when they "assented to the TOU with the intent to

20   breach the TOU." 306 F. Supp. 3d at 1178. Defendants' attempt to limit *Ticketmaster*'s holding to the

21   specific TOUs in that case ignores elementary principles of stare decisis, which Defendants cannot

22   avoid by pointing to inconsequential factual differences.

23         **C.**    **Zazzle Infringed Nicky Laatz's Valid Copyrights**

24         A defendant's claim that a registered copyright is invalid is "an affirmative defense to claims of

25   infringement." *Computerland Corp. v. Microland Computer Corp.*, 586 F. Supp. 22, 24 (N.D. Cal.

26   1984). Despite this, Defendants claim they are "not litigating an affirmative defense of copyright," but

27   are merely "pointing to the insufficiency of Plaintiffs' allegations." Dkt. 50 at 10:10-12. This ignores

28   Hornbook law. "[R]egistration of a copyright constitutes prima facie evidence of the validity of a

copyright and of the facts stated in the certificate" and "serves as a burden-shifting mechanism, because when a copyright is federally registered the copyright itself and the facts within are presumed to be valid, and the burden of proving invalidity rests on the defendant." *Live Face on Web v. eCommerce Software, Inc.*, 2008 WL 11336178, at *2 (C.D. Cal. June 16, 2008). To meet this, ***Defendants must prove*** "'inaccurate information was included on the application for copyright registration, with knowledge that it was inaccurate,'" and "'the inaccuracy of the information, if known, would have caused the Register of Copyrights to refuse registration.'" *Gold Value Int'l Textile, Inc. v. Sanctuary Clothing, LLC*, 925 F.3d 1140, 1144 (9th Cir. 2019). Defendants offer no evidence supporting *any* of these elements, much less all three.

### 1.   A Copyright Examiner's Legal Opinions Have No Legal Force

Defendants' invalid registration defense is founded on a false legal implication that font software is not copyrightable if every line of code is not manually typed. Based on this faulty premise, Defendants claim Nicky Laatz provided inaccurate information in support of her registration application by claiming that her software was "hand-coded" because she did not manually code each line of the software code printout provided to the Examiner, and that if this was known, the Register would have refused registration. But Defendants cite no legal authority in support of their construction. Instead, they cherry-pick remarks made by the Examiner (which is not the Register nor the "Copyright Office" contrary to Defendants' suggestion) in granting Nicky Laatz's registrations, suggesting that the Examiner opined that all of the font software code had to be manually typed by the font designer. But this is not what the Examiner said.

Even if he had said it, the Examiner's legal interpretation is irrelevant because it does not have "the force of law" and is not entitled to any deference from a court. *Boyds Coll., Ltd. v. Bearington Coll., Inc.*, 365 F. Supp. 2d 612, 616 (M.D. Pa. 2005). An administrative agency's legal interpretations only receive deference from courts when it "speaks formally" through its high-level officers. *Center for Sierra Nev. Cons. v. U.S. Forest Serv.*, 832 F. Supp. 2d 1138, 1152 (E.D. Cal. 2011). This is because the Constitution's Appointments Clause dictates only a "principal officer"—one nominated by the President and confirmed by the Senate—may exercise "'policymaking … authority.'" *Decker Coal Co. v. Pehringer*, 8 F.4th 1123, 1135 (9th Cir. 2021). Inferior officers—those *not* nominated by the

President—"lack the power to speak for the agency." *Center for Sierra Nev.*, 832 F. Supp. 2d at 1152.

Copyright examiners are *inferior* officers. *Williams v. Boorstin*, 663 F.2d 109, 111-12 (D.C. Cir. 1980).

