QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
RACHEL HERRICK KASSABIAN (Bar No. 191060)
*rachelkassabian@quinnemanuel.com*
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065-2139
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

ANDREW SCHAPIRO (admitted pro hac vice)
*andrewschapiro@quinnemanuel.com*
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606-1881
Telephone: (312) 705-7400
Facsimile: (312) 705-7401

DANIEL C. POSNER (Bar No. 232009)
*danposner@quinnemanuel.com*
THOMAS D. NOLAN (Bar No. 238213)
*thomasnolan@quinnemanuel.com*
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543
Telephone: (213) 443-3000
Facsimile: (213) 443 3100

WILLIAM F. PATRY (admitted pro
hac vice)
*williampatry@quinnemanuel.com*
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

Attorneys for Defendants Zazzle Inc. and Mohamed Alkhatib

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| NICKY LAATZ,<br><br>                    Plaintiff,<br><br>          vs.<br><br>ZAZZLE INC. and MOHAMED ALKHATIB,<br><br>          Defendants.<br><br>ZAZZLE INC.,<br><br>                    Counter-Claimant,<br><br>          vs.<br><br>NICKY LAATZ,<br><br>          Counter-Defendant. | Case No. 5:22-cv-04844-BLF-VKD<br><br>**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Trial Date: July 14, 2025 |

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION ................................................................................................ 1

MEMORANDUM OF POINTS AND AUTHORITIES ................................................ 1

PRELIMINARY STATEMENT ................................................................................... 1

STATEMENT OF THE ISSUES TO BE DECIDED ................................................... 2

STATEMENT OF FACTS ........................................................................................... 2

ARGUMENT .............................................................................................................. 4

I.     ALL PLAINTIFF'S CLAIMS ARE TIME-BARRED AS A MATTER OF LAW ............. 4

    A.     Plaintiff Filed All Her Claims Outside The Limitations Periods ............................... 4

    B.     The Discovery Rule Does Not Apply ..................................................................... 5

    C.     Plaintiff Had Constructive And Inquiry Notice Of Her Claims Throughout The Limitations Periods ....................................................................................... 6

II.     PLAINTIFF'S FRAUD CLAIMS FAIL AS A MATTER OF LAW .................................... 9

    A.     There Is No Triable Issue Regarding Fraudulent Misrepresentation ...................... 10

    B.     There Is No Triable Issue Regarding Fraudulent Concealment .............................. 11

    C.     There Is No Triable Issue Regarding Promissory Fraud ........................................ 11

III.     PLAINTIFF'S COPYRIGHT CLAIM FAILS AS A MATTER OF LAW ........................ 13

    A.     Legal Standards Relating To Copyrightability Of Fonts ......................................... 13

    B.     The Blooming Elegant Fonts Are Ineligible For Copyright Protection Because They Lack Human Authorship ......................................................................... 15

    C.     Plaintiff's Registrations Are Invalid For Fraud On The Copyright Office ............. 18

    D.     Zazzle Did Not Infringe Plaintiff's Font-Data Copyrights ..................................... 21

IV.     PLAINTIFF'S CONTRACT CLAIM FAILS AS A MATTER OF LAW ......................... 22

    A.     There Is No Triable Issue Regarding The Terms Of The License ........................... 22

    B.     There Is No Triable Issue Regarding Zazzle's Alleged Breach .............................. 23

    C.     There is No Triable Issue Regarding Mr. Alkhatib's Alleged Breach ..................... 24

V.     PLAINTIFF'S TRADEMARK CLAIM FAILS AS A MATTER OF LAW ....................... 24

CONCLUSION ........................................................................................................... 25

# TABLE OF AUTHORITIES

**Page**

## Cases

*AMC Tech., LLC v. Cisco Sys., Inc.*,
    No. 11-CV-03403 PSG, 2012 WL 174949 (N.D. Cal. Jan. 20, 2012) ...................................... 12

*Anagnostellis v. Pitney Bowes Inc*.,
    No. CV 12-239 PSG MRWX, 2013 WL 8840335 (C.D. Cal. Mar. 5, 2013) ............................. 5

*Bay Area Roofers Health & Welfare Tr. v. Sun Life Assurance Co. of Canada*,
    73 F. Supp. 3d 1154 (N.D. Cal. 2014) (Freeman, J.) .................................................................. 22

*Canard v. Bricker*,
    No. 14-CV-04986-JSC, 2015 WL 846997 (N.D. Cal. Feb. 25, 2015) ..................................... 10

*Dr. Seuss Enterprises, L.P. v. ComicMix LLC*,
    300 F. Supp. 3d 1073 (S.D. Cal. 2017) ..................................................................................... 25

*F.D.I.C. v. Frankel*,
    No. 11-CV-03279-LHK, 2011 WL 5975262 (N.D. Cal. Nov. 29, 2011) ................................. 24

*Garrison v. Oracle Corp.*,
    159 F. Supp. 3d 1044 (N.D. Cal. 2016) ....................................................................................... 6

*Grand Fabrics Int'l Ltd. v. Melrose Textile, Inc.*,
    No. 18-748 DSF, 2018 WL 5880175 (C.D. Cal. Aug. 6, 2018) ............................................... 10

*Hellgren v. Providential Home Income Plan Inc.*,
    No. C 06-04728 MHP, 2006 WL 8447964 (N.D. Cal. Oct. 26, 2006), *aff'd*, 291
    F. App'x 70 (9th Cir. 2008) ........................................................................................................ 7

*Hsu v. OZ Optics Ltd*.,
    211 F.R.D. 615 (N.D. Cal. 2002) ........................................................................................ 12, 13

*Jackson v. City of Modesto*,
    No. 1:21-CV-0415 AWI EPG, 2022 WL 3083649 (E.D. Cal. Aug. 3, 2022) ......................... 11

*James v. J2 Cloud Servs. Inc.*,
    No. 216CV05769CASPJWX, 2019 WL 2304157 (C.D. Cal. May 29, 2019),
    *aff'd sub nom. James v. J2 Cloud Servs., LLC*, 823 F. App'x 945 (Fed. Cir.
    2020) ............................................................................................................................................. 7

*Karl Storz Endoscopy Am., Inc. v. Surgical Techs., Inc.*,
    285 F.3d 848 (9th Cir. 2002) ...................................................................................................... 4

*Live Face on Web, LLC v. AZ Metroway, Inc.*,
    No. 515CV01701CASKKX, 2016 WL 4402796 (C.D. Cal. Aug. 15, 2016) ............................ 5

*McKell v. Washington Mut., Inc.*,
  142 Cal. App. 4th 1457 (2006) .......................................................................22

*NBC Universal Media, LLC v. Superior Ct.*,
  225 Cal. App. 4th 1222 (2014) ......................................................................6, 7

*New Kids on the Block v. News Am. Publ'g, Inc.*,
  971 F.2d 302 (9th Cir. 1992) .......................................................................24, 25

*Perez-Encinas v. AmerUs Life Ins. Co.*,
  468 F. Supp. 2d 1127 (N.D. Cal. 2006) ........................................................4, 5, 6

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
  134 S. Ct. 1962 (2014) ..................................................................................5

*Richardson v. Reliance Nat. Indem. Co.*,
  No. C 99-2952 CRB, 2000 WL 284211 (N.D. Cal. Mar. 9, 2000) .........................11

*Romo v. Wells Fargo Bank, N.A.*,
  No. 15-CV-03708-EMC, 2016 WL 324286 (N.D. Cal. Jan. 27, 2016) .................7, 8

*Ryan v. Microsoft*,
  147 F. Supp. 3d 868 (N.D. Cal 2015) ..............................................................5

*Shinde v. Nithyananda Found.*,
  No. EDCV1300363JGBSPX, 2014 WL 10988110 (C.D. Cal. Mar. 21, 2014) .........8

*Smith v. Allstate Ins. Co.*,
  160 F. Supp. 2d 1150 (S.D. Cal. 2001) ...........................................................10

*Sparks-Magdaluyo v. New Penn Fin. LLC*,
  No. 16-CV-04223-MEJ, 2017 WL 3534992, at *1 (N.D. Cal. Aug. 16, 2017). .......9

*UMG Recordings, Inc. v. Augusto*,
  628 F.3d 1175 (9th Cir. 2011) .......................................................................21

*Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*,
  52 F.4th 1054 (9th Cir. 2022) .......................................................................18

*Wakefield v. Wells Fargo & Co.*,
  No. C 13-05053 LB, 2014 WL 5077134 (N.D. Cal. Oct. 9, 2014) .......................4, 6

*WCVB-TV v. Boston Athletic Ass'n*,
  926 F.2d 42 (1st Cir. 1991) ..........................................................................24

## **Statutes**

17 U.S.C. § 102(a) ............................................................................................16

17 U.S.C. § 106 ...............................................................................................21

17 U.S.C. § 410(c) ..................................................................................................... 15

17 U.S.C. § 411(b)(2) ............................................................................................ 18, 21

17 U.S.C. § 507(b) ....................................................................................................... 4

Cal. Civ. Proc. Code § 337 ......................................................................................... 4

Cal. Civ. Proc. Code § 338(d) .................................................................................... 4

Compendium of U.S. Copyright Practices § 302 .................................................... 16

Compendium of U.S. Copyright Practices § 306 .................................................... 16

Compendium of U.S. Copyright Practices § 723 ............................................... 13, 14

Compendium of U.S. Copyright Practices § 906.4 .................................................. 13

Compendium of U.S. Copyright Practices § 1006.1(A) .................................. 13, 15, 20

## **Other Authorities**

37 C.F.R. § 202.1 ...................................................................................................... 13

Fed. R. Civ. P. 56 ....................................................................................................... 1

Compendium of U.S. Copyright Practices § 302 .................................................... 16

Compendium of U.S. Copyright Practices § 306 .................................................... 16

Compendium of U.S. Copyright Practices § 723 ............................................... 13, 14

Compendium of U.S. Copyright Practices § 906.4 .................................................. 13

Compendium of U.S. Copyright Practices § 1006.1(A) .................................. 13, 15, 20

1

## NOTICE OF MOTION

2  TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:  PLEASE TAKE NOTICE THAT

3  on February 27, 2025, before the Hon. Beth Labson Freeman, Courtroom 3, 5th floor, San Jose

4  Courthouse, 280 South 1st Street, San Jose, California 95113, at 9:00 a.m., or as soon thereafter as

5  the matter may be heard, Defendants Zazzle Inc. ("Zazzle") and Mohamed Alkhatib ("Defendants")

6  will, and hereby do, move the Court for an order granting summary judgment.

