PATRICK M. RYAN (SBN 203215)
*pryan@bartkolaw.com*
STEPHEN C. STEINBERG (SBN 230656)
*ssteinberg@bartkolaw.com*
CHAD E. DEVEAUX (SBN 215482)
*cdeveaux@bartkolaw.com*
P. CASEY MATHEWS (SBN 311838)
*cmathews@bartkolaw.com*
BARTKO LLP
1100 Sansome Street
San Francisco, California 94111
Telephone:   (415) 956-1900
Facsimile:   (415) 956-1152

Attorneys for Plaintiff and Counter-Defendant
NICKY LAATZ

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

|  |  |
|---|---|
| NICKY LAATZ, | Case No. 5:22-cv-04844-BLF |
| Plaintiff, | **PLAINTIFF NICKY LAATZ'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| ZAZZLE, INC. and MOHAMED ALKHATIB, | Date:        February 27, 2025 |
| Defendants. | Time:        9:00 a.m. |
| | Courtroom:   3 |
| ZAZZLE, INC., | Judge:        Hon. Beth Labson Freeman |
| Counter-Claimant, | Trial Date:   July 14, 2025 |
| v. | |
| NICKY LAATZ, | |
| Counter-Defendant. | |

# **TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ...................................................................................................1

II.     STATEMENT OF KEY FACTS ............................................................................1

        A.      Nicky Laatz and Her Creation of the Blooming Elegant Trio and Software ............1

        B.      Plaintiff's Registration of Copyrights in the BE Software ...........................................2

        C.      The License ............................................................................................................3

        D.      Zazzle's Scheme to Unlawfully Use the BE Software and BE Trio .......................4

        E.      Plaintiff's Discovery of Zazzle's Breach and Abuse of Her IP Rights ...................5

III.    ARGUMENT ........................................................................................................6

        A.      Defendants' Statute of Limitations Arguments Fail ..............................................6

                1.      Defendants Fail to Meet Their Initial Burden of Production ....................6

                2.      Defendants' Fraudulent Concealment and California's Delayed
                        Discovery Rule Tolled the Statute of Limitations.....................................8

                3.      The Separate-Accrual Rule Precludes Defendant's MSJ ........................10

        B.      Defendants' MSJ on Plaintiff's Fraud Claims Fails..............................................11

                1.      Defendants Misstate the Law Regarding Promissory Fraud .......................11

                2.      There Is Evidence Zazzle Engaged in All Three Forms of Fraud.............12

        C.      Defendants' MSJ on Plaintiff's Copyright Infringement Claims and
                Defendants' Copyright Invalidity Defense Fails on Both Counts...........................14

        1.      Defendants' MSJ Fails Since It Is Founded on Misstatements of Law ...................14

                        a.      The Copyright Office Regulation and Decision, and *Adobe*
                                Case .............................................................................................14

                        b.      There Are No Requirements That Font Software be
                                Described as "Font Data," Nor "Hand-Coded" or "Manually
                                Typed," Nor Created Without a Visual Font Editing Program ........16

                2.      The BE Software Is Copyrightable and Was Properly Registered...............18

                3.      Defendants' MSJ on Their Copyright Invalidity Defense Fails..................20

        D.      Defendants' MSJ on Plaintiff's Breach of Contract Claim Fails ...........................22

                1.      There Are Triable Issues as to the Terms and Meaning of the
                        License ......................................................................................................22

2.     There Are Triable Issues as to Whether Zazzle Breached the License ........23

3.     There Are Triable Issues as to Alkhatib's Breach ........................................24

E.     Zazzle's MSJ as toPlaintiff's Trademark Infringement Claim Fails........................25

IV.     CONCLUSION .................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acme Paper Co. v. Goffstein*
  125 Cal. App. 2d 175 (1954)...................................................................................... 8

*Adobe Sys., Inc. v. S. Software, Inc.*
  1998 WL 104303 (N.D. Cal. Feb. 2, 1998)..............................................................*passim*

*Anderson v. Liberty Lobby, Inc.*
  477 U.S. 242 (1986)................................................................................................... 1

*Angeles Chem. Co. v. Spencer & Jones*
  44 Cal. App. 4th 112 (1996)...................................................................................... 6

*Applied Underwriters, Inc. v. Lichtenegger*
  913 F.3d 884 (9th Cir. 2019)..................................................................................... 25

*Aryeh v. Canon Bus. Sols., Inc.*
  55 Cal. 4th 1185 (2013)........................................................................................ 7, 11

*BMG Rights Mgmt. (US) LLC v. Glob. Eagle Entm't Inc.*
  2019 WL 4544424 (C.D. Cal. Aug. 20, 2019) .......................................................... 9

*Boyds Coll., Ltd. v. Bearington Coll., Inc.*
  365 F. Supp. 2d 612 (M.D. Pa. 2005) ...................................................................... 16

*Celotex Corp. v. Catrett*
  477 U.S. 317 (1986) .................................................................................................. 6

*Data General Corp. v. Grumman Sys. Support Corp.*
  803 F. Supp. 487 (1992) .......................................................................................... 20

*Engalia v. Permanente Med. Grp., Inc.*
  15 Cal. 4th 951 (1997).............................................................................................. 11

*F.D.I.C. v. Frankel*
  2011 WL 5975262 (N.D. Cal. Nov. 29, 2011).......................................................... 24

*Free Speech Sys., LLC v. Menzel*
  390 F. Supp. 3d 1162 (N.D. Cal. 2019) .................................................................... 9

*GCA Corp. v. Chance*
  217 U.S.P.Q. 718 (N.D. Cal. 1982)........................................................................... 20

*Gregory v. Spieker*
    110 Cal. 150 (1895) ................................................................................ 8

*Gruczman v.4550 Pico Partners, Ltd.*
    107 Cal. App. 4th 1 (2003) .................................................................... 10

*Karl Storz Endoscopy Am., Inc. v. Surgical Techs., Inc.*
    285 F.3d 848 (9th Cir. 2002) .................................................................. 6

*Klinger v. Modesto Fruit Co.*
    107 Cal. App. 97 (1930) ........................................................................ 24

*Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc.*
    182 F.3d 157 (2nd Cir. 1999) ................................................................. 6

*New Kids on the Block v. News Am. Publ'g, Inc.*
    971 F.2d 302 (9th Cir. 1992) .................................................................. 25

*Nissan Fire Marine Ins. Co. v. Fritz Co.*
    210 F.3d 1099 (9th Cir. 2000) ................................................................ 6

*Oracle Am., Inc. v. Hewlett Packard Enter. Co.*
    971 F.3d 1042 (9th Cir. 2020) ................................................................ 6

*Ortega v. Comm'r of Soc. Sec.*
    2020 WL 4747912 (N.D. Cal. Aug. 17, 2020) ........................................ 7

*Pashley v. Pac. Elec. Co.*
    25 Cal. 2d 226 (1944) ............................................................................ 8

*Perez-Encinas v. AmerUs Life Ins. Co.*
    468 F. Supp. 2d 1127 (N.D. Cal. 2006) ................................................. 10

*Petrella v. MGM, Inc.*
    572 U.S. 663 (2014) ....................................................................... 7, 10

*Portland Gen. Elec. v. Bonneville Power Admin.*
    501 F.3d 1009 (9th Cir. 2007) ................................................................ 17

*Roches v. Cnty. of Santa Clara*
    2018 WL 3344647 (N.D. Cal. Jul. 9, 2018) ........................................... 9

*Starz Entm't, LLC v. MGM Dom. TV Dist., LLC*
    39 F.4th 1236 (9th Cir. 2022) ................................................................. 9

*Starz Entm't, LLC v. MGM Dom. TV Dist., LLC*
    510 F. Supp. 3d 878 (C.D. Cal. 2021) .................................................... 9

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

*U.S. Lines, Inc. v. Fed. Maritime Comm'n*
    584 F.2d 519 (D.C. Cir. 1978) ................................................................. 17

*U.S. v. Approx. 64,695 Lbs. of Shark Fins*
    520 F.3d 976 (9th Cir. 2008) ................................................................... 18

*U.S. v. Blum*
    1991 WL 317024 (N.D. Cal. Sept. 16, 1991) ........................................... 25

*UAB "Planner5D" v. Facebook, Inc.*
    534 F. Supp. 3d 1126 (N.D. Cal. 2021) ................................................... 17

*Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*
    52 F.4th 1054 (9th Cir. 2022) ................................................................. 21

*Unicolors, Inc. v. H&M Hennes & Mauritz, L. P.*
    595 U.S. 178 (2022) ............................................................................... 21

*W.W. Leasing Unltd. v. Comm. Stand. Title Ins. Co.*
    149 Cal. App. 3d 792 (1983) ..................................................................... 9

*Wakefield v. Wells Fargo & Co.*
    2014 WL 5077134 (N.D. Cal. Oct. 9, 2014) ............................................ 10

*Zetwick v. County of Yolo*
    850 F.3d 436 (9th Cir. 2017) ................................................................... 13

