1  QUINN EMANUEL URQUHART & SULLIVAN, LLP
   RACHEL HERRICK KASSABIAN (Bar No. 191060)        WILLIAM F. PATRY (admitted pro
2  *rachelkassabian@quinnemanuel.com*                hac vice)
   555 Twin Dolphin Drive, 5th Floor                *williampatry@quinnemanuel.com*
3  Redwood Shores, CA 94065-2139                     295 Fifth Avenue
   Telephone: (650) 801-5000                         New York, NY 10016
4  Facsimile: (650) 801-5100                         Telephone: (212) 849-7000
                                                      Facsimile: (212) 849-7100
5
   ANDREW SCHAPIRO (admitted pro hac vice)
6  *andrewschapiro@quinnemanuel.com*
   191 N. Wacker Drive, Suite 2700
7  Chicago, IL 60606-1881
   Telephone: (312) 705-7400
8  Facsimile: (312) 705-7401

9  DANIEL C. POSNER (Bar No. 232009)
   *danposner@quinnemanuel.com*
10 THOMAS D. NOLAN (Bar No. 238213)
   *thomasnolan@quinnemanuel.com*
11 865 South Figueroa Street, 10th Floor
   Los Angeles, CA 90017-2543
12 Telephone: (213) 443-3000
   Facsimile: (213) 443 3100

13                    UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF CALIFORNIA
14                         SAN JOSE DIVISION

15 |                                          | Case No. 5:22-cv-04844-BLF-VKD |
16 | NICKY LAATZ,                             |                                |
   |                                          | **DEFENDANTS' REPLY IN SUPPORT** |
17 |              Plaintiff,                   | **OF MOTION FOR SUMMARY**       |
   |                                          | **JUDGMENT**                   |
18 |       vs.                                |                                |
   |                                          | Date:  February 27, 2025       |
19 | ZAZZLE INC. and MOHAMED ALKHATIB,        | Time:  9:00 a.m.               |
   |                                          | Courtroom: 3                   |
20 |              Defendants.                  | Judge:  Hon. Beth Labson Freeman |
   |                                          | Trial Date: July 14, 2025      |
21 |                                          |                                |
22 | ZAZZLE INC.,                             |                                |
23 |              Counter-Claimant,           |                                |
24 |       vs.                                |                                |
25 | NICKY LAATZ,                             |                                |
26 |              Counter-Defendant.          |                                |
27

28

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................1

I.      EVIDENTIARY OBJECTIONS ...........................................................................1

II.     THERE IS NO GENUINE ISSUE AS TO THE STATUTE OF LIMITATIONS ...............3

III.    THERE IS NO GENUINE ISSUE AS TO FRAUD ...........................................6

IV.     THERE IS NO GENUINE ISSUE AS TO COPYRIGHT INFRINGEMENT ....................7

        A.     The Asserted BE Copyrights Are Invalid For Lack Of Human Authorship ..............7

        B.     The Asserted BE Copyrights Are Invalid For Fraud On The Copyright Office........................................................................12

        C.     Zazzle Did Not Infringe The Asserted BE Copyrights ...........................................13

V.      THERE IS NO GENUINE ISSUE AS TO BREACH OF CONTRACT ...........................14

VI.     THERE IS NO GENUINE ISSUE AS TO TRADEMARK INFRINGEMENT ................15

DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page**

3

### <u>Cases</u>

4

*Adobe v. Software, Inc.*,
    1998 WL 104303 (N.D. Cal. Feb. 2, 1998) ......................................................... 10

5

6

*Albergo v. Immunosyn Corporation*,
    2012 WL 12953736 (S.D. Cal. June 19, 2012) ...................................................... 7

7

*Bell v. Oakland Cmty. Pools Project, Inc.*,
    2020 WL 4458890 (N.D. Cal. May 4, 2020) ........................................................ 5

8

9

*BMG Rights Mgmt. (US) LLC v. Glob. Eagle Entm't Inc.*,
    2019 WL 4544424 (C.D. Cal. Aug. 20, 2019) ...................................................... 5

10

*Engalla v. Permanente Med. Grp., Inc.*,
    15 Cal. 4th 951 (1997) ........................................................................................... 6

11

12

*Fisher v. Nissel*,
    2022 WL 16961479 (C.D. Cal. Aug. 15, 2022) .................................................. 11

13

14

*Free Speech Sys., LLC v. Menzel*,
    390 F. Supp. 3d 1162 (N.D. Cal. 2019) ................................................................ 4

15

*Gregory v. Spieker*,
    110 Cal. 150 (1895) ............................................................................................... 4

16

17

*Hangarter v. Provident Life & Acc. Ins. Co.*,
    373 F.3d 998 (9th Cir. 2004) ................................................................................. 1

18

19

*In re Oracle Corp. Securities Litigation*,
    627 F.3d 376 (9th Cir. 2010) ........................................................................... 6, 14

20

*Perez-Encinas v. AmerUs Life Ins. Co.*,
    468 F. Supp. 2d 1127 (N.D. Cal. 2006) ................................................................ 3

21

22

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
    572 U.S. 663 (2014) ............................................................................................... 5

23

24

*Starz—Goldberg v. Cameron*,
    482 F. Supp. 2d 1136 (N.D. Cal. 2007) ................................................................ 5

25

*Starz Ent., LLC v. MGM Domestic Television Distribution, LLC*,
    510 F. Supp. 3d 878 (C.D. Cal. 2021) .................................................................. 4

26

27

*Yeager v. Bowlin*,
    693 F.3d 1076 (9th Cir. 2012) ............................................................................. 2

