Rachel M. Walsh (SBN 250568)
rwalsh@goodwinlaw.com
**GOODWIN PROCTER LLP**
Three Embarcadero Center
San Francisco, CA 94111
Tel.: +1 415 733 6000
Fax.: +1 415 677 9041

*Attorney for Monotype Imaging Inc.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| NICKY LAATZ, et al.,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>ZAZZLE, INC., et al.,<br><br>　　　　Defendant. | Case No. 5:22-CV-04844-BLF<br><br>**[PROPOSED] BRIEF *AMICUS CURIAE* BY MONOTYPE IMAGING INC., IN SUPPORT OF PLAINTIFF NICKY LAATZ'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Judge:　　Hon. Beth Labson Freeman |

[PROPOSED] BRIEF AMICI CURIAE BY MONOTYPE IMAGING INC., IN SUPPORT OF PLAINTIFF NICKY LAATZ'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Case No. 5:22-CV-04844-BLF

## I. INTRODUCTION

In their Motion for Summary Judgement (the "Motion") (Dkt. No. 338), Defendants Zazzle Inc. ("Zazzle") and Mohamed Alkhatib ("Defendants") have argued that Plaintiff Nicky Laatz's copyright claims fail as a matter of law because the asserted registered fonts lack sufficient originality. Specifically, Defendants argue that because Laatz used an editing program to translate her manual selection of on-curve and off-curve reference points for the individual typeface glyphs in the into the source code for the registered font software that Plaintiff has asserted in this dispute, that software cannot be protected as a matter of law. In so doing, Defendants misunderstand the law concerning copyright in font software, incorrectly asserting that the Copyright office requires the manual drafting of font software source code. Not only is this position unsupported by either Copyright Office regulations and guidance, or any interpreting case law, but it also stands in stark contrast to the Copyright Office's longstanding policies regarding the use of technological tools to aid creation. Finally, accepting Zazzle's argument would overturn precedent upon which multiple industries rely and would wreak havoc on the typeface industry as a whole. Thus, Monotype Imaging Inc. ("Monotype") respectfully submits this brief as an *amicus curia* in partial opposition to Plaintiffs' Motion for Summary Judgment.

## II. INTEREST OF AMICUS CURIAE

Monotype is one of the world's largest provider of digital typesetting and typeface designs for use with consumer electronics devices. Declaration of Dr. Jan Kaestner ("Kaestner Decl.") ¶ 3. With origins of the dating back to 1887, Monotype and the predecessor companies that Monotype derives its name from has have been responsible for myriad developments in printing technology, including the invention of the first fully mechanical hot metal typesetter, which allowed for the development of modern mass market printing. *Id*. ¶ 4. The Monotype group of companies has also developed many of the most widely used typeface designs in the world, including Helvetica, Times New Roman, Gill Sans, Arial, Bembo and Albertus. *Id*. ¶ 5. The development and registration of typeface and font software, and the licensing of such software, is a major portion of Monotype's business. *Id*. That business for decades relied upon case law confirming the copyrightability of

font software and the consistent application of the Copyright Office's regulations regarding the registration of font software and its longstanding views regarding the use of new technology to aid in the creation of copyrighted works. *Id*. ¶¶ 6-10.

The position taken by Defendants in their Motion would create uncertainty regarding the validity of thousands of registered font software products and work great harm on the producers and licensors of such products, such as Monotype. As such, Monotype as an amicus curia has substantial interest in this action.

### III.    ARGUMENT

The parties do not dispute that under present U.S. law, the Copyright Office will not register the design of a typeface alone. However, as made clear in U.S. Copyright Office Regulation on the Registrability of Computer Programs That Generate Typefaces, 57 Fed. Reg. 6201-01 (Feb. 21, 1992), codified at 37 C.F.R. 202 ("1992 Regulation"), an artist may register a copyright in scalable font software that provides instructions on how to display a given typeface on a computer or printer. However, although the 1992 Regulation is clear that the protectability of such font software is to be assessed as any other copyright, Defendants in this dispute have advanced the argument that there are further limitations on how font software is to be protected. As set forth below, not only are Defendants' additional requirements in direct opposition to the law as applied to font software, but also represents a departure from long copyright precedent and would work great harm on both the typeface industry specifically, and software development more widely. As such, Defendants' arguments must be rejected.

