QUINN EMANUEL URQUHART & SULLIVAN, LLP
RACHEL HERRICK KASSABIAN (Bar No. 191060)
*rachelkassabian@quinnemanuel.com*
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065-2139
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

ANDREW SCHAPIRO (admitted *pro hac vice*)
*andrewschapiro@quinnemanuel.com*
MIRANDA M. HULKA (admitted *pro hac vice*)
*mirandahulka@quinnemanuel.com*
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606-1881
Telephone: (312) 705-7400
Facsimile: (312) 705-7401

DANIEL C. POSNER (Bar No. 232009)
*danposner@quinnemanuel.com*
THOMAS D. NOLAN (Bar No. 238213)
*thomasnolan@quinnemanuel.com*
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543
Telephone: (213) 443-3000
Facsimile: (213) 443 3100

WILLIAM F. PATRY (admitted *pro hac vice*)
*williampatry@quinnemanuel.com*
KATY AKOPJAN (admitted *pro hac vice*)
*katyakopjan@quinnemanuel.com*
295 Fifth Avenue
New York, NY 10016
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

Attorneys for Defendants Zazzle Inc. and Mohamad Alkhatib

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

|  |  |
|---|---|
| NICKY LAATZ,<br><br>　　　　　Plaintiff,<br><br>　　vs.<br><br>ZAZZLE INC. and MOHAMED ALKHATIB,<br><br>　　　　　Defendants. | Case No. 5:22-cv-04844-BLF-VKD<br><br>**DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF PLAINTIFF'S DESIGNATED EXPERT WITNESSES**<br><br>Date: May 15, 2025<br>Time:  9:00 a.m.<br>Courtroom:  3<br>Judge:  Hon. Beth Labson Freeman<br><br>Trial Date: July 14, 2025 |
| ZAZZLE INC.,<br><br>　　　　　Counter-Claimant,<br><br>　　vs.<br><br>NICKY LAATZ,<br><br>　　　　　Counter-Defendant. |  |

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ..................................................................................................1

ARGUMENT .......................................................................................................2

I.     LEGAL STANDARDS ...............................................................................2

II.    THE COURT SHOULD EXCLUDE TESTIMONY OF PLAINTIFF'S EXPERTS UNDER FEDERAL RULES OF EVIDENCE 403 AND 702 AND *DAUBERT* .................3

     A.    The Court Should Exclude Portions Of Thomas Phinney's Testimony And All Of Stuart Sander's Testimony ...............................................3

          1.    The Court Should Exclude Phinney's And Sandler's Improper Legal Opinions About Copyright Validity And Infringement .................4

          2.    The Court Should Preclude Cumulative Testimony From Phinney And Sandler ...............................................................6

          3.    The Court Should Exclude Sandler's Lay Testimony About His Internet Searches Of The Copyright Office Website ...................7

          4.    The Court Should Exclude Sandler's Improper Legal Opinions About The Meaning Of The BE License ...................................8

          5.    The Court Should Exclude Sandler's Speculative And Irrelevant Opinions Regarding "Pending Designs" On Zazzle's Platform ...................10

     B.    The Court Should Exclude At Least Portions Of Daniel Garrie's Testimony .........11

          1.    The Court Should Exclude Garrie's Improper Legal Conclusions .............11

          2.    The Court Should Preclude Garrie From Testifying That Zazzle Users Directly "Used" Or "Accessed" The BE Font Data ...................12

          3.    The Court Should Exclude Garrie's Unsupported And Inaccurate Opinions About The Number Of Designs Depicting BE ...................13

          4.    The Court Should Exclude Garrie's Factual Narratives ...............................14

     C.    The Court Should Exclude Sara Parikh's Testimony ...................................15

     D.    The Court Should Exclude Dominic Persechini's Deeply Flawed Damages Opinions ...................................................................18

          1.    The Court Should Exclude Persechini's Flawed Opinions On Lost Profits Damages ...................................................18

          2.    The Court Should Exclude Persechini's Flawed Opinions On License-Based Damages ...............................................20

CONCLUSION ...................................................................................................24

# **TABLE OF AUTHORITIES**

**Page**

## **Cases**

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
    613 F. Supp. 3d 1308 (S.D. Cal. 2020), *aff'd*, 9 F.4th 1102 (9th Cir. 2021) ................. 5, 9, 11

*In re Canvas Specialty, Inc.*,
    261 B.R. 12 (Bkrtcy. C.D.Cal. 2001) ................................................................................. 9

*Citizens Fin. Grp., Inc. v. Citizens Nat. Bank of Evans City*,
    383 F.3d 110 (3d Cir. 2004) ............................................................................................. 15

*Clicks Billiards, Inc. v. Sixshooters, Inc.*,
    251 F.3d 1252 (9th Cir. 2001) .......................................................................................... 15

*Cooper v. Brown*,
    510 F.3d 870 (9th Cir. 2007) .............................................................................................. 2

*Crow Tribe of Indians v. Racicot*,
    87 F.3d 1039 (9th Cir. 1996) .............................................................................................. 4

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993) ........................................................................................... 1, 2, 3, 6, 11

*Desny v. Wilder*,
    46 Cal. 2d 715 (1956) ....................................................................................................... 23

*DSU Med. Corp. v. JMS Co.*,
    296 F. Supp. 2d 1140 (N.D. Cal. 2003), *aff'd*, 471 F.3d 1293 (Fed. Cir. 2006) .................... 21

*Elsayed Mukhtar v. Cal. State Univ. Hayward*,
    299 F.3d 1053 (9th Cir. 2002) ............................................................................................ 3

*Fisher v. Nissel*,
    No. CV 21-5839-CBM-(KSx), 2022 WL 16961479 (C.D. Cal. Aug. 15, 2022) ..................... 8

*Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*,
    772 F.2d 505 (9th Cir. 1985) ............................................................................................ 18

*GemCap Lending I, LLC v. Quarles & Brady, LLP*,
    787 F. App'x 369 (9th Cir. 2019) ....................................................................................... 4

*GemCap Lending, LLC v. Quarles & Brady, LLP*,
    269 F. Supp. 3d 1007, 1029 (C.D. Cal. 2017) ..................................................................... 4

*General Elec. Co. v. Joiner*,
    522 U.S. 136 (1997) ......................................................................................................... 17

*Hamil Am. Inc. v. GFI*,
    193 F.3d 92 (2d Cir. 1999), *cert. denied*, 528 U.S. 1160 (2000) .......................................... 19

*Hammler v. Hernandez*,
    No. 18CV259-CAB-MDD, 2020 WL 8970334 (S.D. Cal. Mar. 5, 2020) ............................... 3

*Hangarter v. Provident Life & Acc. Ins. Co.*,
    373 F.3d 998 (9th Cir. 2004) ...................................................................................... 3, 4, 11

*Holley v. Gilead Scis., Inc.*,
    No. 18-CV-06972-JST, 2023 WL 2469632 (N.D. Cal. Feb. 27, 2023) ................................... 5

*Icon-IP Pty Ltd. v. Specialized Bicycle Components, Inc.*,
    87 F. Supp. 3d 928 (N.D. Cal. 2015) ................................................................................... 5

*Johns v. Bayer Corp.*,
    No. 09CV1935 AJB DHB, 2013 WL 1498965 (S.D. Cal. Apr. 10, 2013) ........................... 14

*Kamar Int'l, Inc. v. Russ Berrie & Co.*,
    752 F.2d 1326 (9th Cir. 1984) ........................................................................................... 18

*Kumho Tire Co., Ltd. v. Carmichael*,
    526 U.S. 137 (1999) ............................................................................................................. 9

*LinkCo, Inc. v. Fujitsu Ltd.*,
    No. 00Civ7242 (SAS), 2002 WL 1585551 (S.D.N.Y. July 16, 2002) ................................. 14

*Lust By & Through Lust v. Merrell Dow Pharm., Inc.*,
    89 F.3d 594 (9th Cir. 1996) .................................................................................................. 3

*McHugh v. United Serv. Auto. Ass'n*,
    164 F.3d 451 (9th Cir. 1999) ..................................................................................... 4, 9, 11

*Moses v. Payne*,
    555 F.3d 742 (9th Cir. 2009) ............................................................................................... 8

*Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*,
    523 F.3d 1051 (9th Cir. 2008) ....................................................................................... 3, 11

*New Line Cinema Corp. v. Russ Berrie & Co.*,
    161 F. Supp. 2d 293 (S.D.N.Y. 2001) ............................................................................... 19

