# EXHIBIT B

Rebuttal Expert Report of Thomas Phinney

in Response to

Expert Report of Christopher Rucinski

in the matter of *Nicky Laatz v. Zazzle, Inc., et al*,

Case No. 5:22-cv-04844 in the Northern District of California

October 22, 2024

1

# Rebuttal Expert Report of Thomas Phinney

## Scope of Assignment[1]

1. This Rebuttal Expert Report is in response to the 2024-09-24 Expert Report of Christopher Rucinski ("Rucinski Report" or "Rucinski Rep.")

2. I have been retained on behalf of Nicky Laatz, (hereinafter, "Plaintiff" or "Nicky Laatz") in the matter of *Nicky Laatz v. Zazzle, Inc., et al*, Case No. 5:22-cv-04844 in the Northern District of California. I have been asked to render opinions with respect to Nicky Laatz's process for designing and creating the Blooming Elegant Trio of fonts and the font software that renders those fonts, as well as general practices for designing and creating fonts and font software within the font industry. I have also been asked to render opinions with respect to the Copyright Office's historical practices regarding the registration of copyrights in font software that was created with the assistance of font editor programs. I was also asked to review and analyze any related opinions set forth by Defendants' expert(s), as in this report.

## Summary of Opinions

3. Rucinski's opinion that fonts, including the Blooming Elegant Trio, are not computer programs, from his computer science perspective, is inconsistent with the U.S. Copyright Office's much broader definition of a program, and with its policy of treating and registering fonts as computer programs, and inconsistent with font industry understanding, custom, and practice based on said policies.

4. Rucinski's narrow definition of "hand coding" is inconsistent with font industry understanding, custom, and practice, and if the U.S. Copyright Office adopted it as a requirement for registering copyrights in fonts, would exclude every or nearly every font ever registered to date.

5. Rucinski's opinions about Nicky Laatz's submissions of text-based files as representations of the fonts she created and sought to register are mistaken.

6. Many of Rucinski's other specific opinions are deficient for the reasons stated herein, potentially due to his lack of prior knowledge or experience in fonts or font creation.

---

[1] Nicky Laatz intends to call Thomas Phinney both as an expert regarding the opinions expressed his reports and a percipient witness regarding the facts related to Mr. Phinney's declarations and expert reports in this case.

# Qualifications

7.  My qualifications are detailed in my curriculum vitae, which is attached as "Appendix A" to this report. I have a Master of Science in graphic arts publishing from the Rochester Institute of Technology's School of Printing, specializing in design and typography, and an MBA from UC Berkeley. I have over 25 years of experience in the font industry, including over a decade with Adobe, most recently as their product manager for fonts and typography. In addition, besides using FontLab for about 30 years (from version 2.5 to the present), I also worked for five years at FontLab as VP, President, and, lastly, CEO. FontLab Studio 5 was the primary program used by Nicky Laatz to design the Blooming Elegant Trio and versions of FontLab have been used to design many of the world's best-known fonts, including Calibri. I have also taught at least a dozen type (font) design workshops to perhaps two hundred students over the years.

8.  I have contracted or consulted on fonts/typography for companies like Google, Microsoft, and Monotype. I have been granted four patents related to fonts: three utility patents for software (one as sole inventor of a font identification system, #7720318, and two as a joint inventor of software for font glyph synthesis, #6,760,029 and 6,678,410) and one design patent (D652071), for the Hypatia Sans typeface. To the best of my knowledge, I was the first-ever Adobe employee to generate both utility and design patents for the company. I have spent about 17 years on the board of the global typography association, ATypI (2004–20, 2023–present), including stints as Secretary, Treasurer, Vice-President, and President (2023–24).

# Opinions

## A. Questions Relating to the Copyrightability of Font Software

### Are Fonts Computer Programs?

9.  Rucinski's other opinions are based on his foundational opinion that, from his computer science perspective, font programs are not computer programs because (1) they do not meet a computer science definition of a program, and (2) they (including OpenType font features that are manually typed) are not written in a programming language. (Rucinski Rep. ¶¶ 22, 26-29, 74, and n. 13.) However, Rucinski's opinion is not relevant to the copyrightability or copyright registration of the Blooming Elegant, Blooming Elegant Sans, and Blooming Elegant Hand fonts and font software for at least two reasons.

