# EXHIBIT C

# REBUTTAL EXPERT REPORT OF STUART SANDLER

# QUALIFICATIONS

### Experience

1. I launched my first font foundry (a company that designs and/or distributes fonts) in 1996, and have since become known throughout the world for my popular display typefaces and my font licensing expertise. I am a font licensing thought-leader, having introduced font licensing concepts and terminology that have been adopted industry-wide. I continue to influence the font licensing industry as a speaker, consultant, educator, and manager of one of the largest font distributors worldwide.

2. I launched the Font Diner font foundry in 1996 and have inspired generations of designers with font and software products influenced by 1950s popular culture. I have since gone on to launch nine unique font foundries and an expansive library of over 1,400 fonts which I manage. My fonts have been licensed for use on everything from Haribo gummi snacks to millions of screens around the world broadcasting the NFL Super Bowl.

3. As a design software complement to my font releases, I launched Mister Retro in 2004, which offers original vector artwork collections and plug-in software for Adobe Photoshop. Works from Mister Retro have been prominently seen and licensed for use in locations such as the opening titling for the Spider-Man: Into the Spider-Verse feature film and on vintage distressed tee shirt graphics.

4. With my expansive font licensing knowledge and expertise, in 2006, I co-founded and launched Font Bros as a distributor of high-quality typefaces from independent font foundries throughout the world specializing in OEM licensing and retail font license sales. Font Bros—with its primary focus on custom font licensing and licensing enforcement—has earned a reputation as the leading font distributor and font licensing advocate often cited in font licensing infringement matters.

5. My son Jackson and I co-founded Artovision in 2016 as the creator and manufacturer of officially licensed collectable dimensional 3D shadowbox and desktop artwork. Licensors include The Beatles (Universal Music/Sony), Halo (343 Studios/Microsoft), Activision/Blizzard, Warner Bros/Rooster Teeth, Bandai Namco, Capcom, Konami, Asmodee, Atari, King Features Syndicate, and more.

### Education

6. I earned an Associate of Science (AS) degree in Visual Communications from the Art Institute of Fort Lauderdale in 1993.

1

**Other Professional Activities**

7.    My speaking engagements and work with professional organizations in my field have included the following:

- Hamilton Wood Type Museum Wayzgoose 2020 – Speaker – Exploring the Face of Hamilton
- Font Diner Font Making Workshop Series – 2017-2020 in association with AIGA Missouri, Hamilton Wood Type Museum, Circles Conference Texas, AIGA Chicago
- The Walt Disney Company – Disney Creative Group – Invited Speaker
- Typecon 2016 – Speaker – To Protect and Defend: EULAs, Copyrights & Infringements
- Typecon 2015 – Speaker – Filmotype Junto: The First Font Collective
- Typecon 2012 – Speaker – The Future of Font Licensing
- Typecon 2009 – Speaker – Filmotype by the Letter
- Board of Directions – The Society of Typographic Aficionados (SOTA) 2003 – 2007

**Publications**

8.    I have authored the following publications:

- Pinchefsky, Carol and Stuart Sandler. "Turn Your Fandom Into Cash A Geeky Guide to Turn Your Passion Into a Business (or at Least a Side Hustle)". May 31, 2022. ISBN: 978-1-63-265197-6. Pp. 44-46.

- Sandler, Stuart. "Sawdust to Pixels: Creating a Digital Font from Wood Type". June 2, 2020. https://woodtype.org/blogs/news/sawdust-to-pixels-creating-a-digital-font-from-wood-type

- Sandler, Stuart. "OEM Licensing and What It Means to You: An Interview with Stuart Sandler of Font Bros.". June 11, 2016. https://medium.com/type-Thursday/oem-licensing-and-what-i-means-to-you-an-interview-with-stuart-sandler-of-font-bros-f14f72aa54bc

- Sandler, Stuart. "Filmotype: The Complete Illustrated History: by the Letter". 2009 Updated in 2017. ISBN: 978-0-61-530688-9

2

# SCOPE OF WORK

9.    I was retained by counsel from the law firm Bartko LLP on behalf of its client, Nicky Laatz, concerning her dispute with Zazzle, Inc., an online platform for customized products such as invitations, greeting cards, gifts, etc., and its employee Mohamed Alkhatib.

