# EXHIBIT D

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

----------------------------------------------------x

NICKY LAATZ,

             Plaintiff,

vs.                              Case No.5:22-cv-04844-BLF-VKD

ZAZZLE, INC., and MOHAMED

ALKHATIB,

             Defendants.

----------------------------------------------------x

***HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY***

REMOTE VIDEOTAPED DEPOSITION OF

STUART SANDLER

Wednesday, October 30, 2024

Stenographically Reported By: Lynne Ledanois

License No. 6811

Job No. 6985678

Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

a quarter before I graduated.  The primary degree that 10:38 I started in was called advertising design.  Its focus was around graphic design for advertising purposes.

This included all aspects of graphic design from typography, from painting, from 10:38 computer-based graphic design, mechanical-based graphic design.

And just prior to graduation, we were notified that they changed the program name to visual communications.  I believe they did so to 10:39 make it more broad.

Regardless, that's the degree that I graduated with and I graduated with a 3.85 cumulative GPA from that program.

Q   Do you have any educational degrees that 10:39 are not listed in this report?

A   Other than my high school diploma, I do not.

Q   Okay.  No other certificates that you have received that are not listed here?

A   That's correct. 10:39

Q   You don't have an education in computer science?

A   I've -- I don't have a formal certificate-based education in computer science, that's correct. 10:40

Page 27

Q    You don't have an education in computer    10:40
programming?

A    I do not have such.

Q    And you mentioned you don't have a formal
certificate in computer science.  Do you have any    10:40
informal education in computer science?

A    Primarily just my 28 years of experience
as -- in the font industry.  Prior to that, having
graduated in '93, 30 plus years in the graphic design
industry as a professional graphic designer.  So the    10:40
use of those tools.

Q    You have no legal training?

A    I have no formal legal training.

Q    You never went to law school?

A    I did not.    10:41

Q    Never practiced as an attorney?

A    That's correct.

Q    Then if we go back to Paragraphs 1 through
5, you describe your experience in the font
industry; correct?    10:41

A    That's correct.

Q    And then in Paragraph 1, you write that
you've become known throughout the world through
your popular display typefaces and your font
licensing expertise; is that correct?    10:41

Page 28

BY MS. AKOPJAN:                                              11:39

Q    Sure.

Do you believe that the professional activities and experience summarized in your expert report are complete?                                      11:39

A    I believe they are as relevant to the matter as for the purpose of my expert report.  Do I believe they are entirely complete?  As I noted, it's -- I mean, I've got other things, but relevant to this matter and relative to my expertise, I believe that       11:40
they are.

Q    Okay.  Mr. Sandler, we used the term "font industry" today; right?

A    That's correct.

Q    You consider yourself to be an expert in    11:40
the font industry; right?

A    Others consider me to be an expert in the font industry.

Q    And you also consider yourself an expert in the font industry?                                  11:40

A    I believe that my expertise is superior in the font industry, yes.

Q    Okay.  And can you please explain what you're referring to by the term "font industry"?

A    I'm happy to.                                11:41

Page 56

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

So the font industry, for clarity, it's 11:41 not an organized entity.  That's probably the first and foremost thing that's important to understand.

What it is is a loosely -- a loose coalition of independent font authors and font 11:41 distributors who develop and work in the same skill set, the same marketplace, primarily any entity that generates or derives its income primarily from the development or licensing of fonts I would consider to be a member of the font industry. 11:42

I think any professional organizations that organize events to bring such parties together, organizations such as ATypI, organizations such as The Type Directors Club, organizations such as SoTA, which is the Society for Typographic Aficionados, 11:42 any recognized organizations, any folks who have participated in those conferences, workshops, forums, I think as I noted, they all are individual.

They have their own businesses and their own practices, but by the virtue of their 11:42 participation, it creates effectively what any interpret to be an industry.

    Q    Okay.  Throughout your report you refer to the term "font industry standards"; correct?

    A    Yes, I do. 11:43

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Q    And are these standard memorialized    11:43
anywhere?

A    As I noted, there's not a single organizing
body.  I think there may be -- the AIGA produces a
document for graphic designers that speaks to matters    11:43
of pricing, best practices as a reference guide.

I have not reviewed this document, I'm
just simply aware of it.

There may be some definitions or
declarations by the AIGA in that publication which    11:43
they produce annually around licensing font,
pricing, et cetera.

Again, I'm speculating because I have not
firsthand knowledge of reading -- having read or
reviewed this particular document, but I'm aware of    11:44
it.

