# EXHIBIT F

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

NICKY LAATZ,

        Plaintiff,

vs.              Case No. 5:22-cv-04844-BLF-VKD

ZAZZLE INC., and MOHAMED ALKHATIB,

        Defendants.

VIDEOTAPED DEPOSITION OF THOMAS PHINNEY

MONDAY, NOVEMBER 4, 2024

9:17 a.m.

Page 1

Compound.                                          09:54:24

THE WITNESS:  The biggest ones     09:54:25
that I am aware of, I believe I am                 09:54:48
specifically covered by non-disclosure             09:54:54
agreements that would not allow me to              09:54:59
answer in any great -- in any useful               09:55:02
details.                                           09:55:04

BY MR. POSNER:                                     09:55:07

Q.    So there's no information you     09:55:08
can provide?                                       09:55:09

A.    And additionally, I would say     09:55:10
that my recollection of details, even to the       09:55:15
extent that I do know them, other details          09:55:18
about numbers would not necessarily be             09:55:21
terribly helpful.                                  09:55:23

Q.    Okay.  What is Font Detective?    09:55:25

A.    Font Detective, LLC is the name    09:55:31
of my sole proprietor, limited liability           09:55:35
company.  So it is effectively me, in my           09:55:44
professional capacity.                             09:55:52

Q.    One more question about license    09:55:54
rates.                                             09:55:56

Do you believe that there is an     09:55:57
industry standard for font license rates?          09:56:00

MR. STEINBERG:  Objection.     09:56:08

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Vague and ambiguous.    09:56:08

THE WITNESS:  Gosh, no.  I 09:56:09 don't think there's a single standard, 09:56:11 which is to say that the -- you know, 09:56:13 as anyone can see, the base price, 09:56:18 even for a single user license, varies 09:56:19 wildly.    09:56:24

What I think there is a 09:56:24 standard for is some general 09:56:26 principles that license fees escalate, 09:56:29 potentially astronomically for 09:56:34 different kinds of uses and different 09:56:38 numbers of users.    09:56:40

BY MR. POSNER:    09:56:41

Q.    But the license fee in the font 09:56:42 industry, in your experience, is a matter of 09:56:44 negotiation between the two licensing 09:56:46 parties?    09:56:48

A.    It depends on the level of the 09:56:49 license.  I think many license fees are 09:56:54 pretty set, when someone licenses something 09:57:02 on a website.    09:57:04

Q.    Okay.  For how long have you -- 09:57:06 have you considered yourself to have worked 09:57:09 in the font industry?    09:57:11

Page 40

Q.    When did you leave Adobe?                10:06:46

A.    End of 2008.                             10:06:49

Q.    Have you ever corresponded with          10:06:55
the Copyright Office in any way, shape, or     10:06:59
form?                                          10:07:03

A.    Not that I recall at the                 10:07:03
moment.                                        10:07:21

Q.    Have you ever spoken with                10:07:21
anyone who, at the time of the speaking,       10:07:23
worked for the Copyright Office?               10:07:27

A.    No, not that I recall.                   10:07:30

Q.    Since leaving Adobe in 2008,             10:07:36
have you been involved in any capacity in      10:07:43
submitting an application for registration of  10:07:48
a font, either your own font or somebody       10:07:51
else's?                                        10:07:54

          MR. STEINBERG:  Objection.           10:07:55
     Vague and ambiguous.                      10:07:55

          THE WITNESS:  I have certainly       10:07:56
     discussed processes for creating files    10:08:00
     that could be submitted, discussed the    10:08:07
     processes by which one could obtain       10:08:10
     copyright registration of the fonts       10:08:17
     with -- with the type designers and       10:08:18
     type foundry representatives.             10:08:27

Page 48

particular application or registration for a    10:11:26

font?    10:11:32

MR. STEINBERG:  Objection.    10:11:32

Vague and ambiguous.    10:11:34

THE WITNESS:  Yes.    10:11:34

BY MR. POSNER:    10:11:39

Q.    What?    10:11:39

MR. STEINBERG:  Same    10:11:41

objections.    10:11:41

THE WITNESS:  I am aware of    10:11:42

back-and-forth with the Copyright    10:11:46

Office on a variety of font    10:11:50

registrations, and discussions about,    10:11:57

you know, questions they may have had    10:12:07

about any number of aspects of    10:12:18

registration, whether it's the format    10:12:20

of a document, of the -- yeah, just...    10:12:22

BY MR. POSNER:    10:12:25

Q.    So you're referring to    10:12:26

communications that you've had with    10:12:27

applicants about their communications with    10:12:29

the Copyright Office, correct?    10:12:32

A.    Yes.    10:12:34

Q.    Other than that, is there any    10:12:34

non-public information of which you are aware    10:12:36

Page 51

about the Copyright Office's handling of

applications or registrations for font

copyrights?

                    MR. STEINBERG:  Objection.

            Vague and ambiguous.  Lacks

            foundation.  Compound.

