# EXHIBIT H

CONFIDENTIAL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

NICKY LAATZ,

             Plaintiff,

      vs.                   No. 5:22-cv-04844-BLF

ZAZZLE, INC. and MOHAMED

ALKHATIB,

             Defendants.

_____/

-- CONFIDENTIAL --

VIDEO-RECORDED DEPOSITION OF DANIEL B. GARRIE, ESQ.

Remote Zoom Proceeding

Guanacaste Province, Costa Rica

Monday, November 11, 2024

REPORTED BY:

LESLIE ROCKWOOD ROSAS, RPR, CSR 3462

Pages 1 - 305                    Job No. 6985719

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL

that the start-up's name was Bright Box.  It had to do

with shipping beauty products to people's homes.

Remember when that whole --

Q.  Yeah.

A.  -- like razors and whatever.                    11:19:29

It was a start-up.  I think it was Bright Box.

I don't know if it was Limited, though, but that's all

I've ever heard of Bright Box.  And certainly not the UK

piece.

Q.  Okay.  That might be a different Bright Box than    11:19:40

this Bright Box, but -- so to your knowledge, prior to

your work on this case you didn't have any relationship

with the plaintiff or any of her companies; right?

A.  That is correct.

Q.  Okay.  I want to talk about the defendant in        11:19:52

this case -- or one of the defendants in this case,

Zazzle.  Were you familiar with the company Zazzle prior

to your work on this case?

A.  I want to say no, but possibly.  My wife prints

books and stationery and other things, and I've been     11:20:10

asked to look at such things, so it wouldn't be out of

the realm of possibility that it had been one of the

services my wife had used to print a T-shirt or cards or

something.

But I don't have any recollection of working or      11:20:25

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL

being aware of Zazzle particularly.  I know of the space and the vertical and the market, but not of a particular company.

Q.  Understood.

Okay.  So is it fair to say that prior -- excuse     11:20:40 me -- prior to this litigation you had never used the Zazzle platform before?

A.  I personally hadn't used -- I mean, I actually -- I can't say with certainty that I have never used it, but I would say as I sit here, I don't remember     11:21:01 using it.

Q.  And you don't have a relationship with Zazzle in any way; right?

A.  No, I do not.

Q.  Any of your relatives, family members, do they     11:21:12 have any relationships with either Nicky Laatz or Zazzle?

A.  For Nicky Laatz, no.  For Zazzle, I have no idea, but I assume no.

Q.  Okay.

A.  But I mean, I don't -- I didn't actually ask     11:21:27 them.  My intermediate family, no, but my brothers and sisters, I don't know.

Q.  All right.  Now, you rendered in your expert report -- and we'll get into more detail later, but you've rendered opinions regarding Zazzle's -- regarding     11:21:46

Page 20

CONFIDENTIAL

say that they weren't -- that the Zazzle allowed -- for

the two things I just mentioned, Zazzle did permit that

to happen, which was a violation of the license agreement

and it -- what it required.  I'm not -- whether or not

that constitutes a breach or not, I don't know.        15:01:00

    Q.  BY MR. MACK:  Okay.  But you are -- so you are

going to be explaining to the jury that Zazzle violated

the terms of the license agreement?

            MR. STEINBERG:  Objection.  Vague and ambiguous.

            THE WITNESS:  Not beyond -- not beyond what I        15:01:15

state in my report.  Like, I'm only going to state:  Did

Zazzle have protection to protect Ms. -- let's just say

the Blooming Elegant font from being -- what was the -- I

forget the exact words -- the Blooming Elegant font from

being extracted?  Well, did they have -- did -- was there        15:01:37

method- -- was there technology -- did Zazzle implement

technology to prevent the Blooming Elegant font from

being extract?  And my answer is no.

    Q.  BY MR. MACK:  And if the Court finds that that's

an improper legal opinion, then you understand you'll be        15:01:55

prevented from offering that opinion?

            MR. STEINBERG:  Objection.  Calls for a legal

conclusion, incomplete hypothetical, vague.

            THE WITNESS:  I would comply with whatever the

Court issued as direction if it was permissible or not.        15:02:12

Page 160

A.  I mean, we rely on it.  We could recreate it for others if necessary and capture it in full and provide it if -- if it's -- I mean, this is -- can be pretty easily recreated.

Q.  Did you ever run a test when a user selects from the dropdown font menu what SVG data was returned, because this SVG data, I think, is from the A/B Ultra selection; right?                                    18:49:37

A.  Yeah.  We looked at both.

Q.  And why didn't you put a screenshot on page 25 of the actual SVG data that's returned for the fonts -- font dropdown menu selection?                          18:49:51

A.  That's just operator error.

Q.  Okay.  But do you have -- do you have that data, do you know, still?                                        18:50:04

A.  Not -- I don't believe so.

Q.  On page 25, the second sentence below that screenshot, you write:  "The SVG data ZIG creates using the instructions obtained from the font software are derivative works of the font software."            18:50:27

Do you see that?

