# EXHIBIT M

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


NICKY LAATZ,                          )

              Plaintiff;          )

                                 )

                                 )

                                 )

   -v-                                )No. 22-CV-04844

                                 )

                                 )

                                 )

ZAZZLE, INC., and MOHAMED        )

ALKHATIB                              )

              Defendant.          )


The Video-Recorded Deposition of SARA PARKIH, PH.D., having been called by Defendants for examination, taken pursuant to notice, and pursuant to all applicable rules of the Federal Code of Civil Procedure, conducted at 191 North Wacker Drive, Chicago, Illinois, and commencing at the hour of approximately 9:03 a.m., on the 12th day of November, 2024.


Reported By Beth Radtke, RPR, CRR

License No. 084-004561

                                                Page 1

A.   Yes, it is.

Q.   And if -- the hypothesis here was that Blooming Elegant trio is an important and popular set of fonts on Zazzle; those are your words in paragraph 5, correct?

A.   Yes.

Q.   But you chose only to survey graphic designers in order to test that, correct?

A.   Yes, I did.  That is correct.

Q.   You didn't survey customers, people who buy the products on Zazzle, correct?

A.   The extent which there might be overlap, but no, I targeted designers, specifically designers who spell their products on Zazzle.

Q.   And so your survey doesn't purport to tell us anything about how important Blooming Elegant is to customers who buy on Zazzle, right?

MR. MATHEWS:   Objection, misstates prior testimony, misstates the evidence.

BY THE WITNESS:

A.   So again, I targeted -- my survey was a study of designers who sell their products on Zazzle. They are the ones who make -- they are the ones who are most knowledgeable about fonts because they are

Page 30

designing these products, they make the initial decision about font selection, they know what their customers like, and so they are an important universe to study in terms of understanding the value and the importance of fonts on Zazzle.

Q. I understand that, but your survey doesn't purport to give us figures about how important Blooming Elegant is to customers who buy on Zazzle, right? It's the perceptions of the sellers that you were measuring, correct?

MR. MATHEWS: Objection, misstates prior testimony, misstates the evidence, vague and ambiguous.

BY THE WITNESS:

A. So the sellers produce products that are important to their customers.

BY MR. SCHAPIRO:

Q. Where in the report do you say that?

A. I'm not sure if I said it in the report, but that's, you know, they would be producing things that their customers want to buy. But I don't think I said it in the report.

Q. And you didn't survey customers by showing them different fonts and asking, would you buy this

Page 31

T-shirt versus this T-shirt, showing them font A or font B; that wasn't part of your survey, correct?

A.   That's correct.

Q.   Do you have any records or documents reflecting conversations that you had with graphic designers in which they conveyed to you what is important to their customers, other than what you reflect in here about the questions you asked?

A.   Well, if you look at the verbatim, some of them certainly talk about what their customers like, so yeah, I mean, there's some -- there's some verbatim comments in the report that talk about -- and also in the data file that we provided that talk about, from the designer's perspective, what their customers like.

Q.   And did you measure those?  Did you compare how many positive comments there were about customers for Blooming Elegant to the other fonts that you tested?

A.   Can you repeat the question?

Q.   I'll rephrase it.

Which font had the highest number of comments that specifically referenced customers and what customers liked?

Page 32

addition to awareness and usage.

Q.    So why did you choose appealingness, uniqueness, difficulty of substitution in order to test the hypothesis about popularity and importance of the font?

A.    Because all of those items are relevant to the importance and popularity of the font.

Q.    Are there other fact that's could be -- strike that.

Are there other factors that would be relevant to the importance of the font?

A.    There might be.

Q.    Such as what?

A.    I -- I can't think of any offhand.

Q.    What about legibility?

A.    Yeah, I would think that would be important.

Q.    What about formality or informality?

A.    It could be important.

Q.    What about novelty?

A.    What do you mean by "novelty"?

Q.    In the verbatim comments, some of the respondents describe fonts as traditional, sometimes they like or sometimes they don't.  Sometimes they describe them as looking new, sometimes retro.

Page 37

Factors such as those.

A.   So you mean, like, the style?

Q.   Yes, the style.  That's a better way to put it.

A.   Yeah, that could be important.

Q.   Did you come up with these criteria, and by "these criteria" I mean unique, appealing, substitutability, the ones that you tested.

