# EXHIBIT 5

# Expert Report of Thomas Phinney

## Scope of Assignment

1. I have been retained on behalf of Nicky Laatz, (hereinafter, "Plaintiff" or "Nicky Laatz") in the matter of *Nicky Laatz v. Zazzle, Inc., et al*, Case No. 5:22-cv-04844 in the Northern District of California. I have been asked to render opinions with respect to Nicky Laatz's process for designing and creating the Blooming Elegant Trio of fonts and the font software that renders those fonts, as well as general practices for designing and creating fonts and font software within the font industry. I have also been asked to render opinions with respect to the Copyright Office's historical practices regarding the registration of copyrights in font software that was created with the assistance of font editor programs. I also expect to review and analyze any related opinions set forth by Defendants' expert(s).

## Summary of Opinions

2.      Font editors, such as FontLab, are complex applications with many features that require expertise and creativity to utilize effectively to create a new font from scratch. Creating a well-crafted vector outline font generally requires, and Nicky Laatz's design process for the Blooming Elegant Trio of fonts and font software[1] at issue in the current case specifically involved, an immense amount of work and considerable originality and creativity, not only in the aesthetic design, but also in the numerous decisions involved in implementing those designs as vector outline font software. In addition, both Nicky Laatz's specific process for creating the Blooming Elegant Trio of fonts and font software and the general process of creating a well-crafted vector outline font and font software, involve a mixture of hand methods, including using a mouse, stylus, or comparable device to draw certain elements, using a combination of such device and/or manual typing to set and adjust on-curve and off-curve reference points and other aspects of each glyph, and manual typing of certain other features related to implementation of the fonts through the software. All of this is compiled by a font editor, such as FontLab, into the font software that renders the font. And font software created through these methods has been eligible for, and has commonly received, copyright registration for over 30 years.

---

[1] I am using the phrasing "fonts and font software" to be consistent with prior usage by Nicky Laatz in this case, to refer to both the typeface and the computer files that implement that design. However, as discussed below, as used in the industry the term "font" is generally used to refer to a computer file, which is a kind of software.

## Qualifications

3.    My qualifications are detailed in my curriculum vitae, which is attached as "Appendix A" to this report. In summary, I have a Master of Science in graphic arts publishing from the Rochester Institute of Technology's School of Printing, specializing in design and typography, and an MBA from UC Berkeley. I have over 25 years of experience in the font industry, including over a decade with Adobe, lastly as their product manager for fonts and typography. In addition, besides using FontLab for about 30 years, I also worked for five years at FontLab: as VP, President, and lastly CEO. FontLab Studio 5 was the primary program used by Nicky Laatz to design the Blooming Elegant Trio, and versions of FontLab have been used to design many of the world's best-known fonts, including Calibri. I have also taught at least a dozen type (font) design workshops to perhaps two hundred students over the years.

4.    I have contracted or consulted on fonts/typography for companies such as Google, Microsoft, and Monotype. I have been granted four patents related to fonts: three utility patents (two jointly, one as sole inventor) and one design patent. To the best of my knowledge, I was the first-ever Adobe employee to generate both a utility patent and a design patent for the company. I have spent about 17 years on the board of the global typography association, ATypI (2004–20, 2023–present), including stints as Secretary, Treasurer, Vice-President, and President (2023–24).

## Opinions

## 1. How Font Editors Work

5.      A *font editor* is a specialized kind of vector drawing program specifically for making fonts. More general vector drawing programs include Adobe Illustrator, Figma, and CorelDRAW. Most font editors, including FontLab Studio 5 (which I understand Nicky Laatz used to create the Blooming Elegant Trio[2]) generally operate in a broadly similar fashion.

6.      A font is a special kind of computer software, a collection of glyphs, and other information (such as names, writing systems/languages supported, sizing of the font, etc.). The design and appearance of glyphs produced by a particular piece of font software is sometimes referred to as a "typeface." The glyphs are the heart of font software. A glyph is a slot in the font software for a character. Each glyph has a width the glyph is positioned within (including potential space on either side), and usually has vector commands for drawing the shape of a character, in outline form.[3]

7.      There is a distinction between the term "characters" and the term "glyphs." A character is the abstract concept of a letter or symbol, such as the lowercase "t" or capital "A." The particular shape of a capital "A" in Blooming Elegant (the script font), Blooming Elegant Hand, and Blooming Elegant Sans are three different glyphs, all representing the same character. But it is possible for one character to relate to multiple glyphs. For instance, the lowercase "t" in Blooming Elegant has a default version plus three alternate versions ("t.alt01" "t.alt02" and "t.alt03"), making for four different glyphs for that one character. Additionally, there are other types of glyphs, such as ligatures, that may relate to multiple characters. For instance, in Blooming Elegant there is a double-t ligature: a single glyph "t_t" that represents two characters.

---

[2] Henceforth, I will refer to the set of three fonts as "the Trio" and use "Blooming Elegant" to mean Nicky Laatz's script font of that name.

