# EXHIBIT 6

**EXHIBIT CONTIDIONALLY FILED UNDER SEAL**

QUINN EMANUEL URQUHART & SULLIVAN, LLP
RACHEL HERRICK KASSABIAN (Bar No. 191060)
   *rachelkassabian@quinnemanuel.com*
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065-2139
Telephone: (650) 801 5000
Facsimile: (650) 801 5100

ANDREW SCHAPIRO (admitted *pro hac vice*)
   *andrewschapiro@quinnemanuel.com*
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606-1881
Telephone: (312) 705 7400
Facsimile: (312) 705 7401

DANIEL C. POSNER (Bar No. 232009)
   *danposner@quinnemanuel.com*
THOMAS D. NOLAN (Bar No. 238213)
   *thomasnolan@quinnemanuel.com*
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543
Telephone: (213) 443 3000
Facsimile: (213) 443 3100

Attorneys for Defendants Zazzle Inc.
and Mohamed Alkhatib

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| NICKY LAATZ<br><br>Plaintiff,<br><br>vs.<br><br>ZAZZLE INC. and MOHAMED ALKHATIB,<br><br>Defendants. | Case No. 5:22-cv-04844-BLF-VKD<br><br>**REBUTTAL EXPERT REPORT OF CHRISTOPHER RUCINSKI**<br><br>Trial Date:   July 14, 2025 |

**REBUTTAL EXPERT REPORT OF CHRISTOPHER RUCINSKI**

At the request of the law firm Quinn Emanuel Urquhart & Sullivan, LLP ("**Quinn Emanuel**") as counsel for Defendants Zazzle Inc. ("**Zazzle**") and Mohamed Alkhatib (collectively, "**Defendants**") in the above-captioned litigation ("**Litigation**"), I hereby submit this expert report ("**Report**"), pursuant to Federal Rule of Civil Procedure 26(a)(2)(B).

**Introduction**

1. My name is Christopher Rucinski. I am the Managing Director of Elysium Digital, LLC ("**Elysium Digital**"), a subsidiary of Aon Corporation ("**Aon**"). My business address is 53 State Street, Suite 2201, Boston, MA 02109. This Report summarizes my current opinions, which are subject to change depending on ongoing discovery and any additional information received.

2. I incorporate into this Report by reference the first expert report I wrote for this Litigation that was submitted on September 24, 2024 ("**First Rucinski Report**"), the first declaration I wrote for this Litigation that was submitted on November 3, 2022 ("**First Rucinski Declaration**"), and the second declaration I wrote for this Litigation that was submitted on May 5, 2023 ("**Second Rucinski Declaration**").

**Education, Expertise, and Previous Testimony**

3. My subject matter expertise includes computer science generally, and I have been admitted to testify as an expert in various federal court proceedings regarding computer source code analysis, data analysis, and digital evidence collection.

4. I graduated *cum laude* with an A.B. in computer science from Princeton University in 2010, and in 2015, I obtained the Global Information Assurance Certification as a Certified Forensic Examiner, which I renewed in 2019. In 2010, I began working at Elysium Digital as a computer scientist, and I continued to work there until Elysium Digital was acquired in 2015 by Stroz Friedberg. I continued to work at Stroz Friedberg until it was acquired by Aon in 2016, and I have worked at Aon since then, now through its subsidiary Elysium Digital.

5. At Elysium Digital, Stroz Friedberg, and Aon, I have consulted on more than 100 technical matters to date, many of which have involved the analysis of various data formats. I have offered expert opinions about the operation of computer source code, and I have testified as an

expert about the operation of computer source code several times in the last several years. I have also provided technical consulting services for the Federal Trade Commission.

6.    My current *curriculum vitae* is attached here as **Exhibit A**.

### Compensation

7.    Aon is being compensated for my time at a rate of $660 per hour, and Aon is being compensated for the time of individuals working at my direction at a rate of $295 per hour. This compensation does not depend on the outcome of this Litigation.

### Summary of Expected Testimony

8.    I have been asked by counsel for Defendants to offer expert opinions responding to the expert report of Thomas Phinney ("**Phinney Report**") and the expert report of Daniel Garrie ("**Garrie Report**"), which are both dated on the same day as the First Rucinski Report, September 24, 2024. To the extent I do not specifically address certain statements in the Phinney Report or the Garrie Report, it should not be assumed that I agree with such statements.

9.    For the reasons discussed in detail below:

a.    Not all computer files are software.

b.    Nicky Laatz used FontLab 5 to create the Blooming Elegant Trio, and FontLab 6 is newer than FontLab 5.

c.    FontLab 5 sets default values for various heights of glyphs in a font such as "cap height," "x-height," "descender depth," and "ascender height," which may or may not be adjusted by a user of FontLab 5.

d.    The format defined by the AFDKO specification is not a general-purpose programming language.

e.    Nicky Laatz does not claim to have hand-coded or otherwise written anything related to hinting.

f.    Nicky Laatz does not claim to have hand-coded or otherwise written anything related to kerning.

g.    The Laatz Copyright Submission PDFs are not source code for the Blooming Elegant OTF Files.

h. The VFJ font file format of the Laatz Copyright Submission PDFs is functionally equivalent to the XML-based UFO font file format.

i. I disagree with the opinions in the Phinney Report interpreting the Copyright Office Examiner's statements.

j. It was likely not apparent to the Copyright Office Examiner that the Laatz Copyright Submission PDFs were created using FontLab.

k. Manually typing text related to designing a font, such as the coordinates of on-curve and off-curve reference points in the glyphs of a font, would be horribly inefficient, and font designers are therefore much more likely to use visual tools like a mouse, stylus, and trackpad to move points on a computer screen to design fonts.

l. "Render" does not mean "compile" as described in the Copyright Office Compendium.

m. The overwhelming majority of the Garrie Report falls under headings of "Background," but these "Background" sections contain the overwhelming majority of substantive analysis and interpretation in the Garrie Report.

n. The Garrie Report selectively editorializes quotations from the Creative Market License Terms.

o. The Nicky Laatz Declaration does not identify the files that comprise "The Software" as described in the Garrie Report.

p. The definition of "software" applied in the Garrie Report distinguishes software from data and defines software in a way that requires it to translate input data into output data.

q. The definition of "software" applied in the Garrie Report contradicts the description of the Blooming Elegant OTF Files as "software" in the Garrie Report.

r. Exhibit E of the Garrie Report describes the Blooming Elegant OTF Files as comprising data, and I agree.

-3-

s. Nicky Laatz did not create the Blooming Elegant TTX Files.

t. The Blooming Elegant TTX Files were not presented to the Copyright Office Examiner during the correspondence documented in the Laatz Copyright Submission Emails.

u. The Blooming Elegant TTX Files are not source code for the Blooming Elegant OTF Files.

v. Nicky Laatz did not hand-code, or otherwise write any of the words in the Blooming Elegant TTX Files depicted in the Garrie Report that the Garrie Report characterizes as "operators."

w. The words in the Blooming Elegant TTX Files depicted in the Garrie Report that the Garrie Report characterizes as "operators" are not necessary to render the Blooming Elegant Trio.

x. The recipe book analogy proposed in the Garrie Report does not correspond to the creation of the Blooming Elegant OTF Files.

y. Zazzle's Create-A-Product API does not permit users of third-party web sites to select fonts in Zazzle's Design Tool or otherwise.

z. Like Zazzle's Create-A-Product API, Zazzle's "Personalize" feature as described in the Garrie Report does not permit users to select fonts outside of Zazzle's Design Tool.

aa. Opinions in the Garrie Report with respect to Zazzle's Design Tool as stated apply to only about 32% of the time that the Blooming Elegant Trio was able to be used on Zazzle's web site.

bb. The methodology in the Garrie Report is flawed because data relied upon in the Garrie Report that could have been preserved and produced was not preserved and produced, and that data's provenance is uncertain.

cc. The Garrie Report is correct that the Zazzle Arbitrary Text Rendering Process sends ephemeral SVG-formatted data to the browser of a user of Zazzle's Design Tool; but is incorrect that it sends SVG files.

REBUTTAL EXPERT REPORT OF CHRISTOPHER RUCINSKI

dd. The ephemeral SVG-formatted data that the Zazzle Arbitrary Text Rendering Process sends to the browser of a user of Zazzle's Design Tool is not the same data as in the corresponding OTF Files.

ee. From a practical perspective, the font rendering capabilities provided by Zazzle's Design Tool differ substantially from the font rendering capabilities of a font file available for use on a user's local computer.

ff. The Zazzle Font Name Text Rendering Process sends cached rasterized font name images to a user's browser, rather than inefficiently generating the same exact image from font files in response to every request from a user's browser.

gg. The Garrie Report's description of "caching" in the Zazzle Font Name Text Rendering Process is limited to caching associated with a user's browser, which is a different process entirely, that Zazzle does not control.

hh. The Garrie Report mischaracterizes the manner in which rasterized PNG images for font names are specified as part of the Zazzle Font Name Text Rendering Process.

ii. The Garrie Report's opinion that "ZIG converts the vector graphic instructions obtained from the font software into scalable vector graphics (SVG) format pursuant to the parameters of the API request" is unsupported.

jj. The following definitive opinion in the Garrie Report is not sufficiently supported: "ZIG and the Microsoft DirectWrite library are stored on the RLV server cluster, along with the font software used to generate each font available in the Design Tool."

kk. I disagree with the Garrie Report's characterization that Microsoft DirectWrite returns "instructions" to ZIG.

ll. I disagree with the Garrie Report's characterization that ZIG converts the vector graphic instructions obtained from the font software into Scalable Vector Graphics (SVG) format pursuant to the parameters of the API request.

-5-

mm.   The Garrie Report does not show or purport to show how certain components of the Blooming Elegant OTF Files are accessed by users of Zazzle's Design Tool.

nn. The Garrie Report mischaracterizes the Zazzle Font Name Text Rendering Process by equating it to the Zazzle Arbitrary Text Rendering Process.

oo. The Garrie Report does not opine that Zazzle should have implemented a third-party tool for logging API requests, and there are possible reasons why Zazzle would not have done so.

pp. The Garrie Report's description of the alleged lack of technical controls employed by Zazzle, to the extent it is accurate, also accurately describes the same lack of technical controls employed by Nicky Laatz's web site.

qq. The Garrie Report overstates the number of unique designs created in Zazzle's Design Tool in which the Blooming Elegant Trio of fonts were used.

rr.  To the extent the Garrie Report offers the opinion that a user merely accessing Zazzle's Design Tool constitutes that user accessing a given font, I disagree.

ss.  I disagree with other statements and opinions in the Garrie Report.

**Information and Materials Considered**

10.    In arriving at the opinions I express in this Report, I have relied upon my personal knowledge, education, training and professional experience. In addition, I have considered the following materials:

a.   Dkt. 27, Declaration of Stephen C. Steinberg in Support of Plaintiffs' Motion For Partial Summary Judgment, dated September 21, 2022 ("**Steinberg Declaration**").

b.   Dkt 27-1, Exhibit 1 to the Steinberg Declaration, a PDF submitted to the U.S. Copyright office for the "Blooming Elegant" font copyright registration ("**Blooming Elegant Copyright Submission PDF**").

c.   Dkt 27-4, Exhibit 4 to the Steinberg Declaration, copies of email correspondence between Stephen Steinberg and the U.S. Copyright Office

-6-

regarding the "Blooming Elegant" font ("**Blooming Elegant Copyright Submission Emails**").

d.  Dkt 27-2, Exhibit 2 to the Steinberg Declaration, a PDF submitted to the U.S. Copyright office for the "Blooming Elegant Sans" font copyright registration ("**Blooming Elegant Sans Copyright Submission PDF**").

e.  Dkt 27-5, Exhibit 5 to the Steinberg Declaration, copies of email correspondence between Stephen Steinberg and the U.S. Copyright Office regarding the "Blooming Elegant Sans" font ("**Blooming Elegant Sans Copyright Submission Emails**").

f.  Dkt 27-3, Exhibit 3 to the Steinberg Declaration, a PDF submitted to the U.S. Copyright office for the "Blooming Elegant Hand" font copyright registration ("**Blooming Elegant Hand Copyright Submission PDF**").

g.  Dkt 27-6, Exhibit 6 to the Steinberg Declaration, copies of email correspondence between Stephen Steinberg and the U.S. Copyright Office regarding the "Blooming Elegant Hand" font ("**Blooming Elegant Hand Copyright Submission Emails**").

h.  Dkt. 82-3, Creative Market Terms of Service as of April 28, 2017, according to the Wayback Machine ("**Creative Market TOS**").

i.  Dkt. 89-1, Declaration of Plaintiff Nicky Laatz in Support of Plaintiff's Refiled Motion For Partial Summary Judgment, dated April 7, 2023 ("**Nicky Laatz Declaration**").

j.  Dkt. 89-9, Declaration of John Laatz in Support of Plaintiff's Refiled Motion For Partial Summary Judgment, dated April 7, 2023 ("**John Laatz Declaration**"), and attached exhibits.

k.  Dkt. 89-41, Creative Market License Terms as of December 16, 2016, according to the Wayback Machine ("**Creative Market License Terms**"). This is the same document as Exhibit C to the Garrie Report.

