# EXHIBIT 10

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

------------------------------------
                                    )
NICKY LAATZ,                        )
                                    )
          Plaintiff                 )
                                    )
vs.                                 ) C.A. No.
                                    ) 5:22-CV-04844-
ZAZZLE INC. and MOHAMED ALKHATIB,   ) BLF-VKD
                                    )
          DEFENDANTS                )
                                    )
------------------------------------

VIDEOTAPED DEPOSITION OF

CHRISTOPHER T. RUCINSKI

TUESDAY, NOVEMBER 12, 2024

9:18 A.M. - 6:31 P.M.

VERITEXT LEGAL SERVICES

101 ARCH STREET

BOSTON, MASSACHUSETTS

REPORTED BY:  Sandra A. Deschaine, CSR, RPR,
CLR, RSA
Job No. 7007220

Page 1

APPEARANCES:


ON BEHALF OF THE PLAINTIFF:

BARTKO LLP

    Stephen Steinberg, Esquire

    1100 Sansome Street

    San Francisco, California 94111

    925.457.0353

    sstein@barkkolaw.com


ON BEHALF OF DEFENDANTS AND THE WITNESS:

QUINN EMANUEL URQUHART & SULLIVAN LLP

    Daniel Posner, Esquire

    Miranda Hulka, Esquire (via Zoom)

    865 S. Figueroa, 10th Floor

    Los Angeles, California 90017

    213.443.3000

    danposner@quinnemanuel.com

    mirandahulka@quinnemanuel.com


Also Present:  Jake Before, videographer

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
                     INDEX
EXAMINATION                                    PAGE
Christopher T. Rucinski
   By Mr. Steinberg ..................... 6

EXHIBITS
Exhibit          Description                   Page
Exhibit 270      Bates number                  72
                 RUCINSKI0000002,
                 Invoices
Exhibit 271      Bates number                  98
                 RUCINSKI0000002,
                 Invoices
Exhibit 272      Expert Report of              110
                 Christopher Rucinski

Exhibit 273      101 - Definitions             174

Exhibit 274      Compendium:  Chapter          176
                 700, Literary Works
Exhibit 275      Compendium 1000,              206
                 Websites and Website
                 Content
Exhibit 276      Rebuttal Expert Report        226
                 of Christopher Rucinski

Exhibit 277      What is an API                266
                 (application programming
                 interface)?,