Indeed, a rejection by an individual examiner is subject to two additional layers of scrutiny before the Copyright Office has been deemed to officially act: (a) first, by a U.S. Copyright Office staff attorney conducting a de novo review as part of a "First Reconsideration"; and (b) second, by the Copyright Office's Review Board—which consists of the Register of Copyrights, the General Counsel of the U.S. Copyright Office, and a third individual designated by the Register—which conducts yet another de novo review. 37 CFR section 202.5. Only then is the Copyright Office deemed to have officially acted. And even then, courts do not defer to the Copyright Office, but instead must "make an independent determination as to copyrightability." *UAB "Planner5D" v. Facebook, Inc.*, 534 F. Supp. 3d 1126, 1134-35 (N.D. Cal. 2021). As such, even if the Examiner had endorsed Defendants' faulty construction regarding the copyrightability of font software (he did not), his opinion would be irrelevant to any issue of whether "the Register of Copyrights" would have "refuse[d] registration'" based on this construction. *Gold Value*, 925 F.3d at 1144.

### 2.   *Adobe* Proves Nicky Laatz's Copyrights Are Valid

The actual *law* governing whether font software created using a font generating program is copyrightable debunks Defendants' false claims and is what governs the issue. This is set forth in the U.S. Copyright Office's regulation on the Registrability of Computer Programs That Generate Typefaces. 57 Fed. Reg. 6201-01. The only case interpreting it is *Adobe Sys., Inc. v. S. Software, Inc*, 1998 WL 104303 (N.D. Cal. Feb. 2, 1998). There, Adobe created new font software by using "[a]n Adobe editor" allowing a designer to "display[] and manipulate the on-curve and off-curve reference points of each displayed glyph altering its outline." *Id.* at *1. Adobe then "use[d] its own software" to compile those on-curve and off-curve reference points into a final font file. *Id.* In ruling on Adobe's motion for summary judgment on copyright infringement, the court described the issue as "whether the material at issue [wa]s protectable expression under the Copyright Act." *Id*. at *3. Adobe argued its selection and placement of those points using its software was copyrightable because it required "creative choice by the editors." *Id*. at *5. The court relied on the 1992 Copyright Office regulation, stating "computer programs designed for generating typeface in conjunction with low resolution and

1  other printing devices may involve original computer instructions entitled to protection under the

2  Copyright Act." *Id*. at *4 (citing 57 Fed. Reg. 35 at 6201-2 (February 12, 1992)). The court held the

3  software was entitled to copyright protection because "there is some creativity" in this process because

4  "font editors make creative choices as to what points to select based on the image in front of them on

5  the computer screen." *Id.* at *5.

6         Nicky Laatz used the FontLab program to hand-code the font data just as Adobe did. FontLab

7  enables designers to hand-code font data, including the "on-curve" and "off-curve" reference points for

8  each individual character of a given font, either by typing code or using a mouse. Sandler Decl. ¶¶ 9-

9  19; Decl. of T. Phinney ("Phinney Decl.") ¶¶ 13-20. The "on-curve" reference points indicate fixed

10 points in each character, and the "off-curve" reference points dictate the shape of the curve between the

11 on-curve reference points. Phinney Decl. ¶ 17; Sandler Decl. ¶ 15. The undisputed evidence shows

12 Nicky Laatz hand-coded on-curve and off-curve reference points for the characters in the Blooming

13 Elegant Trio of fonts. Supp. N. Laatz Decl. ¶ 6. Undisputed evidence proves Nicky Laatz hand-coded

14 other font-wide variables, such as CapHeight, character spacing, and ascender and descender height

15 when creating the Blooming Elegant Trio of fonts. *Id.*; Phinney Decl. ¶¶ 13-22; Sandler Decl. ¶¶ 16-25.

16 With the assistance of FontLab, Nicky Laatz then took the hand-coded coordinates for each glyph's

17 reference points, the hand-coded font-wide variables, and any other code (such as kerning or OpenType

18 glyph substitution) that had been written by her for the Blooming Elegant Font and converted them into

19 a final font software format file. Supp. N. Laatz Decl. ¶¶ 3-9. Nicky Laatz designed her software just as

20 Adobe did, resulting in unique and creative font software, as corroborated by the fact that Zazzle

21 designers overwhelmingly view it as unique, valuable, and non-substitutable. Decl. of Sara Parikh, Ex.

22 1. Nicky Laatz's work also reflects industry custom and practice for registering font software. Thus,

23 there is not disputed fact that the copyrights are valid. Phinney Decl. ¶¶ 13-22; Sandler Decl. ¶¶ 12-19.