7         Defendants seek rulings pursuant to Fed. R. Civ. P. 56 that Plaintiff's: (i) claims are all time-

8  barred; (ii) fraud claims fail for lack of any actionable false statement, act of "concealment," or

9  evidence of fraudulent intent; (iii) copyright claim fails because Plaintiff's asserted "font data"

10  copyrights are invalid and Zazzle did not infringe them; (iv) contract claim fails as a matter of law

11  for lack of any triable issue of fact whether Zazzle or Mr. Alkhatib is liable for breach of the license

12  for Blooming Elegant; and (v) trademark claim fails as a matter of law for nominative fair use.

13

## MEMORANDUM OF POINTS AND AUTHORITIES

14

## PRELIMINARY STATEMENT

15         Plaintiff is a font designer who sued Zazzle and one of its employees for the alleged breach

16  of a license for the "Blooming Elegant" trio of fonts ("BE") that Plaintiff offers commercially for

17  less than $20.  Fundamentally, this case presents a simple licensing dispute of modest scale.  Yet

18  Plaintiff has litigated this case through a bevy of claims, scorched-earth discovery, and a wildly

19  excessive damages claim as though it were far more complex and valuable than it is.

20         The Court should put an end to Plaintiff's litigation run amok by granting summary

21  judgment.  Plaintiff's claims fail for multiple reasons.  To start, all Plaintiff's claims are time-barred.

22  It is undisputed that Zazzle licensed BE and used it **openly and prominently** on its public website

23  starting in October 2017.  Plaintiff—whose business is licensing fonts and who knew Zazzle—did

24  not sue until August 2022, long after the applicable limitations periods expired.  Plaintiff may not

25  rely on the "discovery rule" because the facts underlying her claims were easily discoverable.

26         While the Court need not proceed past the time-bar, Plaintiff's claims fare no better on the

27  merits.  Two years of discovery have established that (i) Plaintiff's fraud claims fail because there

28  is no evidence of a false statement, concealment, or "scheme" to defraud; (ii) the copyright claim

fails because Plaintiff does not hold valid copyrights in original, human authorship, she committed fraud on the Copyright Office, and, in any case, Zazzle did not infringe any copyrights in the BE "font data" she registered; (iii) the contract claim fails because neither Zazzle nor Mr. Alkhatib breached the license when properly construed; and (iv) the trademark claim fails because Zazzle's only use of the mark was fair use.  Zazzle is entitled to summary judgment on all claims.

## STATEMENT OF THE ISSUES TO BE DECIDED

1.      Whether Plaintiff's claims are time-barred as a matter of law.

2.      Whether Plaintiff's fraud claims fail as a matter of law for lack of any actionable false statement, act of "concealment," or evidence of fraudulent intent.

3.      Whether Plaintiff's copyright claim fails as a matter of law because Plaintiff's asserted "font data" copyrights are invalid and Zazzle did not infringe them.

4.      Whether Plaintiff's contract claim fails as a matter of law for lack of any triable issue of fact as to whether Zazzle or Mr. Alkhatib are liable for breach of the BE license.

5.      Whether Plaintiff's trademark claim fails as a matter of law for nominative fair use.

## STATEMENT OF FACTS

*Zazzle*.  Zazzle is a leading online marketplace for customizable consumer goods—such as t-shirts, mugs, invitations, and the like.  Zazzle's Design Tool—the customization platform on its website—offers, among other design elements, hundreds of licensed fonts in a variety of styles.

*Nicky Laatz*.  In 2016, Plaintiff used the FontLab "font generating engine" to draw three typefaces she called Blooming Elegant, Blooming Elegant Hand, and Blooming Elegant Sans. (Declaration of Thomas Nolan, filed concurrently, at Ex. A, N. Laatz Decl. (Dkt. 89-1) ¶¶ 4-7.)[1] Plaintiff has offered BE for license for $20 or less on Creative Market, a design marketplace, and other marketplaces, including her own website nickylaatz.com.  (Ex. B, N. Laatz Tr. 45:7-11.) Plaintiff contends she did not grant the type of broad, commercial license in BE that Zazzle would have needed, and that if she did, it would have been through direct negotiations with her for a bespoke license.  (Ex. A, N. Laatz Decl. (Dkt. 89-1) ¶¶ 43-44.)

---

[1]  Citations herein to "Ex. __" are to Exhibits to the Nolan Declaration unless otherwise noted.

1      ***Blooming Elegant***.  On November 2, 2016, Zazzle's (now-former) employee Monica

2   McGhie contacted numerous designers using a "form" email inquiring about "server-based"

3   licenses.  (Ex. C1.)  Plaintiff was one such designer, and (unlike others) she did not respond.

4   Nevertheless, the "Offering Page" for BE on the Creative Market site stated that the purchaser may

5   "Use This Font For:  Commercial Use, Unlimited Number of Projects, [and] Unlimited End Products

6   for Sale," and the associated "License Terms" provided that "Installable Items (Fonts and Add-Ons)

7   can be used in an unlimited number of projects and End Products for sale (one seat per license)."

8   (Ex. D, Dkt. 89-36.)  On May 4, 2017, Zazzle purchased the license, with its employee Mr. Alkhatib

9   following all prompts to create an account on Creative Market, provide contact and payment

10  information, and complete the purchase.  (Ex. E, Alkhatib Decl. (Dkt. 102-7) ¶¶ 3-7.)  Mr. Alkhatib

11  provided his @zazzle.com email address and used a Zazzle company credit card.  (*Id*. at ¶¶ 4, 7, 9;

12  Ex. F, Alkhatib Tr. 212:18-19; Ex. G, Creative Market Tr. 90:7-9.)  There was no field prompting

13  Mr. Alkhatib to identify his employer.  (Ex. E, Alkhatib Decl. (Dkt. 102-7) ¶ 4; Ex. G, Creative

14  Market Tr. 92:17-24.)  He completed the transaction on the Creative Market platform, and never

15  communicated with Plaintiff about the license.  (Ex. G, Creative Market Tr. 94:9-14.)

16      ***Zazzle's Promotion Of Blooming Elegant***.  In October 2017, Zazzle announced the addition

17  of BE (and other fonts) to the Zazzle Design Tool, and between October 2017 and August 2019,

18  Zazzle made numerous public posts referencing or depicting BE, including eight blog posts and 34

19  Instagram posts.  (Exs. H; I1-I8; J1-J32.)  Plaintiff has "followed" Zazzle's Instagram account since

20  March 2016, meaning these posts were delivered contemporaneously to her Instagram feed.  (Ex.

21  B, N. Laatz Tr. 161:24-162:5.)  Plaintiff herself used the "#zazzle" hashtag on at least nine of her

22  own Instagram posts—including several between October 12, 2017 and August 24, 2019, and thus

23  within the relevant limitations periods (as discussed below).  (Exs. K1-K9.)  Plaintiff received at

24  least 677 emails from Zazzle during the limitations period, including at least 48 that included images

25  of products featuring BE.  (Declaration of Jason Li, filed concurrently, at ¶¶ 2-4.)  Zazzle's records

26  reflect that Plaintiff opened at least 32 of these marketing emails.  (*Id*. at ¶ 7.)  And in 2018, Zazzle

27  reposted and tagged Plaintiff in an Instagram post Plaintiff originally created.  (Ex. L.)

28      ***The Lawsuit***.  Plaintiff did not contact Zazzle about BE until August 26, 2020, when she

asserted for the first time that Zazzle exceeded the scope of the license. (Ex. M.) Rather than resolve the dispute informally on reasonable terms, Plaintiff delayed while she applied to register the copyrights in the "font data" for BE. After extended correspondence with the Copyright Office in which Plaintiff repeatedly refused to confirm that she had "generated" BE using FontLab, the Copyright Office issued the three registrations in July 2021. (Dkt. 82-1.) This lawsuit followed.