**Statutes**

17 United States Code § 507(b) ...................................................................... 6

Code of Civil Procedure
    § 337(a) ................................................................................................... 6
    § 337(d) ................................................................................................... 6

**Court Rules**

Federal Rules of Civil Procedure, Rule 56(a) ................................................. 6

**Other Authorities**

37 Code of Federal Regulations
    § 202.1(e) .............................................................................................. 14
    § 202.5 ................................................................................................... 17

57 Federal Register 6201-01, 1992 WL 29306, Feb. 21, 1992 ....................... 14

57 Federal Register 6202, 1992 WL 29306, Feb. 21, 1992 ............................ 14

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Compendium of U.S. Copyright Office Practices, Third Edition (January 2021)
        § 1509.1(F) ................................................................................................ 19
        § 721.5 ....................................................................................................... 20
        § 723 ................................................................................................... 17, 19r

https://creativemarket.com/licenses ................................................................ 4

Restatement (Second) of Agency § 4 (1958) ............................................... 25

## I.     INTRODUCTION

Faced with mountains of evidence of their own wrongful conduct, Defendants shamelessly assert that no triable issues remain and that they are entitled to judgment as a matter of law. This gambit is a thinly veiled attempt to try the case in the guise of a summary judgment motion. The Court, of course, must reject this invitation because "the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). And if the Court *could* assess the evidence at this stage, Defendants still lose because it overwhelmingly establishes their unlawful conduct.

## II.     STATEMENT OF KEY FACTS

### A.     Nicky Laatz and Her Creation of the Blooming Elegant Trio and Software

Plaintiff Nicky Laatz is a designer and creator of premium fonts and the installable software to implement those fonts on computers. Nicky Laatz Decl. ISO Opp. to MSJ ("N. Laatz Decl.") ¶ 2. Such fonts are typically licensed by graphic designers to use in invitations, business cards, signs, websites, and other applications. *Id.* Plaintiff specializes in artistic script fonts, such as the Blooming Elegant font. *Id.* ¶ 3. She offers licenses for limited use of her fonts and font software through her website and online marketplaces like Creative Market, which is the primary source of income for her and her family. *Id.* ¶ 4. She has enjoyed incredible success, earning her first $1 million from licenses sold on Creative Market in 2015, and increasing sales since then. *Id.* She is followed by over 35,000 users on Creative Market, due to the popularity of her designs. *Id.*

In 2016, Plaintiff designed, created, and began licensing the Blooming Elegant Trio of fonts ("BE Trio") and the Blooming Elegant Software ("BE Software" and collectively, the "BE Trio and Software") that implements those fonts. *Id.* ¶ 5. The BE Trio consists of three fonts: Blooming Elegant ("BE Font"), Blooming Elegant Hand ("BE Hand"), and Blooming Elegant Sans ("BE Sans"). *Id.* The BE Trio and Software include 631 glyphs (graphical representations of characters)—254 in BE Font, 186 in BE Hand, and 191 in BE Sans. *Id.* ¶ 8.

Plaintiff spent weeks, and well over 100 hours, creating the BE Trio and Software. *Id.* ¶ 9. She initially designed glyphs in a mix of Adobe Illustrator and FontLab Studio 5 ("FontLab") by hand using a stylus (similar to a mouse). *Id.* ¶ 10; Decl. of T. Phinney ISO Plf.'s Opp. to Defs.'

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

MSJ ("Phinney Decl.") ¶¶ 33-34. She then manipulated and adjusted the on-curve and off-curve reference points for the glyphs in FontLab, also by hand using a stylus. N. Laatz Decl. ¶¶ 11-13; Phinney Decl. ¶ 35. Among other things, for the BE Font, Plaintiff adjusted the reference points to thicken the downstrokes in each glyph in varying ways to make it look more like handwriting. N. Laatz Decl. ¶¶ 11-13. She also manually adjusted the incoming and outgoing strokes and left and right-side bearing of each letter to ensure it would connect seamlessly to any adjacent letter(s). N. Laatz Decl. ¶ 13. She also set values for font-wide variables, and manually typed and inserted custom code to instruct the software how to implement ligatures (letter combinations) and stylistic alternate letters. N. Laatz Decl. ¶¶ 13-14; Phinney Decl. ¶¶ 35-37. Plaintiff used FontLab to compile the coordinates and instructions into a set of OTF files, which are executable files that can be installed on a computer and enable the computer to implement and render the fonts. N. Laatz Decl. ¶ 15. She then tested the software again and again, repeatedly adjusted reference points, variables, and instructions to fix any issues before recompiling it into OTF files. *Id.*

**B.    Plaintiff's Registration of Copyrights in the BE Software**

On February 18, 2018, Plaintiff applied to register her copyrights in the BE Software. N. Laatz Decl. ¶ 16; Decl. of S. Steinberg ISO Plf.'s Opp. to Defs.' MSJ ("Steinberg Decl.") ¶ 2. Per U.S. Copyright Office guidelines, the deposit for each font program consisted of human-readable code she prepared by exporting each OTF file as a VFJ file (a human-readable "source file format" native to FontLab) and printing to PDF. N. Laatz Decl. ¶ 16; Steinberg Decl. ¶ 3.

The Copyright Office Examiner emailed Plaintiff's agent, noting that each deposit "appear[ed] to be a font," asked if it was XML, should be described as "XML code," and if so, if it was "hand-coded by a human" or "merely generated by a font program." N. Laatz Decl. ¶ 18; Steinberg Decl. Exs 10-12. Plaintiff (through her agent) responded accurately that the works she sought to register were fonts, <u>not</u> XML—the deposits were PDFs of code for the installable OTF files—and attached the OTF files. N. Laatz Decl. ¶ 18; Steinberg Decl. Exs. 10-12. The Examiner responded that "[w]e no longer register fonts as 'computer programs' as they are not eligible for that registration," and repeated his questions. N. Laatz Decl. ¶ 19; Steinberg Decl. Exs. 10-12. Plaintiff (through her agent) expressed confusion at his statement because a 1992 Copyright Office

decision and the Compendium of Copyright Office Practices ("Compendium") state that software for rendering fonts can (and must) be registered as computer programs, and emailed the Examiner copies of these authorities. N. Laatz Decl. ¶ 19; Steinberg Decl. Exs. 10-12. Plaintiff also answered accurately that she "personally created the designs and instructions in the font software file we submitted, including instructions for linking, spacing, kerning, and outlining characters … packaged as an OTF installable computer program file," and while "[t]he PDF file that we initially submitted … was generated by a font program in a sense, [] it also reflects Ms. Laatz's original creative work." *Id.*

In response, the Examiner suggested changing the description of each work from "computer program" to "font data" and asked if it was "hand-coded and [] contains the entire work." N. Laatz Decl. ¶ 20; Steinberg Decl. Exs. 13-15. Again, because the Examiner's statement on the description contradicted the above-cited authorities, Plaintiff (through her agent) responded accurately that the installable OTF files emailed to the Examiner were "computer program[s]" under the applicable legal authorities and the "entire work[s]" of Plaintiff. N. Laatz Decl. ¶ 20; Steinberg Decl. Exs. 13-15. The Examiner responded "[t]he compiled version (OTF file) is not an acceptable deposit," but the works could be registered on "approval to change the [descriptions] to 'font data' and confirmation of if it was hand-coded." N. Laatz Decl. ¶ 21; Steinberg Decl. Exs. 13-15. While the Examiner's proposed change contradicts the above-cited authorities, Plaintiff authorized the change and, based on the process described above, stated accurately that she "hand-coded the designs and instructions in the font data." N. Laatz Decl. ¶ 21; Steinberg Decl. Exs. 13-15. Neither the 1992 Decision nor Compendium state that font software must be "hand-coded," and neither these authorities nor the Examiner defined the phrase as applied to such software.

On July 16, 2021, the Copyright Office issued registrations for the BE Software programs, accurately listing Plaintiff as the author. N. Laatz Decl. ¶ 22; Dkts. 89-21 to 89-23.

## C.   The License

On February 16, 2016, Plaintiff began selling limited licenses to the BE Trio and Software on her Creative Market shop. N. Laatz Decl. ¶ 24. A user could pay $20 to download and use the BE Trio and Software with specific limitations. *Id.*; Dkt. 89-36. The Court has already found the

Blooming Elegant License (the "License") included, and Defendants assented to, at least the: (1) Creative Market Terms of Service; (2) Creative Market License Terms ("License Terms"); and (3) Blooming Elegant Offering Page ("Offering Page"). Dkt. 174 at 21.