28

1

**Rules/Statutes**

2    F.R.E 201(b)(2) ................................................................................................ 11

3    F.R.E. 401................................................................................................... 2, 3

4    F.R.E. 402................................................................................................... 2, 3

5    F.R.E. 602...................................................................................................... 2

6    F.R.E. 702................................................................................................... 2, 3

7    F.R.E. 703................................................................................................... 2, 3

8    L.R. 7-5(b)................................................................................................... 1, 2

9

10

11

**Other Authorities**

12

13    1992 U.S. Copyright Office Regulation on the Registrability of Computer
       Programs That Generate Typefaces

14        57 Fed. Reg. 6201-01 (Feb. 21, 1992) ........................................................ 9

15    Compendium of U.S. Copyright Office Practices (3d ed. 2021) .................................. 8, 9, 10, 14

16

17

18

19

20

21

22

23

24

25

26

27

28

# INTRODUCTION

Plaintiff fails to demonstrate a genuine issue for trial. On the statute of limitations, she concedes her claims accrued within the limitations period, so she must rely on the "discovery rule" to salvage them, but that rule does not help her because her claims were easily discoverable. On fraud, she has no response to the undisputed evidence that Zazzle never "concealed" its licensing or use of Blooming Elegant ("BE"), but instead publicly promoted the availability of BE on its Design Tool, including in communications to Plaintiff. On copyright infringement, she continues to misplace reliance on inapt authorities relating to "computer programs" that the Copyright Office and this Court already rejected. She otherwise does not, and cannot, refute that she generated the BE "font data" with a third-party font program—and concealed that fact from the Copyright Office—so her registrations are invalid for lack of human authorship and fraud. In any event it is undisputed that Zazzle never received the work that was copyrighted—the "VFJ" font-data files— and thus could not have infringed upon any valid copyrights Plaintiff has in them. On breach of contract, Plaintiff conflates Zazzle's use of the BE typeface, which is not governed by the License, with its use of the underlying font software, which Zazzle did not use in excess of the License. And on trademark infringement, she fails to refute that "nominative fair use" bars her claim. The Court should grant Defendants' Motion for Summary Judgment.

## I.     EVIDENTIARY OBJECTIONS

Plaintiff attempts—for the **fifth** time (*see* Dkts. 49, 53, 104, and 108)—to introduce improper evidence in disregard for the Rules of Evidence, Ninth Circuit law, and Local Rules. Most notably, she submits, via the Declarations of Patrick Ryan ("Ryan Decl."), Nicky Laatz ("N. Laatz Decl."), Daniel Garrie ("Garrie Decl."), Thomas Phinney ("Phinney Decl."), and Stuart Sandler ("Sandler Decl."), dozens of pages of improper legal arguments that attempt to usurp the Court's authority to interpret the law and decide the ultimate issues, and also violate the page limits for Plaintiff's brief. *See* L.R. 7-5(b) ("An affidavit or declaration may contain only facts . . . and must avoid conclusions and argument."); *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004) (expert may not "give an opinion as to her legal conclusion, *i.e.*, an opinion on an ultimate issue of law"). The Court should strike or disregard the evidence identified below.

1          **1.**     **Ryan Decl.:** ¶¶ **2** and **12** contain improper legal argument (L.R. 7-5(b)).

2          **2.**     **N. Laatz Decl.:** ¶¶ **16, 19-21, 24, 28, 31, 39, 40-41, 44-46, 49-50, 52-53, 55-56, 58-**

3    **59, 61, 63-65** (as misnumbered beginning on p. 21 of declaration), **and 67-68** (at pp. 22-23) contain

4    improper legal argument (L.R. 7-5(b)) that lack foundation from this lay witness (F.R.E. 602); ¶¶ **16**

5    **and 19-21** regarding Plaintiff's purported "understanding" of U.S. copyright law contradict her

6    sworn testimony that she has no "experience or training in U.S. copyright law" (Reply Decl. of

7    Thomas Nolan, filed concurrently, at Ex. SS (N. Laatz Tr. 213:22-24); *see Yeager v. Bowlin*, 693

8    F.3d 1076, 1080 (9th Cir. 2012) ("party cannot create an issue of fact by an affidavit contradicting

9    his prior deposition testimony")); and ¶¶ **41, 45, 49, 55, 61, and 67** contain (sometimes verbatim)

10   testimony the Court previously struck as improper legal conclusions and argument (*see* Dkt. 174

11   (striking ¶¶ 59, 60, 64, and 65 of Supp. Decl. of N. Laatz (Dkt. 106-1))).

12         **3.**     **Garrie Decl.:** ¶¶ **7-9, 13, 18, 19-20, 23, 25-26, and 28** contain improper legal

13   argument (L.R. 7-5(b)) (*e.g.*, that there is a triable "question of fact" on the statute of limitations

14   (¶ 8), Plaintiff was not "on notice" of her claims (¶ 19), and Zazzle "generate[d] a derivative work"

15   (¶ 26)); ¶¶ **20-25** lack foundation regarding how Instagram works (F.R.E. 703); and ¶¶ **31-37** are

16   irrelevant, as "low-code" or "no-code" coding have no bearing on this case (F.R.E. 401, 402).

17         **4.**     **Phinney Decl.:** ¶¶ **6-13, 38-45, 48, 50-53, 55, 59-60, 66-79, and 83-84** contain

18   improper legal argument (L.R. 7-5(b)), and, to the extent they interpret Copyright Office rules and

19   regulations, are improper expert testimony (F.R.E. 702, 703); ¶¶ **38, 39, 42, 43-44, and 60** are

20   irrelevant to the extent they state the "font industry's" purported "understanding" of copyright law,

21   as that has no bearing on this case (F.R.E. 401, 402); ¶¶ **48 and 83-84** lack foundation as Mr.