**a.    Defendants Misstate the Law Regarding Copyrighting Font Software**

In their Motion, Defendants claim that "if a font designer uses a third-party computer program to generate the typeface, as Plaintiff did here, then the resulting font [software] is ineligible for registration"; and that therefore to be protected, font software must be "hand-coded." Defendants are wrong on both points.

Contrary to Defendants assertions, there are no special requirements regarding whether font

software can be protected under copyright. Instead, as in all copyrights, all that is necessary is sufficient human creativity to establish originality. 17 U.S.C. § 102(a). "Original, as the term is used in copyright, means only that the work was independently created by the author . . . and that it possesses at least some minimal degree of creativity." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991) (emphasis added). Importantly, "the requisite level of creativity is extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark, no matter how crude, humble or obvious it might be." *Id*.

This bedrock principal of copyright protection was not amended or countermanded by the 1992 Regulation, which makes it clear that font software may be granted copyright protection, "assuming it meets the ***usual standard of authorship.***" (emphasis added). Instead, the 1992 Regulation focuses on the classic originality analysis, stressing that "the creation of scalable font output programs to produce harmonious fonts consisting of hundreds of characters typically involves many decisions in drafting the instructions that drive the printer" and that "[t]he expression of these decisions is neither limited by the unprotectible shape of the letters nor functionally mandated." Nowhere does it suggest that there is any differing test to establish copyrightability of font software.

The only case interpreting the 1992 Regulation – *Adobe Sys., Inc. v. S. Software, Inc.* – does not hold otherwise. 1998 WL 104303 (N.D. Cal. Feb. 2, 1998). Instead, after reviewing facts strikingly similar to those here, the *Adobe* court found that the traditional creativity threshold described in *Feist* applies with equal force to establishing rights in font software. *Id*. at *5.

Specifically, *Adobe* involved font software that was created by Adobe artists using font editing software to create scalable font software. *Id*. at *1. Those artists would either create glyphs directly in the editing software, or import glyphs created in other software. Scalable fonts were created by manually manipulating "the on-curve and off-curve reference points of each displayed glyph altering its outline." *Id*. "The objective of the manipulation is to efficiently, aesthetically and

3

[PROPOSED] BRIEF AMICI CURIAE BY MONOTYPE IMAGING INC., IN SUPPORT OF PLAINTIFF NICKY LAATZ'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Case No. 5:22-CV-04844-BLF

accurately render the appearance of each glyph" and the resulting font software files which are output from the design program determine the ultimate image that is displayed or printed. *Id*. This process – which is largely the same process used today – involves skilled artists making many creative decisions, for instance by defining the Bézíer curves that constitute the font outlines and manually adjusting the font software output instructions which are translated by the editing software into specific, and original, source code instructions. Indeed, the *Adobe* court explicitly found that because "two independently working programmers using the same data and same tools can produce an indistinguishable output but will have few points in common" – that is two independent artists would generate different source code for the same font software – the Adobe font software programs at issue were protectable original works of authorship. *Id*. at *5. The fact that editing software was used and the fact that artists did not directly write the source code at issue was irrelevant to this ruling. *Id*. And contrary to Defendants arguments, questions regarding how the editing software functioned, or whether the editing software was created by Adobe or bought off the shelf were similarly irrelevant. *Id*. All that mattered was the bedrock principle that to be protected under copyright, an artist using that editing software had to be able to make meaningful choices that could be seen in the final source code. *Id*. That is all that matters here.

Nor do Defendants' citations to the Copyright Office Compendium ("Compendium") § 723 avail them. Specifically, Defendants selectively cite the Compendium to suggest that the use of editing software renders font software unprotectable. Yet § 723 of the Compendium says nothing of the kind. Looking past Defendants' cherry-picked quotations, it instead states:

> A computer program that generates bar codes or a particular typeface, typefont, or letterform may be registered if the program contains a sufficient amount of original authorship in the form of statements or instructions to a computer. For example, creating a scalable font output program that produces harmonious fonts consisting of hundreds of characters may require numerous decisions in drafting the instructions that drive a printer or other output device. If this expression contains a sufficient amount of original authorship, the work may be registered as a computer program.