*Oracle Am., Inc. v. Google Inc.*,
    131 F. Supp. 3d 946 (N.D. Cal. 2015) ............................................................................... 19

*Oracle Am., Inc. v. Google Inc.*,
    No. C 10-03561 WHA, 2012 WL 4017808 (N.D. Cal. Apr. 10, 2012) ............................... 20

*Pelican Int'l, Inc. v. Hobie Cat Co.*,
    655 F. Supp. 3d 1002 (S.D. Cal. 2023) ............................................................................. 21

*Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*,
   752 F.3d 807 (9th Cir. 2014)................................................................7

*Roblox Corp. v. WowWee Grp. Ltd.*,
   No. 22-CV-04476-SI, 2024 WL 4057418 (N.D. Cal. Sept. 3, 2024)......................12

*San Francisco Baykeeper v. City of Sunnyvale*,
   627 F. Supp. 3d 1085 (N.D. Cal. 2022) ...............................................24

*Santa Clarita Valley Water Agency v. Whittaker Corp.*,
   2021 WL 6107023 (C.D. Cal., 2021) ...................................................6

*Silvertop Assocs. Inc. v. Kangaroo Mfg. Inc.*,
   931 F.3d 215 (3d Cir. 2019) ..........................................................6

*Stephens v. Union Pac. R.R. Co.*,
   935 F.3d 852 (9th Cir. 2019) .....................................................10, 13

*Think20 Labs LLC v. Perkinelmer Health Scis., Inc.*,
   No. SACV2100541CJCDFMX, 2023 WL 9005633 (C.D. Cal. Nov. 30, 2023) ...............21

*THOIP v. Walt Disney Co.*,
   690 F. Supp. 2d 218 (S.D.N.Y. 2010) .................................................17

*Thomson Reuters Enter. Ctr. GMBH v. Ross Intel. Inc.*,
   No. 1:20-CV-613-SB, 2025 WL 458520 (D. Del. Feb. 11, 2025) ..........................6

*U.S. v. Soderman*,
   429 Fed. App'x 663 (9th Cir. 2011)....................................................8

*United Fabrics Int'l, Inc. v. Lane Bryant, Inc.*,
   No. CV086865ODWPLAX, 2010 WL 11545595 (C.D. Cal. June 24, 2010) ....................20

**Statutes**

17 U.S.C. § 101 ............................................................................6

17 U.S.C. § 504(b) .......................................................................18

**Other Authorities**

5 Nimmer on Copyright § 14.03 (2024).......................................................19

Compendium of U.S. Copyright Practices § 721.3 ............................................6

Fed. R. Evid. 402 ........................................................................14

Fed. R. Evid. 403.................................................................1, 3, 6, 14

Fed. R. Evid. 702 ..................................................................................... 1, 2, 3, 5, 7, 8, 11, 13

## NOTICE OF MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:  PLEASE TAKE NOTICE THAT on May 15, 2025, before the Hon. Beth Labson Freeman, Courtroom 3, 5th Floor, San Jose Courthouse, 280 South 1st Street, San Jose, California, 95113, at 9:00 a.m., or as soon thereafter as the matter may be heard, Defendants Zazzle Inc. ("Zazzle") and Mohamed Alkhatib (together, "Defendants") will, and hereby do, move the Court for an order excluding certain anticipated trial testimony of Plaintiff's designated expert witnesses—Thomas Phinney, Stuart Sandler, Daniel Garrie, Sara Parikh, and Dominic Persechini—pursuant to Federal Rules of Evidence 403 and 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

## INTRODUCTION

The Court should exclude Plaintiff's designated experts' testimony, in whole or in part, because it is improper and inadmissible for multiple reasons.

***Thomas Phinney and Stuart Sandler***.  Phinney and Sandler hold themselves out as "font industry" experts.  Each intends to offer overlapping opinions at trial on contested legal issues as to which they have no foundation to testify and that are squarely in the Court's exclusive domain, including about the copyrightability of fonts, the validity of Plaintiff's copyright registrations, and, as to Sandler, the meaning of the Blooming Elegant ("BE") License.  None of this is proper expert testimony.  The Court should exclude Sandler's testimony entirely, and exclude Phinney's testimony except as relating to the operation of FontLab and Plaintiff's use of it.

***Daniel Garrie***.  Garrie purports to be a technical expert.  But he does not limit his opinions regarding the operation of the BE font data files on Zazzle's platform to technical opinions that he is qualified to offer.  Instead, he intends to offer sweeping, broad testimony on legal issues (*e.g.*, copyrightability, statute of limitations) that he has no expertise to offer, and that are based on assumptions (*e.g.*, about how a user would perceive how she is interacting with the BE font data on the Design Tool) that are speculative, unsupported, and inconsistent with his own deposition testimony.  The Court should exclude these improper aspects of Garrie's intended testimony because they do not constitute reliable expert opinion.

***Sara Parikh***.  Parikh is a purported survey expert on whose opinions Plaintiff intends to rely

to argue that BE was important and popular on the Zazzle platform. But by her own admission Parikh tested only whether 136 self-identified professional designers found BE "more appealing" or "unique" relative to five other fonts, including, for example, `Courier`. That is not the question in this case. Her testimony is useless and the Court should not allow her to present it to the jury.

***Dominic Persechini***. Persechini intends to offer trial testimony in support of Plaintiff's exorbitant damages claims based on Zazzle's alleged profits attributable to infringement and purported "license" fees. His methodology is flawed in several fatal ways. His calculations of Zazzle's profits ignore settled Ninth Circuit authority governing calculation of profits, which holds that a defendant may deduct "overhead" expenses from its revenue when, as here, the expenses contributed to the production and sale of the at-issue goods. His "alternative" measure of damages for contract and fraud—which would award Plaintiff a $14 "license fee" for each of the millions of users who visited Zazzle's Design Tool while BE was available, regardless of whether they actually designed or purchased a product bearing BE—is even more flawed. Persechini admitted that his analysis is not a "lost license" calculation at all because it bears no relation to the realities of the font market in which commercial font licenses (like Plaintiff's own license for BE) sell for mere dollars or, at most, a few thousand dollars for broad commercial rights. Because Persechini's calculations are not based on reliable methodologies—in addition to being contrary to the factual record and applicable law—the Court should preclude him from presenting them to the jury.

## **ARGUMENT**

## I.    **LEGAL STANDARDS**

Under Federal Rule of Evidence 702, expert testimony is admissible only if relevant and reliable. *See Daubert*, 509 U.S. at 589. Testimony is relevant if it will "assist the trier of fact to understand or determine a fact in issue." *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007). For expert testimony to be reliable, it must be "based on sufficient facts or data" and "the product of reliable principles and methods," and "the expert [must have] reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

District courts must act as "gatekeepers" to ensure that expert testimony is sufficiently reliable to assist the factfinder in understanding or determining a fact at issue, and to exclude

1    unreliable and irrelevant expert testimony.  *See Daubert* 509 U.S. at 597; *Elsayed Mukhtar v. Cal.*

2    *State Univ. Hayward*, 299 F.3d 1053, 1063 (9th Cir. 2002).  An expert may not "give an opinion as

3    to her legal conclusion, *i.e.*, an opinion on an ultimate issue of law," nor "instruct[ ] the jury as to

4    the applicable law."  *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1016 (9th Cir.

5    2004).  Nor may an expert opine on an ultimate issue of fact, as in doing so the expert substitutes

6    his judgment for that of the finder of fact.  *Hammler v. Hernandez*, No. 18CV259-CAB-MDD, 2020

7    WL 8970334, at *1 (S.D. Cal. Mar. 5, 2020) ("An expert is generally not permitted to opine on an

8    ultimate issue of fact except in limited circumstances, since such opinions may 'invade the province

9    of' the jury."); *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1060 (9th Cir. 2008)

10   ("evidence that merely tells the jury what result to reach is not sufficiently helpful to the trier of fact

11   to be admissible").  The proponent of the expert testimony bears the burden of proof on

12   admissibility.  *Lust By & Through Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir.

13   1996); *see also* Fed. R. Evid. 702 advisory committee's notes to 2000 amendment.