10. First, the U.S. Copyright Office broadly defines a computer program as: "[A] set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result." (17 U.S.C. § 101, as quoted in U.S. Copyright Office Compendium (Third Edition) § 723 & Glossary p. 4). Font programs, in general, and the font software for implementing the Blooming Elegant Trio of fonts, more specifically,

3

are sets of instructions that are used in a computer to cause text to be displayed in a particular typeface, which fits within this broad definition.

11. Second, the U.S. Copyright Office decided in the Final Regulation on the "Registrability of Computer Programs that Generate Typefaces" of 1992[2] that it would treat vector outline fonts (such as PostScript Type 1, TrueType, and OpenType fonts) as a kind of computer program. Since then, this decision to treat vector outline fonts as a kind of computer program has shaped the font industry's understanding and been relied on in the industry's practices in creating fonts and registering copyrights for them for decades.

12. More specifically, the 1992 Regulation states that:

> We are also persuaded that computer programs designed for generating typeface in conjunction with low resolution and other printing devices may involve original computer instructions entitled to protection under the Copyright Act. For example, the creation of scalable font output programs to produce harmonious fonts consisting of hundreds of characters typically involves many decisions in drafting the instructions that drive the printer. The expression of these decisions is neither limited by the unprotectible shape of the letters nor functionally mandated. This expression, assuming it meets the usual standards of authorship, is thus registrable as a computer program.

13. Similarly, the current U.S. Copyright Office Compendium (Third Edition) ("Compendium") states at § 723:

> A computer program that generates bar codes or a particular typeface, typefont, or letterform may be registered if the program contains a sufficient amount of original authorship in the form of statements or instructions to a computer. For example, creating a scalable font output program that produces harmonious fonts consisting of hundreds of characters may require numerous decisions in drafting the instructions that drive a printer or other output device. If this expression contains a sufficient amount of original authorship, the work may be registered as a computer program.

14. As I have explained elsewhere, the "statements or instructions to a computer" to implement fonts generally referred to in this portion of the Compendium, and specifically for the Blooming Elegant Trio of fonts, encompass multiple areas of originality and creativity (*e.g.*, design and point placement).

15. The 1992 Regulation expanded on the 1988 "Policy Decision on Copyrightability of Digitized Typefaces." The 1988 decision held that digital fonts, as considered at that time, were not subject to copyright registration. The 1992 Regulation clarified that the

---

[2] Registrability of Computer Programs that Generate Typefaces, 57 Fed. Reg. 6201, 6202 (Feb. 21, 1992) ("1992 Regulation").

4

1988 decision had only considered bitmap fonts, and the U.S. Copyright Office considered and concluded that vector outline fonts could reasonably be considered and registered as computer programs.

16.     The 1992 Regulation explains what it means to be a "computer program"[3] that "generates" a particular "typeface, typefont or letterform": vector outline fonts (which at the time of the 1992 Regulation were recently introduced) are protectable programs for generating non-protectable fonts (those non-protectable fonts being single-size patterns of bitmaps or pixels in print or on screen).[4]

## Rucinski's Use of the Term "Hand Coding"

17.     Rucinski supplies a definition of "hand-coding":

> In this Report I use the term "hand-code" to refer to a person manually typing digital text, with or without the assistance of computer software programs such as Microsoft Word or Atom that suggest textual corrections or changes to text that a user has already manually typed. … Hand-coded text does not include digital text automatically generated by templates or in response to a user's use of visual design interfaces (such as WYSIWYG design interfaces used to manipulate images with a mouse or stylus) provided by software programs such as Dreamweaver and FontLab version 6 or later.

Rucinski Rep. ¶ 32.

18.     The 1992 Regulation does not mention "hand-coding" at all. And the Compendium does not mention "hand-coding" as a requirement of, nor in connection with, registration of fonts and font software. Rather, the term only appears in the Compendium concerning the registration of website content, more specifically Hypertext Markup Language ("HTML") used in website design (Compendium §§

---

[3] That is, a "computer program" as the term is used by the U.S. Copyright Office and the U.S. Copyright Act.

[4] I note that in 1992 the idea that scalable vector fonts could be used not only for print but also for screen displays was still relatively new. Despite being a feature of the late-80s NeXT computer, scalable fonts on screen only became mainstream in the early 90s, with the introduction of Adobe Type Manager (October 1989 Mac, June 1990 Windows) and the TrueType format (May 1991 on Mac, April 1992 on Windows). Thus it is not surprising that the Copyright Office was still focused on the print usage, where the known value was and what the font industry had focused on for centuries.