10.    In addition to the opinions I previously provided in my initial September 24, 2024 Expert Report, which are incorporated herein by reference, I was asked to provide a rebuttal to the opinions that were detailed in the September 24, 2024 Expert Report of Christopher Rucinski ("Rucinski Report" or "Rucinski Rep.") regarding the copyright registration for and creation of the Blooming Elegant Trio of fonts and font software.[1]

11.    In addition to the materials I reviewed in connection with my initial September 24, 2024 Expert Report, I have reviewed the following additional materials in connection with the rebuttal opinions contained in this report:

- September 24, 2024 Expert Report of Christopher Rucinski and All Exhibits Thereto
- LAATZ0507365
- LAATZ0507369
- LAATZ0507374
- LAATZ0507371
- LAATZ0507372
- LAATZ0507373
- Docket Entries Nos. 144, 148, 154, 156, 176 from *Laatz v. Zazzle, Inc. et al.*, Northern District of California, Case No. 5:22-cv-04844
- September 24, 2024 Expert Report of Thomas Phinney
- Deposition Transcript and Exhibits for Deposition of Stephen Steinberg, September 13, 2024
- U.S. Copyright Office Compendium (3rd Edition)
- U.S. Copyright Office Regulation on the Registrability of Computer Programs That Generate Typefaces, 57 Fed. Reg. 6201-01 (Feb. 21, 1992), codified at 37 C.F.R. pt. 202

---

[1] Nicky Laatz intends to call Stuart Sandler both as an expert regarding the opinions expressed in his reports, and a percipient witness regarding the facts related to Mr. Sandler's declarations and expert reports in this case.

3

# OPINIONS

**Authorship of a Computer Program that Generates Typefaces for U.S. Copyright Office Copyright Registration**

12.    Based on my review of Mr. Rucinski's curriculum vitae and professional experience, it is my understanding Mr. Rucinski has never developed a computer program that generates typefaces in any manner that contains a minimal US-ASCII character set (letterforms shown on a standard computer keyboard) and misunderstands the level of human creative authorship required to generate such a computer program.

13.    The Rucinski Report defines the term "hand-code" to mean "a person manually typing digital text, with or without the assistance of computer software programs such as Microsoft Word or Atom that suggest textual corrections or changes to text that a user has already manually typed." (Rucinski Rep. ¶ 32.) Mr. Rucinski also expressly excludes any use of a "visual design interface," including FontLab, from his definition of "hand-coded." The Rucinski Report appears to assume that programs which implement fonts must be "hand-coded" in Mr. Rucinski's sense of the term in order to be registrable as font computer programs. This assumption is incorrect.

14.    Based on my understanding of methods of typeface creation and authorship and subject to the literary authorship requirements of the U.S. Copyright Office (U.S. Copyright Office Regulation on the Registrability of Computer Programs That Generate Typefaces, 57 Fed. Reg. 6201-01 (Feb. 21,1992) ("1992 Regulation"), and my review of testimony and other materials and information in this case, Nicky Laatz has demonstrated a profuse amount of original authorship in the creation of hundreds of Glyphs and the digital instructions for the Blooming Elegant, Blooming Elegant Hand, and Blooming Elegant Sans computer programs that generate the corresponding typefaces.

15.    This is further supported by the U.S. Copyright Office Compendium (Third Ed.) § 723, which states *"A computer program that generates bar codes or a particular typeface, typefont, or letterform may be registered if the program contains a sufficient amount of original authorship in the form of statements or instructions to a computer. For example, creating a scalable font output program that produces harmonious fonts consisting of hundreds of characters may require numerous decisions in drafting the instructions that drive a printer or other output device. If this expression contains a sufficient amount of original authorship, the work may be registered as a computer program."*

16.    The Rucinski Report cites to the same Copyright Office Compendium from which the above text is taken to support Mr. Rucinski's definition of the term "hand-coded," but does not cite to nor address the above-quoted portion of the Copyright Office

4

Compendium regarding the requirements for registrability of computer programs that generate typefaces.

17. Instead, Mr. Rucinski cites sections of the Compendium on design of websites and use of HTML ("Hypertext Markup Language") and erroneously attempts to draw a comparison between HTML and font editing applications and/or computer programs that generates typefaces. (Rucinski Rep. ¶ 32, n.12-13.) Specifically, Mr. Rucinski cites to Section 1002.4 of the Copyright Office Compendium to support his definition of "hand-coded." (Rucinski Rep. ¶ 32, n. 12.) But Mr. Rucinksi's citation to the Copyright Office Compendium's requirement that HTML must be "hand-coded" is inapposite. Unlike computer programs that generate typefaces, HTML is not considered either source code or a computer program by the U.S. Copyright Office. (Compendium (Third) § 721.10(A).)