Beyond that -- I apologize, can you reask
your question?  I want to make sure I'm answering it
correctly.

Q    Sure.  I asked if the industry standards    11:44
that you're referring to were memorialized anywhere?

A    Oh, thank you very much.  Appreciate that.
As I noted, since there is not an
organized body that represents the font industry,
there is no such singular document that the folks    11:44

Page 58

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

who participate in the font industry would consult   11:44
or refer to.

Q    Okay.  And understanding there's not a
singular document, are there various guidelines
written about font industry standards?   11:44
A    Yes, I believe there are.  I would direct
counsel to review Monotype, MyFonts website, they have
published lots of articles around subject matter that
speaks to what they interpret as standards and
expected practices, trends in the font industry.   11:45
        And I think as the largest font licensors
and distributor, they have -- pardon me, they have a
reputation -- I'll get a quick drink here.

Q    Sure.

A    Excuse me.   11:45
        They have a reputation in providing
education to folks in the font industry.
        And so I think many would look to those
documents and publications as guidance.
        MR. RYAN:  Objection, nonresponsive.   11:46
        THE WITNESS:  May be referred to as
guidance, yes.
BY MS. AKOPJAN:
Q    And these publications that you mentioned
from Monotype and MyFonts, these are articles online   11:46

Page 59

you recall offering a license that was more than     12:11
$10,000 on any of your platforms?

       MR. RYAN:  Objection, vague and ambiguous,
compound.

       THE WITNESS:  Can you specifically which     12:11
question you would like me to respond to?

BY MS. AKOPJAN:

    Q   Sure.

       Do you recall offering a license that was
more than $10,000 on any of your platforms?     12:11

       MR. RYAN:  Objection, vague and ambiguous
as to the term "offering."

       THE WITNESS:  Can you specify what you
mean by "offer"?

BY MS. AKOPJAN:     12:11

    Q   Sure.

       Have you sold any of your fonts for more
than $10,000?

       MR. RYAN:  Objection, vague and ambiguous.

       THE WITNESS:  In the retail marketplace     12:12
that a consumer could find a price of a font license
that I've offered for sale, I don't believe there is
a singular item that would be a 10,000-dollar
license fee, even if all thresholds were maxed out,
unless they purchased my entire collection     12:12

Page 72

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

individually in the same transaction.    12:12

Any licenses that may have potentially exceeded that amount would have required a license upgrade or OEM or a custom license offline.

But certainly it's possible that that    12:13 price could be approached online, but it would -- you would have to go out of your way to attempt to sell retail licenses at that price for all of my fonts.

BY MS. AKOPJAN:    12:13

Q    Mr. Sandler, earlier today you've mentioned that you created or licensed over a thousand fonts; correct?

A    Not quite accurate.  I've authored or coauthored or created over a thousand fonts.    12:13

Q    Okay.

A    You said licensed.  I did not understand what you meant by that.  I certainly don't license my own work as the purchaser or user of it, as the creator of it.    12:14

Q    Okay.  And so you have created, authored or coauthored over a thousand fonts?

A    That's correct.

Q    You have no recollection of ever licensing any of those fonts for over $1,000?    12:14

Page 73

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

MR. RYAN:  Objection, mischaracterizes the testimony.   12:14

THE WITNESS:  To recap, in the retail marketplace via my distributors, I don't recall a singular license purchase for licensing terms that I have decided to extend in the retail marketplace that would expressly hit a price point that exceeded $1,000 at a retail distribution marketplace offering.   12:14

It is possible.   12:15

BY MS. AKOPJAN:

Q    What is the highest amount that you know of that any individual font has ever been licensed for?

A    I would be wildly speculating.  I don't know what other licensors have charged for their license material at the highest level.   12:15

Those discussions are usually confidential and they are not shared in any way.

Q    You agree that you are an expert in the --   12:15

A    I'm sorry, can you repeat?  You broke up in the video recording.

Q    Sure.

You agree that you are an expert in the field of font licensing; right?   12:16

Page 74

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

A    Yes, everyone considers me an expert in the    12:16
font industry.

Q    Based on -- I'm sorry, Mr. Sandler, please
finish your sentence.

A    I'm sorry, I was just clarifying, many    12:16
people do, not everybody.  I can't know that.

Q    Based on your experience as an expert in
this industry, what is the highest amount that you
know of, that you personally know of that any
individual font has ever been licensed for?    12:16

MR. RYAN:  Objection, vague and ambiguous.