                    THE WITNESS:  Other than

            information from the applicants, I

            don't believe so.

BY MR. POSNER:

        Q.    Now, you -- we'll go over a

couple of invoices and then we can take a

short break.

                So we just received this

morning, two invoices that were produced to

us.  And I don't have hard copies to show

you.  I believe your counsel might be able to

show them to you on his computer.  I also

think you are probably familiar with them,

but --

        A.    And I probably am.

        Q.    Yeah.

                Is it correct that you've

issued two invoices for the work that you've

done on this lawsuit so far?

Page 52

THE WITNESS:  I believe it's -- 10:27:20
the math suggests it was 60 hours on 10:27:22
the previous invoice.  But for -- I 10:27:26
can say that it's about that or a 10:27:35
fairly similar number that I have 10:27:38
accumulated for the rebuttal report, 10:27:40
plus preparing for the deposition. 10:27:42

MR. POSNER:  Okay.  Let's take 10:27:44
our break. 10:27:48

MR. MATHEWS:  Before we go off 10:27:50
the record, I just want to point out, 10:27:50
I think the exhibits on Exhibit Share 10:27:50
were mismarked. 10:27:53

So 237 has been marked for 10:27:54
Phinney 00023; and 236 is the 10:27:57
subsequent invoice, Phinney 0004 to 6. 10:28:00

MS. HULKA:  I'll redo them. 10:28:49

THE VIDEOGRAPHER:  Off the 10:28:49
record.  The time is 10:28 a.m. 10:28:49

(Break taken.) 10:41:33

THE VIDEOGRAPHER:  We're back 10:42:54
on the record.  The time is 10:43 a.m. 10:43:30

BY MR. POSNER: 10:43:35

Q.     Are you a trained computer 10:43:38
scientist, Mr. Phinney? 10:43:41

Page 65

A.    No, I would not say so.    10:43:44

Q.    Are you a trained computer    10:43:51
programmer?    10:43:53

A.    It is not my occupation.    10:43:54

Q.    Are you proficient in any    10:43:57
computer programming languages?    10:44:00

A.    I have at times had a passing    10:44:01
familiarity with a number of computer    10:44:06
languages.    10:44:09

Q.    Which ones?    10:44:09

A.    PostScript and Python.  And if    10:44:15
you go back to my teens, then Basic and    10:44:36
Pascal.    10:44:42

Q.    Are you aware of the PostScript    10:44:42
language ever having been used to write any    10:44:45
software relating to fonts?    10:44:50

A.    Yes.    10:44:52

Q.    Okay.  What are you aware of?    10:44:52

A.    Well, the original PostScript    10:44:54
Type 3 fonts are, in fact -- or can be --    10:45:04
fully capable PostScript programs.  Anything    10:45:08
you can do in the PostScript language is    10:45:12
legitimate fodder in the PostScript Type 3    10:45:14
format.    10:45:19

So despite any other debates    10:45:20

Page 66

A.    No, that's a master's degree. 11:10:41
So just due to space constraints, I've been 11:10:44
trying to keep my resume to two pages, and so 11:10:49
I don't include my Bachelor of Arts in 11:10:52
Psychology from the University of Alberta. 11:10:55

I have, of course, had 11:11:01
particular interest in cognitive psychology 11:11:03
and test theory, and both in things related 11:11:10
to fonts back then, but also statistics and a 11:11:18
variety of other particular areas. 11:11:22

Q.    Your master's of science from 11:11:24
Rochester was not a computer science degree, 11:11:27
correct? 11:11:30

A.    It was not a computer science 11:11:30
degree, no. 11:11:32

Q.    And your Master's of Business 11:11:32
Administration from University of California 11:11:34
Berkley was not a computer science degree, 11:11:40
correct? 11:11:41

A.    That's correct. 11:11:42

Q.    Is it correct that you have no 11:11:42
legal training or legal education? 11:11:44

A.    I have no formal legal 11:11:46
education, that's correct. 11:11:48

Q.    Okay.  Is your job at -- well, 11:11:55

Page 86

are fairly critical here.                    03:39:38

I have no opinion on whether    03:39:39
this is true from a computer science         03:39:41
perspective.  But Mr. Rucinski's conclusion  03:39:45
is irrelevant, as detailed above, the US     03:39:48
Copyright Office has defined a computer       03:39:55
program as definition.                       03:39:56

Q.    You go and say more, for sure,    03:39:57
in paragraph 39.                             03:39:57

But what I'm just focused on    03:39:57
is, it's correct that you have no opinion    03:40:00
about whether Mr. Rucinski is correct about  03:40:02
this, from a computer programming -- from a  03:40:06
computer science perspective.                03:40:10

That's correct, right?    03:40:13

A.    Yes.    03:40:14

Q.    You're not a computer    03:40:14
scientist?                                   03:40:15

A.    No.    03:40:16

Q.    Okay.  You can put Mr.    03:40:16
Rucinski's report aside and pull out your    03:40:18
opening report, please, which is Exhibit 242.  03:40:22