A.  I'm looking for it.  Give me one second.

Page 25?

Q.  Yes.

A.  I see the recipe from one language.  (Reading.)   18:50:53

CONFIDENTIAL

Q.   Yes.   Just the second sentence where it talks about derivative works.

Do you see that?

A.   Using instructions obtained are derivative works for the font software.                    18:51:12

Yes.

Q.   Okay.   When you say "derivative work" in this sentence, what definition are you using?

A.   Well, it has to access the Blooming Elegant -- in this case it has to access the Ultra font, but it      18:51:23 would access the Blooming Elegant font and then you're creating another representation of the Blooming Elegant font.

Q.   Okay.   Is that the definition that you used, anything that's another representation of something else?      18:51:36

MR. STEINBERG:   Objection.   Mischaracterizes prior testimony.

Q.   BY MR. MACK:   Oh, Mr. Garrie, you know that derivative work has a legal definition.

A.   Yeah, I do.   I was trying to avoid using      18:51:51 copyright law to define.   But it's based on preexisting work.   It's a transformation or adaptation.

Q.   But you're not rendering an opinion that this SVG data qualifies as a derivative work in any copyright sense; right?                    18:52:07

Page 264

A.   I explained the context upon which I was saying that they select the font, it accesses through the DirectWrite, returns it back and the new representation is a derivative from whatever the original was.

Q.   Okay.  So you're just using the word    18:52:25 "derivative" as the word "derived from"; right?

A.   I'm not using --

MR. STEINBERG:  Objection.  Misstates prior testimony.

THE WITNESS:  I don't know if I'd characterize    18:52:38 it as that.  I would -- I would -- I mean, basically it's taking and embedding the Blooming Elegant font, transforming at some level.  I'm not using it in the sense of the copy -- like as in the -- as you said as the -- under the -- I just used it in the sense that it's    18:53:10 a derivative work.

Q.   BY MR. MACK:  Okay.  But you're not -- you're not rendering an opinion that the SVG data legally qualifies as a derivative work under copyright law; right?    18:53:25

A.   Not beyond what I've said in my report, and I don't use the words legally for anything to state that. But not beyond what I state in my report.

Q.   Okay.  And you're not going to explain to the jury that the SVG data ZIG returns or ZIG creates    18:53:38

Page 265

CONFIDENTIAL

or -- but I will note that the license in C is a single

seat user license and the -- that Zazzle gave every user

the ability to access the Blooming Elegant.  I don't know

if I'll use as many as -- unfettered and unlicensed, but

I would not disagree with the -- the general sentiment of    19:37:50

what's being stated.

Q.  Okay.  But you're not going to render any

opinions to the jury that the -- on the scope of the

license; correct?

MR. STEINBERG:  Objection.  Vague and ambiguous.    19:38:01

THE WITNESS:  Not beyond what I've stated in my

report, right, where -- so not beyond what I state in my

report and the declarations.

Q.  BY MR. MACK:  Okay.  And we already looked at

the landing page of the license that said commercial use,    19:38:16

unlimited number of projects; right?

A.  So --

MR. STEINBERG:  Objection.  Mischaracterizes the

evidence and the prior testimony.

Brian, you've got to stop doing that.    19:38:26

MR. MACK:  What am I doing, Mr. Steinberg?  We

already looked at the document earlier today and he

admitted that's what it said.

MR. STEINBERG:  No.  When you read it, it says

with some exceptions, and every time you try to misstate    19:38:39

Page 285

CONFIDENTIAL

I'm looking for the exact words.

On number 2, "A purchased item may be used in one project.  As an exception, installable items may be used in an unlimited number of projects on a one seat per license basis."                                              19:41:29

That's all I'm going to say.  I mean --

Q.  BY MR. MACK:  So you're going to render opinions to the jury on the terms of the license agreement, Exhibit C; right?

A.  No, that's not --                                   19:41:39

MR. STEINBERG:  Objection.  Mischaracterizes prior testimony.

THE WITNESS:  I'm only going to use that language as it's reflected in my report to explain why I used the language in my report that you were just -- as I   19:41:49 said before, I don't know if I'll use the unfettered and -- with the adjective -- as strongly worded, but certainly I will present the sentiment of what is stated there, which is Zazzle gave each of its users unfettered and unlicensed access to the Blooming Elegant Trio of   19:42:14 Fonts.

Q.  BY MR. MACK:  Okay.  You agree --

A.  And my point being is that each user could log in and use the Blooming Elegant font.  I'm not going to speak to whether or not it violated the license or not.   19:42:25

Page 288

CONFIDENTIAL

MR. STEINBERG:  Objection.  Compound.

THE WITNESS:  Sorry.

MR. STEINBERG:  Go ahead.