Did you come up with those on your own, or did you have discussions with the plaintiff or her lawyers about those.

MR. MATHEWS:  Objection, calls for privileged information.

I'm instructing the witness, to the extent she can, she can answer the question, but I would caution the witness not to reveal the substance of any conversations that she may have had with counsel that would be privileged.

BY MR. SCHAPIRO:

Q.   So you can answer, but your lawyer is telling you don't talk about specific conversations you had with your lawyers.

A.   Well, certainly any survey I design would be informed by my conversations with my clients, but I

Page 38

wrote the questionnaire.

Q.   Did you ever speak with Nicky Laatz -- have you ever spoken with Nicky Laatz?

A.   No.

Q.   Have you ever spoken with John Laatz?

A.   No.

Q.   In preparing this survey, did you spend any time looking around on the Zazzle site?

A.   Yes, I believe I did.

Q.   And I see you linked -- I know you told us the link no longer works, but you linked, at one point in your report, to a list about fonts on the Zazzle site, correct?

A.   Yeah, I believe the link still works, it's just not the same page.

Q.   Sure.

And so you are aware that Zazzle -- that there are approximately 300 fonts available on Zazzle, correct?

A.   I wasn't aware of the exact number, no.

Q.   Are you aware of the magnitude, or you did your survey without looking at that?

A.   I believe I looked at the other fonts.  I didn't count them.

Page 39

You could also have a ubiquitous font, or ubiquitous product, for example, that is very unique. Those aren't mutually exclusive. I don't think of them as mutually exclusive.

Q. Why didn't you compare Blooming Elegant to sets of fonts that were similar to Blooming Elegant?

MR. MATHEWS: Objection, misstates prior testimony, mischaracterizes the evidence, vague and ambiguous, lack of foundation.

BY THE WITNESS:

A. So I said in my report, first, I didn't see a reason just to compare it to similar fonts. I wanted to show a range of fonts, and compare it to a range of fonts including other fonts that were -- that Zazzle considered to be popular, as well as a mix of plain and script fonts and more or less common fonts. There was no reason that I needed to compare it to other similar fonts.

BY MR. SCHAPIRO:

Q. Well -- sorry, go ahead.

A. I should say that Delighted has a similar handwritten script style, and Freehand Loose is also -- Freehand is also similar in the sense that it has sort of more handwritten elements as well.

Page 50

selecting the fonts that consumers use.

BY MR. SCHAPIRO:

Q.    And then within the universe of graphic designers you didn't survey -- strike that.

You didn't survey all graphic -- strike that again.

You limited your survey to graphic designers who sell on Zazzle and are classified by Zazzle as bronze or above, based on their sales, correct?

A.    Yeah, these are Zazzle classifications.

Q.    Why did you do that?

A.    Well, if you notice, on page 6 of my report, paragraph 16, bronze has to have lifetime sales based on Zazzle's own classifications of $1,000 or more, so anybody that was -- so this constitutes I would -- probably most of Zazzle's sales through their stores. Anybody below $1,000 is likely to have -- that's de minimus lifetime sales of, I think it's $100 to $999, I think.

So this would constitute the most active designers on Zazzle.  And even 1,000 to 25,000 lifetime sales, you know, that's a pretty low threshold.  So I felt it was a really good representation of graphic designers who were selling

Page 111

their products on Zazzle.

Q. You testified a moment ago: "This constitutes I would say most of Zazzle's sales through their stores."

What is your basis for saying that?

A. Just based on math, that, in any industry, the distribution of sales skews towards the more active salespeople. So I mean, they're going to account for a disproportionate level of Zazzle sales, just because they're selling more product.

Q. I want to drill down there.

The word you use in paragraph 17 is "disproportionate," and that's the word you just used, right?

A. Yeah.

Q. But a moment ago in your testimony, you said: "So this constitutes, I would say, most of Zazzle's sales through their stores."

I'm asking what's your basis for suggesting that people at bronze or above are responsible for most of Zazzle's sales through their stores?

A. So maybe I misspoke when I said "most." I would say disproportionate amount of sales.

I don't know exactly. I don't know how

Page 112

Zazzle's sales distribute by their badge level.