[3] When I use the term "font," I am referring to a vector outline font. However, fonts existed for centuries prior to computers (in foundry metal, hot metal, and phototype), and there have been *other* kinds of fonts on computers (e.g. bitmap fonts, vector stroke/skeleton fonts). But all these things are rare and not generally used today.

8.    Font editors generally have a "font window" which shows a table of all the glyphs in a particular font.



*Figure 1. - Font Window in FontLab Studio 5*

9.    From the font window, the user double-clicks on a glyph cell in the font window and that opens the corresponding "glyph window" for editing the design of that particular glyph. If the glyph has not been opened or defined by the user before, it is now instantiated for the first time, has a width automatically assigned, and is displayed in a different color in the font window.



*Figure 2 Glyph Window in Fontlab Studio 5*

5

10. At any time, the designer can set the total glyph width or adjust the white space on either side of the glyph. The glyph window also shows the standard heights (set by the designer) as guidelines running across the whole window, and allows the user to edit these heights. These heights include the cap height (i.e. the height of capital letters),[4] x-height (i.e. the height of the lowercase body, as of the letter x), descender depth (i.e. the depth of the descender portion of letters like p and q), ascender height (i.e. the height of the ascender portion of for letters such as b, which is usually just a little higher than the caps), and so on. These heights have default values, but can be (and usually are) adjusted by the user.

11. Where the initial shapes come from is a source of variation in the design process, especially in the initial steps. Users may:

   A. Draw the vector outlines of each glyph in the glyph window from the start;

   B. Draw a skeleton of each glyph in a separate program, such as Adobe Illustrator, then apply a stroke to that skeleton (as explained at more length below);[5] or

   C. Have analog lettering, created by brush, pen, stone carving, or other means, which they then take a scan or photo of to get a starting computer image file.

      1. Computer software (such as Adobe Illustrator, ScanFont, or FontLab (starting with version 6) can "auto-trace" that image to get initial vector outlines; or

      2. The tracing can be done manually by the user drawing with the image in a background layer.

12. Of all these options, the only one in which the computer, rather than the designer, is placing the initial points and determining the initial coordinates is "11.C.1," when the user starts with analog lettering, scans or photographs it, and then uses an "autotrace" function to create the initial vector outlines. Even in this circumstance, a designer will typically then modify the points and coordinates as part of the process of creating the font. More importantly, this is neither the most

---

[4] Some font software and typefaces have capital letters that extend slightly above the cap height for aesthetic or design reasons.

[5] I understand that this is the process used by Nicky Laatz to create the Blooming Elegant Trio of fonts and font software.

common way fonts are made, nor the way Nicky Laatz testified that she made the fonts and font software at issue in this case.

13. To "draw a skeleton" or "draw outlines" are both computer-based processes. The designer uses a computer mouse or equivalent electronic device such as a stylus, trackpad, or otherwise, to draw Bézier lines, which broadly work the same way, regardless of whether they are outlines, or a skeleton centerline.

14. The points define a Bézier curve, that describes a shape. A single line or closed circuit, no matter how complex, is what we call a "contour." On the contour, "on-curve" points indicate places the contour passes through, while "off-curve" points control the shape of the curve in between those on-curve points. Straight lines do not require off-curve points at all.



*Figure 3 - Editing On and Off Curve Points in FontLab Studio 5*

7

15. Creating and then editing these shapes (and the amount of white space around them) is a process of refinement and adjustment. The font editor, such as FontLab, gives the designer constant feedback about point position, allowing them to keep key positions and distances consistent. Font editors, including FontLab Studio 5 (which Nicky Laatz used to create the fonts and font software at issue in this case), also show the coordinates of these points when they are selected by the designer. Within font editors, including FontLab Studio 5, the designer can either change the position of points by selecting the point and entering alternate coordinates, or can drag and thereby change the position of the point using a mouse or stylus. These two methods of altering the position of on-curve and off-curve points in a glyph's design are functionally identical.



*Figure 4 - Node Properties Window Where Node Coordinates Can Also Be Edited in FontLab Studio 5*

16. There are many steps to create a piece of font software besides creating the design of the glyphs. Spacing is often done both initially when designing characters, and again once enough have been designed to check spacing on larger amounts of text. At the very end of the design process comes kerning, which is the making of adjustments to spacing to deal with particular letter combinations that interact with each other in unique ways. Kerning typically brings glyphs closer together, but sometimes acts to move them farther apart. For example, combinations such as "VA," "LT," or "To" are typical cases that often

8

need kerning to move the letters closer together to avoid looking like there is a space between them.

17.    Besides the height data, there are myriad other pieces of information that a designer inputs when creating a piece of font software. Some are required, notably some of the name fields that determine things such as what name is displayed for the family and style name of the typeface in an application's font menu. Many are not technically required, but are present in most fonts, such as creation date, and copyright and trademark notices.

18.    Another thing that fonts (including some members of the Trio) can have is OpenType layout features. In most font editors (including FontLab Studio 5), this functionality is manually typed using a dedicated coding language invented by one of my colleagues at Adobe while I worked there: the "Adobe Font Development Kit for OpenType feature language," or AFDKO language for short.