REBUTTAL EXPERT REPORT OF CHRISTOPHER RUCINSKI

l.  Compendium of U.S. Copyright Office Practices, Third Edition, January 2021 ("**Copyright Office Compendium**").[1]

m.  FontLab 5 User's Manual For Windows ("**FontLab 5 Manual**").[2]

n.  Transcript of the deposition of Jason Li that took place on July 17, 2024 ("**Li Deposition**").

o.  The materials listed in the First Rucinski Report and exhibits to the First Rucinski Report.

p.  The materials listed in or cited in the Garrie Report.

q.  The materials listed in or cited in the Phinney Report.

r.  The materials listed in **Exhibit B** to this Report.

s.  Any materials cited in this Report or exhibits to this Report.

11.     In this Report I refer to the Blooming Elegant Copyright Submission Emails, the Blooming Elegant Sans Copyright Submission Emails, and the Blooming Elegant Hand Copyright Submission Emails collectively as the "**Laatz Copyright Submission Emails**."

12.     In this Report I refer to the Blooming Elegant Copyright Submission PDF, the Blooming Elegant Sans Copyright Submission PDF, and the Blooming Elegant Hand Copyright Submission PDF collectively as the "**Laatz Copyright Submission PDFs**."

13.     The documents that I cite in this Report comprise the information upon which I am specifically relying to support the opinions stated in this Report. However, these specific citations to documents are not the sole bases for my opinions, and I reserve the right to rely on additional documents and further information.

---

[1] Accessed from https://www.copyright.gov/comp3/docs/compendium.pdf on Sept. 3, 2024.

[2] Accessed from https://help.fontlab.com/pdf/FLS5WinManual.pdf on Sept. 8, 2024.

**Glossary of Select Technical Terms Used in This Report**

14.    **UFO**: Unified Font Object format, which is a font file format that primarily uses XML.[3]

15.    **Markup Language**:[4] A markup language is a computer language, such as HTML (HyperText Markup Language) or XML (eXtensible Markup Language), that provides a structured format for digital information. Markup languages may be used to specify formatting for images, text, individual characters, or other visual elements that may be displayed on a computer screen. Markup languages are not programming languages.

**Not All Computer Files Are Software**

16.    The Phinney Report paragraph 2, footnote 1, states in part "However, as discussed below, as used in the industry the term 'font' is generally used to refer to a computer file, which is a kind of software." To the extent the Phinney Report states an opinion that all "computer file[s]" are a "kind of software," I disagree. Certain computer files may contain data (*e.g.*, .jpeg files that contain data that may be used to render an image) and not software.

**Nicky Laatz Used FontLab 5 to Create the Blooming Elegant Trio, and FontLab 6 is Newer Than FontLab 5**

17.    In the Phinney Report, paragraph 3 states in part "FontLab Studio 5 was the primary program used by Nicky Laatz to design the Blooming Elegant Trio." In the Phinney Report, paragraph 5 states in part "FontLab Studio 5 (which I understand Nicky Laatz used to create the Blooming Elegant Trio)." In the Phinney Report, paragraph 22 states in part "FontLab (6 and higher, newer than the version 5 Nicky Laatz used to create the fonts in question)." I agree that Nicky Laatz used FontLab 5 to create the Blooming Elegant Trio and that FontLab version 6

---

[3] *See, e.g.*, http://unifiedfontobject.org/ generally and specifically. https://unifiedfontobject.org/versions/ufo1/glyphs/glif, both last visited September 18, 2024.

[4] This definition is consistent with the section 1006.1(A) of the Copyright Office Compendium, which describes HTML and how the Copyright Office may register HTML as a literary work and not as a computer program.

REBUTTAL EXPERT REPORT OF CHRISTOPHER RUCINSKI

is newer than FontLab version 5. This is consistent with the opinions I set forth in the First Rucinski Report in paragraphs 36 – 37.

**FontLab 5 Sets Default Values for Various Heights of Glyphs in a Font Such as "Cap Height," "X-Height," "Descender Depth," and "Ascender Height," Which May or May Not Be Adjusted by a User of FontLab 5**

18.     In the Phinney Report, paragraph 10 states that FontLab 5 sets default values for various heights of glyphs in a font such as "cap height," "x-height," "descender depth," and "ascender height," which may or may not be adjusted by a user of FontLab 5. Specifically, paragraph 10 states, "These heights have default values, but can be (and usually are) adjusted by the user." I agree that the default values of these heights for glyphs may or may not be adjusted by a user of FontLab 5, and this is consistent with the opinions I set forth in the First Rucinski Report in paragraphs 64 – 66.

**The Format Defined by the AFDKO Specification is Not a General-Purpose Programming Language**

19.     In the Phinney Report, paragraph 18 states that the "Adobe Font Development Kit for OpenType feature language" or "AFDKO language" is a "dedicated coding language." I agree that the format defined by the AFDKO Specification is not a general-purpose programming language, and this is consistent with the opinions I set forth in the First Rucinski Report in paragraph 74. The term "programming" does not appear anywhere in the Phinney Report. The term "programming" appears exactly two times in the Garrie Report, and both times it appears in the phrase "Application Programming Interface" as the Garrie Report uses it to characterize the operation of Zazzle's servers, which has nothing to do with AFDKO.

**Nicky Laatz Does Not Claim to Have Hand-Coded or Otherwise Written Anything Related to Hinting**

20.     In the Phinney Report, paragraph 19 states that "Most, but not all, fonts also include something called 'hinting.' ... Hinting can be done manually by a designer or more recently, done automatically by a font editor, or a separate utility, which is broadly referred to as 'autohinting.' Some designers do not bother with hinting at all." In the Phinney Report, paragraph

-10-

24 states, "The Blooming Elegant Trio of fonts and font software include a small set of kerning pair adjustments for Blooming Elegant Sans, and what appears to me to be autohinting for all three fonts." The Phinney Report does not claim that Laatz hand-coded or otherwise wrote anything related to hinting, and I agree because Nicky Laatz does not claim in the Nicky Laatz Declaration that she hand-coded or otherwise wrote anything related to hinting. This is consistent with the opinions I set forth in the First Rucinski Report in paragraph 40.

**Nicky Laatz Does Not Claim to Have Hand-Coded or Otherwise Written Anything Related to Kerning**

21.     In the Phinney Report, paragraph 24 states, "The Blooming Elegant Trio of fonts and font software include a small set of kerning pair adjustments for Blooming Elegant Sans, and what appears to me to be autohinting for all three fonts." The Phinney Report does not claim that Laatz hand-coded or otherwise wrote anything related to kerning, and I agree because Nicky Laatz does not claim in the Nicky Laatz Declaration that she hand-coded or otherwise wrote anything related to kerning. This is consistent with the opinions I set forth in the First Rucinski Report in paragraph 40.

**Provenance of the Blooming Elegant OTF Files**

22.     In my declaration in this Litigation dated November 3, 2022 ("**First Rucinski Declaration**"), I explain how I purchased and downloaded the Blooming Elegant Trio (comprising the fonts Blooming Elegant, Blooming Elegant Hand, and Blooming Elegant Sans) from Creative Market in 2022 and how I downloaded in particular the following files: "BloomingElegant.otf," "Blooming Elegant Hand.otf," and "Blooming Elegant Sans.otf" (collectively the "**Blooming Elegant OTF Files**").[5]

23.     The Phinney Report does not explicitly address the Blooming Elegant OTF Files, but under the heading "Materials Considered in Forming Opinions" of the Phinney Report the following is listed: "Blooming Elegant, Blooming Elegant Hand, and Blooming Elegant Sans .otf

---

[5] *See, e.g.*, First Rucinski Declaration at paragraphs 18 – 23.

REBUTTAL EXPERT REPORT OF CHRISTOPHER RUCINSKI

font files." The Phinney Report does not explain the provenance of these files, but I assume for the purposes of this Report that they are identical to the Blooming Elegant OTF Files.

24.    Page 11 of the Garrie Report states, "The Software consists of three files named 'Blooming Elegant.otf,' 'Blooming Elegant Sans.otf,' and 'Blooming Elegant Hand.otf.'" The Garrie Report also describes various analyses performed on these files. The Garrie Report does not explain the provenance of these files, but I assume for the purposes of this Report that they are identical to the Blooming Elegant OTF Files.[6]

**The Laatz Copyright Submission PDFs Are Not Source Code for the Blooming Elegant OTF Files**

25.    The Phinney Report characterizes the text of VFJ font files and specifically the Laatz Copyright Submission PDFs as "source code" in several paragraphs.[7] The Phinney Report does not explicitly state the file or files for which the text of VFJ font files – and specifically the Laatz Copyright Submission PDFs – are "source code." The closest the Phinney Report comes to stating an opinion regarding this is in paragraph 35, in which the Phinney Report states, "VFJ is a particular form of JSON (JavaScript Object Notation), and a plain text equivalent of a FontLab

---

[6] I make this assumption notwithstanding the slight difference in the name of one of the files. One of the Blooming Elegant OTF Files is named "BloomingElegant.otf," without a space, and the corresponding file discussed in the Garrie Report is named "Blooming Elegant.otf," with a space.

[7] *See, e.g.*, Phinney Report at paragraph 35: "The font source code submitted on behalf of Nicky Laatz (Exhibits 1-3 to the Steinberg Declaration dated Sept. 22, 2021) is in FontLab VFJ format"; Phinney Report at paragraph 40: "Nicky Laatz's use of FontLab in creating the Blooming Elegant Trio of fonts and font software was apparent from the font source code file types she submitted …"; Phinney Report at paragraph 46: "Even if a designer were to manually type all of the source code for a font, it would still have to be compiled"; Phinney Report at paragraph 48, Figure 6, which depicts a screenshot using FontLab 8, a version of FontLab which post-dates both FontLab 5, with which Nicky Laatz created the Blooming Elegant Trio and FontLab 7, with which Nicky Laatz created the Laatz Copyright Submission PDFs.

VFC source file, because the U.S. Copyright Office would not accept compiled binary font files (TTF or OTF)." The Phinney Report characterizes VFJ files as a "plaint text equivalent" to VFC files, but the Phinney Report does not state a relationship between VFJ files and TTF or OTF files. The Garrie Report does not offer any opinions regarding source code, and the term "source code" does not appear anywhere in the Garrie Report, even though Mr. Garrie, unlike Mr. Phinney or any of Plaintiff's other experts, purports to have formal training in computer science and holds himself out as a technical expert. To the extent the Phinney Report states an opinion, or Mr. Phinney or Mr. Garrie later offers an opinion, that the Laatz Copyright Submission PDFs are source code for the Blooming Elegant OTF Files, I disagree for the reasons stated in the First Rucinski Report.[8]

**The VFJ Font File Format of the Laatz Copyright Submission PDFs Is Functionally Equivalent to the XML-Based UFO Font File Format**

26.    In the Phinney Report, paragraph 36 states, "these were not actually XML files, though they are functionally equivalent to XML files," and "these" and "they" in that quotation refer to the Laatz Copyright Submission PDFs. To my knowledge, Nicky Laatz did not submit XML files for the Blooming Elegant Trio to the Copyright Office, but she did possess copies of such XML files in February 2021, during the same time period covered by the Laatz Copyright Submission Emails. Nicky Laatz produced LAATZ0496272 in this Litigation, which is the text of an email from Nicky Laatz to John Laatz dated February 22, 2021, and it lists three attachments: (1) BloomingElegant.ufo.zip, (2) Blooming Elegant Hand.ufo.zip, and (3) Blooming Elegant Sans.ufo.zip. The contents of those attached zip files, unzipped into the original files, were produced by Nicky Laatz in this Litigation as the 661 files listed in **Exhibit C** to this Report, which I have reviewed, and which appear to correspond to the Blooming Elegant Trio. These attachments comprise files in the UFO font format, which primarily uses XML. I agree with the Phinney Report that the VFJ font file format of the Laatz Copyright Submission PDFs is

---

[8] *See, e.g.*, First Rucinski Report, paragraph 38.