Exhibit 278      The Type 2 Charstring         279
                 Format, Technical Note
                 #5177
```

Page 3

November 12, 2024

9:018 a.m.

Videotaped deposition of Christopher T. Rucinski, held at Veritext, 101 Arch Street, Boston, Massachusetts, pursuant to Notice, before Sandra A. Deschaine, a Shorthand Reporter, Registered Professional Reporter, Certified LiveNote Reporter, and Notary Public in and for the Commonwealth of Massachusetts.

Page 4

P R O C E E D I N G S

THE VIDEOGRAPHER:  Good morning. We are going on the record at 9:18 a.m. on November 12, 2024.  This is Media Unit 1 of the video-recorded deposition 09:18 AM of Chris Rucinski taken by counsel for plaintiff in the matter of Nicky Laatz versus Zazzle, Inc., et al. filed in United States District Court, in the Northern District of California, San 09:18 AM Jose Division, Case Number 5:22-cv-04844-BLF.  The location of this deposition is Boston, Massachusetts.

My name is Jake Before representing Veritext and I'm the 09:18 AM videographer.  The court reporter is Sandy Deschaine from the firm of Veritext.

Counsel and all present, including remotely, will now state their 09:18 AM appearances and affiliations for the record, beginning with the noticing attorney.

MR. STEINBERG:  Yes.  This is Steve Steinberg from Bartko LLP 09:18 AM

Page 5

representing the plaintiff; and also on the Zoom I believe is Michael Mann and Dean Corn from Law & Forensics, who are experts in the case, or I should say they're assisting one of the testifying experts in the case.

MR. POSNER:  This is Dan Posner for the Defendant Zazzle.  I believe on the Zoom line is my colleague Miranda Hulka.

THE VIDEOGRAPHER:  Will the court reporter please swear in the witness and we can proceed.

CHRISTOPHER T. RUCINSKI, Deponent, having first been satisfactorily identified by the production of his Massachusetts driver's license and duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION

BY MR. STEINBERG:

Q.   Good morning, Mr. Rucinski.

A.   Good morning.

Q.   Did I say your name properly?

A.   Rucinski, yes, that's correct.

Page 6

undergraduate degree in computer science.  I

graduated cum laude from Princeton.  I did

not get a master's degree.

I do have some training classes

that I've attended since college; a couple          09:21 AM

forensics courses, for which I got a

certification; and I've done some training

with a CopyrightX course, which --

THE STENOGRAPHER:  X?

A.   CopyrightX, like the letter,             09:22 AM

course, which was affiliated with Harvard Law

School.

I think there's a couple other

trainings like that on my CV, which I don't

have in front of me, but I'm sure you have a        09:22 AM

copy somewhere.

BY MR. STEINBERG:

Q.   Was any of your coursework at

Princeton relevant to your work in this case?

A.   Yes.                                     09:22 AM

Q.   Like what?

A.   All of my computer science

coursework was relevant to this case.

Q.   Did you do any coursework related

to fonts?                                           09:22 AM

Page 9

A.    I don't think any of the specific courses that I took related to fonts directly.  They may have come up in passing in some of the courses.

Q.    Did any of your coursework relate    09:22 AM to font software?

A.    Will you define what you mean by "font software"?

Q.    You've never heard that phrase before?    09:22 AM

A.    I've seen it come up in this case quite a bit.

Q.    Okay.  Do you consider software that generates fonts to be software?

MR. POSNER:  Objection, vague.    09:23 AM

A.    Will you define what you mean by "generates"?

BY MR. STEINBERG:

Q.    Why don't we ask this.  What would you consider an OTF file to be?    09:23 AM

MR. POSNER:  Objection, vague.

A.    An OTF is a font file, is how I would describe it.

BY MR. STEINBERG:

Q.    Okay.  Did any of your coursework    09:23 AM

Page 10

relate to working with OTF files?

MR. POSNER:  Objection, vague.

A.    I don't recall interacting with OTF files directly, but if I had to use a font for a website or something like that, I   09:23 AM may have interacted with one.

BY MR. STEINBERG:

Q.    Did any of your coursework relate to VFJ files?

MR. POSNER:  Objection, vague.   09:23 AM

A.    So I graduated from college in 2010.  I don't think VFJ files even existed until approximately 2017; so, no.

BY MR. STEINBERG:

Q.    Okay.  Has any of your subsequent   09:24 AM training or coursework that you mentioned earlier after college involve working with OTF files?

A.    You said limited to my training after college; is that right?   09:24 AM

Q.    Yes.

A.    I don't recall any of it relating directly to OTF files.

Q.    Did any of it relate to VFJ files?

A.    Certainly none of it before 2017;   09:24 AM

Page 11

but otherwise, no, I don't think any of it

directly related to files.

          Q.    Have you ever designed a font?

               MR. POSNER:  Objection, vague.

          A.    Well, as part of my work on this          09:24 AM

case, I did use FontLab to design glyphs, for

example; but I don't think I ever designed

the entirety of a typeface, if that's what

you mean by your question.

BY MR. STEINBERG:                                         09:24 AM

          Q.    So before this case, you had never

tried designing a font or a typeface,

correct?

               MR. POSNER:  Objection,

          compound.                                       09:25 AM

          A.    I can't recall designing a

typeface before this case, I think that's

right.

BY MR. STEINBERG:

          Q.    You mentioned that you had done          09:25 AM

something called CopyrightX training.

               Did I get that right?

          A.    That is the name of the course,

yes.

          Q.    And what is that course about?          09:25 AM

                                                          Page 12

A.    At a high level, it's about copyright law and policy both in the U.S. and internationally.

Q.    Was there anything that you learned in that course relevant to your work    09:25 AM in this case?

A.    Well, the allegations in this case are about copyright, so I think it's relevant; but I hasten to add that I don't intend to opine about legal issues regarding    09:25 AM copyright in this case.