24         **3.      The Copyrights Are Not the Product of Fraud**

25         The authorities addressed above show Defendants cannot meet their burden of proving Nicky

26 Laatz knowingly provided "inaccurate information" in her copyright registration application, much less

27 that any such "information, if known, would have caused the Register of Copyrights to refuse

28 registration.'" *See Gold Value*, 925 F.3d at 1144. During the registration process, Nicky Laatz's

counsel informed the Examiner that she used a font program as part of the creation process. Steinberg

Decl., Ex. 4 at 5 (Dkt. 27-4) ("The PDF file that we initially submitted … was generated by a font

program in a sense, but it also reflects Ms. Laatz's original creative work. If you have further questions,

perhaps we could set up a call between us and the author, as I want to make sure that nothing is

misunderstood?"). This aligns with *Adobe*'s holding that when a font designer uses font generating

software to assist with creating font software and customizes it in that manner, they are "hand-coding"

such that it is copyrightable. Thus, Nicky Laatz's confirmation that she hand-coded the font data is

accurate and consistent with both *Adobe* and the custom and practice in the industry. Thus, Defendants

cannot prove any inaccuracy, much less that it would have caused the *Register* to refuse registration.

### 4. Defendants Admit They Copied Laatz's Copyrighted Font Software

Defendants' declarations admit they intentionally copied Nicky Laatz's software. Zazzle admits

"the text functionality provided by Zazzle's tools uses font software that always resides exclusively on

Zazzle's **servers,**" thus proving that Zazzle knowingly copied Nicky Laatz's font software onto

**multiple** different servers. Li Decl. ¶ 3 (Dkt. 49-2). Also, Zazzle's November 2016 request to acquire a

perpetual server license proves it knew the license did not permit Zazzle to copy the software onto its

servers. N. Laatz Decl. Ex. 1 (Dkt. 27-21). Defendants' conduct constitutes an unambiguous breach of

the license. *See Oracle*, 6 F. Supp. 3d at 1117.

### D. Zazzle Admits it Used the "Blooming Elegant" Mark in Commerce Without Permission, But Fails to Meet the Requirements for Nominative Fair Use

Zazzle's admitted use of the "Blooming Elegant" mark does not constitute nominative fair use.

When a defendant admits to using a registered mark to refer to the trademarked good itself, and raises a

nominative use defense, ***the Sleekcraft test does not apply***. *Cairns v. Franklin Mint Co.*, 292 F.3d

1139, 1151 (9th Cir. 2002). Instead, courts ask if: "(1) the product was 'readily identifiable' without use

of the mark; (2) defendant used more of the mark than necessary; or (3) defendant falsely suggested he

was sponsored or endorsed by the trademark holder." *United Tactical Sys., LLC v. Real Action*

*Paintball, Inc.* ("*UTS*"), 2014 WL 6788310, at *10 (N.D. Cal. Dec. 2, 2014). Under this test, Zazzle

cannot rely on fair use, nor avoid a finding of likelihood of confusion. As in *UTS,* Defendants were

capable of referring to their product without use of the mark, as it is undisputable that they could have

1    identified the Blooming Elegant font software without using the "Blooming Elegant" mark. *Id.* at *11.

2    **E.    Nicky Laatz Had No Reason to Suspect Defendants' Wrongful Actions**

3          Defendants claim the statute of limitations bars Nicky Laatz's infringement claims. Not so. As a

4    threshold matter, Defendants' timeliness argument would only limit damages and not preclude

5    summary judgment on liability. *Petrella v. MGM*, 572 U.S. 663, 686-87 (2014) (copyright owner was

6    entitled to damages within three-year limitations period despite being aware of the infringement eleven

7    years prior to commencing her action). Zazzle now concedes that it continued to use Nicky Laatz's font

8    software until at least *June 2022*, before replacing it with "Morgana." Haley Decl. (Dkt. 49-8) ¶¶ 5-8.