## ARGUMENT

## I.    ALL PLAINTIFF'S CLAIMS ARE TIME-BARRED AS A MATTER OF LAW

### A.    Plaintiff Filed All Her Claims Outside The Limitations Periods

Under California law, statutes of limitations are strict, and claims accrue (and limitations clocks begin to run) when all necessary elements of the claim are present, "regardless of whether any damage is apparent or whether the injured party is aware of his right to sue." *Perez-Encinas v. AmerUs Life Ins. Co.*, 468 F. Supp. 2d 1127, 1134 (N.D. Cal. 2006) (collecting cases); *see also Wakefield v. Wells Fargo & Co.*, No. C 13-05053 LB, 2014 WL 5077134, at *9 (N.D. Cal. Oct. 9, 2014) ("Generally speaking, a cause of action accrues at 'the time when the cause of action is complete with all of its elements.'") (citation omitted). The applicable limitations periods are four years for breach of contract (Cal. Civ. Proc. Code § 337), and three years for fraud (Cal. Civ. Proc. Code § 338(d)), copyright infringement (17 U.S.C. § 507(b)), and trademark infringement (*see Karl Storz Endoscopy Am., Inc. v. Surgical Techs., Inc.*, 285 F.3d 848, 857 (9th Cir. 2002) (borrowing state statute of limitations for trademark claims, Cal. C. Civ. P. § 338(d)).

The key facts and dates regarding the accrual of Plaintiff's claims are as follows: ***February 2014***: Plaintiff opens her own shop on Zazzle as a seller (Ex. B, N. Laatz Tr. 157:17-158:20; Ex. N); ***November 2, 2016***: Ms. McGhie sends Plaintiff a message inquiring about licensing BE (to which Plaintiff never responds) (Ex. C1); ***May 4, 2017***: Mr. Alkhatib purchases the BE license on the Creative Market site behalf of Zazzle (Dkt. 82 ¶ 90; Ex. E, Alkhatib Decl. (Dkt. 102-7) ¶ 7); ***October 12, 2017***: Zazzle makes BE publicly available in its Design Tool (Ex. H); ***November 2017 through August 2019***: Zazzle follows the public rollout of BE with multiple social media posts, blog posts, and marketing emails that Plaintiff received (Exs. J1-J32; Li Decl. at ¶¶ 2-3, Ex. QQ); ***January 29, 2020***: Plaintiff's husband John Laatz receives an email stating that BE is on Zazzle

(Ex. O; Ex. P, J. Laatz Tr. 319:14-320:10); **August 25, 2020**:  Plaintiff receives another email message stating that BE is available on Zazzle (Ex. A, N. Laatz Decl. (Dkt. 89-1) ¶ 49, Ex. 7; Ex. B, N. Laatz Tr. 181:6-25; Ex. P, J. Laatz Tr. 319:2-11); **August 26, 2020**:  Plaintiff sends notice of her claims to Zazzle (Ex. M); and **August 24, 2022**:  Plaintiff files suit (Dkt. 1).

Plaintiff's claims therefore accrued at the latest by October 12, 2017, when Zazzle made BE publicly available, allegedly in excess of its rights.  The three-year statutes of limitations thus expired no later than October 12, 2020, and the four-year statute October 12, 2021.  Because Plaintiff did not file her claims until August 24, 2022, her claims are all time-barred.

Plaintiff cannot rely on a "continuous accrual" or "continuing violation" theory to avoid the time bar, because while she alleges ongoing harm (*i.e.*, damages) from the availability of BE on Zazzle, all such alleged harm "arose out of a single transaction"—the license purchase in 2017—so these doctrines are inapplicable.  *Ryan v. Microsoft*, 147 F. Supp. 3d 868, 895-896 (N.D. Cal 2015) (regarding contract and fraud); *see also Live Face on Web, LLC v. AZ Metroway, Inc.*, 2016 WL 4402796, at *7 n.4 (C.D. Cal. Aug. 15, 2016) ("[T]o the extent that defendants used the infringing source code in 2011 and allowed the code to remain unchanged as a part of defendants' source code through 2015, any such continued use based on a single act of infringement in 2011 would constitute 'harm from [a] past violation[ ] that [was] continuing' through 2015, and not a series of 'new wrong[s]' that give rise to '[s]eparately accruing harm' for each month of defendants' allegedly infringing use") (citing *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962, 1969 n.6 (2014)).

### B.    The Discovery Rule Does Not Apply

Plaintiff has previously attempted to invoke the "discovery rule" to excuse her late filing. (Dkt. 26 at 24-25.)  Plaintiff bears the burden of proving that the discovery rule applies.  *See Anagnostellis v. Pitney Bowes Inc*., 2013 WL 8840335, at *1-2 (C.D. Cal. Mar. 5, 2013).  She cannot meet that burden here because the discovery rule does not apply to a case like this.

The "discovery rule" can provide relief from California's strict statutes of limitations by tolling accrual until "the plaintiff discovers or could have discovered, through the exercise of reasonable diligence, all of the facts essential to his cause of action."  *Perez-Encinas*, 468 F. Supp. 2d at 1134.  But the discovery rule applies only where the defendant **fraudulently conceals** a claim

1   or if the claim is otherwise ***difficult to discover***.  *See, e.g.*, *Wakefield v. Wells Fargo & Co.*, No. C

2   13-05053 LB, 2014 WL 5077134, at *10-11 (N.D. Cal. Oct. 9, 2014) (no delayed accrual of breach

3   of contract claim where there was no evidence of concealment); *Perez-Encinas*, 468 F. Supp. 2d at

4   1134 ("California courts have long applied the delayed discovery rule to claims involving fraud,

5   difficult-to-detect injuries, or the breach of a fiduciary relationship . . . . Traditionally, however, the

6   discovery rule had not been held applicable to breach of contract actions except in cases involving

7   fraud or misrepresentation."); *NBC Universal Media, LLC v. Superior Ct.*, 225 Cal. App. 4th 1222,

8   1232-33 (2014) ("common thread" for discovery rule is that cause of action is "particularly difficult"

9   to detect or harm is caused secretly).  Moreover, simply asserting fraudulent concealment is not

10   enough; the plaintiff must have evidence of fraud.  *See Garrison v. Oracle Corp.*, 159 F. Supp. 3d

11   1044, 1071-74 (N.D. Cal. 2016) (no tolling where fraudulent concealment claim was "conclusory").

12        The discovery rule does not apply here because Zazzle was transparent about its licensing

13   and use of BE.  Zazzle (i) asked Plaintiff about a license; (ii) purchased a license using a Zazzle

14   email address and credit card; and (iii) offered and promoted BE ***publicly and by name***, including

15   with widespread promotional emails, social media posts and its website, all bearing photos and

16   videos.  Zazzle did the opposite of "concealing" its conduct.  Because Plaintiff cannot show

17   fraudulent concealment or that Zazzle's licensing or use of BE was difficult to detect, the discovery

18   rule does not apply.  *See, e.g.*, *Perez-Encinas*, 468 F. Supp. 2d at 1135 (declining to apply discovery

19   rule to breach of contract claim where alleged breach was not "secretive" and there was no evidence

20   of fraud, and noting that plaintiffs' purported lack of knowledge regarding claim did not "convert

21   the alleged breaches into secretive breaches").  Plaintiff's claims are therefore time-barred.

22        **C.    Plaintiff Had Constructive And Inquiry Notice Of Her Claims Throughout The**
        **Limitations Periods**

23

24        Even when applicable, the discovery rule tolls the accrual of a claim only until the plaintiff

25   could have discovered the claim with reasonable diligence—*i.e.*, until the plaintiff has

26   "constructive" or "inquiry" notice of the claim.  Even if Plaintiff could invoke the discovery rule

27   here, it would not excuse her late filing because she could have and would have discovered Zazzle's

28   alleged unauthorized use of BE more than four years before she sued had she been diligent.

A plaintiff has constructive notice of a claim when she "receives information of circumstances that would put a reasonable person on notice, or has an opportunity to obtain such knowledge through sources open to his or her investigation." *Hellgren v. Providential Home Income Plan Inc.*, No. C 06-04728 MHP, 2006 WL 8447964, at *3 (N.D. Cal. Oct. 26, 2006), *aff'd*, 291 F. App'x 70 (9th Cir. 2008) (emphasis added). A plaintiff has "inquiry" notice if she, "through the exercise of due diligence, should have discovered the basis for the cause of action." *See, e.g.*, *Romo v. Wells Fargo Bank, N.A.*, No. 15-CV-03708-EMC, 2016 WL 324286, at *4 (N.D. Cal. Jan. 27, 2016) (internal citation omitted); *see also NBC Universal Media,* 225 Cal. App. 4th at 1232-33 (2014) (plaintiff must show "inability to have made earlier discovery despite reasonable diligence" and held on inquiry notice where episode of show with misappropriated content was released) (internal citation omitted); *James v. J2 Cloud Servs. Inc.*, No. 216CV05769CASPJWX, 2019 WL 2304157, at *12 (C.D. Cal. May 29, 2019), *aff'd sub nom. James v. J2 Cloud Servs., LLC*, 823 F. App'x 945 (Fed. Cir. 2020) (finding inquiry and constructive notice of patent claim based on notice that defendant was seeking patent which was publicly filed).

Here, the undisputed evidence establishes that Plaintiff had constructive and inquiry notice of her claims well outside the applicable limitations periods.