The License Terms: (a) limit use to "one seat per license"; (b) make it "non-transferable"; (c) prohibit "shar[ing] … in a tool or template"; (d) prohibit making the fonts available on a "shared drive"; and (e) prohibit "publicly display[ing] the [fonts] … without imposing technical or written restrictions to prevent the unauthorized use of the [fonts] by third parties." Dkt. 89-41. The Offering Page stated "The Standard License on Creative Market allows Commercial Use of fonts and add-ons :) Unlimited Sales, Unlimited Projects with only a few exceptions – See https://creativemarket.com/licenses"—the latter was a link to the Creative Market License FAQ ("License FAQ"). Dkt. 89-36. The Offering Page's right side featured another prominent link to the License FAQ, near the Purchase button. And purchasers received an email to download the software containing another link to the License FAQ. N. Laatz Decl. ¶¶ 24, 32; Decl. of J. Laatz ISO Plf.'s Opp. to Defs.' MSJ ("J. Laatz Decl."), Ex. B. The License FAQ stated: "A single Standard License for an Installable Item (Fonts and Add-Ons) covers one user, which we call a seat. Each license can be used to install the purchased Installable Item on up to two computers used by the end user, so long as only one computer is used at a time. … This means that each unique user of the Installable Item requires their own license of the purchased Item." Dkt. 89-37.

### D.    Zazzle's Scheme to Unlawfully Use the BE Software and BE Trio

On November 2, 2016, Zazzle's Senior Product Marketing Manager, Monica McGhie, contacted Plaintiff stating Zazzle wanted to license the BE Software and make the BE Trio available to Zazzle's designers. Ms. McGhie said they "weren't able to find any [licensing] options that address non-personal use," and asked: "Do you offer a license in perpetuity for server-based use?" N. Laatz Decl. ¶ 34, Ex. 1, ¶ 37. Ms. McGhie claims she now only remembers visiting the Offering Page and not the License FAQ or Terms. Ryan Decl. Ex. 4 ("McGhie Dep.") at 52:24-53:2, 58:7-19. But this does not contradict her earlier message, and she could have only known the License did not cover "server-based use" by her or someone else reviewing the License FAQ or Terms. Thus, strong evidence exists that in November 2016, Zazzle knew the License did

1    not cover its intended use. Plaintiff did not respond to Ms. McGhie. Laatz Decl. ¶ 39.

2         Despite knowing the License did not authorize Zazzle's intended use, Zazzle (specifically,

3    Bobby Beaver) instructed Defendant Mohamed Alkhatib ("Alkhatib") to buy the License, which

4    he did on May 4, 2017. Dkt. 49-3 ("Alkhatib Decl.") ¶ 3; Ryan Decl. Ex. 10 ("Alkhatib Dep.") at

5    181:3-19. He executed the License in his name concealing his agency and intended use. Dkt. 102-

6    7 ¶¶ 4-5; Dkt. 102-9; Dkt. 102-10; N. Laatz Decl. ¶¶ 42-54. But Zazzle admits "the Blooming

7    Elegant font was … purchased … by Mohamed Alkhatib … for use on our site." Ryan Decl.,

8    Exs. 1; J. Laatz Decl., Ex. B. Zazzle then illegally copied the BE Software ████████████

9    ████ (Ryan Decl. Ex. 23 ("Beaver Dep.") at 164:7-165:2, 165:25-166:10; Ryan Decl. Ex. 11 at

10   9) and, starting in October 2017, made the BE Trio available to its millions of users in its design

11   tools, providing access to the BE Trio and Software on Zazzle's website for designers and users to

12   use in their designs. Beaver Dep. at 47:6-11-48:19, 49:11-20, 164:7-22; Decl. of D. Garrie ISO

13   Opp. to Defs.' MSJ ("Garrie Decl.") ¶¶ 29-30; Ryan Decl. Ex. 20.

14        **E.      Plaintiff's Discovery of Zazzle's Breach and Abuse of Her IP Rights**

15        Plaintiff first learned of Zazzle's use of the BE Trio and Software when she was contacted

16   by a Zazzle user on August 25, 2020. N. Laatz Decl. ¶ 42, Ex. 2. She promptly contacted Zazzle,

17   who falsely claimed the License purchased by Alkhatib covered their use. *Id.* ¶¶ 43-44; J. Laatz

18   Decl., Exs. A & B. Even after the License's limitations were pointed out, Zazzle continued using

19   the BE Trio and Software. J. Laatz Decl., ¶¶ 4-6, Ex. C.

20        Plaintiff never saw any examples of Zazzle's social media posts and/or marketing emails

21   that allegedly displayed products using the BE Font. N. Laatz Decl. ¶¶ 65, 69-70. And even if she

22   had seen any of them, it would not have raised red flags because designers who buy their own

23   licenses to the BE Trio and Software are permitted to use static images with the fonts on their own

24   products offered through Zazzle. *Id.* Zazzle identifies one other email to John Laatz, not Plaintiff,

25   from an individual mentioning seeing Blooming Elegant somewhere on "Zazzle," but it did not

26   raise any red flags because he did not know what Zazzle was and it could have referred to a static

27   image from a designer with a license. J. Laatz Decl. ¶¶ 2-3. Moreover, it was received in January

28   2020, so it does not impact the statute of limitations analysis whatsoever.

1    **III.    ARGUMENT**

2        **A.    Defendants' Statute of Limitations Arguments Fail**

3            **1.    Defendants Fail to Meet Their Initial Burden of Production**

4        On the statute of limitations affirmative defense, Defendants bear the initial burden of

5    production, as well as the separate burden of persuading the Court that there is no genuine dispute

6    as to any material fact. *Celotex*, 477 U.S. at 331. This burden is "heavy" and requires establishing

7    beyond peradventure all elements of the affirmative defense. *Nationwide Life Ins. Co. v. Bankers*

8    *Leasing Ass'n*, 182 F.3d 157, 160 (2d Cir. 1999). When the movant "fails to carry its initial burden

9    of production," the motion must be denied even if the nonmoving party has not "produce[d]

10    anything." *Nissan Fire Marine Ins. Co. v. Fritz Co.,* 210 F.3d 1099, 1102-03 (9th Cir. 2000).

11        California law subjects a fraud claim to a 3-year statute of limitations, and such a claim

12    does not "accrue[] until the discovery, by the aggrieved party, of the facts constituting the fraud or

13    mistake." CCP § 337(d). Copyright infringement claims must be "commenced within three years

14    after the claim accrued." 17 U.S.C. § 507(b). Such a "claim accrues—and the statute of limitations

15    begins to run—when a party discovers, or reasonably should have discovered, the alleged

16    infringement." *Oracle Am., Inc. v. Hewlett Packard Enter. Co.*, 971 F.3d 1042, 1047 (9th Cir.

17    2020). California law subjects breach of written contract claims to a 4-year statute of limitations.

18    CCP § 337(a). Such claims accrue "when the plaintiff discovers, or could have discovered through

19    reasonable diligence, the injury and its cause." *Angeles Chem. Co. v. Spencer & Jones*, 44

20    Cal. App. 4th 112, 119 (1996). Trademark infringement claims are subject to a 3-year statute of

21    limitations, which begins to run upon actual or constructive knowledge of the wrong. *Karl Storz*

22    *Endoscopy Am., Inc. v. Surgical Techs., Inc.*, 285 F.3d 848, 857 (9th Cir. 2002).

23        Because accrual of each count depends on establishing Plaintiff's knowledge (actual or

24    constructive), Defendants' initial burden of production included establishing this requisite

25    knowledge as a matter of law. But Defendants present no evidence of actual knowledge, and their

26    production fails to establish the absence of a genuine dispute of material fact over purported

27    constructive knowledge. Thus, Defendants did not meet their initial burden and the motion fails.

28        Defendants also failed to meet their initial burden regarding the separate accrual rule. The

"separate-accrual rule" in copyright law provides that "when a defendant commits successive violations [of the Copyright Act], the statute of limitations runs separately from each violation. Each wrong gives rise to a discrete 'claim' that 'accrue[s]' at the time the wrong occurs." *Petrella v. MGM, Inc.*, 572 U.S. 663, 671 (2014). Under California law when "liability arises on a recurring basis, a cause of action accrues each time a wrongful act occurs, triggering a new limitations period," meaning "a suit for relief may be partially time-barred as to older events but timely as to [wrongdoing occurring] within the applicable limitations period." *Aryeh v. Canon Bus. Sols., Inc.*, 55 Cal. 4th 1185, 1192, 1199 (2013). Defendants fail to address with evidence, much less defeat as a matter of law, this rule. For this reason too, their motion fails.

Defendants argue that their wrongful conduct began, and Plaintiff's claims accrued, on October 12, 2017, when Zazzle made the BE Trio available in its Design Tools in excess of its rights. Dkt. 338 at 4-5. But this argument fails because it ignores the discovery and knowledge requirements set forth in the law cited above and does not address the separate accrual rule.