22   Phinney has no credentials that would allow him to opine whether "OTF" or "VFJ" files constitute

23   "source code" under the Copyright Act, or that Defendants "cop[ied] Nicky Laatz's font software"

24   (F.R.E. 702, 703); ¶¶ **52-53** lack foundation, as Mr. Phinney has no basis to opine about what the

25   Copyright Office Examiner meant by the words in his emails (F.R.E. 702, 703); ¶ **55** lacks

26   foundation, as Mr. Phinney provides no basis for his assertion about what the Copyright Office has

27   supposedly "always insisted" (F.R.E. 702, 703); and ¶¶ **69-79** are irrelevant (F.R.E. 401, 402).

28         **5.**     **Sandler Decl.:** ¶¶ **15-36, 43-51** contain improper legal argument (L.R. 7-5(b)), lack

1    foundation at least in large part (F.R.E. 702, 703), and also are irrelevant to the extent they state the

2    definition of certain license terms "as it is understood and accepted in the font industry," as neither

3    the font industry's definition of a term, nor "licensing practices in the font industry," bears on the

4    meaning of the license at issue (F.R.E. 401, 402); ¶ **43** lacks foundation, as Mr. Sandler provides no

5    factual basis nor any expert credentials that support his assertion that "[t]he work that designers do

6    in font editing programs like FontLab can only be characterized as 'hand-coding'" (F.R.E. 702,

7    703); and ¶ **51** contains improper expert testimony, as Mr. Sandler merely repeats the results of a

8    search on the Copyright Office's public website that any lay witness could perform (F.R.E. 702).

9    **II.    THERE IS NO GENUINE ISSUE AS TO THE STATUTE OF LIMITATIONS**

10           Plaintiff does not dispute that her claims accrued no later than October 12, 2017 and are all

11    time-barred unless she can meet her burden of showing that the discovery rule (i) applies in this case

12    and (ii) tolled the accrual of her claims until after October 12, 2020 for fraud, copyright and

13    trademark, and after October 12, 2021 for breach of contract.  Plaintiff fails to meet her burden.

14           ***First***, Plaintiff hardly attempts to refute Zazzle's showing (*see* Mot. 5-6) that the discovery

15    rule does not apply at all because Plaintiff's claims were not difficult to discover and Zazzle did not

16    fraudulently conceal them.  She makes the conclusory argument that the "harm" from Defendants'

17    alleged breaches was "not 'reasonably discoverable by [Plaintiff] until a future time'" (Opp. 10

18    (citing *Perez-Encinas v. AmerUs Life Ins. Co.*, 468 F. Supp. 2d 1127, 1134 (N.D. Cal. 2006)), but

19    the evidence is all to the contrary.  Plaintiff declares that it "was not [her] practice" to grant the

20    license she contends Zazzle would have needed to use BE in its Design Tool.  (N. Laatz Decl. ¶ 57.)

21    Thus, the only information she would have needed to discover that Zazzle was allegedly using BE

22    without authorization was the fact that BE was on Zazzle.  And indeed, she asserts that she actually

23    discovered her claims merely upon learning from a customer in August 2020 that BE was "on

24    Zazzle."  (*Id.* ¶ 42 & Ex. 2.)  But the signs that BE was "on Zazzle" were everywhere in Plaintiff's

25    orbit from the moment Zazzle put it there in October 2017 and started promoting it by its name—

26    including in communications to Plaintiff herself.  There is no evidence that Plaintiff's claims were

27    "difficult to discover" in the manner required for the discovery rule to apply.  (Mot. 6 (citing cases).)

28           Nor is there any evidence that Zazzle fraudulently concealed Plaintiff's claims.  The most

1    Plaintiff argues (Opp. 10) is that Mr. "Alkhatib misrepresented that he would comply" with the

2    license Zazzle obtained—but Plaintiff does not identify any misrepresentation by Mr. Alkhatib

3    about that. And unlike in Plaintiff's lead case—*Gregory v. Spieker*, from the year ***1895***—Zazzle

4    did not "cloak" itself with Mr. Alkhatib; Zazzle could not have licensed BE through Creative Market

5    except through a (human) employee. Plaintiff does not even attempt to explain how Zazzle could

6    have "fraudulently concealed" its use of BE at the same time it was widely promoting and

7    publicizing the availability of BE on its platform, by name, to its users and social-media followers

8    (including Plaintiff). At bottom, Plaintiff's argument boils down to an accusation that Zazzle used

9    BE in excess of the License—but if that were "fraudulent concealment," then every breach-of-

10   license claim would be a fraud claim too, which, as Zazzle has shown, is not the law. (Mot. 10.)

11       ***Second***, even assuming the discovery rule could apply, Plaintiff fails to refute Zazzle's

12   showing—based on overwhelming undisputed evidence (Mot. 6-9)—that she had constructive and

13   inquiry notice of her claims well within the limitations periods because she could have and would

14   have discovered them had she used any reasonable diligence. Plaintiff tries to reframe the argument

15   by focusing on whether Zazzle established her "actual knowledge" of her claims. (*E.g.*, Opp. 6.)

16   But this misses the point of the "discovery rule," which tolls the accrual of a claim only until a

17   plaintiff "reasonably ***should*** have discovered" or "***could*** have discovered through reasonable

18   diligence, the injury and its cause"—as Plaintiff's own authorities recognize. (Opp. 6 (citing cases).)

19   On this question, Plaintiff does not dispute that she did virtually nothing to attempt to determine if

20   Zazzle was using BE during the limitations period, and indeed was willfully blind to Zazzle's use

21   of BE, or that, had she used any diligence, she easily would have discovered her claims.