4
[PROPOSED] BRIEF AMICI CURIAE BY MONOTYPE IMAGING INC., IN SUPPORT OF PLAINTIFF NICKY LAATZ'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Case No. 5:22-CV-04844-BLF

> \* \* \*
> When asserting a claim in a computer program that generates typeface, typefont, letterform, or barcodes, the applicant should identify the author(s) that created the work. Specifically, the applicant should provide the name of the person(s) or organization(s) that created the source code for the program. The registration specialist may communicate with the applicant if it appears that the author merely assigned coordinates to a particular letterform and then used a third party program to render typeface or typefont from those coordinates (but did not create any of the source code for that program).

*Id*.

From a review of this passage, it becomes clear that what is prohibited is not ***any*** use of editing software, but the specific use of editing software to simply, mechanically scan an existing typeface, typefont, or letterform without involving any "decisions in drafting the instructions that drive a printer or other output device" from a human artist. *Id*.

Thus, contrary to Defendants' claims, § 723 does nothing but repeat the principle explained in *Adobe*: if editing software is used to generate font software, to be protected under copyright, a human artist must be directing that editing software such that the choices that artist makes (for example the selection of on- and off-curve reference points and defining the Bézier curves) can be seen in the source code that the editing software outputs.

Other than their misquoting of § 723 of the compendium, Defendants do not offer any controlling authority to support their novel claim that copyright registration is reserved only for font software source code which has been directly typed by a software engineer.[1] This is unsurprising, as Defendants' purported requirement is in direct tension with the holding in *Adobe* and the Copyright Office's own regulations.

---

[1] Defendants make much of the use by Copyright Examiners of the term "hand coded." See Dkt, No. 338 at 13-15. However, there is nothing in the language cited by Defendants that suggests that the Copyright Office requires artists to manually type in source code instructions for font software to be protected. Instead, given the long practice of using editing software to create font software data that has been registered by the Copyright Office, it is more reasonable to read the statements by the examiner as distinguishing efforts by an artist using a stylus to "hand-code" creative information about a typeface from instances where software is used to simply scan in existing glyphs and which therefore generates font data without any artistic creativity.

Instead, Defendants are left attempting to paint Plaintiff's use of a third-party editing program as some sort of outlier. In fact, this Plaintiff's use of a font software editing program is the standard practice in generating scalable font software and has been since at least the issuance of the 1992 Regulation. Kaestner Decl. ¶¶ 7-9. Indeed, as one of the largest creators of font software in the world, Monotype's artists have used similar methods to create over 50,000 font software products, of which more than 1,600 have been registered by the Copyright Office. *Id*. Based on Monotype's unique experience in navigating the registration process as one of the largest owners of font software copyright registrations, Plaintiff's use of editing software appears to represent nothing more than the industry standard. *Id*.

      **b. Defendants' Argument Stands in Stark Contrast to Long Copyright Precedent Regarding the Use of Technology**

Even if Defendants' arguments had not already been explicitly rejected by the *Adobe* Court, and the Copyright Office's own guidances and regulations, they would still fail. At bottom, Defendants' argument is that because Plaintiff utilized technology to aid her creative endeavors, such artistic work cannot represent an "original work[] of authorship." 17 U.S.C. 102(a). Yet, by focusing on the tools Plaintiff used, and not how she used them, Defendants repeat a common mistaken challenge to copyright validity that has been repeatedly defeated.

In 1884, the Supreme Court rejected a similar challenge to the validity of a copyright involving the then relatively new technology of photography in *Burrow-Giles Lithographic Co. v. Sarony*. 111 U.S. 53 (1884). After being sued for producing an unauthorized lithographic reproduction of a photo of Oscar Wilde, the *Burrow-Giles* defendants claimed that the plaintiff had no valid rights in their photograph because it was the "mere mechanical reproduction of the physical features or outlines of some object, animate or inanimate, and involves no originality of thought or any novelty in the intellectual operation connected with its visible reproduction in shape of a picture." *Id*. at 281. In other words, because a camera consistently uses the physics of light and the laws of chemistry to make a "perfect" reproduction of an image, anything a camera creates cannot be the creative expression of a human author.