## II.    THE COURT SHOULD EXCLUDE TESTIMONY OF PLAINTIFF'S EXPERTS UNDER FEDERAL RULES OF EVIDENCE 403 AND 702 AND *DAUBERT*

### A.    <u>The Court Should Exclude Portions Of Thomas Phinney's Testimony And All Of Stuart Sander's Testimony</u>

18   Plaintiff plans to call two purported "font industry" experts at trial: Phinney and Sandler.

19   Phinney intends to offer testimony on (i) copyright registration requirements and practices; (ii) font

20   industry practices for designing and creating fonts and font software; and (iii) Plaintiff's process for

21   designing and creating BE within FontLab.  Sandler intends to offer testimony on: (i) copyright

22   registration requirements and practices; (ii) the meaning of the terms of the BE License and other

23   licenses offered by Plaintiff; and (iii) whether Zazzle's conduct "violated" the BE License.  For the

24   reasons set forth in detail below, the Court should exclude Phinney's and Sandler's testimony under

25   *Daubert*, except for Phinney's testimony regarding the operation of FontLab and Plaintiff's use of

26   it to create BE.  And at a minimum, the Court should preclude Phinney and Sandler from offering

27   cumulative testimony on the same subject matter.  *See* Fed. R. Evid. 403.

28

**1.    The Court Should Exclude Phinney's And Sandler's Improper Legal Opinions About Copyright Validity And Infringement**

Phinney and Sandler both intend to opine on (i) the law governing the copyrightability of fonts; (ii) the Copyright Office's historical and present practices and policies regarding the registration of fonts; (iii) the meaning of the Copyright Office's correspondence with Plaintiff's counsel regarding her applications to register the BE copyrights; (iv) the validity of Plaintiff's BE copyright registrations; and (v) Zazzle's alleged infringement of the BE copyrights.  *See, e.g.*, Declaration of Thomas Nolan ("Nolan Decl.")[1] filed concurrently, at Ex A, Phinney Report ¶¶ 2 (stating that similar font software has been "eligible for … copyright registration for over 30 years"), 26-27 (purporting to interpret the 1976 Copyright Act), 28 (opining on what the Copyright Office had "in mind" in 1992), 31 (interpreting a court decision), 39-41 (stating that his opinion is the "only reasonable interpretation" of the Copyright Office's position and stating what the Examiner "could not have meant"); Ex. B, Phinney Rebuttal Report ¶¶ 10 (purporting to opine on the Copyright Office's definition of "computer program"), 19 (stating what the Copyright Office "knew" and intended in 1992); Ex. C, Sandler Rebuttal Report ¶¶ 13-21 (stating legal conclusions based on the Copyright Office Compendium), 29 (accusing the Copyright Office Examiner of committing "misfeasance" by not adhering to Sandler's interpretation of copyright law), 31 (stating that the BE fonts "are copyrightable").  The Court should exclude these improper opinions.

It is well established that experts may not offer opinions instructing the jury on the applicable law, or drawing ultimate legal conclusions based on the facts.  *Hangarter*, 373 F.3d at 1016.  Nor can expert testimony "be used to provide legal meaning or interpret [legal documents] as written," which both experts seek to do here.  *McHugh v. United Serv. Auto. Ass'n*, 164 F.3d 451, 454 (9th Cir. 1999); *see also Crow Tribe of Indians v. Racicot*, 87 F.3d 1039, 1045 (9th Cir. 1996) (role of experts is to interpret and analyze facts, not to testify about the law); *GemCap Lending, LLC v. Quarles & Brady, LLP*, 269 F. Supp. 3d 1007, 1029 (C.D. Cal. 2017), *aff'd sub nom. GemCap Lending I, LLC v. Quarles & Brady, LLP*, 787 F. App'x 369 (9th Cir. 2019) ("An expert's

---

[1]  Citations herein to "Ex.__" are to Exhibits to the Nolan Declaration unless otherwise noted.

1    interpretations of statutes and regulations ... are 'statements of the law ...' that 'should be

2    excluded.'").    Because Phinney's and Sandler's "opinions" about the applicable copyright

3    registration requirements violate these basic principles, the Court should exclude them.

4         The Court should also preclude Phinney and Sandler from testifying about these legal issues

5    because they are not qualified to do so.  *See* Fed. R. Evid. 702.  Neither Phinney nor Sandler has the

6    appropriate expertise to testify regarding internal Copyright Office practices or policies, copyright

7    law more generally, or the Copyright Office's state of mind (purpose or intent) in issuing regulations

8    and corresponding with Plaintiff about her applications.  Neither has any background in copyright

9    law or has worked at the Copyright Office, and neither was involved in drafting any of the Copyright

10   Office's rules and regulations.  *See, e.g.*, Ex. A, Phinney Report ¶ 25 (admitting he is not a lawyer);

11   Ex. D, Sandler Dep. Tr. 28:12-17 (same) and 214:2-4 (admitting he has never worked for the

12   Copyright Office); Ex. F, Phinney Dep. Tr. 311:5-314:21 (admitting he has no personal knowledge

13   of what the Copyright Office considered or meant in the 1992 Regulation); 48:3-11 (admitting he

14   has never corresponded with the Copyright Office or any of its employees); 51:19-52:9 (admitting

15   his only non-public knowledge about, or insight into, the Copyright Office's policies, procedures,

16   or handling of registrations of fonts is from conversations with persons that have applied for

17   copyright registration in font files).  Thus, even it were otherwise proper for Phinney and Sandler to

18   opine about legal standards relating to copyrightability of fonts—and it is not—they lack the

19   requisite expertise to do so.  *Cf. Icon-IP Pty Ltd. v. Specialized Bicycle Components, Inc.*, 87 F.

20   Supp. 3d 928, 946 (N.D. Cal. 2015) (permitting expert witness "who spent more than thirty-four

21   years working at the PTO[] to testify about the general practices and procedures of that office").

22        Moreover, courts are clear that "the opinions of [expert] witnesses on the intent, motives, or

23   states of mind of corporations, regulatory agencies and others have no basis in any relevant body of

24   knowledge or expertise."  *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 613 F. Supp. 3d

25   1308, 1320-21 (S.D. Cal. 2020), *aff'd*, 9 F.4th 1102 (9th Cir. 2021); *see also Holley v. Gilead Scis.,*

26   *Inc.*, No. 18-CV-06972-JST, 2023 WL 2469632, at *7 (N.D. Cal. Feb. 27, 2023) (excluding expert

27   testimony that opined on the FDA's "state of mind," including what the FDA "was aware of" and

28   its views on certain classes of drugs).  Any testimony about the Copyright Office's intent or the

-5-

DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF PLAINTIFF'S
DESIGNATED EXPERT WITNESSES

1   Copyright Examiner's motives or the intended meaning of his statements would necessarily be based

2   on Phinney's and Sandler's "subjective belief or unsupported speculation," *Daubert*, 509 U.S. at

3   590, and thus is inherently unreliable and irrelevant.

4       Further, Phinney's and Sandler's opinions that Plaintiff's BE copyright registrations are

5   valid go directly to the ultimate issue of law that underlies Plaintiff's claim for copyright

6   infringement and Zazzle's counterclaim for copyright invalidity.  A determination of the validity of

7   Plaintiff's asserted BE copyrights is a legal question for the Court to decide, and thus not a proper

8   matter for expert testimony.  *Thomson Reuters Enter. Ctr. GMBH v. Ross Intel. Inc.*, No. 1:20-CV-

9   613-SB, 2025 WL 458520, at *2 (D. Del. Feb. 11, 2025) ("Copyright validity is a question of law,

10  not fact[.]") (citing *Silvertop Assocs. Inc. v. Kangaroo Mfg. Inc.*, 931 F.3d 215, 219 (3d Cir. 2019)).

11      For similar reasons, the Court should preclude Phinney and Sandler from testifying that the

12  BE "font data" constitutes "source code," "software," or a "computer program."  Both conceded

13  that they are not computer scientists and do not have any education or professional experience in

14  computer programming. Ex. F, Phinney Dep. Tr. 86:11-20, 65:24-66:4, 236:17-19; Ex. D, Sandler

15  Dep. Tr. 27:21-28:3, 131:7-16 (stating he is not a technical expert).  Moreover, the Copyright Act

16  and Compendium define a "computer program" and "source code."  17 U.S.C. § 101; Compendium

17  § 721.3 (re. "source code").  It would be improper for Phinney and Sandler to offer (unqualified)

18  legal opinions that the Copyright Office was wrong to conclude that the BE font data was not a

19  "computer program" because it did not constitute "source code"—which is unquestionably a correct

20  conclusion under the Copyright Act—and the Court should preclude them from doing so.

### 2.    The Court Should Preclude Cumulative Testimony From Phinney And Sandler

22      At a minimum, the Court should preclude Phinney and Sandler from presenting overlapping

23  testimony on the same subject matter (copyright registration requirements and practices), because

24  such cumulative testimony is unnecessary and would unduly prejudice Defendants.  *See* Fed. R.