However, from a technical point of view, rendering a font on screen is a very similar operation to rendering it for print; it requires "rasterizing" the font. Whether for screen or print,  the scalable vector font outlines need to be translated (rasterized) to a fixed set of dots or pixels at some particular size.

1002.4, 1006.1(A)), which is entirely different from and has nothing to do with the design, creation, and registration of fonts or font software.

19. Further, to the extent that Mr. Rucinski assumes that his definition of "hand-coding" is a requirement for registration of fonts, he would be mistaken, as both the U.S. Copyright Office's 1992 Regulation and the court's opinion in *Adobe Systems, Inc. v S. Software, Inc.*, 1998 WL 104303 (N.D. Cal. Feb. 2, 1998) were based in part on demonstrations of visual font editing tools similar to FontLab, including FontLab Studio 5. Specifically, during my eleven years of experience working at Adobe Systems, I learned that immediately before the issuance of the 1992 Regulation, members of the Copyright Office visited Adobe in California and met with individuals from Adobe, including my former manager, David Lemon, and Adobe co-founder John Warnock. During that meeting, representatives from Adobe demonstrated how Adobe created font software using visual font editing software similar to FontLab. Thus, the Copyright Office knew that fonts were created with visual editing tools when they issued the 1992 Regulation and started accepting applications and issuing registrations for normal PostScript Type 1 and TrueType fonts (and later of OpenType fonts like the Blooming Elegant Trio, once those became available). Similar practices were also involved in creating the fonts at issue, and a similar demonstration took place in the *Adobe* court case, which was decided during my tenure at the company.

20. If Mr. Rucinski's definition of "hand-coding" were correct and if it became a requirement for copyright registration that font software must be entirely "hand-coded" as Mr. Rucinski defines it, that would disqualify all or nearly all the fonts ever registered by the Copyright Office.[5] As noted above, this would be inconsistent with the fact that the U.S. Copyright Office knew that programs similar to FontLab were used to create font software before it issued the 1992 Regulation and registered copyrights for font software created using FontLab and similar visual font editing software after issuing the 1992 Regulation.

## The Lack of Text-based Source Files and Inconsistency in Source-like Representations

21. For fonts authored in these visual font editing tools, the native source formats for all the most popular font creation tools up until at least 2011 (including FontLab Studio 5,

---

[5] It is theoretically possible (though unlikely) that someone authored font software using purely manual typing of text-based coding (for example, MetaFont). However, through my decades of experience in the font industry, I know most of the type designers and type foundries behind most registered fonts, and I am familiar with their design processes. It is standard practice in the industry to use a visual editing tool to design a font; it is just a question of which one (e.g., Fontographer, FontLab, Type Tool, Font Forge, Gyphs App, Font Creator, Robofont, etc.).

the tool used by Nicky Laatz to create the Blooming Elegant Trio of fonts at issue in the current case) were binary, rather than text.

22. The U.S. Copyright Office has always insisted that copyright filings for font programs be accompanied by text-based representations of those programs, even when the native source code used by the creating applications was binary rather than text files. Common practice across the font industry for many years was to use TTX to translate the compiled font binary into an XML-based format for submission to the Copyright Office. For example, as prompted by Adobe legal counsel, I submitted copyright filings for Adobe using this approach, and explained to other type foundries how to do so.

23. When submitting copyright applications today, in at least some cases, the native font editor file is text-based and could be used. For example, for some modern font editing tools, the source formats are either plain text by default (such as Glyphs App and Robofont, both first released in 2011) or optionally so (FontLab 6 and later, starting in December 2017).

24. However, in both cases—submission of a translation of the compiled font binary in an XML-based format or a native text-based file to the Copyright Office—and perhaps in contrast to Mr. Rucinski's experience with other kinds of computer programming, the way textual font information is *stored* in the source file does not usually precisely match how it is *entered*, including for OpenType feature code, which many tools use the AFDKO language for. Regardless, these differences are about formatting and data structures *around* the text or code, rather than anything functional.

25. As the Rucinski Report states, the proportion of the source code for font programs that is entered manually as text data, whether it is numeric fontwide fields or OpenType layout features, represents a small proportion of the total file size. This is true for almost all fonts, including the Blooming Elegant Trio.