18. Mr. Rucinski, having only reviewed and considered the correspondence between Stephen Steinberg and the Examiner also erroneously attempts to infer that authorship of a computer program that generates typefaces must be "hand-coded" as he has defined the term and as a requirement by the U.S. Copyright Office for the deposit of its source code or its copyright registration. But the requirement for "hand-coding" exists only for HTML, and is not stated as a requirement for registration of any other type of computer program. There have been no changes to the published regulations or Compendium by the U.S. Copyright Office that may suggest otherwise.

19. Specifically, the U.S. Copyright Office Regulation on the Registrability of Computer Programs That Generate Typefaces, 57 Fed. Reg. 6201-01 (Feb. 21, 1992) ("1992 Regulation") states:

> We are also persuaded that computer programs designed for generating typeface in conjunction with low resolution and other printing devices may involve original computer instructions entitled to protection under the Copyright Act. For example. the creation of scalable font output programs to produce harmonious fonts consisting of hundreds of characters typically involves many decisions in drafting the instructions that drive the printer. The expression of these decisions is neither limited by the unprotectible shape of the letters nor functionally mandated. This expression, assuming it meets the usual stand of authorship, is thus registrable as a computer program.

20. 37 C.F.R. pt. 202 further explains that a "computer program" can be in either source or object code, and is broadly defined as a "set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result." Copyright registration is made for original computer programs in the literary work classification upon submission of an appropriate application, fee and deposit copies identifying the work. In general, the first 25 pages or the equivalent and the

5

last 25 pages of the equivalent of computer source code should be deposited in seeking registration. 37 CFR 202.20(c)(2)(v11).

21.    U.S. Copyright Office (Compendium (Third Ed.) § 723) further supports this by stating "'Computer program' is the most appropriate term for registering a claim in this type of work," and supersedes communication from the Examiner who wrongly opined that the Copyright Office "no longer register[s] fonts as 'computer programs' as they are not eligible for the registration," which is proven false by concurrent and subsequent copyright registrations issued by the U.S. Copyright Office for computer programs that generates typefaces cited in Appendix A expressly defining their Authorship as computer programs.

22.    The Rucinski Report neither cites to nor addresses the aforementioned regulations or provision of the Compendium.

23.    The Rucinski Report erroneously attempts to draw a comparison between Microsoft Word, a "What You See Is What You Get" (or "WYSIWYG") application, and FontLab Studio. (Rucinski Rep. ¶¶ 23, 24, 30, 32.) The latter is considered in the font industry to be a GUI based application to assist in the authoring of computer programs that generate typefaces. Rucinski's assumptions around the methods of authorship as understood in the font industry using FontLab Studio are conjecture and dismiss the significant amount of original authorship executed by Nicky Laatz in the creation of the Blooming Elegant Font Trio computer programs that generate typefaces, for which the U.S. Copyright Office issued copyright registrations.

24.    As a professional font author having personally authored or co-authored over one-thousand (1,000) typefaces, I am familiar with and have implemented a wide variety of methods that are required to author a computer program that generates typefaces as defined by the U.S. Copyright Office from start to finish. Generally, the process starts with the creation of all individual letterform and non-letterform elements ("Glyphs") required and desired for the typeface. Those Glyphs can be initially drawn physically or digitally but ultimately must end up as a set of digital instructions defining their shape to create a desired output.

25.    Once all the individual Glyphs have been created digitally, additional digital instructions must be manually authored which include: the dimensions of the typeface, the defined distance from the left and right side of each Glyph, the defined distance from the left and right side of each Glyph when specific Glyphs are next to one another, the definition of Glyph substitutions that occur under specifically defined conditions (also known as OpenType features), and relevant internal and external information associated with the typeface to assure its desired output.

**Filing Requirements for a Computer Program that Generates Typefaces for the U.S. Copyright Office**

26.    Since 1998, I have personally filed and successfully obtained twenty-four (24) copyright registrations for computer programs that generate typefaces from the U.S. Copyright Office. For each of these filings I authored and created the computer program that generates typefaces using either the Fontographer[2] or FontLab Studio GUI based applications to assist in the authoring of the computer programs. For most of those copyright filings, the copyright registration for the computer program that generates typefaces expressly states that it was created with the use of Fontographer or FontLab Studio, and identifying the use of these applications to create the computer programs that generate typefaces in each of my copyright filings did not impact or prevent me from obtaining the copyright registrations. For example, the registration for the family of fonts with title "In-Flight Meal Family" (Copyright Registration No. TX0006771345), which was registered by my company Font Diner, Inc., expressly states that the family of fonts was created with the use of Fontographer.