THE WITNESS:  Frankly, it would be
speculation.  I can't recall a specific watermark
licensing fee that was ever paid.

BY MS. AKOPJAN:    12:17

Q    You cannot recall any licensing -- you
cannot recall any specific watermark licensing fee
that has ever been paid?

A    Correct.  Given the fact that even as a
distributor who represents 140 plus font designers,    12:17
and as the -- I own nine foundries which I distribute,
licensing deals can -- there is not a top end limit
for what a licensing deal could be.

It's always going to be specific to the
terms and the conditions and what amount is agreed    12:17

Page 75

upon by the licensee and the licensor.                          12:17

So even my knowledge of where I may guess that threshold to be would not be based in fact. And I don't wish to perjure myself.  It would be speculation if at all.                          12:18

Q   Do you know any prices that any individual fonts -- strike that.

Do you know any prices that fonts have been offered or licensed for?

MR. RYAN:  Objection, vague and ambiguous.   12:18

THE WITNESS:  Yes.  So at the retail marketplace, a distributor such as Font Bros, such as MyFonts, Creative Market, you can easily calculate and see the licensing fee that is offered under the terms and conditions.                          12:18

So any and every one of those scenarios is a possible scenario.

BY MS. AKOPJAN:

Q   Okay.  Have you ever seen one for more than $10,000?                          12:19

A   Oh, I think if you identify a desktop end user license for 10,000 users, that would wildly exceed $10,000, sure.

Q   Have you ever heard of any single font or bundle of three fonts being offered for more than   12:19

Page 76

things that might aid anyone who's interested in        12:31

enhancing a design product.

Q    Okay.  Do you believe that Creative Market

adheres to font industry standards?

A    As I noted, there is no singular document        12:31

that identifies the standards so that each distributor

and business owner or font author may distribute the

fonts under terms and conditions that they wish to.

From my experience, generally Creative

Market -- and the reason I have never launched any      12:32

products for sale via Creative Market personally is

because I did not find the terms and conditions they

extended to their customers to be the same terms and

conditions which I would be comfortable extending my

font typeface and font software products for sale.      12:32

Q    What terms and conditions that Creative

Market offers concern you?

A    I would need to review them specifically to

give you a thorough answer.

But I believe in some cases the terms and       12:33

conditions to be at a lower threshold than some of

my other end user license agreement terms and

conditions that I sell my own fonts under and that I

sell via other distributors.

By way of example, I limit the total           12:33

Page 84

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

And I've identified in my report the basis 02:42 specifically which my technical understanding of the Zazzle implementation of the Blooming Elegant Font Trio product was how it was used in accordance with that understanding. 02:42

BY MS. AKOPJAN:

Q     Do you believe that any of the statements Mr. Li made about how Zazzle's systems and the design tool worked were inaccurate?

MR. RYAN:  Objection, lack of foundation, 02:43 vague and ambiguous, calls for speculation.

THE WITNESS:  As I'm not a technical expert, it would be difficult for me to state that. I simply don't have the expertise, nor was I asked to opine on Mr. Li's methodology of 02:43 implementation.

BY MS. AKOPJAN:

Q     So you cannot say one way or the other whether you believe the statements Mr. Li made about how Zazzle's systems and the design tool worked were 02:43 accurate?

A     I have no expertise.  It was a deposition, I believe Mr. Li was being truthful in his deposition. I have no reason to question that he wasn't attempting to do his best to provide an accurate representation 02:43

Page 131

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

BY MS. AKOPJAN:                                              05:35

Q    You weren't working for the copyright office in 2021; right?

A    I have never been an employee of the U.S. Copyright Office.                                      05:35

Q    And you have no insight into whether the copyright examiner was correctly stating the copyright office's current position other than the information you've previously provided?

A    Other than the information that I've reviewed and what I just stated, that is my opinion, yes.                                                     05:35

Q    Mr. Sandler, we referred to Appendix A to your rebuttal report; right?

A    I have it in front of me.                          05:36

Q    And you included 22 copyright registrations in this list?

A    I did number them, but let me see where I identify that.

Q    I think it was 22.                                05:37

A    Yes, I can confirm there are 22 identified successfully-issued copyright registrations.

Q    And can you explain your process for preparing this list?

A    Sure.  As I identified previously, the same  05:37

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

I, LYNNE M. LEDANOIS, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [] was [x] wasn't requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: November 1, 2024

LYNNE MARIE LEDANOIS

CSR No. 6811

Page 230