Did you write your report,    03:40:33
Exhibit 242?                                 03:40:39

A.    Yes.    03:40:42

Page 236

A.   Yes.   05:28:36

Q.   Exhibit 227 is what you're referring to, correct?   05:28:37 05:28:42

A.   Yes.   05:28:42

Q.   All right.  And this is the final regulation on the registerability of computer programs that generate typefaces, dated February 21, 1992.   05:28:43 05:28:49 05:28:57 05:29:00

Do you see that?   05:29:02

A.   Yes.   05:29:03

Q.   In 1992, you were not a professional in the font industry, correct?   05:29:03 05:29:09

A.   Correct.   05:29:10

Q.   You were in college, right?   05:29:15

A.   Yes, I believe.   05:29:22

Q.   Suffice to say, you had no involvement in the preparation of this 1992 regulation, correct?   05:29:23 05:29:26 05:29:28

A.   That's correct.   05:29:29

Q.   Do you know who wrote it?   05:29:30

A.   No.   05:29:31

Q.   Have you ever spoken with anybody who was involved in writing it?   05:29:33 05:29:36

A.   No.   05:29:38

Q.   So you have no personal   05:29:39

Page 311

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

firsthand knowledge about what the Copyright    05:29:46

Office considered in connection with issuing    05:29:50

this regulation, correct?    05:29:53

MR. STEINBERG:  Objection.    05:29:54

Mischaracterizes the evidence.    05:29:55

THE WITNESS:  That's a    05:29:57

different question.  And I think it    05:30:00

would depend on your definition of    05:30:03

"personal firsthand knowledge."    05:30:06

I certainly have had -- the    05:30:09

person who organized the particular    05:30:17

presentations, Adobe's presentations    05:30:19

to the Copyright Office was my manager    05:30:24

at Adobe for at least half my time at    05:30:28

Adobe.    05:30:34

So it was something that we    05:30:35

have spoken about at various points,    05:30:39

including, you know, back in the '90s.    05:30:45

BY MR. POSNER:    05:30:50

Q.    So years after the 1992    05:30:51

regulation was issued you were working at    05:30:53

Adobe, and you spoke with a person who worked    05:30:56

at Adobe, who had made a presentation to the    05:30:59

Copyright Office years earlier regarding the    05:31:03

eligibility of fonts for registration; is    05:31:07

Page 312

that correct?                                      05:31:12

A.    He made a -- he organized the     05:31:12
set of Adobe presentations that the Copyright     05:31:15
Office sent a delegation to Adobe's offices       05:31:20
to see and discuss with Adobe.  He was the        05:31:23
person who put that together.                     05:31:27

Q.    Who is that person?             05:31:29

A.    David Lemon.                    05:31:30

Q.    Is he still alive?             05:31:32

A.    Yes.                           05:31:33

Q.    When is the last time you've    05:31:34
spoken with him?                                  05:31:35

A.    Not within the last week or     05:31:36
two, I don't think, but certainly within the      05:31:44
last couple of months.                            05:31:46

Q.    Okay.  Did you contact him to    05:31:47
talk about this case?                             05:31:57

A.    Yes, I contacted him, at least   05:31:58
in part, to talk about some of the background     05:32:02
events with the Copyright Office and so on.       05:32:07
That -- I can't remember if that was the          05:32:13
reason for the last time I contacted him.         05:32:17

Q.    What did you talk about?        05:32:20

A.    Just more details about the     05:32:23
process, the fact that -- that presentation I     05:32:34

Page 313

mentioned, I think was roughly three months before the decision that the Copyright Office staff visited Adobe to see the present- -- I don't know if it's best described as a presentation or a set of presentations that Mr. Lemon had organized.

Q.    What -- what -- was -- at the time of the presentations, was Adobe using PostScript Type 1 font software?

A.    Yes.

Q.    But you've never spoken with anybody who works or has worked at the Copyright Office about the final regulation, correct?

MR. STEINBERG:  Objection. Asked and answered.

THE WITNESS:  I don't think I have successfully spoken to anyone at the Copyright Office about the final regulation or other issues regarding copyright registration.

I noticed something I have written that strongly suggests that at some point in the past I reached out, but -- to the Copyright Office for

Page 314

CERTIFICATE

I, Mary C. Soldati, Registered Professional reporter, Oregon and Washington Certified Shorthand Reporter, hereby certify that at said time and place, I reported in stenotype all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were transcribed through computer-aided transcription by me to the best of my ability; and that the foregoing pages constitute a full, true and accurate record of all such testimony adduced and oral proceedings had, and of the whole thereof.

In witness whereof, I have hereunto set my hand this 8th day of November, 2024.

Mary C. Soldati, RPR

CSR-WA No. 3406

Expires April 20, 2025

CSR-OR No. 19-0457

Expires September 30, 2025

Page 331