THE WITNESS:  So this is where we have a
terminology disagreement.  I believe that by putting it          19:43:40
in the cloud, it doesn't change the fact that the
Blooming Elegant OTF files, or the functionality that
they deliver, was provided to the same functionality
level, at some level, if they had just installed the font
into their own machine.                                          19:43:56

But the bottom line being is that without access
to the Blooming Elegant OTFs via the DirectWrite process,
I would not be able to generate a product.

Similarly, if I had bought the software, put it
on my machine, I would have been able to generate the          19:44:09
products, as well as done other things, like, write Word
documents and other functional features that -- but I
certainly would say that Zazzle's servers and the cloud
environment allowed the users to obtain -- to engage with
the Blooming Elegant font in that fashion.                       19:44:33

Q.  BY MR. MACK:  Okay.  But that was completely
non-responsive to my question, so --

A.  Oh, I apologize.  What was the question?

Q.  The question is:  That all users of Zazzle's
design tool have to access the font through the Zazzle          19:44:44

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL

servers; right?

MR. STEINBERG:  Objection.  Asked and answered.

And I disagree with your prior objection, Brian.

THE WITNESS:  We'll say the Zazzle environment, because they have caching servers and other things.  But that statement is -- I would agree is -- I would characterize it differently, but I would agree with the tenant of the statement.

19:45:03

Q.  BY MR. MACK:  Okay.  And you would agree that all the API calls from the user's browser go to one of the -- the Zazzle environment; right?

19:45:21

MR. STEINBERG:  Objection.  Vague and ambiguous, incomplete hypothetical.

THE WITNESS:  But-for -- but-for -- if Zazzle didn't exist, they couldn't use it, if that's --

19:45:39

Q.  BY MR. MACK:  Okay.

A.  If the Zazzle server environment didn't operate, they wouldn't be able to use the Blooming Elegant font.

Q.  Okay.  So all the API calls are received by a Zazzle server, right, in connection with the Zazzle design tool?

19:45:54

MR. STEINBERG:  Objection.  Incomplete hypothetical.

THE WITNESS:  I don't know who controls and operates Zazzle's server environment, but I'll say within

19:46:02

Page 291

CONFIDENTIAL

Mr. Rucinski pointed out, with the information that was available.

Q.  And then on page 37 you write -- I think you talked about this a little earlier -- "From a practical perspective and from a user's perspective, the outcome of    19:51:30 the process summarized above is effectively the same as a user directly obtaining a copy of the software, installing it on their computer, and having the option to use it to generate text in the Blooming Elegant Trio of Fonts."    19:51:42

Do you see that?

A.  I do.

Q.  And then you give two examples of programs, Adobe Illustrator and CorelDRAW.

Do you see that?    19:51:57

A.  Yeah.

Q.  And why did you choose those two examples of programs?

A.  I picked CorelDRAW because I'm a hard core WordPerfect fan, and I picked Adobe Illustrator because    19:52:09 it's a widely used tool.

Q.  Okay.  You would agree that if a user had a copy of the font software installed locally, they could also open up Microsoft Word and type a document in the font; right?    19:52:26

Page 296

A.  Yeah.  And as I stated earlier, that they -- it would be a -- you would have a much -- you would have a wider breadth of uses then.  You're not going to type your thesis in Zazzle.

Q.  Let's move on to your deposition prep for                19:52:47
today's deposition.  Did you -- obviously you prepared
for today's deposition; right?

A.  I did.

Q.  And at a high level, without getting into any
communications with counsel, what did you do to prepare?     19:53:00

A.  I had multiple conversations with counsel, and
then I reviewed my report.  I reviewed as much of the
Rucinski report and the exhibits as I could.  I reviewed
some declarations.  I reviewed my prior declarations.

I tried to review as many of the exhibits and             19:53:23
references, as well as the interrogatories and other
materials, but there's a -- there is a lot of information
that is covered in the two -- the three declarations and
the report.

Q.  And you said you had communications with counsel        19:53:42
to prepare.  How many -- how many different meetings did
you have?

A.  I'd say total probably six to seven hours.

Q.  And when were those meetings?

A.  The last couple days.  I think we met on               19:53:57

Page 297

CONFIDENTIAL

STATE OF CALIFORNIA     ) ss:

COUNTY OF MARIN         )


        I, LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462, do hereby certify:

        That the foregoing deposition testimony was taken before me at the time and place therein set forth and at which time the witness was administered the oath;

        That testimony of the witness and all objections made by counsel at the time of the examination were recorded stenographically by me, and were thereafter transcribed under my direction and supervision, and that the foregoing pages contain a full, true and accurate record of all proceedings and testimony to the best of my skill and ability.

        I further certify that I am neither counsel for any party to said action, nor am I related to any party to said action, nor am I in any way interested in the outcome thereof.

        IN WITNESS WHEREOF, I have subscribed my name this 13th day of November, 2024.




                    LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462


                                          Page 302