Q.   And if 3 percent of a group are responsible for 7 percent of sales, that's, by definition, disproportionate, correct?

A.   Yes.

Q.   7 percent of sales is not particularly significant, is it?

A.   You know, I think it depends on -- I would say for the company it could be.  I mean, they're selling more than average, so they are -- they probably are important.

Q.   And you looked at the Swain report, you told us earlier, and so I don't know if -- if you -- strike that.

On page 12 of the Swain report, in footnote 25, Dr. Swain reports that there are more sellers at the basic level than all other levels combined.

Does that cause you to reconsider your decision to exclude sellers at the basic level from your research?

MR. MATHEWS:  Objection, misstates prior testimony, misstates the evidence.

Page 113

survey population for this study.

Q.    Of all of the people who have used Blooming Elegant on Zazzle, what percentage are graphic designers at the bronze level and above?

MR. MATHEWS:  Objection, vague and ambiguous as to graphic designer, incomplete hypothetical, lack of foundation.

MR. SCHAPIRO:  I agree with you vague and ambiguous as to graphic designer.  That is vague and ambiguous.

BY THE WITNESS:

A.    Again, I have not seen any data from Zazzle about who uses or who has used Blooming Elegant on the platform.  So I don't know the answer to that.

BY MR. SCHAPIRO:

Q.    And you believe that, whether a font is important or popular -- strike that.

Is whether a font is important or popular determined by the number of designers who create designs with it?

A.    So there is a -- this is not a yes or no answer.

Designers are designing products that they hope their customers will buy, and so if they are

Page 116

A.    So again, these were respondents -- these respondents were selected because they sell their products on Zazzle.  I have no reason to believe that it's not representative of all designers who sell their products on Zazzle.

Q.    Did you do anything to test that?

A.    I tested graphic designers who -- who are classified by Zazzle as bronze or above.  So between $1,000 and over $500,000 in lifetime sales is a pretty broad range of sales on Zazzle, so I feel like it's a pretty comprehensive sample.

Q.    It's a comprehensive sample of people at bronze level and higher, correct?

A.    Yes, that's correct.

Q.    You don't have any data you can share with us to tell us whether the universe of bronze level and higher graphic designers share the opinions of people who are lower than bronze level, correct?

A.    No, I haven't seen any data from people that are lower than bronze level.

Q.    What percentage of stores on Zazzle are bronze level or above?

A.    I don't know.

Q.    You worked with a company called Guidepost

Page 119

that sell on Zazzle.  So I already knew that.

And then, we had a verification question in the screening questionnaire to verify that they are graphic designers, and I think we had 11 people that terminated on that basis, that were not graphic designers.

Q.    But the terminated people got the hundred dollars also, right?

A.    No.

Q.    And in fact, the invitation to the survey said that you were seeking to determine "your professional experience" -- strike that.

It says:  "The purpose is to understand what is important to graphic designers."  Correct?

A.    Yes.

Q.    So you're signaling there to the recipients that you're looking for graphic designers, right?

A.    Yes.  Because we were.

Q.    And if, hypothetically, a hundred dollars was meaningful to someone for a ten-minute survey, that person might be inclined to suggest that he or she is a graphic designers so they don't get bounced out without the hundred dollars, right?

A.    So remember, we have a targeted sample.

Page 145

wasn't there?

MR. MATHEWS:  Objection, lack of foundation.

BY THE WITNESS:

A.   I'm not sure.

I did ask them if they're familiar with each of the six fonts that I asked them about, and I believe all of them had high familiarity among these respondents.

BY MR. SCHAPIRO:

Q.   They said they had high familiarity.

I'm asking whether there is a way to check those answers.  You could have used a control, right?

MR. MATHEWS:  Objection, lack of foundation.

BY THE WITNESS:

A.   So I mean, you can do anything with a survey.  A control was not necessary here.

BY MR. SCHAPIRO:

Q.   But if I were seeking reassurance that people weren't making it up or mistaken when they said that they had used Freehand, one of the things that you, as an experienced survey designer, could have done was include a font that is invented just for the survey, and if those people said oh, yes, I'm familiar with that, I've used that, that would allow

Page 176

importance rating.