*Figure 5 - OpenType Window in FontLab Studio 5 Where OpenType Feature Language Can Be Entered*

9

19. Most, but not all, fonts also include something called "hinting." This is additional code in the font intended to improve how the vector outlines are converted to pixels on screen, or dots in printing, when there are not enough pixels/dots to render the outlines perfectly. The code can be font-level or glyph-specific. Information otherwise coded in the font such as the standard heights can feed into the hinting code. Hinting can be done manually by a designer or more recently, done automatically by a font editor, or a separate utility, which is broadly referred to as "autohinting." Some designers do not bother with hinting at all.

20. To summarize, there are many different steps and decisions that go into creating a font.

## 2. Nicky Laatz's Design Process

21. Based on my experience in the font industry, Nicky Laatz's design process for the Blooming Elegant Trio of fonts and font software as described in her deposition is mostly typical among professional and semi-professional type designers, and included the steps described previously. The only less common aspect of her process was that she started with drawing strokes as single lines—what I would call a skeleton—rather than the outline "body" around the stroke. She adjusted the skeleton lines of one or more font glyphs until she was happy with the shape, and then added a stroke to them. To this stroked line, she then used the Adobe Illustrator function to "Expand" the stroke (in recent versions of Illustrator this can be found at Menu > Object > Expand Appearance).

22. Although this is not the most common approach to designing a font, it is also far from unique. Later versions of FontLab (6 and higher, newer than the version 5 Nicky Laatz used to create the fonts in question) have added extensive support for exactly this feature, natively in FontLab, and even the option of keeping strokes as single line skeletons as a live feature, so one can continue editing each skeleton, and seeing how this affects the expanded stroke interactively. Previously, as with Nicky Laatz's creation of the Blooming Elegant Trio of fonts and font software, one could approximate this by (a) modifying a skeleton in FontLab, (b) then seeing the effect of the Illustrator "Expand" function, (c) then undoing the modification and making further edits to the skeleton, and (d) then going back to Illustrator to see the effect of the Expand function again. A user could repeat this cycle as many times as needed until happy with the result, as Nicky Laatz did with the Blooming Elegant Trio of fonts.

10

23.    After this, Nicky Laatz followed a more typical font creation and editing process, working with a vector outline and modifying it further until she was happy with the results, as described previously.

24.    The Blooming Elegant Trio of fonts and font software include a small set of kerning pair adjustments for Blooming Elegant Sans, and what appears to me to be autohinting for all three fonts.

## 3. Copyright Protection for Fonts

25.    While I am not a lawyer, my background includes having been the product manager for fonts at Adobe, the CEO of FontLab, and currently the President (until September 2024) of ATypI, the global typography association. Thus, I am familiar with the font industry's understanding of copyrights as applied to fonts.

26.    I understand that in implementing and issuing regulations under the 1976 Copyright Act, written before the current era of digital fonts, the U.S. Copyright Office has specifically disclaimed the ability to copyright a typeface as such. To this day, it remains broadly accepted in the font industry that the abstract design of a typeface is not subject to copyright protection in the U.S. (although one can get a design patent on a typeface design). In 1988, the Copyright Office declared that this lack of copyright protection also applied to digital fonts—but they were dealing with early digital fonts which were bitmaps, which is to say patterns of dots.

27.    However, in February 1992, the U.S. Copyright Office issued a new decision titled "Registrability of Computer Programs that Generate Typefaces", 57 Fed. Reg. 6201, in which the U.S. Copyright Office indicated that it had been persuaded that digital vector outline fonts might well be considered computer programs whose creation involves many decisions and sufficient originality and creativity to be subject to copyright registration.

28.    This was done in part in response to presentations to the Copyright Office spearheaded by Adobe, and coordinated by my former manager at Adobe, David Lemon, in or around October 1991. These presentations demonstrated for the U.S. Copyright Office Adobe's font development process circa 1990, so I believe the U.S. Copyright Office had that process and normal desktop fonts such as Adobe's in mind when the U.S. Copyright Office made its February 1992 policy decision. The new technology demonstrated at that time was that the latest digital fonts used vector outlines to draw each letter.

11

29.    Since the 1992 policy decision, the type design community has understood that computerized fonts are copyrightable under certain circumstances.

30.    This understanding was strengthened by the argument and demonstrations Adobe made, and by the subsequent decision, in *Adobe Systems, Inc. v Southern Software, Inc.*, which was during my tenure at the company.

31.    All the above agreed that a designer using a visual tool to set the coordinates of the on- and off-curve Bézier control points that constitute a glyph, on screen, is a creative act, and taking into account the myriad considerations that can underlie those decisions on coordinate positions, those coordinate position decisions can be protected by copyright. Further, although the underlying shapes of the glyphs in a font may not be protected by copyright in the U.S., the shape of a given font glyph does not mandate only one possible set of coordinates, and selection of coordinates—placing those on- and off-curve points to get a desired shape—is a creative act.