REBUTTAL EXPERT REPORT OF CHRISTOPHER RUCINSKI

functionally equivalent to the XML-based UFO font file format of LAATZ0496272 and the unzipped contents of its attachments.

## Definition of "Hand-Coded" as Used in This Report

27.    In this Report, I apply the same definition of "hand-code" as appears in the First Rucinski Report, for the reasons stated therein. In this Report I use the term "hand-code" to refer to a person manually typing digital text, with or without the assistance of computer software programs such as Microsoft Word or Atom that suggest textual corrections or changes to text that a user has already manually typed. If one hand-codes digital text, such digital text is said to have been "hand-coded."[9]

28.    The Phinney Report does not propose a general definition of "hand-coded" that should be applied in the present dispute. The closest the Phinney Report comes to proposing such a definition is in paragraph 39, where the definition explicitly includes "all forms of input Nicky Laatz used." Paragraph 39 of the Phinney Report is as follows: "The only reasonable interpretation of the U.S. Copyright Office Examiner's position that only fonts 'hand-coded by a human author' are registrable is that all forms of input Nicky Laatz used in creating the fonts are 'hand coding,' whether they involved manipulating points onscreen with a stylus or mouse, or manual typing." I disagree with the Phinney Report's interpretation of "hand-coded" for the reasons stated in the First Rucinski Report.[10]

29.    In paragraphs 42 – 48, the Phinney Report also opines that a definition of "hand-coded" limited to "only manual typing of text" is "unreasonable" and "inconsistent." I disagree with the Phinney Report's interpretation of "hand-coded" in these paragraphs for the reasons stated in the First Rucinski Report.[11]

## I Disagree With the Opinions in the Phinney Report Interpreting the Copyright Office Examiner's Statements

---

[9] *See, e.g.*, First Rucinski Report, paragraph 32.

[10] *See, e.g.*, First Rucinski Report, paragraph 32.

[11] *See, e.g.*, First Rucinski Report, paragraph 32.

-14-

30.     The Phinney Report offers two opinions regarding the interpretation of the Copyright Office Examiner's statements in the Laatz Copyright Submission Emails. The first is in paragraph 39, which states in its entirety: "The only reasonable interpretation of the U.S. Copyright Office Examiner's position that only fonts 'hand-coded by a human author' are registrable is that all forms of input Nicky Laatz used in creating the fonts are 'hand coding,' whether they involved manipulating points onscreen with a stylus or mouse, or manual typing." I disagree for the reasons stated in the First Rucinski Report and specifically paragraph 32.

31.     The second opinion in the Phinney Report regarding the interpretation of the Copyright Office Examiner's statements in the Laatz Copyright Submission Emails is in paragraph 41, which states in its entirety: "The only reasonable explanation for the examiner's reference to the fonts being 'hand-coded by a human author' as opposed to 'generated by a font program, such as FontLab or Fontographer,' is that he was thinking of newer tools that are capable of generating new fonts with little input from any human author, similar to AI. But these tools are very new, and did not even exist yet when Nicky Laatz created the Blooming Elegant Trio of fonts and font software in or around 2016."[12] I disagree.

32.     The Copyright Office Examiner explicitly mentions FontLab and Fontographer in their statement but does not mention or even allude to unnamed "newer tools … similar to AI." It stands to reason that, absent a compelling reason to think otherwise that is more than mere speculation, when the Copyright Office Examiner wrote "FontLab," the Copyright Office Examiner was thinking about FontLab.

33.     The Phinney Report does not identify any specific newer tools that are similar to AI as part of the speculation about exactly what the Copyright Office Examiner was thinking in a particular moment in time, and the Phinney Report offers no evidence to support this speculation. ChatGPT, among the most well-known revolutionary generative AI tools was not released until

---

[12] The Phinney Report does not define the acronym "AI." I assume the Phinney Report intends this to mean "Artificial Intelligence," and that is how I use the acronym "AI" in this Report.

REBUTTAL EXPERT REPORT OF CHRISTOPHER RUCINSKI

November 2022,[13] more than a year after the time period covered by Copyright Office Examiner's statements in the Laatz Copyright Submission Emails, and more than six years after Nicky Laatz purports to have created the Blooming Elegant Trio. The Garrie Report does not offer any opinions regarding the Copyright Office Examiner's statements in light of AI, and neither the term "AI" nor the term "artificial intelligence" appears anywhere in the Garrie Report, even though Mr. Garrie, unlike Mr. Phinney or any of Plaintiff's other experts, purports to have formal training in computer science and holds himself out as a technical expert. Additionally, a date of "2016" appears as both the "Year of Completion" and the year of the "Date of 1st Publication" in each of the three copyright registration applications[14] that Nicky Laatz submitted in connection with the correspondence with the Copyright Office documented in the Laatz Copyright Submission Emails, so the Copyright Office Examiner would have had a very easy way to check when the Blooming Elegant Trio was created.

### It Was Likely Not Apparent to the Copyright Office Examiner that the Laatz Copyright Submission PDFs Were Created Using FontLab

34.    The Phinney Report at paragraph 40 states, "Further, even in the present case, Nicky Laatz's use of FontLab in creating the Blooming Elegant Trio of fonts and font software was apparent from the font source code file types she submitted and was expressly stated in the text of the files themselves, and the examiner ultimately issued registrations for them." To the extent the Phinney Report states an opinion that merely the submission of the Laatz Copyright Submission PDFs to the Copyright Office Examiner made it apparent to the Copyright Office Examiner that Nicky Laatz used FontLab to create the fonts at issue in this Litigation, I disagree.

---

[13] *See, e.g.,* https://openai.com/blog/chatgpt/, a blog post from OpenAI, the creator of ChatGPT, entitled "Introducing ChatGPT" dated November 30, 2022, last accessed October 18, 2024.

[14] *See, e.g.*, LAATZ0507180, LAATZ0507183, and LAATZ0507186.

REBUTTAL EXPERT REPORT OF CHRISTOPHER RUCINSKI

35. The Copyright Office Examiner explicitly asks whether the Laatz Copyright Submission PDFs were "generated by a font program, such as FontLab or Fontographer."[15] Neither Mr. Phinney nor I can know exactly what the Copyright Office Examiner was thinking when he instructed Nicky Laatz's lawyer to tell him whether FontLab generated the Laatz Copyright Submission PDFs, but if it was already apparent to the Copyright Office Examiner that they were generated by FontLab, there isn't an obvious reason why the Copyright Office Examiner would spend the time confirming it.

36. The Copyright Office Examiner also states, "If this is XML, please confirm."[16] The Copyright Office Examiner appears to have been unsure of even the basic format of the Laatz Copyright Submission PDFs, and there isn't an obvious reason the Copyright Office Examiner would spend time establishing the basic format if it was already apparent. The basic format of the Laatz Copyright Submission PDFs is JSON, not XML.[17] If the Copyright Office Examiner looked at the Laatz Copyright Submission PDFs and was competent to make a decision about what their content means, he likely would not have spent the time to confirm it by asking about it.

37. One of the Laatz Copyright Submission PDFs, Blooming Elegant Hand Copyright Submission PDF, does not contain the text "FontLab" anywhere in its 439 pages despite having been created by FontLab. The other two Laatz Copyright Submission PDFs, Blooming Elegant Copyright Submission PDF and Blooming Elegant Sans Copyright Submission PDF, are 460 pages long and 235 pages long, respectively. Both contain only a single reference to "FontLab," on pages 456 and 229 respectively. It is not the case that every file generated by FontLab has "FontLab" in the file; the Blooming Elegant Hand Copyright Submission PDF is one such file.

---

[15] *See, e.g.*, the Copyright Office Examiner's email dated February 18, 2021, in each of the Laatz Copyright Submission Emails.

[16] *See, e.g.*, the Copyright Office Examiner's email dated February 18, 2021, in each of the Laatz Copyright Submission Emails.

[17] *See, e.g.*, First Rucinski Report, paragraph 37; Phinney Report, paragraph 36: "Contrary to the examiner's suggestion, these were not actually XML files…"

REBUTTAL EXPERT REPORT OF CHRISTOPHER RUCINSKI

While it may be apparent to Mr. Phinney, the former CEO of FontLab, that looking for the text "FontLab" in a JSON file using the FontLab proprietary VFJ format, which is what each of the Laatz Copyright Submission PDFs are, is an indicator that such files were generated by FontLab, it likely was not apparent to a Copyright Office Examiner who appears to have also been unsure about even the basic format of the Laatz Copyright Submission PDFs.

**Manually Typing Text Related to Designing a Font, Such as the Coordinates of On-Curve and Off-Curve Reference Points in the Glyphs of a Font, Would Be Horribly Inefficient, and Font Designers Are Therefore Much More Likely to Use Visual Tools Like a Mouse, Stylus, and Trackpad to Move Points on a Computer Screen to Design Fonts**

38.    In the Phinney Report, paragraph 45 states, "Fundamentally, fonts are visual creations, and creating them by typing a textual representation of their underlying code is horribly inefficient, which is why type designers have used visual tools like a mouse, stylus, and trackpad to place and move points on screen in their creation of fonts since before the 1992 U.S. Copyright Office policy decision."[18] I agree that manually typing text related to designing a font, such as the coordinates of on-curve and off-curve reference points in the glyphs of a font, would be horribly

---

[18] The Phinney Report states later in this same paragraph, "Adobe created a visual editor and all Adobe type designers immediately switched to it for designing the remainder of their 'base 35' PostScript fonts circa 1985. Adobe never went back to typing text to represent font coordinates." It's unclear what the basis is in the Phinney Report for the claim that "*all* Adobe type designers *immediately* switched to it" (emphasis added). While there are reasons they may have done so, the Phinney Report cites no evidence that every single one of "Adobe type designers" actually immediately and with no delay for any reason whatsoever, switched to it. Additionally, while there are reasons it may have done so, the Phinney Report cites no evidence supporting the opinion that Adobe *never* went back to typing text to represent font coordinates. It's unclear what the basis is in the Phinney Report for the claim that the company Adobe, or any of its many thousands of employees, actually never did this, not once for any reason whatsoever, publicly or privately, at any single point in time over nearly 40 years since 1985.

-18-

inefficient and that font designers are therefore much more likely to use visual tools like a mouse, stylus, and trackpad to move points on a computer screen to design fonts.

**"Render" Does Not Mean "Compile" as Described in the Copyright Office Compendium**

39.     Footnote 8 in paragraph 50 of the Phinney Report states, "I assume that 'render' here really means 'compile' in the software sense, i.e., turning source code into a program. In the font industry, we use 'compiling' in this context. Contrariwise, to 'render' the font means the final step of imaging it for screen or print, which is something done with the compiled font, by the operating system (for screen) or a printer (for print), not by a font editing program." This assumption is made in relation to the following statement in the Copyright Office Compendium, in section 723: "The registration specialist may communicate with the applicant if it appears that the author merely assigned coordinates to a particular letterform and then used a third party program to render typeface or typefont from those coordinates (but did not create any of the source code for that program)." I disagree with this opinion in the Phinney Report. First, "render" makes sense in the above quotation from the Copyright Office Compendium with its plain and ordinary meaning, displaying as an image on a screen; fonts are rendered in this way to actually use them. If the drafters of the Copyright Office Compendium had instead intended to write "compile" in the software sense, then they would have done so. The word "compile" in the software sense appears elsewhere in the Copyright Office Compendium, for example in section 1509.1(F)(5), which states in part, "CD-ROMs typically contain a copy of the source code for the computer program that has been converted or compiled into object code," but the drafters of the Copyright Office Compendium decided to refrain from using "compile" in the software sense to describe fonts.