Q.    Well, are you relying on anything you learned in that case -- in that course, the CopyrightX course for your work in this case?    09:26 AM

A.    No.

Q.    Your report does cite the U.S. Copyright Compendium, do you recall that?

A.    I don't have my report in front of    09:26 AM me, but I think you're correct that I did cite to the Compendium.

Q.    Did the CopyrightX course that you took involve looking at the Copyright Compendium?    09:26 AM

Page 13

MR. POSNER:  Objection, vague.

A.   It's possible it was mentioned in the course, but I don't recall explicitly having to look at it for that course.

BY MR. STEINBERG:                              09:26 AM

Q.   Going back to your coursework at Princeton, what coursework at Princeton do you think qualifies you to be an expert in this case?

A.   Well, to be clear, I think my            09:26 AM
qualification -- my qualifications as an expert for this case include not only the time I spent at Princeton and the coursework in computer science there, but also my experience in work to date.                       09:27 AM

But to your question, I think all of the computer science coursework that I did at Princeton is relevant to my work in this case.  I can give you some examples of courses, if you'd like.                              09:27 AM

Q.   Sure.

A.   So there were a few courses that were more directly related to programming software, certainly some of the introductory courses.  There was a course on artificial        09:27 AM

Page 14

intelligence I took that include some programming. I also took a course on computer networking that was relevant to this case. I also took a course on -- I think it was just entitled "Programming Languages," 09:27 AM that was also relevant to this case. There are probably others. I don't have my full list of courses in front of me.

Q. Okay. But none of that coursework related to programming of fonts and font 09:27 AM software, correct?

A. Those courses related to programming generally. But, like I said before, I don't think they were related to fonts directly. 09:28 AM

Q. Is there anything from your CopyrightX course that you took that you think helps qualify you to be an expert in this case?

A. No. 09:28 AM

Q. Did anything in the CopyrightX course that you took relate to fonts or font software?

MR. POSNER: Objection, vague.

A. In your last question and in this 09:28 AM

Page 15

one you used the phrase "font software,"

which I asked you to define earlier.  Should

we do that now?

BY MR. STEINBERG:

Q.   Can you answer the question?          09:28 AM

MR. POSNER:  Objection, vague.

A.   Would you repeat the question?

MR. STEINBERG:  Can you read it

back?

THE STENOGRAPHER:  "Did any of the    09:28 AM

CopyrightX coursework that you took

relate to fonts or font software?"

THE WITNESS:  I'll answer it this

way:  I don't recall in the CopyrightX

course the discussion -- or a discussion    09:29 AM

around the copyright ability of fonts or

typefaces.

BY MR. STEINBERG:

Q.   You mentioned that you received a

certification related to forensics; is that    09:29 AM

right?

A.   I did.

Q.   And what is that certification?

A.   It was -- the coursework was

through SANS, and I believe the certification    09:29 AM

Page 16

understanding is I don't think they were

required to submit the entirety of the source

code for the copyright registration.

BY MR. STEINBERG:

Q.   Okay.  So you understand that to          10:38 AM

register copyrights in a computer program you

don't have to submit the entire code,

correct?

A.   I'm not an expert in copyright

law, but that's my understanding, yes.          10:38 AM

Q.   Do you recall what kind of

computer program that code was for that you

reviewed in the copyright deposits?

A.   Sorry.  Your question was what was

the code that was submitted or I'm sorry,       10:39 AM

would you repeat it?

Q.   Yeah, do you recall what kind of

computer program the code in the copyright

deposits that you reviewed was for?

A.   I don't remember what sort of        10:39 AM

program it was for.  It was definitely

human-readable and it was source code, but I

cannot recall what it was for.

Q.   How did you determine that it was

source code?                                    10:39 AM

Page 61

past.  But for those cases, my recollection is that my work was primarily related to analyzing the whole body of the source code. I think we -- at least one of them, the reason we were looking at the source code    10:45 AM submitted to the Copyright Office was to determine what version of source code was, in fact, copyrighted.

BY MR. STEINBERG:

Q.   And what case was that?                      10:46 AM

A.   I don't remember which specific case that was, but it's probably not on my CV.  I think this was just a consulting matter.

Q.   So you said you recalled at least    10:46 AM a few times where you've looked at copyright deposits for computer programs; is that right?

A.   I mean, I'm guessing it's been like two or three cases that have had that    10:46 AM property.

Q.   So we talked about the first one where you looked at the first and last 25 pages, and we talked about a second one where you looked at the code to determine what    10:46 AM

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

version had been registered.  Is there another one that you remember?

A.    Those two were probably the same one.  I don't remember the details of these cases.  I did estimate that there were maybe    10:47 AM two or three of them in the past, but I'm really reaching with my memory here.

Q.    Okay.  So you only specifically remember looking at copyright deposits for a computer program in one prior case before    10:47 AM this one, correct?

A.    There's definitely been prior cases where the source code has been the subject of copyright, but I think I only specifically remember looking at a copyright    10:47 AM deposit for one of them and likely there were something like two other ones, but I don't recall the details of those cases.

Q.    Okay.  You said there's definitely been prior cases where the source code has    10:47 AM been the subject of copyright, but you're not talking about prior cases where you looked at the copyright deposits?