9          The claims are timely under California's discovery rule, which applies to copyright claims. "[A]

10   claim alternatively accrues when the copyright holder knows or reasonably should know that an

11   infringement occurred" under the "discovery rule." *Starz Ent't, LLC v. MGM Dom. TV Dist., LLC*, 39

12   F.4th 1236, 1237 (9th Cir. 2022). As this Court held, "under California's delayed discovery rule, 'a

13   cause of action will not accrue until the plaintiff discovers or should have discovered, through the

14   exercise of reasonable diligence, all the facts essential to the cause of action.'" *Roches v. Cnty. of Santa*

15   *Clara*, 2018 WL 3344647, at *4 (N.D. Cal. July 9, 2018). The "rule permits the accrual of an action to

16   be postponed and the running of the limitations period to be tolled 'until the plaintiff discovers, or has

17   reason to discover, the cause of action.'" *Id*. "The duty of diligence does not create a duty to

18   continuously monitor a licensor to ensure compliance with its obligations, absent any reason to

19   otherwise suspect a breach. ***The law does not inject such paranoia into the licensor-licensee***

20   ***relationship***." *Starz Ent't, LLC v. MGM Dom. TV Dist., LLC*, 510 F. Supp. 3d 878, 888 (C.D. Cal.

21   2021) (Emphasis added).

22         The *Starz* case has close factual parallels to this dispute. There, MGM granted Starz exclusive

23   rights to exhibit MGM-owned movies. *Starz*, 39 F.4th at 1238. "In August 2019, a Starz employee

24   discovered that the film *Bill and Ted's Excellent Adventure* was available to view on Amazon's video

25   streaming service, despite being subject to an exclusive license with Starz ... [and] MGM [thereafter]

26   admitted that it had improperly licensed 244 titles to third parties ... Starz then conducted its own

27   investigation, discovering that breaches had been happening since at least 2015 without STARZ's

28   knowledge, and included nearly 100 additional violations beyond those MGM admitted to." *Starz*, 510

F. Supp. 3d at 881 (internal citations omitted). The court ruled Starz's claims were timely because Starz was not on notice that MGM was violating its rights until an employee discovered *Bill & Ted* streaming on Amazon in August 2019. *Starz*, 39 F.4th at 1247. Similarly here, Zazzle's open use on its *own* webpage was insufficient to put Nicky Laatz on notice that Zazzle had stolen her fonts until she discovered the theft after August 25, 2020. Thus, *Starz* debunks Defendants' bogus argument.

As the *Starz* District Court noted, "being one of hundreds of movies and shows available on Amazon" debunked MGM's argument that its unlawful streaming of the movie was "'open and notorious' such that a reasonable person would be aware of it." *Starz*, 510 F. Supp. 3d at 888-889. Likewise, here, Zazzle offers "hundreds of fonts" on its website (Haley Decl., ¶ 5) and Nicky Laatz licensed her font software thousands of times. Supp. N. Laatz Decl. ¶¶ 35-36. Finally, Zazzle's November 2016 inquiry into a server-based license and Alkhatib's subsequent purchase of a single-seat license using his Zazzle e-mail address and company credit card many months later falls far short. First, the inquiry is consistent with Zazzle's intent to comply with, not break, the law. Second, Creative Market does not provide customer email addresses or billing information to Nicky Laatz. (Supp. N. Laatz Decl. ¶¶ 21-26.) Yet, even if it did, it is absurd for Zazzle to suggest that Nicky Laatz—who sells thousands of licenses each year—should have connected Alkhatib's use of his Zazzle e-mail address (without including Zazzle in the name field for his order) to McGhie's earlier inquiry and thereby leap to the conclusion that Zazzle was about to violate the terms of the license. The law requires reasonable diligence, not omniscience.

## IV.    CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' Motion.

DATED: November 10, 2022                                      Respectfully submitted,

                                              BARTKO ZANKEL BUNZEL & MILLER


                                              By:_____/s/ Patrick M. Ryan_____
                                                          PATRICK M. RYAN
                                                        Attorneys for Plaintiffs
                                                        NICKY LAATZ and
                                                  NICKY LAATZ CREATIONS UK LTD.