***First***, no later than 2016, Plaintiff knew that Zazzle was a major design platform that provided its users access to fonts. There are only a handful of such platforms—including Etsy, Minted, and Creative Market—and Zazzle is one. Plaintiff was not only a professional font designer, she was a seller and customer on Zazzle. (Exs. N, Q; Ex. B, N. Laatz Tr. 157:17-158:20.)

***Second***, beginning in February 2016, Plaintiff engaged with Zazzle, including about BE specifically, from her own social-media accounts. Plaintiff sought to leverage Zazzle's following in the design community by "tagging" Zazzle (with "#zazzle") in her Instagram posts advertising her fonts, including in multiple posts announcing and using BE. (*See* Exs. K1-9.) Plaintiff testified that she tagged Zazzle because she knew it was a marketplace for consumer product designs whose customers "were most likely to be interested in [BE]." (Ex. B, N. Laatz Tr. 163:15-164:21.)

***Third***, Plaintiff received frequent social-media engagement from Zazzle, including about BE. Plaintiff has followed Zazzle on Instagram since March 2016—meaning Zazzle's posts were

served to Plaintiff's feed throughout the limitations period. (*See* Ex. B, N. Laatz Tr. 161:24-162:5.) Between November 20, 2017 and June 27, 2019, Zazzle made 34 Instagram posts depicting BE—about one post every other week—any of which would have put Plaintiff on actual notice of Zazzle's use. (Ex. J1-J32.) And in 2018, Zazzle reposted and tagged Plaintiff in an Instagram post Plaintiff originally created. (Ex. L; Ex. B, N. Laatz Tr. 165:7-170:24) This too would have triggered an affirmative notification to Plaintiff from Zazzle's account. (Ex. B, N. Laatz Tr. 166:11-13.)

**Fourth**, in November 2016, Zazzle told Plaintiff directly that it was interested in using BE in its Design Tool when a (now former) Zazzle employee wrote her to ask about obtaining a "server" license. (*See* Dkt. 82 ¶¶ 82-83.) Plaintiff asserts that Zazzle should have construed her non-response as a rejection of Zazzle's request, and that she did not ever grant such licenses (at least absent a direct negotiation with her). (*See id.* at ¶¶ 85-89.) On May 4, 2017, Mr. Alkhatib purchased a license for BE on Creative Market, using his Zazzle company email address and credit card. (Ex. F, Alkhatib Tr. 212:18-19; Ex. G, Creative Market Tr. 90:7-9.)

**Fifth**, in October 2017, Zazzle made BE available in its publicly accessible Design Tool and widely publicized its addition of that font. (Ex. H.) Shortly thereafter, Zazzle started sending evidence of its use of BE directly to Plaintiff's inbox on a near-weekly basis. Plaintiff received many marketing emails from Zazzle, at least **48** of which included images of products featuring BE, before August 24, 2018. (*See* Li Decl. at ¶¶ 4-5, Exs. RR1-RR48.) Thus it is undisputed that **Zazzle directly sent Plaintiff proof that it was using BE**, including as early as January 2018. Although Plaintiff asserts she never reviewed any of the emails she received from Zazzle (Ex. A2, N. Laatz Supp. Decl. (Dkt. 106-1) ¶ 80), that is not the test, and in any event, undisputed evidence shows that Plaintiff opened many of them (Li Decl. at ¶ 7, Ex.QQ). *See, e.g.*, *Shinde v. Nithyananda Found.*, No. EDCV1300363JGBSPX, 2014 WL 10988110, at *5-6 (C.D. Cal. Mar. 21, 2014) (discovery rule did not toll claims where plaintiffs received relevant information).

In response to this overwhelming evidence, Plaintiff claims, essentially, excusable neglect. But to excuse her late filing under the discovery rule, Plaintiff must establish that Zazzle's open, public use of BE was somehow "concealed" or hard to discover, **and** that she exercised reasonable diligence to discover her claims during the limitations period. *Romo*, 2016 WL 324286, at *4;

*Sparks-Magdaluyo*, 2017 WL 3534992, at *6.  Plaintiff cannot make either of those showings.  She ignored a barrage of evidence that Zazzle was offering BE on its Design Tool despite (allegedly) not having rights to do so.  Zazzle's direct request to Plaintiff for a server license—which Plaintiff insists she never would have granted—followed by Zazzle's purchase of the license on Creative Market and then its public and widely promoted rollout of BE, would have given any reasonably diligent licensor (who held Plaintiff's purported beliefs about the license's terms) countless reasons and opportunities to at least *suspect* Zazzle's alleged unauthorized use.

Plaintiff has in fact candidly admitted to a complete *lack* of diligence.  She claims that even though communications from Zazzle "popped up in my notifications," she did not "check my messages" or "notifications," and she was not "good with communication with . . . people trying to contact me."  (Ex. B, N. Laatz Tr. 166:10-21.)  She testified that she would only "occasionally" check to see if her fonts were available on pirate sites (*id*. at 150:6-151:6), and that she never used an automated Google alert to monitor her fonts (*id*. at 174:23-176:10; *see* Ex. P, J. Laatz Tr. 78:12-82:6; Ex. R, Pltf. Resp. to Rog. 18 (Plaintiff primarily relies on "reports" from third parties to identify unauthorized use of her fonts); Ex. S, Pltf. Resp. to RFA 13-14 (same)).  Remarkably, Plaintiff asserts she did not discover her claims, or even investigate further, even when a Zazzle user sent her husband (who was in charge of "enforcement" (Ex. P, J. Laatz Tr. 69:20-23, 72:3-13)) a direct email on January 29, 2020 stating that the customer "*liked the Blooming Elegant font on Zazzle*" (Ex. B, N. Laatz Tr. 182:1-184:1; Ex. O; Ex. P, J. Laatz Tr. 319:14-320:10).  This occurred eight months before Plaintiff alleges she actually discovered her claims.

In short, the undisputed evidence showing Plaintiff's lack of diligence, and that she could and would have timely discovered her claims with reasonable diligence, precludes her attempt to rely on the discovery rule and renders her claims untimely.

## II.    PLAINTIFF'S FRAUD CLAIMS FAIL AS A MATTER OF LAW

Not content to limit this case to what (at most) it actually is—a licensing dispute—Plaintiff added inflammatory allegations of fraud, all essentially asserting that Zazzle and/or Mr. Alkhatib harbored a secret intent to breach the license at the time of purchase.  Plaintiff's fraud claims overlook the open and public nature of everything Zazzle did with respect to the license—its direct

request to Plaintiff for information about the license; Mr. Alkhatib's purchase of the license for Zazzle using his "zazzle.com" email address and credit card; and, most notably, Zazzle's widely publicized use and promotion of BE for years.  Against those undisputed facts, the most Plaintiff can muster, after years of exhaustive discovery, is that after Plaintiff failed to respond to Zazzle's inquiry, Defendants must have ***intended to*** obtain and then breach a license Zazzle knew would not cover its use.  That story is a non-sequitur, belied by the undisputed evidence of the actual nature of Zazzle's acquisition and use of the license.  Indeed, if this case also sounded in fraud, so would almost every other contract case involving disputed contract terms.  *See, e.g.*, *Grand Fabrics Int'l Ltd. v. Melrose Textile, Inc.*, No. 18-748 DSF (AFMX), 2018 WL 5880175, at *3 (C.D. Cal. Aug. 6, 2018) ("To allow a fraud claim under [such] facts would allow a fraud claim to be filed every time a contract was allegedly breached.") (collecting authorities).

The parties have devoted enough ink and resources to Plaintiff's fatuous effort to make this case sound in fraud.  The Court should grant summary judgment on Plaintiff's fraud claims.

### A.    There Is No Triable Issue Regarding Fraudulent Misrepresentation

Fundamental to any fraud claim is a misrepresentation to the defrauded party.  *See, e.g.*, *Smith v. Allstate Ins. Co.*, 160 F. Supp. 2d 1150, 1152-54 (S.D. Cal. 2001) (plaintiff must identify misrepresentation and show that representations were actually false when made); *Canard v. Bricker*, 2015 WL 846997, at *6 (N.D. Cal. Feb. 25, 2015) (same).  But discovery has confirmed that Defendants made no false statement to Plaintiff, Creative Market, or anyone else when Mr. Alkhatib, acting on Zazzle's behalf, purchased the BE license on Creative Market.  Mr. Alkhatib simply followed the prompts in Creative Market's online purchasing platform.  Creative Market confirmed this beyond any doubt in its testimony:  ***First***, that nothing false was communicated to Creative Market (Ex. G, Creative Market Tr. 94:5-8 ("Q: So in Creative Market's view, is any of the information … that Mr. Alkhatib provided to Creative Market false? A: No.")); and ***second***, that nothing at all was communicated to Plaintiff when Mr. Alkhatib purchased the license for Zazzle (*id*. at 94:9-14 (Q: Did [Mr. Alkhatib] provide any information to the Laatz shop owner directly at the time he made the purchase? …A:  Not to my knowledge.")).

**B.    There Is No Triable Issue Regarding Fraudulent Concealment**

Unable to find any actual misrepresentations, Plaintiff attempts to show "concealment"—*i.e*., that Zazzle "hid" its true identity or intentions in the license purchase.  But fraudulent concealment requires proof of actual concealment of material facts and a duty to disclose them.  *See, e.g.*, *Jackson v. City of Modesto*, 2022 WL 3083649, at *7 (E.D. Cal. Aug. 3, 2022) (dismissing claim of fraud by omission that "fails to allege any kind of duty that would have required [defendant] to disclose any facts to Plaintiffs").  Plaintiff fails to establish a triable issue in either respect.