Defendants also argue that from November 2017 to August 2019, Zazzle made social media and blog posts and sent marketing emails they allege Plaintiff received, implying that she therefore knew or should have discovered their wrongful conduct during that period. *Id.* at 4. Zazzle proffers 34 Instagram posts to its account that it claims "depict[ed Blooming Elegant," and as Plaintiff "followed" Zazzle, they speculate the "posts were delivered contemporaneously to her Instagram feed" and "put [her] on actual notice of Zazzle's use." *Id.* at 3, 7-8; Dkts. 338-21 to 338-52. But speculation does not meet Defendants' burden of production. *E.g.*, *Ortega v. Comm'r of Soc. Sec.*, 2020 WL 4747912, at *4 (N.D. Cal. Aug. 17, 2020). Nor does it establish the requisite actual or constructive knowledge as a matter of law. In addition to not showing the posts were ever actually in Plaintiff's Instagram feed and observed by her, such posts do not reveal if the design being shown was made by a designer who had their own license to use the BE Trio and Software.

Defendants proffer eight blog posts that they claim "depict[ed Blooming Elegant." Dkt. 338 at 3; Dkts. 338-13 to 338-20. But again, they fail to identify non-speculative, competent evidence that Plaintiff actually saw any of these, and they also do not establish constructive knowledge as a matter of law since the posts do not reveal whether the designs were created by a

1    designer who had their own license to use the BE Trio and Software.

2    Regarding emails, Defendants claim "Plaintiff received at least 677 emails from Zazzle

3    during the limitations period, including at least 48 that included images of products featuring BE,"

4    and "Zazzle's records reflect that Plaintiff opened at least 32 of these marketing emails." Dkt. 338

5    at 3, 8. Here, Defendants seek to mislead the Court and fail to meet their burden in three ways:

6    (1) a close comparison reveals no overlap between the 48 emails Zazzle claims included images of

7    products featuring Blooming Elegant, and the 32 emails they claim Plaintiff opened (*compare* Dkt.

8    338-100 ¶ 7, *with id.* ¶ 5), so Zazzle's data actually shows she never saw any email depicting

9    Blooming Elegant; (2) the data purportedly showing emails were "opened" does not mean they

10   were opened by Plaintiff (versus automatically downloaded but sent to trash); and (3) the emails

11   contain images which could have been created by a designer who had a license to use the BE Trio

12   and Software, such that they would not have put her on notice of Defendants' wrongdoing.

### 2.    Defendants' Fraudulent Concealment and California's Delayed
### Discovery Rule Tolled the Statute of Limitations

15   Defendants' statute of limitations argument ignores the tolling effect of their fraudulent

16   concealment and fails to properly address tolling under California's delayed discovery rule.

17   When a defendant's "liability accrues by reason of fraud, the statute [of limitations] will

18   not run until the fraud is discovered." *Pashley v. Pac. Elec. Co.*, 25 Cal. 2d 226, 229 (1944).

19   Claims are tolled when a principal "use[d] [an undisclosed agent's] name to cloak" the principal's

20   tort. *Gregory v. Spieker*, 110 Cal. 150, 153 (1895). Here, Zazzle used Alkhatib to purchase a one

21   seat license in his own name and concealed that it was for Zazzle's illicit use. Plaintiff had no

22   reason to know this until Zazzle claimed on August 26, 2020 that an employee had purchased a

23   license, and on January 21, 2021 when it first presented a receipt for the License. N. Laatz Decl.

24   ¶¶ 43-54; J. Laatz Decl. ¶ 6. As in *Gregory*, Zazzle "use[d] [Alkhatib's] name to cloak [Zazzle's]

25   movements" and intent. *See Acme Paper Co. v. Goffstein*, 125 Cal. App. 2d 175, 179 (1954).

26   Defendants argue Alkhatib did not "fail to disclose his [agency]" because he used his

27   Zazzle.com email address on Creative Market. Mot. at 16:5-6. But Creative Market does not

28   provide purchaser email addresses to Plaintiff. N. Laatz Decl. ¶¶ 46-48; Ryan Decl. Ex. 9

1   ("Reynaud Dep.") at 174:7-17. Further, merely using his work email address does not reveal an

2   agency relationship in the purchase, nor that, contrary to his representations, Defendants intended

3   to use the fonts in violation of the License. Even still, "[i]t is not the third person's duty" to

4   investigate whether an agency relationship exists. *W.W. Leasing Unltd. v. Comm. Stand. Title Ins.*

5   *Co.*, 149 Cal. App. 3d 792, 795 (1983). "[T]he duty to disclose the identity of the principal is on

6   the agent." *Id.* Zazzle did not disclose that it had secretly purchased a license via Alkhatib until

7   January 21, 2021. This fraudulent concealment tolled the statutes of limitations until that date.

8       The limitations period as to Plaintiff's claims was alternatively tolled until at least August

9   25-26, 2020, when she first learned of Zazzle's use of her fonts, under the delayed discovery rule.

10  "[U]nder California's delayed discovery rule, 'a cause of action will not accrue until the plaintiff

11  discovers or should have discovered, through the exercise of reasonable diligence, all the facts

12  essential to the cause of action.'" *Roches v. Cnty. of Santa Clara*, 2018 WL 3344647, at *4 (N.D.

13  Cal. Jul. 9, 2018). Likewise, under federal law, "[t]he duty of diligence does not create a duty to

14  continuously monitor" a licensee "to ensure compliance with its obligations, absent any reason to

15  otherwise suspect a breach. The law does not inject such paranoia into the licensor-licensee

16  relationship. [] '[I]t would be unreasonably burdensome to impose on a copyright owner a never

17  ending obligation to discover whether anyone to whom he ever supplied his [IP] would copy it.'"

18  *Starz Entm't, LLC v. MGM Dom. TV Dist., LLC*, 510 F. Supp. 3d 878, 888 (C.D. Cal. 2021).

19      In *Starz*, in August 2019, a Starz employee discovered an MGM movie streaming on

20  Amazon in breach of the license. *Starz*, 510 F. Supp. 3d at 881. MGM then "admitted that it had

21  improperly licensed 244 titles to third parties." *Id*. MGM argued Starz could have detected the

22  breach as early as 2015 by looking on Amazon. *Id.* at 888-89. The court held Starz's claims were

23  timely due to the difficulty in determining if streaming was done pursuant to an authorized license.

24  *Id.* The court noted that many courts have declined to charge plaintiffs with inquiry notice in more

25  "open and notorious" cases of infringement, citing *Free Speech Sys., LLC v. Menzel*, 390 F. Supp.

26  3d 1162, 1170-71 (N.D. Cal. 2019) (plaintiff's photographs available on defendant's website);

27  *BMG Rights Mgmt. (US) LLC v. Glob. Eagle Entm't Inc.*, 2019 WL 4544424, at *4 (C.D. Cal.

28  Aug. 20, 2019) (infringing music playlists available on airlines flown by plaintiff's executives).

Here, far greater difficulty exists given that Plaintiff has sold hundreds of thousands of licenses to her fonts, including tens of thousands of licenses in 2017 alone. N. Laatz Decl. ¶ 47. It is unreasonable for Defendants to argue that Plaintiff should have somehow monitored all her licensees, including Alkhatib, as well as their employers.

Defendants' cited cases support the application of the discovery rule here. *Wakefield v. Wells Fargo & Co.* 2014 WL 5077134 (N.D. Cal. Oct. 9, 2014) held the rule was properly applied in cases involving misrepresentation. Here, Alkhatib misrepresented he would comply with the one seat license agreement in making his purchase. Likewise, *Perez-Encinas v. AmerUs Life Ins. Co.*, 468 F. Supp. 2d 1127, 1134 (N.D. Cal. 2006) held the discovery rule applies where, as here, the harm from contract breaches is not "reasonably discoverable by plaintiffs until a future time."

Nothing in Zazzle's papers establishes that Plaintiff knew or should have discovered all facts essential to each (or any) cause of action. The emails from Zazzle never reached Plaintiff's inbox nor were read by her. N. Laatz Decl. ¶¶ 69-73; Garrie Decl. ¶¶ 8-13. Moreover, emails with static images using the fonts do not reveal nor give rise to a reason to believe they were created by someone who had not purchased a single-seat license. N. Laatz Decl. ¶ 65. Simply put, "it is unreasonable to expect a contracting party to continually monitor whether the other party is performing some act inconsistent with one of the many possible terms." *Gruczman v.4550 Pico Partners, Ltd.*, 107 Cal. App. 4th 1, 5 (2003). Thus, Zazzle's blame-the-victim strategy fails.

### 3.    The Separate-Accrual Rule Precludes Defendant's MSJ

The "separate-accrual rule" in copyright law provides that "when a defendant commits successive violations [of the Copyright Act], the statute of limitations runs separately from each violation. Each time an infringing work is reproduced or distributed, the infringer commits a new wrong. Each wrong gives rise to a discrete 'claim' that 'accrue[s]' at the time the wrong occurs." *Petrella*, 572 U.S. at 671. Thus, even if Defendants had shown that a portion of Plaintiff's claims accrued earlier than August 25, 2020 (they have not), she is at least entitled to copyright infringement damages for the three years preceding her filing the Complaint to ████████, the last date on which Zazzle admits users could use the BE Trio to depict text in the design tools. *See Petrella*, 572 U.S. at 686-87 (three years of damages available regardless of when plaintiff

1    becomes aware of ongoing copyright infringement); Ryan Decl. Ex. 20; Garrie Decl. ¶¶ 26-30

2    (establishing that Zazzle provided users with access to and ability to run the BE Software).