22       Plaintiff's authorities do not support her. She relies on *Starz Ent., LLC v. MGM Domestic*

23   *Television Distribution, LLC*, 510 F. Supp. 3d 878 (C.D. Cal. 2021), to argue that the appearance of

24   a static image of a product on Zazzle bearing BE would not have triggered suspicion because the

25   designer of that product might have had a separate license to use BE. But even the most cursory

26   look at Zazzle would have revealed that BE was publicly available for customization and use ***in the***

27   ***Design Tool***, which Plaintiff immediately would have known she had not authorized as she has

28   alleged. Plaintiff likewise misplaces reliance on *Free Speech Sys., LLC v. Menzel*, 390 F. Supp. 3d

1162, 1170-71 (N.D. Cal. 2019), a motion to dismiss case where the court was required to accept the truth of the plaintiff's allegations that he "could not have reasonably discovered" his claims. And *BMG Rights Mgmt. (US) LLC v. Glob. Eagle Entm't Inc*. rejected exactly the sort of speculation Plaintiff asks the Court to engage in here.  2019 WL 4544424, at *4 (C.D. Cal. Aug. 20, 2019).

This case instead is in accord with a decision cited in *Starz—Goldberg v. Cameron,* 482 F. Supp. 2d 1136 (N.D. Cal. 2007)—where the plaintiff claimed that *The Terminator* infringed his screenplay and soundtrack, but that he did not discover that until 20 years after the film's release because he was on a 20-year spiritual Yoga journey off the electronic grid.  In granting-in-part motions to dismiss, the court found the plaintiff's involvement in the creative industries rendered it "unreasonable [for him to] reemerge from electronic isolation twenty years later and thereafter commence suit for copyright infringement."  *Id.* at 1149.  Similarly here, Plaintiff is a professional designer and licensor of fonts to online services (like, and indeed including, Zazzle), followed and was followed by Zazzle on social media, and even had her own commercial shop on Zazzle.

On top of all this, Plaintiff confirms she actually knew about Zazzle's use in August 2020 (N. Laatz Decl. ¶ 42)—when she still had two months to file timely claims based on an October 2017 accrual date, or request a tolling agreement.  She did neither, and instead let her alleged damages continue to accrue, day-by-day, for two full years, until August 24, 2022.

***Third***, as a final fallback, Plaintiff misplaces reliance on the "separate accrual" rule to argue her limitations clock reset every day BE was in the Design Tool, until its complete removal in March 2023.  Not so.  In copyright, the "separate accrual rule" provides that a new act of reproduction or distribution can give rise to a new "claim" accruing at the time of the new infringement.  *Petrella v. Metro-Goldwyn-Mayer, Inc*., 572 U.S. 663, 671 (2014).  But *Petrella* explained that "separately accruing harm should not be confused with harm from past violations that are continuing" (*id.* at n.6), and courts addressing online use have found subsequent views or uses of an infringing work are not "new" infringements that continually reset the limitations clock (*see* Mot. 4-5 (collecting cases)); *Bell v. Oakland Cmty. Pools Project, Inc.*, 2020 WL 4458890, at *5 (N.D. Cal. May 4, 2020)  (granting summary judgment that publication of an infringing Twitter post to each user was not a new infringement, and collecting consistent authorities).  Zazzle's only allegedly infringing

1  acts were its download and installation of the BE "software" on its servers, and then making BE

2  available in the Design Tool—all of which were completed by October 2017.  Zazzle took no further

3  or different action after October 2017 with the "software," such that a new or different claim would

4  arise and continually "reset" the limitations clock, day-by-day, all the way through 2023.

5  **III.    THERE IS NO GENUINE ISSUE AS TO FRAUD**

6          Zazzle established (Mot. 10-12) that it did not fraudulently misrepresent or conceal any

7  material information or enter into the license with the intent to breach it.  In response, Plaintiff elides

8  virtually all the elements and requirements of a fraud claim and instead argues that, "[t]o prove

9  fraud, Plaintiff need only prove Zazzle acted 'recklessly and without regard for the truth in order to

10 induce action.'"  (Opp. 11 (quoting *Engalla v. Permanente Med. Grp., Inc*., 15 Cal. 4th 951, 974

11 (1997).)  But one does not engage in "fraud" merely by "acting recklessly."  Instead, as the full

12 quote from *Engalla* that Plaintiff excerpts makes clear, fraud requires a "false representation" made

13 with fraudulent intent.  15 Cal. 4th at 974.  Plaintiff's argument (Opp. 12) that "Zazzle acted

14 recklessly as to whether it knew its intended use of [BE] would comply with the terms of the

15 License" misses the mark—because it does not turn on any alleged false representations.

16          When the elements of fraud are properly considered, Plaintiff's failure to establish a genuine

17 dispute of material fact as to whether Zazzle engaged in fraud is clear.  For starters, Plaintiff offers

18 no response to Zazzle's argument (Mot. 9-10) that Zazzle could not have acted with the requisite

19 intent to defraud Plaintiff—whether by misrepresentation, concealment, or promissory fraud—

20 because everything Zazzle did with respect to obtaining the license and then using BE was open and

21 public, including Zazzle's initial outreach to Plaintiff regarding a license, Zazzle's purchase of the

22 license through a Zazzle employee using his Zazzle email address, and Zazzle's public promotion

23 of the availability of BE on its platform.  In light of these undisputed facts, it is folly for Plaintiff to

24 attempt to convert her garden-variety claim for breach of a license into claims for fraud.

25          The most Plaintiff offers to attempt to salvage her fraud claims is speculation and conjecture,

26 which is insufficient to defeat a motion for summary judgment.  *See In re Oracle Corp. Securities*

27 *Litigation*, 627 F.3d 376, 387 (9th Cir. 2010) ("non-moving party [must] designate specific facts

28 demonstrating the existence of genuine issues for trial").  She contends (Opp. 12) that Zazzle's

argument that none of its employees ever read the License Terms or FAQ (which Plaintiff claims—though Zazzle disputes—would have made clear that the License would not cover Zazzle's intended use) is "solely based on self-serving testimony."  Not only is this argument insufficient to defeat summary judgment, *see Albergo v. Immunosyn Corporation*, 2012 WL 12953736, at *4 (S.D. Cal. June 19, 2012) (argument that evidence is "self-serving and unreliable" is "insufficient to successfully oppose a properly-supported summary judgment motion), but Plaintiff does not explain why uncontradicted testimony from Zazzle's witnesses is inadequate to support summary judgment.