In rejecting this, however, the Supreme Court reasoned that photographs could still be copyrightable creations of "authors," despite issuing from a mechanical device, because the photographic result nonetheless "represent[ed]" the "original intellectual conceptions of the author." *Id.* at 59.  A camera may generate only a "mechanical reproduction" of a scene, but does so only after the photographer develops a "mental conception" of the photograph, which is given its final form by that photographer's decisions like "posing the [subject] in front of the camera, selecting and arranging the costume, draperies, and other various accessories in said photograph, arranging the subject so as to present graceful outlines, arranging and disposing the light and shade, suggesting and evoking the desired expression, and from such disposition, arrangement, or representation" crafting the overall image.  *Id.* at 59–60.  In other words, as long as a human author directed the use of that consistent machine and could use it in ways to fix even minor examples of artistic expression, the output of a camera can be copyrighted.

*Burrow-Giles* thus stands for the principle that human involvement in, and ultimate creative control over, a work at issue is the only important question in assessing whether a work created using a new form of technology falls within the bounds of copyright.  The scope of the Copyright clause is "broad"; it is "not limited to script or printed material," but rather encompasses "any physical rendering of the fruits of creative intellectual or aesthetic labor." *Goldstein v. California*, 412 U.S. 546, 562 (1973) (quoting *Burrow-Giles,* 111 U.S. at 58).

Even though it is nearly 150 years old, the guiding principle enunciated in *Burrow-Giles* remains as vital as ever.  Whenever a new technology arises, there are parties who claim that use of that technology renders artistic work outside the scope of copyright protection.  Yet it has consistently been held that as long as there is a human directing the use of that technology, and the output of that use has sufficient evidence of originality, copyright protection is proper.  Indeed, just one month ago the copyright office issued Copyright and Artificial Intelligence Part 2: Copyrightability  (https://www.copyright.gov/ai/Copyright-and-Artificial-Intelligence-Part-2-Copyrightability-Report.pdf) ("AI Report"), which addressed the copyrightability of works made

utilizing artificial intelligence. In so doing, the Copyright office stated:

> Over the years, copyright has proven flexible enough to respond to new technologies and mediums as they emerge. Protection has been extended to photographs, motion pictures, video games, and computer programs—to name just a few. At the same time, courts have been called on to explore and analyze the nature of authorship. As authors have increasingly used technology in the process of creation, the relative roles of human and machine can be central to the analysis of copyrightability.
>
> \* \* \*
>
> The crucial question appears to be whether the "work" is basically one of human authorship, with the computer merely being an assisting instrument, or whether the traditional elements of authorship in the work (literary, artistic, or musical expression or elements of selection, arrangement, etc.) were actually conceived and executed not by man but by a machine."

*Id*. at 1-2 (citing 6 U.S. COPYRIGHT OFFICE, SIXTY-EIGHTH ANNUAL REPORT OF THE REGISTER OF COPYRIGHTS FOR THE FISCAL YEAR ENDING JUNE 30, 1965, at 5 (1966), https://www.copyright.gov/reports/annual/archive/ar-1965.pdf.). Addressing the specific question of whether art utilizing artificial intelligence could be protected, the Copyright Office expressly stressed that the use of technology can never be per se invalidating.

> For a work created using AI, like those created without it, a determination of copyrightability requires fact-specific consideration of the work and the circumstances of its creation. Where AI merely assists an author in the creative process, its use does not change the copyrightability of the output.

*Id*.

Defendants' argument that the use of editing programs to create font software would categorically prevent copyright registration is in direct opposition to this clear and longstanding practice and has been repeatedly rejected by both the Copyright Office and federal courts encountering it. As it has been consistently held that the Copyright Office could not "'take the categorical position that registration will be denied merely because a computer may have been used in some manner in creating the work,'" Defendants' argument must be rejected. *Id*. (citing U.S.