25  Evid. 403; *Santa Clarita Valley Water Agency v. Whittaker Corp.*, 2021 WL 6107023, at *3 (C.D.

26  Cal., 2021) (disallowing "the introduction of expert evidence that is duplicative, cumulative, and

27  confusing").  If the Court allows Phinney or Sandler to testify on copyright registration issues at all

28

1    (it should not), the Court should preclude any duplicative testimony regarding on these issues.

2        ### 3.    The Court Should Exclude Sandler's Lay Testimony About His Internet Searches Of The Copyright Office Website

3

4        Sandler additionally intends to offer improper "opinions" that certain third-party copyright

5    registrations, for "fonts" he purportedly discovered by searching the Copyright Office public

6    website, support his opinions about the Copyright Office's policies and practices in registering fonts,

7    including that he "estimate[s] that there are 36 font software copyright registrations … that have

8    been issued by the United States Copyright Office from 2020 to date," some of which he believes

9    (without explanation) were created with the use of "font editing software."  *See, e.g.*, Ex. E, Sandler

10   Report ¶¶ 62-66; Ex. C, Sandler Rebuttal Report Appendix A.  These opinions are improper because

11   (i) Sandler's search of public Copyright Office records is incomplete, unhelpful, and unreliable; (ii)

12   his haphazard internet searches (which any lay person could have conducted) do not qualify as

13   expert analysis; and (iii) his purported analysis of the significance of these other registrations is just

14   more improper legal opinion.

15       A court may exclude expert testimony that is based on unreliable principles or methods or

16   legally insufficient facts and data.  Fed. R. Evid. 702; *Pyramid Techs., Inc. v. Hartford Cas. Ins.

17   Co.*, 752 F.3d 807, 813 (9th Cir. 2014) ("[T]he trial court must assure that the expert testimony both

18   rests on a reliable foundation and is relevant to the task at hand.").  Here, Sandler conducted a

19   superficial and arbitrary search of the Copyright Office website and extracted limited information

20   from publicly available registration certificates to support his opinions about the Copyright Office's

21   purported practices regarding the registration of fonts.  These searches were the product of unreliable

22   "cherry-picking," as he ignored a significant amount of relevant information in the Copyright Office

23   records, including the correspondence files that would reveal what the applicants did to create their

24   fonts and the representations they made to the Copyright Office about that.  As Defendants showed

25   on summary judgment, even a cursory examination of a few such correspondence files (which

26   Zazzle obtained from the Copyright Office in response to Sandler's misguided opinions about the

27   records he obtained) shows that—contrary to Sandler's misguided assumptions based on the

28   certificates of registration alone—the Copyright Office has repeatedly and consistently required

applicants to represent (as Plaintiff could not credibly do here) that they "hand coded" the entirety of the font-data files they applied to register and did not generate that data with a third-party font-generating program like FontLab.  *See* Dkt. 347 at 11.  These correspondence files confirm that the testimony Sandler intends to offer about other registrations is unreliable and misleading.

Moreover, Sandler's purported "analysis" of the third-party copyright registrations he identified is based only on internet searches that any lay person could have performed (with less bias and more integrity).  The searches required no specific skills or professional acumen, and they therefore are not the proper subject of expert testimony.  *See, e.g*., *Moses v. Payne*, 555 F.3d 742, 756 (9th Cir. 2009) ("Under Rule 702, expert testimony is helpful to the jury if it concerns matters beyond the common knowledge of the average layperson and is not misleading."); *U.S. v. Soderman*, 429 Fed. App'x 663, 667 (9th Cir. 2011) (finding that "knowing where to find . . . information online and which search engines to use" was a lay witness opinion, not an expert opinion).

Further, these other font registrations are "matters of public record" of the Copyright Office, and are therefore properly subject to judicial notice.  *Fisher v. Nissel*, No.: CV 21-5839-CBM-(KSx), 2022 WL 16961479, at *3-4 (C.D. Cal. Aug. 15, 2022).  Thus, if there were any basis for Plaintiff to introduce "evidence" at trial relating to the legal standards that apply to the registration of fonts, then the appropriate way for her to do so would be to seek judicial notice (or a stipulation) to introduce the records into evidence, and then explain their significance through attorney argument.  But in no event would it be proper for Plaintiff to have an expert with no relevant qualifications offer speculative (and incorrect) opinions about the meaning of the records.  Accordingly, the Court should exclude any testimony from Sandler about his search and "analysis" of Copyright Office records.

### 4.   The Court Should Exclude Sandler's Improper Legal Opinions About The Meaning Of The BE License

Sandler also plans to opine on (i) the meaning of the terms of the BE License, and (ii) whether Zazzle's licensing practices "violated standard font industry licensing practices."  Ex. E, Sandler Report ¶ 12; *see id.* ¶¶14-22, 23-33, 35-43, 48, 49, 51-61.  This testimony is improper too.

Contract construction is the function of the court, and unless a contract is deemed

1    ambiguous, it is also "improper for an expert to interpret or construe a contract in his opinion." *Aya*

2    *Healthcare Services, Inc.*, 613 F.Supp.3d at 1320; *McHugh*, 164 F.3d at 454 ("[Expert] testimony

3    cannot be used to provide legal meaning or interpret the policies as written").  The Court should not

4    permit Sandler to construe the contract for the jury, invading the function of the Court.

5        Nor should the Court permit Sandler to construe the BE License on the basis of supposed

6    "font-industry standards" or font industry "custom and usage"—because there is no recognized field

7    of expertise in "font industry standards."  "Where there is no field of expertise, nobody will qualify

8    as an expert witness on the subject."  *In re Canvas Specialty, Inc.*, 261 B.R. 12, 19 (Bkrtcy. C.D.Cal.

9    2001); *see, e.g.*, *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999) (explaining that

10   astrology and necromancy lack a recognized body of knowledge to support expertise).  Nevertheless,

11   Sandler premises his interpretation of the BE License solely on his "understanding of the font

12   industry" or "font industry standards."  *See* Ex. E, Sandler Report ¶¶ 14, 15, 18-22, 25, 27, 29, 32,

13   33, 36, 38-40, 42, 47, 49, 52, 54-58).  At the same time, he admits that the font industry is "not an

14   organized entity" but instead a "loose coalition of independent font authors and font distributors

15   [who] have their own businesses and their own practices."  Ex., D, Sandler Dep. Tr. 56:23-57:22.

16   He further acknowledged that there are no memorialized set of rules or standards for this purported

17   "industry."  *Id.* 58:20-59:13.  Phinney, similarly denied that there is an industry "standard" for font

18   licensing.  Indeed, when asked whether he "believed there is an industry standard for font license

19   rates," Phinney replied:  "Gosh, no.  I don't think there's a single standard."  Ex. F, Phinney Dep.

20   Tr. 39:21-40:13.  And Defendants are aware of no case where a Court has recognized the "font

21   industry" as a recognized body of knowledge and expertise.

22       Even if the "font industry" did lend itself to such expertise, Sandler offers no foundation—

23   other than *ipse dixit*—for his claim that Creative Market, the issuer of the BE License, is a "member"

24   of the "font industry," or that the applicable Creative Market Standard License was drafted in

25   accordance with "font industry standards."  *See* Ex. D, Sandler Dep. Tr. 84:5-84:15 ("I did not find

26   the terms and conditions [Creative Market] extended to their customers to be the same terms and

27   conditions which I would be comfortable extending my font typeface and font software products for

28   sale.").  Sandler admitted that "[t]he Creative Market Standard Licenses Terms cover digital content

licensed by Creative Market, not just fonts and font software." Ex. E, Sandler Report ¶17. The Court should preclude Sandler from offering "expert" opinions regarding the meaning of the BE License purportedly based on his understanding of "font industry" standards, because there is no such thing—and if there is, the BE License does not conform to it.

### 5.   The Court Should Exclude Sandler's Speculative And Irrelevant Opinions Regarding "Pending Designs" On Zazzle's Platform

Finally, the Court should preclude Sandler from offering his wildly speculative opinions regarding "pending designs," which are unsaved drafts of designs that Zazzle users subsequently abandoned. In ostensible support of Plaintiff's misguided damages theory based on a lost-license fee (discussed below), Sandler intends to testify that any quantification of the Zazzle users who accessed the Design Tool while BE was available must include users with unfinished designs (*e.g.*, users who may have just played around with BE (and other typefaces) on the Design Tool but never finished or purchased any products bearing BE). *See* Ex. E, Sandler Report ¶¶ 46-47.