26. The Rucinski Report appears to concede that the overwhelming majority of the source code in the Blooming Elegant Trio font programs is the glyph drawing code (most of which consists of the on-curve and off-curve reference points for the glyphs), which was created through a visual interface rather than typing. (Rucinski Rep. ¶¶ 48-63, 75-76.) Most font editing programs, including FontLab, have their own approach to storing this information. However, Mr. Rucinski asserts that the on-curve and off-curve reference points in the glyph drawing code were not "hand-coded" by Nicky Laatz because Mr. Rucinski believes the reference points were set using Fontlab's graphic interface rather than typing out the actual coordinates of each point. I disagree. As detailed in my initial September 24, 2024, Expert Report, there is no functional difference between selecting the coordinates for on-curve and off-curve reference points using a keyboard and selecting the coordinates for those points by moving them with a mouse, stylus, or another visual editing tool in FontLab's graphical interface.

7

## Discussion of Additional Specific Points in the Rucinski Report

27.     Paragraph 9.b of the Rucinski Report states: "Nicky Laatz did not hand-code the Blooming Elegant OTF Files." I disagree with this opinion for the reasons detailed in my initial September 24, 2024 Expert Report. As detailed above, Mr. Rucinski's opinion appears to be based on his narrow definition of hand-coding, which, if considered necessary for fonts to have copyright protection, would invalidate the copyrights of all or nearly all font software ever registered by the Copyright Office as described above.

28.     Paragraph 9.d of the Rucinski Report states: "The Laatz Copyright Submission PDFs are not source code for the Blooming Elegant OTF Files." This is not entirely accurate. The PDFs that were submitted in connection with Nicky Laatz's applications for copyright registration of the Blooming Elegant, Blooming Elegant Sans, and Blooming Elegant Hand font software are source code in the sense that they can be compiled to produce the corresponding fonts. They are not what was initially compiled to create the fonts, but they were instead decompiled from the produced fonts. This was required because of the Copyright Office's insistence that applicants submit a text form of the source code and because the native source files for FontLab (and most other font editors until recent years) have been binary rather than text.

29.     Paragraph 9.e of the Rucinski Report states: "Neither the Blooming Elegant OTF Files nor the Laatz Copyright Submission PDFs may be used to generate fonts." Mr. Rucinski further says "a font file cannot on its own without a font generating software program such as FontLab be used to design, generate, or edit fonts. Each and every one of the Blooming Elegant OTF Files and each and every one of the VFJ files depicted in the Laatz Copyright Submission PDFs are such font files with the aforementioned uses and limitations." (Rucinski Rep. ¶ 39.) This is false. Operating systems and printers use each OTF file (a scalable vector font program) to generate bitmap and pixel-based fonts on screen and in print. The latter (i.e. bitmap and pixel-based fonts on screen and in print) are what the 1992 Copyright Office regulation considers "fonts" (and hence unprotected) rather than "font software" (which in the 1992 Regulation are referred to as "scalable font output programs," meaning vector outline fonts such as Type 1, TrueType, and OpenType fonts). Additionally, although VFJ file are not natively supported by operating systems or printers, FontLab itself uses them to generate bitmap and pixel-based fonts on screen.

30.     Paragraph 9.f of the Rucinski Report states: "Nicky Laatz claims to have hand-coded or otherwise written only limited subsets of the text related to the Laatz Copyright Submission PDFs." Nicky Laatz has explained in detail what she did to create the Blooming Elegant Trio of fonts and font software, and at no point has adopted or used Mr. Rucinski's definition of "hand-coding." Based on my understanding of the term "hand-coding," as detailed in my initial September 24, 2024 Expert Report (rather than Mr. Rucinski's definition), Nicky Laatz hand-coded all or nearly all of the creative

content that is represented in the PDFs that were submitted to the U.S. Copyright Office, including most or all of the vector outlines of the glyphs of the fonts.

31.    Paragraph 9.g of the Rucinski Report states: "The hand-coding that Nicky Laatz claims to have done for the values of fontwide variables in the Laatz Copyright Submission PDFs amounts to merely selecting integer values using the prompts provided by FontLab 5." Mr. Rucinski's use of the word "selecting" is misleading, as it appears intended to make it sound as if there is a pre-set list of numbers to choose from. This is not true; these are simple numeric fields that one can enter integer numbers in. ("Integers" are positive or negative whole numbers, without decimals or fractions.)