27.    It is my understanding that Mr. Rucinski has never filed or registered a copyright for a computer program that generates typefaces. As such, Mr. Rucinski appears to lack expertise in and misunderstands the submission deposit requirements of the U.S. Copyright Office with regard to human-readable source code.

28.    The submission deposit requirements for computer programs are clearly detailed in the U.S. Copyright Office Compendium, Section 1509.1(F), which Mr. Rucinski neither cites nor addresses in the Rucinski Report. While the Copyright Office generally requires submission of human-readable "source code" rather than binary "object code" which is also an accepted file format when submitting an application for Copyright Registration, the Copyright Office expressly considers source code (such as VFJ files which are in the JSON ("JavaScript Object Notation") data format) and compiled binary object code files (such as an OTF or OpenType file format) to be two representations of the same work. (*See* Copyright Office Compendium §§ 721.3-721.5.), Thus, Mr. Rucinski erroneously asserts the VFJ files could not be submitted as the human-readable source code representing the corresponding OTF files (Rucinski Rep. ¶ 38), when the distinction is irrelevant in the eyes of the Copyright Office as stated in the Compendium.

29.    More importantly, the Rucinski Report fully ignores the documented deposit requirements and fails to address or acknowledge the misfeasance of the Examiner's position on what is and what is not acceptable classification of computer programs that generate typefaces for the purpose of obtaining a copyright registration. The Rucinski Report relies on Mr. Rucinski's own assertion of a "hand-

---

[2] Fontographer is a font editor similar to FontLab.

coding" requirement (and Mr. Rucinski's own definition of "hand-coding" as explained above), but this requirement is not based on any statement or regulation published by the Copyright Office for the registration of copyrights for computer programs that generate typefaces.

30. Mr. Rucinski erroneously asserts the source code deposited is "essentially data" and "the process the Laatz Declaration describes is not reasonably understood to constitute the creation of original computer software." (Aug. 3, 2023 Rucinski Decl. ¶ 9.)  But in the same year the Blooming Elegant (TX0008984766), Blooming Elegant Sans (TX0008984762), and the Blooming Elegant Hand (TX0008984764) computer programs that generate typefaces were created by Nicky Laatz (*i.e.* 2016), the U.S. Copyright Office issued two (2) copyright registrations for computer programs that generate typefaces to other font designers. In 2017, the U.S. Copyright Office issued five (5) copyright registrations for computer programs that generate typefaces to other font designers. And in 2018, the U.S. Copyright Office issued twelve (12) copyright registrations for computer programs that generate typefaces to other font designers. Each of these copyright registrations is identified in Appendix A. This demonstrated pattern of successfully filed registrations for computer programs that generate typefaces by the Copyright Office corroborates and reconfirms the U.S. Copyright Office's position on what it considers suitable and acceptable copyright registrations for computer programs that generate typefaces under the U.S. Copyright Office Regulation on the Registrability of Computer Programs That Generate Typefaces, 57 Fed. Reg. 6201-01 (Feb. 21,1992) ("1992 Regulation") and U.S. Copyright Office (Compendium (Third Ed.) § 723.

31. My opinion that the Blooming Elegant Trio font software constitutes a set of computer programs that are copyrightable is further supported by my own experience in registering computer programs that generate typefaces with the U.S. Copyright Office, and by other past experience as well. Specifically, in January 2012, in the interest of assisting font authors in the filing of their own copyright registrations for computer programs that generate typefaces, I authored a PDF 'How-to' guide on how to file a typeface copyright registration which was distributed within the font author community via the Internet. The guide was created based on my knowledge of successful copyright registration practices and was updated from time to time as new information and feedback were provided to me by fellow font authors and John Poff, Supervisor of the Literary Division of the U.S. Copyright Office.

32. In fact, prior to publishing and distributing the PDF guide, I shared it with Mr. Poff to review and to identify and advise any information which was incorrect to assure the guide was accurate for such accepted registrations by the Copyright Office for computer programs that generate typefaces. Mr. Poff confirmed the guide was accurate and encouraged font authors to reach out should they have any questions

8

or require additional clarification by allowing us to publish his contact information in the guide.