Q.    No, not the importance rating.  The importance rating, right, was just a component of your overall assessment.

I'm asking about your final conclusion, and maybe the answer is you can't necessarily say, but your conclusion is Blooming Elegant is important and popular, at least as among the -- among the ones that you looked at, and I'm asking you --

A.    Actually, I didn't -- I didn't qualify this.

Q.    Okay.

A.    This is an absolute statement.

Q.    So --

A.    It is based on the results of the survey whether you look at the absolute numbers -- I'm sorry, did I interrupt you?

Q.    No, no, I was trying to stop myself from interrupting.

A.    Okay.  The absolute numbers or the relative numbers, I -- I really just said based on the results of the survey, it's my opinion that Blooming Elegant trio is an important popular set of fonts on Zazzle.

Q.    Right.  And so I'm asking you, do you have an opinion, based on the survey, of whether Blooming

Page 193

Elegant is more important in the world than Courier?

MR. MATHEWS:  Objection, vague and ambiguous.

BY THE WITNESS:

A.  I guess it depends on what you would consider part of important.

I mean, Courier is ubiquitous, as you see in paragraph 41 of my report; a hundred percent of respondents are familiar with it, and two-thirds have used it.  But it has lower ratings than most of the other fonts for appeal, uniqueness, importance, and being difficult to substitute.

BY MR. SCHAPIRO:

Q.  So is Courier more important than Blooming Elegant, or is Blooming Elegant more important than Courier?  Or does it -- is that not something you can say?

A.  It depends on what the criteria are.

I mean, Blooming Elegant -- Courier is widely used; obviously, people depend on it.  But Blooming Elegant is considered to be more appealing, more unique, more important in their work, and more difficult to substitute than Courier.

Page 194

Q.   So you also concluded as part of your overall ultimate conclusion that Blooming Elegant is popular, right?

A.   Yes.

Q.   Which is more popular, Blooming Elegant or Courier?

A.   Again, same answer.

You know, in terms of awareness and usage, Courier is higher than Blooming Elegant, although Blooming Elegant is still quite high.

But in terms of what people -- you know, whether people like it and find it unique and important in their work, Courier scores lower than Blooming Elegant.

Q.   And which is more popular, Blooming Elegant, which is used or at least known by 75 percent of your respondents, or Century Bold which is used or known by 98 percent of your respondents?  Which is more popular?

A.   So again, it depends on your criteria for popular.  You're talking about Century Bold again?

Q.   Yeah.

A.   Is that the one you're talking about?

So that's very similar to Courier in the

Page 195

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

sense that it's got near universal awareness, 70 percent of respondents have used it.  It is -- it scores better than Courier on appeal and importance, but about the same as Courier on uniqueness and difficult to substitute.

It scores lower than Blooming Elegant on all of the opinion measures, including appeal, uniqueness, importance, and difficult to substitute.

Q.   Among graphic designers bronze level or above?

A.   Yes, that sell products on Zazzle, yes, correct.  That's correct.

MR. SCHAPIRO:  Why don't we take a break and we'll see if we have anything else.

THE WITNESS:  Okay.

THE VIDEOGRAPHER:  We are going off the record.  The time is 2:53 p.m.

(A short break was taken.)

THE VIDEOGRAPHER:  We are back on the record.  The time is 2:59 p.m.

BY MR. SCHAPIRO:

Q.   Dr. Parikh, in your report at paragraph 7, you list the materials that you have reviewed in connection with this matter.

Page 196

CERTIFICATE OF

CERTIFIED SHORTHAND REPORTER

I, Beth Radtke, a Certified Shorthand Reporter of the State of Illinois, CSR License No. 084-004561, do hereby certify:

That previous to the commencement of the examination of the aforesaid witness, the witness was duly sworn by me to testify the whole truth concerning the matters herein;

That the foregoing deposition transcript was stenographically reported by me and was thereafter reduced to typewriting under my personal direction and constitutes a true and accurate record of the testimony given and the proceedings had at the aforesaid deposition;

That I am not a relative or employee or attorney or counsel for any of the parties herein, nor am I interested directly or indirectly in the outcome of this action.

IN WITNESS WHEREOF, I do hereunto set my hand at Chicago, Illinois, this 15th day of November, 2024.

Beth Radtke, RPR, CRR

License No. 084-004561

Page 199