32.    There have been advances in fonts since the 1990s, as newer font formats include ever more complex options. Variable fonts and complex OpenType feature code are among the increasingly-common elements of fonts that make modern vector fonts of the 2000s possess quite a lot more than the "modicum" of creativity necessary to consider them subject to copyright protection as with the fonts at issue in *Adobe Systems, Inc. v Southern Software, Inc.*

33.    The 1992 policy decision also stated that "The scope of the copyright will be, as in the past, a matter for the courts to determine."

## 4. The Blooming Elegant Trio Copyright Applications & "Hand Coding"

34.    I reviewed the emails between Nicky Laatz's counsel, Stephen Steinberg, and the U.S. Copyright Office examiner, and noted a number of issues raised therein, based on my experience in the font industry.

35.    The font source code submitted on behalf of Nicky Laatz (Exhibits 1-3 to the Steinberg Declaration dated Sept. 22, 2021) is in FontLab VFJ format. VFJ is a particular form of JSON (JavaScript Object Notation), and a plain text equivalent of a FontLab VFC source file, because the U.S. Copyright Office would not accept compiled binary font files (TTF or OTF).

12

36.   Contrary to the examiner's suggestion, these were not actually XML files, though they are functionally equivalent to XML files, which one can extract from a compiled font using TTX, that many applicants have commonly submitted to the copyright office for registrations of font software that have been granted in the past.

37.   The examiner asked, "if this is XML please let us know if it was hand-coded by a human author or if it was generated by a font program, such as FontLab or Fontographer. If the XML was merely generated by a font program and was not hand coded by a human author, it cannot be registered."

38.   Regarding his reference to whether the fonts were "hand coded," as explained above, as with most fonts, the Blooming Elegant Trio of fonts and font software were authored by Nicky Laatz through a mixture of hand methods, including using a stylus and tablet in initial design (where others might use a mouse to the same effect), so there was "drawing," as well as manual typing as a means of input.

39.   The only reasonable interpretation of the U.S. Copyright Office examiner's position that only fonts "hand-coded by a human author" are registrable is that all forms of input Nicky Laatz used in creating the fonts are "hand coding," whether they involved manipulating points onscreen with a stylus or mouse, or manual typing.

40.   Regarding his reference to fonts being "merely generated by a font program" such as "FontLab or Fontographer," he could not have meant that any use of these font editors in designing and creating a font renders it unregistrable because I know from my experience in the font industry, and I further understand from Stuart Sandler, that the U.S. Copyright Office has registered numerous fonts that were created with the assistance of both the FontLab and Fontographer font editors, including some where the use of these programs is apparent on the face of the copyright registrations. Further, even in the present case, Nicky Laatz's use of FontLab in creating the Blooming Elegant Trio of fonts and font software was apparent from the font source code file types she submitted and was expressly stated in the text of the files themselves, and the examiner ultimately issued registrations for them.

41.   The only reasonable explanation for the examiner's reference to the fonts being "hand-coded by a human author" as opposed to "generated by a font program, such as FontLab or Fontographer," is that he was thinking of newer tools that are capable of generating new fonts with little input from any human author, similar

13

to AI. But these tools are very new, and did not even exist yet when Nicky Laatz created the Blooming Elegant Trio of fonts and font software in or around 2016.

## 5. Zazzle's Alternative Interpretation of "Hand Coding"

42.    Zazzle has proposed an alternative interpretation of "hand coding" in this context to mean only manual typing as text, like typical (but not all) software code.

43.    Based on my experience in the font industry, such an interpretation is unreasonable and inconsistent with the understanding of the font industry, as it would constitute a massive change to the U.S. Copyright Office's rules for registration of fonts, which if applied retroactively would invalidate nearly all (perhaps literally all) copyright registrations ever issued for fonts.

44.    It is technically possible to design fonts by literally typing in all coordinates as text. In the early 1980s, the very first Adobe PostScript Type 1 fonts ever created (Adobe's versions of Courier, Times Roman, Helvetica and Symbol, comprising 4 typefaces and 13 individual fonts) were created this way, but I am unaware of any type designer who has used this process in recent decades.

45.    Fundamentally, fonts are visual creations, and creating them by typing a textual representation of their underlying code is horribly inefficient, which is why type designers have used visual tools like a mouse, stylus, and trackpad to place and move points on screen in their creation of fonts since before the 1992 U.S. Copyright Office policy decision. For example, Adobe created a visual editor and all Adobe type designers immediately switched to it for designing the remainder of their "base 35" PostScript fonts circa 1985. Adobe never went back to typing text to represent font coordinates. Most Adobe staff migrated to more friendly and flexible third-party tools as these became available. This migration was fully completed by the end of 1999, as Adobe's font editor ran only on SunOS 3 which was never made Y2K compliant. And I am aware that such fonts have received copyright registrations.

46.    Even if a designer were to manually type all of the source code for a font, it would still have to be compiled. Adobe's earliest fonts had a plain-text format (PFA or "Printer Font ASCII"), but they also soon found need for a binary form (PFB or "Printer Font Binary"), which had to be converted from the plain-text version, rather like a software compiler.