**The Overwhelming Majority of the Garrie Report Falls Under Headings of "Background," but These "Background" Sections Contain the Overwhelming Majority of Substantive Analysis and Interpretation in the Garrie Report**

40.     The main body of the Garrie Report, without exhibits, is 41 pages. Section I. Introduction and Qualifications spans approximately the first two pages. Section II. Factual Background spans approximately the next six pages. Section III. Technical Background spans approximately the next 27 pages. The final six pages contain two headings with explicitly stated

REBUTTAL EXPERT REPORT OF CHRISTOPHER RUCINSKI

expert opinions and a conclusion section. The overwhelming majority of substantive analysis and interpretation in the Garrie Report appear in the Factual Background and Technical Background sections, even though "Background" implies undisputed facts and technical details.

**The Garrie Report Selectively Editorializes Quotations from the Creative Market License Terms**

41.    The Garrie Report includes the Creative Market License Terms as Exhibit C, but the Garrie Report does not include as an exhibit the Creative Market TOS, which are listed in Exhibit B to the Garrie Report as one of the materials reviewed in the preparation of the Garrie Report. I understand from Quinn Emanuel that the Court has ruled in this Litigation that Zazzle was bound by both the Creative Market License Terms and the Creative Market TOS. Pages 4 and 5 of the Garrie Report include selective quotations ("**Editorialized Quotations**") of several provisions of the Creative Market License Terms that employ liberal use of bracketed editorialization.

42.    The Editorialized Quotations replace the capitalized term "Item" in the Creative Market License Terms with different text in different Editorialized Quotations. The Editorialized Quotations replace the term "Item" in the Creative Market License Terms either with "fonts and the font software" or "Blooming Elegant Trio digital content, including the Software." Figures 1 – 4 below illustrate.

For "Installable Items (Fonts and Add-Ons)," "an End Product must be a unique implementation of the [fonts and the font software]. For example, you may purchase a font and use it to make unique word art, … but you must not redistribute the original files in any way";[11]

*Figure 1*: Excerpt 1 from the Editorialized Quotations, with highlighting added

**Installable Items (Fonts and Add-Ons):**
Here, an End Product must be a unique implementation of the Item. For example, you may purchase a font and use it to make unique word art, or purchase and use a brush to create an illustration, but you must not redistribute the original files in any way.

*Figure 2*: Creative Market License Terms corresponding to Excerpt 1, with highlighting added

REBUTTAL EXPERT REPORT OF CHRISTOPHER RUCINSKI

> The License prohibits a licensee from "sublicens[ing], ... shar[ing], transfer[ing], or otherwise redistribut[ing]e the [Blooming Elegant Trio digital content, including the Software] (e.g. as stock, in a tool or template, with source files, and/or not incorporated into an End Product) under any circumstances, not even for free";[14]

*Figure 3*: Excerpt 2 from the Editorialized Quotations, with highlighting added

> You may not sublicense, resell, share, transfer, or otherwise redistribute the Item (e.g. as stock, in a tool or template, with source files, and/or not incorporated into an End Product) under any circumstances, not even for free.

*Figure 4*: Creative Market License Terms corresponding to Excerpt 2, with highlighting added

43.    Each of the seven Editorialized Quotations adds the term "software" or "Software" (1) where it does not exist in the actual Creative Market License Terms and (2) in a manner that associates the word "software" with fonts. Some Editorialized Quotations do this multiple times. The word "font" appears four times in the Creative Market License Terms, and word "software" appears exactly one time in the Creative Market License Terms. The word "software" is not associated with fonts in the Creative Market License Terms, and the only time that "software" appears is in the section entitled "Miscellaneous" and concerns open source software licenses, not fonts. The term "software" appears several dozen times in the Creative Market TOS, and the term "font" appears three times. The word "software" is not associated with fonts in the Creative Market TOS.

**The Nicky Laatz Declaration Does Not Identify the Files that Comprise "The Software" as Described in the Garrie Report**

44.    Page 11 of the Garrie Report states, "The Software consists of three files named 'Blooming Elegant.otf,' 'Blooming Elegant Sans.otf,' and 'Blooming Elegant Hand.otf'" and includes footnote 32, which cites to paragraph 4 of the Nicky Laatz Declaration. Paragraph 4 of the Nicky Laatz Declaration does not identify any OTF files, and in the entirety of the Nicky Laatz Declaration, "OTF" appears exactly one time, in paragraph 8, in the context of a general description of FontLab.

-21-

REBUTTAL EXPERT REPORT OF CHRISTOPHER RUCINSKI

**The Definition of "Software" Applied in the Garrie Report Distinguishes Software from Data and Defines Software in a Way that Requires It to Translate Input Data Into Output Data**

45.    Page 3 of the Garrie Report states, "As used herein, the Software refers to the program used to generate the Blooming Elegant Trio of Fonts" and includes footnote 4, which cites the definition of "Software" in Black's Law Dictionary (12th ed. 2024) stated as, "The sequence of instructions by which a computer accepts and translates input symbols, executes actions, and outputs symbols such as numbers, characters in an email message, pictures in a text message, the music played on a mobile device, or GPS coordinates." This is the only definition of "software" offered in the Garrie Report, and for the purposes of this Report I assume that the Garrie Report is applying the definition of "software" as explicitly quoted in the Garrie Report footnote 4. In particular, because the Garrie Report explicitly reproduces only the first definition in the entry for "software," I assume that the Garrie Report does not apply the alternative second definition of "software" in Black's Law Dictionary (12th ed. 2024) nor does he apply anything from the additional context provided in the entry for "software" in Black's Law Dictionary (12th ed. 2024). The full entry of "software" in Black's Law Dictionary (12th ed. 2024) appears below in Figure 5.

software. (1958) 1. The sequence of instructions by which a computer accepts and translates input symbols, executes actions, and outputs symbols such as numbers, characters in an email message, pictures in a text message, the music played on a mobile device, or GPS coordinates. 2. More broadly, anything that can be stored electronically. Cf. HARDWARE.

"Computer software is a set of instructions that runs on a computer. It does not consist solely of programming language. Rather, from a technical perspective, software is defined as a program and all of the associated information and materials needed to support its installation, operation, repair, and enhancement. It also includes written programs, procedures, rules, and associated documentation pertaining to the operation of a computer system, which are stored on digital medium. Indeed, because computer software instructs a computer how to perform actions, in the broadest sense, it includes everything that is not hardware. Put another way, computers are, in effect, incomplete machines when manufactured and acquire functionality only after being coupled with software." Daniel B. Garrie & Francis M. Allegra, *Plugged In: Guidebook to Software and the Law* § 2.1, at 45–46 (2013).

*Figure 5*: Full entry for "software" from Black's Law Dictionary (12th ed. 2024), p. 1680

-22-

REBUTTAL EXPERT REPORT OF CHRISTOPHER RUCINSKI

46.    The definition of "software" applied in the Garrie Report distinguishes between (1) a "sequence of instructions," which is software under this definition, and (2) "input symbols" (a.k.a. "input") and symbols that the software outputs (a.k.a. "output"), such as "numbers, characters in an email message, pictures in a text message, the music played on a mobile device, or GPS coordinates." The input symbols and output symbols in this definition are both data.

47.    In the definition of "software" applied in the Garrie Report, the "sequence of instructions" that comprise the software are required to "accept and translate[] input symbols … and output[] symbols" which is to say that the definition of "software" applied in the Garrie Report is required to accept and translate data into other data.

**The Definition of "Software" Applied in the Garrie Report Contradicts the Description of the Blooming Elegant OTF Files as "Software" in the Garrie Report**

48.    Page 3 of the Garrie Report states, "At a high level, the Software can be thought of as instructions that enable design tools or other pieces of software to render text in the Blooming Elegant Trio of Fonts." In the preceding quotation, "the Software" refers to the Blooming Elegant OTF Files. In the preceding quotation, examples of "design tools or other pieces of software" include FontLab. If FontLab is "software" as that term is used in the Garrie Report and as is stated by the Garrie Report in the preceding quotation, then FontLab is required to accept and translate data into other data. In the example provided in the proceeding quotation, the data supplied to FontLab or other pieces of software is the Blooming Elegant OTF Files, which are translated by FontLab or other pieces of software into rendered text. Therefore, the Blooming Elegant OTF Files are data, not "software" as that term is used in the Garrie Report.

49.    In the preceding quotation, if the Blooming Elegant OTF Files are "software" as that term is used in the Garrie Report and as is stated by the Garrie Report in the preceding quotation, then the Blooming Elegant OTF Files are required to accept and translate data into other data. However, OTF files cannot accept data outside of the OTF files and translate it into other data. For example, all data related to on-curve and off-curve reference points for glyphs are contained within the OTF files. Therefore, the Blooming Elegant OTF Files are not "software" as that term is used in the Garrie Report.

-23-

**Provenance of the Blooming Elegant TTX Files**

50.     Pages 12-14 and Exhibit E (entitled "Python Scripts to Extract OTF Data") of the Garrie Report describe and document a procedure used to convert the Blooming Elegant OTF Files into "Blooming Elegant.ttx," "Blooming Elegant Hand.ttx," and "Blooming Elegant Sans.ttx" (collectively, "**Blooming Elegant TTX Files**"), which are formatted with XML. After receiving the Garrie Report, I requested through counsel production in native format of the Blooming Elegant TTX Files that resulted from this procedure, and I received them.

**Exhibit E of the Garrie Report Describes the Blooming Elegant OTF Files as Comprising Data, and I Agree**

51.     Exhibit E of the Garrie Report, entitled "Python Scripts to Extract OTF Data," documents several dozen lines written in the Python programming language that convert each of the Blooming Elegant OTF Files into the Blooming Elegant TTX Files. In this example, applying the term "software" as that term is used in the Garrie Report, the Python scripts depicted in Exhibit E to the Garrie Report are software, that software's input data comprises the Blooming Elegant OTF Files, and that software's output data comprises the Blooming Elegant TTX Files. I also agree with the characterization in the title of Exhibit E of the Garrie Report, "Python Scripts to Extract OTF Data" that these Python scripts extract OTF data from the Blooming Elegant OTF Files.

**Nicky Laatz Did Not Create the Blooming Elegant TTX Files**

52.     To my knowledge, the first time the Blooming Elegant TTX Files were created was in the course of this Litigation as documented in the Garrie Report. To my knowledge, Nicky Laatz has not claimed to have created the Blooming Elegant TTX Files, and the Garrie Report does not state that Nicky Laatz created the Blooming Elegant TTX Files. Additionally, FontLab 5, which Nicky Laatz used to create the Blooming Elegant Trio, does not support the TTX format. "TTX" does not appear anywhere in any of the 913 pages of the FontLab 5 Manual, and Figure 6 shows the file formats that may be opened using FontLab 5 according to the FontLab 5 Manual, none of which are the TTX file format.

-24-

You will see the **Open File** dialog box in which you can select a font file to open. In this dialog box, you will see all the fonts that can be opened: TrueType/OpenType TT (.ttf), Windows Type 1 and Windows Multiple Master (.pfb), Unix/ASCII Type 1 (.pfa), OpenType PS (.otf), Ikarus files (.ik), FontLab 2.5 font files (.vfa), FontLab 3.x/4.x/Studio 5 font files (.vfb), as well as FontLab Studio Project files (.flw).

*Figure 6*: Page 115 of the FontLab 5 Manual

**The Blooming Elegant TTX Files Were Not Presented to the Copyright Office Examiner During the Correspondence Documented in the Laatz Copyright Submission Emails**

53.    Nothing in the Laatz Copyright Submission Emails suggests that the Blooming Elegant TTX Files were submitted to the Copyright Office Examiner, and Nicky Laatz has not claimed that they were.

**The Blooming Elegant TTX Files Are Not Source Code for the Blooming Elegant OTF Files**

54.    The Blooming Elegant TTX Files documented in the Garrie Report are not source code for the Blooming Elegant OTF Files because the Blooming Elegant TTX Files were created from the Blooming Elegant OTF Files and therefore cannot be their source.

**Nicky Laatz Did Not Hand-Code, or Otherwise Write Any of the Words in the Blooming Elegant TTX Files Depicted in the Garrie Report that the Garrie Report Characterizes as "Operators"**

55.    Pages 13 and 14 of the Garrie Report identify three words that the Garrie Report describes as "operators": "callgsubr," "hintmask," and "vvcurveto." To my knowledge, Nicky Laatz has not claimed to have hand-coded or otherwise written any of these three words or any of the other words in the Blooming Elegant TTX Files depicted in the Garrie Report that Garrie Report characterizes as "operators." In particular, in the Nicky Laatz Declaration, none of the words "callgsubr," "hintmask," and "vvcurveto" appear. The Garrie Report does not state that Nicky Laatz hand-coded or otherwise wrote any of these three words or any of the other words in the Blooming Elegant TTX Files depicted in the Garrie Report that the Garrie Report characterizes as "operators."