A.    Yeah, that's the distinction I'm making.  Often in the cases I'm working on    10:48 AM

Page 68

where source code is the subject of the
copyright, the nature of the registration is
not particularly contentious.

Q.   In those cases is it the source
code that's subject to the copyright or is it   10:48 AM
the executable computer program?

A.   That sounds like you're asking for
a legal conclusion which I'm not qualified to
make.

Q.   Well, no, I'm asking what you   10:48 AM
remember from those cases in the copyright
registrations that you reviewed?

A.   Would you repeat your question?

Q.   Yeah, in those cases that you
mentioned where you looked at copyright   10:48 AM
deposits related to computer programs, was it
the source code that was subject to the
copyright registration or the executable
computer program?

MR. POSNER:  Objection, vague,   10:48 AM
foundation, calls for a legal
conclusion.

A.   So I recall what was submitted as
the deposit for the copyright, but I don't
think I could tell you what was actually   10:49 AM

Page 69

copyrighted as distinguished between the
executable binary code and the source code.

BY MR. STEINBERG:

Q.   So it's possible in those cases
that the deposit was source code but what was   10:49 AM
actually copyrighted was the binary code or
executable computer program, correct?

MR. POSNER:  Objection, calls for
speculation and a legal conclusion.

A.   I don't know what was actually --   10:49 AM
what actually had the copyright in those
cases.

BY MR. STEINBERG:

Q.   Other than the one case that we
were talking about, you don't remember any   10:49 AM
other specific case where you reviewed
copyright deposits, correct?

A.   Yeah, I think that's accurate.

Q.   So I think we talked about what
your initial assignment was, and then you   10:49 AM
also wrote an initial report in this case,
correct?

A.   I did.

Q.   And what was your assignment for
that?                                        10:50 AM

Page 70

Q.   All right.  Can you read that paragraph?

A.   It says, "I have been asked by counsel for defendants to offer expert opinions concerning the creation and content    11:58 AM of the Blooming Elegant Trio, the Blooming Elegant OTF files and the Laatz copyright submission PDFs."

Q.   Okay.  Is that a fair summary of the scope of your assignment in this case?    11:58 AM

A.   I think that summarizes the scope of my assignment for this expert report.

Q.   Okay.  Thank you.

If you look down in paragraph 9, there's a number of subpoints.    11:59 AM

Do you see that?

A.   I do see that.

Q.   Does it list all of the affirmative opinions that you plan to provide in this case?    11:59 AM

A.   No.  Well, let me -- let me rephrase that.

So there are opinions that I plan to provide in this case that are detailed in both of my expert reports.    11:59 AM

Page 112

in my direct testimony at trial.  I just don't know how it's going to shake out, if that makes sense.

BY MR. STEINBERG:

Q.   Okay.  Are all the reasons that          12:00 PM
support these opinions that are laid out in paragraph 9 set forth elsewhere in your report?

A.   I think everything I relied upon          12:01 PM
for these opinions is in this report somewhere.

Q.   All right.  Let's look at paragraph 9b.

A.   Okay.

Q.   You write, "Nicky Laatz did not          12:01 PM
hand code the Blooming Elegant OTF files."

Do you see that?

A.   I do see that.

Q.   Now, that opinion depends on your definition of hand coding that's provided          12:01 PM
elsewhere in the report, correct?

A.   I did apply my definition of hand code defined elsewhere in this report for this opinion in paragraph 9b.

Q.   Okay.  So that opinion depends on          12:01 PM

Page 114

your definition of hand coding being adopted
by the court, correct?

MR. POSNER:  Object to the form.

A.   I don't know that the court will
adopt a definition of hand code.          12:02 PM

BY MR. STEINBERG:

Q.   Okay.  Well, if the court or the
finder of fact were to interpret the phrase
"hand coding" to include the use of a visual
editing tool to develop software, would it     12:02 PM
change this opinion?

MR. POSNER:  Object to the form.

A.   Yeah.  Can you clarify what you
mean by "use"?  I think you said use of a
visual design tool.                            12:02 PM

BY MR. STEINBERG:

Q.   I said a visual editing tool.

A.   A visual editing tool.  But what
do you mean by "use"?

Q.   Well, have you ever used a visual     12:02 PM
editing tool?

A.   Yes.

Q.   Okay.

A.   But there's multiple ways you can
use it, I think that's what I'm getting at.    12:02 PM

Page 115

Q.   Well, if use of a visual editing

tool could be considered part of hand coding,

then would that change your opinion?

A.   Let me give you an example.

Supposing that the court or the          12:04 PM

finder of fact came to a conclusion that if

one uses a visual design tool and the WYSIWYG

interface of it, to have that tool generate

human-readable text, such that that text is

said to be hand coded, that would not change    12:05 PM

this opinion, because the OTF files are not

human-readable.

Q.   Okay.  But if the finder of fact

were to find that using a visual editing tool

to generate OTF files constituted hand          12:05 PM

coding, would that change your opinion here?

MR. POSNER:  Object to the form of

the question.

A.   I'm sorry, your question said

that -- could you just repeat it?  So I want    12:05 PM

to make sure I heard exactly what you said.

BY MR. STEINBERG:

Q.   Sure.

If the finder of fact found that

using a visual editing tool to generate OTF     12:05 PM

Page 117

files constituted hand coding, would that change your opinion here that Nicky Laatz did not hand code the Blooming Elegant OTF files?

A.   Well, if the court or finder of fact determined that if one used a visual    12:06 PM editing tool in any way to create OTF files, and that constituted hand coding, I wouldn't dispute that Nicky Laatz used FontLab 5, which is a visual editing tool, in connection with the creation of the OTF files.    12:06 PM

So in that very specific case, I think that would change this opinion.