***First***, Zazzle "concealed" nothing.  As Creative Market confirmed, Mr. Alkhatib used his @zazzle.com email address and Zazzle company credit card, and there was no prompt or mechanism for Mr. Alkhatib to enter his employer or company information (Ex. G, Creative Market Tr at 92:17-24), nor any way for "Zazzle" to purchase the license other than through an employee (a human being).  Zazzle then put the BE typefaces to use publicly in its Design Tool, truthfully and accurately using the name "Blooming Elegant."  There is nothing Zazzle tried to "hide," and nothing else that Zazzle could have reasonably disclosed.  Plaintiff herself admitted this:  "Q:  Do you think Zazzle was trying to hide the fact that it was offering Blooming Elegant?  … A: I don't believe they were trying to hide it, no."  (Ex. B, N. Laatz Tr. 192:17-22.)

***Second***, even if Plaintiff could identify some additional "disclosure" Defendants should have made, they had no legal duty to do so.  Zazzle made an ordinary arms-length commercial purchase from a public internet website, through Mr. Alkhatib, following the licensing process that Creative Market and Plaintiff herself established.  Defendants had no legal duty to disclose more information than Plaintiff and/or Creative Market requested, or to "preview" or summarize its subsequent, public use in any separate communication to Plaintiff.  *See Jackson*, 2022 WL 3082549, at *7.

**C.    There Is No Triable Issue Regarding Promissory Fraud**

Plaintiff's "promissory fraud" theory fares no better.  To prove promissory fraud, it is not enough for Plaintiff to show that Defendants' actions breached the license (which they dispute), because a dispute about contract interpretation or performance presents a contract claim.  *See, e.g.*, *Richardson v. Reliance Nat. Indem. Co*., No. C 99-2952 CRB, 2000 WL 284211, *5 (N.D. Cal. Mar. 9, 2000) (under such "theory, every breach of contract would support a claim of fraud so long as the

plaintiff adds to his complaint a general allegation that the defendant never intended to keep her promise"). Rather, Plaintiff would have to prove that, at the time of purchase, Defendants knew the license would not cover the intended use, and so fraudulently schemed to breach it immediately. *See Hsu v. OZ Optics Ltd*., 211 F.R.D. 615, 620 (N.D. Cal. 2002) (defendant must have "harbored an intention not to be bound by terms of the contract ***at formation***") (emphasis added); *AMC Tech., LLC v. Cisco Sys., Inc.*, 2012 WL 174949, at *3 (N.D. Cal. Jan. 20, 2012) (while plaintiff alleged defendant never intended to perform, it "failed" to allege any actions" to "substantiate" such intent "at the time it entered the agreement"). And Plaintiff would have to reconcile that assertion with the evidence of Zazzle's open and public use of BE. Plaintiff cannot make these showings.

It is undisputed that the only terms relating to the BE license that any Zazzle employee was aware of before purchasing the license were those on the BE Offering Page stating that the purchaser could "Use This Font For: Commercial Use, Unlimited Number of Projects, [and] Unlimited End Products for Sale." (Ex. F, Alkhatib Tr. 237:15-23; Ex. U, Sheu Tr. 43:11-44:23.) No common-sense interpretation of those broad terms would prohibit Zazzle's use, and thus they do not support (and indeed undercut) Plaintiff's theory of fraud. Nor, as Plaintiff has implied, should Zazzle have known from the $20 price of the BE license that its scope would not permit Zazzle's use. In fact, as Plaintiff's own purported font-licensing expert admitted, many fonts are distributed for no cost at all with full commercial rights. (*See* Ex. U, Sheu Tr. 49:13-22 ("[T]here are plenty of other script fonts or fonts that we could use that are free or unlimited-use, including the Google fonts that we ended up using. Which were free."); Ex. C2 (font designer responding to Monica McGhie's email request regarding a commercial server license for Zazzle by confirming that the requested font is "100% free, for both personal and commercial use").)

Plaintiff's theory of breach, and thus the basis of her claim for promissory fraud, turns on Zazzle's supposed knowledge of, and intent to breach, the terms of the License Terms and FAQ page. (Ex. A, N. Laatz Decl. (Dkt. 89-1) ¶ 13.) As an initial matter, the Court has already ruled the FAQ document is not part of the license (Dkt. 174 at 15). But in any event, all ***eight*** Zazzle employees whom Plaintiff deposed on the issue have now testified that they were not aware of the FAQ terms. (Ex. W, Liu Oct. Tr. 61:8-65:19; Ex. X, B. Beaver Tr. 148:17-149:23; Ex. T, McGhie

Tr. 52:24-53:2, 58:7-19; Ex. U, Sheu Tr. 48:12-50:2; Ex. Y, Haley Tr. 60:20-22; Ex. F, Alkhatib Tr. 92:24-94:7, 224:23-228:24; Ex. Z, Larson Tr. 33:3-12, 52:16-53:5; Ex. V, Liu Sept. Tr. 82:22-83:19; Ex. AA, J. Beaver Tr. 35:4-36:22.)  Zazzle could not have "harbored an intention" to breach the license, as Plaintiff asserts, without having read the FAQ terms Plaintiff claims apply and accepted Plaintiff's interpretation of them, neither of which occurred.  *See Hsu*, 211 F.R.D. at 620.

Moreover, as described above, neither Zazzle nor Mr. Alkhatib made any false or misleading statements when purchasing the license or did anything to conceal Zazzle's public use of BE.  This cannot be reconciled with Defendants having an undisclosed intent to breach at the time of purchase.

### III.    PLAINTIFF'S COPYRIGHT CLAIM FAILS AS A MATTER OF LAW

Plaintiff's copyright claim fails because (i) the BE fonts are ineligible for copyright protection for lack of human authorship, (ii) Plaintiff's "font-data" copyright registrations are invalid for fraud on the Copyright Office, and (iii) Zazzle did not infringe on her asserted copyrights.

### A.    Legal Standards Relating To Copyrightability Of Fonts

The Copyright Office has issued guidelines about what aspects of "fonts" and similar types of works may be eligible for registration.  Under these guidelines, the BE fonts are ineligible for registration because they do not meet the requirement of original, human authorship.

***No copyright protection for "typeface"***.  For starters, "typeface"—the appearance of a font's characters (or "glyphs")—is not copyrightable, no matter its "creativity."  37 C.F.R. § 202.1.

***Limited copyright protection for "computer programs" that generate typefaces***.  In contrast, a "computer program that generates . . . a particular typeface . . . may be registered if the program contains a sufficient amount of original authorship in the form of statements or instructions to a computer."  Copyright Office Compendium ("Compendium") § 723; *see* Dkt. 176 at 8.  The registration of any "computer program" requires a deposit of the program's "source code," which are "statements and instructions written by a human being using a particular programming language."  Compendium Glossary p. 19; *see* Compendium § 1006.1(A) ("computer programs" are "hand-coded by programmers using computer programming languages").  The registration for a "computer program that creates or uses certain typeface or typefont designs . . . covers only the source code that generates these designs, not the typeface . . ."  Compendium § 906.4.

Importantly, the Copyright Office indicates that if a font designer uses a third-party computer program to generate the typeface, as Plaintiff did here, then the resulting font (the file that implements the typeface) is ineligible for registration. Specifically, the Copyright Office explains that if an "author *merely assigned coordinates to a particular letterform and then used a third party program to render typeface* or typefont from those coordinates (but did not create any of the source code for that [third-party] program)," the Copyright Office Examiner may "communicate with the applicant" regarding the application. Compendium § 723 (emphasis added).

***Limited copyright protection for "hand-coded" font data***. The Copyright Office previously registered some fonts as "computer programs," including when the designer used a "font editor" like FontLab. But as the Examiner explained to Plaintiff in February 2021 when she applied to register the BE fonts as "computer programs," the Copyright Office "***no longer***" does this because fonts are "not eligible" for registration as computer programs. (Ex. BB, Dkt. 89-18 at 5; *see* Ex. CC, Phinney Tr. 270:20-271:3 (Plaintiff's expert recognizing that although Copyright Office "decided to treat font programs like general computer programs," they have "many differences").)

Instead, where the font data submitted for registration is not source code (*i.e.*, "statements and instructions written by a human being using a particular programming language"), the Copyright Office may register the data as "XML code," "font code," or "font data," but only if it meets certain requirements. In particular, as Plaintiff's own purported expert on the copyrightability of fonts, Thomas Phinney, put it, "the Copyright Office has been telling people that ***drawing glyph outlines in a font editor does not count***" (Ex. CC, Phinney Tr. 302:8-304:16 (emphasis added)), and that designers must instead "input the code as text to create font glyph shapes (as opposed to using a drawing interface, as is nearly universally done)," which leaves the copyrightability of fonts "murky at best" (*id*. at 117:8-118:21, 127:14-128:25). And in fact, after refusing to register the BE fonts as "computer programs," the Examiner told Plaintiff that the Copyright Office could register them as "font data" only if she confirmed that the data "was hand-coded rather than generated by a font design program" and the files she submitted were the "entire work." (Ex. BB, Dkt. 89-18 at 4.)