3        California law also provides that when "liability arises on a recurring basis, a cause of

4    action accrues each time a wrongful act occurs, triggering a new limitations period," meaning "a

5    suit for relief may be partially time-barred as to older events but timely as to [wrongdoing

6    occurring] within the applicable limitations period." *Aryeh*, 55 Cal. 4th at 1192, 1199. Because the

7    License covered only one seat for one user, Zazzle breached it and triggered new limitations

8    periods each time it provided a user with access to and/or use of the BE Trio and Software. Ryan

9    Decl. Ex. 20. Thus, even if Defendants had shown a portion of Plaintiff's claims accrued prior to

10   August 25, 2020 (they have not), their motion fails since it does not eliminate all recovery,

11   particularly for contract breaches from the four years preceding the Complaint to March 13, 2023.

12   **B.    Defendants' MSJ on Plaintiff's Fraud Claims Fails**

13       **1.    Defendants Misstate the Law Regarding Promissory Fraud**

14       To prove fraud, Plaintiff need only prove Zazzle acted "recklessly and without regard for

15   the[] truth in order to induce action." *Engalia v. Permanente Med. Grp., Inc.*, 15 Cal. 4th 951, 974

16   (1997). Statements made with reckless disregard for their truth "are the equivalent of

17   misrepresentations knowingly and intentionally uttered." *Id.*

18       Here, at a minimum, Defendants acted with reckless disregard as to whether they intended

19   to comply with the License. Zazzle admits it always intended—even before buying the License—

20   to place the BE Trio in its design tools on its website for its users to access and use. Ryan Decl.

21   Ex. 21 ("Liu 30(b)6 Dep.") at 87:1-25. Multiple Zazzle employees admitted reviewing the

22   Offering Page before Zazzle bought the License, ***including*** language stating the license permitted

23   "Commercial Use" with "a few exceptions" (McGhie Depo at 165:4-167:13; Ryan Decl. Ex. 8

24   ("Sheu Dep.") at 45:2-48:7), followed by a link to the License FAQ (which linked to the License

25   Terms) stating, inter alia, that the License was limited to "one seat" or "one user." Dkt. 89-36.

26   Defendants' willful-blindness defense that Zazzle employees only read the Offering Page, but

27   studiously avoided clicking that link, is both implausible, given Zazzle's request for a different

28   type of license than was offered, and an admission of liability, as it constitutes reckless disregard.

Further, seven other Zazzle employees, including in-house counsel Liana Larson, received an email with a link to the Offering Page, two days before Alkhatib bought the License. Ryan Decl. Ex. 5. Larson confirmed she ███████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████ Ryan Decl. Ex. 13 ("Larson Dep.") at 21:15-23, 43:7-45:3. She was also the only one ███████████████████████████████████████████████ █████████ *Id.* at 35:1-9. Yet, she ███████████████████████████████████████████ ████████████████████████████████████████████ *Id.* at 42:5-18. Alkhatib similarly was "not sure" anyone at Zazzle reviewed the terms of the License before buying it. Alkhatib Dep. at 92:8-23. At a minimum, Zazzle acted recklessly as to whether it knew its intended use of the BE Trio and Software would comply with the terms of the License.

### 2. There Is Evidence Zazzle Engaged in All Three Forms of Fraud

Zazzle's Motion rests on the false claim that it is "undisputed that the only terms relating to the BE license that any Zazzle employee was aware of before purchasing the license were those on the BE Offering Page stating that the purchaser could 'Use This Font For: Commercial use, Unlimited Number of Projects, [and] Unlimited End Products for Sale.'" Dkt. 338 at 12:10-13. But the evidence demonstrates that a reasonable jury could conclude otherwise for several reasons.

***First***, Defendants' claim that no Zazzle employee ever read License Terms or FAQ before Alkhatib purchased the License is solely based on self-serving testimony about events from over seven years ago. Yet, neither Zazzle, nor any of its employees who visited or received a link to the Offering Page (which linked to the License FAQ, which linked to the License Terms) reviewed their web browser histories to see if they visited the License FAQ or Terms. Liu 30(b)(6) Dep. at 20:15-28:25. Further, Zazzle set up a folder labeled "Fonts – Legal" to collect font licensing information for the licenses Alkhatib purchased on May 4, 2017; yet Zazzle claimed it could not determine whether the folder ever contained copies of the License Terms or FAQ. *Id.* at 80:11-81:14. Instead, Zazzle relied on a screen shot of the folder ***created after this dispute began*** and which shows ***the contents were altered after this dispute began*** to claim that no employee ever copied the License Terms or FAQ into the folder. *Id.*; Ryan Decl. Ex. 22. Moreover, as explained

1  above, the only plausible explanation for Ms. McGhie's 2016 message asking Plaintiff if she

2  offered licenses for "server-based use" is that she or others reviewed the License FAQ or Terms at

3  that time and saw the prohibitions on such use. Thus, Zazzle's claim no employee reviewed the

4  License Terms or FAQ rests entirely on witness credibility, which cannot be assessed on summary

5  judgment. *Zetwick v. County of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017).

6        ***Second***, Zazzle engaged in fraud with respect to ███████████████████████

7  ██████████████████. On that day, Alkhatib also ███████████████████████████

8  ██████████████████ Alkhatib Dep. at 208:9-209:19. Alkhatib confirmed ████████████

9  ███████████████████ (Ryan Decl. Ex. 12 ), yet he ███████████████████████████

10  ███████████████████████████████████ Ryan Decl. Ex. 14. As Alkhatib

11  confirmed, ████████████████████████████████████████████. Alkhatib

12  Dep. at 140:11-142:5; Ryan Decl. Ex. 11 (Alkhatib Dep. Ex. 188). Before buying ███████

13  ████████████████████████████████████████████. Ryan Decl. ¶ 12,

14  Exs. 15-18. Thus, ██████████████████████████████████████████████████

15  ██████████████████████████████████████████████████████████.

16        Defendants' attack on Plaintiff's fraudulent misrepresentation and fraudulent concealment

17  counts also fails. Plaintiff alleges Zazzle and Alkhatib "misrepresented … the [] License was to be

18  used in accordance with the terms of the [] License, including that it was for a single user named

19  Mohamed Alkhatib." Dkt. 82 ¶ 176. She also alleges Zazzle and Alkhatib concealed "Alkhatib's

20  employment agency relationship" and Defendants' "true intention … to allow Zazzle to install the

21  [BE] Trio and [BE] Software on its servers [and] roll it out to Zazzle's entire user base." *Id.*

22  ¶ 185(a) & (b). Ample evidence supports these allegations.

23        For instance, Alkhatib bought the License in his own name. Although he used his Zazzle

24  email address to purchase the License, this was not viewable on his Creative Market account nor

25  provided to Plaintiff. Reynaud Dep. at 174:7-17. Buyers who license Plaintiff's fonts via Creative

26  Market sometimes indicate if the purchase is for an entity by including its name in one of the

27  name fields on their Creative Market account (N. Laatz Decl. ¶ 51), but not Alkhatib. Further,

28  Defendants admit they did not, at any point, disclose to Plaintiff that their intent in buying the

License was to install the BE Software on Zazzle's servers and "roll [the BE Trio] out to Zazzle's entire user base." Dkt. 338 at 10:24-27 ("[N]othing at all was communicated to Plaintiff when Mr. Alkhatib purchased the license for Zazzle."). At minimum, a reasonable jury could conclude that Zazzle knowingly made false representations and concealed information it had a duty to disclose.

C.    **Defendants' MSJ on Plaintiff's Copyright Infringement Claims and Defendants' Copyright Invalidity Defense Fails on Both Counts**

1.    **Defendants' MSJ Fails Since It Is Founded on Misstatements of Law**

a.    **The Copyright Office Regulation and Decision, and *Adobe* Case**

The Code of Federal Regulations provides that "[t]ypeface as typeface" is "not subject to copyright." 37 C.F.R. § 202.1(e). But, in adopting the latter, the Copyright Office also clarified its "practices regarding registration of claims to copyright in computer programs used in the generation of digitized representations of typeface designs." Registrability of Computer Programs That Generate Typefaces, 57 FR 6201-01, 1992 WL 29306, Feb. 21, 1992 (the "1992 Decision"). The Office noted that "applications stating claims for computer programs used in conjunction with the generation or design of typeface … indicated there had been a significant technological advance." *Id.* at 6201. It held a public hearing and received submissions (*id.* at 6202), including presentations by Adobe demonstrating its font development process and use of a visual font editing program to create the software to render digital fonts, and that such software used vector outlines to draw each letter. Phinney Decl. ¶¶ 38-45. Based thereon, the Office decided:

> [C]omputer programs designed for generating typeface in conjunction with low resolution and other printing devices may involve original computer instructions entitled to protection under the Copyright Act. For example, the creation of scalable font output programs to produce harmonious fonts consisting of hundreds of characters typically involves many decisions in drafting the instructions that drive the printer. The expression of these decisions is neither limited by the unprotectible shape of the letters nor functionally mandated. This expression, assuming it meets the usual standard of authorship, is thus registrable as a computer program.