Plaintiff also argues (Opp. 13) that "the only plausible explanation for Ms. McGhie's 2016 message to Plaintiff is that she or others reviewed the License FAQ or Terms at that time," but this too is speculation.  It is undisputed that Ms. McGhie sent a form message to many designers (Mot. 3, Ex. C2).  And even if Plaintiff had any evidence that Ms. McGhie, or any other Zazzle employee, reviewed the License Terms or FAQ, Plaintiff's theory that Zazzle thus ***intended to*** breach the License would still be speculation and indeed belied by evidence of Zazzle's public use of BE.

Finally, Plaintiff's argument (Opp. 13) that Mr. Alkhatib must have understood that the License would not cover Zazzle's intended use because he supposedly reviewed other licenses at the same time is just another speculative *non-sequitur*—as the Court already recognized in denying Plaintiff discovery into Zazzle's purchase of other fonts (*see, e.g.*, Dkt. 218 at 1 (denying Plaintiff discovery on information relating to other font licenses Zazzle purchased as "neither relevant to a claim or defense")).  Plaintiff otherwise fails to identify any evidence that Mr. Alkhatib made any false or misleading statements when purchasing the License or did anything to conceal Zazzle's public use of BE.  Plaintiff's argument (Opp. 13) that other "[b]uyers . . . sometimes indicate if the purchase is for an entity by including its name in one of the name fields" does not show that Mr. Alkhatib was required to do this (he was not), or even that there was any opportunity for him to do so during the purchase process (there was not).  Plaintiff's fraud claims fail as a matter of law.

## IV.    THERE IS NO GENUINE ISSUE AS TO COPYRIGHT INFRINGEMENT

### A.    The Asserted BE Copyrights Are Invalid For Lack Of Human Authorship

It is undisputed that no matter how much "creativity" Plaintiff put into the appearance of the BE typefaces, they are ineligible for copyright protection.  Plaintiff's frustration that her "100+

1    hours of human creativity and input to adjust and perfect each glyph" might "mean[] nothing" (Opp.

2    19) is best directed to Congress, not to this Court.

3           Plaintiff misapprehends the significance of the fact that the BE typefaces are not

4    copyrightable.  She compares (Opp. 19) Zazzle's argument that FontLab, not Plaintiff, "authored"

5    the BE font files to "arguing [that] Microsoft Word authored briefs written using such software,

6    Adobe Photoshop authored photos processed using such software, or that GarageBand authored

7    songs written or recorded using such software."  But these comparisons are inapt because no matter

8    what process is used to create an original brief, photo, or song, those works—the **output** of the

9    creative process—are independently copyrightable by the authors of the works.  In contrast, a

10   typeface is not copyrightable by its author; only the "font data" that renders the typeface may be

11   protectable, but only if a human author—rather than a computer program—created it.

12          Thus, the relevant question here, as the Examiner made clear in his correspondence, is

13   whether the BE font data was "hand coded" by Plaintiff "rather than generated by a font design

14   program."  (Ex. BB. at 5); *see, e.g.*, Compendium § 306 ("The U.S. Copyright Office will register

15   an original work of authorship, provided that the work was created by a human being.").  On this

16   dispositive question, there are no genuine issues of material fact: although Plaintiff concealed her

17   use of FontLab from the Copyright Office, she admits now that she used it to create the BE font

18   data.  (N. Laatz Decl. ¶ 11.**)**  The asserted BE copyrights are therefore ineligible for registration and

19   the Court should invalidate them.  Plaintiff offers no persuasive counterarguments.

20          ***First***, recognizing that she cannot meet (at least without fraud) the registration requirements

21   that actually apply to the BE font data, Plaintiff clings to her argument that the font data is eligible

22   for registration as a "computer program."  But even if Plaintiff were correct about this (she is not),

23   it would not demonstrate the validity of her asserted BE registrations, or even create a triable issue,

24   because the Copyright Office explicitly ***refused*** to register the BE font data as a "computer

25   program."  Indeed, in response to Plaintiff's repeated protestations, the Examiner explained that the

26   Copyright Office "***no longer register[s] fonts as 'computer programs' as they are not eligible for***

27   ***that registration***."  (Ex. BB at 5.)  Because Plaintiff did not receive registrations of the BE font files

28   as "computer programs," her argument that they are eligible for such registrations—which

1    comprises the majority of her copyrightability argument (*see* Opp. 14-20)—is inapt and irrelevant.

2    　　　In any event, Plaintiff is wrong that the BE font data is eligible for registration as a "computer

3    program."  Plaintiff does not dispute (*see* Mot. 13) that a work is eligible for registration as a

4    "computer program" only if it contains "source code," which must be "written by a human being

5    using a particular programming language" (Compendium § 721.3).  Nor does Plaintiff—including

6    through her computer-science expert, Mr. Garrie—dispute that the BE font data does not contain

7    "source code" as defined by the Copyright Act.  Accordingly, Plaintiff has failed to show any error

8    in the Copyright Office's refusal to register the BE font data as a "computer program."

9    　　　***Second***, Plaintiff continues to misplace reliance (Opp. 14-18) on the same inapt "authorities"

10   relating to font-generating "computer programs" that she presented, without avail, to the Examiner

11   in 2021 and to this Court in her motion to dismiss Zazzle's counterclaim.