[PROPOSED] BRIEF AMICI CURIAE BY MONOTYPE IMAGING INC., IN SUPPORT OF PLAINTIFF NICKY LAATZ'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Case No. 5:22-CV-04844-BLF

COPYRIGHT OFFICE, ANNUAL REPORT OF THE Examining Division, Copyright Office, for the Fiscal Year 1965, at 4 (1965), https://copyright.gov/reports/annual/archive/ar-examining1965.pdf).

### c. Accepting Defendants Argument Would Overturn Precedent Upon Which the Font Producing Industry Relies

As discussed above, the method used by Plaintiff to create the registered font software at issue in this dispute – the use of an editing program such as FontLab to input, manipulate, and adjust the on-curve and off-curve reference points for the glyphs of a typeface using a stylus – has long been the industry standard way to create font software. Kaestner Decl. ¶¶ 6-9. This was the methodology utilized in the industry in 1992 when the Copyright Office clarified that font software was protectable, and this was the method used by the prevailing plaintiff in *Adobe*. *See Adobe*, 1998 WL 104303 at *1; Kaestner Decl. ¶¶ 6-9. To hold that such a common and well-known practice would somehow render the output font software per se unprotectable as a matter of law would introduce chaos and uncertainty into the font and typeface industry and would work extreme harm on all aspects of that industry. Kaestner Decl. ¶ 10.

More than 5,000 individual creatives and foundries license their font software through Monotype and royalties for such software forms part or all of such licensor's income. Kaestner Decl. ¶ 8. If font software is held unprotected by intellectual property, this would mean that the legal basis for royalties vanishes, artists would lose the main incentive to create and distribute font software, and the profession of "type designer" would almost certainly disappear. *Id*. ¶¶ 10-11. Nor is this merely a niche concern, as prestigious design schools and universities such as the Rhode Island School of Design, the School of Visual Arts, Parsons School of Design at The New School, The Cooper Union, the Royal Academy of Art, The Hague (Netherlands), and the University of Reading (England) all provide specialized design curricula directed to that profession, and many such programs would likely collapse in response to a ruling that the vast majority of font software was unprotectable under copyright. *Id*. ¶¶ 10-11.

.

Such an outcome clearly contradicts the Copyright Office's consistent position that one major purpose of copyright is to ensure that artists can live off their creative works: "If authors cannot make a living from their craft, they are likely to produce fewer works. And in our view, society would be poorer if the sparks of human creativity become fewer or dimmer." The AI Report at 37. Rejecting copyright protection for font software simply because it was made using common technological tools would extinguish some of these "sparks of human creativity".

Additionally, holding that the use of editing software precludes registration of a creative work would not only impact the font industry, but would have strong ramifications throughout all technology markets. Most software today is programmed in development environments that assist in translating creative choices of the programmer to functional code. Designers of graphical user interfaces, video games, and data analytics, as but a few examples, regularly use editing programs that translate image and movement-based inputs into final source code. Protectable source code is often generated by editing software that aids in translating drawings, flowcharts, or other visual inputs into computer actionable code. Under Defendants' argument that use of software to translate visual inputs into source code cannot be protected, all such works would potentially be rendered unprotectable as a matter of law. Given the extreme impacts of deviating from the long precedent of copyright law, Defendants' position regarding the copyrightability of font software made via editing software must be rejected.

### IV. CONCLUSION

For the foregoing reasons, this Court, in deciding Defendants' pending Motion for Summary Judgment, should reject Defendants' argument that the asserted copyrights are ineligible for copyright protection because they were created using an editing program.

| | | |
|---|---|---|
| 1 | Dated: February 26, 2025 | GOODWIN PROCTER LLP |

By: */s/ Rachel M. Walsh*
Rachel M. Walsh (SBN 250568)
*rwalsh@goodwinlaw.com*
**GOODWIN PROCTER LLP**
Three Embarcadero Center
San Francisco, CA 94111
Tel.: +1 415 733 6000
Fax.: +1 415 677 9041

*Attorney for Monotype Imaging Inc.*

[PROPOSED] BRIEF AMICI CURIAE BY MONOTYPE IMAGING INC., IN SUPPORT OF PLAINTIFF NICKY LAATZ'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Case No. 5:22-CV-04844-BLF