As an initial matter, the Court has already ruled, multiple times, that "pending designs" are not relevant to this case. *See* Dkts. 287 and 288 (Magistrate Judge DeMarchi finding pending designs irrelevant to any claim or defense), and Dkts. 314 and 333 (affirming Judge DeMarchi's decision). Sandler's irrelevant testimony regarding "pending designs" would be a waste of the Court and jury's time and would undoubtedly cause unnecessary jury confusion.

Moreover, Sandler's opinions about "pending designs" are unreliable, speculative, and lack evidentiary support. Sandler merely assumes—with no basis—that a Zazzle user who creates a stylized graphic using the Design Tool "would likely complete and capture their design before taking the steps that would cause the design to become what Zazzle refers to as a 'finished' or 'finalized' design." Ex. E, Sandler Report ¶ 47. These assumptions amount to pure guesswork as to what unidentified Zazzle users may or may not have done to "capture" unfinished designs. Expert opinions based on mere "assumptions and speculation" are inadmissible. *Stephens v. Union Pac. R.R. Co.*, 935 F.3d 852, 856 (9th Cir. 2019). The Court should exclude Sandler's opinions about "pending designs," such as his unsupported conclusion that "the number of total users Zazzle allowed to access the Zazzle design tool containing the Blooming Elegant Trio is likely substantially

1   understated" because it excludes "pending designs."  Ex. E, Sandler Report ¶ 47.

2        **B.    The Court Should Exclude At Least Portions Of Daniel Garrie's Testimony**

3        Garrie, a purported "technical" expert, intends to testify regarding the operation of Zazzle's

4   Design Tool and Plaintiff's BE font data.  The Court should limit Garrie's testimony to these

5   technical topics, and exclude the other impermissible legal conclusions, speculative testimony,

6   factual narratives, and flawed opinions he apparently intends to offer, as detailed below.

7             **1.    The Court Should Exclude Garrie's Improper Legal Conclusions**

8        In his expert report, Garrie offered several opinions about ultimate legal issues in this case,

9   including that the "BE Software"—which Garrie defines as the BE "OTF" files—are "copyright

10  protected"; that the License Terms restrict use of the "fonts and the font software"; that Zazzle

11  breached the BE License and infringed Plaintiff's copyrights by giving its users "unlicensed access"

12  to the BE fonts and distributing "derivative works" of the BE font data; that "Zazzle continued to

13  make the Blooming Elegant Trio of Fonts available on the Design Tool for at least two years despite

14  knowing that Zazzle's use of the Blooming Elegant Trio of Fonts violated the License"; and about

15  whether Plaintiff was on "notice" of her claims for purposes of the statute of limitations.  *See* Ex.

16  G, Garrie Report pp. 2, 4-5, 7 n.27, 11, 25, 35-37, 40, 41; Garrie Decl. (Dkt. 342-52) ¶ 19.  At

17  deposition, Garrie confirmed that he plans to testify at trial consistent with his report.  Ex. H, Garrie

18  Dep. Tr. 160:6-18, 285:7-14, 288:7-21.

19       The Court should preclude Garrie from offering these unsupported and improper legal

20  opinions that he is not qualified to offer.  Such testimony would usurp the Court's duty to decide

21  the law and the jury's duty to decide the ultimate facts.  *See, e.g.*, *Hangarter*, 373 F.3d at 1016;

22  *McHugh*, 164 F.3d at 454; *Nationwide*, 523 F.3d at 1058.  Garrie's testimony on these issues, such

23  as that Zazzle "knew" it violated the BE License, is also mere speculation about a corporation's

24  intent and motives.  Fed. R. Evid. 702; *Daubert*, 509 U.S. at 590.  Garrie has never worked at Zazzle,

25  he was not involved in the purchase of the BE License or Zazzle's use of the BE fonts, and he is not

26  qualified to opine on Zazzle's knowledge or state of mind.  Ex. H, Garrie Dep. Tr. 19:15-20:-14;

27  *Aya Healthcare Servs.*, 613 F. Supp. 3d at 1320-21.

28       Similarly, the Court should preclude Garrie from testifying that Zazzle created and delivered

-11-                              Case No. 5:22-cv-04844-BLF-VKD

1  "derivative works" based on the BE "OTF" data files to Zazzle's users.  Ex. G, Garrie Report pp.

2  25, 36, 37, 40.  The question of whether something is a "derivative work" is a legal conclusion, *see,*

3  *e.g.*, *Roblox Corp. v. WowWee Grp. Ltd.*, No. 22-CV-04476-SI, 2024 WL 4057418, at *7 (N.D. Cal.

4  Sept. 3, 2024) (excluding expert testimony about whether works were "derivative works" as "an

5  improper opinion about a legal conclusion"), and one that Garrie, a computer scientist who identifies

6  strictly as a technical expert, is not qualified to make.  Indeed, when asked what he meant by

7  "derivative work" and whether he intends to testify that Zazzle created derivative works based on

8  the BE OTF files in a legal sense, Garrie denied that he would.  Ex. H, Garrie Dep. Tr. 263:17-

9  265:23.  The Court should ensure he does not by precluding him from offering this testimony.

10          **2.      The Court Should Preclude Garrie From Testifying That Zazzle Users
                      Directly "Used" Or "Accessed" The BE Font Data**

11

12          To support her theories of breach of contract and copyright infringement, Plaintiff intends

13  to rely on Garrie's opinion that "Zazzle enabled millions of users **to use the Software** [*i.e.*, the OTF

14  files] to render text in the Blooming Elegant Trio of Fonts using the Design Tool."  Ex. G, Garrie

15  Report p. 40 (emphasis added).  The Court should preclude Garrie from offering this unreliable and

16  incorrect opinion.  Indeed, Garrie himself makes clear in his report ████████████████████

17  █████████████████████████████████████████████████████████████████████████████

18  ██████████████████.  For example, Garrie states that when a "user selected 'Blooming Elegant'

19  from the font menu to write [text], █████████████████████████████████████████████████

20  ███."  *Id.* pp. 36-37, 40 (emphasis added).  Similarly, Garrie conceded at deposition that Zazzle

21  users do not directly access the licensed OTF files or the font data contained therein, but instead

22  ████████████████████████████████████████  Ex. H, Garrie Dep. Tr. 290:24-291:8.

23  Consistent with Garrie's admissions in his report and at his deposition, it is undisputed that Design

24  Tool users never access, view, or use any part of the BE OTF files or the font data contained therein,

25  as Zazzle's Chief Technology Officer and Vice President of Engineering have repeatedly confirmed.

26  Ex. I, Li Dep. Tr. 122:9-19; Ex. J, Beaver Dep. Tr. 40:1-43:14.

27          Garrie attempts to bridge the obvious gap between his findings and his ultimate conclusion

28  by stating that, "from a user's perspective, the outcome of the process . . . is effectively the same as

a user directly obtaining a copy of the Software, installing it on their computer, and having the option to use it to generate text in the Blooming Elegant Trio of Fonts within a design tool." Ex. G, Garrie Report p. 37. But Garrie's speculation about what would be "effectively the same" to a hypothetical user is neither proper expert testimony nor a credible factual basis for an opinion that, as a technical matter, Zazzle allows its users to access the font data files held on its servers. *See Stephens*, 935 F.3d at 856 (expert opinions based on mere "assumptions and speculation" are inadmissible).

Nor could Garrie credibly opine that ***Zazzle's use*** of the BE font data is "effectively the same" as a user "directly obtaining" his or her own copy of the BE OTF files, as Garrie admitted that users who directly obtained the BE OTF files and installed them on their device "would have a much wider breadth of use" than they gain from supposedly "accessing" the BE typefaces on Zazzle's Design Tool. Ex. H, Garrie Dep. Tr. 296:22-297:4. For example, a user who obtains her own copy of the BE OTF files would be able to install the files on a local computer and use the fonts in applications like Microsoft Word or Adobe Acrobat in the same way the user could use any of the default fonts provided in those applications, or could embed the font data in a website such that all text on the website automatically renders in that font. Neither of these functions is possible with the renderings of the BE typefaces displayed to the user in the Design Tool. The Court should preclude Garrie from offering misleading and incorrect testimony that Zazzle permitted its users to "access" or "use" the BE font data, or that what Design Tool users did to "access" or "use" the BE typefaces is "effectively the same" as having full and direct access to the BE font data, particularly when Garrie's own testimony and report prove the falsity of such testimony. *See* Fed. R. Evid. 702.