32.    Additionally, it is misleading to characterize anything presented by FontLab 5 in this area as a "prompt"—this is simply part of FontLab 5's Font Info dialog. A user of FontLab 5 is never forcibly faced with this interface unless and until they choose to call it up and modify the contents as part of their creative process.



33.    Paragraphs 45-46 of the Rucinski Report correctly state that letter spacing is not a simple font-wide value, but is rather done by the author for each glyph. But this means that the glyph spacing in Nicky Laatz's Blooming Elegant Trio of fonts represents much more original decision-making in this area than might have immediately been apparent. Excepting empty glyphs (such as the space character) which only have a width, Nicky Laatz set two values for each glyph in each font, amounting to hundreds of decisions per font instead of two decisions per font. These are complicated, subtle, interrelated decisions.[6]

---

[6] To give an idea of how much thought and work is involved in spacing, I have a 53-minute video on YouTube that is a basic introduction to this topic, and really only covers how to space a simple sans serif font (it would apply to Blooming Elegant Sans, but not the other two

34. From my examination of the three fonts in the Blooming Elegant Trio, and confirmed by discussion with Nicky Laatz, she did space all three of the fonts in question manually. (FontLab 5 offered automated spacing, but it did not produce usable results for connected script fonts such as Blooming Elegant.)

35. Paragraph 47 of the Rucinski Report states: "Nicky Laatz does not claim that she hand-coded or otherwise specified the names of the variables that determine cap height, letter spacing, ascender height, and descender height." This point makes no sense, as FontLab Studio 5 (and most other font editors) do not offer any means to customize those names, and as the meaning of these variables is standardized, it would frankly be bizarre to do so.

36. "Sidebearings" are the white space between the origin of the glyph and the leftmost glyph point, and between the rightmost glyph point and the advance width—which is to say, the full amount of space the glyph occupies. Paragraph 61 of the Rucinski Report correctly states that the values for sidebearings are not directly stored in a font file (whether source file or generated font). Rather, the font files store the glyph coordinates and the full width allocated to each glyph. Moving the right sidebearing of the glyph visually increases the full "advance width" (space allotted) of the glyph, while moving the left sidebearing adjusts not only the advance width but also the x-coordinate position of every point in the glyph, relative to the whole coordinate system. That is to say, reducing the right sidebearing from 25 to 10 is the same as reducing every x (horizontal) coordinate position value in the glyph by 15 and also reducing the total advance width by 15. This is an example of a situation in which visual editing tools are helpful, as editing those coordinates by manually typing text would be inefficient and prone to error. Human creativity is neither lost nor reduced by editing the sidebearings (and affecting the coordinates of the glyph's reference points) with a visual editing tool.

37. Paragraph 9.h of the Rucinksi Report states: "The font-wide variable values that Nicky Laatz claims to have hand-coded constitute a vanishingly small amount of text in the Laatz Copyright Submission PDFs, which FontLab, not Nicky Laatz, generated." Mr. Rucinski's first point is correct that the font-wide variable values are a small part of the total creative work in the Blooming Elegant Trio, as with any other fonts, but the rest of his point is grossly misleading. The overwhelming majority of the non-structural content of the Laatz Copyright Submission PDFs is Nicky Laatz's creative work. The creative choices of placement of on-curve and off-curve reference points were not lost in compiling the font from the original (binary) source, nor in decompiling it afterwards to create a text file that could be submitted to the Copyright Office.

38. Paragraph 9.j of the Rucinski Report states: "Nicky Laatz used FontLab to assign reference point coordinates for the glyphs in The Blooming Elegant Trio and used

members of the Trio). *How to Space a Font. FontLab Studio 5 tutorial with Thomas Phinney*, https://www.youtube.com/watch?v=tbc_O7bNROs.

10

FontLab to create the Blooming Elegant OTF Files." As discussed above and in my initial September 24, 2024 Expert Report, this is an accurate description of how Nicky Laatz created the Blooming Elegant Trio of fonts. Paragraph 9.k goes on to state: ""Nicky Laatz almost certainly did not hand-code the overwhelming majority of individual glyph reference points in the Laatz Copyright Submission PDFs." Mr. Rucinski's opinion that this is not "hand-coding" is incorrect and misleading because there is no functional difference between assigning the coordinates for reference points by typing them out using a keyboard and assigning the coordinates for reference points by inserting and moving their position with a mouse, stylus, or other visual editing tool using FontLab 5's graphical interface. This is particularly so given that FontLab 5 displays the numerical coordinates of a given reference point when it is selected and being moved in the graphical interface.