**Compensation**

25.    I am charging Plaintiff Nicky Laatz $650 per hour for my time working on this matter. No part of my compensation is based upon the outcome of this matter.

Stuart Sandler

_____October 22, 2024____

Date

9

# APPENDIX A

**ISSUED COPYRIGHT REGISTRATIONS BY THE U.S. COPYRIGHT OFFICE FOR A COMPUTER PROGRAM THAT GENERATES TYPEFACES**

**2016 Issued Copyright Registrations**

Blooming Elegant
TX0008984766 / 2021-02-18
Date of Publication: 2016-02-16
Authorship: Font Data / Text

Blooming Elegant Sans
TX0008984762 / 2021-02-18
Date of Publication: 2016-02-16
Authorship: Font Data / Text

Blooming Elegant Hand
TX0008984764 / 2021-02-18
Date of Publication: 2016-02-16
Authorship: Font Data / Text

PlayBall! font
TX0008254864 / 2016-04-13
Date of Publication:  2016-03-17
Authorship: computer program / Computer File

Computer Program for a CASHMERE BOOK Typeface Font.
TX0008328429 / 2016-08-28
Date of Publication: 2016-08-28
Authorship: computer program / Computer File

**2017 Issued Copyright Registrations**

LINGERIE XO DREAMLINE TYPE FONT SOFTWARE
TX0009108342 / 2022-04-13
Date of Publication: 2017-11-13
Authorship: XML CODE / Computer File

LINGERIE XO CALLIGRAPHIC TYPE FONT SOFTWARE
TX0009108339 / 2022-04-13
Date of Publication: 2017-11-13
Authorship: XML CODE / Computer File

10

Computer Program for a MING ROMANTIC Typeface Font
TX0008521835 / 2017-12-07
Date of Publication: 2017-12-06
Authorship: XML Code / Computer File

Computer Program for a DeKALB Typeface Font
TX0008403613 / 2017-06-04
Date of Publication: 2017-05-08
Authorship: computer program / Computer File

72 Font Computer Program
TX0008452070 / 2017-09-01
Date of Publication: 2017-06-08
Authorship: computer program / text

**2018 Issued Copyright Registrations**

Xants font computer program version 1.012
TX0008649078 / 2018-09-11
Date of Publication: 2018-06-12
Authorship: computer program / Computer File

Volvo NOVUM 2.001 TrueType
TX0008978667 / 2021-04-15
Date of Publication: 2018-06-18
Authorship: computer program / Computer File

Volvo NOVUM 2.001 OpenType
TX0008978674 / 2021-04-15
Date of Publication: 2018-06-18
Authorship: computer program / Computer File

Minion 3 version 1.021 font computer program
TX0008581883 / 2018-05-17
Date of Publication: 2018-04-18
Authorship: computer program / Computer File

MANIFOLD CF REGULAR FONT SOFTWARE
TX0009196769 / 2022-11-03
Date of Publication: 2018-04-11
Authorship: XML COMPUTER CODE / Computer File

KREUZ MEDIUM FONT SOFTWARE

11

TX0009200292 / 2022-12-01
Date of Publication: 2018-03-26
Authorship: XML CODE / Computer File

KREUZ EXTENDED LIGHT FONT SOFTWARE
TX0009200286 / 2022-12-01
Date of Publication: 2018-03-26
Authorship: XML CODE / Computer File

KREUZ CONDENSED REGULAR FONT SOFTWARE
TX0009200283 / 2022-12-01
Date of Publication: 2018-03-26
Authorship: XML CODE / Computer File

KREUZ CONDENSED MEDIUM FONT SOFTWARE
TX0009201086 / 2022-12-01
Date of Publication: 2018-03-26
Authorship: XML CODE / Computer File

KREUZ CONDENSED LIGHT FONT SOFTWARE
TX0009201077 / 2022-12-01
Date of Publication: 2018-03-26
Authorship: XML CODE / Computer File

Joschmi font computer program version 1.012
TX0008649073 / 2018-09-11
Date of Publication: 2018-06-12
Authorship: computer program / Computer File

aUI FONT SOFTWARE
TX0008928191 / 2020-12-15
Date of Publication: 2018-10-10
Authorship: XML CODE / Computer File

12