47.    Historically, the demonstration of font creation given by Adobe for the U.S. Copyright Office at the October 4, 1991 Public Hearing which led to the February

14

1992 Final Regulation on Registrability of Computer Programs that Generate Typefaces did not show vector outline computer fonts (the "computer programs" of the title) being made solely through manual typing.

48. Beyond that, Zazzle's interpretation of "hand coding" as being limited to manual typing is also flawed in that using a mouse or stylus to place and manipulate the on-curve and off-curve points is functionally equivalent to typing in coordinates by hand. The designer is making creative decisions and specifying the points exactly as they choose in both instances. Indeed, recent versions of FontLab show this in real time, as they allow users to see and manipulate both the visual representation of each glyph and the corresponding numerical coordinates simultaneously and interchangeably, such that a designer can move a point by hand with a mouse or stylus, then manually type new coordinates and see it move, or vice versa.



*Figure 6 - FontLab Studio 8 Showing Source Code Alongside Visual Representation of Glyph Characters*

15

## 6. The *Adobe Systems, Inc. v Southern Software, Inc.* Ruling and "Third Party" Compiling

49. The most recent (Jan. 2021) Compendium of U.S. Copyright Office Practices, as well as the editions from Sept. 2017[6] and Dec. 2014,[7] make reference to the *Adobe Systems, Inc. v Southern Software, Inc.* decision and the 1992 U.S. Copyright Office policy decision quoted therein when they state that "creating a scalable font output program that produces harmonious fonts consisting of hundreds of characters may require numerous decisions in drafting the instructions that drive a printer or other output device. If this expression contains a sufficient amount of original authorship, the work may be registered as a computer program."

50. All of these versions of the Compendium also state "The registration specialist may communicate with the applicant if it appears that the author merely assigned coordinates to a particular letterform and then used a third party program to render[8] typeface or typefont from those coordinates (but did not create any of the source code for that program)." Here, the Copyright Office makes mention of using "a third party program."

51. In a recent decision on Nicky Laatz's Refiled Motion for Summary Judgment in this case, the Court suggested that using one's own font editing program rather than a third-party program to "render" the typeface perhaps could be a key difference between the *Adobe* case and the present one.

52. Based on my experience in the font industry, this is not consistent with the font industry's understanding of, and practices based on, the *Adobe* decision for multiple reasons.

53. First, at the time of the *Adobe* decision, use of font editing programs made by third parties had already been the dominant way of making fonts for a decade, and in fact, designers at Adobe itself had already begun migrating to using such tools themselves.

---

[6] https://www.copyright.gov/comp3/2017version/docs/compendium.pdf

[7] https://www.copyright.gov/comp3/docs/compendium-12-22-14.pdf

[8] I assume that "render" here really means "compile" in the software sense, i.e., turning source code into a program. In the font industry, we use "compiling" in this context. Contrariwise, to "render" the font means the final step of imaging it for screen or print, which is something done with the compiled font, by the operating system (for screen) or a printer (for print), not by a font editing program.

16

54. Second, while the "third party program" phrase did not appear in the February 1992 U.S. Copyright Office Final Regulation, it was included in the 2014 and 2017 editions of the Compendium. Yet I know from my experience in the font industry, and I further understand from Stuart Sandler, that the U.S. Copyright Office has registered fonts that were created with the assistance of both the FontLab and Fontographer font editing programs, including many times since 2014.

55. Third, the suggestion that using a font editing tool from a third party bars prevents a font designer from establishing copyrights in a font, implies that the creator or owner of the font editing software has some rights to any font created with such software. As the former CEO of FontLab and based on my experience in the font industry, neither FontLab nor other publishers of widely used font editing software believe they have any such rights, nor do other people who design fonts. When I wrote the latest FontLab End User License Agreement (EULA) in April 2019 (just before I left the company, and still their current license), I did not address (nor even consider raising) the possibility of FontLab having any copyrights to fonts created and compiled with the assistance of our software.

56. If using one's own (as opposed to a third-party) font editor had been required to establish copyrights in a font, Adobe, rather than completely migrating to new third-party font design tools before the year 2000, would have instead invested in updating their own tools to work on newer computers.

57. As a further consideration, if font designers learned that the creators of font editing software could have a stake in the fonts designed with those tools, it would likely adversely impact sales (licensing) of such font editors.

58. It would also create ambiguity when there are multiple creators or owners of a single font editor. In fact, the code in most font editors that I am familiar with, including FontLab, include libraries from outside sources. For example, most font editors run AFDKO code licensed from Adobe (which is open source now, but was not always, particularly when it was included in FontLab Studio 5) in order to generate the binary/compiled OpenType feature code. FontLab 8.4 credits about a hundred other copyright holders for code included therein.