-25-

REBUTTAL EXPERT REPORT OF CHRISTOPHER RUCINSKI

**The Words in the Blooming Elegant TTX Files Depicted in the Garrie Report that the Garrie Report Characterizes as "Operators" Are Not Necessary to Render the Blooming Elegant Trio**

56.     Pages 13 and 14 of the Garrie Report identify three words that the Garrie Report describes as "operators": "callgsubr," "hintmask," and "vvcurveto." None of these three words appear in the Laatz Copyright Submission PDFs, which depict VFJ files that may be used to depict the Blooming Elegant Trio in FontLab with a version of 6 or greater.

**The Recipe Book Analogy Proposed in the Garrie Report Does Not Correspond to the Creation of the Blooming Elegant OTF Files**

57.     The Garrie Report states at page 11, "An OTF file can be thought of as a recipe book. Just as a recipe book may have instructions for how to cook each dish in a certain type of cuisine, an OTF file has instructions for how to render each character in a certain font." To the extent the Garrie Report offers the opinion that Nicky Laatz wrote instructions in the "recipe book" of the Blooming Elegant OTF Files for how to render characters in the constituent fonts, just as one would write instructions in a recipe book for how to create a specific cooked dish of food, I disagree. A more accurate analogy involving a recipe book is that Nicky Laatz as chef specified the appearance of cooked dishes (the fonts), and the details of how to create the cooked dishes as recorded into a recipe book were outsourced to a sous-chef, in this case the FontLab software program.

**Zazzle's Create-A-Product API Does Not Permit Users of Third-Party Web Sites to Select Fonts in Zazzle's Design Tool or Otherwise**

58.     Page 7 of the Garrie Report states, "Zazzle also offers the ability for third-party websites to integrate with the Design Tool using Zazzle's Create-A-Product API (the 'Create-A-Product API')." Footnote 23 on page 7 of the Garrie Report states, "Zazzle also offers the ability for certain third parties to embed the Design Tool into third-party websites, effectively making the Design Tool accessible to users of such third-party websites." Footnote 54 on page 21 of the Garrie Report also contains a paragraph approximately ten sentences long that discusses the Create-A-Product API. The Garrie Report cites

REBUTTAL EXPERT REPORT OF CHRISTOPHER RUCINSKI

https://asset.zcache.com/assets/graphics/z4/uniquePages/zAPI/ZazzleApiGuide.v3.pdf (which is Exhibit D to the Garrie Report) ("**Create-A-Product API Guide v3**") and https://asset.zcache.com/assets/graphics/z4/uniquePages/zAPI/ZazzleApiGuide.v2.pdf ("**Create-A-Product API Guide v2**").[19] I reviewed both, and the functionality I describe in this Report does not substantially differ between the two. To the extent the Garrie Report offers the opinion that Zazzle's Create-A-Product API permits users of third-party web sites to select fonts in Zazzle's Design Tool,[20] I disagree.

59.    Create-A-Product API Guide v3 and Create-A-Product API Guide v2 summarize the features that the Create-A-Product API provides on pages 4 and 5, and page 7 respectively. Figures 7 and 8 below depict these summaries.



## Templates

The Create-a-Product API utilizes templates to seamlessly populate images and/or text provided by your site and create finished products for customers to purchase. However, for most users of the API, the idea of templates is the hardest to grasp. Let's see if we can simplify how templates are used.

A template is a blueprint of where images and text should be placed on a product, and how inbound images and text should be treated (e.g. font type and size, fit or fill the image space). By designating specific elements of your design as Template Objects (images or text), you are instructing the API how to handle images and text that you pass through an API link.

*Figure 7*: Create-A-Product API Guide v3, pp. 4 – 5

---

[19] Both URLs were last accessed on October 20, 2024.

[20] In this Report I use the phrase "Zazzle's Design Tool" to refer to the web page accessible as of October 21, 2024, at https://www.zazzle.com/create/designtool.

REBUTTAL EXPERT REPORT OF CHRISTOPHER RUCINSKI

### Step 4: Create your Template(s)

#### What is a Template?

Templates are products that feature designated areas in the design where images and/or text can be replaced. By designating specific elements of your design as "Template Objects," you tell us where on your product text or images can be changed. The Create-a-Product API utilizes templates to seamlessly populate images and/or text provided by your site and create finished products for customers to purchase.

*Figure 8*: Create-A-Product API Guide v2, p. 7

60.    In short, Zazzle's Create-A-Product API: (1) permits an owner or employee of a third-party web site to create a design on Zazzle.com using Zazzle's Design Tool, (2) permits an owner or employee of a third-party web site to make a template from that design by specifying certain text or images that may be changed in the template by a user of a third-party web site, (3) provides a design-specific Zazzle URL in which a third-party web site may pass parameters to enable its users to change text or images in the template, and (4) in response to that Zazzle URL being accessed, displays a page on Zazzle's web site to the user of the third-party web site that includes an image of the design or finished product with the text or images specified by that user populated in the design or finished product. In the use of Zazzle's Create-A-Product API, an owner or employee of a third-party web site may access Zazzle's Design Tool in order to create the template, including selecting fonts for text. However, Zazzle's Create-A-Product API does not permit a user of the third-party web site to access Zazzle's Design Tool and does not allow a user of the third-party web site to select fonts for text.

61.    A user of a third-party web site may specify images, text, and text color through the Create-A-Product API, but a user of a third-party web site may not specify the font for text in this way. Figure 9 below shows an example Zazzle URL for the Create-A-Product API, including the various types of parameters that may be passed using it. "t_image1_iid" and "t_image2_iid" correspond to images that may be specified by a user of a third-party web site, "t_text1_txt" and "t_text2_txt" correspond to text that may be specified by a user of a third-party web site, and "t_text1_txtclr" corresponds to text color that may be specified by a user of a third-party web site. There are no parameters that correspond to the font for text, and the Garrie Report also does not identify any.

-28-

REBUTTAL EXPERT REPORT OF CHRISTOPHER RUCINSKI

Here is an example link (color coded) to show the various parameter/value pairs generating a single product from a single link.

```
https://www.zazzle.com/api/create/at-238268965591408603?rf=238268965591408603&ax=Linkover&pd=168619482839304922&ed=true&tc=apidocumentation_1to1_templatelink&ic=redheart_googledrive&t_image1_iid=https%3A%2F%2Fdrive.google.com%2Fuc%3Fid%3D1AYH4u8x4qWiCyaWMhdvvul9K5IHuPP2q&t_text1_txt=MOM&t_text1_txtclr=000000
```

For an explanation of each parameter and the possible values, reference this table.

| Parameter | Definition | Value | Required? |
|---|---|---|---|
| at | Your member account ID | 18 digit number | Yes |
| rf | Your Associate ID | 18 digit number | No |
| ax | Type of API request | "linkover" | Yes |
| pd | Your template's Product ID found in the URL of that template - e.g. https://www.zazzle.com/api_documentation_test_template_mug-168619482839304922 | 18 digit number | Yes |
| ed | Specifies whether or not the customer can customize the product. | true OR false | No |
| tc | This is a Tracking Code that you can define to track where your link was clicked from. Example: "MyBlog." Sales of products using tracking codes will appear in your referral history. https://www.zazzle.com/my/earnings/referralhistory | Up to 100 alphanumeric characters including underscores. Example "MyWebsite" | No |

| | | | |
|---|---|---|---|
| ic | This is an Image Code that you can define to track what image was used from your website. Purchased products with image tracking codes will show in your royalty history. https://www.zazzle.com/my/earnings/royaltyhistory | Up to 100 alphanumeric characters including underscores. Example "Golden_Gate_Bridge_001" | No |
| t_image1_iid | The URL for the first image object within your template. The default is image1 but yours may be different if you renamed it while setting up the template image object. Example: if you named it photo it would be t_photo_iid. | URL Encoded* link to the image being passed into the template image object. | Yes |
| t_image2_iid | The URL for the second image object within your template. The default is image2 but yours may be different if you renamed it while setting up the template image object. | URL Encoded* link to the image being passed into the template image object. | Yes |
| t_text1_txt | The text to place into the first text object within your template. The default is text1 but yours may be different if you renamed it while setting up the template text object. Example: if you named it name it would be t_name_txt. | Encoded* text | Yes |
| t_text2_txt | The text to place into the second text object within your template. The default is text2 but yours may be different if you renamed it while setting up the template text object. | Encoded* text | Yes |
| t_text1_txtclr | Text color assignment of the first text object within your template. | 6 digit hex color code. Example: 4169e1 | No |

Additional image and text parameter/value pairs can be added to support each object that is present in a template. If you do not change the names for each object, the automatic naming convention is to increment the number by 1 for each new parameter (e.g. text1, text2, text3, etc...).

*Figure 9*: Create-A-Product API Guide v3, pp. 7 – 8

-29-

**Like Zazzle's Create-A-Product API, Zazzle's "Personalize" Feature as Described in the Garrie Report Does Not Permit Users to Select Fonts Outside of Zazzle's Design Tool**

62.    The Garrie Report does not discuss Zazzle's "Personalize" feature in the main body of the Garrie Report; it is discussed only in footnotes, specifically footnote 26 on page 7 and footnote 54 on page 21. The Garrie Report does not specify what the Personalize feature is or otherwise define the term. The Garrie Report does not cite documentation for the Personalize feature. The Garrie Report states in Footnote 26, "The Personalize feature allows a user to enter text and images that will appear in predefined locations on a product with predefined settings (Size, Font, etc.) without entering the Design Tool. When a user enters text into the appropriate fields for the Personalize feature, product preview images on the page will dynamically update to display the text the user has entered on the product using the predefined locations and settings." The Garrie Report does not offer the opinion that Zazzle's "Personalize" feature permits users to select fonts outside of Zazzle's Design Tool. I agree that Zazzle's "Personalize" feature as described in the Garrie Report does not permit users to select fonts outside of Zazzle's Design Tool.

**Overview of the Garrie Report's Description of the Two Processes by Which Text is Rendered in Zazzle's Design Tool**

63.    Pages 14 – 35 of the Garrie Report describe (at times inaccurately) in some technical detail two different processes for rendering text in Zazzle's Design Tool. One of those processes is the process by which Zazzle's systems render arbitrary text inputted by a user, which may change with each such rendering, into Zazzle's Design Tool ("**Zazzle Arbitrary Text Rendering Process**"). The other of those processes is the process by which Zazzle's systems renders the name of a given font in the font selection menu, which does not change with each such request for a given font, of Zazzle's Design Tool ("**Zazzle Font Name Text Rendering Process**"). Page 19 of the Garrie Report describes (at times inaccurately) both of these processes, identifying first the Zazzle Font Name Text Rendering Process and second the Zazzle Arbitrary Text Rendering Process, in simplified terms: "In highly simplified terms, the general technical process by which fonts are displayed in the font menu and in a text object is as follows: every time

-30-

a user views a font in the font menu or applies a font to text in a text object, the Design Tool sends requests from the user's device to Zazzle's servers, which use the font software for the particular font to generate images of the requested text in that font. Zazzle's servers then send the images of the text in the selected font to the user's device and the images are displayed in the Design Tool."

**Opinions in the Garrie Report with Respect to Zazzle's Design Tool as Stated Apply to Only About 32% of the Time that the Blooming Elegant Trio Was Able to be Used on Zazzle's Web Site**

64.     Page 7 of the Garrie Report states, "The Blooming Elegant Trio of Fonts were available for users of the Design Tool to incorporate into any product or design created using the Design Tool from at least around October 2017 to at least around August 2022." Page 9 of the Garrie Report states that Mr. Garrie "analyzed the Software, Design Tool, deposition testimony from Zazzle's representatives, Zazzle's discovery responses, and other documents related to these topics to determine how fonts are currently generated within the Design Tool, which has not changed substantially since February of 2021, the time Client-Side Acceleration (CSA) released for the Zazzle mobile application."[21] The analysis in the Garrie Report with respect to Zazzle's Design Tool and the Blooming Elegant Trio therefore covers roughly February 2021 to August 2022, or about 19 months. The time period during which the Blooming Elegant Trio was available on Zazzle's web site covers roughly October 2017 to August 2022, or about 59 months. Therefore, the opinions in the Garrie Report with respect to Zazzle's Design Tool as stated apply to only about 32% of the time that the Blooming Elegant Trio was able to be used on Zazzle's web site.