Q.   Now, your report assumes that it's a requirement for font software to be hand coded in order to be entitled to copyright    12:07 PM registration, correct?

A.   I would not say that.

Q.   Okay.  Well, so if the court or the finder of fact were to determine that hand coding is not a requirement for    12:07 PM copyright registration, then your opinions that Nicky Laatz did not hand code the Blooming Elegant OTF files would be irrelevant, correct?

MR. POSNER:  Object to the form,    12:07 PM

Page 118

manually type in numbers for these variables that you're describing in paragraph 9g, correct?

A.    I think she probably did that for one of the three font files that are related      12:38 PM
to the Blooming Elegant Trio.  There were two for which she almost certainly did not enter any values for these fields because the values were the default values.

But for the, I think, three fields      12:39 PM
that she identifies here for that single font file, then she would have had to manually type in those numbers into those three fields.

Q.    Okay.  So you agree, then, that      12:39 PM
Nicky Laatz did type in manually at least some of the values of the font-wide variables that you're describing in paragraph 9g, correct?

A.    I agree with that for three such      12:39 PM
fields for one of the font files at issue in this case, but not the other two.

Q.    When you -- well, let me back up.

Have you ever used FontLab before your work in this case?                                  12:39 PM

Page 145

A.   I don't think I had, no.

Q.   And you had never worked with OTF files before this case, correct?

A.   I probably encountered them, but I hadn't used a font editing program to interact with them.                                      12:40 PM

Q.   When you say you'd "encountered them," what do you mean?

A.   It's possible I included them as part of website development, for example; but I don't recall a specific example of doing that.                                            12:40 PM

Q.   Did you review the FontLab manual when you were getting up to speed on using it for the purposes of your work in this case?      12:40 PM

A.   I did review the FontLab 5 manual, yes.

Q.   Did you review the FontLab 6 manual?

A.   I reviewed portions of online documentation for FontLab 6 and probably FontLab 7 as well.                                   12:40 PM

Q.   Do you recall seeing references to decompiling in the FontLab manual that you reviewed?                                          12:41 PM

Page 146

for the coordinates that you set, correct?

A.    These two figures show the coordinates before the point is moved and after the point is moved but not while it's being moved.                                    01:45 PM

Q.    Isn't it true that the default settings in FontLab actually show the coordinates for all the points?

A.    I don't think that's true, actually.                                          01:45 PM

Q.    Okay.  You've only used FontLab for this case, correct?

A.    Could you rephrase that?

Q.    You only used FontLab for the purpose of your work in this case, correct?    01:45 PM

A.    I've used other things besides FontLab for this case.  That's where I'm getting hung up on your question.

Q.    I see what you're saying.  Okay.

A.    Sorry.                                          01:46 PM

Q.    What I'm getting at is you don't have any experience using FontLab other than your work in this case, correct?

A.    It's true that I did not use FontLab before I was engaged in this case.    01:46 PM

Page 162

MR. POSNER:  Objection, misstates the witness's testimony.

A.   This chapter does appear to be related to computer or in part related to computer programs that generate typeface,   02:10 PM typefont or barcodes, but I don't have a legal opinion to offer about what is copyrightable.

BY MR. STEINBERG:

Q.   Let's look at page 5 -- I'm sorry,   02:10 PM page 35.

A.   Page 5 is not present.  I see page 35.

Q.   You see Section 21.1?

A.   I do.   02:10 PM

Q.   It says, "What is a computer program?"  And then it says, "The Copyright Act defines a computer program as 'a set of statements or instructions to be used directly or indirectly in a computer in order   02:10 PM to bring about a certain result.'"

And then it cites 17 U.S.C. Section 101.

Do you see that?

A.   I do see that text.   02:11 PM

Page 182

Q.   And that's the same definition we looked at in Exhibit 273?

MR. POSNER:  Objection.  The documents speak for themselves.

A.   Those two definitions appear to        02:11 PM match.

BY MR. STEINBERG:

Q.   Do you disagree with this definition of a computer program that's set forth in Exhibit 274?                        02:11 PM

MR. POSNER:  Objection, asked and answered.

A.   I think it's a definition of a computer program.

BY MR. STEINBERG:                            02:11 PM

Q.   And you don't disagree with it, do you?

A.   It's a definition of a computer program, but I'm not sure it's the most apt definition to apply in this case.        02:11 PM

Q.   The Blooming Elegant OTF files contain instructions for a computer to generate the corresponding Blooming Elegant typefaces, correct?

MR. POSNER:  Objection, vague.        02:12 PM

Page 183

you?

A.   I do.

Q.   All right.  And you provide there in paragraph 32 a definition of the phrase "hand code" or "hand coded," correct?                02:55 PM

A.   I do.

Q.   And you define it to only include a person manually typing text, correct?

A.   There's additional verbiage in my definition.                02:55 PM

Q.   Right.  You say, "with or without the assistance of computer software programs."  You give other, other examples there.

But you're limiting it to manual                02:55 PM typing of text, correct?

A.   I'll just read you the definition.

Q.   Sure.

A.   And this is the first sentence of paragraph 32 of my affirmative report.                02:55 PM

"In this Report I use the term hand code to refer to a person manually typing digital text, with or without the assistance of computer software programs such as Microsoft Word or Atom that suggest                02:55 PM

Page 204

textual corrections or changes to text that a user has already manually typed."

Q.   All right.  Thank you.