In imposing these requirements, the Copyright Office has applied to fonts the same standards it applies to HyperText Markup Language ("HTML"), which is often used to build websites. *See*

Compendium § 1006.1(A).  This makes sense because fonts are commonly submitted to the Copyright Office in Extensible Markup Language ("XML") and JavaScript Object Notation ("JSON"), which, like HTML, are not "source code" but rather formats for structuring data—in the case of fonts, the numerical coordinates describing the design of the glyphs.  (Decl. of Christopher Rucinski, filed concurrently, at ¶¶ 16-18; Ex. DD, Garrie Tr. 237:6-12; *see* Ex. BB, Dkt. 89-18 at 4 (Examiner noting similarities among "font data (or XML, HTML, etc.)").)

The Copyright Office explains that HTML cannot be registered as a "computer program" because it "does not constitute source code," but "may be registered as a literary work if the code was created by a human being (rather than a website design program) and if it contains a sufficient amount of creative expression."  Compendium § 1006.1(A).  However, similar to the limitations on the registration of fonts as "computer programs," the Copyright Office will not register HTML if the creator used a computer program to generate the HTML—because in that case, there is no human authorship.  In particular, the Copyright Office notes that "[u]nlike computer programs that are hand-coded by programmers using computer programming languages, HTML is frequently generated by website design software that provides templates or WYSIWYG ("What You See Is What You Get") functionality."  *Id*.  "If the website design software automatically creates the HTML, the website designer is not considered the author of the resulting markup language," and the HTML is ineligible for registration.  *Id*.  The Copyright Office also specifies that to register HTML, the applicant must submit "the entire work" as the deposit copy, which differs from the requirement that applicants need only submit excerpts of source code for computer programs.  *Id*.

**B.    The Blooming Elegant Fonts Are Ineligible For Copyright Protection Because They Lack Human Authorship**

As Zazzle shows below, Plaintiff obtained her registrations in the BE "font data" only by providing knowingly inaccurate information to the Copyright Office, so the registrations are invalid for fraud.  But even without any finding of fraud, Plaintiff's copyrights are invalid because they are not original works of human authorship, and thus are ineligible for registration, in any form.

Because Plaintiff registered the copyrights in the BE fonts more than five years after she allegedly created them, she bears the burden to prove the validity of her copyrights.  17 U.S.C. §

410(c).   To meet her burden, Plaintiff must establish that the fonts are "original works of authorship," 17 U.S.C. § 102(a), that were "created by a human author," Compendium §§ 302, 306. Plaintiff cannot meet her burden because the undisputed facts establish that the BE fonts are not original works of human authorship.  Indeed, Plaintiff's design process for creating the BE fonts presents the textbook example of how ***not*** to create copyrightable fonts.

In 2016, and long before she had U.S. copyright protection on her mind, Plaintiff designed the "glyphs" for the BE fonts by drawing them with a hand-held "stylus" on a tablet touch-screen in Adobe Illustrator.  (Ex. CC, Phinney Tr. 201:12-208:23.)  Plaintiff then copied and pasted those glyphs into the FontLab computer program to continue the design process.  (*Id.* at 208:25-210:18.) FontLab is a "font-generating engine" which, as Mr. Phinney (the former CEO of FontLab) explained, provides "vital" "WYSIWYG" functionality that allows a font designer to draw and modify "glyphs" for a font using a visual design interface.  (*Id*. at 82:19-24, 140:5-148:9.)  When Plaintiff pasted her pre-designed glyphs into FontLab, FontLab assigned numerical "coordinates" (*i.e*., integers that fall within a range of available integers) to the glyphs which correspond to their "on curve" and "off curve" reference points.  (Rucinski Decl. ¶ 28-32; Ex. CC, Phinney Tr. 158:18-161:9, 167:1-170:17, 214:6-215:17.)  These coordinates "dictate" the shapes of the glyphs.  (*Id*. at 162:18-23.)  Plaintiff then modified the designs in FontLab, still using her hand-held stylus, and FontLab adjusted the numerical coordinates accordingly.  (*Id*. at 195:14-22, 250:2-251:2.)  Plaintiff also used FontLab to assign coordinates for certain "font-wide" variables, such as for the relative height of capital to lowercase letters, and she used certain "default" coordinate values and automated editing features that FontLab provides, which resulted in additional coordinates that FontLab assigned.  (*Id*. at 169:18-170:7, 278:21-281:24, 283:6-284:2, 287:5-289:19.)

After Plaintiff completed her designs, FontLab "automatically" "convert[ed] [the coordinates] into a final font software format file, such as .OTF or .TTF, which implements the font for computers."  (Ex. EE, Phinney Decl. (Dkt. 89-50) at 5; Ex. CC, Phinney Tr. 170:22-172:7.)  OTF is a non-human readable ("binary") format which is often used to transmit font data, and what Zazzle received when it licensed BE in 2016.  (Rucinski Decl. ¶22; Ex. CC,  Phinney Tr. 173:1-3.)

When Plaintiff applied for her registrations in 2021, she initially tried to submit deposit

copies of her works in OTF format, but the Copyright Office refused to accept them, explaining that the "compiled version (OTF file) is not an acceptable deposit."  (Dkt. 89-18 at 2.)  Instead, Plaintiff submitted the deposit copies in "VFJ" format, which is a "JSON"-based format proprietary to FontLab and "functionally equivalent" to the more commonly used XML format.  (Ex. FF, Phinney Report ¶ 36; Ex. CC, Phinney Tr. 177:10-21, 255:15-258:1.)  To create the VFJ files in 2021 (for purposes of her applications for copyright registration), Plaintiff used FontLab to export the coordinates that FontLab had assigned to the BE fonts (*i.e.*, the font data) as VFJ files and created PDF documents of those files, which she submitted to the Copyright Office.  (Ex. CC, Phinney Tr. 251:13-252:4.)  The PDF files for each BE font are hundreds of pages long and consist of text created by FontLab as well as the same numerical coordinates that FontLab assigned to the glyphs Plaintiff drew.  (*Id*. at 180:1-12, 262:16-266:2, 273:22-275:1, 289:20-290:12; Rucinski Decl. ¶ 34.)

No matter how Plaintiff tries to dress up her creative process with conclusory references to "hand coding" (*e.g.*, Ex. A, N. Laatz Decl. (Dkt. 89-1) ¶ 9), she cannot meet her burden to show the BE fonts are eligible for registration as computer programs, "font data," or in any other format.  It is undisputed that Plaintiff used FontLab—a third-party font-generating computer program—to generate the "code" she sought to register.  Within FontLab, she used that program's "WYSIWYG" drawing interface to modify the glyphs she had previously drawn in Adobe Illustrator.  FontLab "assigned coordinates" to her drawings, and then automatically exported those same coordinates into the "font software" files that she submitted to the Copyright Office in support of her applications, along with reams of other text that Plaintiff does not even contend she "hand coded."

It is undisputed that the "drawings" Plaintiff made of the glyphs (or any adjustments she made to their appearance) are not copyrightable—because they simply reflect uncopyrightable typeface.  And because Plaintiff used FontLab to "merely assign[] coordinates" to the typeface designs, and further because the VFJ files do not contain "source code," the resulting font data is not copyrightable as a computer program—as the Copyright Office rightly determined.  Nor are the BE fonts eligible for registration as non-source code text or data, because Plaintiff used a font-design program with "WYSIWYG" functionality to design the glyphs and then automatically generate the "code" that digitally represents those designs.  Indeed, the font-data files explicitly state (albeit

1    inconspicuously) that they were "Generated by: FontLab."  (Exs. HH1-HH3, Dkt. 89-15-17.)

2        Based on this undisputed evidence, no reasonable juror could find that Plaintiff, rather than

3    FontLab, "authored" the code in the VFJ files she registered.  The Court should therefore find that

4    the BE fonts are ineligible for copyright protection in *any* form because they lack human authorship.

5        **C.    Plaintiff's Registrations Are Invalid For Fraud On The Copyright Office**

6        Because Plaintiff's BE fonts are ineligible for registration, the Court need not reach the

7    question of fraud on the Copyright Office to invalidate Plaintiff's registrations.  But should the Court

8    do so, the result is the same—Plaintiff's registrations are invalid because she obtained them only by

9    knowingly providing materially inaccurate information to the Copyright Office—in particular, by

10   falsely representing that she "hand coded" the font data without use of a font-generating program.

11       A party seeking to invalidate a copyright for fraud on the Copyright Office must show: "(1)

12   the registrant submitted a registration application containing inaccuracies, (2) the registrant knew

13   that the application failed to comply with the requisite legal requirements, and (3) the inaccuracies

14   in question were material to the registration decision by the Register of Copyrights."  *Unicolors,*

15   *Inc. v. H&M Hennes & Mauritz, L.P.*, 52 F.4th 1054, 1067 (9th Cir. 2022).  If the Court finds that

16   the registrant has provided inaccurate information to the Copyright Office, then it should ask the

17   Copyright Office "to advise the court whether the inaccurate information, if known, would have

18   caused the Register of Copyrights to refuse registration."  17 U.S.C. § 411(b)(2).