*Id.* at 6202. The Copyright Office decided that in registering such works, "descriptions such as

1    'computer program' should be used" by applicants. *Id.* at *6201-02.

2         *Adobe Sys., Inc. v. S. Software, Inc.*, the seminal case on the 1992 Decision, granted

3    summary judgment for a plaintiff for infringement of "font software programs." 1998 WL 104303,

4    *1 (N.D. Cal. 1998). Adobe bought "digitized font files from third parties," thereby "obtain[ing] a

5    digital representation of the x and y coordinates for the glyphs which [were] translated into

6    Adobe's font coordinate system." *Id.* "An Adobe editor then display[ed] and manipulat[ed] the on-

7    curve and off-curve reference points of each displayed glyph altering its outline … to efficiently,

8    aesthetically and accurately render the appearance of each glyph." *Id.* Adobe compiled the

9    coordinates and instructions into "files [that] determine the ultimate image that is displayed." *Id.*

10        In considering if "the material at issue [wa]s protectable expression," the court noted "[a]

11   computer program is defined by the Copyright Act as 'a set of statements or instructions to be

12   used directly or indirectly in a computer to bring about a certain result.'" *Id.* at *3. "The fact that a

13   computer program produces unprotectable typefaces does not make the computer program itself

14   unprotectable." *Id.* The defendants claimed "the numerical reference points that define an outline

15   of a glyph are unprotectable as a matter of law," and thus "'merely manipulating an unprotectable

16   font image to create another, slightly different … font image cannot possibly give rise to

17   protectable expression.'" *Id.* at *4. They argued that "because the output is not protected and there

18   cannot be any creativity in what the editor does to obtain the output, nothing is protectable." *Id.*

19   Adobe asserted "while the shape of the glyph necessarily dictates some [but not all] of the points

20   to be chosen to create the glyph, … each rendering of a specific glyph requires choices by the

21   editor as to what points to select and where to place those points." *Id.* Adobe argued "the selection

22   of points and the placement of those points [by its editors] are expression which is copyrightable

23   in an original font output program. The actual code is dictated by the selected points." *Id.*

24        The court noted that "[t]o qualify for copyright protection, a work must be original,"

25   meaning "the work was independently created … and [] possesses at least some minimal degree of

26   creativity." *Id.* at *5. "[T]he requisite level of creativity is extremely low; even a slight amount

27   will suffice"—"no matter how crude, humble or obvious it might be." *Id.* Applying this standard,

28   the court held that while "the glyph dictates to a certain extent what points the editor must choose"

there "is some creativity in designing the font software" because "it does not dictate every point that must be chosen." *Id.* As such, the "editors make creative choices as to what points to select based on the image in front of them on the computer screen." *Id.* "The code is determined directly from the selection of the points. Thus, any copying of the points is copying of literal expression, that is, in essence, copying of the computer code itself." *Id.* The fact that the requisite "creativity is involved is illustrated by the fact that two independently working programmers using the same data and same tools can produce an indistinguishable output but will have few points in common." *Id.* As such, "Adobe['s] font software programs" were "protectable original works." *Id.*

> **b.** **There Are No Requirements That Font Software be Described as "Font Data," Nor "Hand-Coded" or "Manually Typed," Nor Created Without a Visual Font Editing Program**

Defendants ignore both the 1992 Decision and *Adobe*. Instead, contradicting both the law and Copyright Office custom and practice, Defendants argue that: (1) font software can "no longer" be protected or registered as a "computer program," only "font data"; (2) to be entitled to copyright protection and registration, such software or data must be "hand-coded," which they narrowly define as "manually typed"; and (3) font software created using a visual font editing program like FontLab is not eligible for copyright protection and registration. Dkt. 338 at 14-18; Dkt. 338-150 ¶¶ 15-17, 37-48. Defendants' purported support consists of: (a) correspondence from the Examiner who evaluated Plaintiff's applications; (b) parts of the Compendium applicable to HTML, not font software; and (c) Defendants' expert's opinions based on the Examiner's statements, Compendium, and his own definition of "hand-coding." *Id.* These arguments fail.

As shown above, the 1992 Decision states that software for rendering fonts should be described as a "computer program." Nowhere does that decision nor *Adobe* state that such software should be described as "font data," nor that it must be "hand-coded," "manually typed," or created without a visual font editing program to be copyrightable and registrable. The Examiner's statements do not change this for several reasons.

*First*, his legal interpretations are irrelevant and do not have "the force of law," as inferior officers such as he are entitled to no deference. *Boyds Coll., Ltd. v. Bearington Coll., Inc.*, 365 F.

1   Supp. 2d 612, 616 (M.D. Pa. 2005). Rejection by an individual examiner is subject to two more

2   layers of review before the Copyright Office has been deemed to officially act. 37 C.F.R. § 202.5.

3   This internal process never took place here. And even when this process is complete, courts do not

4   defer, but must "make an independent determination as to copyrightability." *UAB "Planner5D" v.*

5   *Facebook, Inc.*, 534 F. Supp. 3d 1126, 1134-35 (N.D. Cal. 2021).

6          *Second*, while the Examiner asked if the BE Software was "hand-coded by a human

7   author" rather than "merely generated by a font program," nowhere did he define this as requiring

8   only manual typing and no use of a visual font editing program like FontLab to set and manipulate

9   reference points for glyphs. Steinberg Decl. Exs. 13-15. Indeed, it was apparent from the deposits

10  that the BE Software was created using FontLab because as Defendants admit, the code said

11  "Generated by: FontLab" (Dkt. 49 at 17:28-18:3) and the Examiner issued registrations.

12  Moreover, the requirements Defendants argue for would be inconsistent with: (1) understanding,

13  custom, and practice in the font industry over the past 25+ years (Phinney Decl. ¶¶ 58-79); (2) the

14  fact that before and after Plaintiff obtained her registrations, the Copyright Office issued

15  registrations for font software created using FontLab and Fontographer (Decl. of S. Sandler ISO

16  Opp. to Defs.' MSJ ("Sandler Decl.") ¶¶ 49-51, Ex. 1); and (3) the field of computer science, in

17  which "coding" refers to a variety of forms of input, include visual. Garrie Decl. ¶¶ 31-37.

18         Even if the Examiner purported to amend or repeal the 1992 Decision or change Copyright

19  Office practices, the decision governs. While "it is within the power of [an] agency to amend or

20  repeal its own regulations [an] agency is not free to ignore or violate its regulations while they

21  remain in effect." *U.S. Lines, Inc. v. Fed. Maritime Comm'n*, 584 F.2d 519, 527 n.20 (D.C. Cir.

22  1978). Rather, it "is bound by its [existing] regulations" until it repeals them or "Congress changes

23  the law." *Portland Gen. Elec. v. Bonneville Power Admin.*, 501 F.3d 1009, 1035 (9th Cir. 2007).

24         The Compendium also does not support Defendants' arguments. Section 723 on

25  "Computer Programs That Generate Typeface" tracks the 1992 Decision and *Adobe*. It states that

26  "[a] computer program that generates … a particular typeface … may be registered if the program

27  contains a sufficient amount of original authorship in the form of … instructions to a computer."

28  *Id.* For instance, "creating a scalable font output program that produces harmonious fonts

consisting of hundreds of characters may require numerous decisions in drafting the instructions

that drive a printer or other output device. If this expression contains a sufficient amount of

original authorship, the work may be registered as a computer program." *Id.* And "[c]omputer

program' is the most appropriate term for registering a claim in this type of work." *Id.*

Nowhere does the Compendium state that font software must be "hand-coded," "manually

typed," or that use of a visual font editing program to set and manipulate reference points and

compile them with other instructions in a font software program precludes registration. Instead,

Defendants and their expert rely on a section of the Compendium that covers "Hypertext Markup

Language (HTML)" and states HTML must be "hand-coded" rather than "generated by website

design software" to be registrable, and that it cannot be registered as a "computer program." Mot.

at 13-15 (citing § 1006.1(A)). Defendants argue, without support, that the Copyright Office now

applies these requirements to fonts. *Id.* Importing a hand-coding requirement from one part of the

Compendium to a different part where it does not appear, violates fundamental rules and canons of

construction. Where, as here, "an agency includes language in one section" and "omits it in

another, it is reasonable to presume that the agency acted intentionally in forgoing the language."

*U.S. v. Approx. 64,695 Lbs. of Shark Fins*, 520 F.3d 976, 983 (9th Cir. 2008).