12   　　　The 1992 U.S. Copyright Office Regulation on the Registrability of Computer Programs

13   That Generate Typefaces, 57 Fed. Reg. 6201-01 (Feb. 21, 1992) is inapplicable to the BE font data

14   because it applies to "***computer programs*** used in conjunction with the ***generation or design*** of

15   typeface."  Not only is the BE font data not a "computer program" because it does not contain source

16   code, but even if it were, Plaintiff does not dispute that it cannot be used to "generate or design" a

17   typeface, but instead is used merely to display a previously designed typeface.  Plaintiff is thus

18   wrong to argue (Opp. 17) that the Examiner here "purported to amend or repeal" the 1992

19   Regulation—because it actually does not apply at all to the BE font files.

20   　　　Similarly, the Compendium of U.S. Copyright Office Practices § 723 (3d ed. 2021) is inapt

21   because it applies to "a ***computer program*** that ***generates*** . . . a particular typeface."  And even if

22   § 723 could apply to font data that displays a previously generated typeface, it still would not support

23   the copyrightability of the BE font data.  Plaintiff omits to mention the Copyright Office's express

24   statement in § 723 that "merely assigning coordinates to a particular letterform and then [using] a

25   third party program to render typeface  . . . from those coordinates"—which is even more than what

26   Plaintiff did here—is insufficient to create copyrightable content.  Plaintiff's failure to reference this

27   language is telling because this Court relied on it to deny Plaintiff's motion to dismiss.  (Dkt. 176

28   at 8.)  If § 723 is relevant at all, it only further shows why the BE font data is not copyrightable.

1    **Third**, Plaintiff continues to rely on *Adobe v. Software, Inc.*, 1998 WL 104303 (N.D. Cal.

2    Feb. 2, 1998), but provides no reason why this Court should reconsider its prior ruling that *Adobe*

3    "does not support Laatz's argument that her copyright registrations are valid." (Dkt. 176 at 8.)  As

4    the Court correctly concluded, *Adobe* is inapposite because "Judge Whyte had no occasion to

5    consider whether," consistent with § 723 (which post-dates *Adobe* by decades), "a work is

6    copyrightable where, as here, the copyright holder merely 'selected coordinates and various other

7    points of instruction' and a third-party software wrote the implementing code." (*Id.* (quoting Zazzle

8    Counterclaims ¶ 27).)   The most Plaintiff offers in response is the (improperly argumentative)

9    opinion of her "font industry" expert, Mr. Phinney, that the Court's ruling "is not consistent with

10   the font industry's understanding of, and practices based on," *Adobe*. (Phinney Decl. ¶ 70.)  But

11   even if the "font industry" would prefer that *Adobe* supported the copyrightability of the BE font

12   data, that has no bearing on whether the Court was correct to conclude otherwise.

13       **Fourth**, Plaintiff takes issue (Opp. 18) with the Examiner's application to the BE font data

14   of the same "hand coding" requirement the Copyright Office applies to HTML "markup language"

15   (*see* Mot. 15), but she fails to refute that it made perfect sense for him to do this.  Plaintiff does not

16   dispute that the BE font data was in "VFJ" format—a JSON format which is "functionally

17   equivalent" to the more commonly used XML markup language (Ex. FF, Phinney Report ¶ 36; Ex.

18   CC, Phinney Tr. 177:10-21, 255:15-258:1)—or that the computer program Plaintiff used to generate

19   it, FontLab, offers "WYSIWYG" functionality similar to computer programs that website designers

20   use to generate HTML (Ex. CC, 82:19-24, 140:5-148:9).  Just as a "website designer is not

21   considered the author of" markup language that a "website design software automatically creates,"

22   Compendium § 1006.1(A), Plaintiff is not the author of font data that FontLab automatically created.

23   HTML and font data submitted as XML or VFJ thus present similar concerns regarding human

24   authorship, so that it makes sense for the Copyright Office to apply the same standards to them.

25       Plaintiff also is wrong to suggest (Opp. 17-18) that the Examiner here "change[d] Copyright

26   Office practices"—or, as Plaintiff's second "font industry" expert, Mr. Sandler, put it, engaged in

27   "misfeasance" (Ex. TT, Sandler Rebuttal Report at ¶ 29)—by refusing to register the BE font data

28   as a "computer program" and instead applying the same "hand-coding" requirements that apply to

HTML.  A closer look at other "font" registrations Mr. Sandler identifies—including the judicially noticeable correspondence files for them, *see, e.g.*, F.R.E 201(b)(2); *Fisher v. Nissel*, 2022 WL 16961479, at *3 (C.D. Cal. Aug. 15, 2022) (taking judicial notice of Copyright Office correspondence files and search results as "they are matters of public record")—shows that the Copyright Office has repeatedly applied the ***same standards*** that the Examiner applied to Plaintiff's applications.  (*See, e.g.*, Nolan Reply Decl. ¶¶ 5-8; Ex. UU (requiring that the "entire" deposit of "font software" be "hand-coded and not generated by a third party program"); Exs. VV-XX.)

Similarly, Plaintiff fails to show (Opp. 21) that the "hand-coding" requirement is "inconsistent with . . . the Copyright Office custom and practice in registering numerous fonts created using FontLab both before and after Plaintiff's applications were filed and approved."  To the extent the Copyright Office did this ***before*** Plaintiff's applications in January 2021, the Examiner explained that it "no longer" does.  (Ex. BB at 5.)  And Plaintiff is simply wrong that the Copyright Office has registered "numerous fonts created using FontLab" ***after*** she obtained her registrations because this is demonstrably false.  In fact, a search of Copyright Office filings confirms there are no registrations that reference "FontLab" since 2017.  (Nolan Reply Decl. ¶ 9.)  The two purported examples that Mr. Sandler identifies (Sandler Decl. ¶ 51; Dkt. 342-56 at 15, 44) do not mention FontLab at all, so it is unclear what basis Plaintiff has to assert otherwise.