### 3. The Court Should Exclude Garrie's Unsupported And Inaccurate Opinions About The Number Of Designs Depicting BE

To inflate the number of users who, according to Plaintiff's damages expert, would have needed to obtain their own license to use BE on Zazzle's Design Tool, Garrie states in his Report that at least ███████ users created or customized at least one design in the Design Tool during the relevant period, and that these users created at least ██████ unique designs in the Design Tool depicting BE. Garrie also ventures into pure speculation by opining that "the actual numbers for both are likely significantly higher" because the numbers he provided do not account for "pending

designs" (*i.e.*, abandoned drafts, as discussed above).  Ex. G, Garrie Report pp. 38-40.

To support these opinions, Garrie purports to rely on Defendants' response to Interrogatory No. 12, which he claims shows that "the Software was used to generate text in the Blooming Elegant Trio of Fonts in at least ███████ unique designs using the Design Tool."  *Id*. p. 38.  But as the Interrogatory Response makes clear, ████████ is the number of ***products sold*** depicting BE, not the number of ***designs created*** depicting BE; the two are entirely distinct.  *See* Ex. K. at 15.  In fact, Zazzle provided the number of designs created depicting BE in its Response to Interrogatory No. 5, which Garrie ignores, and that number is ████████.  *See id*. at 10-11.  Garrie's opinion is thus demonstrably inaccurate.

Further, as discussed above, "pending designs" are irrelevant, and the Court should exclude any testimony about them as it would risk confusing the jury. Fed. R. Evid. 402, 403.  And even if "pending designs" were somehow relevant, Garrie's opinion that the number of Zazzle users who created a design depicting BE is "likely significantly higher" than the estimated ████████ users and (incorrect) ████████ designs is pure speculation.  As he admits, "it is not possible to know how many times the Blooming Elegant Trio of Fonts were used in pending designs," and Garrie has offered no basis for his conclusion that the number of "pending designs" was "significant."  Ex. G, Garrie Report p. 40.  The Court should exclude these speculative and irrelevant opinions.

### 4. The Court Should Exclude Garrie's Factual Narratives

Finally, the Court should preclude Garrie from testifying about any of the lengthy factual narratives he included in his Report regarding Plaintiff's creation of BE or Zazzle's purchase and use of BE.  *See e.g.*, Ex. G, Garrie Report, Section II.A.  It is well established that experts may not offer a factual narrative simply to give it the imprimatur of "expert" testimony.  *See, e.g.*, *Johns v. Bayer Corp*., No. 09CV1935 AJB DHB, 2013 WL 1498965, at *28 (S.D. Cal. Apr. 10, 2013) (excluding expert testimony that "offer[ed] nothing more than a factual narrative" of documents in the record); *LinkCo, Inc. v. Fujitsu Ltd*., No. 00Civ7242 (SAS), 2002 WL 1585551, at * 1-2 (S.D.N.Y. July 16, 2002) (where expert's report was based on a review of "documents, computer documents, computer files, deposition transcripts and exhibits," the "testimony by fact witnesses familiar with those documents would be far more appropriate ... and renders [the expert witness]"

secondhand knowledge unnecessary for the edification of the jury").  Nor is Garrie—a technical expert—qualified to offer expert testimony on these issues.

### C.    The Court Should Exclude Sara Parikh's Testimony

Parikh intends to offer survey evidence and related testimony to support her opinion that the "Blooming Elegant Trio is an important and popular set of fonts on Zazzle," Ex. L, Parikh Report p. 20, and the related inference that BE had outsized importance to Zazzle's platform and overall business.  Plaintiff intends to use the Parikh survey to justify her astronomical damages demand. Parikh's survey is fatally flawed and does not support these conclusions at all.  The Court should exclude Parikh's testimony entirely or, at a minimum, strictly limit Parikh's testimony to the facts of her survey.

Although issues with "methodology, survey design, reliability, the experience and reputation of the expert, critique of conclusions" typically go to the weight accorded to the survey, that is only after a court has determined that the survey is "conducted according to accepted principles."  *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1263 (9th Cir. 2001).  Here, Parikh's survey departs from scientifically accepted principles of survey design in multiple ways:  (i) the "universe" of survey participants was under-inclusive and not representative; (ii) the prompts she provided to the respondents were biased and not fairly representative; (iii) her survey failed to include a control which would allow Defendants to determine the degree of error or bias in her responses; and (iv) she purports to draw conclusions from her survey that are not supported by the questions she asked.

***Unrepresentative "Universe."***  Selecting the proper population to survey (the "universe") is critical.  To support any reliable conclusions, a survey must query relevant people; if it does not, it "will be of little probative value in litigation."  *Citizens Fin. Grp., Inc. v. Citizens Nat. Bank of Evans City*, 383 F.3d 110, 119 (3d Cir. 2004).  Parikh limited her survey universe to graphic designers on Zazzle at the "Bronze level" or above, which requires a certain substantial minimum threshold of sales.  Ex. L, Parikh Report p. 6.  She did not survey designers below the Bronze level, Zazzle designers who did not sign up for the "Pro" program which assigns these levels, Zazzle customers, or other users.  Ex. M, Parikh Dep. Tr. at 30:15-32:3.  She said she limited the universe this way because she assumed that the group she surveyed constituted most of Zazzle's sales.  *Id.* 111:7-

112:1.  That is verifiably false, and Parikh even admitted that she "didn't know how Zazzle's sales distribute by their badge level," or what percentage of people who used BE on Zazzle were designers at the Bronze level or above.  *Id.* 112:24-113:1, 116:2-14.  Nor could she provide any basis to conclude that the opinions of Bronze-level designers are representative of the opinions of lower tier designers or the public at large.  *Id.* 119:15-20.  It is impossible to know from Parikh's survey whether or not such Bronze designers are actually representative of all users of the Design Tool, because Parikh did not collect data on Zazzle customers, designers below the Bronze level, or other users who are not professional graphic designers.

Parikh's universe was thus both unrepresentative and underinclusive, as she excluded not only graphic designers who did not reach Zazzle's Bronze level, but also Bronze-level Zazzle sellers who do not consider themselves graphic designers (who were screened out of her sample, *id.* 145:2-6), and ordinary Zazzle users and customers who select or customize products to purchase.  Her results are therefore inapplicable to Zazzle users, customers, or designers as a whole.  If the Court permits Parikh to testify at all, the Court should limit her testimony to opinions about the supposed views of ***Zazzle sellers at the Bronze level or higher who are professional graphic designers***, and exclude any testimony that extrapolates her opinions to any other Zazzle designers or users because her survey did not measure their views.

***Under-representative Typeface Sampling.***  Through her survey, Parikh purports to "to measure awareness, usage, and perceptions of the Blooming Elegant Trio set of fonts among graphic designers who sell their products on Zazzle."  Ex. L, Parikh Report p. 4.  But she did so ***not*** by providing the survey respondents with a fulsome presentation of available typefaces on Zazzle, or even all typefaces that bear similar characteristics to BE, but rather by placing images of the three BE typefaces alongside five other typefaces, or "trios" of typefaces, that she selected arbitrarily, and not for any similarity or comparability to BE.  Ex. M, Parikh Dep. Tr 50:11-18.  She then asked her survey respondents whether these handful of typefaces were appealing, unique, important to their work, and difficult to substitute.  Parikh's survey examples were so limited, so arbitrarily chosen, and so unrepresentative of available fonts, that it would not be helpful for the jury to consider them—as whether BE is "popular" or "important" *vis-à-vis* five other cherry-picked and dissimilar

-16-

typefaces has no bearing on this case and does not support Parikh's ultimate conclusion about BE's "importance." The Court should preclude Parikh from testifying about her survey on this basis alone. And at a minimum, the Court should limit Parikh's testimony to statements about how the BE typefaces compare to ***the five other specific typefaces or trios of typefaces*** she selected for comparison—but not to the general "importance" or "popularity" of BE overall.

**_Improper Omission of a "Control."_** A "control" allows a survey expert to "estimate the degree of background 'noise' or 'error' in the survey." *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 240 (S.D.N.Y. 2010). Parikh acknowledged that she did not use a control, claiming only that it was not necessary to her survey. Ex. M, Parikh Dep. Tr. 176:11-16. Defendants' rebuttal survey expert, Scott Swain, has explained the various sources of error or bias that pervade Parikh's results because of that omission. Ex. N, Swain Rebuttal Report pp. 13-16. This choice was a departure from generally accepted standards of the scientific community and prejudices Defendants by depriving their expert of the means to quantify the effect of the sources of error or bias present in her survey design. *Id.*; *THOIP.*, 690 F. Supp. 2d at 240. The Court should exclude Parikh's survey entirely based on her improper omission of a control.