39. Paragraph 9.l of the Rucinski Report states: "The OpenType features for the Blooming Elegant font that Nicky Laatz claims to have written are written in the format defined by the AFDKO Specification, which is not a programming language." I have no opinion on whether this is true from a computer science perspective, but Mr. Rucinski's conclusion is irrelevant. As detailed above, the U.S. Copyright Office has broadly defined a "computer program" as "a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result," and has decided more specifically that vector outline fonts are covered by copyright and shall be treated like computer programs, rendering the question of whether the AFDKO language is a programming language irrelevant. The feature code reflects Nicky Laatz's creative choices about what glyphs to create and what features to assign them to, and it is part of the compiled font. As far as I know, the Copyright Office has never explicitly considered questions of OpenType layout features or the source representation of those features in AFDKO code. They were not under consideration at the time of the 1992 Regulation, as these features did not yet exist.

40. In elaborating on this issue, paragraph 74 of the Rucinski Report states: "The AFDKO Specification does not define a way to express loops, conditional statements, and 'goto' statements, statements, so it does not enable a computer programmer to express various forms of control flow such as loops, conditional statements, and 'goto' statements." While these issues are irrelevant, Mr. Rucinski is mistaken both specifically as to AFDKO and generally as to what attributes are required for something to constitute a "programming language." The AFDKO Specification does have a particular form of conditional statements with contextual code. I taught an entire workshop on this area of code that is only triggered by the presence or absence of specific glyphs in specific relationship to the glyphs being operated on. For example, this is how the Bickham Script Pro fonts triggered many "th" ligatures, each one of which was different, even when a user simply typed the word "the" repeatedly. It is not unusual for programming languages, particularly functional ones, to lack flow control features. Python and Rust do not have "goto" statements, and in Java "goto" is a reserved word with no function. Some programming languages also do not have loops (e.g. Haskell).

41.    Note also that OpenType CFF fonts (such as the OTF files referenced) can have subroutines, and OpenType TTF fonts can have components. Both of these involve pieces of drawing code that are expressed once, and then referenced from other parts of glyph drawing code, usually repeatedly.

42.    Paragraph 9.n of the Rucinski Report states: "The OpenType features for the Blooming Elegant font that Nicky Laatz claims to have written were changed by FontLab when it generated the Laatz Copyright Submission PDFs." This is misleading. First, the structural boilerplate of spaces, brackets, etc., would have been equally present if the FontLab VFC binary source file had been opened and re-saved in FontLab VFJ format. In FontLab, and indeed in all font editors whose source files I have examined, such differences are always present when one compares the way the OpenType layout feature code is authored in the font editor interface, versus the way that code is represented in the font editing programs' human-readable native file formats. Second, a few automated comments, set off by a "#" sign, such as adding a plain English name for the four-letter feature code, are *automatically added by FontLab* upon opening/decompiling a compiled TTF or OTF font. This feature was added around the time I started managing the company, in version 5.1 or 5.2, but it does not affect the functioning of the code.

43.    Paragraph 9.p of the Rucinski Report states: "The Blooming Elegant OpenType 'liga' feature text that Nicky Laatz claims to have written is strictly conventional." The "feature text" to which Mr. Rucinski refers is "code," and is referred to as such by everyone in the font industry, including programmers. Further, I am unaware of any requirement that code or anything else be "unconventional" to be subject to copyright protection.

44.    Paragraph 9.q of the Rucinski Report states: "The Blooming Elegant OpenType feature names that Nicky Laatz claims to have written are strictly conventional." This reflects Mr. Rucinski's complete lack of understanding of how OpenType features work in applications using fonts. Whenever possible, an author creating a font with OpenType features *should* use one of the documented, pre-existing 4-letter codes because that is how applications know each feature and what it does. Many applications have no mechanism for handling unknown features, and those that do will still be stuck displaying the cryptic 4-letter code if the feature is not a "conventional" (documented) feature.