59. Aside from the font editor itself, fonts exported from a font editor are often processed further with additional tools, such as post-processing compilers, though such tools were not used by Nicky Laatz in relation to the Blooming Elegant Trio of fonts and font software. Using an additional compiler to produce a single font is very common in font production, and there has never been any suggestion or understanding in the font design industry that such use precludes

17

a designer from establishing copyrights in their fonts, nor that it creates any rights in the third-party publisher of the compiler software.

60.    For example, from about 2000 onwards, for all OpenType fonts produced by Adobe, and many other fonts produced by third parties, a tool called "makeotf" from AFDKO was used. Makeotf takes a PostScript Type 1 font alongside a separate OpenType feature code / kerning data file as input, and converts it to OpenType CFF (.otf). As far as I know, Adobe still uses makeotf as a separate utility to process its fonts. The input files that are fed into makeotf are created using another font editor.

61.    A similar process is followed for many other fonts. For example, all Google Fonts go through the "fontmake" compiler as the final step in generating a TrueType font (TTF). A majority of the world's largest websites use one or more Google Fonts.

# 7. Compensation

62.    I am charging Plaintiff Nicky Laatz $650 per hour for my time working on this matter. No part of my compensation is based upon the outcome of this matter.


_____

Thomas Phinney

_____September 24, 2024_____

Date

18

## Materials Considered in Forming Opinions

- 2024-05-29 Laatz's Amended R&Os to Zazzle's RFAs, Set 1
- 2024-05-29 Laatz's Amended R&Os to Zazzle's ROGs, Set 1
- 2024-08-08 Laatz's R&Os to Zazzle's ROGs, Set 2
- Aug. 1, 2024 Nicky Laatz Deposition Transcript and Exhibits
- Aug. 2, 2024 John Laatz Deposition Transcript and Exhibits
- Dkt. 89-48 Decl. of Sara Parikh ISO Refiled Partial Motion for Summary Judgment
- LAATZ0507365
- LAATZ0507369
- LAATZ0507374
- LAATZ0507371
- LAATZ0507372
- LAATZ0507373
- Blooming Elegant, Blooming Elegant Hand, and Blooming Elegant Sans .otf font files

19

# Publications in Prior 10 Years

**Communication Arts**

Note: *Communication Arts* is the highest-circulation international trade journal of visual communications, founded in 1959.

- "Fonts and the Law" — *Communication Arts* magazine, 20 Apr 2021
- "Fontocalypse Now" — *Communication Arts* magazine, 20 Apr 2020
- "Variable Fonts are the Next Generation" — *Communication Arts* magazine, 19 Jan 2017
- "Finding a Common Language: Reconciliation & Revival through Letterforms" — *Communication Arts* magazine, 10 Sep 2015

**Blog Posts on Phinney on Fonts** (thomasphinney.com)

- What Does It Cost to Have a Custom Typeface Designed? (15 Jun 2024)
- Do Companies Get Sued for Using Fonts Illegally? (27 May 2024)
- Why Did Adobe Discontinue Font Chameleon in the 90s? (22 Feb 2023)
- Font Detective Forensic Typography Assistant Needed (22 Nov 2022)
- Font Detective Talk in Dublin, 16 Nov 2022 (14 Nov 2022)
- Font Production Person Needed, first half 2021 (17 Dec 2020)
- Science Gothic—Design/Production Person Needed (29 Jul 2019)
- Career Change! (25 Apr 2019)
- Reliably Changing Versions of Fonts (5 Nov 2018)
- LA IDUG: Variable Fonts, Color Fonts & FontLab (23 Aug 2018)
- Font Detective Site Launch (24 Apr 2018)
- Why Variable Fonts Will Succeed (27 Jan 2018)
- "Truth" is Hard to Come By (12 Jan 2018)
- Will Calibri Leave Pakistan Sans Sharif? (18 Jul 2017)
- The Lesson of Color Fonts for Variable Fonts (14 Sep 2016)
- Brazil Visa for ATypl São Paulo (16 Sep 2015)
- Women's Voices in Type & ATypl (14 Aug 2015)

## Deposition and Trial Testimony in Prior 4 Years

| Date | What | Case | Case Number | Venue |
|------|------|------|-------------|-------|
| 6/7/2024 | Deposition | Mubanda et al. v City of Santa Barbara et al. | 18CV00628 | Superior Court of California, County of Santa Barbara — Anacapa Division |
| 4/22/2022 | Deposition | Leedeman v Midland | #01-20-0016-0242 | AAA arbitration (civil case also exists) |

## Conference/workshop presentations in the previous 10 years

I have given 37 conference presentations or workshops, plus 17 font design workshops in the past decade

| | | | |
|--|--|--|--|
| 4/22/2024 | Kuala Lumpur, Indonesia | Document Examination Division, Dept. of Chemistry, Government of Malaysia | two-day font forensics workshop |
| 4/11/2024 | Canberra, Australia | ASFDE (Australasian Society of Forensic Document Examiners) | two-day font forensics workshop |
| 1/24/2023 | Melbourne, Australia | Crafting Type @ Portable (design agency) | three-day font design workshop |
| 11/16/2022 | Dublin, Ireland | Typography Ireland | Font Detective Extra Bold |
| 11/17/2022 | Dublin, Ireland | Crafting Type @ Technological University Dublin | three-day font design workshop |