**The Methodology in the Garrie Report is Flawed Because Data Relied upon in the Garrie Report that Could Have Been Preserved and Produced Was Not Preserved and Produced, and that Data's Provenance is Uncertain**

---

[21] There were also changes to Zazzle's systems in November 2018. Before then, rasterized images rather than images with vector path data were sent back to users' browsers that were accessing Zazzle's Design Tool. *See, e.g.*, Li Deposition at 133:3 – 136:10.

REBUTTAL EXPERT REPORT OF CHRISTOPHER RUCINSKI

65.    The Garrie Report depicts two copies of the same image in two undated, unlabeled, and non-numbered figures on pages 25 and 31 ("**Garrie Network Capture Figure**") for which the Garrie Report does not explain the provenance. The Garrie Report does not even state that the Garrie Network Capture Figure was created by Mr. Garrie or corresponds to Mr. Garrie's use of the Zazzle web site. The Garrie Network Capture Figure depicts a screenshot of what appears to be a network capture using Developer Tools in a modern browser such as Chrome or Firefox. The Garrie Network Capture Figure depicts only a part of the browser window and depicts only a very small portion of the data. I requested through Quinn Emanuel that Mr. Garrie produce "The file depicted in the images on pages 25 and 31." The response received from Plaintiff's counsel was that "The images on pages 25 and 31 are from reviewing data transmitted to the browser in the browser development tools; there is no associated file to provide as these were the packets stored in memory from using Zazzle's website with development tools active." I disagree. While it's true that normally data shown in the Developer Tools of a modern web browser is ephemeral, it can be saved as a file called a .har file that may be subsequently reopened in modern web browser's Developer Tools or other network analysis applications. In addition to making a small screenshot of a very limited portion of the data depicted in his web browser, Mr. Garrie could have simply saved a .har file at the end of his experiment but chose to not do so, even though he relied upon that data in the Garrie Report.

66.    In addition, just as Nicky Laatz[22] and Plaintiff's expert Stuart Sandler[23] produced videos depicting use of Zazzle's web site (some of which are cited in the Garrie Report), so too could Mr. Garrie have preserved and produced such a video corresponding to use of Zazzle's web site, but he chose not to.

**The Garrie Report is Correct that the Zazzle Arbitrary Text Rendering Process Sends Ephemeral SVG-Formatted Data to the Browser of a User of Zazzle's Design Tool; But is Incorrect that It Sends SVG Files**

---

[22] *See, e.g.*, LAATZ0508537, LAATZ0508538, LAATZ0508539.

[23] *See, e.g.*, SANDLER0000001, SANDLER0000002, and SANDLER0000003.

-32-

67.    Attached to this Report as **Exhibit D** ("**Design Tool Video**," or "**DTV**") and **Exhibit E** are a video depicting my use of Zazzle's web site using the Firefox web browser on October 20, 2024, and the corresponding network capture .har file created using Firefox's Developer Tools, respectively.

68.    In the DTV from 00:00 to 5:11, I demonstrate the Zazzle Arbitrary Text Rendering Process from the perspective of an end user, using the same "Ultra" font, font size of 86.40, and arbitrary text "abab," that the Garrie Report describes and depicts in part in the Garrie Network Capture Figure. DTV 1:49-2:48 shows data received by my web browser from the Zazzle web site. Figure 10 ("**DTV 2:26 Figure**") below is screenshot of the DTV at 2:26, and Figure 11 below is the Garrie Network Capture Figure, for comparison. The data received under the "glyphs" heading, partially depicted in the Garrie Network Capture Figure, matches exactly with the data received in the corresponding portions of the DTV 2:26 Figure.



*Figure 10*

REBUTTAL EXPERT REPORT OF CHRISTOPHER RUCINSKI

*Figure 11*

69.    The DTV 2:26 Figure depicts data formatted in the same way that data could be formatted in an SVG file,[24] but the DTV 2:26 Figure does not depict an SVG file being sent to my browser as part of the Zazzle Arbitrary Text Rendering Process. SVG files contain much more than just vector path data and in particular are also formatted using XML.[25] This is consistent with Jason Li's testimony stating a complete answer of ████ to the question ███████████ ████████████████████████████████████████████████████████ ████████"[26] This is also consistent with the Garrie Report, which asserts that data, that is formatted in the same way that data could be formatted in an SVG file,[27] is sent from Zazzle as part of the Zazzle Arbitrary Text Rendering Process but does not assert that actual SVG files are sent.[28]

---

[24] *See, e.g.*, https://developer.mozilla.org/en-US/docs/Web/SVG/Tutorial/Paths, last accessed on October 20, 2024.

[25] *See, e.g.*, https://developer.mozilla.org/en-US/docs/Web/SVG, last accessed on October 20, 2024, which states, "Scalable Vector Graphics (SVG) is an XML-based markup language for describing two-dimensional based vector graphics."

[26] *See, e.g.*, Li Deposition at 287:4-13.

[27] The Garrie Report repeatedly characterizes this data as "SVG data"; it never describes it as "SVG Software" or otherwise associate SVG with the word "software."

[28] The phrase "SVG data" appears many times in the Garrie Report, but there is one instance where the phrase "SVG image" appears, on page 28. To the extent the Garrie Report offers an opinion that Zazzle's web site sends SVG files to a user's browser as part of the Zazzle Arbitrary Text Rendering Process, I disagree.

-34-

**The Ephemeral SVG-Formatted Data that the Zazzle Arbitrary Text Rendering Process Sends to the Browser of a User of Zazzle's Design Tool is Not the Same Data as in the Corresponding OTF Files**

70.     Footnote 36 on page 11 of the Garrie Report states, "As discussed in Section III(C) below, Zazzle's servers converted vector graphics in OTF format into SVG (Scalable Vector Graphics) format as part of the operations that enabled users to render text in a particular font using the Design Tool." I disagree that the vector graphics data in OTF format are merely changed into SVG format as part of the Zazzle Arbitrary Text Rendering Process. The Zazzle Arbitrary Text Rendering Process actually transforms the vector graphics data in OTF format before it reaches the user's browser as part of the Zazzle Arbitrary Text Rendering Process.

71.     If the ephemeral SVG-formatted data that the Zazzle Arbitrary Text Rendering Process sends to the browser of a user of Zazzle's Design Tool were the same data as in the corresponding OTF files,[29] then the ephemeral SVG-formatted data received by the user's browser would be the same for different sizes of the same font, but the DTV shows that's not the case. DTV 1:23-4:13 depicts using Zazzle's Design Tool to display "abab" in the Ultra font at sizes 86.40 and 20. The path data for the glyphs "a" and "b" differ between sizes 86.40 and 20.

**From a Practical Perspective, the Font Rendering Capabilities Provided by Zazzle's Design Tool Differ Substantially from the Font Rendering Capabilities of a Font File Available for Use on a User's Local Computer**

72.     Pages 36 – 37 of the Garrie Report state, "For instance, if a user selected 'Blooming Elegant' from the font menu to write 'Happy Birthday,' Zazzle's servers used the Software to create SVG data for 'Happy Birthday' in the Blooming Elegant Font." Page 37 of the Garrie Report states, "From a practical perspective and from a user's perspective, the outcome of the process summarized above is effectively the same as a user directly obtaining a copy of the

---

[29] OTF files do not contain vector information for all possible font sizes; one advantage of vector path data over pixel-specific data is that one instance of it can be scaled up or down to different sizes without introducing pixelation.

-35-

Software, installing it on their computer, and having the option to use it to generate text in the Blooming Elegant Trio of Fonts within a design tool, such as Adobe Illustrator or CorelDRAW. The main difference is that the user's actions within the Design Tool trigger Zazzle's servers to use the Software, but the result (i.e. rendering text in the Blooming Elegant Trio of Fonts within a design tool on the user's computer) is effectively the same as a user's computer using a locally installed copy of the Software." I disagree.

73.    When the contents of a font file such as an OTF font file are available for use on a local computer, a user of that computer may use the corresponding font in arbitrary applications such as word processors like Microsoft Word. Suppose a user manually typed a 20-page document in Microsoft Word with a font that corresponded to an OTF font file available for use on the user's computer. In order to do so, the user would type the letters on their keyboard, and the corresponding letters would essentially instantaneously appear in the Microsoft Word document. Microsoft Word would automatically handle line breaks as the user typed. Microsoft Word would align the rows of text according to paragraph spacing, and the user could shift paragraphs to the left or right with the click of a button. The same tasks would be incredibly cumbersome using the procedure that the Garrie Report proposes, consisting of rendering text in a font using Zazzle's web site. In order to compose the same 20-page document in the above example, one would have to type in small sections of text into Zazzle's Design Tool, take a screenshot for each small section, which would likely number in the hundreds for a 20-page document, and then compose the screenshots so they all aligned correctly. Further formatting changes would not be as simple as clicking a button in Microsoft Word or allowing Microsoft Word to automatically handle line breaks. Such formatting changes would be much more difficult since they would require adjusting each of the hundreds of screenshots.

74.    As another example, when the contents of a font file such as an OTF font file are available for use on a web server that hosts a web site, a programmer of a web site can easily select the font with which to automatically render various text on the web site. This same task would be incredibly cumbersome using the procedure that the Garrie Report proposes, consisting of rendering text in a font using Zazzle's web site. In order to apply a font to all the text in the web

site in the example above using the procedure that the Garrie Report proposes, a programmer would have to type in small sections of text into Zazzle's Design Tool, take a screenshot for each small section, which would likely number in the thousands, and then compose the screenshots so they all aligned correctly on the web site. Additionally, if it is possible for a user of a web site to generate arbitrary text that would be displayed on the web site (*e.g.*, text for a forum post or a comment) it would not be possible to display such arbitrary text in a particular font without the contents of a font file such as an OTF font file available on the web site's web server. Attempting to do this by rendering text in a font using Zazzle's web site would not be possible because a web site user's forum post or comment would not be known in advance by the programmer of the web site.

75. Additionally, the SVG-formatted data at issue with respect to Zazzle's Design Tool relates to only the individual glyphs requested by the user. Font files contain additional data used for rendering fonts such as individual glyph spacing, kerning for specific glyph pairs, and ligatures. The SVG-formatted data at issue with respect to Zazzle's Design Tool is not equivalent to the data in a font file.

**The Zazzle Font Name Text Rendering Process Sends Cached Rasterized Font Name Images to a User's Browser, Rather Than Inefficiently Generating the Same Exact Image from Font Files in Response to Every Request from a User's Browser**

76. From 1:24-2:00, The DTV depicts the arbitrary text "abab" being input into Zazzle's Design Tool and rendered in the Ultra font with a size of 86.40. 1:54 of the DTV depicts the part of the HTTP request that results in the vector path glyph data being sent to the user's browser. That HTTP request is sent to https://www.zazzle.com/rlv/svc/edit?output=js. In the DTV, every time new arbitrary text needs to be rendered in a different font or a different size of a font, a new HTTP request is sent to https://www.zazzle.com/rlv/svc/edit?output=js in order to employ the Zazzle Arbitrary Text Rendering Process, which returns vector path glyph data to the browser for the arbitrary text. 2:00 in the DTV depicts part of the response from Zazzle's server, and it comes

-37-
REBUTTAL EXPERT REPORT OF CHRISTOPHER RUCINSKI

from the Zazzle server with a host name of "dzn10-008.prod.zazzle.com." "dzn" refers to Zazzle's design servers.[30]

77. From 5:12-5:26, the DTV depicts displaying new font names in the font selection part of the Zazzle Design Tool, and no new fonts are actually selected during this time. This depicts part of the Zazzle Font Name Text Rendering Process, and because the DTV shows that no HTTP requests to https://www.zazzle.com/rlv/svc/edit?output=js are made during this time, no vector path glyph data is sent to the user's browser during this time. 5:35-5:58 of the DTV shows parts of some of the HTTP requests and responses that occurred to display font names, which are not arbitrary and do not change over time, during 5:12-5:26 of the DTV. The Yuji font name is one such font name that was displayed, and 5:54 of the DTV shows the PNG image depicting the Yuji font name. PNG images are not vector images; they are rasterized images.[31] The corresponding HTTP request for the Yuji font name is shown at 5:57 in the DTV, and that HTTP request was sent to https://rlv.zcache.com/svc/view?areacolor=false&content_padding=0.03&csa=true&image_type=png&pdt=zazzle_print&rvtype=content&t__smart=1&t_text0=Yuji&t_text0_fface=Yuji Syuku&vheight=40&view_objects=covertext&vwidth=128 ("**Yuji Font Name Cache URL**").