And where did you get that definition from?                                    02:56 PM

A.   I created this definition.

Q.   And what is it based on?

A.   Let's see.  So primarily it's based on my experience from a computer science perspective as to what hand code is    02:56 PM likely to mean, but I also have citations to a few other documents, including the Copyright Office Compendium.  And I also cite to the correspondence with the Copyright Office examiner.                                    02:56 PM

Q.   So you remember seeing something about a definition of hand coding in the correspondence with a copyright examiner?

A.   Well, the phrase "hand code" or "hand coding" or something close to it           02:56 PM appears in that correspondence, and it occurred to me that whatever definition I should offer should take into account how the examiner used that phrase.

Q.   Okay.  Now, you cite the Copyright        02:57 PM

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

content contained on websites, correct?

A.   That's what it says in that sentence I just read.

Q.   It doesn't cover literary works, does it?                                          03:00 PM

MR. POSNER:  Objection, vague, calls for a legal conclusion.  Document speaks for itself.

A.   There may be portions of this that are relevant to literary works, but literary   03:00 PM works are not mentioned in that sentence I just recited to you.

BY MR. STEINBERG:

Q.   It doesn't mention computer programs that generate typefaces either, does   03:00 PM it?

MR. POSNER:  Objection, vague. Documents speaks for itself.

A.   Well, I don't have the full chapter in front of me; but certainly that's   03:00 PM not mentioned in the sentence I read to you.

BY MR. STEINBERG:

Q.   Well, it's not mentioned anywhere in the section on what this chapter covers, right?                                          03:00 PM

Page 208

A.   It does not appear to be mentioned in subsection 1001 entitled, "What This Chapter Covers."

Q.   Okay.  Let's look at Section 1002.4.  It's on page 5.                    03:01 PM

And this is cited in your report, correct?

A.   This is cited in my report.

Q.   So this section relates to "Hypertext Markup Language" or (HTML),                    03:01 PM correct?

A.   The title of subsection 1002.4 is indeed "Hypertext Markup Language (HTML)."

Q.   Does it say anywhere that it applies to computer programs as a whole?                    03:01 PM

MR. POSNER:  Objection, vague. The document speaks for itself.

A.   Well, it is relevant to computer programs.  It says at the end of the first paragraph of that subsection, for                    03:02 PM registration purposes.  Well, it says, "For registration purposes HTML is not considered a computer program."

I think this is also maybe the only place where hand coded is mentioned in                    03:02 PM

Page 209

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

the Compendium, which I think Mr. Phinney

acknowledges in his rebuttal report.

BY MR. STEINBERG:

Q.   I think that's right.

So what's your basis for applying          03:02 PM

the words "hand coded," as used here in

Section 1002.4 of the Copyright Compendium,

to a computer program for generating

typefaces?

MR. POSNER:  Objection, vague,          03:02 PM

misstates witness's testimony.

A.   Well, so the issue that I

considered here was, in part, that the

copyright examiner used the phrase "hand

coded" or "hand code" or something similar to     03:02 PM

it.

What could he possibly have been

referring to?

Well, Compendium has a section

that includes the phrase "hand coded," and so     03:03 PM

that seemed relevant to what definition ought

to be applied in the copyright examiner's

correspondence.

BY MR. STEINBERG:

Q.   Okay.  And you thought to apply     03:03 PM

Page 210

that, even though this section says it applies to content contained on websites and not any other kind of content, correct?

MR. POSNER:  Objection, vague, misstates the document.                          03:03 PM

A.   Well, it occurred to me that HTML could be considered to be similar to submissions that copyright examiners have received related to typefaces.  So even though it is technically a separate section,          03:03 PM it didn't seem outside the realm of possibility that it would be relevant to how a copyright examiner was considering files associated with typefaces.

BY MR. STEINBERG:                                                03:03 PM

Q.   Okay.  So you were interpreting the copyright examiner's statements using the phrase "hand code" or "hand coded," and then interpreting them to apply some sort of definition from this section here in 1002.4?          03:04 PM

A.   I'm saying, I considered this section in my definition of hand coded.

Q.   Okay.  And you then applied that definition to your analysis of the Blooming Elegant OTF files?                                     03:04 PM

Page 211

A.    I applied that definition at various places in my reports, some of which concerns the Blooming Elegant OTF files.

Q.    Let's look at your other section you cited in your report, which I believe is    03:04 PM 1006.1(A), which is the next page, 12, of Exhibit 275.

Do you have that in front of you?

A.    I do see page 12.    03:04 PM

Q.    Okay.  And you cite this also in your report, correct?

A.    I do.  It's Footnote 13.

Q.    And this section is also -- has the same heading, "Hypertext Markup Language    03:04 PM (HTML)," correct?

A.    Subsection 1006.1(A) is indeed entitled, "Hypertext Markup Language (HTML)."

Q.    It doesn't say anywhere in this section that this applies to font software,    03:05 PM does it?

MR. POSNER:  Objection, document speaks for itself.

A.    I don't think subsection 1006.1(A) mentions typefaces explicitly; but the    03:06 PM

Page 212

sections of it that I excerpt in my Footnote 13 seem as though they could be relevant, nonetheless.

BY MR. STEINBERG:

Q.    What's the basis for that?                03:06 PM

A.    Well, this is one of the other few portions of the Compendium that mentions the phrase "hand coded".

Q.    There's no actual definition of hand code or hand coded or hand coding in           03:06 PM this Section 1006.1(A), is there?