19       The facts establishing Plaintiff's fraud on the Copyright Office are amply reflected in the

20   correspondence between Plaintiff's attorney, Stephen Steinberg, and the Examiner.  In February

21   2021, Plaintiff applied to register the font data used to install the Blooming Elegant fonts as

22   "computer programs" for which Plaintiff identified herself as the sole author.  (*See* Exs. GG1-3.)

23   As noted, Plaintiff submitted PDF copies of VFJ files containing the BE font data generated in 2021

24   using FontLab's "export" function.  (Ex. A, N. Laatz Decl. (Dkt. 89-1) ¶12; Exs. HH1-3.)  After

25   reviewing those files, the Examiner explained that the submitted work was not a "computer

26   program" but rather a "font," which he assumed may have been XML code (instead of the

27   "functionally equivalent" JSON format used in VFJ files).  (Ex. BB, Dkt. 89-18 at 7.)  The Examiner

28   explained that a font "***cannot be registered***" if it was "***merely generated by a font program and was***

1    *not hand coded by a human author*.”  (*Id.* (emphasis added).)  The Examiner asked Mr. Steinberg

2    to “please confirm” if the PDF files contained XML code, and to “please let us know” if the data

3    was “hand-coded by a human author or if it was merely generated by a font program.”  (*Id.*)

4         In his response, Mr. Steinberg did not answer the Examiner's questions and withheld the

5    facts that the font data in the PDF files were “generated by” FontLab in 2016 and exported to VFJ

6    format in 2021.  And he resisted the Examiner's refusal to register the files as “computer programs”

7    by agreeing that “the work is a font,” but stating that he has “seen fonts registered as ‘computer

8    programs.’”  (*Id.* at 5.)  The Examiner was clear in his reply:  ***We no longer register fonts as

9    ‘computer programs’ as they are not eligible for that registration***.”  (*Id.* at 4 (emphasis added).)

10   He asked again that Mr. Steinberg confirm that the font data “was hand-coded rather than generated

11   by a font-design program,” and stated again that “[i]f this code was merely generated by a font

12   program and was not hand coded by a human author, it cannot be registered.”  (*Id.* at 5.)

13        With his back against the wall, Mr. Steinberg responded (six weeks later) by pointing the

14   Examiner to Copyright Office publications, including a 1992 Practice Guide and the 2021

15   Compendium, which he asserted (wrongly) established a “policy” that “fonts can be registered as

16   computer programs.”  (*Id.*)  In particular, Mr. Steinberg conflated “computer programs that generate

17   typefaces” (like FontLab), which these publications explain may be registered as “computer

18   programs” if they contain original, handwritten source code, with the “fonts” themselves (*i.e.*, the

19   “output files” from the use of a “computer program that generates a typeface” (*see* Ex. CC, Phinney

20   Tr. 174:13-177:15)), which, as the Examiner clearly explained, are eligible for registration only if

21   “hand coded ***without*** the use of a “font-design program.”  While again avoiding the Examiner's

22   questions, Mr. Steinberg stated that Plaintiff “personally created” certain information in the font

23   files.  (Ex. BB, Dkt. 89-18 at 4.)  He added—careful with his words—that the “PDF file” Plaintiff

24   submitted as the deposit “was generated by a font program in a sense,” though as he admits, he was

25   referring to the PDF file itself, not the font data in it.  (Ex. II, Steinberg Tr. 77:1-24.)

26        In his next reply, and Mr. Steinberg's cited publications notwithstanding, the Examiner

27   reiterated that the “font data” was ineligible for registration as a “computer program” because it did

28   not contain “source code,” but offered to register it, as “font data,” if Mr. Steinberg confirmed that

1    "the information in the PDF file that you submitted is hand-coded[.]"  (Ex. BB, Dkt. 89-18 at 3.)

2    After waiting another six weeks, Mr. Steinberg pushed back again and asked to replace the

3    PDF files with OTF data files—which are not human readable and contain no source code (Rucinski

4    Decl. at ¶¶ 22, 48; Ex. JJ, Rucinski Decl. (Dkt. 49-10) ¶ 10)—and to register the font data as

5    "computer programs."  Mr. Steinberg still did not disclose that the font data was "generated by"

6    FontLab.  The Examiner had now had enough.  He reiterated that the OTF file was not an "acceptable

7    deposit," but that he could register the "font data" in the PDF files if it was "hand coded."  (Ex. BB,

8    Dkt. 89-18 at 1.)  He made clear that if Mr. Steinberg did not "confirm that the font data in the PDF

9    file was hand-coded, *I will refuse registration with no further action*."  (*Id*. at 2 (emphasis added.)

10    After yet another six weeks, Mr. Steinberg represented to the Examiner for the first time that

11    "Ms. Laatz hand-coded the designs and instructions in the font data that we submitted as a pdf file."

12    (*Id*. at 1.)  Mr. Steinberg said nothing about FontLab.  The Examiner issued the registrations.

13    The undisputed facts establish that Mr. Steinberg, on Plaintiff's behalf, provided knowingly

14    inaccurate information to the Copyright Office.  As Plaintiff's agent, Mr. Steinberg is imputed with

15    Plaintiff's knowledge regarding her creation of the BE fonts.  Plaintiff plainly knew that she used

16    FontLab to "generate" the BE fonts.  Yet Mr. Steinberg never disclosed that material fact to the

17    Examiner, or confirmed that the PDF files were in FontLab's proprietary VFJ format (not XML),

18    despite the Examiner's repeated requests that he do so.  Instead, Mr. Steinberg represented only that

19    the PDF copies of the font files were "generated by a font program in a sense," thus falsely indicating

20    that the font data contained within them was not.  And when faced with a final rejection of the

21    application—and the demise of this case before it was even filed—Mr. Steinberg ultimately

22    represented, after not having done so for the previous five months, that Plaintiff "hand coded" the

23    BE font data, even though it was plain that the Copyright Office viewed "hand coding" as the

24    *alternative to* using a third-party program to generate the font data (*see* Ex. BB, Dkt. 89-18 at 5

25    (asking Mr. Steinberg to confirm that the code "was hand coded *rather than* generated by a font

26    design program); Compendium § 1006.1(A) (HTML "may be registered as a literary work if the

27    code was created by a human being (*rather than* a website design program)")), and that Plaintiff had

28    not "hand-coded" anything but instead merely drawn her uncopyrightable glyph designs.

1    These were material misrepresentations, as the Examiner stated clearly that if the font data

2    was, in fact, generated by a font program, it was ineligible for registration.  At a minimum, the

3    Copyright Office should have the chance to consider whether the true facts about Plaintiff's creation

4    of the BE fonts would have caused it to refuse registration.  *See* 17 U.S.C. § 411(b)(2).

5    **D.    Zazzle Did Not Infringe Plaintiff's Font-Data Copyrights**

6    Even if Plaintiff could establish the validity of her copyrights, her infringement claim would

7    still fail because no reasonable juror could find that Zazzle infringed on her "font-data" copyrights.

8    To prove infringement, Plaintiff must establish that Zazzle had access to the copyrighted work and

9    violated "at least one of the exclusive rights granted to copyright owners by the Copyright Act,"

10   including the rights to reproduce, distribute, or prepare derivative works based on the work.  *UMG*

11   *Recordings, Inc. v. Augusto*, 628 F.3d 1175, 1178 (9th Cir. 2011); 17 U.S.C. § 106.  Plaintiff cannot

12   do so here because Zazzle never received the VFJ-formatted "font data" that the Copyright Office

13   registered, but instead only received the OTF files that the Copyright Office **refused** to register.

14   Zazzle therefore could not have infringed any of Plaintiff's "exclusive rights" in the font data.

15   Specifically, Zazzle purchased a license for the BE fonts in 2017 and received installable

16   OTF files.  (Rucinski Decl. ¶ 9.)  These "binary" files contain no text or source code and are not

17   human readable.  (*Id*. at ¶¶ 22, 48.)  Zazzle never received the font data that Plaintiff later registered

18   in the VFJ format.  Indeed, the VFJ format itself, and thus the specific BE "font data" the Copyright

19   Office registered in 2021—did not even exist in 2017 when Zazzle obtained its license.  (Ex. NN, ¶

20   38.)  Despite Plaintiff's repeated protestations—surely based on her (attorneys') concern that her

21   registration of the VFJ files alone would not support an infringement claim—the Copyright Office

22   explicitly **refused** to register a copyright in the "compiled version (OTF file)" that Plaintiff sought

23   to register as a "computer program" because "it is not an acceptable deposit," and instead limited

24   Plaintiff to registering as "font data" the text contained in the VFJ files (a "literary work," under the

25   Copyright Act).  (Ex. BB, Dkt. 89-18 at 1.)  Because Zazzle never received that font data or the text

26   contained in it, Zazzle could not have copied, reproduced, or created a derivative work based on it,

27   and thus did not violate any of Plaintiff's alleged exclusive rights in the font-data files.