The Copyright Office's statement that HTML must be "hand-coded," without including

such phrase as a requirement to register any other type of "computer program," including font

software, shows no such requirement exists. And Defendants' claim that the Copyright Office no

longer registers font software as computer programs contradicts the 1992 Decision, the

Compendium, and Copyright Office practices in registering such software. Sandler Decl. ¶¶ 49-51.

## 2. The BE Software Is Copyrightable and Was Properly Registered

Plaintiff's testimony on how she designed and created the BE Software summarized above

and in more detail in her declaration, and Mr. Phinney's analysis of such testimony as well as the

software files themselves, show that her creation met standards set forth in the 1992 Decision and

*Adobe*. N. Laatz Decl. ¶¶ 5-15; Phinney Decl. ¶¶ 33-53. In sum, Plaintiff created the BE Software

just as the Copyright Office considered in issuing its 1992 Decision, as *Adobe* found to be

copyrightable, and as the Office has approved for registration of software for numerous fonts both

1    before and after the BE Trio. Phinney Decl. ¶ 53; Sandler Decl. ¶¶ 49-50.

2        Defendants argue that FontLab actually "assigned" and "adjusted" the coordinates, and

3    "authored" the BE Software making it ineligible for registration (Dkt. 338 at 16-18), as if

4    Plaintiff's 100+ hours of human creativity and input to adjust and perfect each glyph meant

5    nothing. This is nonsensical, and akin to arguing Microsoft Word authored briefs written using

6    such software, Adobe Photoshop authored photos processed using such software, or that

7    GarageBand authored songs written or recorded using such software. At a minimum, Plaintiff's

8    and her experts' testimony raises genuine issues of material fact to be resolved by a jury.

9        In applying to register her copyrights to the BE Software, Plaintiff was required to deposit

10   human readable printouts of source code as representations of the executable software program

11   files. The Compendium states that "[t]o register a computer program that generates typeface,

12   typefont, letterform, or barcodes, the applicant must submit a portion of the source code for that

13   program. … For a discussion of the deposit requirements for computer programs, see Chapter

14   1500, Section 1509.1(F)." Compendium § 723. It further explains that "[t]he U.S. Copyright

15   Office considers source code to be the best representation of the copyrightable authorship in a

16   computer program. The Office generally discourages applicants from submitting object code,

17   because it cannot be examined for copyrightable authorship." Compendium § 1509.1(F). "The

18   source code should be submitted either on paper or in an electronic file in a form that is

19   perceptible to the human eye without the aid of a machine or device." *Id.*

20       Plaintiff did what was required by opening the OTF files for the BE Software in FontLab

21   and exporting them as VFJ files, a "human-readable" "source file format," and printing them to

22   PDFs for submission to the Copyright Office. N. Laatz Decl. ¶¶ 16; Phinney Decl. ¶¶ 46-53. To

23   avoid any doubt the VFJ files were "representations" of actual executable and installable computer

24   programs for rendering fonts, she also sent the OTF files to the Examiner. N. Laatz Decl. ¶¶ 20.

25   The VFJ files and corresponding OTF executable files are functionally equivalent, as either can be

26   opened in FontLab and used to create the other format. Phinney Decl. ¶ 47.

27       Defendants further assert that even if the copyrights are valid, they only cover the VFJ

28   source code files deposited with the Copyright Office, which they never had access to. Dkt. 338 at

21. As noted above, the Copyright Office requires the deposit of human-readable source code, not object code. But both case law and Copyright Office guidelines state that "source code and object code as two representations of the same work" and a registration covers both. Compendium § 721.5; *accord GCA Corp. v. Chance*, 217 U.S.P.Q. 718, 719-20 (N.D. Cal. 1982). Like here, in *GCA Corp.*, the defendants argued that the plaintiff's copyrights only protected the source code, not the object code. 217 U.S.P.Q. at 719-20. The court rejected this, holding that "[b]ecause the object code is the encryption of the copyrighted source code, the two are to be treated as one work; therefore, copyright of the source code protects the object code as well." *Id.* Thus, the defendants' "copying of the operating programs" constituted infringement. *Id.* Similarly, in *Data General Corp. v. Grumman Sys. Support Corp.*, the defendant argued the plaintiff could not show "a link between the object code programs copied by [the defendant] and the source code programs registered with the copyright office" by the plaintiff. 803 F. Supp. 487, 490 (1992). But the court held the plaintiff's software was "protected from unauthorized copying, whether from its object or source code version." *Id.* Thus, copying of "either the source or object code representation" of the software program could show infringement. *Id.* at 490-91.

Here, the VFJ source code files that Plaintiff deposited with the Copyright Office correspond to the executable OTF object code files for the BE Software. Defendants admit they copied the OTF files ████████████, thereby making the software available to be used by Zazzle's millions of users. Garrie Decl. ¶¶ 26-30; Ryan Decl. Ex. 11.

### 3.    Defendants' MSJ on Their Copyright Invalidity Defense Fails

Defendants fail to show Plaintiff provided any information to the U.S. Copyright Office that was inaccurate, or even if it were, that she knew it was both factually inaccurate <u>and</u> failed to comply with legal requirements. At minimum, genuine disputes of material fact exist as to alleged inaccuracies and Plaintiff's knowledge that preclude summary judgment, and do not justify even reaching the secondary issue of materiality, though this issue should also be resolved in her favor.

"[A] party seeking to invalidate a copyright registration under § 411(b) must demonstrate that (1) the registrant submitted a registration application containing inaccuracies, (2) the registrant knew that the application failed to comply with the requisite legal requirements, and

(3) the inaccuracies in question were material to the registration decision by the Register of Copyrights." *Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*, 52 F.4th 1054, 1067 (9th Cir. 2022). "Lack of knowledge of either fact or law can excuse an inaccuracy in a copyright registration." *Unicolors*, 595 U.S. at 182. Thus, "prior to making a materiality determination, a court must assess if the registrant submitted his application with knowledge that the information was factually inaccurate <u>and</u> with knowledge that the application failed to comply with the governing legal requirements." *Unicolors*, 52 F.4th at 1065 (underline added).

Defendants claim Plaintiff falsely represented she "hand-coded" (which <u>Defendants</u> define as "manually typed") the BE Software code she sought to register, and failed to disclose she used a font editing program. Dkt. 338 at 18-21. Neither claim is supported by the evidence.

In corresponding with the Examiner, Plaintiff stated that she "hand-coded the designs and instructions in the font data that we submitted as a pdf file," by which she was referring to the process described above, including setting and adjusting reference points for each glyph by hand using her stylus, setting values for font-wide variables, and manually typing and inserting custom code to implement ligatures (letter combinations) and stylistic alternate letters. N. Laatz Decl. ¶¶ 5-15; Phinney Decl. ¶¶ 46-53; Steinberg Decl. Exs. 13-15. She also disclosed that she created "an OTF installable computer program file" for each font, and that "the PDF file that [she] initially submitted … was generated by a font program in a sense, but it also reflects Plaintiff's original creative work." N. Laatz Decl. ¶ 19; Steinberg Decl. Exs. 13-15. And as Defendants admit, the PDF files themselves stated they were "Generated by: FontLab." Dkt. 49 at 17:28-18:3.

Nowhere did Plaintiff (or the Examiner) define "hand-coded" to mean she "manually typed" each coordinate or other part of the code in the PDF files and/or BE Software and did not use a visual font editing program as described above. Defendants' strained reading is not only inconsistent with Plaintiff's understanding, but also the font industry's understanding, and the Copyright Office custom and practice in registering numerous fonts created using FontLab both before and after Plaintiff's applications were filed and approved. Sandler Decl. ¶¶ 34-48.

Even if Defendants could show Plaintiff's use of the phrase "hand-coded" was inaccurate, there is no evidence she knew it was factually inaccurate <u>and</u> that unless she "manually typed"

every coordinate and other code underlying her font software, it was ineligible for registration. Indeed, Plaintiff knew that neither "hand-coding" nor "manual typing" are stated requirements in the 1992 Decision or the Compendium. Similarly, even if Defendants could show Plaintiff insufficiently disclosed her use of FontLab to create the BE Software, there is no evidence she knew it was factually inaccurate <u>and</u> that such use would preclude registration. In fact, there were numerous examples of font software where use of FontLab or a similar visual font editing program was disclosed on the face of the application and registrations were issued. Sandler Decl. ¶¶ 49-51. So, she had no reason to believe her use of such a program precludes registration.

There are at least genuine issues of material fact as to whether any of Plaintiff's statements were inaccurate, her knowledge and understanding about the alleged factual inaccuracy, and whether it would preclude registration of her copyrights.

### D.    Defendants' MSJ on Plaintiff's Breach of Contract Claim Fails

#### 1.    There Are Triable Issues as to the Terms and Meaning of the License

To begin, Defendants misrepresent the Court's prior ruling by falsely claiming the Court "rejected Plaintiff's claim that there was mutual assent to the 'License FAQ' document." Dkt. 338 at 22. Rather, the Court found Plaintiff—long before completion of fact discovery—had not ***yet*** "established Defendants' assent to any terms contained in the License FAQ." Dkt. 174 at 15.