***Fifth***, when Plaintiff finally grapples with the "hand coding" requirement (after doing all she can to avoid it altogether), she fails to create a genuine dispute about whether she "hand coded" the BE font data "rather than [used] a font-generating computer program" to create it.  It is undisputed that Plaintiff generated the BE font data as follows: (i) she drew her (uncopyrightable) "glyph designs" with a hand-held "stylus" in the Adobe Illustrator program; (ii) she copied the designs into FontLab which automatically assigned numerical coordinates to reflect their "on curve" and "off curve" "reference points"; (iii) she adjusted the designs using her stylus, which resulted in corresponding changes to the coordinates; (iv) she selected a few "font wide" variables by choosing numbers that correspond with them; and (v) years after she completed her designs, FontLab automatically "exported" the coordinates and variables into its "VFJ" file format which Plaintiff submitted to the Copyright Office as multi-hundred page PDF files containing reams of code that

1  Plaintiff indisputably did not create.  (*See, e.g.*, N. Laatz Decl. ¶¶ 11-16; Phinney Decl. ¶¶ 33-37,

2  47; Rucinski Decl., ¶¶ 37-48.)  If Plaintiff's process amounted to "hand coding by a human author

3  rather than using a font-generating computer program," that distinction would be meaningless.

4       Moreover, because Plaintiff did not "hand code" the font data "rather than" use a font-design

5  program to generate it, it matters not whether a human author theoretically could "hand code" font

6  data by using a stylus rather than manually typing it in.  However, if that distinction mattered, then

7  the only plausible conclusion is the one that Mr. Phinney reached before Plaintiff's counsel advised

8  him to say otherwise—which is that a human "hand codes" by manually typing. (Ex. PP2 at 3.)  If

9  the Court holds Plaintiff to her own expert's standard, then the evidence is even more definitive that

10  Plaintiff did not "hand code" the BE font data.  Indeed, the most Plaintiff even argues she "typed"

11  (*see* Mot. 2) are a few lines of "OpenType" text for two limited features ("ligatures" and "alternate

12  letters") of only one of the three BE typefaces.  But it is undisputed that FontLab altered those lines

13  of text in generating the VFJ files, and, therefore, whatever Plaintiff "typed" does not appear in the

14  copyrighted files anyway.  (*See* Rucinski Decl., ¶¶ 43.)

15       **B.      The Asserted BE Copyrights Are Invalid For Fraud On The Copyright Office**

16       Although the Court need not find fraud on the Copyright Office to invalidate Plaintiff's

17  registrations, Plaintiff has failed to raise a genuine dispute that she committed fraud.  It is undisputed

18  that the Examiner explained to Plaintiff that the Copyright Office "***cannot***" register font data if it

19  was "merely generated by a font program" like FontLab, and asked Plaintiff to confirm that the BE

20  font data was "hand-coded by a human author" rather than "generated by a font program." (Ex. BB

21  at 5.)  It is also undisputed that Plaintiff knew she used FontLab to generate the BE font data, yet

22  ultimately represented that she "hand coded" it without ever disclosing her use of FontLab.  Plaintiff

23  also concealed that the font data was not in the XML format the Examiner asked about, but instead

24  in FontLab's proprietary VFJ format—as disclosing this would have revealed her use of FontLab.

25       To avoid a finding of fraud in the face of this undisputed evidence, Plaintiff argues (Opp.

26  21) that she could not have knowingly misled the Copyright Office because the Examiner's

27  distinction between "hand coding by a human author" and "using a font program" was "inconsistent

28  with Plaintiff's understanding, [and] also the font industry's understanding, and the Copyright

Office custom and practice." But even if Plaintiff (and her counsel) genuinely held these (incorrect) "understandings"—which again is inconsistent with Plaintiff's deposition testimony, *supra* p. 2—that would not give Plaintiff a license to conceal her use of FontLab or fail to respond truthfully to the Examiner's questions. And if Plaintiff actually was unclear about the distinction between "hand coding" and "using a font program," she could have asked the Examiner what he meant. Plaintiff never did, because she did not need to; the Examiner was clear about what he meant.

Plaintiff also appears to challenge the materiality of her misstatements by arguing (Opp. 22) that there is "no evidence" that she knew her use of FontLab "would preclude registration." But again, the Examiner was explicit about this—including by saying that if Plaintiff did not "confirm that the font data in the PDF file was hand-coded"—which the Examiner had previously distinguished from "using a font program"—then "I will refuse registration with no further action."

Finally, Plaintiff makes a tepid argument (Opp. 21) that she did not need to respond truthfully to the Examiner's questions about her use of FontLab because "the PDF files themselves stated they were 'Generated by: FontLab.'" But despite the single, buried references to FontLab at the end of hundreds of pages of two of the three BE font-data files Plaintiff submitted, Plaintiff still was required to respond fully and accurately—rather than simply assume the Examiner had seen these buried references that Plaintiff never bothered to identify (surely because she was not aware of them either). And even if Plaintiff was aware of them, it was clear that the Examiner was ***not***, or else he would not have had to ask, repeatedly, whether Plaintiff used FontLab to generate the font data.

## C.    Zazzle Did Not Infringe The Asserted BE Copyrights

There is another, easy way to decide the copyright claim. It is undisputed that Zazzle never received the VFJ files that comprise the copyrighted works, and that Zazzle never (and could not have) violated any of Plaintiff's alleged exclusive copyrights in them. Plaintiff's response (Opp. 20) rests on the faulty premise that the BE font data was registered as a "computer program," so that her registration in the purported "source code" for the program (the VFJ files that Zazzle never received, and which contain no actual source code) "covers" the "object code" as well (the OTF files that Zazzle did receive). But, as noted, it is undisputed that the Copyright Office explicitly, and correctly, ***refused*** to register the BE font data as a "computer program" and also rejected the

1  OTF files as the deposit copy.  (Ex. BB at 4.)  Nor does Plaintiff address the fact that—unlike

2  "computer programs," which may be registered through the submission of a portion of the human-

3  readable source code (Compendium § 1509.1(F))—the Copyright Office required Plaintiff to submit

4  the "entire work" for the BE font data (Ex. BB at 4), showing that the deposit copies for the BE font

5  data are not simply "representations" of the registered works but rather are the works themselves.