**_Unsupported Conclusions._** Finally, an expert's sources and data must support their opinions. Where there is "simply too great an analytical gap between the data and the opinion proffered," the expert's testimony is unreliable and should be excluded. *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Parikh's survey questions asked only whether each typeface she showed the respondents was "appealing," "unique," "important to you in your work," and "difficult for you to find a similar font that would serve as a good substitute." Ex. L, Parikh Report pp. 11-12. Based on answers to her questions limited to these characteristics, Parikh framed her ultimate conclusion as follows: the "Blooming Elegant Trio is an important and popular set of fonts on Zazzle." *Id.* p. 20. When asked why she chose these particular characteristics to test a hypothesis about the "popularity" and "importance" of BE on Zazzle, Parikh stated only that "I wrote the questionnaire." Ex. M, Parikh Dep. Tr. 37:2-39:1. Parikh also conceded that her data did not allow her to conclude whether BE was overall more important than the "Courier" font (one of her five comparators), *id.* 194:15-19, or whether Blooming Elegant was more popular than Courier or Century Bold (another

1  comparator), *id.* 195:5-21.  Parikh was also unable to explain how she defined the "importance" or

2  "popularity" of a font, and could not explain how the four characteristics she asked about translated

3  to her overall conclusion about importance and popularity on Zazzle.  *Id.* 193:19-196:8.

4      In short, Parikh conceded that she cannot use the data she gathered from her survey to

5  support her ultimate conclusions about BE's supposed importance and popularity.  The Court should

6  therefore preclude Parikh from offering her unreliable and unsupported opinions.  And if the Court

7  permits Parikh to testify at all, it should preclude her from offering any opinions about the overall

8  popularity or importance of BE on Zazzle.

9      **D.    The Court Should Exclude Dominic Persechini's Deeply Flawed Damages**
10          **Opinions**

11      Plaintiff intends to call Persechini to testify on damages, including (i) the disgorgement of

12  Zazzle's alleged profits from its sale of goods containing BE, and (ii) certain "alternative" measures

13  of damages based on hypothetical "license fees" that Plaintiff alleges Zazzle should pay.  For the

14  reasons set forth below, the Court should not permit Persechini to present either of these deeply

15  flawed theories to the jury.  After those exclusions, the only remaining substantive "opinion"

16  Persechini purports to offer is as to Zazzle's revenues from sales of the at-issue goods.  But that

17  information is not in material dispute—indeed, Zazzle will stipulate to it, such that no expert

18  testimony is needed on revenues.  The Court should thus preclude Persechini from testifying.

19          **1.    The Court Should Exclude Persechini's Flawed Opinions On Lost**
20              **Profits Damages**

21      The Copyright Act allows for disgorgement of "any profits of the infringer that are

22  attributable to the infringement and are not taken into account in computing the actual damages."

23  17 U.S.C. § 504(b).  In calculating profits, the accused infringer "may prove his or her deductible

24  expenses and the elements of profit attributable to factors other than the copyrighted work."  *Id.*

25  Importantly, in addition to "direct" costs of production, the defendant may deduct a reasonable share

26  of "indirect" (or "overhead") expenses that "contributed to the production of the infringing work."

27  *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 516 (9th Cir. 1985); *accord*

28  *Kamar Int'l, Inc. v. Russ Berrie & Co.*, 752 F.2d 1326, 1332-33 (9th Cir. 1984); 5 Nimmer on

1   Copyright § 14.03 (2024) (collecting cases) ("Once a sufficient nexus is shown between a category

2   of overhead and the production or sale of the infringing product, a court need not scrutinize for

3   inclusion or exclusion particular items within the overhead category.") (citing *Hamil Am. Inc. v.*

4   *GFI*, 193 F.3d 92, 105 (2d Cir. 1999), *cert. denied*, 528 U.S. 1160 (2000)); *Oracle Am., Inc. v.*

5   *Google Inc.*, 131 F. Supp. 3d 946, 955 (N.D. Cal. 2015) (overhead other than taxes is properly

6   deductible in calculating profits); *New Line Cinema Corp. v. Russ Berrie & Co.*, 161 F. Supp. 2d

7   293, 303 & n.4 (S.D.N.Y. 2001) (deducting "overhead expenses in the same percentage as the sales

8   of the infringing goods bears to its total sales").

9       In calculating Zazzle's alleged profits attributable to alleged infringement, Persechini

10  departed from this well settled law because he deducted virtually none of Zazzle's relevant overhead

11  expenses. Persechini's calculation starts with total sales revenue for at-issue goods of ███████,

12  to which he adds shipping revenue, for a total of ███████. Ex. O, Persechini Report ¶ 6. This

13  aspect of his analysis is not controversial. Zazzle does not contest the starting figure, or the inclusion

14  of shipping revenue as a general matter. Zazzle's calculation of net revenue differs by only

15  ██████—an immaterial amount for these purposes. To avoid the risk of confusion to the jury and

16  promote efficiency at trial, and notwithstanding that its revenue figure is more accurate, Zazzle is

17  willing to stipulate to a revenue figure to present to the jury, so that expert testimony on that subject

18  is unnecessary.

19      From there, however, Persechini's profits analysis wildly departs from the appropriate

20  methodological framework and becomes inherently flawed. In calculating profits, Persechini

21  deducted certain of Zazzle's direct costs (███████████████████████████████

22  ██████████). Ex. O, Persechini Report Fig. 3. But he failed to deduct the COGS

23  category of "███████," and although he "consider[ed]" several categories of indirect costs,

24  he only deducted two of them: ██████████████████. He otherwise failed to deduct

25  all categories of Zazzle's expenses, even though these constitute "core" operating expenses of

26  Zazzle's core business of producing and selling customized consumer products, such as the at-issue

27  BE goods. In particular, he failed to deduct obvious and commonly recognized expenses such as

28  ██████████████████████████████████████████████████████████████

**DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF PLAINTIFF'S**
**DESIGNATED EXPERT WITNESSES**

1   ███████████████████████.  As a result, he deducted only a portion of Zazzle's expenses, in a

2   range of ████████████████, and therefore improperly concluded that Plaintiff is entitled

3   to net profits between ███████████████.  In deposition, Persechini **admitted** that his

4   methodology was based on his general understanding of economics, but **not** the applicable law

5   governing profits attributable to alleged infringement.  Ex. P, Persechini Dep. Tr. 67:6-17 (Q:

6   "You're describing the source of … this incremental standard as Economics 101 as opposed to the

7   Copyright Act or as opposed to case law; is that right?  A:  There may be case law that goes to

8   incremental expense, but none comes to mind.").

9        The result of Persechini's improper exclusion of certain of Zazzle's core operating expenses

10   is significant because it greatly overstates the amount of profits the jury may properly consider at

11   trial.  Defendants submit that the proper calculations of net profits, if Persechini actually followed

12   the correct legal framework and deducted **all** allowable expenses rather than just some, would be

13   vastly lower, at ████████.  Permitting Persechini to provide the jury with a grossly inflated

14   disgorgement theory which ignored well-established Ninth Circuit law holding that a company may

15   deduct a fair share of its "overhead" operating expenses from its profits, would be highly prejudicial

16   to Defendants, and would impermissibly invite jury error.  *See, e.g.*, *United Fabrics Int'l, Inc. v.*

17   *Lane Bryant, Inc.*, No. CV086865ODWPLAX, 2010 WL 11545595, at \*5 (C.D. Cal. June 24, 2010)

18   (allowing deduction of overhead); *Oracle Am., Inc. v. Google Inc.*, No. C 10-03561 WHA, 2012

19   WL 4017808, at \*4 (N.D. Cal. Apr. 10, 2012) (concluding it would be "highly prejudicial" to

20   preclude presentation of overhead costs to the jury).

21        **2.   The Court Should Exclude Persechini's Flawed Opinions On License-Based Damages**

22

23        As an "alternative" measure of damages for Plaintiff's contract and fraud claims, Persechini

24   intends to testify about a series of "formulas" he used to calculate damages by multiplying a fixed

25   $14 "license fee" (*i.e.*, the amount Plaintiff typically retains from a standard $20 license of the sort

26   Zazzle purchased) by various quantifications of the total number of Zazzle users who "used" or

27   theoretically had "unlicensed access" to BE.  The formula at the highest end of these made-up

28   calculations assumes (without support) a base of ████████ users, which results in an astronomical

DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF PLAINTIFF'S
DESIGNATED EXPERT WITNESSES

1  and unhinged damages calculation of ███████ .  (His calculation based on a different estimate

2  of such users is still absurdly high, but much lower:  ██████████ .)