45.    Nicky Laatz also made creative decisions about *which* OpenType features to use. In place of 'liga' for standard ligatures that will be on by default in savvy applications, Laatz *could* have used 'rlig' (to invoke required ligatures that could not be turned off), or 'dlig' to invoke discretionary ligatures that are off by default but can be turned on by users in savvy applications. (There is also 'clig' for contextual ligatures, but as Nicky Laatz is likely aware, that would be inappropriate for non-contextual ligatures such as the ones in the Blooming Elegant font.)

## 7. Compensation

46.    I am charging Plaintiff Nicky Laatz $650 per hour for my time working on this matter. No part of my compensation is based upon the outcome of this matter.

_____
Thomas Phinney

_____October 22, 2024_____

Date

13

# **Materials Considered in Forming Opinions**

In addition to the materials identified in my September 24, 2024 Expert Report in this matter, I have considered the following additional materials in forming the opinions expressed in this report:

- Docket Entries 148, 154, 156, 176 in the case captioned *Nicky Laatz v. Zazzle, Inc. et al.*, Northern District of California, Case No. 5:22-cv-04844
- September 24, 2024 Expert Report of Stuart Sandler

14

# Publications in Prior 10 Years

**Communication Arts**

Note: *Communication Arts* is the highest-circulation international trade journal of visual communications, founded in 1959.

- "Fonts and the Law" — *Communication Arts* magazine, 20 Apr 2021
- "Fontocalypse Now" — *Communication Arts* magazine, 20 Apr 2020
- "Variable Fonts are the Next Generation" — *Communication Arts* magazine, 19 Jan 2017
- "Finding a Common Language: Reconciliation & Revival through Letterforms" — *Communication Arts* magazine, 10 Sep 2015

**Blog Posts on Phinney on Fonts** (thomasphinney.com)

- What Does It Cost to Have a Custom Typeface Designed? (15 Jun 2024)
- Do Companies Get Sued for Using Fonts Illegally? (27 May 2024)
- Why Did Adobe Discontinue Font Chameleon in the 90s? (22 Feb 2023)
- Font Detective Forensic Typography Assistant Needed (22 Nov 2022)
- Font Detective Talk in Dublin, 16 Nov 2022 (14 Nov 2022)
- Font Production Person Needed, first half 2021 (17 Dec 2020)
- Science Gothic—Design/Production Person Needed (29 Jul 2019)
- Career Change! (25 Apr 2019)
- Reliably Changing Versions of Fonts (5 Nov 2018)
- LA IDUG: Variable Fonts, Color Fonts & FontLab (23 Aug 2018)
- Font Detective Site Launch (24 Apr 2018)
- Why Variable Fonts Will Succeed (27 Jan 2018)
- "Truth" is Hard to Come By (12 Jan 2018)
- Will Calibri Leave Pakistan Sans Sharif? (18 Jul 2017)
- The Lesson of Color Fonts for Variable Fonts (14 Sep 2016)
- Brazil Visa for ATypI São Paulo (16 Sep 2015)
- Women's Voices in Type & ATypI (14 Aug 2015)

# Deposition and Trial Testimony in Prior 4 Years

| Date | What | Case | Case Number | Venue |
|---|---|---|---|---|
| 6/7/2024 | Deposition | Mubanda et al. v City of Santa Barbara et al. | 18CV00628 | Superior Court of California, County of Santa Barbara — Anacapa Division |
| 4/22/2022 | Deposition | Leedeman v Midland | #01-20-0016-0242 | AAA arbitration (civil case also exists) |

# Conference/workshop presentations in the previous 10 years

I have given 37 conference presentations or workshops, plus 17 font design workshops in the past decade

| | | | |
|---|---|---|---|
| 4/22/2024 | Kuala Lumpur, Indonesia | Document Examination Division, Dept. of Chemistry, Government of Malaysia | two-day font forensics workshop |
| 4/11/2024 | Canberra, Australia | ASFDE (Australasian Society of Forensic Document Examiners) | two-day font forensics workshop |
| 1/24/2023 | Melbourne, Australia | Crafting Type @ Portable (design agency) | three-day font design workshop |
| 11/16/2022 | Dublin, Ireland | Typography Ireland | Font Detective Extra Bold |
| 11/17/2022 | Dublin, Ireland | Crafting Type @ Technological University Dublin | three-day font design workshop |