21

| 10/21/2022 | Phoenix, AZ | AFDE (Association of Forensic Document Examiners) | 1) Type Size<br>2) The Secret of the Certificate |
|---|---|---|---|
| 8/8/2022 | San Antonio, TX | ASQDE (American Society of Questioned Document Examiners) | Font ID, Type Size & Questioned Documents |
| 7/6/2022 | Thessaloniki, Greece | ICTVC (International Conference on Typography & Visual Communication) | Variable Font Design Tradeoffs |
| 6/8/2022 | St Augustine, FL | NADE (National Association of Document Examiners) | Font ID & Questioned Documents |
| 10/2021 | Malaysia (remote) | Document Examination Division, Dept. of Chemistry, Government of Malaysia | Examination & Identification of Fonts in Document Forensics (4-day workshop) |
| 2/21/2020 | Anaheim, CA | AAFS (American Academy of Forensic Sciences) | Detecting Backdated Documents via Line Ending Approach to Font ID (Poster presentation) |
| 6/12/2019 | Seattle, WA | Creative Pro Week / InDesign Conference | 1) Exploiting Advanced Font Features in InDesign<br>2) Font Detective |
| 11/19/2018 | (remote/online) | SAFE (Scientific Association of Forensic Examiners) | Font ID & Questioned Documents |

22

| 10/2018 | Savannah, GA | AFDE (Association of Forensic Document Examiners) | 1) The Value of Font Identification in Questioned Document Authentication Examinations<br>2) Put Your Best Font Forward: Typography Best Practices for Forensic Presentations |
|---|---|---|---|
| 10/2018 | Savannah, GA | Savannah College of Art & Design | 1) Font Detective, Extra Bold<br>2) type design workshop |
| 9/20/2018 | Los Angeles, CA | InDesign User Group | (OpenType features) |
| 3/1/2018 | Mumbai | Typo Day | type design workshop |
| 10/25/2017 | Edmonton, Canada | | Font Detective |
| 6/9/2017 | Faenza, Italy | Kerning Conference | Variable Fonts: Full Circle 1991–2017 |
| 4/3/2017 | Berlin, Germany | Typo Labs | Spacing & Kerning in FontLab VI |
| 1/13/2017 | San Francisco, CA | Crafting Type @ Electronic Frontier Foundation (EFF) | three-day font design workshop |
| 11/2/2016 | San Diego, CA | Adobe MAX | OpenType features workshop |
| 9/21/2016 | Chicago, IL | WebVisions | Variable Fonts: What just happened? (plus workshop) |
| 8/24/2016 | Seattle, WA | TypeCon Seattle | workshop — FontLab VI |
| 7/7/2016 | Thessaloniki, Greece | ICTVC (International Conference on | Font Detective, Bold Condensed |

23

| | | Typography & Visual Communication) | |
|---|---|---|---|
| 6/10/2016 | San Francisco, CA | Crafting Type @ Electronic Frontier Foundation (EFF) | three-day font design workshop |
| 5/6/2016 | Copenhagen, Denmark | Crafting Type | three-day font design workshop |
| 2/21/2016 | Bangalore, India | Typo Day | type design workshop |
| 10/14/2015 | São Paulo, Brazil | ATypI São Paulo | FontLab VI |
| 8/12/2015 | Denver, CO | TypeCon Denver | Tools for Font Troubleshooting Workshop |
| 7/11/2015 | London/Reading, England | Granshan | new fonts for new writing systems |
| 5/16/2015 | Corvallis, OR | Crafting Type @ Oregon State University | two-day font design workshop |
| 4/29/2015 | San Francisco, CA | Typo SF | Font Detective, Extra Bold |
| 4/19/2015 | Boston, MA | Crafting Type @ Lesley University | three-day font design workshop |
| 3/27/2015 | Portland, OR | Crafting Type @ Portland State University | three-day font design workshop |
| 3/14/2015 | Hong Kong | Crafting Type @ Hong Kong PolyTechnic University | three-day font design workshop |
| 2/26/2015 | Mumbai, India | Typo Day Mumbai / IIT Bombay | type design workshop |

24

| 1/30/2015 | Chicago, IL | Crafting Type @ Harrington College of Design | three-day font design workshop |
|---|---|---|---|
| 1/29/2015 | Chicago, IL | AIGA Chicago | Font Detective, Extra Bold |
| 9/2014 | Barcelona, Spain | ATypI Barcelona | Easier Font Making: 3 Things Commercial Fonts Could Learn from Open Source |

25

# Thomas W. Phinney

Font Detective llc · 5114 se 62nd Avenue, Portland, or 97206
thomas@thefontdetective.com / tphinney@cal.berkeley.edu
thefontdetective.com / www.thomasphinney.com / Quora answers
+1 206 399 9287 / toll free 1 833 fontguy

## FONT EXPERTISE

Identification · Point Size · History · Technology · Type Design · Output · Business

## WHAT HE DOES

✎ Expert on typography, font design, production, history, availability, and IP of fonts.