78. The word "cache" appears in the above URL in its domain, "zcache," and this indicates that caching is involved in returning from Zazzle's servers the rasterized PNG image of a font name as part of the Zazzle Font Name Text Rendering Process. Caching is a mechanism by which web sites can save on web servers (in this case, controlled by Zazzle) copies of static or dynamically generated resources, in this case a rasterized image, and send copies of that saved resource to browsers rather than having to dynamically generate it each time. This decreases web

---

[30] *See, e.g.*, Li Deposition at 122:9-124:6.

[31] *See, e.g.*, https://www.w3.org/TR/2003/REC-PNG-20031110/, last accessed on October 21, 2024, which states, "This document describes PNG (Portable Network Graphics), an extensible file format for the lossless, portable, well-compressed storage of raster images."

REBUTTAL EXPERT REPORT OF CHRISTOPHER RUCINSKI

site response times and reduces the amount of computation necessary to serve web site resources.[32]

79.    Zazzle employs caching by using the CDN[33] known as Fastly.[34] The domain of the Yuji Font Name Cache URL, rlv.zcache.com, is an alias for a domain controlled by Fastly: prod.zazzle.map.fastly.net. This is shown in the DNS records for rlv.zcache.com, as depicted in Figure 12 below, which shows that the rlv.zcache.com domain is associated with prod.zazzle.map.fastly.net on the basis of its CNAME record.[35]

---

[32] *See, e.g.*, https://aws.amazon.com/caching/, last accessed on October 21, 2024, which states, "Caching allows you to efficiently reuse previously retrieved or computed data," "Cached information can include the results of database queries, computationally intensive calculations, API requests/responses and web artifacts such as HTML, JavaScript, and image files.," and "Caching helps applications perform dramatically faster and cost significantly less at scale."

[33] Content Distribution Network.

[34] *See, e.g.*, https://www.fastly.com/products/cdn.

[35] *See, e.g.*, https://www.cloudflare.com/learning/dns/dns-records/dns-cname-record/, last accessed on October 22, 2024, which states, "A 'canonical name' (CNAME) record points from an alias domain to a 'canonical' domain."

-39-

*Figure 12*[36]

80.    Cache-related header information returned from rlv.zcache.com in the response to accessing the Yuji Font Name Cache URL is depicted at 6:00 in the DTV. One such header returned from rlv.zcache.com is "cache-control,"[37] which sets a "max-age" of 3196800 seconds, which is 37 days. This means that this particular image may be cached for 37 days after creation

---

[36] This is a screenshot of https://www.nslookup.io/domains/rlv.zcache.com/dns-records/#google as it appeared on October 22, 2024.

[37] *See, e.g.*, https://www.fastly.com/documentation/guides/concepts/edge-state/cache/cache-freshness/, last accessed October 22, 2024, which states, "The most common (and best practice) means of controlling cache lifetime is by setting an appropriate Cache-Control header on a backend response. When a response is received from a backend, the readthrough cache interface parses relevant response headers to determine whether it can be cached, and for how long."

before it should be generated again, and before that time it will be served from cache rather than generated each time it is requested by a user's browser. Another such header returned from rlv.zcache.com is "expires," which is set to a specific time on "Wed, 13 Nov 2024," which indicates when this particular cache expires and when this specific "Yuji" font name image should be generated again. I have no reason to believe that a cache duration of 37 days is not representative for font name images served to users as part of the Zazzle Font Name Text Rendering Process, and such a cache duration, when applied to millions of image requests across many users, is consistent with a substantial reduction of several orders of magnitude in the number of times a font name image would need to be freshly generated when using Fastly caching, as advertised by Fastly:



*Figure 13*[38]

81.     In describing the Zazzle Font Name Text Rendering Process, page 27 of the Garrie Report states, "Thus, each time a user views a font name in the font menu of the Design Tool, the RLV server clusters, through the chain of events described above, use the font software for the corresponding font to generate an image of the font name and send that image to the user's device." I disagree. This description in the Garrie Report is incorrect, and the Garrie Report does not address Zazzle's caching on servers that Zazzle controls of rasterized PNG images of a font names as part of the Zazzle Font Name Text Rendering Process. Font name images are not generated every time they are requested by a user of Zazzle's Design Tool. The overwhelming

---

[38] This is a screenshot from https://www.fastly.com/blog/let-the-edge-work-for-you-how-shielding-improves-performance/ as it appeared on October 22, 2024.

REBUTTAL EXPERT REPORT OF CHRISTOPHER RUCINSKI

majority of the time, no newly generated image is necessary, and therefore is not generated, because a cached image for the font name is used instead.

**The Garrie Report's Description of "Caching" in the Zazzle Font Name Text Rendering Process is Limited to Caching Associated with a User's Browser, Which is a Different Process Entirely, that Zazzle Does Not Control**

82.    Page 27 of the Garrie Report states, "The Design Tool receives the rasterized image of the font name in the typeface of the requested font and caches the rasterized image on the user's device. Caching the rasterized image means that the rasterized image is temporarily stored on the user's device." This statement in the Garrie Report includes footnote 83, which cites to Defendant Zazzle Inc.'s Responses and Objections to Plaintiff Nicky Laatz's Interrogatories, Set Two (Aug. 5, 2024), Interrogatory Nos. 19, 20, and 21 ("**Zazzle's Rog Response 19, 20, and 21**"). Zazzle's Rog Response 19, 20, and 21 does not state that Zazzle's Design Tool affirmatively performs caching on a user's device. Rather, Zazzle's Rog Response 19, 20, and 21 states that, ██

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████ (emphasis added). Caching in a user's web browser is controlled by the user's web browser according to the settings of the user's web browser, which the user controls. Modern web browsers may perform caching of any images or other resources they receive from web servers. Caching an image or file in a user's web browser is not the same as a user downloading that image or file for general use. Such a cached image or file is temporarily stored on the user's device explicitly for the browser's use and is removed from the user's device when the browser's cache is cleared.

**The Garrie Report Mischaracterizes the Manner in Which Rasterized PNG Images for Font Names Are Specified as Part of the Zazzle Font Name Text Rendering Process**

83.    Page 22 of the Garrie Report states as part of its description of the Zazzle Font Name Text Rendering Process, "The API request contains parameters for the image of the font name as it is to appear in the font menu, such as the text of the font name, the glyphs of the

requested font, the size of the font, etc." I disagree. Footnote 56 in the Garrie Report provides an example of the URL-based API request described in this quotation, which is (emphasis added): "https://rlv.**zcache**.com/svc/view?areacolor=false&content_padding=0.03&csa=true&**image_type =png**&pdt=zazzle_print&rvtype=content&t__smart=1&**t_text0=Morgana&t_text0_fface=Morg ana&vheight=40**&view_objects=covertext&**vwidth=128**." "zcache" in this URL refers to the server-side caching that Zazzle systems perform as described earlier. "image_type=png" refers to the type of image to be returned, in this case a PNG image, which is a rasterized image format. "t_text0=Morgana" refers to the *text* to be returned. The opinion in the Garrie Report on this page incorrectly states that "the glyphs of the requested font" are specified in this API request. That is not the case; only text is specified. Each character of text, *e.g.*, "a," may have multiple visual representations of it specified within a font, referred to as glyphs, and there is not a mechanism in this API request for glyphs to be specified. "t_text0_fface=Morgana" in the above URL refers to the Morgana font. "vheight=40" and "vwidth=128" in the above URL refer to height and width parameters, but they do not include the "size of the font," *e.g.*, 20pt., as stated in the opinion in the Garrie Report on this page.

**The Garrie Report's Opinion That "ZIG Converts the Vector Graphic Instructions Obtained from the Font Software Into Scalable Vector Graphics (SVG) Format Pursuant to the Parameters of the API Request" is Unsupported**

84.    Page 24 of the Garrie Report states, as part of its description of the Zazzle Font Name Text Rendering Process, "ZIG converts the vector graphic instructions obtained from the font software into Scalable Vector Graphics (SVG) format pursuant to the parameters of the API request." The Garrie Report includes footnote 69 to support this opinion, which states, "It is reasonable to conclude that the vector graphic instructions are converted into Scalable Vector Graphics (SVG) format to render a rasterized image, as this also occurs when preparing vector paths" and cites to the Li Deposition at 240:23 – 241:7. This section of the Li Deposition does not correspond to the Zazzle Font Name Text Rendering Process, and the Garrie Report does not provide support for the conclusion that "the vector graphic instructions are converted into Scalable

REBUTTAL EXPERT REPORT OF CHRISTOPHER RUCINSKI

CONFIDENTIAL

Vector Graphics (SVG) format to render a rasterized image, as this also occurs when preparing

vector paths" beyond the unsupported statement that such a conclusion is reasonable.

**The Following Definitive Opinion in the Garrie Report is Not Sufficiently Supported: "ZIG**

**and the Microsoft DirectWrite Library Are Stored on the RLV Server Cluster, Along with**

**the Font Software Used to Generate Each Font Available in the Design Tool."**

85.     Page 22 of the Garrie Report states the following definitive opinion, which is not

sufficiently supported in the Garrie Report: "ZIG and the Microsoft DirectWrite library are stored

on the RLV server cluster, along with the font software used to generate each font available in the

Design Tool." Footnote 59 of the Garrie Report corresponds to this opinion, and it cites the Li

Deposition at 240:23-241:3 as well as footnotes 54 and 57. Footnote 57 of the Garrie Report cites

the Li Deposition at 239:23-240:12. Footnote 54 of the Garrie Report cites the Li Deposition at

154:18-156:15, 240:8-9, and 240:23-241[sic].[39] The full citation in the Garrie Report to support

this opinion is thus the Li Deposition 154:18-156:15, 239:23-240:12, and 240:23-241:25. In

154:18-156:15, Jason Li testifies that ███████████████████████████

███████████████████████████████████████  In 239:23-240:12, Jason Li

testifies that █████████████████████████████████████

██████████████████████████████  Jason Li does not definitively

state in any of this testimony that the RLV server cluster stores (1) ZIG, (2) the Microsoft

DirectWrite Library, and (3) OTF font files.

**I Disagree with the Garrie Report's Characterization that Microsoft DirectWrite Returns**

**"Instructions" to ZIG**

86.     Page 23 of the Garrie Report states, "The Microsoft DirectWrite library returns to

ZIG the instructions to display the font name of the requested font in the typeface of the requested

font." I disagree. This statement in the Garrie Report cites 131:18-132:16 of the Li Deposition in

---

[39] I assume, conservatively, for the purpose of this Report, that this citation to page 241 of the Li

Deposition, which is missing a line number, refers to the final line of page 241 of the Li

Deposition.

REBUTTAL EXPERT REPORT OF CHRISTOPHER RUCINSKI

CONFIDENTIAL

footnote 67, where Jason Li testifies that ███████████████████████████ ███████████████████████████████ (emphasis added). The Garrie Report cites nothing else to support its opinion that the Microsoft DirectWrite library returns *instructions*, and the Garrie Report does not provide an example of what the Microsoft DirectWrite library returns. It is therefore most accurate to refer to what is returned by the Microsoft DirectWrite library as "data/information."

**I Disagree with the Garrie Report's Characterization that ZIG Converts the Vector Graphic Instructions Obtained from the Font Software into Scalable Vector Graphics (SVG) Format Pursuant to the Parameters of the API Request**

87. Page 24 of the Garrie Report states, "ZIG converts the vector graphic instructions obtained from the font software into Scalable Vector Graphics (SVG) format pursuant to the parameters of the API request." I disagree. As explained in the previous section, and as the Garrie Report also describes on page 23, ZIG does not obtain anything from OTF files, which the Garrie Report characterizes as "font software." Rather, ZIG directly interfaces with Microsoft DirectWrite. As explained in the previous section, what ZIG receives from Microsoft DirectWrite is most accurately described as "data/information" rather than "instructions."