MR. POSNER:  Objection.  The document speaks for itself.

A.    Sorry.  Was your question limited to just subsection 1006.1(A)?                      03:07 PM

BY MR. STEINBERG:

Q.    Yes.

A.    I think this section uses the phrase "hand coded" but does not provide an explicit definition of it.                       03:07 PM

Q.    And the same goes for the section we looked at before, 1002.4, correct?

There's no actual definition of hand coded in there, correct?

A.    I guess just -- sorry, one point     03:07 PM

Page 213

of clarity.  On page 5, is this the entirety of subsection 1002.4, the page ends at that point so I'm not certain.

Q.    Yes, it is.

A.    Okay.  In that case, I think      03:08 PM
subsection 1002.4 uses the phrase "hand coded," but, yeah, I agree it does not provide a definition of hand coded.

Q.    If we go back to Exhibit 274 and go to Section 723, that applies to computer      03:08 PM
programs, 723, the section that applies to computer programs that generate typeface, typefont or barcodes.

Do you have that in front of you?      03:08 PM

A.    I do see that.

Q.    Do you see the phrase "hand code" or "hand coded" or "hand coding" anywhere in there?

A.    I do not see the phrase "hand      03:09 PM
code" or "hand coding" in subsection 723.

Q.    Let's turn back to your report. And if you can go to pages 24 to 26.  Turn to page 24, I guess I should say.  Let's start there.      03:10 PM

Page 214

A.    Sure.

So hypothetically, you can imagine a system where Zazzle somehow tracks all of the -- I'm trying not to use words that Jason Li described it to avoid confusing the issue.    05:53 PM

Let's say that Zazzle somehow tracks designs that are created holistically, and then it also tracks designs that are created directly using its design tool, which would be a subset.    05:53 PM

If the only other way to create designs would be through the create-a-product API, then the difference between those two numbers would be the number of designs created with the create-a-product API.    05:53 PM

Q.    Okay.  Are you sure that a user of a third-party website using the create-a-product API, and then customizing a design template that's offered through that, would be redirected to the Zazzle website?    05:54 PM

A.    That's what I stated in my report and that was my impression from the create-a-product API documentation; but I'm happy to take a second look at it if you'd like.    05:54 PM

Page 305

Q.   That's all right.  We can move on.

Why don't we go to the next section.

Can you turn to paragraph 64 of your rebuttal report?                          05:54 PM

A.   Okay.  I'm there.

Q.   The heading there states -- you write, "Opinions in the Garrie report with respect to Zazzle's design tool as stated apply to only about 32 percent of the time   05:55 PM that the Blooming Elegant Trio was able to be used on Zazzle's website."

Do you see that?

A.   I do see that text.

Q.   And what's the purpose of          05:55 PM including that opinion in your rebuttal report?

MR. POSNER:  Object to the form of the question.

A.   Well, I was given the assignment   05:55 PM to, in part, respond to Mr. Garrie's report. And he has a number of conclusions that are not qualified with respect to time.  And so I thought it was prudent to reach back into his report with respect to the time period that   05:55 PM

Page 306

he identifies that the Blooming Elegant Trio

was able to be used on Zazzle's website, and

then compare that with a later time frame

that he cites to in his report.

BY MR. STEINBERG:                                05:56 PM

        Q.   So do you know how images of text

and particular fonts were generated for use

in Zazzle's design tool prior to February

2021?

        A.   I think Mr. Li talks about that in    05:56 PM

his deposition.  But I think Mr. Garrie

doesn't address that in his report.

        Q.   So you think Mr. Li explained it

sufficiently during his deposition?

                MR. POSNER:  Object to the form.   05:56 PM

        A.   I don't know what you mean by

"sufficiently," but I think he did provide

testimony about that time period.

BY MR. STEINBERG:

        Q.   Did he say it was materially         05:56 PM

different?

                MR. POSNER:  Objection,

        foundation.

        A.   I can look at his deposition

transcript again.  I do recall that there        05:57 PM

Page 307

were differences before and after February 2021, but I don't recall their precise nature.

BY MR. STEINBERG:

Q.    Now, the only part of this                    05:57 PM
testimony that's cited here, though, is the change that you note in Footnote 21 that happened in November of 2018 when it switched from rasterized images to images with vector path data, correct?                                       05:57 PM

A.    Well, what I'm saying in this paragraph is that Mr. Garrie opines that there were no substantial changes going back to February '21, but he does not make a similar conclusion for the time period before       05:58 PM
that.  And then in Footnote 21 I'm giving an example of such a change that preceded February 2021, but there may be others.

Q.    But you don't cite any testimony regarding changes that were made between       05:58 PM
November 2018 and February 2021 in how Zazzle's design tool worked, correct?

A.    In this paragraph I don't think I do.  That doesn't mean they don't exist.

Q.    Did you talk about such changes       05:58 PM

Page 308

with Mr. Li when you spoke regarding your rebuttal report?

A.   I don't think we did, actually.

Q.   All right.  So you don't actually have any evidence that there were such changes made to the Zazzle design tool and the way it operated between November 2018 and February 2021, correct?          05:58 PM

A.   Mr. Li's deposition testimony is evidence.  I imagine there's testimony in there that's relevant to that time period and changes that occurred during it.          05:59 PM

Q.   But that's not cited here in your report, is it?

A.   Doesn't mean it doesn't exist.          05:59 PM

Q.   Well, as you sit here today, do you recall any such testimony specifically?