28

1    **IV.    PLAINTIFF'S CONTRACT CLAIM FAILS AS A MATTER OF LAW**

2        To prove a cause of action for breach of contract under California law, a party must plead

3    the existence of a contract, the plaintiff's performance of that contract or excuse for failure to

4    perform, the defendant's breach, and damage to the plaintiff resulting therefrom.  *See McKell v.*

5    *Washington Mut., Inc*., 142 Cal. App. 4th 1457, 1489 (2006) (citing 4 Witkin, Cal. Procedure (4th

6    ed. 1997),  Pleading, § 476, p. 570).  Plaintiff's contract claim fails because there are no relevant

7    factual disputes about Zazzle's actions regarding BE, the Court has already ruled on the contents of

8    the license, and Zazzle's actions did not breach that license.  Nor is there any evidentiary basis for

9    Plaintiff to maintain a separate claim of breach against Mr. Alkhatib personally.

10        **A.    There Is No Triable Issue Regarding The Terms Of The License**

11        Contract interpretation is a question of law.  *See, e.g*., *Bay Area Roofers Health & Welfare*

12    *Tr. v. Sun Life Assurance Co. of Canada*, 73 F. Supp. 3d 1154, 1161 (N.D. Cal. 2014) (Freeman,

13    J.).  The Court has already ruled that the license at issue consists of at least the Creative Market

14    Terms of Service ("TOS") and "License Terms."  (Pltf's MSJ Order (Dkt. 174) at 16.)  In addition,

15    the prominently displayed "Offering Page" for BE stated that the purchaser may "Use This Font

16    For:  Commercial Use, Unlimited Number of Projects, [and] Unlimited End Products for Sale."  (Ex.

17    D, Dkt. 89-36.)  As noted, the Court already rejected Plaintiff's claim that there was mutual assent

18    to the "License FAQ" document (Dkt. 174 at 15-16), and discovery has confirmed there was no such

19    assent.  Plaintiff argued that Zazzle had constructive notice of the License FAQ because there was

20    a link to it in the email receipt Mr. Alkhatib received, and the BE Offering Page and License Terms

21    contain links to the FAQ.  But in its Order on Plaintiff's MSJ, the Court found that none of these

22    placements provided reasonably conspicuous notice of its contents (*id.*), and since then, Plaintiff has

23    not obtained any evidence that Zazzle viewed the License FAQ or was otherwise on notice of its

24    terms.  To the contrary, all the evidence shows that Zazzle had no notice of, nor assented to, the

25    License FAQ.  (Ex. W, Liu Oct. Tr. 53:3-54:7, 61:8-65:19; Ex. F, Alkhatib Tr. 226:1-8; Ex. Z,

26    Larson Tr. 52:16-53:5; Ex. V, Liu Sept. Tr. 82:22-83:19;  Ex. T, McGhie Tr. 52:24-53:2; Ex. U,

27    Sheu Tr. 52:2-4.)  There is thus no basis to include the License FAQ as "terms of" the license.

28

**B.    There Is No Triable Issue Regarding Zazzle's Alleged Breach**

None of Plaintiff's varied and shifting theories of Defendants' alleged breach has any merit.

***First***, Plaintiff alleges that Defendants breached the license by "[d]ownloading, copying, and installing both the [BE] Trio and [BE] Software onto multiple Zazzle servers and thereby allowing the fonts and the font software to be used on more than the two computers permitted by the license." (Dkt. 82 ¶ 218(a).)  But neither the License Terms nor the TOS (nor the Offering Page) limits the number of servers or computers onto which an installable licensed "Item" can be downloaded, copied, or installed.  (Dkt. 82, Exs. C-D.)

***Second***, Plaintiff alleges that Defendants breached by "[a]llowing persons other than Alkhatib to access and use both the [BE] Trio and [BE] Software—including both agents and employees of Zazzle and millions of individuals who accessed and used the fonts and the font software on Zazzle's website."  (Dkt. 82 ¶ 218(b).)  But Mr. Alkhatib licensed BE on Zazzle's behalf.  Zazzle (including its employees acting on its behalf) holds the license and is entitled to access and use the licensed asset.  And no persons, other than Zazzle employees, ever accessed or used the actual asset protected by the license—the BE font software.  (Ex. KK, Li Tr. 122:15-19.)

***Third***, Plaintiff alleges that Defendants breached the License by "[s]haring and redistributing the [BE] Trio and [BE] Software as part of Zazzle's Design Tool, not incorporated into an end product."  (Dkt. 82 ¶ 218(c).)  But the license limits access to and use of the ***font software*** files, not the typefaces the software renders.  (Dkt. 82, Ex. C at 1, 2 (referring to licensed "Font" as an "***Installable*** Item" and specifying that "you may purchase a font and use it to make unique word art . . . but you must not redistribute the ***original files*** in any way") (emphasis added).)  The undisputed evidence is that Zazzle never shared or redistributed the font software outside of Zazzle and its employees.  (Ex. X, B. Beaver Tr. 40:1-43:14; Ex. KK, Li Tr. 122:15-19.)

***Fourth***, Plaintiff alleges that Zazzle breached the license by "[f]ailing to pay the price prescribed by the license for 'each unique user' who was provided access to the [BE] Trio and [BE] Software by Defendants—again including both agents and employees of Zazzle and millions of individuals who accessed and used the fonts and the font software on Zazzle's website."  (Dkt. 82 ¶ 218(d).)  Such a theory is massively overbroad as it would extend a licensing requirement to,

essentially, every person who ever navigated to any part of zazzle.com where BE may have appeared. Not only is this theory implausible, it is irrelevant, because the "each unique user" language is contained only in the License FAQ document—which is not part of the license—and not the License Terms or TOS. (Dkt. 174 at 14-15.) And, as noted, the license restricts access to the *font software*—the "Installable Item"—not the rendered typefaces themselves. (Dkt. 82, Ex. C at 1, 2.) Zazzle users were not provided access to the font software, and any use on behalf of Zazzle by Zazzle employees was licensed use by the license holder (Zazzle).

### C.    There is No Triable Issue Regarding Mr. Alkhatib's Alleged Breach

While Plaintiff continues to seek a personal recovery from Mr. Alkhatib, the undisputed evidence shows that Mr. Alkhatib (i) purchased the license on behalf of Zazzle as its agent and employee; (ii) provided complete and accurate responses to all prompts provided by Plaintiff and Creative Market; and (iii) made no use of the license for any purpose other than Zazzle's website. There is no basis to send Plaintiff's misguided individual claims against Mr. Alkhatib to a jury. *See, e.g.*, *F.D.I.C. v. Frankel*, 2011 WL 5975262, at *5 (N.D. Cal. Nov. 29, 2011) (dismissing contract claim against an individual defendant acting as employee and/or agent of his employer).

## V.    PLAINTIFF'S TRADEMARK CLAIM FAILS AS A MATTER OF LAW

Since making the conclusory allegation that "Zazzle's use of the name "Blooming Elegant" on its website violates Plaintiff's alleged trademark rights to the "BLOOMING ELEGANT" mark, Plaintiff has neither provided evidence of trademark infringement (such as any evidence of likely consumer confusion), nor pursued such evidence in discovery. (Dkt. 82 at ¶ 105.) Plaintiff's apparent abandonment of this claim makes sense, as Zazzle's only use of the mark was to identify the BE trio of typefaces by their actual names—which is nominative fair use as a matter of law.

The "nominative" use of a mark—where the only word reasonably available to describe a particular thing is pressed into service—lies outside the strictures of trademark law: "Because it does not implicate the source-identification function that is the purpose of trademark, it does not constitute unfair competition..." *New Kids on the Block v. News Am. Publ'g, Inc.*, 971 F.2d 302, 308 (9th Cir. 1992); *see WCVB-TV v. Boston Athletic Ass'n*, 926 F.2d 42, 46 (1st Cir. 1991) ("In technical trademark jargon, the use of words for descriptive purposes is called a 'fair use,' and the

law usually permits it even if the words themselves also constitute a trademark."). The nominative fair use defense has three elements: "first, the product or service in question must be one not readily identifiable without use of the trademark; second, only so much of the mark or marks may be used as is reasonably necessary to identify the product or service; and third, the user must do nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder." *New Kids*, 971 F.2d at 308. All three elements are easily met here.

**First**, Zazzle identified the BE trio of typefaces—as among the hundreds of options in the drop-down font selector list in Zazzle's Design Tool, and in selected related blog posts and statements—only by their actual names, "Blooming Elegant," "Blooming Elegant Sans," and "Blooming Elegant Hand." (Ex. LL.) **Second**, Zazzle used no more than the names of the three typefaces to identify them—and could have used no less of the mark to do that. **Third**, Zazzle did not state or suggest in any way that its use of the BLOOMING ELEGANT Mark, to identify the BE typefaces, was with Plaintiff's sponsorship or endorsement. Mere use of a mark is insufficient. Rather, "[t]his factor is 'viewed as asking whether, ***in addition to mere use of the mark***, defendant has engaged in some additional conduct that affirmatively suggests sponsorship or endorsement by the plaintiff.'" *Dr. Seuss Enterprises, L.P. v. ComicMix LLC*, 300 F. Supp. 3d 1073, 1091 (S.D. Cal. 2017) (internal citations omitted) (emphasis added). Plaintiff has no evidence that Zazzle took any such affirmative act. Zazzle's use of the mark is thus textbook nominative fair use.

## CONCLUSION

The Court should grant Defendants' Motion for Summary Judgment.


DATED: November 21, 2024                QUINN EMANUEL URQUHART &
                                        SULLIVAN, LLP

                                        By   /s/ *Andrew H. Schapiro*
                                             Andrew H. Schapiro

                                        *Attorneys for Defendants*
                                        *Zazzle Inc. and Mohamed Alkhatib*