Defendants' assertion that "all the evidence shows that Zazzle had no notice of, nor assented to, the License FAQ" is equally misleading. Zazzle employees Monica McGhie and Catherine Sheu both reviewed the Offering Page prior to purchase. McGhie Dep. at 165:4-167:13; Sheu Dep. at 45:2-48:7. The Offering Page featured two prominent links to the License FAQ, including that which was immediately after language stating that the License allowed "Unlimited Sales, Unlimited Projects ***with only a few exceptions***." Dkt. 89-36. At least one Zazzle employee admitted reading this language and the link. Sheu Dep. at 45:2-48:7. Ms. McGhie, in turn, ███

███████████████████████████████████████████. Ryan Decl. Ex. 5. And on the day Alkhatib bought the License, ████████████████████████████████████████████ ████████████████████████. Ryan Decl. Ex. 12 (Alkhatib Dep. Ex. 190).

The only evidence Defendants cite in support of their claim they did not assent to the License FAQ consists of self-serving testimony from Zazzle's employees regarding events that happened over seven years ago. Dkt. 338 at 22. But these employees agreed their recollection was hindered by the passage of time. *E.g.*, McGhie Dep. at 184:23-24; 188:17-19; Sheu Dep. at 86:5-7; 88:11-20. Moreover, no employee reviewed their browser history to see if they ever accessed the License FAQ webpage. Nor did any Zazzle employee ever determine if the "Fonts – Legal" Google folder that Zazzle used to collect licensing information for the fonts Alkhatib purchased on May 4, 2017 ever contained a copy of the License FAQ. Liu 30(b)(6) Dep. at 80:11-81:14. Thus, Zazzle's evidence rests entirely on the credibility of its own witnesses, including Alkhatib's assertion that he did not review the License FAQ but did ███████████████████████████ ██████████████████████████████.

Even if there was no genuine dispute of material fact as to whether Zazzle assented to the License FAQ, there are still disputes as to the interpretation of the terms of the License. Zazzle itself claimed "the [License] as Plaintiff defines it is ambiguous, but the license as Zazzle defines it is not ambiguous." Ryan Decl. Ex. 2 (Zazzle 2d Amended Resp. to RFAs, Set One) at 86.

### 2.    There Are Triable Issues as to Whether Zazzle Breached the License

Bafflingly, Zazzle no triable issues exist regarding its breach of the License. But it flagrantly violated numerous License Terms—which the Court held are part of the License.

*First*, the License stated that Plaintiff granted the licensee "a non-exclusive, ***non-transferable right to use***, modify, and reproduce the Item worldwide." Dkt. 89-41 (emphasis added). Zazzle's 30(b)(6) representative Jason Li testified ████████████████████████ ████████████████████████████████████████████████████████████████████ ███████████████████████. Ryan Decl. Ex. 7 ("Li Dep.") at 130:17-139:15; Garrie Decl. ¶¶ 26-28. Thus, Zazzle gave every person who accessed Zazzle's design tool (while the BE Trio was available) the ability to use the BE Software in violation of the License. Garrie Decl. ¶ 30.

*Second*, consistent with the above term, the License Terms state "Installable Items" (including "fonts") "may be used in an unlimited number of Projects ***on a one seat per license basis***." Dkt. 89-41 (emphasis added). This means that only one individual is permitted to use the

1   BE Trio and Software under the License. Sandler Decl. ¶¶ 16-23. Yet, Zazzle permitted every

2   person who accessed its design tools while the BE Trio was available to use the BE Software.

3       *Third*, the License states the licensee "may not sublicense, resell, ***share***, transfer, or

4   otherwise redistribute the Item (e.g. as stock, ***in a tool or template***, with source files, and/or not

5   incorporated into an End Product) ***under any circumstances, not even for free***." Dkt. 89-41

6   (emphasis added). Yet Zazzle admits it incorporated the BE Software into its design tools, thus

7   sharing the software with all of Zazzle's millions of customers and users. Garrie Decl. ¶ 28.

8       *Fourth*, the License states the licensee "may not publicly display the Item … in any digital

9   format without imposing technical or written restrictions to prevent the unauthorized use of the

10  Item by third parties." Dkt. 89-41. Many similar websites and programs, impose such restrictions

11  by requiring users to verify they have rights to use specific font software. Yet, Zazzle failed to

12  impose any such restrictions when it made the BE Trio and Software available to anyone who

13  accessed its design tools. Ryan Decl. Ex. 19 ("Liu Dep.") at 191:12-196:25.

### 3.    There Are Triable Issues as to Alkhatib's Breach

15      Defendants claim Alkhatib cannot be liable for breach of the License as "an individual

16  defendant acting as employee and/or agent of his employer." Dkt. 338 at 24. This misstates the

17  law and ignores key facts. The case Defendants cite states "an agent acting on behalf of a

18  ***disclosed principal*** cannot be held personally liable on the contract." *F.D.I.C. v. Frankel*, 2011

19  WL 5975262, at *5 (N.D. Cal. Nov. 29, 2011) (emphasis added). Here, Zazzle was an <u>undisclosed</u>

20  principal. When an agent executes a contract on behalf of a principal "without disclosing [his or

21  her] agency," the other party can sue ***both*** the agent and the principal. *Klinger v. Modesto Fruit

22  Co.*, 107 Cal. App. 97, 99, 101 (1930). This is because "[t]he agent may be held liable for his

23  negligence in failing to disclose his principal and because the agent has seen fit to contract in his

24  own name." *Id.* After "agency is established," the suing party has the option, any time before

25  judgment, "to designate which party [it] elects to hold responsible." *Id.* at 100.

26      Defendants argue Alkhatib "disclosed" he was an agent of Zazzle when he "used his

27  @zazzle.com email address and Zazzle company credit card." Dkt. 338 at 11. But Creative Market

28  did not and does not provide Plaintiff with such information. Reynaud Dep. at 95:9-97:12, 174:8-

17. Alkhatib did not otherwise communicate that he was acting on Zazzle's behalf and Plaintiff did not learn Alkhatib was an agent of Zazzle until pre-lawsuit discussions. Dkt. 338 at 10; N. Laatz Decl. ¶¶ 46-54. Because she "ha[d] no notice that [Alkhatib] [wa]s acting for the principal, the one for whom [Alkhatib] acts is an undisclosed principal." *U.S. v. Blum*, 1991 WL 317024 at *6 (N.D. Cal. Sept. 16, 1991) (citing Restatement (Second) of Agency § 4 (1958)).

Alkhatib himself was responsible for many breaches of the License outlined above. For instance, Alkhatib installed the BE Software on ▮▮▮▮▮ Zazzle's servers so it could make the BE Trio available to its users in its design tools. Alkhatib Dep. at 181:25-182:6; Ryan Decl. Ex. 11 (Alkhatib Dep. Ex. 188). Defendants' motion on Plaintiff's contract claim must fail.

### E.    Zazzle's MSJ as to Plaintiff's Trademark Infringement Claim Fails

Zazzle attacks Plaintiff's trademark infringement claim based only on a nominative fair use defense. Dkt. 338 at 24-25. But this defense fails because it is only available where a defendant can show "the product or service in question [is] not readily identifiable without use of the trademark." *Applied Underwriters, Inc. v. Lichtenegger*, 913 F.3d 884, 893 (9th Cir. 2019). Zazzle must show the infringed trademark was "the only word reasonably available to describe a particular thing." *New Kids on the Block v. News Am. Publ'g, Inc.*, 971 F.2d 302, 308 (9th Cir. 1992). Zazzle makes no such showing. In fact, when it finally removed the BE Trio from its design tools it replaced it with a copycat font called "Morgana"—showing it could have used the fonts without using the Blooming Elegant mark. Ryan Decl. Ex. 6 ("Haley Dep.") at 93:23-95:15. Zazzle caused confusion amongst the consuming public as to the origin, sponsorship, and quality of Zazzle's products that use the Blooming Elegant mark. For example Plaintiff received an email in 2020 from a Zazzle user stating: "I would like to use your blooming elegant font on Zazzle. I see that they have it, however I am trying to figure out how to use the glyphs to make the swirl at the beginning and end of the letters." N. Laatz Decl. Ex. 2 (August 25, 2020 Message).

### IV.    CONCLUSION

Plaintiff respectfully requests that the Court deny Defendants' Motion in its entirety.

1    DATED: December 19, 2024                          Respectfully submitted,

2                                                      BARTKO LLP
                                                A Professional Law Corporation
3

4                                           By:  _____/s/ Patrick M. Ryan_____
                                                      PATRICK M. RYAN
5                                           Attorney for Plaintiff and Counter-Defendant
                                                      NICKY LAATZ
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28