6  There is thus no basis for Plaintiff's reliance on authorities and standards that might apply to

7  copyrighted "computer programs"—because the BE font-data files are not computer programs.

8      Plaintiff offers no other response to Zazzle's non-infringement arguments.  Even if the Court

9  finds the asserted BE copyrights may be valid, Defendants are still entitled to summary judgment.

10  **V.      THERE IS NO GENUINE ISSUE AS TO BREACH OF CONTRACT**

11      Plaintiff asserts (Opp. 22) there is a genuine issue as to whether Zazzle assented to the

12  License FAQ because two Zazzle employees reviewed the Offering Page, which featured links to

13  the FAQ, before the purchase, and a Zazzle employee emailed a link to the Offering Page to other

14  employees before the purchase.  But Plaintiff offers no evidence to create a triable issue as to

15  whether any Zazzle employee actually read the FAQ.  Plaintiff complains again (Opp. 23) about

16  Defendants' supposed "self-serving" testimony, but this argument does not preclude summary

17  judgment, *see supra* p. 7, and Plaintiff has failed to meet her burden to produce "specific facts

18  showing that there is a genuine issue for trial," *In re Oracle Corp.*, 627 F.3d at 387.  Absent any

19  evidence that Zazzle assented to the FAQ, the Court should conclude that it is not part of the License.

20      Plaintiff also misconstrues the License, and fails to create a triable issue, by arguing (Opp.

21  23-24) that the licensed "Item" includes the "BE Software" (the font data used to render the BE

22  typefaces) *and* the "BE Trio" (the typefaces themselves).  But this contradicts a plain reading of the

23  License Terms and common sense.  It is undisputed that the "Item" Zazzle received in exchange for

24  a $20 fee was a *computer file* containing the BE font data.  The License Terms characterize "Fonts"

25  as "Installable Items"—a description that cannot apply to typefaces which cannot be "installed"—

26  and further make clear that it is the use of the computer file, not the typefaces, that is restricted.

27  (*E.g.*, Dkt. 82, Ex. D at 2 ("[Y]ou may purchase a font and use it to make unique word art . . . but

28  you must not distribute *the original files* in any way.").)  And in practice, it makes no sense that the

1  BE typefaces would be a licensed "Item" given that typefaces are not eligible for copyright
2  protection and are publicly and freely available to anyone who visits any of the websites where BE
3  is licensed—all of which display every glyph in the BE family. (*See* Dkt. 263 at 6, n.3.)  Indeed,
4  under Plaintiff's strained interpretation, an unlicensed user could permissibly visit the Offering Page
5  and capture and distribute copies of the BE typefaces, while a licensed user could not.

6       When the License is properly limited to the "BE Software," Plaintiff has failed to show a
7  triable issue because it is undisputed that Zazzle never made any unauthorized use of the software.
8  In particular, it is undisputed that the "Software" refers only to the OTF files that Zazzle received.
9  Plaintiff has produced no evidence that the contents of those files were in any way "incorporated"
10  into the Design Tool; the files resided at all times on Zazzle's internal servers, accessible to, and
11  used by, Zazzle alone. (Ex. KK, Li Tr. 122:15-19; Ex. X, B. Beaver Tr. 40:1-43:14.)  Plaintiff's
12  technical expert, Mr. Garrie, concedes this, stating that "every time a user incorporated text in the
13  Blooming Elegant Trio of Fonts into a design using Zazzle's Design Tool, ***Zazzle's servers used the***
14  ***OTF files*** for the Blooming Elegant Trio of Fonts (the 'Blooming Elegant OTF Files')," and users
15  of the Design Tool received only "images of the requested text in that font." (Garrie Decl. ¶¶ 26,
16  27.)  It is undisputed that these images neither contain nor reveal any of the font data in the OTF
17  files. (Garrie Report (Dkt. 342-53) at n.36 and p. 30.)  Plaintiff fails to produce any evidence—only
18  conclusory arguments (Opp. 23-24)—that a Zazzle user ever received, used, or accessed the licensed
19  OTF files, or any of the font data in them.

20  **VI.    THERE IS NO GENUINE ISSUE AS TO TRADEMARK INFRINGEMENT**

21       Plaintiff argues (Opp. 25) that "nominative fair use" does not apply because BE was
22  apparently "readily identifiable without use of the trademark."  But all she does to support this
23  argument is note that after removing BE, Zazzle referred to its replacement—"Morgana"—by its
24  name.  If anything, that shows that each distinct typeface must be identified by its name—which is
25  the opposite of what Plaintiff attempts to show.  Nor does Plaintiff identify any evidence of
26  "confusion," as the email she cites (Mot. 25) simply mentions that BE is "on Zazzle," without any
27  indication that the customer was confused about Zazzle's affiliation with Plaintiff or her sponsorship
28  or endorsement of Zazzle's use.  The Court should dismiss Plaintiff's meritless trademark claim.

1    DATED:  January 23, 2025          QUINN EMANUEL URQUHART &
                                       SULLIVAN, LLP
2
                                       By   /s/ Andrew H. Schapiro
3                                          Andrew H. Schapiro

4                                          *Attorneys for Defendants*
                                           *Zazzle Inc.*
5                                          *and Mohamed Alkhatib*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 5:22-cv-04844-BLF-VKD

Defendants' Reply In Support Of Motion For Summary Judgment