3      A "lost" or "hypothetical" license fee can be a valid measure of damages, but only if it

4  comports with economic reality.  *See, e.g.*, *Pelican Int'l, Inc. v. Hobie Cat Co.*, 655 F. Supp. 3d

5  1002, 1048 (S.D. Cal. 2023) ("The testimony of a damages expert in a patent suit who relies on non-

6  comparable licenses in reaching his royalty rate should be excluded."); *DSU Med. Corp. v. JMS Co.*,

7  296 F. Supp. 2d 1140, 1158 (N.D. Cal. 2003) (excluding damages expert where expert's

8  hypothetical contract failed to "conform to economic reality"), *aff'd*, 471 F.3d 1293 (Fed. Cir. 2006);

9  *Think20 Labs LLC v. Perkinelmer Health Scis., Inc*., No. SACV2100541CJCDFMX, 2023 WL

10  9005633, at *3 (C.D. Cal. Nov. 30, 2023) (excluding damages expert who does not rely on "sound

11  economic evidence").  In other words, an expert cannot simply make up a "lost license" theory of

12  damages that has no support in the relevant market.  Yet that is precisely what Persechini did here.

13      a.  The "Alternative" Measures Have No Basis In Fact

14      Persechini fails to establish any basis in the extensive record of this case, or from the

15  commercial market for "fonts" more generally, to support his fixed $14 "license fee" for ***every single***

16  ***Zazzle user who theoretically may have viewed text in BE in the Design Tool*** (whether or not they

17  actually did view it, and whether or not they did use it).  In fact, Persechini admitted that he did not

18  base his $14 license fee on any comparable licenses—or, indeed, any license at all.  *See, e.g.*, Ex. P,

19  Persechini Dep. Tr. 210:2-16 ("[M]y analysis does not look at kind of a hypothetical negotiation,

20  willing licensor, willing licensee.  That's not the framework I use."); *id.* 202:24 ("I'm not opining

21  to a reasonable royalty.").  Nor could he have done so, because there is no support in the record—

22  or in logic—for Persechini's absurd theory.

23      To be clear, Persechini purports to impose a $14 "license fee" for BE, solely limited to

24  Zazzle, for every single user of the Design Tool, ***whether they actually used BE or not***.  Essentially,

25  Persechini would impose an "entry fee" for the Design Tool, for every single user, on the basis that

26  the user could, theoretically, view or use BE (among over 100 other fonts).  That is absurd, and knit

27  from whole cloth.  Persechini has no evidence, and there is none in the record, showing that any

28  willing buyer in the typeface market would pay anything close to what his "license fee" theory

assumes for merely having the theoretical opportunity to look at or use BE—or, for that matter, any typeface in existence. Ex. O, Persechini Report ¶¶ 59-60, 75-78.

It is also at odds with Plaintiff's own licensing practices. Plaintiff has never asked for, been offered, or agreed to a separate "license" fee for each and every visitor to an online service who might (or might not) view one of her typefaces, or even for every person who actually used her typefaces through a commercial online service. *See* Ex. Q, Kinrich Report ¶¶ 65, 67, Sec. IV.C.2. As of 2017—the key time period in this case—Plaintiff offered ███████████████ ████████████████████████████████████████████████████ ███. *See id.* ¶ 68 (citing Ex. R1, N. Laatz Dep. Tr. 131:10-132:20 and Ex. R2, Dep. Ex. 128 (LAATZ0516563) (message to Minted)). It is contrary to the factual record for him to assume that, one year earlier, Plaintiff would have charged (or Zazzle would have paid) orders of magnitude more—on an individual-user basis—for Zazzle's users to have the theoretical ability to view or use the BE typeface. Indeed, none of Plaintiff's licenses for any typeface has ever exceeded a few thousand dollars, even for server-based commercial use. S*ee* Ex. Q, Kinrich Report ¶¶ 68, 74 (citing Ex. S, J. Laatz Dep. Tr. 105:6-12, 108:6-7). Nor could Plaintiff's "font-licensing" expert identify any examples of font licenses exceeding that range. Ex. D, Sandler Dep. Tr. 72:17-73:1, 73:21-76:5.

Further, Persechini's theory is at odds even with the $14 Standard License Plaintiff actually offered (and Zazzle acquired). Persechini purports to charge $14 for theoretical "access" to and "use" of BE **solely on Zazzle's Design Tool**; but any licensee of the actual Standard License has rights to use the typeface **anywhere**, not just on Zazzle. *See.* Dkts 338-7 (BE Offering Page) and 338-8 (Creative Market License Terms). Persechini would, therefore, charge "full-freight" of $14 for a "license" that is dramatically narrower in scope than the actual $14 Standard License.

Accordingly, the factual record in this case confirms that Persechini's "alternative" lost-license calculations is not grounded in any accepted methodology for calculating a font license, nor is it grounded in the facts of this case, including Plaintiff's licensing history.

b.   The "Alternative" Measures Have No Basis In Law

Persechini's "alternative" calculations not only lack any basis in the factual record or the

market; they also lack any support in the law, including in any of the law Persechini cited in his report to support his novel theory.  *See* Ex. O, Persechini Report Section 5.  Indeed, Persechini simply cites basic law regarding damages that could result from the offer and acceptance of a contract, but he does not contend that Plaintiff "offered," or that Zazzle "accepted," to pay a $14 "license fee" for each and every person who ever visited Zazzle's Design Tool (or even its public website) while BE was available.  His primary authority for his "framework" is *Desny v. Wilder*, 46 Cal. 2d 715, 736 (1956), which is an inapt California Supreme Court case establishing an "idea submission" remedy in the entertainment industry that applies only in the ***absence*** of an enforceable contract or copyright.  Persechini thus relies on selective quotes, taken out of context, from a decades-old case that crafts a special remedy for situations in which there is ***no contract*** and ***no copyrighted work***.

Finally, Persechini's alternative calculation is flawed and unreliable because he calculated the number of persons who allegedly "may have used" BE (*i.e.*, the number he multiplied times $14 to calculate the total "lost license" fee) based on data from the survey that Plaintiff's expert Parikh ran.  Specifically, Parikh found (as discussed in more detail above) that 54% of the 136 professional graphic designers that she surveyed had used BE.  *See* Section II.D, *infra*.  Persechini then grossly misapplied that 54% figure not just to the surveyed population of professional designers, but to the massively broader population of ***all*** users of the Design Tool while BE was available, whether or not they ever viewed or used BE (11,341,123 users according to his count).  In other words, Persechini simply assumes that, if 54% of 136 professional designers may have used BE, then 54% of more than ██████ general users of the Design Tool (whether or not they were even aware of BE) must have used BE as well.  Based on that unsupported assumption, Persechini applies the 54% figure to his earlier high-end damages estimate of ████████, for a result of ████████.  Ex. O, Persechini Report ¶¶ 83-85.  This is a quintessential non-sequitur untethered to any scientific method, based on sheer speculation.  Persechini fails to demonstrate why a small sample of professional designers is representative of the entire population of users of the Design Tool (it plainly is not).  His threadbare analysis, which he based entirely on a flawed survey and then extrapolated to an entirely different population, is facially unreliable.  The Court should exclude it

DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF PLAINTIFF'S
DESIGNATED EXPERT WITNESSES

1  for this reason too.  *San Francisco Baykeeper v. City of Sunnyvale*, 627 F. Supp. 3d 1085, 1100

2  (N.D. Cal. 2022) ("[A]n expert whose proffered testimony relies on another expert's theories that

3  have been or may be excluded as unreliable should also be excluded.").

4  <u>**CONCLUSION**</u>

5        For the foregoing reasons, the Court should exclude, in whole or in part, the anticipated trial

6  testimony of Plaintiff's designated expert witnesses Thomas Phinney, Stuart Sandler, Daniel Garrie,

7  Sara Parikh, and Dominic Persechini.

8

9  DATED:  April 7, 2025             QUINN EMANUEL URQUHART &
                            SULLIVAN, LLP
10

11                 By    */s/ Andrew H. Schapiro*
                        Andrew H. Schapiro
12
                        *Attorneys for Defendants*
13                       *Zazzle Inc. and Mohamed Alkhatib*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF PLAINTIFF'S
DESIGNATED EXPERT WITNESSES