16

| 10/21/2022 | Phoenix, AZ | AFDE (Association of Forensic Document Examiners) | 1) Type Size<br>2) The Secret of the Certificate |
|---|---|---|---|
| 8/8/2022 | San Antonio, TX | ASQDE (American Society of Questioned Document Examiners) | Font ID, Type Size & Questioned Documents |
| 7/6/2022 | Thessaloniki, Greece | ICTVC (International Conference on Typography & Visual Communication) | Variable Font Design Tradeoffs |
| 6/8/2022 | St Augustine, FL | NADE (National Association of Document Examiners) | Font ID & Questioned Documents |
| 10/2021 | Malaysia (remote) | Document Examination Division, Dept. of Chemistry, Government of Malaysia | Examination & Identification of Fonts in Document Forensics (4-day workshop) |
| 2/21/2020 | Anaheim, CA | AAFS (American Academy of Forensic Sciences) | Detecting Backdated Documents via Line Ending Approach to Font ID (Poster presentation) |
| 6/12/2019 | Seattle, WA | Creative Pro Week / InDesign Conference | 1) Exploiting Advanced Font Features in InDesign<br>2) Font Detective |
| 11/19/2018 | (remote/online) | SAFE (Scientific Association of Forensic Examiners) | Font ID & Questioned Documents |

17

| | | | |
|---|---|---|---|
| 10/2018 | Savannah, GA | AFDE (Association of Forensic Document Examiners) | 1) **The Value of Font Identification in Questioned Document Authentication Examinations** 2) **Put Your Best Font Forward: Typography Best Practices for Forensic Presentations** |
| 10/2018 | Savannah, GA | Savannah College of Art & Design | 1) Font Detective, Extra Bold 2) type design workshop |
| 9/20/2018 | Los Angeles, CA | InDesign User Group | (OpenType features) |
| 3/1/2018 | Mumbai | Typo Day | type design workshop |
| 10/25/2017 | Edmonton, Canada | | Font Detective |
| 6/9/2017 | Faenza, Italy | Kerning Conference | Variable Fonts: Full Circle 1991–2017 |
| 4/3/2017 | Berlin, Germany | Typo Labs | Spacing & Kerning in FontLab VI |
| 1/13/2017 | San Francisco, CA | Crafting Type @ Electronic Frontier Foundation (EFF) | three-day font design workshop |
| 11/2/2016 | San Diego, CA | Adobe MAX | OpenType features workshop |
| 9/21/2016 | Chicago, IL | WebVisions | Variable Fonts: What just happened? (plus workshop) |
| 8/24/2016 | Seattle, WA | TypeCon Seattle | workshop — FontLab VI |
| 7/7/2016 | Thessaloniki, Greece | ICTVC (International Conference on Typography & Visual Communication) | Font Detective, Bold Condensed |

18

| 6/10/2016 | San Francisco, CA | Crafting Type @ Electronic Frontier Foundation (EFF) | three-day font design workshop |
| 5/6/2016 | Copenhagen, Denmark | Crafting Type | three-day font design workshop |
| 2/21/2016 | Bangalore, India | Typo Day | type design workshop |
| 10/14/2015 | São Paulo, Brazil | ATypI São Paulo | FontLab VI |
| 8/12/2015 | Denver, CO | TypeCon Denver | Tools for Font Troubleshooting Workshop |
| 7/11/2015 | London/Reading, England | Granshan | new fonts for new writing systems |
| 5/16/2015 | Corvallis, OR | Crafting Type @ Oregon State University | two-day font design workshop |
| 4/29/2015 | San Francisco, CA | Typo SF | Font Detective, Extra Bold |
| 4/19/2015 | Boston, MA | Crafting Type @ Lesley University | three-day font design workshop |
| 3/27/2015 | Portland, OR | Crafting Type @ Portland State University | three-day font design workshop |
| 3/14/2015 | Hong Kong | Crafting Type @ Hong Kong PolyTechnic University | three-day font design workshop |
| 2/26/2015 | Mumbai, India | Typo Day Mumbai / IIT Bombay | type design workshop |
| 1/30/2015 | Chicago, IL | Crafting Type @ Harrington College of Design | three-day font design workshop |
| 1/29/2015 | Chicago, IL | AIGA Chicago | Font Detective, Extra Bold |

19

| 9/2014 | Barcelona, Spain | ATypI Barcelona | Easier Font Making: 3 Things Commercial Fonts Could Learn from Open Source |
|--------|------------------|-----------------|------------------------------------------------------------------------------|