✎ Accurately determine point size from printed or digital samples. (See: https://bit.ly/2qnxFab)

✎ Prove backdating when documents use fonts that were not available as of the document date.

✎ Recommended by Microsoft for font ID and availability of Calibri, Aptos & other Microsoft fonts.

✎ Designs multilingual (Latin, Greek, Cyrillic, etc.) & symbol fonts for clients (e.g. Adobe, Google)

## EXPERIENCE & KNOWLEDGE

✎ President 2023–24, Association Typographique Internationale (ATypI), the global typography association. Also: board member, Vice President, Treasurer, Secretary (2004–20, 2023–)

✎ Consulted on questioned documents by *The Washington Post, The Dallas Morning News,* pbs television's *History Detectives*, bbc News, the us Treasury, and many others

✎ Expert witness clients include a "big three" auto maker, a major California city. Expert in Gorbachev v Guriev, PK Music v Timberlake. Recognized expert by courts in the usa, uk and Canada.

✎ Presentations on forensic document typography worldwide, including at forensics conferences (aafs, asqde/swafde, afde, nade, safe), and multi-day workshops (asfde, gov't of Malaysia).

✎ Testified in court regarding questioned documents, and also at a finra hearing.

✎ Judge/juror in type design competitions: Prix Charles Peignot (twice) and Granshan.

✎ Font consulting clients have included Google, Microsoft, Monotype and Oxford University Press

✎ Conceived and drove one of the first web font solutions (Extensis WebInk)

✎ Cited in acknowledgments for contributions to common typography textbooks (incl. Bringhurst)

✎ 4 font-related patents (two on glyph synthesis, one on font identification, one design patent)

✎ Many articles in *Communication Arts,* oft-quoted in design & printing publications

✎ Over 100 presentations and workshops at font, typography and graphic design conferences in 20+ countries, including ATypI, TypeCon, TypoTechnica, InDesign Conference and Adobe Max.

✎ Author of articles on the history of type, and font formats/technology

✎ Invited expert, Book Industry Study Group (BISG) regarding fonts in ebooks and font licensing

✎ Guest speaker on typography for university & college courses, incl. Reading ma Typeface Design

✎ Some past case discussions: http://bit.ly/biNqem; https://adobe.ly/3aWqFvH; http://bit.ly/cKtOhS

# OUTSIDE EMPLOYMENT

2014–2019
## CEO—FontLab
FontLab makes font creation and editing tools, including FontLab and Fontographer, used to create many of the world's commercial fonts (e.g. Calibri). Joined as VP, later President, then CEO.

2013–present
## Instructor—Crafting Type
Teaching intro type design in 3-day workshops all over the world, both solo and as a member of a team.

2009–2014
## Senior Product Manager, Fonts & Typography—Extensis (a division of Celartem, Inc.)
Responsible for fonts and typography in Extensis' font-related applications, including Suitcase Fusion and Universal Type Server. Conceived and drove WebINK web font solution (before Typekit/Adobe).

1997–2008
## Product Manager, Fonts & Global Typography—Adobe Systems (and previous titles)
Contributed to business, technical, design, writing, and evangelism. Responsibilities included driving and specifying typographic functionality in Adobe apps, managing type group's relationships with Microsoft and Apple, assisting/evangelizing third-party developers, managing beta testing, writing docs and marketing materials, specifying and acquiring custom fonts for global languages, and being a resource for technical, business, legal and product management. Stint in Core Tech, managing InDesign's core tech needs (fonts, color management, printing, PDF export, etc.). Designed Hypatia Sans, a typeface that supports Latin, Greek and Cyrillic, as a registration incentive for Adobe Creative Suite.

1997
## Instructor (p/t)—Rochester Institute of Technology
After Master of Science, created and taught a senior-level course in font production.

1996–1997
## Associate Consultant—Caslon & Company
Consulting firm managed Print on Demand Initiative. Clients included Apple, Adobe, and Microsoft.

1995–1996
## Font Production (p/t)—Monotype Typography, Inc.
Learned TrueType hinting from Tom Rickner, and hinted two faces of Franklin Gothic for Microsoft.

1995–1996
## Consultant (p/t)—Diamondsoft, Inc.
Created font classification system, still used in Extensis' Suitcase Fusion & Universal Type Server.

1995–1996
## Graduate Assistant (p/t)—Cary Graphic Arts Collection, Rochester (NY) Inst. of Technology
The Lawson fellowship paid me to work at this world-class rare book library on the history of printing.

# EDUCATION

## Master of Business Administration—University of California at Berkeley, 2003
Completed MBA at UC Berkeley's Haas School of Business (part time while working at Adobe).

## Master of Science—Rochester Institute of Technology, 1997
MS in Graphic Arts Publishing from RIT's School of Printing Management and Sciences, specialized in Design & Typography. Achieved 4.0 GPA, received Alexander S. Lawson fellowship.