88. Page 24 of the Garrie Report goes on to state, "In the case of the Blooming Elegant Trio of Fonts, for example, ZIG would convert the vector graphic instructions from OTF format into SVG format. As with OTF files, SVG data contains mathematical formulas that instruct computers or mobile devices how to render images, such as the glyphs that make up a piece of text in a particular font." I disagree for the same reasons.

**The Garrie Report Does Not Show or Purport to Show How Certain Components of the Blooming Elegant OTF Files are Accessed by Users of Zazzle's Design Tool**

89. Page 24 of the Garrie Report states, "In the case of the Blooming Elegant Trio of Fonts, for example, ZIG would convert the vector graphic instructions from OTF format into SVG format. As with OTF files, SVG data contains mathematical formulas that instruct computers or mobile devices how to render images, such as the glyphs that make up a piece of text in a particular font." The Garrie Report does not show or purport to show how certain components of

-45-

REBUTTAL EXPERT REPORT OF CHRISTOPHER RUCINSKI

the Blooming Elegant OTF Files are accessed by users of Zazzle's Design Tool. For example, in the Nicky Laatz Declaration at paragraphs 9 and 10 Nicky Laatz identifies the "on-curve" and "off-curve" reference points she used to create the Blooming Elegant Trio, stating that "The 'on-curve' reference points indicate fixed points for each character/glyph, and the 'off-curve' reference points dictate the shape and location of the curve between the 'on-curve' reference points." Separate and apart from describing the data that could be used to render specific glyphs, the Nicky Laatz Declaration goes on to describe, "cap height, letter spacing, ascender height, and descender height" that determine "how the characters/glyphs should appear next to each other" in the Blooming Elegant Trio. Separate and apart from describing the data that could be used to render specific glyphs, the Nicky Laatz Declaration goes on to describe, "custom code that FontLab incorporated into the final packaged software for the Blooming Elegant Trio of fonts that implemented ligatures and stylistic alternate letters for the fonts." The Garrie Report does not show or purport to show how information related to the cap height, letter spacing, ascender height, descender height, supported ligatures, and supported stylistic alternatives of the Blooming Elegant OTF Files are accessed by users of Zazzle's Design Tool.

**The Garrie Report Mischaracterizes the Zazzle Font Name Text Rendering Process by Equating it to the Zazzle Arbitrary Text Rendering Process**

90.    On page 24 as part of its description of the Zazzle *Font Name* Text Rendering Process, the Garrie Report states, "Below is an example of SVG data used to display the characters 'a' and 'b' in the Ultra font." The example shown is the Garrie Network Capture Figure. As described earlier, the Garrie Network Capture Figure contains the same information depicted in the DTV video I created when demonstrating the Zazzle Arbitrary *Text Rendering* Process. As described earlier, the call to https://www.zazzle.com/rlv/svc/edit?output=js, as partially depicted in the Garrie Network Capture Figure, *does not occur* as part of the Zazzle *Font Name* Text Rendering Process, but the Garrie Report includes it in its description of that process. If the Garrie Network Capture Figure were to apply to the Zazzle Font Name Text Rendering Process (which it does not), then for the Ultra font it would depict not the characters "a" and "b" as it actually does, but the characters "U," "l," "t," "r," and "a" used to display the name of the Ultra font.

REBUTTAL EXPERT REPORT OF CHRISTOPHER RUCINSKI

**The Garrie Report Does Not Opine that Zazzle Should Have Implemented a Third-Party Tool for Logging API Requests, and There Are Possible Reasons Why Zazzle Would Not Have Done So**

91.    Page 35 of the Garrie Report states, "For example, Zazzle *could* have implemented a third-party tool for logging API requests like Loggly but did not" (emphasis added). The Garrie Report does not offer the opinion that Zazzle *should* or *reasonably* could have done this. Keeping detailed logs can be burdensome for companies both in terms of logistics and in terms of the cost of data storage. In my experience I have commonly seen companies store detailed data for as little as 30 days before it is destroyed. There are also enhanced data privacy risks that companies take on when storing user data for longer than is strictly necessary for business purposes.

**The Garrie Report's Description of the Alleged Lack of Technical Controls Employed by Zazzle, to the Extent it is Accurate, Also Accurately Describes the Same Lack of Technical Controls Employed by Nicky Laatz's Web Site**

92.    Page 32 of the Garrie Report states, "There are no technical controls in the Design Tool to prevent users from extracting images of text in a particular font and potentially using the font images in other contexts. In fact, Zazzle enables users with a Zazzle account to download images of their designs, which could include images of font glyphs. During the time the Blooming Elegant Trio of Fonts were available in the Design Tool, even users without a Zazzle account were able to download images of their designs." The Garrie Report goes on to cite LAATZ0508537 and LAATZ0508539, which are videos produced by Nicky Laatz that depict a user taking screenshots of rendered glyphs on Zazzle's web site, opening those images in an image editing program, and moving around individual isolated characters in the image editing program.

93.    **Exhibit F** ("**Nickylaatz.com Font Capture Video**") attached to this Report is a video I created on October 20, 2024, that corresponds to LAATZ0508539. Whereas LAATZ0508539 shows taking a screenshot of "a b c d" of glyphs in the Blooming Elegant font on Zazzle's web site, the Nickylaatz.com Font Capture Video shows taking a screenshot of "a b c d" of glyphs in the Blooming Elegant font from nickylaatz.com. Whereas LAATZ0508539 shows using the paid program Adobe Photoshop to isolate and move around the "a" glyph from the

-47-

CONFIDENTIAL

previously taken screenshot, the Nickylaatz.com Font Capture Video shows using the free program GNU Image Manipulation Program[40] to isolate and move around the "a" glyph from the previously taken screenshot. Figure 14 and 15 below depict the final result of LAATZ0508539 and the Nickylaatz.com Font Capture Video respectively.



*Figure 14*: LAATZ0508539 at 1:23



*Figure 15*: Nickylaatz.com Font Capture Video at 1:47

**The Garrie Report Overstates the Number of Unique Designs Created in Zazzle's Design Tool in Which the Blooming Elegant Trio of Fonts Were Used**

94.     Page 38 of the Garrie Report states, ███████ represents the minimum number of users who created or customized at least one design in the Design Tool, and ███████ represents the minimum number of unique designs created in the Design Tool in which the Blooming Elegant Trio of Fonts were used, though the actual numbers for both are likely significantly higher." But Defendant Zazzle Inc.'s Amended Responses and Objections to Plaintiff Nicky Laatz's Interrogatories (July 3, 2024), Response to Interrogatory No. 12, which the Garrie Report cites in support of this assertion, states that ███████ is the number of "unique products depicting the Blooming Elegant typefaces sold at any time," not the number of unique designs created in the

---

[40] *See, e.g.*, https://www.gimp.org/.

-48-

CONFIDENTIAL

Design Tool. The Garrie Report incorrectly ignores another of Zazzle's responses in that same document, to Interrogatory No. 5, which asks Zazzle to identify the number of *designs* displayed related to the Blooming Elegant Trio, and Zazzle responds by identifying ████████ as the number of "designs depicting the Blooming Elegant typefaces that were ever displayed on a web browser or in Zazzle's mobile application to any Zazzle visitor or user at any time, including published designs publicly viewable in Zazzle's marketplace and private designs viewable only to the user that created or customized it." By confusing products and designs, the Garrie Report overstates the number of unique designs created in Zazzle's Design Tool in which the Blooming Elegant Trio Fonts were used by more than 70% and more than one million.

**To the Extent the Garrie Report Offers the Opinion That a User Merely Accessing Zazzle's Design Tool Constitutes That User Accessing a Given Font, I Disagree**

95.    Page 40 of the Garrie Report states, "By loading the Blooming Elegant Trio digital content, including the Software, onto more than 100 of its servers, Zazzle gave at least 9,706,337 unlicensed users *the ability to choose and access* the Blooming Elegant Trio of Fonts on Zazzle's website and in its the Design Tool" (emphasis mine). The "ability to choose and access" is not the same as actually accessing. As the Garrie Report describes,[41] and as I have addressed earlier in this Report, the Zazzle Font Name Text Rendering Process for a given font name occurs only after a user scrolls to the location of the corresponding font name in the font selection menu of the Zazzle Design Tool, and the Zazzle Arbitrary Text Rendering Process occurs only after a user selects a font name in which to display arbitrary text. To the extent the Garrie Report offers the opinion that a user merely accessing Zazzle's Design Tool constitutes that user accessing a given font, I disagree.

**I Disagree with Other Statements and Opinions in the Garrie Report**

96.    I disagree with other statements and opinions in the Garrie Report as explained in the following paragraphs of this section.

---

[41] *See, e.g.*, Garrie Report at page 27: "The process outlined above occurs every time a user scrolls to a given font in the font menu of the Design Tool."

REBUTTAL EXPERT REPORT OF CHRISTOPHER RUCINSKI

97.     Page 6 of the Garrie Report states, "By loading Blooming Elegant Trio digital content, including the Software, onto its shared drives and servers, Zazzle enabled the Blooming Elegant Trio of Fonts to be accessible and usable on Zazzle's website and mobile design tools, as described below." To the extent the Garrie Report offers the opinion that merely loading the Blooming Elegant OTF Files onto Zazzle's shared drives and servers, Zazzle enabled access to the Blooming Elegant OTF Files or use of the Blooming Elegant Trio to others outside Zazzle through Zazzle's web site and mobile app, I disagree. See, *e.g.*, Li Deposition at 153:24-154:16. In response to the question, ███████████████████████████████████████ ████████████████████████████████ Jason Li's answer begins with, ██████ ██████ and he explains that at least one other step is necessary, updating ██████████ ████████████████████████████████████.

98.     Page 6 of the Garrie Report states, "Put another way, *but for* Zazzle loading the Blooming Elegant Trio digital content, including the Software, onto Zazzle's systems, *Zazzle would not have been able* to give unlicensed users access to the Blooming Elegant Trio of Fonts on Zazzle's website and in its Zazzle's Design Tool" (emphasis added). I disagree. There are many ways other than loading the Blooming Elegant OTF Files onto its systems that Zazzle would have been able to make the Blooming Elegant OTF Files or use of the Blooming Elegant Trio available in Zazzle's Design Tool but did not. Zazzle would have been able to upload the Blooming Elegant OTF Files to a cloud hosted services such as Dropbox,[42] Box,[43] AWS,[44] or Azure[45] and then reference the cloud-hosted location of the Blooming Elegant OTF Files in Zazzle's Design Tool. Zazzle would have been able to upload the Blooming Elegant OTF Files using a peer-to-peer file sharing service such as BitTorrent[46] and then reference the peer-to-peer-

[42] *See, e.g.*, https://dropbox.com/.

[43] *See, e.g.*, https://box.com/.

[44] *See, e.g.*, https://aws.amazon.com/.

[45] *See, e.g.*, https://azure.microsoft.com/en-us/pricing/purchase-options/azure-account.

[46] *See, e.g.*, https://www.bittorrent.com/.

-50-

hosted location of the Blooming Elegant OTF Files in Zazzle's Design Tool. To the extent additional software development was necessary to implement other options like these, Zazzle, being a company that developed and maintained its web site, would have been able to develop its web site further in order to implement these options. Zazzle, of course, did none of those things.

### Further Work with Respect to the Morgana Font

99.    I understand from Quinn Emanuel that Nicky Laatz has objected to Zazzle's use of the font known as "Morgana" as a replacement on Zazzle's web site for the Blooming Elegant script font. I understand from Quinn Emanuel that Nicky Laatz has not substantiated her claim related to its objection to Zazzle's use of the font known as "Morgana" as a replacement on Zazzle's web site for Blooming Elegant. The Garrie Report mentions and/or depicts the Morgana font on pages 18, 19, 22, 33, and 34 but the Garrie Report does not substantiate, or even mention, this claim. The Garrie Report does not compare the Morgana font or related font files to Blooming Elegant or related font files in any way. If Nicky Laatz should substantiate this claim in the future, including but not limited to by way of expert opinions offered by Mr. Garrie or other experts, I explicitly reserve the right to respond to it.

### Supplementation and Further Work

100.    I may prepare visual aids to demonstrate various aspects of my testimony at trial or at hearings. I reserve the right to supplement my opinions in this Report in response to new documents or information or if the parties in this Litigation or other parties related to this Litigation assert additional claims or produce new materials, expert reports, or testimony or if Court decisions require me to clarify or provide additional support for my opinions.

Date: October 22, 2024

_____
Christopher Rucinski