A.   I recall it generally.  I mean, I remember reading Mr. Garrie's report and noting the date of February 2021.  And going back to Mr. Li's deposition testimony and thinking that there were changes prior to February 2021.  I just don't recall what they were as I sit here right now.          05:59 PM

Q.   All right.  Well, your Footnote 21          05:59 PM

Page 309

mentions one change, that before a certain time frame rasterized images were provided to users instead of vector path data, correct?

A.   I do reference that in Footnote 21.                                                          05:59 PM

Q.   So is it your opinion that when Zazzle was returning rasterized images to users, they weren't using the Microsoft DirectWrite library to access the Blooming Elegant OTF files in order to generate the          06:00 PM images?

A.   I don't think I state that opinion in my report.

Q.   Okay.  So you don't disagree with Mr. Garrie that the process was essentially          06:00 PM the same, even during the time frame when Zazzle was returning rasterized images to users?

A.   So two things.  One, I don't think Mr. Garrie expresses that opinion.  I don't          06:00 PM think he opines on the time period prior to February 2021.  I can take a look at his report again.  But even if he were to opine that, I don't think I would agree generally that the process would be the same.  You've          06:00 PM

Page 310

identified one example where it's different

here in Footnote 21 of my rebuttal report.

Q.   Well, I'm talking about the process by which the Microsoft DirectWrite library accesses the Blooming Elegant font     06:01 PM files.  That process was no different, or you're not aware of anything to suggest it was different in the time frame in which Zazzle was providing rasterized images to users, correct?                                    06:01 PM

A.   Well, it certainly might have been.  I mean, I would have to look at Mr. Li's testimony again, but I think the rasterized images were still returned from Microsoft DirectWrite.  So it's not            06:01 PM necessarily the case that Microsoft DirectWrite was somehow interacting with OTF files in the same manner as it would have for returning vector path data.

Q.   Okay.  But you don't recall any      06:01 PM specific testimony from Jason Li, as you sit here today, that it was actually different, the way in which the Microsoft DirectWrite library was interacting with the OTF files from Blooming Elegant, correct?               06:02 PM

Page 311

A.   Yeah.  Like, I said, I don't recall Mr. Li's deposition testimony in detail, so I can't cite you a place where he says that.

Q.   All right.  Let's look at the next page, page 32.  You see the heading at the bottom of the page.

A.   I do see that.

Q.   So you write, "The Garrie Report is Correct that the Zazzle Arbitrary Text Rendering process Sends Ephemeral SVG-formatted Data to the Browser of a User of Zazzle's Design Tool; But is incorrect that It Sends SVG Files."

Did I read that correctly?

A.   I think you did.  I would pronounce it ephemeral, but I could be wrong about that.

Q.   Thank you.

So is it your recollection that the Garrie report states that Zazzle servers send SVG files as part of that process?

A.   So as I state -- excuse me.  As I state in Footnote 28, the Garrie report has a single instance where the phrase "SVG image"

Page 312

appears on page 28 of Garrie's report,

whereas elsewhere he uses the phrase "SVG

data."

So I just wanted to clarify that

if Mr. Garrie is referring to an SVG image          06:03 PM

file here, which he might be, it's unclear

from his report, I would disagree that an SVG

file is transmitted.

Q.   All right.  So you would agree

with me then that Mr. Garrie does not use the          06:03 PM

phrase "SVG files" in his report, correct?

MR. POSNER:  Object to the form.

The document speaks for itself.

A.   I expect that's literally true;

but, again, my point here was that SVG image          06:04 PM

might be later construed to refer to an SVG

file.  So I wanted to make clear that that

was not the case.

BY MR. STEINBERG:

Q.   But his report doesn't say that,          06:04 PM

does it?

MR. POSNER:  Same objections.

A.   I mean, if I said -- his report

doesn't literally say "SVG file."  I'm

clarifying what SVG image -- what I would          06:04 PM

Page 313

agree with with respect to SVG image and what I would disagree with.

BY MR. STEINBERG:

Q.   In fact, up above, on page 34, lines 14 to 15, you admit that the Garrie report, "Does not assert that actual SVG files are sent," right?          06:04 PM

A.   Sorry.  You're at paragraph 69?

Q.   That's right.  This is where you were pointing to Footnote 28.          06:04 PM

A.   Right.  So what I'm saying here is, it doesn't literally assert that, but then that's my note in Footnote 28 that, just to be clear, to the extent that SVG image is intended, either in the process of Mr. Garrie          06:05 PM writing his report or later, to refer to a SVG image, I wanted to make clear that I would disagree with that if Mr. Garrie were to opine that way later.

Q.   Okay.  You mean to the extent he          06:05 PM changes SVG image to SVG file; is that what you meant?

A.   No.  I mean that, you know, maybe several months from now Mr. Garrie looks at his report and he says, "SVG image, maybe          06:05 PM

Page 314

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.

I, Sandra A. Deschaine, Registered Professional Reporter and Notary Public within and for the Commonwealth of Massachusetts at large, do hereby certify that the videotaped deposition of Christopher T. Rucinski, in the matter Nicky Laatz vs. Zazzle, Inc. and Mohamed Alkhatib, at the offices Veritext, 101 Arch Street, Boston, Massachusetts, on November 12, 2024, taken and transcribed by me; that the witness provided satisfactory evidence of identification as prescribed by Executive Order 455 (03-13) issued by the Governor of the Commonwealth of Massachusetts; that the transcript produced by me is a true record of the proceedings to the best of my ability; that the witness is reading and signing; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action, on this 15th of November 2024.

Sandra A. Deschaine
Registered Professional Reporter

My Commission Expires:

July 5, 2024

Page 336