IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| LAATZ, ET AL, | ) | CV-22-4844-BLF |
| | ) | |
| PLAINTIFFS, | ) | SAN JOSE, CALIFORNIA |
| | ) | |
| VS. | ) | FEBRUARY 27, 2025 |
| | ) | |
| ZAZZLE, INC., ET AL, | ) | PAGES 1-112 |
| | ) | |
| DEFENDANTS. | ) | **REDACTED** |
| | ) | |
| _____ | ) | |

SEALED TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE BETH LABSON FREEMAN
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

FOR THE PLAINTIFF:     BARTKO, LLP
                       1100 SANSOME STREET
                       SAN FRANCISCO, CA 94111
                       BY:  **STEPHEN CORY STEINBERG**
                            **PATRICK CASEY MATHEWS**
                            **NATALIE FELSEN**

FOR THE DEFENDANT:     QUINN EMANUEL URQUHART & SULLIVAN, LLP
                       191 N. UPPER WACKER DRIVE, SUITE 2700
                       CHICAGO, IL 60606
                       BY:  **ANDREW SCHAPIRO**
                            **MIRANDA HULKA**

APPEARANCES CONTINUED ON THE NEXT PAGE

OFFICIAL COURT REPORTER:    SUMMER FISHER, CSR, CRR
                            CERTIFICATE NUMBER 13185

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED WITH COMPUTER

APPEARANCES CONTINUED:

FOR THE DEFENDANT:          QUINN EMANUEL URQUHART & SULLIVAN, LLP
                           555 TWIN DOLPHIN DRIVE, 5TH FLOOR
                           REDWOOD SHORES, CA 94065
                           BY:  **RACHEL M. KASSABIAN**

                           QUINN EMANUEL TRIAL LAWYERS
                           865 S FIGUEROA ST, 10FL
                           LOS ANGELES, CA 90017
                           BY:  **DANIEL C. POSNER**

SAN JOSE, CALIFORNIA                    FEBRUARY 27, 2025

P R O C E E D I N G S

(COURT CONVENED AT 9:56 A.M.)

THE CLERK:  CALLING CASE 22-4844.  LAATZ, ET AL. VERSUS ZAZZLE, INC., ET AL.

COUNSEL, PLEASE COME FORWARD AND STATE YOUR APPEARANCES.

MR. STEINBERG:  GOOD MORNING, YOUR HONOR.

STEPHEN STEINBERG FROM BARTKO, LLP REPRESENTING THE PLAINTIFF, NICKY LAATZ.

MR. MATHEWS:  GOOD MORNING, YOUR HONOR.

CASEY MATHEWS FROM BARTKO, LLP, ALSO REPRESENTING THE PLAINTIFF NICKY LAATZ.

MS. FELSEN:  GOOD MORNING, YOUR HONOR.

NATALIE FELSEN, ALSO FROM BARTKO, LLP, ALSO REPRESENTING PLAINTIFF NICKY LAATZ.

THE COURT:  GOOD MORNING.

MS. KASSABIAN:  GOOD MORNING, YOUR HONOR.

RACHEL KASSABIAN OF QUINN EMANUEL HERE ON BEHALF OF DEFENDANTS ZAZZLE AND MR. ALKHATIB.

MR. POSNER:  GOOD MORNING.

I'M DAN POSNER FROM QUINN EMANUEL, ALSO FOR THE DEFENDANT ZAZZLE.

MS. HULKA:  GOOD MORNING.

MIRANDA HULKA ON BEHALF OF DEFENDANTS.

MR. SCHAPIRO:  GOOD MORNING, YOUR HONOR.

ANDREW SCHAPIRO, ALSO FROM QUINN EMANUEL, ALSO FOR ZAZZLE.

THE COURT:  WELCOME TO EVERYONE.  THANK YOU.

ALL RIGHT.  I DID MY EASY CASE FIRST.  AND AS YOU CAN SEE, THAT WASN'T SO EASY EITHER.

I HAVE A LOT OF COMMENTS TO MAKE.  AND I THINK PERHAPS THE MOST CLARITY THAT WAS BROUGHT TO ALL OF THESE PAPERS WAS IN ZAZZLE'S OPENING BRIEF, THAT THIS CASE IS REALLY ABOUT A BREACH OF CONTRACT CASE AND IT HAS SPUN COMPLETELY OUT OF CONTROL.

I THINK THAT'S ACTUALLY RIGHT, I THINK THERE ARE A LOT OF DISTRACTING ISSUES THAT ARE INTERFERING WITH THE PARTIES' ABILITY TO SEE WHAT THE REAL DISPUTE IS.  AND THERE'S PLENTY THAT CAN GO TO TRIAL.

SO I'M HOPING THAT THROUGH THIS MOTION, AND THIS IS ALWAYS THE PURPOSE OF THESE MOTIONS, IS TO CUT THROUGH SOME OF THAT SO THAT YOU CAN FOCUS YOUR ENERGIES ON WHAT THE VALID DISPUTE IS REMAINING.

I WILL GIVE SOME INITIAL THOUGHTS.  I WELCOME YOUR ARGUMENT ON ALL OF THE ISSUES, BUT YOU MAY DECIDE THAT SOME OF THE ISSUES WEREN'T YOUR STRONGEST SUIT ANYWAY.

SO THE FIRST ISSUE WAS ON THE STATUTE OF LIMITATIONS ISSUE AND LACHES.  I THINK THEY ARE DISPUTED FACTS, I THINK THAT I CAN'T MAKE ANY SUMMARY JUDGEMENT RULING ON THAT.

ON THE FRAUD CLAIMS, I'M LIKELY TO GRANT THE MOTION.  I AGREE WITH THE DEFENSE THAT IF THIS THEORY OF FRAUD WERE CORRECT IN A BREACH OF CONTRACT SITUATION, EVERY BREACH OF

CONTRACT WOULD BE A FRAUD AND THAT'S NOT THE LAW.

I'M GOING TO LEAVE THE COPYRIGHT ISSUES UNTIL LAST, ALTHOUGH I HOPE THEY DON'T EAT US ALIVE TODAY.

ON THE BREACH OF CONTRACT CLAIMS, THERE'S PLENTY TO GO TO TRIAL ON.  I THINK MR. ALKHATIB SHOULD BE DISMISSED.  I DON'T THINK HE WAS AN UNDISCLOSED AGENT UNDER THE PARTICULARS OF THIS CASE WITH AN ONLINE CLICK AND BUY LICENSE, AND I FRANKLY DON'T THINK THAT ADDS ANYTHING, THE PLAINTIFF'S SUCCESS DOES NOT HINGE ON WHETHER MR. ALKHATIB IS THE LIABLE PARTY.

I HAVE -- SOMETHING WE DO NEED TO FOCUS ON THIS MORNING ON THE BREACH OF CONTRACT, WHEN THE PLAINTIFFS BROUGHT THEIR MOTION FOR SUMMARY JUDGEMENT, I FOUND THAT THEY HAD NOT PROVED THAT AS A MATTER OF LAW THE FAQ WAS PART OF THE CONTRACT, BUT I DIDN'T FIND THE OPPOSITE THAT IT WAS NOT.

SO MR. SCHAPIRO, IN YOUR PAPERS I FINALLY FOUND ONE LINE WHERE I THINK YOU ARE ASKING ME TO MAKE THAT LEGAL DETERMINATION.  IT WASN'T REALLY CLEAR, BUT I HAVE TO MAKE THAT DECISION BEFORE IT GOES TO THE JURY.

AND IF THAT'S -- AND MR. STEINBERG, YOU WILL LET ME KNOW IF YOU THINK IT'S NOT PROPERLY BEFORE ME NOW, BUT IN MY VIEW, THE PAPERS THAT MAKE UP THE CONTRACT, THE OTHER THREE DOCUMENTS, I THINK SO CONCLUSIVELY EXPLAIN TO THE PURCHASER THAT THE TERMS OF SERVICE AND THE LICENSE AGREEMENT ARE THE BINDING TERMS, THAT THE SHOP PAGE, OR IT HAD ANOTHER NAME, THAT HAS THE LINK TO THE FAQ'S IS NOT PART OF THE CONTRACTURAL

AGREEMENT.  SO I THINK THIS WHOLE ARGUMENT AS TO WHETHER ZAZZLE READ THE FAQ IS A DISTRACTION TO WHAT'S BEFORE ME NOW.

BUT I AGREE WITH THE PLAINTIFF THAT EVEN WITHOUT THE FAQ, THERE IS PLENTY TO GO TO TRIAL ON, THERE IS PLENTY IN DISPUTE AND THERE IS A -- I THINK THAT THERE IS A VALID THEORY OF LIABILITY THAT CAN GO TO A JURY, EVEN WITHOUT THE FAQ.  I THINK THAT WOULD HAVE MADE YOUR LIFE A LITTLE EASIER BUT I DON'T THINK IT'S ESSENTIAL.

SO THEN I WANT TO TURN TO THE COPYRIGHT ISSUE.  WHETHER THIS IS A VALID COPYRIGHT OR NOT IS AN UNBELIEVABLY COMPLICATED ISSUE THAT APPEARS TO ME TO BE, I HAVE A COPYRIGHT ISSUE BY THE COPYRIGHT OFFICE UNDER ONE UMBRELLA OF COPYRIGHTABILITY, AND THE PLAINTIFFS ARE ARGUING THAT IT'S VALID UNDER A DIFFERENT THEORY.  AND I'M NOT REALLY -- I DON'T THINK I ACTUALLY UNDERSTAND THIS WHOLE LINE OF ARGUMENT, AND -- BECAUSE -- AND I'M TRYING TO DETERMINE WHETHER THIS IS A LEGAL DETERMINATION BECAUSE IT'S FACTUAL, AND IF IT COMES DOWN TO HOW MUCH HAND CODING DID MS. LAATZ DO, I HAVE TO SEND THAT TO THE JURY.

SO I GUESS THE BOTTOM LINE OF WHAT I'M SAYING IS IN THE MIDST OF MY LACK OF UNDERSTANDING THE COPYRIGHT ISSUE AT THE LEVEL I WOULD LIKE TO HAVE, IT STILL LOOKS LIKE NO MATTER WHAT, THERE ARE DISPUTED ISSUES OF FACT ON WHETHER THE BLOOMING ELEGANT TRIO WAS COPYRIGHTABLE.

ON THE FRAUD ON THE COPYRIGHT OFFICE, I THINK THEY ARE DISPUTED FACTS.  AND WHETHER OR NOT THERE IS INFRINGEMENT,

THAT'S AN INTERESTING ISSUE, THERE IS A TECHNICAL PART OF THAT THAT I'M NOT SURE I HAVE, THAT I GRASP, AS TO HOW ZAZZLE LETS ITS CUSTOMERS MAKE THEIR T-SHIRTS AND THEIR INVITATIONS OR WHATEVER THE PRODUCTS ARE, BECAUSE THE TYPE -- I THINK EVERYONE AGREES THE TYPEFACE IS NOT COPYRIGHTABLE.

SO JUST SEEING AN IMAGE OF IT IS NOT DISTRIBUTION OF THE COPYRIGHTABLE MATERIAL, IT'S THE -- AND WHAT ARE THE PHRASES -- WELL IT'S THE SOURCE CODE IS WHAT'S COPYRIGHTED, AND THE QUESTION IS TECHNICALLY HOW IS THIS HAPPENING?  DOES THE CUSTOMER OF ZAZZLE HAVE ACCESS TO THE SOURCE CODE, THE COPYRIGHTED MATERIAL, OR IS ZAZZLE RECEIVING INSTRUCTIONS, CREATING SOMETHING AND SENDING IT OUT, AND DOES THAT MATTER?

SO I'M JUST GOING TO ADMIT I'M REALLY CONFUSED ABOUT HOW THAT PLAYS OUT AS TO WHETHER OR NOT THERE IS INFRINGEMENT, AND SO I CAN'T EVEN TELL YOU WHICH WAY I WOULD GO ON IT.

BUT I THINK THERE IS A LOT OF DISTRACTION HERE, I THINK THIS IS REALLY A BREACH OF CONTRACT CASE, AND I GUESS AS THE BEST DEFENSE IS A GOOD OFFENSE SO KILLING THE COPYRIGHT WOULD CERTAINLY BE A BIG VICTORY FOR ZAZZLE BUT I DON'T KNOW THAT THAT'S -- I MEAN, IF THAT'S THE CASE YOU WANT TO TRY TO A JURY, I SUPPOSE YOU WILL GET TO DO THAT BECAUSE I DON'T THINK THIS IS SUMMARY JUDGEMENT MATERIAL.

ALL RIGHT.  THAT'S A LOT.  I HOPE IT'S AT LEAST HELPFUL, I ALWAYS THINK IT'S HELPFUL FOR ME TO TELL YOU WHERE I'M CONFUSED SO YOU CAN DEVOTE SOME TIME.

FOR ZAZZLE, WHO IS GOING TO TAKE THE LEAD ON THAT?

MR. SCHAPIRO:  SO YOUR HONOR, THAT WAS VERY HELPFUL, I APPRECIATE IT.  BY THE WAY, I MEANT TO SAY WHEN I WAS DOING THE INTRODUCTIONS THAT MELANIE SHERK FROM ZAZZLE IS ALSO HERE.

THE COURT:  OH, THANK YOU.  WELCOME.

SO I'M GOING TO HAVE YOU USE THE PODIUM, IF YOU DON'T MIND.  YOU HAVE A BIG VOICE, BUT WE SOMETIMES WE LOSE IT.

MR. POSNER:  YOUR HONOR, WE DO HAVE A POWERPOINT WE WOULD LIKE TO USE.  ARE WE ABLE TO CONNECT THE LAPTOP AT THE PODIUM?

THE COURT:  AND ARE YOU LEAVING THOSE SLIDES WITH ME?

MR. SCHAPIRO:  YES, WE HAVE A COPY.

THE COURT:  I APPRECIATE THAT.

MR. SCHAPIRO:  IS THERE A WAY TO PLUG IN THE LAPTOP TO HDMI UP HERE?

THE CLERK:  YES.

(PAUSE IN PROCEEDINGS.)

MR. SCHAPIRO:  AND YOUR HONOR, THE WAY WE HAVE DIVIDED THIS IS I'M GOING TO SPEAK ON WHAT IT SOUNDS LIKE AFTER YOUR TENTATIVE MIGHT BE IN SOME WAYS THE LESS SPICY PIECE, STATUTE OF LIMITATIONS.

THE COURT:  AND YOU WILL WIN, SO THAT'S GOOD.

MR. SCHAPIRO:  STATUTE OF LIMITATIONS AND FRAUD.

I HOPE I CAN TURN YOU AROUND ON STATUTE OF LIMITATIONS BECAUSE I THINK WE HAVE GOT -- WHEN I POINT OUT THE UNDISPUTED

FACTS HERE, WE ARE IN A PRETTY STRONG POSITION, BUT THAT'S WHY WE ARE HERE.  AND MY COLLEAGUE, DAN POSNER, IS GOING TO DISCUSS CONTRACT AND COPYRIGHT ISSUES.  AND THE QUESTIONS YOU HAVE POSED I THINK WILL ALLOW HIM VERY READILY TO I THINK ANSWER THE ISSUES THAT YOU ARE GRAPPLING WITH BECAUSE THESE ARE WHAT WE HAVE BEEN DISCUSSING AS WELL.

AND TO THE EXTENT THAT YOUR HONOR IS INTERESTED IN HEARING ABOUT THE EVIDENTIARY OBJECTIONS THAT ARE LIVE IN THIS CASE, OUR ASSOCIATE, MS. HULKA, IS PREPARED TO ANSWER.

THE COURT:  OKAY.  WELL I CERTAINLY WANT TO GIVE HER THE OPPORTUNITY TO MAKE ANY ARGUMENTS ON THEM, AND SO DID YOU WANT TO DO THAT FIRST OR LAST?  HOW DID YOU WANT TO HANDLE THAT?

MR. SCHAPIRO:  WHY DON'T WE DO THAT LAST.

IS THIS UP ON EVERYONE'S SCREENS NOW?

THE COURT:  YES.

MR. SCHAPIRO:  AND HEARING WHAT YOUR HONOR HAS SAID, I MAY ZIP THROUGH A FEW OF THESE SLIDES AND LINGER ON THE ONES THAT I THINK ARE THE MOST VALUABLE.

THE COURT:  THANK YOU.  I HAVE ALL OF THEM AFTERWARDS, SO THAT'S GREAT.

MR. SCHAPIRO:  YES.

ALL RIGHT.  AND YET I'M HITTING A BUTTON AND NOTHING IS HAPPENING.

SHALL I HAND A PAPER UP AND ONE FOR YOUR HONOR'S CLERKS AS

WELL?  AND ONE FOR ME.  ALL RIGHT.  WELL HOPEFULLY WE WILL GET THIS WORKED OUT.

SO I'M LOOKING AT THE SLIDE ON PAGE 3 NOW.  YOUR HONOR, THE DEFAULT HERE, WHICH IS OF COURSE WHERE DO WE START, WHICH IS THAT THE STATUTE OF LIMITATIONS FOR THE CAUSES OF ACTION AT ISSUE ARE EITHER THREE YEARS OR FOUR YEARS HERE.  SO UNLESS THE PLAINTIFFS CAN FIT THEMSELVES INTO AN EXCEPTION, THEIR CLAIMS ARE TIME BARRED BECAUSE THE ELEMENTS OF EACH CAUSE OF ACTION WERE COMPLETE, WHICH IS THE TEST, BY OCTOBER OF 2017, AND THEY DIDN'T SUE UNTIL NEARLY FIVE YEARS LATER.

AND I JUST WANT TO BE CLEAR THAT ORDINARILY IT IS THE LAST ELEMENT ESSENTIAL TO THE CAUSE OF ACTION THAT STARTS THE CLOCK, YOUR HONOR KNOWS THIS, AND THAT THE MERE FACT THAT A PLAINTIFF MIGHT HAVE BEEN IGNORANT OF HIS OR HER CAUSE OF ACTION DOESN'T EXCUSE IT.

SO THE QUESTION HERE IS DOES ANY EXCEPTION APPLY?  WELL THE PLAINTIFF HAS THE BURDEN TO SHOW THAT SHE FALLS WITHIN AN EXCEPTION.  AND IN THIS CASE, THE TWO EXCEPTIONS THAT THE PLAINTIFF HAS RAISED, OR THREE, I SUPPOSE, BECAUSE TWO OF THEM ARE COUSINS OF EACH OTHER, THE DISCOVERY RULE AND THE SEPARATE ACCRUAL RULE AND THE CONTINUOUS ACCRUAL RULE.

I'M GOING TO START WITH THE DISCOVERY RULE.  SO THE DISCOVERY RULE AS TO WHICH THE PLAINTIFF BEARS THE BURDEN IS NOT JUST SAYING OH, IT WASN'T EASY FOR ME TO DISCOVER, IT MUST BE PARTICULARLY DIFFICULT FOR THE PLAINTIFF TO DISCOVER THE

CLAIM.  THAT'S THE NBC UNIVERSAL CASE.  SHE HAS TO SHOW AN INABILITY TO HAVE MADE THE DISCOVERY DESPITE REASONABLE DILIGENCE.

AND SHE HAS CONSTRUCTIVE NOTICE WHEN THERE ARE SOURCES THAT ARE OPEN TO HIS OR HER INVESTIGATION FROM WHICH SHE COULD GET THAT KNOWLEDGE.  SOURCES THAT ARE OPEN TO HER INVESTIGATION.

SO WHAT ARE THE UNDISPUTED FACTS IN THIS CASE?  WELL FIRST OF ALL, WE KNOW IT'S UNDISPUTED THAT THE PLAINTIFF HERE WAS FAMILIAR WITH ZAZZLE, SHE WAS NO STRANGER TO IT, SHE HAD A ZAZZLE SHOP OR A ZAZZLE ACCOUNT FROM FEBRUARY OF 2014 LONG BEFORE THE EVENTS THAT OCCURRED IN THIS CASE.  WE KNOW THAT IN NOVEMBER OF 2016 MONICA MCGHIE SENT A MESSAGE TO THE PLAINTIFFS, THEY SAY THAT WAS A KEY STEP IN THIS CASE.  AND THEN IN MAY OF 2017 MR. ALKHATIB PURCHASES THE BLOOMING ELEGANT LICENSE.

WE ARE NOT SAYING THAT THE CAUSE OF ACTION HAD ACCRUED YET AT THAT POINT, BUT THAT'S THE BACKGROUND.  THEN IN OCTOBER, ZAZZLE MAKES THE BLOOMING ELEGANT TYPEFACE PUBLICLY AVAILABLE IN ITS DESIGN TOOL.

SO AT THAT POINT -- AFTER THAT POINT, WHAT HAPPENS?  THE PLAINTIFF HAS THE BURDEN, AND I EXPECT THEM TO COME UP HERE, THEY WILL HAVE TO CONVINCE YOU THAT AFTER OCTOBER 17TH IT WAS PARTICULARLY DIFFICULT FOR THEM TO HAVE DISCOVERED THIS, THAT THERE WERE NOT SOURCES OPEN TO THEIR INVESTIGATION FROM WHICH

THEY COULD HAVE DISCOVERED THAT ZAZZLE WAS ON THE DESIGN TOOL.

WELL NOT ONLY CAN THEY NOT SHOW THAT, BUT THE EVIDENCE INDISPUTABLY, AND IT'S NOT OUR BURDEN, ESTABLISHES THE OPPOSITE, FROM NOVEMBER 2019 UNTIL AUGUST OF 2019 ZAZZLE PUBLICLY ANNOUNCED THE ROLLOUT OF BLOOMING ELEGANT AND FOLLOWED IT WITH SOCIAL MEDIA POSTS, BLOG POSTS, MARKETING E-MAILS SENT DIRECTLY TO THE PLAINTIFF.

AND I THINK THIS IS INTERESTING AS WELL, IN 2020, WHEN WE ARE THINKING ABOUT DILIGENCE HERE, 2020 WHICH IS ALREADY, OF COURSE LESS THAN THREE YEARS BEFORE THEY FILED SUIT, BUT IT SHOWS THE DILIGENCE THAT WAS LACKING HERE.  JOHN LAATZ WHO SUPPOSEDLY IS THE ENFORCER OF COPYRIGHTS FOR MS. LAATZ, RECEIVES AN E-MAIL FROM SOMEONE SAYING HI, I LIKE BLOOMING ELEGANT ON ZAZZLE.  DOES NOTHING, NOTHING, DOESN'T EVEN ANSWER IT.

ONLY IN AUGUST OF 2020 WHEN THEY GET ANOTHER E-MAIL DOES HE SAY, OH MY GOD, I WAS SHOCKED, SHOCKED BECAUSE WE NEVER WOULD HAVE LICENSED.  I KNEW IMMEDIATELY FROM THAT THAT THERE HAD BEEN A BREACH HERE SO WE SPRUNG INTO ACTION.

BUT HOW DID THEY SPRING INTO ACTION, DID THEY DO WHAT SOMEONE IN THESE CIRCUMSTANCES OFTEN DOES, WHICH IS SAY WE MIGHT HAVE A STATUTE OF LIMITATIONS PROBLEM HERE, LET'S GO SEEK A TOLLING AGREEMENT.  NO, THEY SENT A LETTER AT SOME POINT TO ZAZZLE, THEY DID NOTHING TO SEEK TOLLING, NOTHING TO ENFORCE THEIR RIGHTS IN A COURT UNTIL TWO YEARS, APPROXIMATELY TWO

YEARS LATER.  SO THAT IS THE COMPLETE OPPOSITE OF DILIGENCE.

I WANT TO JUST SPEND ANOTHER MOMENT ON THE UNDISPUTED EVIDENCE BECAUSE YOUR HONOR SAID YOU THOUGHT THAT THERE ARE ISSUES THAT COULD GO TO A JURY.  AND I UNDERSTAND WHY YOU THINK THAT, HAVING READ THE OTHER SIDE'S BRIEF, BUT I THINK WHEN YOU SCRATCH BELOW THE SURFACE, THAT'S NOT TRUE.

THE PLAINTIFF RECEIVED 677 E-MAILS FROM ZAZZLE DURING THE LIMITATIONS PERIOD, 48 OF THOSE INCLUDED IMAGES OF PRODUCTS THAT HAD BLOOMING ELEGANT ON THEM.  WE KNOW THAT SHE OPENED SOME OF THESE E-MAILS.  NOW THEY SAID IN THEIR BRIEF, YEAH, BUT SHE DIDN'T OPEN THE ONES THAT HAD BLOOMING ELEGANT IN IT.

THAT'S NOT THE TEST, THE TEST IS, IS IT DISCOVERABLE, IS IT DISCOVERABLE?  AND IF I GET A LOT OF THINGS BY POSTAL MAIL AND SOMEONE IS SENDING ME SOMETHING THAT TELLS ME I MIGHT HAVE A CLAIM AND I SAY, YOU KNOW WHAT, I'M NOT VERY GOOD ABOUT OPENING THE POSTAL MAIL, I OPENED SOME OF THE MAIL FROM YOU, BUT NOT ALL OF THE MAIL FROM YOU.  IF I SAID, YOU KNOW WHAT, I GET A LOT OF ECF NOTICES DURING THE DAY, AND THAT'S TRUE, I DO, I SAY I OPENED SOME OF THEM BUT I DIDN'T OPEN THE OTHER SO IT WASN'T DISCOVERABLE TO ME THAT THE HEARING HAD BEEN ADJOURNED, I THINK I WOULD BE LAUGHED OUT OF COURT, RIGHTFULLY, AND THE SAME RESULT SHOULD ACCRUE HERE.

IT'S NOT JUST WHAT WE SENT HER, BUT SHE'S ACTIVE ON INSTAGRAM, AND ZAZZLE POSTED 34 POSTS, SO THESE WOULD HAVE GONE DIRECTLY TO HER FEED THAT REFERENCED OR DEPICTED BLOOMING

ELEGANT.

BUT THERE IS MORE. SHE USED THE ZAZZLE HASHTAG HERSELF ON AT LEAST NINE OF HER OWN INSTAGRAM POSTS BETWEEN 2017 AND 2019. SO WHAT IS HER BASIS FOR SAYING YEAH, BUT YOU CAN'T EXPECT ME TO HAVE NOTICED THAT BLOOMING ELEGANT WAS ON ZAZZLE, THIS WAS PARTICULARLY DIFFICULT FOR ME TO DISCOVER.

AND THEN THE CHERRY ON THE SUNDAE, IN 2018 ZAZZLE REPOSTED AN IMAGE THAT SHE HAD PUT ON INSTAGRAM AND TAGGED HER. IF YOU USE INSTAGRAM YOU WILL KNOW THAT WHEN YOU ARE TAGGED, YOU GET A NOTIFICATION. SO SHE'S TAGGED IN THE INSTAGRAM POST FROM ZAZZLE BUT WANTS THIS COURT TO SAY, NO, WE CAN'T EXPECT HER TO HAVE BEEN PAYING ANY ATTENTION TO ZAZZLE.

AND IT MATTERS, YOUR HONOR, THIS ISN'T JUST SOME GOTCHA, BECAUSE IF YOU LOOK AT SOME OF THE ARGUMENTS ABOUT FRAUD AND CONTRACT HERE, THE PLAINTIFFS HAVE, ON MULTIPLE OCCASIONS, CRITICIZED ZAZZLE FOR NOT HAVING -- NO LONGER BEING ABLE TO ACCESS CERTAIN COMPUTER FOLDERS OR FOR PEOPLE'S LACK OF MEMORY SAYING, WELL THESE FOLKS SAID THEY THINK THEY LOOKED AT THIS PIECE OF THE LICENSE BACK IN 2016 BUT THEY ARE NOT SURE.

WELL, WHY? WHY ARE THEY NOT SURE ABOUT THAT? WHO SHOULD BEAR THE BURDEN OF THE FACT THAT MEMORIES FADE WHEN YOU ARE ASKING PEOPLE ABOUT SOMETHING THAT HAPPENED IN 2016, WHICH WAS A KEY MOMENT IN THIS CASE. MONICA MCGHIE IS NO LONGER WITH THE COMPANY.

SO IT'S NOT JUST SOME TECHNICAL ARGUMENT THAT WE ARE

MAKING HERE, THE VERY FAMILIAR POLICY REASONS FOR STATUTE OF LIMITATIONS ARE IMPLICATED IN THIS CASE. THE PLAINTIFF ADMITTED HER LACK OF DILIGENCE, THIS IS OUR SLIDE 9. SO WHEN SHE WAS ASKED ABOUT THE INSTAGRAM POST IN HER DEPOSITION, SHE SAID WELL I WASN'T AWARE AT THE TIME THAT THEY HAD TAGGED ME. I'M INCREDIBLY BAD AT LOOKING AT -- I'M NOT A VERY GOOD SOCIAL INSTAGRAM USER, I DON'T CHECK MESSAGES.

I'M SKIPPING OVER SOME OF THE TEXT HERE. I DON'T CHECK NOTIFICATIONS, I WAS WORSE AT IT BACK THEN. SHE WAS ASKED HOW SHE MONITORS THE USE OF HER FONTS, SUPPOSEDLY HER MILLION DOLLAR BUSINESS, "OCCASIONALLY WE WILL CHECK FOR MY FONTS BEING AVAILABLE ON PIRATE WEBSITES." "DO YOU HAVE GOOGLE ALERTS SET UP FOR YOUR FONTS?" "I DO NOT."

SO THAT'S A FAR CRY FROM BEING DILIGENT. AND WE DON'T HAVE TO PROVE THAT SHE WASN'T DILIGENT.

THE COURT: IT'S JUST REALLY HARD TO FIND THIS AS A MATTER OF LAW, THAT'S THE PROBLEM HERE. I THINK YOU HAVE STRONG EVIDENCE, BUT WHETHER IT'S UNDISPUTED IS MY THRESHOLD.

MR. SCHAPIRO: WELL THE THINGS THAT ARE UNDISPUTED, AND I WILL BE CURIOUS TO HEAR WHAT COUNSEL FOR PLAINTIFF SAYS TO TRY TO MEET HER BURDEN OF SHOWING THAT THERE IS EVIDENCE FROM WHICH A REASONABLE JURY COULD CONCLUDE THAT SHE WAS DILIGENT, THAT SHE WAS DILIGENT, WE DON'T HAVE TO SAY A REASONABLE JURY WOULD AGREE WITH EVERYTHING WE SAY, THEY HAVE TO PERSUADE YOU THAT THERE'S EVIDENCE IN THIS CASE, IF THERE'S

A DISPUTE ABOUT EVIDENCE THAT WOULD SHOW THAT SHE'S DILIGENT. IT IS UNDISPUTED THAT SHE RECEIVED ALL OF THIS.  IT IS UNDISPUTED THAT TESTIMONY I JUST READ FROM HER DEPOSITION, THAT'S HER TESTIMONY UNDER OATH.  IT'S UNDISPUTED THAT WHEN JOHN LAATZ RECEIVES THESE NOTIFICATIONS IN 2020 --

THE COURT:  WELL, BUT IF THAT'S WHAT PUT HER ON NOTICE, SHE SUED WITHIN THE LIMITATIONS PERIOD.

MR. SCHAPIRO:  I WILL REITERATE WHAT I SAID EARLIER, THE RELEVANCE OF THAT IS, IT SHOWS WHAT KIND OF OPERATION THEY WERE RUNNING, IT WAS NOT DILIGENT.  WHEN YOU COMBINE HER DEPOSITION TESTIMONY, THEIR RECEIPT AND INACTION OF THOSE E-MAILS, IT MAKES IT HARD, I THINK, FOR THEM TO SAY, OH YEAH, WE RAN A TIGHT SHIP HERE AND WE WERE REASONABLY DILIGENT.

SO SHE WAS AWARE OF ZAZZLE BOTH GENERALLY AND SPECIFICALLY, ZAZZLE PUBLICLY ANNOUNCED WHAT IT WAS DOING, SHE RECEIVED DIRECT ACTUAL E-MAILS FROM US.

NOW THERE IS ANOTHER RULE CALLED THE SEPARATE ACCRUAL RULE.  I THINK THAT'S A RED HERRING HERE, AS THE SUPREME COURT SAID IN THE PETRELLA CASE, SEPARATELY ACCRUING HARM SHOULD NOT BE CONFUSED WITH HARM FROM PAST VIOLATIONS THAT ARE INFRINGING.

AND ON THAT, I WOULD DIRECT YOUR HONOR TO, WE HAVE CITED THESE CASES IN OUR BRIEF, THE LIVE FACE CASE, AND THERE'S A TERRIFIC CASE CALLED BELL V. OAKLAND COMMUNITY POOLS PROJECT, BELL IS ALSO CITED IN OUR BRIEF.

IN THAT CASE, THE COURT CORRECTLY NOTED THAT JUST

DISPLAYING AN INFRINGING POST TO TWITTER USERS REPEATEDLY WAS NOT A NEW INFRINGEMENT, INFRINGEMENT HAPPENED WHEN YOU REPRODUCED OR COPIED THE COPYRIGHTED ITEM.  AND FINALLY, NOR DOES THE SUPPOSED CONTINUOUS ACCRUAL RULE APPLY.

THE CASES ARE CLEAR AND WE'VE CITED THEM IN OUR BRIEF THAT IF YOU HAVE RECURRING INJURIES DURING THE LIMITATIONS PERIOD BUT THEY HAVE ARRIVED OUT OF A SINGLE TRANSACTION THAT OCCURRED BEFORE THE LIMITATIONS PERIOD, THE CONTINUOUS ACCRUAL DOCTRINE DOESN'T APPLY, IF THEY ARISE OUT OF A SINGLE TRANSACTION.

AND HERE, THE TRANSACTION THAT IS THE BASIS OF THIS CASE IS THE PURCHASE AND SUPPOSED MISUSE OF THE LICENSE AND THE DATA THAT WAS PROVIDED, WHETHER WE WANT TO CALL IT FONT DATA OR SOMETHING ELSE.

SO THAT IS STATUTE OF LIMITATIONS, YOUR HONOR.  AND I DO ENCOURAGE THE COURT, BECAUSE SPECULATION ISN'T ENOUGH, IT'S NOT ENOUGH FOR THE PLAINTIFF TO SAY IT'S POSSIBLE THAT MAYBE FOR SOME REASON THIS WAS HARD FOR HER.  IT'S NOT ENOUGH FOR THE PLAINTIFFS TO SAY WELL SHE DIDN'T ACTUALLY DISCOVER IT UNTIL LATER.  THEY HAVE THE BURDEN OF PERSUADING.

ALL RIGHT.  FRAUD CLAIMS.  I WON'T SPEND A WHOLE LOT OF TIME ON THIS BECAUSE I WAS TAUGHT EARLY AS A LAWYER TO QUIT WHILE YOU ARE AHEAD, AND MAYBE I WILL HAVE TO GET UP AFTER I HEAR HOW THE CONVERSATION GOES WITH THE PLAINTIFFS, BUT I THINK FROM ALL OF THE FACTS THAT I'VE JUST RECOUNTED, ZAZZLE'S USE OF BLOOMING ELEGANT WAS THE OPPOSITE OF HIDDEN OR CONCEALED HERE.

WHAT KIND OF FRAUDSTER SAYS, I'M GOING TO TRICK YOU INTO GIVING ME YOUR THING, AND THEN I'M GOING TO COME KNOCKING ON YOUR DOOR EVERY DAY AND SAY, HEY LOOK, I'VE GOT YOUR THING, I'VE GOT YOUR THING.  THAT WOULD BE, AS YOU'VE PROBABLY HEARD, AUSA'S SAY TO JURIES IN DRUG CASES, WELL GEE, HE MUST BE THE WORST FRAUDSTER EVER, RIGHT?

THE COURT:  THE ONLY ONES WE CATCH.

MR. SCHAPIRO:  SO THERE'S REALLY LITTLE BASIS FOR FRAUD CLAIMS HERE.  I UNDERSTAND, OF COURSE, WHY THEY SURVIVED AT THE MOTION TO DISMISS.

THE COURT:  BUT THE FRAUD IS AT THE TIME OF THE -- OF GETTING THE LICENSE, NOT WHAT THEY DID AFTERWARDS.

MR. SCHAPIRO:  THAT'S CORRECT.

BUT THE PURPOSE OF THE FRAUD, SUPPOSEDLY, WAS TO SNEAKILY TAKE THIS.  SO IF YOU ARE TRYING TO -- IF THE JURY WERE ASKED, OKAY, IS THERE A REASONABLE BASIS TO CONCLUDE THAT THEY HAD THIS DESIRE TO STEAL THIS THING?  YOU CAN LOOK AT THE EVIDENCE OF WHAT THEY DID TWO DAYS LATER AND SAY, I DON'T THINK SO.

AND YOUR HONOR GAVE THE PLAINTIFFS A BIT OF A ROAD MAP BACK IN THE MOTION FOR SUMMARY JUDGEMENT RULING, THIS IS MY SLIDE 17, AND NOW DISCOVERY HAS CONFIRMED THAT OUR POSITION WAS CORRECT.  AND YOUR HONOR SAID, AND THIS WAS DOCKET 174, AND YOU SAID "THERE REMAINS FACTUAL DISPUTE.  FOR EXAMPLE, PLAINTIFF HAS NOT EVEN SUBMITTED EVIDENCE THAT MS. MCGHIE INFORMED ANYONE ELSE AT ZAZZLE THAT PLAINTIFF HAD NOT RESPONDED TO THE MESSAGE

INQUIRING ABOUT PERPETUAL SERVER-BASED LICENSES OR THAT ANY ZAZZLE EMPLOYEE BELIEVED THAT PLAINTIFF'S FAILURE TO RESPOND TO THE MESSAGE MEANT THAT PLAINTIFF WOULD NOT GRANT SUCH A LICENSE."

SO YOU SAID TO THEM, YOU HAVEN'T SHOWN THAT YET, WHEN YOU ARE SEEKING YOUR OWN SUMMARY JUDGEMENT, AND THEN WHAT HAPPENED IN DISCOVERY --

THE COURT:  IT'S AN JUXTAPOSITION WITH THE STATUTE OF LIMITATIONS ARGUMENT, A FAILURE TO RESPOND, SHE FAILED TO RESPOND OR EVEN REGISTER ALL THOSE E-MAILS, AND NOW THIS IS SUPPOSED TO MEAN YOU SHOULD HAVE KNOWN I WAS DENYING IT.

SO IT'S NOT PLAUSIBLE.  I AGREE WITH YOU.

MR. SCHAPIRO:  YEAH.  ALL RIGHT.

SO THEY HADN'T -- YOU ALSO POINTED OUT IN THAT RULING BACK AT 174, THAT PLAINTIFF HAD NOT YET EVEN DEPOSED MS. MCGHIE. WELL PLAINTIFF HAS NOW DEPOSED MS. MCGHIE.  SHE SAYS SHE DIDN'T INFORM ANYONE ELSE AT ZAZZLE, NO ONE ELSE AT ZAZZLE WAS AWARE OF HER LACK OF REPONSE.  IN FACT, ALL EIGHT ZAZZLE EMPLOYEES WHO WERE DEPOSED BY THE PLAINTIFFS, TRYING TO MAKE THEIR CASE, TESTIFIED THEY HAD NO SUCH BELIEF, AND MR. ALKHATIB TESTIFIED THAT HE HAD NO INTENT TO DEFRAUD.

SO THAT'S -- I'M NOT SURE -- YES, MY SLIDE NUMBER 23, JUST TO JUMP TO THAT, THIS IS WHAT THE UNDISPUTED EVIDENCE FROM ALL OF THE DEPOSITIONS IS.  SO WHAT WE KNOW IS THAT THE PLAINTIFFS -- THE DEFENDANTS, THE KEY PEOPLE AT ZAZZLE WERE

AWARE OF WHAT IS CALLED THE OFFERING PAGE, BUT THERE IS NOT A SCINTILLA OF EVIDENCE, NOT A SCINTILLA THAT ANYONE AT ZAZZLE WAS AWARE OF ANYTHING OTHER THAN THE OFFERING PAGE.

AND THE OFFERING PAGE IS THE ONE THAT SAYS, COMMERCIAL USE, UNLIMITED NUMBER OF PROJECTS AND UNLIMITED END PRODUCTS FOR SALE.  AND I'M MENTIONING THIS IN THE FRAUD SECTION BECAUSE THE PLAINTIFF'S THEORY IS, OH, WELL THE MERE FACT THAT HE BOUGHT THIS LICENSING MUST HAVE HARBORED ILL INTENT.

WELL NO, WE NOW KNOW THAT THE PEOPLE WHO HAD ANY AWARENESS AT ALL OF THE PRODUCT, WE ARE LOOKING AT A PAGE THAT SAYS RIGHT ON ITS FACE "COMMERCIAL USE, UNLIMITED NUMBER OF TIMES."

SO YOUR HONOR, I THINK THE FRAUD CLAIMS AS YOU'VE PREVIEWED CAN'T SURVIVE.

THE COURT:  SO ARE YOU ALSO ARGUING THE UNDISCLOSED AGENT AS PART OF THE FRAUD CLAIMS OR IS THAT SEPARATE?

MR. SCHAPIRO:  YES, IT LOSES FOR THE SAME REASONS, BECAUSE YOU CAN'T --

THE COURT:  I GUESS IT'S UNDISCLOSED PRINCIPLE IS THE WAY THAT LAATZ TERMS IT.

MR. SCHAPIRO:  RIGHT.  SO THERE IS -- I THINK -- WELL A CASE WE CITED IN OUR BRIEF, I DON'T WANT TO TAKE TOO LONG, SPECIFICALLY ON AN UNDISCLOSED PRINCIPLE CASE THAT SAYS SPECULATION, THINKING MAYBE HE MUST HAVE, ISN'T A SUBSTITUTE FOR EVIDENCE AT THE SUMMARY JUDGEMENT PHASE.

SO ALL OF THE EVIDENCE SAYS, MR. ALKHATIB WAS DOING THIS

BECAUSE HE WAS ASKED TO BY ZAZZLE, THE FIELDS OF THE -- THAT HE SIGNED ON JUST SAID WHAT THEY SAID.

CREATIVE MARKET ITSELF, THIS IS ONE OF OUR SLIDES, SAID HE HAD FILLED EVERYTHING OUT CORRECTLY.  SO THAT NEEDS TO FALL.

THE COURT:  IT SEEMS TO ME GETTING TO THE, SORT OF THE CRUX OF THE CASE, THAT IF MR. ALKHATIB IS NO LONGER A PARTY, IT DOESN'T AFFECT THE POTENTIAL LIABILITY AGAINST ZAZZLE.  HIS CONDUCT IS STILL EVIDENCE.

MR. SCHAPIRO:  THAT'S FAIR AS WELL, YEAH.

THE COURT:  BUT HIS CONDUCT WILL ALWAYS BE EVIDENCE IN THE CASE, BUT HIS BEING NAMED AS A PARTY, I DON'T THINK ADS ANYTHING.  I MEAN, IF ZAZZLE WINS AND HE LOSES, I THINK MS. LAATZ IS GOING TO BE DISAPPOINTED THAT HE'S PROBABLY NOT -- DOESN'T HAVE THE NET WORTH TO COVER WHAT SHE THINKS HER CASE IS WORTH.

MR. SCHAPIRO:  SHE WILL BE DISAPPOINTED NO MATTER WHAT.  I WILL STOP THERE.

THE COURT:  I KNOW YOU WOULD LIKE TO WIN.

MR. SCHAPIRO:  YOUR HONOR, I THINK I WILL NOW CEDE THE PODIUM TO MY COLLEAGUE, DAN POSNER, WHO WILL TALK ABOUT CONTRACT AND COPYRIGHT.

THE COURT:  THANK YOU.  OKAY.

COPYRIGHT STUFF IS GOING TO TAKE SOME TIME.  I'M MINDFUL OF THE CLOCK, AND YOU HAVE ABOUT 30 MINUTES LEFT IN YOUR TOTAL ARGUMENT.

MR. POSNER:  I THINK THAT'S PLENTY OF TIME FOR ME TO GET THROUGH THE POINTS I WOULD LIKE TO MAKE.

THE COURT:  NO, NO, WE WILL TAKE A BREAK AT 11, THAT'S NOT THE ISSUE, BUT YOU HAVE 30 MINUTES, AND WE STILL HAVE THE BREACH OF CONTRACT AND THEN THE WHOLE COPYRIGHT ISSUE, WHICH TO ME IS SO COMPLICATED.

MR. POSNER:  RIGHT.

THE COURT:  AND JUST MAKE SURE YOU SPEAK INTO THAT MICROPHONE THERE, MR. POSNER.

MR. POSNER:  ALL RIGHT.

DAN POSNER FOR THE DEFENDANT, ZAZZLE.  THANK YOU, YOUR HONOR, IT'S A PLEASURE TO BE IN YOUR COURTROOM.

IF I MAY, I WOULD LIKE TO START WITH COPYRIGHT.  THAT'S JUST HOW WE ARRANGED IT, AND I THINK LET'S GET TO IT.  WE HAVE PUT A LOT OF THOUGHT INTO THIS ISSUE.

AND I THINK WE HAVE CRACKED THE CODE HERE AND IT'S ACTUALLY NOT AS COMPLICATED AS ANYONE THINKS, AND I THINK FRANKLY THERE IS A REASON WHY THE FONT INDUSTRY IS CONCERNED ABOUT WHAT'S HAPPENING HERE BECAUSE THESE COPYRIGHTS ARE VERY VULNERABLE AND WE HAVE BEEN PUT IN A POSITION WHERE WE NEED TO DEFEND OURSELVES AGAINST ONE AND WE PUT A LOT OF THOUGHT INTO IT, AND I WOULD LIKE TO CONVINCE YOUR COURT WHY THIS IS NOT EVEN A SUMMARY JUDGEMENT ISSUE AT THIS POINT, THESE COPYRIGHTS ARE INVALID.

AND WE HAVE RAISED THREE INDEPENDENT REASONS WHY WE SHOULD

PREVAIL ON THE COPYRIGHT CLAIM ON SUMMARY JUDGEMENT.  AND THE FIRST ONE WHICH YOUR HONOR REFERENCED IS THE LACK OF HUMAN AUTHORSHIP ISSUE, AND THAT'S WHERE I BEGIN.  THE SECOND ISSUE IS THE FRAUD ON THE COPYRIGHT OFFICE ISSUE, THAT'S ANOTHER BASIS FOR COPYRIGHT INVALIDITY.  YOUR HONOR DOES NOT NEED TO REACH THAT ISSUE IF YOU DECIDE THAT IT'S INVALID FOR LACK OF HUMAN AUTHORSHIP.

AND THEN THE THIRD ISSUE FRANKLY MIGHT BE THE MOST SIMPLE WHICH IS THE LACK OF INFRINGEMENT, AND IT IS NOT QUITE AS YOUR HONOR ARTICULATED IT IN ADDRESSING YOUR TENTATIVES AND I WILL EXPLAIN WHY BRIEFLY.

SO ON THE LACK OF HUMAN AUTHORSHIP ISSUE, FOR ONE THING THERE IS NO DISPUTE THAT HUMAN AUTHORSHIP IS A REQUIREMENT, EVERYBODY AGREES WITH THAT.  YOUR HONOR HAS ADDRESSED THESE ISSUES BEFORE, AND AT THE TIME, THERE WAS RIGHTLY SOME CONFUSION AND DISAGREEMENT ABOUT MS. LAATZ'S CREATIVE PROCESS, WHAT DID SHE DO TO CREATE THE BLOOMING ELEGANT FONT?

THERE REALLY IS NO DISPUTE ANYMORE, WE HAVE SPILLED A LOT OF INK ON THIS, TAKEN EXPERT DEPOSITIONS, AND I THINK THE PARTIES ARE LARGELY IN AGREEMENT, AND I'M SURE THERE ARE DISPUTED ISSUES AS TO WHAT MS. LAATZ DID, I DON'T THERE ARE ANY.

AND THIS IS LAID OUT IN OUR PAPERS AND I DON'T INTEND TO GO INTO DETAIL ON IT BUT WE KNOW NOW SHE STARTED BY DRAWING GLYPHS IN A SEPARATE PROGRAM AND PASTED THEM INTO FONTLAB.

FONTLAB ASSIGNED, AUTOMATICALLY, COORDINATES -- IT'S ALL LAID OUT IN DETAIL IN THE PARTY'S PAPERS, SO I THINK THAT'S AN IMPORTANT DISTINCTION BETWEEN WHERE WE ARE NOW AND WHERE WE WERE BEFORE, THAT THERE REALLY IS NO DISPUTE ABOUT THAT.

WHAT'S ALSO UNDISPUTED IS PLAINTIFF USED FONTLAB, A FONT-GENERATED COMPUTER ENGINE, FOR EVERY ASPECT OF HER DESIGN PROCESS.  AND TO BE SURE, SHE DID NOT DISCLOSE THAT FACT TO THE COPYRIGHT OFFICE, BUT SHE ADMITS TO IT NOW AND DISCUSSES HOW SHE USED IT AT LENGTH.

SO WITH THAT, THE ONLY QUESTION REALLY REMAINING IS WHETHER WHAT THE PLAINTIFF DID IS SUFFICIENT TO AMOUNT TO HUMAN AUTHORSHIP UNDER THE COPYRIGHT ACT, AND THE ANSWER IS NO.  AND SO THE REMAINING ISSUE IS WHAT DO WE LOOK TO FOR GUIDANCE ABOUT WHAT AMOUNTS TO HUMAN AUTHORSHIP IN THE CONTEXT OF CREATING FONT DATA OF THIS SORT?

AND THE GUIDANCE THAT WE HAVE COMES PRIMARILY FROM THE COPYRIGHT OFFICE ITSELF.  AND EVERYONE AGREES THAT COPYRIGHT OFFICE GUIDANCE IS PERSUASIVE AND THAT'S WHAT WE SHOULD BE FOLLOWING TO DETERMINE THE ELIGIBILITY OF FONTS FOR COPYRIGHT PROTECTION.

AND WE HAVE THE COPYRIGHT OFFICE EXAMINER'S STATEMENTS, MANY STATEMENTS WHICH YOUR HONOR IS FAMILIAR WITH BUT I WILL BRIEFLY MENTION, AND THEN VARIOUS COMPENDIUM PROVISIONS WHICH THE PARTIES ALSO AGREE ARE PERSUASIVE AUTHORITY ON THIS QUESTION OF COPYRIGHTABILITY.

MR. SCHAPIRO:  I WOULD LIKE TO START WITH THE COPYRIGHT OFFICE CORRESPONDENCE.  THIS IS EXHIBIT, BB, YOUR HONOR HAS CONSIDERED THESE ON SEVERAL OCCASIONS NOW.  THE EXAMINER HERE WAS EXPLICIT ABOUT WHAT THE REQUIREMENTS ARE.

SO THE PLAINTIFF SUBMITTED A COPYRIGHT.  THEY APPLIED -- SHE APPLIED FOR A REGISTRATION AS A COMPUTER PROGRAM.  THAT'S WHAT SHE SOUGHT TO ATTAIN REGISTRATION FOR IS AS A COMPUTER PROGRAM.  AND THE EXAMINER IMMEDIATELY TOLD HER, I CANNOT REGISTER WHAT YOU SUBMITTED AS COMPUTER PROGRAMS BECAUSE THEY ARE NOT COMPUTER PROGRAMS, THEY ARE FONTS.

AND THE EXAMINER WENT ON TO SAY, IF THIS IS XML, WHICH IS A FORM OF MARKUP LANGUAGE, BEGINNING TO GET A LITTLE TECHNICAL, BUT THAT'S THE COMMON FORM IN WHICH FONT DATA IS SUBMITTED FOR REGISTRATION, IT'S IN A MARKUP LANGUAGE CALLED XML, AND THE EXAMINER SAID IS THIS XML, IF SO, LET ME KNOW IF IT WAS HAND-CODED BY A HUMAN AUTHOR OR IF IT WAS GENERATED BY A FONT PROGRAM LIKE FONTLAB.

AND ON FOUR OCCASIONS, THE EXAMINER MADE THE SAME STATEMENTS TO THE PLAINTIFF THROUGH MR. STEINBERG, HER COUNSEL, BECAUSE AS I WILL SHOW YOU IN A MOMENT, THE PLAINTIFF KEPT RESISTING THIS REQUIREMENT, THE HAND-CODING REQUIREMENT, AND KEPT SAYING, CAN'T YOU REGISTER THIS AS A COMPUTER PROGRAM? WHY ARE YOU HOLDING ME TO THIS HAND-CODING REQUIREMENT?

AND THE EXAMINER KEPT SAYING, WE DON'T DO THIS ANYMORE, WE DON'T REGISTER FONT DATA AS COMPUTER PROGRAMS, WE REGISTER THEM

AS TEXT, PROVIDED THAT THEY WERE HAND-CODED RATHER THAN CREATED BY A FONT DESIGN PROGRAM.

THE COURT: SO I ASKED THIS QUESTION. SO THE PLAINTIFF ARGUES IN THEIR BRIEF THAT IT ACTUALLY IS A COMPUTER PROGRAM AND IT SHOULD BE CONSIDERED UNDER THE 1992 DECISION.

IN YOUR REPLY YOU POINT OUT, THAT'S ALL WELL AND GOOD BUT THAT'S NOT THE POINT BECAUSE HER COPYRIGHT WAS NOT ISSUED AS A COMPUTER PROGRAM SO SHE CAN'T ARGUE VALIDITY UNDER A DIFFERENT THEORY OF COPYRIGHTABILITY. SO HELP ME OUT WITH THAT.

MR. POSNER: YEAH. WELL I THINK FOR ONE THING, IT'S UNDISPUTED SHE DID NOT GET REGISTRATIONS AS COMPUTER PROGRAMS, AND THAT --

THE COURT: YOU ARE TRYING TO INVALIDATE IT. SO THEY ARE SAYING, WELL EVEN IF IT DOESN'T QUALIFY HERE AS IT WAS ISSUED, IT QUALIFIES IT HERE AS A COMPUTER PROGRAM, AND THE EXAMINER WAS WRONG AND SHOULDN'T HAVE EXCLUDED THIS.

SO IS THAT EVEN AN ARGUMENT THAT I CAN CONSIDER? I MEAN, THIS KIND OF INVALIDITY WOULD NORMALLY GO BACK TO THE COPYRIGHT OFFICE AND NOT TO ME, SO I'M STRUGGLING.

MR. POSNER: AND IT COULD HAVE AND SHOULD HAVE GONE BACK TO THE COPYRIGHT OFFICE.

SO THIS IS HIGHLY UNUSUAL AND I THINK YOUR HONOR IS RIGHT TO BE CONFUSED ABOUT IT. THEY HAVE A REGISTRATION IN FONT DATA AND THEY KNOW THAT THAT REGISTRATION IS VALID ONLY IF THEY CAN SHOW SHE HAND-CODED THE FONT DATA RATHER THAN USED A

FONT-GENERATING COMPUTER PROGRAM TO GENERATE IT.

THEY KNOW THEY CANNOT MEET THAT STANDARD, AND WE SUBMIT THE ONLY REASON WHY THEY DID IS BECAUSE THEY MISLEAD THE COPYRIGHT OFFICE ABOUT IT.

SO WHAT THEY ARE DOING HERE, AND REALLY WHAT THE WHOLE INDUSTRY IS DOING NOW, IS SAYING ODDLY, THAT EVEN THOUGH THEY HAVE THIS REGISTRATION, RATHER THAN DEFEND WHAT THEY HAVE, THEY WANT TO SHOW THAT THE COPYRIGHT OFFICE GOT IT WRONG AND THE EXAMINER MESSED UP AND GAVE THEM THE WRONG REGISTRATION AND THAT THEY SHOULD HAVE BEEN GIVEN A COMPUTER PROGRAM REGISTRATION.

BUT YOUR HONOR IS RIGHT ON TWO POINTS:  ONE, THEY DO NOT HAVE A COMPUTER PROGRAM REGISTRATION, THAT'S NOT WHAT THEY HAVE ASSERTED AGAINST US IN THIS LAWSUIT --

THE COURT:  AND I CAN'T GIVE HER ONE, I DON'T GIVE COPYRIGHTS.

MR. POSNER:  SO THE REMEDY THERE IS TO INVALIDATE WHAT THEY HAVE AND THE IMPLICATIONS WILL FLOW FROM THAT, BUT THAT'S NOT THE REGISTRATION THEY HAVE.

BUT TO GIVE YOUR HONOR SOME COMFORT, THE COPYRIGHT OFFICE DID KNOW ERR IN FAILING TO GIVE THEM A COMPUTER PROGRAM REGISTRATION, THE EXAMINER COULD NOT HAVE BEEN MORE CLEAR ABOUT IT, IT'S RIGHT HERE ON THIS SLIDE, IT SO HAPPENS, "WE NO LONGER DO THIS," AND IN ANOTHER SLIDE HE SAYS "WE DON'T DO THIS BECAUSE FONT DATA IS NOT A COMPUTER PROGRAM BECAUSE IT DOES NOT

DISPUTE SOURCE CODE."

AND YOUR HONOR MENTIONED SOURCE CODE IN YOUR INTRODUCTORY DISCUSSIONS.  THE PLAINTIFFS WILL USE THAT WORD AS MANY TIMES AS THEY CAN, BUT THE ONE THING THEY DON'T EVER DO, THEIR EXPERTS OR ANYBODY, IS REFERENCE THE DEFINITION OF SOURCE CODE UNDER THE COPYRIGHT ACT.

AND THERE IS A SPECIFIC DEFINITION OF SOURCE CODE AND IT REQUIRES THAT IT IS HUMAN-AUTHORED DATA THAT IS WRITTEN IN A COMPUTER PROGRAMMING LANGUAGE.

THAT'S THE DEFINITION OF SOURCE CODE UNDER THE COPYRIGHT ACT.  THERE IS NO DISPUTE THAT THE FONT HERE IS NOT.

THE COURT:  WHEN I READ THESE PAPERS, AND MAYBE I MISSED IT, DID MS. LAATZ EVER TESTIFY THAT SHE'S CAPABLE OF AUTHORING SOURCE CODE UNDER THIS DEFINITION?

MR. POSNER:  FIRST OF ALL, SHE WASN'T FAMILIAR WITH THE DEFINITION AND SHE SAID SHE DOESN'T HAVE FAMILIARITY WITH U.S. COPYRIGHT LAW.

BUT TO BE SURE, YOUR HONOR, WHEN SHE CREATED THIS IN 2015/2016 OVERSEAS, U.S. COPYRIGHT PROTECTION WAS NOT ON HER MIND, SHE IS NOT A COMPUTER PROGRAMMER, SO NO, SHE DID NOT.

THE COURT:  IT'S A REALLY CLEAR QUESTION BECAUSE YOU DON'T HAVE TO BE A LAWYER TO KNOW WHETHER OR NOT YOU CAN WRITE SOURCE CODE.

SO SOFTWARE ENGINEERS DO IT EVERY DAY, AND IF YOU ASK THEM DO YOU WRITE SOURCE CODE, THEY SAY SURE I DO.  YOU COULD THEN

FOLLOW IT UP TO SAY, AND WHAT DO YOU DO?  BUT DID YOU ASK HER

THAT QUESTION, DO YOU KNOW HOW TO WRITE SOURCE CODE?

MR. POSNER:  YES, I BELIEVE WE DID ASK HER.  SHE'S

NOT A COMPUTER PROGRAMMER.  I DON'T WANT TO MISSTATE THE

RECORD, WE CAN PROVIDE THOSE CITES, BUT SUFFICE IT TO SAY I'M

CONFIDENT SHE'S A GRAPHIC DESIGNER, SHE DESIGNS FONTS BY HAND,

SHE'S NOT A COMPUTER CODER.

BUT NOBODY HAS ALLEGED EVEN THAT SHE USED A COMPUTER

PROGRAMMING LANGUAGE TO CODE THIS DATA.  AND SHE SIMPLY DIDN'T.

AND THAT'S REALLY THE END OF THE STORY.  WHAT SHE SUBMITTED IS

NOT A COMPUTER PROGRAM UNDER THE COPYRIGHT ACT.  AND YOU NEED

LOOK NO FURTHER THAN WHAT THE EXAMINER TOLD HER OVER AND OVER

AGAIN AND THE COMPENDIUM PROVISIONS.

SO WE SAY THAT THEIR ARGUMENT ON INFRINGEMENT TOO, I WILL

GET THERE IN A MOMENT, IT ALL GOES AWAY BECAUSE IT ALL TURNS ON

THE COPYRIGHT OFFICE HAVING ERRED IN DECLINING TO GIVE HER A

COMPUTER PROGRAM REGISTRATION.

THE COURT:  BECAUSE I THINK I'M HEARING YOUR SIMPLE

SORT OF THROUGH LINE ON THE COPYRIGHT ISSUE, SO I WANT TO MAKE

SURE I UNDERSTAND IT, THAT YOU ARE ARGUING TO ME THAT THERE'S

NO EVIDENCE THAT SHE HAND-AUTHORED THE SOURCE CODE FOR THE FONT

PROGRAM, AND WHETHER OR NOT THE EXAMINER MADE A MISTAKE IN

REJECTING HER ALTERNATE THEORY OF BEING A COMPUTER PROGRAM IS

NOT SOMETHING I CAN EVEN DEAL WITH BECAUSE I CAN INVALIDATE THE

COPYRIGHT GIVEN BUT I CAN'T VALIDATE A COPYRIGHT UNDER THIS

OTHER THEORY EVEN IF I WERE TO AGREE WITH HER.

MR. POSNER:  THE LATTER POINT IS CERTAINLY CORRECT, YES, SHE HASN'T.  BUT I DO WANT TO TAKE ISSUE AGAIN WITH YOUR HONOR'S USE OF SOURCE CODE BECAUSE IT'S NOT A QUESTION ABOUT WHETHER THERE'S A DISPUTE ABOUT WHETHER SHE HAND-CODED SOURCE CODE.  THERE IS NO DISPUTE THAT WHATEVER SHE DID, DID NOT CONSTITUTE SOURCE CODE UNDER THE COPYRIGHT ACT.

AND THERE IS NO DISPUTE THAT UNDER THE DEFINITION OF SOURCE CODE IN THE COPYRIGHT ACT, A COMPUTER PROGRAM MUST BE WRITTEN IN SOURCE CODE.  AND HERE IT'S NOT.  AND I BRING THAT UP TO JUST CONFIRM THE CORRECTNESS OF THE COPYRIGHT OFFICE'S REJECTION OF HER REGISTRATIONS AS COMPUTER PROGRAM SO THAT THERE'S REALLY NO REASON FOR YOU TO EVEN GRAPPLE.

THE COURT:  DO I NEED TO DECIDE THAT THE COPYRIGHT OFFICE WAS INCORRECT IN REJECTING THE COMPUTER PROGRAM APPLICATION?

MR. POSNER:  NO.

THE COURT:  BECAUSE I GUESS I'M TRYING TO FIGURE OUT, LET'S SAY I DECIDE THEY WERE WRONG, I DON'T KNOW WHERE THAT TAKES ME BECAUSE I CAN'T THEN GO THE NEXT STEP TO DETERMINE WHETHER THIS BLOOMING ELEGANT SHOULD HAVE BEEN GIVEN A COPYRIGHT UNDER THE COMPUTER PROGRAM REQUIREMENTS, I CAN'T DO THAT.

MR. POSNER:  CORRECT.

THE COURT:  SO THE BEST I CAN DO IS MAYBE AGREE WITH

YOU THAT IT'S UNDISPUTED THAT SHE HAS NO VALID COPYRIGHT UNDER THE GROUNDS THAT IT WAS ISSUED BECAUSE -- THEN I'M AT THE FRAUD.  THE ONLY WAY I REACH THAT IS YOUR FRAUD CLAIM.

MR. POSNER:  NO, YOUR HONOR, IF YOUR HONOR -- SHE HAS A COPYRIGHT REGISTRATION IN FONT DATA, NOT SOURCE CODE, NOT A COMPUTER PROGRAM, SHE HAS A FONT DATA COPYRIGHT REGISTRATION, THAT IS THE REGISTRATION THAT SHE NEEDS TO DEFEND THE VALIDITY OF IN THIS CASE.

AND SHE HAS NOT DONE THAT AND WE KNOW SHE HAS NOT DONE THAT BECAUSE SHE'S TRYING TO TURN THE ISSUE TO SOMETHING ELSE AND SAYING, OH WELL I SHOULD HAVE GOTTEN A COMPUTER PROGRAM REGISTRATION.  BUT IF YOUR HONOR DETERMINES THAT SHE SHOULD NOT HAVE RECEIVED THE FONT DATA REGISTRATION BECAUSE SHE DID NOT -- SHE USED A COMPUTER PROGRAM TO CREATE IT, THEN THE REMEDY IS TO INVALIDATE THE REGISTRATION SHE HAS, AND SHE ASSERTED IN THAT LAWSUIT AND THAT'S REALLY THE END OF STORY FOR THIS COURT.

THE COURT:  SO IT WOULD BE SUDDENLY THE COPYRIGHT OFFICE TO AGAIN PRESENT THIS AS A COMPUTER PROGRAM.

MR. POSNER:  WHICH WOULD HAVE IMPLICATIONS ON THIS CASE BECAUSE YOU NEED A VALID REGISTRATION BEFORE YOU CAN FILE A LAWSUIT.  I WOULD SAY SHE HAD REMEDIES IN THE COPYRIGHT OFFICE IF SHE FELT THE COPYRIGHT OFFICE WAS WRONG TO REJECT HER COMPUTER PROGRAM REGISTRATION, THERE IS A WHOLE APPEAL PROCESS THERE.

YOU CAN EVEN ACCEPT A REJECTION AND THEN FILE SUIT, THE

STATUTE ALLOWS YOU TO DO THAT, BUT THEY TOOK THEIR REGISTRATION, AND NOW INSTEAD OF DEFENDING THE ONE THEY HAVE, THEY ARE ARGUING THEY SHOULD HAVE RECEIVED SOMETHING ELSE, THAT IS IMPROPER.

THE COURT:  WELL SHE ONLY -- I BELIEVE, AS I RECALL FROM THE EARLY MOTIONS TO DISMISS, SHE ONLY SOUGHT TO REGISTER THIS WHEN SHE WAS READY TO SUE, 2021.

MR. POSNER:  IT WAS DAYS BEFORE, AND THAT MATTERS WHEN WE GET TO THE FRAUD ARGUMENT, IT ALSO MATTERS WHEN WE GET TO THIS ARGUMENT THAT I'M TALKING ABOUT NOW BECAUSE THEY RECOGNIZED THEY WERE IN TROUBLE, THEY APPLIED FOR THE COMPUTER PROGRAMMING AND RIGHT AWAY THE EXAMINERS, I CAN'T DO IT THAT WAY, I CAN DO IT IF YOU DIDN'T USE A COMPUTER PROGRAM.  AND INSTEAD OF SAYING OKAY, WE WILL TAKE THAT, THEY PUSHED BACK, AND THEY PUSHED BACK, AND THEY PUSHED BACK UNTIL THEIR BACKS WERE AGAINST THE WALL.

THE COURT:  BUT I DON'T NEED -- WHAT I'M TRYING TO MAKE SURE, IN YOUR VIEW, I DON'T NEED TO DECIDE WHETHER OR NOT THE COPYRIGHT EXAMINER WAS INCORRECT IN REJECTING IT AS A COMPUTER PROGRAM AND I DON'T NEED TO DECIDE WHETHER OR NOT THE 1992 DECISION OR COMPENDIUM WOULD HAVE REQUIRED THE COPYRIGHT OFFICE TO EVALUATE THE APPLICATION AS A COMPUTER PROGRAM.

MR. POSNER:  I AGREE WITH THAT, YOUR HONOR.  THAT'S NOT THE REGISTRATION THAT THEY HAVE AND THAT THEY HAVE ASSERTED IN THIS CASE.  BUT I WOULD LIKE TO GIVE YOUR HONOR COMFORT THAT

THAT'S THE RIGHT RESULT.

AND SO TO SPEED FORWARD, THE EXAMINER SAID EXACTLY WHAT I'M SAYING, AND I THINK WHAT YOUR HONOR IS UNDERSTANDING, OVER AND OVER AGAIN AND WHAT THE PLAINTIFFS HAVE DONE IS TRIED TO DO ANYTHING THEY CAN TO DISCREDIT THAT AND TO SAY THE EXAMINER IS WRONG.

AND WE SHOWED YOU, THE EXAMINER ITSELF HERE SAID OVER AND OVER, AND WHAT WE SHOWED YOU MORE RECENTLY IN SOME OF THESE SLIDES IS THAT THIS EXAMINER DID NOT GO ROGUE BY SAYING, CAN'T DO IT AS A COMPUTER PROGRAM, YOU HAVE TO HAVE HAND-CODED. EXAMINER, AFTER EXAMINER, AFTER EXAMINER HAVE DONE THAT.  THIS IS THE POLICY NOW OF THE COPYRIGHT OFFICE.

AND WE HAVE SHOWN THESE EXAMPLES IN OUR REPLY BRIEF.  TIME AFTER TIME EXAMINERS SAY, YOU ARE SUBMITTING FONT DATA, YOU HAVE TO TELL ME THAT IT WAS HAND-CODED IN ITS ENTIRETY RATHER THAN CREATED BY A COMPUTER PROGRAM WHEN THE APPLICANT SAYS "I HAND-CODED," AS IN THESE EXAMPLES, THEY GET A REGISTRATION.

AND SO THAT IS THE LAW.  THEY CAN NOT MEET THAT STANDARD AND THAT'S THE REASON WHY THEIR REGISTRATIONS ARE INVALID. THERE ARE COMPENDIUM PROVISIONS TO BE SURE THAT SUPPORT OUR VIEW, YOUR HONOR IS FAMILIAR WITH THIS ONE, SECTION 723.

NOW WE SUBMIT THAT 723, LIKE THE 1992 DOCUMENT THAT THEY RELY ON, THOSE ARE ALL FACIALLY INAPPLICABLE BECAUSE THEY APPLY TO COMPUTER PROGRAMS THAT ARE WRITTEN IN SOURCE CODE THAT ARE USED TO GENERATE NEW TYPEFACES.  SO IT WOULD BE SOMETHING

COMPARABLE TO FONTLAB, THE PROGRAM THAT SHE USED HERE.  THEY DON'T APPLY TO THE OUTPUT OF THOSE FILES.

AND THE COPYRIGHT OFFICE IN SECTION 723 WAS PRETTY CLEAR, THEY LAID OUT THE SITUATIONS IN WHICH A COMPUTER PROGRAM AKIN TO FONTLAB MIGHT BE ELIGIBLE FOR REGISTRATION BUT THEN THEY CLARIFY, IF ALL THE AUTHOR DID IS USE ONE OF THOSE THIRD PARTY PROGRAMS TO TYPE IN COORDINATES AND THEN THE PROGRAM AUTOMATICALLY ASSIGNED COORDINATES -- EXCUSE ME.  IF THE AUTHOR USED ONE OF THOSE PROGRAMS TO DESIGN A TYPEFACE AND THE PROGRAM ASSIGNED COORDINATES, WHICH IS WHAT HAPPENED HERE, THEN ESSENTIALLY YOU DON'T GET YOUR REGISTRATION.

AND THAT IS WHAT HAPPENED HERE, THIS IS ANOTHER INDICATION THAT THE COPYRIGHT OFFICE WAS RIGHT AND HAS THIS POLICY.  AND THE PLAINTIFF HAS NO RESPONSE TO THIS.  I FIND IT NOTABLE BECAUSE YOUR HONOR RELIED ON THAT LANGUAGE IN THE ORDER ON THE MOTION TO DISMISS.  THEY DON'T MENTION IT IN THEIR OPPOSITION BRIEF.

WE ALSO SHOWED YOU THAT IT MAKES A LOT OF SENSE THAT THE EXAMINERS HAVE REPEATEDLY APPLIED THIS HAND-CODING REQUIREMENT AND THEY SEEM TO BE IMPORTING IT FROM ANOTHER COMPENDIUM PROVISION WHICH IS SECTION 1006.1 WHICH CONCERNS -- GETS A LITTLE TECHNICAL, BUT IT'S AN ANALOGOUS FORM OF MARKUP LANGUAGE CALLED HTML, AND EVERYONE AGREES THAT FONT DATA IS TYPICALLY SUBMITTED IN A FORM OF MARKUP LANGUAGE.  IT'S OFTEN XML, HERE IT WAS SLIGHTLY DIFFERENT, BUT AS THEY ADMIT, FUNCTIONALLY

EQUIVALENT FORM OF MARKUP LANGUAGE.

THIS IS AN IMPORTANT SLIDE I WOULD ENCOURAGE YOUR HONOR TO READ BECAUSE I THINK IT WILL GIVE YOU SOME COMFORT THAT THE STANDARDS THAT THE EXAMINERS HAVE IMPOSED OVER AND OVER AGAIN ARE -- THEY MAKE SENSE, BECAUSE THE SAME CONCERNS THAT THE COPYRIGHT OFFICE HAS ABOUT FORMS OF COMPUTER PROGRAMS AUTOMATICALLY GENERATING HTML SO THAT THE COMPUTER PROGRAM RATHER THAN THE HUMAN AS THE AUTHOR, THOSE APPLY TO FONT DATA JUST AS WELL.

AND WHEN YOU LEARN WHAT FONTLAB DOES, IT MAKES SENSE, YOU DRAW YOUR GLYPH WITH A STYLUS OR YOU PASTE IT IN FROM SOMETHING ELSE AND BOOM THE COORDINATES POP UP AUTOMATICALLY. YOU ARE NOT THE AUTHOR OF THAT WHEN THAT HAPPENS.

SO I TOUCHED ON THIS BASED ON YOUR HONOR'S QUESTION, BUT I THINK IT'S TELLING THAT EVERY TIME THE COPYRIGHT OFFICE SAID DID YOU HAND CODE RATHER THAN USE A FONT PROGRAM, THEY RESISTED. THEY DID IT BACK AT THE EXAMINATION STAGE AND THAT'S STILL THE PRIMARY ARGUMENT THAT THEY MAKE NOW THAT COMPRISES THE BULK OF THEIR COPYRIGHT ARGUMENT IN THEIR OPPOSITION BRIEF.

THIS NEXT SLIDE, THESE ARE THE REGISTRATIONS THEY HAVE, THEY DON'T SAY COMPUTER PROGRAMS, THEY ARE FONT DATA, THEY ARE TEXT FILES, THAT'S WHAT THEY REGISTERED. AND SO DEFENDING THEM ON THE GROUNDS OF POTENTIALLY BEING COMPUTER PROGRAMS DOESN'T MAKE SENSE.

I HAVE A FEW SLIDES HERE, I THINK I TOUCHED ON THESE

POINTS, THESE ARE ALL THE REASONS WHY YOUR HONOR, IF YOU GET THERE, COULD TAKE COMFORT IN THE FACT THAT THE COPYRIGHT OFFICE WAS CORRECT, TO REJECT THE REGISTRATION AS COMPUTER PROGRAMS. THEY REALLY DON'T DISPUTE THIS.  THERE IS NO SOURCE CODE, IT'S NOT A COMPUTER PROGRAM.

THE COURT:  THAT'S MY POINT.  I DON'T THINK -- WHAT I'M HEARING FROM YOU, YOU ARE ARGUING I DON'T NEED TO DECIDE IF THEY WERE CORRECT.

MR. POSNER:  ON THAT POINT.

THE COURT:  ON THAT POINT.

MR. POSNER:  CORRECT.

THE COURT:  BECAUSE THEY DIDN'T ISSUE IT AS A COMPUTER PROGRAM, AND I CAN ONLY LOOK AT THE VALIDITY OF THE REGISTRATION GIVEN.

MR. POSNER:  THE ONE THAT'S ASSERTED AGAINST US, THE ONE THAT'S IN THE CASE.  AND THEY DON'T HAVE A COMPUTER PROGRAM REGISTRATION, AND SO IT IS A BIG DISTRACTION AND AN ODD ONE.

I THINK THAT THEY FOCUS SO MUCH ON THIS ISSUE RATHER -- AND I KNOW WHY I THINK THEY DO AND I WILL MENTION THAT WHEN WE GET TO THE INFRINGEMENT.

SO I'M GOING TO SPEED ALONG BECAUSE THEY DON'T HAVE A REGISTRATION IN COMPUTER PROGRAM.  THIS IS A HANDY CHART IF YOUR HONOR WANTS MORE INFORMATION ABOUT WHY WHAT THEY REGISTERED IS NOT A COMPUTER PROGRAM.

NOW YOUR HONOR SUGGESTED FOR A MINUTE THAT -- OR IN YOUR

TENTATIVE THOUGHTS -- THAT THERE MIGHT BE A QUESTION ABOUT WHETHER SHE HAND-CODED ENOUGH.  IT'S REALLY NOT THE ISSUE. WHEN YOU LOOK AT WHAT THE EXAMINER SAID, THE EXAMINER -- AND AGAIN, OVER AND OVER EXAMINERS HAVE DONE THIS, THEY DRAW A DISTINCTION BETWEEN USING THE FONT PROGRAM ON THE ONE HAND AND HAND-CODING ON THE OTHER.  AND THERE IS NO QUESTION THAT SHE USED THE FONT PROGRAM HERE.

AND I JUST WANT TO POINT OUT TO TRY TO SAY, WELL EVEN IF YOU USE FONTLAB, YOU CAN STILL GET A REGISTRATION, THEY SAY THE COPYRIGHT OFFICE HAS A CUSTOM AND PRACTICE OF REGISTERING FONTS CREATED USING FONTLAB, BOTH BEFORE AND AFTER HER APPLICATIONS WERE APPROVED.

THAT'S A QUOTE FROM HER BRIEF, AND SHE SAYS IT IN A COUPLE PLACES.

THAT'S NOT TRUE, YOUR HONOR, NONE OF THE DOZENS OF FONT REGISTRATIONS THAT THE PLAINTIFFS HAVE IDENTIFIED ACTUALLY IDENTIFY FONTLAB.  I'M NOT SURE WHY THEY SAID THAT BUT I THINK THEY REALIZED THEY NEED TO CONVINCE THE COURT THAT USING FONTLAB --

THE COURT:  WASN'T IT THE FORMER CEO OF FONTLAB WHO SAID THAT?

MR. POSNER:  NO, IRONICALLY IT'S THE OTHER ONE, MR. SANDLER.  THEY COVERED SIMILAR GROUNDS.  I DON'T KNOW THAT MR. PHINNEY WOULD HAVE SAID THAT.

WHETHER OR NOT THE APPLICANTS IN THOSE REGISTRATIONS

ACTUALLY USED FONTLAB, NONE OF THEM SAID THEY DID AND NONE OF THE REGISTRATIONS INDICATE THAT THEY DO, SO I'M NOT SURE WHAT BASES THEY HAVE TO MAKE THAT STATEMENT.

JUST TO CLOSE ON THIS POINT, AGAIN, THEY TRY VERY HARD TO SAY THE EXAMINER GOT IT WRONG.  IT'S SORT OF AN ODD THING FOR THEM TO DO, THEY CRITICIZE THE EXAMINER AS BEING ENTRY LEVEL OR SORT OF GOING ROGUE.  THAT'S NOT WHAT THE EVIDENCE SHOWS.  THE COPYRIGHT OFFICE NOW HAS A CLEAR POLICY ABOUT HOW IT HANDLES FONT DATA.  HER REGISTRATIONS, HER FONT DATA DOES THAT AND DOES NOT MEET THAT STANDARD, AND SO THEY TRY TO DISTRACT BY GOING SOMEWHERE ELSE, BUT WE THINK THE COURT CAN AND SHOULD INVALIDATE THEM BY LACK OF HUMAN AUTHORSHIP, THEY DON'T MEET THE STANDARD.

IF WHAT SHE DID IS HAND-CODING RATHER THAN USING A FONT-GENERATED PROGRAM THEN THAT DISTINCTION WOULD MEAN NOTHING, IT WOULD BE MEANINGLESS, AND THEY DON'T HAVE A RESPONSE TO THAT.

THE COURT:  YOU ARE RUNNING OUT OF TIME.

MR. POSNER:  ON THE FRAUD ISSUE, WE HAVE COVERED ALL THESE POINTS.  MR. STEINBERG IS CHARGED WITH MS. LAATZ'S KNOWLEDGE OF WHAT SHE DID.  THE EXAMINER COULD NOT HAVE BEEN MORE CLEAR ABOUT WHAT THE STANDARD WAS.  MR. STEINBERG RESISTED, RESISTED, AND THEN FINALLY WHEN THE EXAMINER SAID, I'M GOING TO REJECT THESE REGISTRATIONS, THESE APPLICATIONS, IF YOU DON'T TELL ME THAT SHE HAND-CODED AND HE SAID SHE

HAND-CODED.

BASED ON THE WAY THE EXAMINER EXPLAINED WHAT HAND-CODING IS AS AN ALTERNATIVE TO USING FONTLAB, THAT WAS A MISREPRESENTATION, IT WAS AT LEAST INACCURATE.

AGAIN, YOUR HONOR DOESN'T HAVE TO REACH THIS ISSUE BUT WE SUBMIT THE RECORD IS CLEAR, OVER SIX MONTHS OF COMMUNICATIONS WITH THE COPYRIGHT OFFICE, THEY NEVER MENTIONED FONTLAB.  AND THEY NEVER MENTION FONTLAB, THEY DID NOT EVEN ANSWER HIS REPEATED QUESTION THAT THE FILE THEY SUBMITTED WAS IN THIS SO CALLED VFJ FORMAT BECAUSE THAT'S PROPRIETARY TO FONTLAB AND IT WOULD HAVE GIVEN IT AWAY.

SO THAT'S THE FRAUD CLAIM.  I DON'T THINK THERE ARE DISPUTED FACTS THERE, WE ALL KNOW WHAT WAS SAID.

AND ON THE INFRINGEMENT POINT, SO AS I SAID, THIS MIGHT BE THE MOST SIMPLE.  THIS ISN'T REALLY A QUESTION OF WHAT THE USERS OF ZAZZLE RECEIVED.  THE ARGUMENT THAT WE MAKE HERE IS THAT THE COPYRIGHT OFFICE VERY EXPLICITLY SAID WE ARE NOT GOING TO REGISTER WHAT HAS BEEN REFERRED TO AS THE OTF FILE.

SO WHEN ZAZZLE GOT ITS LICENSE FOR THE BLOOMING ELEGANT FONT, IT RECEIVED FROM PLAINTIFF AN OTF FILE WHICH IS A NON-HUMAN READABLE FILE 0'S AND 1'S.  THAT'S ALL WE EVER GOT.

YEARS LATER ON THE EVE OF LITIGATION, WHEN THEY APPLIED TO REGISTER THE COPYRIGHT, THEY TRIED TO SUBMIT THE OTF FILE AS THE DEPOSIT COPY AND THEY TRIED TO REGISTER IT.  AND YOU WILL SEE IN THE EXAMINER CORRESPONDENCE THAT THE EXAMINER REPEATEDLY

SAID NO, NO, NO, I CANNOT TAKE THE OTF FILE, IT IS NOT A SUITABLE COPY, ALL I CAN TAKE IS THE FULL ENTIRE COPY OF THE TEXT, THE DATA THAT YOU SAY OR THAT YOU NEED TO TELL ME THAT YOU HAND-CODED.

THAT'S THE VFJ FILE, IT'S MULTI HUNDRED PAGES, UNFORTUNATELY I THINK IT'S IN THE RECORD AND WE HAVE SUBMITTED A LOT OF PAPER ON IT, REAMS OF CODE, THAT NO QUESTION SHE DID NOT WRITE IT, BUT THAT'S THE ENTIRE FILE.

WE, ZAZZLE, IT'S UNDISPUTED NEVER RECEIVED THE VFJ FILE. WE DIDN'T GET IT, DIDN'T EVEN EXIST AS A FILE FORMAT UNTIL YEARS AFTER WE LICENSED, BUT THAT'S THE COPYRIGHTED WORK.  AND SO WITHOUT HAVING RECEIVED IT, WITHOUT EVER HAVING ACCESS TO IT, WE COULD NOT HAVE INFRINGED ON ANY RIGHTS SHE MIGHT HAVE IN THAT FILE.

THE COURT:  SHE ARGUES THEY ARE THE SAME.

MR. POSNER:  SHE RELIES ON OLD CASES THAT EXPLICITLY APPLY TO REGISTRATIONS FOR COMPUTER PROGRAMS.  AND THIS IS WHY THEY WERE SO RESISTANT, AND WHEN THE EXAMINER SAID I CAN'T REGISTER THE OTF, THEY SAID UH OH, WE NEED TO PUSH BACK AND WE NEED TO PUSH BACK AGAIN.  BECAUSE THEY WERE READY TO BRING AN INFRINGEMENT CLAIM AND THEY KNEW THAT WE HAD NEVER RECEIVED THE FILE THAT THE EXAMINER WAS INSISTING THEY REGISTER AND LIMITING THEM TO REGISTER.

AND TO BE SURE, IN THE CONTEXT OF A COMPUTER PROGRAM, THERE ARE DIFFERENT RULES BECAUSE THERE'S REAL SOURCE CODE, THE

COPYRIGHT OFFICE SAYS JUST GIVE US A SNIPPET OF IT AND THEN THAT THE SOURCE CODE WILL BE THE REPRESENTATION OF THE ACTUAL COPYRIGHTED WORK WHICH IS THE COMPUTER PROGRAM.  THAT'S UNIQUE TO COMPUTER PROGRAMS, THAT IS NOT WHAT THEY HAVE HERE, THEY HAVE A TEXT REGISTRATION IN THESE MULTI-HUNDRED PAGE VFJ FILES THAT WE NEVER RECEIVED.

THIS IS AN EASY AND CORRECT WAY TO RESOLVE THIS CLAIM BECAUSE THERE WAS NO INFRINGEMENT.

THE COURT:  I THINK IT'S INTERESTING THAT YOU SAY VFJ IS PROPRIETARY TO FONTLAB.  DIDN'T THE EXAMINER KNOW THAT?

MR. POSNER:  WELL THEY NEVER TOLD THEM THAT IT WAS VFJ.  AND THIS IS AN INTERESTING THING --

THE COURT:  ISN'T IT OBVIOUS WHEN YOU GET IT?

MR. POSNER:  NO.  IF YOU LOOK AT THE FILE, THERE IS NOTHING OBVIOUS ABOUT IT, IT'S CODE.  AND THE EXAMINER, SEEMINGLY HAVING EXPERIENCE WITH THIS, LOOKED AT THE FILE AND SAID, IT LOOKS TO ME LIKE THIS IS XML WHICH IS A DIFFERENT TYPE OF MARKUP LANGUAGE, CAN YOU CONFIRM TO ME WHETHER IT'S XML.

AND WITHIN MONTHS OF TIME AND ROUNDS AND ROUNDS OF CORRESPONDENCE, THEY NEVER ANSWERED THAT QUESTION.  THEY SAID NO, IT'S NOT XML, IT'S FONTLAB'S VFJ, BECAUSE DOING THAT WOULD HAVE REVEALED THAT IT'S VFJ.

NOW TO ANTICIPATE ONE POINT THAT I THINK THEY WILL MAKE, IN TWO OF THE THREE MULTI-HUNDRED PAGE FILES THAT THEY SUBMITTED, AT THE VERY END OF THEM THERE IS A REFERENCE TO THE

FILE HAVING BEEN GENERATED BY FONTLAB. AND THEY SAY OH, THEREFORE WE DIDN'T HAVE TO TRUTHFULLY ANSWER THE EXAMINER'S QUESTIONS OR POINT IT OUT. PLAINLY, THE EXAMINER WASN'T AWARE OF THAT, I WOULD SUBMIT THE PLAINTIFFS PROBABLY WEREN'T EITHER, BECAUSE IF THE EXAMINER WERE, HE WOULDN'T HAVE ASKED OVER AND OVER AGAIN, DID YOU USE FONTLAB TO GENERATE THIS?

AND SO IT WASN'T EVIDENT AT ALL FROM THE FILE. THE EXAMINER QUESTIONED, IS IT XML, AND THEY NEVER ANSWERED HIS QUESTION BECAUSE IT WOULD HAVE REVEALED THAT IT WAS FONTLAB PROPRIETARY.

I LIKE THE ISSUE AND I CAN GO ON BUT I FEEL LIKE I HAVE SAID A LOT AND WE ARE RUNNING OUT OF TIME, BUT IF YOUR HONOR HAS QUESTIONS --

THE COURT: SO YOU HAVE ABOUT FIVE MINUTES TO COVER THE BREACH OF CONTRACT.

MR. POSNER: YEAH.

WELL I THINK THERE ARE A COUPLE ISSUES. YOUR HONOR HAS ADDRESSED THIS ISSUE AT SOME LENGTH BEFORE. THE FIRST ONE IS WHETHER THE FREQUENTLY ASKED QUESTIONS PAGE -- AND UNFORTUNATELY, I STILL SEE WE HAVE OUR ERROR IN OUR SECOND BULLET, WHICH PROBABLY BOTHERS ME MORE THAN YOU. IT'S NOT THE FIRST AMENDED COMPLAINT, IT'S THE FREQUENTLY ASKED QUESTIONS -- BUT THAT IS NOT PART OF THE CONTRACT, AND THAT'S AN IMPORTANT INTERPRETATION FOR YOUR HONOR TO MAKE OR CONCLUSION TO REACH.

THE REMAINING QUESTION --

THE COURT:  THE PROBLEM I HAVE IS I ONLY ONE FOUND ONE SENTENCE WHERE YOU SAID THAT AND I DIDN'T GET ANY ARGUMENT ON IT.

I MEAN, YOU SAID AT ONE POINT THAT I HAD ALREADY FOUND THAT THE FREQUENTLY ASKED QUESTIONS WERE NOT PART OF THE CONTRACT, WHICH IS NOT WHAT I FOUND, AND THAT'S BROUGHT UP IN THE OPPOSITION.  I FOUND THAT PLAINTIFF DIDN'T ESTABLISH THAT IT WAS.  THE OPPOSITE IS NOT NECESSARILY TRUE AND YOU DON'T GET RELIEF FROM THEIR MOTION.

SO THAT'S WHY I'M ASKING WHETHER THAT'S PROPERLY BEFORE ME.  AND THE PROBLEM IS -- AND I WILL KICK YOUR TRIAL DATE BECAUSE I DON'T CARE, I HAVE TO SOLVE THAT PROBLEM, THAT'S FOR ME.

MR. POSNER:  YES.

THE COURT:  AND IF I HAVE TO HAVE ANOTHER ROUND OF SUMMARY JUDGEMENT, YOUR TRIAL DATE IS GOING TO BE IN TWO YEARS.  SO I WANT TO BE REALLY CLEAR ON THAT, THAT'S NOT A JURY ISSUE.

MR. POSNER:  UNDERSTOOD.

I THINK WEIGH RAISED THIS IN THE ENTIRETY OF THIS LENGTHY PARAGRAPH AT THE BOTTOM OF PAGE 2 OF THE OPENING BRIEF, THAT WAS THE INTENT OF THAT SECTION.

THE COURT:  AND THAT'S JUST WHERE I UNDERLINED IT.

MR. POSNER:  YEAH.

AND THE LAST SENTENCE CERTAINLY SAYS THERE IS NO BASIS TO INCLUDE THE FAQ, BUT THE INTENT OF THE PRECEDING PARAGRAPH WAS

TO MAKE THE POINT.

THE COURT:  BUT YOU ARE TALKING ABOUT NO NOTICE OR ASSENTING TO THE FAQ'S.

MR. POSNER:  CORRECT.  BECAUSE THAT'S WHERE WE THOUGHT YOUR HONOR HAS LEFT OFF.  THERE IS A QUESTION ABOUT CLICKWRAP AND BROWSEWRAP AND THOSE ISSUES DON'T EVEN REALLY COME UP ANYMORE NOW, THEY DON'T RAISE THEM IN THEIR OPPOSITION. THE QUESTION REALLY BECAME, ALL RIGHT, THOSE DON'T WORK, BUT AS A FACTUAL MATTER, DID ANY ZAZZLE EMPLOYEE NEVERTHELESS SEE AND ASSENT TO THE FREQUENTLY ASKED QUESTIONS.  EVERYONE HAS BEEN DEPOSED NOW, EVERYONE DENIED IT, AND THE ONLY THING THAT THEY DO, AND MR. SCHAPIRO MENTIONED THIS, IS TO SAY YOU CAN'T BELIEVE THEM, IT'S SELF-SERVING TESTIMONY.  AND WE SAID THAT'S NOT ENOUGH TO CREATE A GENUINE DISPUTE FOR TRIAL, SO WE THINK THE RECORD ESTABLISHES AT THIS POINT AS A MATTER OF LAW THAT THE FREQUENTLY ASKED QUESTIONS ARE NOT INCLUDED IN THE CONTRACT.

THE OTHER THREE DOCUMENTS LIKELY ARE -- WELL, THE OFFERING PAGE, BECAUSE WE LOOKED AT IT, AND THE LICENSE TERMS BECAUSE YOUR HONOR HAS AGREED TO THAT CONCLUSION ALREADY, I BELIEVE WE OBJECTED TO IT AT THE TIME.

BUT THAT'S POINT ONE, IS WHAT IS THE CONTRACT?  AND IT IS, AT MOST, THE OFFERING PAGE, THE LICENSING TERMS AND THE TERMS OF SERVICE, BUT NOT THE FREQUENTLY ASKED QUESTIONS, NO EVIDENCE THAT WE ASSENTED, AND WE DO THINK THAT'S AN IMPORTANT

CONCLUSION FOR YOUR HONOR TO REACH AT THIS STAGE.

THERE IS ANOTHER ISSUE ABOUT THE INTERPRETATION OF THE CONTRACT WHICH IS WHAT IS THE LICENSED ITEM, THE LICENSED WORK? AND THERE'S BEEN A DISPUTE ABOUT THIS.  AND WE LAY THIS OUT IN OUR PAPERS, WE HAVE SOME SLIDES HERE THAT MIGHT BE HELPFUL ON THE POINT.

THE COURT:  SO I NEED TO INTERPRET THE CONTRACT AS TO WHAT WAS LICENSED.

MR. POSNER:  IT'S A WORD IN THE CONTRACT THAT THE PARTIES DISPUTE MEANING THE ITEM OR THE INSTALLABLE ITEM.

WE FEEL IT'S CLEAR -- THAT THE LICENSE MAKES CLEAR THAT THE LICENSED ITEM IS A DIGITAL INSTALLABLE WORK, IT IS NOT A TYPEFACE.  AND THAT MAKES A LOT OF SENSE BECAUSE A TYPEFACE IS NOT COPYRIGHTABLE.  WE ALL AGREE WITH THAT, IT'S NOT PROTECTABLE.  AND YOU WILL NOTICE THOUGH, AND I ENCOURAGE YOUR HONOR TO REVISIT --

THE COURT:  YOU HAVE TWO MINUTES, AND I HAVE NO CHOICE BUT TO HOLD YOU TO IT.

MR. POSNER:  I WILL GET THERE.  I'LL DO IT.

YEAH, I ENCOURAGE YOUR HONOR TO REVISIT THE PLAINTIFFS ARGUMENTS WITH AN EYE TOWARD LIMITING THE ITEM TO THE SOFTWARE. BECAUSE THEY DON'T DO THAT, THEY EXPLICITLY TRY TO INCLUDE THE TYPEFACE IN ADDITION TO THE SOFTWARE, BECAUSE WHEN THEY NEED TO SHOW THAT TO BREACH THE LICENSE, ZAZZLE'S USERS USED THE LICENSED ITEM, THEY NEED TO SHOW THAT IT'S THE TYPEFACE,

BECAUSE THEY CAN'T SHOW IT WITH THE SOFTWARE BECAUSE ZAZZLE'S USERS NEVER USED OR ACCESSED OR HAD ACCESS TO THE SOFTWARE.

AND YOU WILL SEE IT IN MR. SANDLER'S DECLARATION WHICH WE THINK IS ENTIRELY OBJECTIONABLE FOR REASONS WE CAN ARGUE AND THAT WE HAVE EXPLAINED, BUT IF YOUR HONOR WERE GOING TO CONSIDER IT, YOU WILL NOTICE HE SAYS THE LICENSED ITEM, I'M GOING TO DEFINE IT AS THE FONT AND THE FONT SOFTWARE, IS WHAT HE CALLS IT.  BY FONT, HE MEANS TYPEFACE.  THAT IS NOT PART OF THE LICENSED ITEM, SO IT'S IMPORTANT TO EVALUATE THEIR CLAIMS OF BREACH BY LIMITING THE ITEM TO ONLY THE DATA, THE OTF DATA FILE THAT WE RECEIVED AND NOT THE TYPEFACE.

AND WE THINK ALL THEIR CLAIMS FOR BREACH FALL APART.  WHEN THE FAQ IS EXCLUDED AND WHEN THE ITEM IS LIMITED TO THE -- PROPERLY LIMITED TO THE SOFTWARE -- WE HAVE A COUPLE SLIDES HERE THAT I DON'T NEED TO BELABOR, BUT ALL FOUR OF THEIR CLAIMS FOR BREACH FALL APART WHEN THE FAQ IS NOT PART OF IT.

THE COURT:  WHAT HAPPENS IF TODAY WHEN I REVIEW WHETHER THE FAQS ARE PART OF THE CONTRACT, I DISAGREE WITH YOU AND I'VE DISAGREED WITH THEM AND WE STILL HAVE NO RULING, WHAT HAPPENS?

MR. POSNER:  WELL, I THINK WE STILL WIN.

THE COURT:  I STILL NEED TO DECIDE, I NEED TO DECIDE WHAT THE CONTRACT IS.

MR. POSNER:  RIGHT.

I MEAN, THE FAQ DOESN'T -- THE FAQ DOESN'T CHANGE THE FACT

THAT ZAZZLE IS STILL THE PURCHASER, AND ZAZZLE IS STILL THE PURCHASER AND IT IS AN ENTITY AND IT'S NOT AN INDIVIDUAL AND THERE IS NOTHING IN THE FAQ THAT WOULD -- COULD REASONABLY BE INFERRED TO SAY THAT ONLY ONE INDIVIDUAL PERSON WITHIN AN ENTITY THAT'S PROPERLY A LICENSEE CAN USE THE SOFTWARE.

THE COURT:  OKAY.  SO HERE'S THE PROBLEM, IN YOUR BRIEFING, IN THE PARAGRAPH INVOLVING WHETHER OR NOT ANY ZAZZLE EMPLOYEE HAD KNOWLEDGE OF THE FAQ'S, YOU THEN THROW IN THE LINE SAYING IT'S NOT PART OF THE CONTRACT.

THAT'S NOT MY ANALYSIS BECAUSE WHETHER OR NOT THEY HAD KNOWLEDGE IS A DISPUTED ISSUE, MAYBE, I MEAN IT'S WEAK, BUT IT'S A DIFFERENT KIND OF ISSUE THAN ME READING THE FOUR CORNERS OF THE CONTRACT AND DECIDING THE DOCUMENTS.

SO THAT'S WHY I SAID I KNOW AT PAGE 22 YOU THREW IN THE LINE THAT THE FAQ IS NOT PART OF THE CONTRACT, BUT I DIDN'T GET THE ANALYSIS OF WHY IT ISN'T.

MR. POSNER:  IT'S THIS SLIDE, BECAUSE WE THINK THAT'S WHERE THE COURT LEFT OFF SAYING, DID ANYBODY ACTUALLY AS A MATTER OF FACT --

THE COURT:  AWARENESS IS NOT AN ELEMENT OF DETERMINING WHAT MAKES UP THE CONTRACT.

MR. POSNER:  WELL ASSENT IS, I BELIEVE THAT'S WHAT YOUR HONOR -- THAT'S WHAT WE WERE TRYING TO SHOW HERE.

THE COURT:  YOU CAN'T ASSENT WHEN YOU DON'T READ THE CONTRACT BECAUSE YOU ARE DEEMED TO HAVE READ IT.  THAT'S THE

PROBLEM YOU HAVE. IT DOESN'T GO AWAY BECAUSE YOU DIDN'T READ IT.

MR. POSNER: WE WERE NOT AWARE OF IT THOUGH. AND YOUR HONOR ALREADY CONCLUDED --

THE COURT: SO I THINK THAT -- I'M LEANING TO SAYING THAT BECAUSE THE SECTION OF THE CONTRACT THAT SAYS THE TERMS OF SERVICE AND THE LICENSING TERMS MAKE UP THE CONTRACT, THAT THAT WOULD HAVE THEN -- THAT CONCLUDES THE ISSUE, AND A LINK SOMEWHERE ELSE THAT DOESN'T EXPRESSLY SAY THAT IT'S PART OF THE CONTRACT THEN WOULDN'T BE. THAT WAS THE BEST I COULD DO.

MR. POSNER: WE ARE MORE THAN HAPPY TO STOP THERE AND THAT RULING WOULD MEAN THE FAQ IS OUT.

WHAT WE INTERPRETED YOUR HONOR SAYING AND WHY WE WROTE IT THE WAY WE DID, YES THE FAQ IS OUT FOR THAT REASON, BUT IF THERE COMES UP WITH ANY EVIDENCE THAT ANYONE ACTUALLY AS A FACTUAL MATTER LOOKED AT IT, THEN I MIGHT CONSIDER IT. THERE IS NO SUCH EVIDENCE AND NO DISPUTE ABOUT THAT AND THAT'S FURTHER REASON WHY THE FAQ WOULD BE EXCLUDED.

THE COURT: OKAY. WE ARE GOING TO TAKE A BREAK. AND YOU ARE DONE?

MR. MR. POSNER: THANK YOU.

THE COURT: ALL RIGHT. WE ARE GOING TO TAKE A BREAK. LET'S TAKE A TEN-MINUTE BREAK.

(RECESS FROM 11:03 A.M. UNTIL 11:16 A.M.)

THE COURT: OKAY. SO WE ARE GOING TO TURN TO THE

PLAINTIFF.  MR. STEINBERG, ARE YOU GOING TO START?

MR. STEINBERG:  I WILL, YOUR HONOR.

WITH YOUR HONOR'S PERMISSION, I WOULD LIKE TO ADDRESS THE STATUTE OF LIMITATIONS AND THE COPYRIGHT ISSUES AND THEN MY COLLEAGUE, MR. MATHEWS, WILL ADDRESS -- ALSO THE TRADEMARK ISSUES.  MY COLLEAGUE, MR. MATHEWS, WILL ADDRESS THE FRAUD AND THE CONTRACT CLAIMS, HE'S ALSO PREPARED ADDRESS THE EVIDENTIARY OBJECTIONS WHICH I KNOW YOUR HONOR HASN'T HEARD ARGUMENT ON YET.

THE COURT:  I NORMALLY DON'T BUT I KNOW SOMEONE WAS SPECIALLY HERE TO ARGUE THEM SO I WANT TO GIVE HER A LITTLE BIT OF TIME, AND YOU MIGHT ALSO.

MR. STEINBERG:  SURE, YOUR HONOR.

THE COURT:  BUT YOU WILL BE LOOKING AT THE CLOCK.

MR. STEINBERG:  AND HOW MUCH TIME DO I HAVE, YOUR HONOR?

THE COURT:  AN HOUR.  THAT'S WHAT I GAVE THE DEFENDANTS.

MR. STEINBERG:  ALL RIGHT.  THANK YOU.  I WILL TRY TO BE MINDFUL OF THAT.

THE COURT:  WELL I WILL BE IF YOU ARE NOT.

MR. STEINBERG:  THANK YOU.  I APPRECIATE IT.

STARTING OFF WITH THE STATUTE OF LIMITATIONS, AND IF WE COULD GO TO SLIDE 5, PLEASE.

SO AS A STARTING POINT, I THINK IT'S IMPORTANT TO KEEP IN

MIND DEFENDANTS HAVE THIS WRONG IN TERMS OF WHO BEARS THE BURDEN. THIS IS AN AFFIRMATIVE DEFENSE ON THE STATUTE OF LIMITATIONS. DEFENDANTS BEAR THE BURDEN, BOTH THE PRODUCTION, AND THE SEPARATE BURDEN OF PERSUASION TO SHOW THERE IS NO GENUINE DISPUTE AS TO ANY MATERIAL FACT ON THIS DEFENSE IN ORDER FOR THEM TO PREVAIL, AND IT IS A HEAVY BURDEN.

THE COURT: SO THEY HAVE PUT FORTH THE AFFIRMATIVE DEFENSE THAT THE STATUTES OF LIMITATIONS ARE THREE AND FOUR YEARS AND THAT THE CLAIMS AROSE IN 2017 AND SUIT WAS FILED IN 2023. THEY HAVE PUT FORTH EVIDENCE ON THEIR STATUTE OF LIMITATIONS DEFENSE. THEY ARE DONE. ONLY IF YOU COME FORWARD WITH DELAYED DISCOVERY FOR WHICH YOU BEAR THE BURDEN OF PROOF CAN YOU BEAT THIS DEFENSE.

MR. STEINBERG: SO I WOULD RESPECTFULLY DISAGREE WITH THAT, YOUR HONOR, AND THE REASON IS THAT THEY SAY IN THEIR REPLY THAT THE DATE OF ACCRUAL IS NOT DISPUTED. THAT IS FALSE.

THE COURT: THAT'S A DIFFERENT ISSUE. I WANT TO BE CLEAR. YOU BEAR THE BURDEN OF PROOF ON DELAYED DISCOVERY. A DEFENDANT COULD NEVER PROVE THAT THERE WAS DELAY -- THAT THERE WAS NOT DELAY, AN ABSENCE OF DELAY, IT IS YOUR BURDEN. BUT IF THERE ARE DISPUTED ISSUES OF FACT THEN WE WILL GO TO TRIAL ON IT, THAT'S WHERE I STARTED.

MR. STEINBERG: OKAY. THANK YOU, YOUR HONOR. AND THERE ARE MANY.

BUT I DO WANT TO ADDRESS THE ISSUE OF ACCRUAL FOR A

MOMENT.

AND IF WE TURN TO SLIDE 7, PLEASE.

SO WHAT THIS SAYS IS THAT THE DATE OF ACCRUAL FOR EACH OF THE CLAIMS THAT'S AT ISSUE IN THIS CASE HAS IMBEDDED WITHIN IT THE CONCEPT THAT PLAINTIFF HAS TO HAVE DISCOVERED OR HAVE KNOWLEDGE OF THE FACTS UNDERLYING THE CLAIM.

FOR EXAMPLE, FOR THE FRAUD CLAIM, THIS IS IMBEDDED RIGHT IN THE STATUTE IN 338(D), IT SAYS THAT A FRAUD CLAIM DOESN'T ACCRUE UNTIL THE PLAINTIFF DISCOVERS THE FACTS CONSTITUTING FRAUD.

SIMILARLY IN A BREACH OF CONTRACT CLAIM, AND THE CITATION IS ON THE NEXT SLIDE, A CONTRACT CLAIM DOES NOT ACCRUE UNTIL THE PLAINTIFF DISCOVERS OR COULD HAVE DISCOVERED THROUGH REASONABLE DILIGENCE, THE INJURY AND ITS CAUSE.

AND SIMILARLY ON A COPYRIGHT INFRINGEMENT CLAIM, THAT CLAIM DOES NOT ACCRUE UNTIL THE PLAINTIFF DISCOVERS OR REASONABLY SHOULD HAVE DISCOVERED THE ALLEGED INFRINGEMENT.

SO EVERY ONE OF THESE CLAIMS HAS A KNOWLEDGE OR A DISCOVERY REQUIREMENT IMBEDDED IN WHEN THE ACCRUAL HAPPENS.

THE COURT:  OKAY.  THANK YOU.

MR. STEINBERG:  THAT'S THE CONCEPT THAT I WANT TO GET ACROSS.

SO WHEN DEFENDANTS SAY THERE'S NO DEBATE THAT THE CLAIMS ACCRUED IN OCTOBER OF 2017, THAT'S SIMPLY FALSE.

SO WHEN DO WE CONTEND THAT THE CLAIMS ACCRUED?  AND IF WE

COULD SKIP TO THE SLIDE 11, PLEASE -- I'M SORRY, SLIDE 12.

SO THE QUESTION OF WHEN THE FRAUD IN THE CONTRACT CLAIMS ACCRUE, ZAZZLE FRAUDULENTLY CONCEALED AND MR. ALKHATIB FRAUDULENTLY CONCEALED THAT THE PURCHASE WAS ON BEHALF OF ZAZZLE AND THAT THEY INTENDED TO BREACH, RIGHT FROM THE GET-GO, THE INTENT WAS ALWAYS TO PUT IT ON THE WEBSITE, OKAY. THOSE FACTS WERE NOT KNOWN AND COULD HAVE BEEN KNOWN TO MS. LAATZ BACK IN 2017 --

THE COURT: OKAY. I'M GOING TO DISMISS THAT CONCEALMENT CLAIM. I WANT TO BE REALLY CLEAR, YOU HAVE NOTHING ON THAT. THIS IS AN INTERNET PURCHASE WHERE A PERSON BUYS IT WITH THEIR CREDIT CARD, AND THIS IS NOT CONCEALMENT. ONE HAS TO INTEND TO CONCEAL. AND YOUR CONCEPT OF RECKLESSNESS DOES NOT APPLY.

SO I THINK THERE ARE DISPUTED FACTS ON THE ACCRUAL DATE. THEY DON'T HAVE TO BE STRONG, THEY JUST HAVE TO BE THERE, BUT THIS IS NOT IT.

MR. STEINBERG: ALL RIGHT. I UNDERSTAND, YOUR HONOR.

SO LET'S TALK ABOUT SOME OF THOSE DISPUTED FACTS THEN. IF WE GO TO -- IF YOUR HONOR WOULD LIKE, I CAN TALK ABOUT SOME OF THE EVIDENCE THE DEFENDANTS PROFFER.

THE COURT: SO YOU KNOW, THE EVIDENCE THAT THE DEFENSE HAS IS PRETTY STRONG, BUT I'M NOT WEIGHING IT AGAINST YOURS, BUT I SEE IT, ALL OF THESE E-MAILS AND THE INSTAGRAM AND EVERYTHING, THAT'S ALL THERE.

SO I JUST NEED TO KNOW, WHAT EVIDENCE DO YOU HAVE THAT SHOWS THAT IN THE LIGHT OF THIS EVIDENCE THAT THEY HAVE, THAT THE CLAIMS STILL DID NOT ACCRUE, THAT THERE WAS DILIGENCE, ESSENTIALLY, IN PROTECTING HER COPYRIGHT OR HER LICENSE?

MR. STEINBERG:  SURE.

WELL YOUR HONOR, THE BURDEN IS NOT ON US TO SHOW DILIGENCE, RIGHT, THE BURDEN IS -- YOU KNOW, COULD -- DID SHE KNOW OR SHOULD SHE HAVE KNOWN BASED ON THE INFORMATION THAT SHE HAD AVAILABLE TO HER, RIGHT, THAT SHE HAD BEFORE HER.

THE COURT:  SO YOU HAVE TO COME FORWARD WITH -- OKAY. LET'S JUST -- SO WE HAVE A PROBLEM IF YOU ARE GOING TO KEEP TURNING THIS ON WHAT THEY NEED TO DO.  THEY MET THEIR MOVING BURDEN.  YOU NEED TO COME FORWARD WITH SOMETHING, IT DOESN'T NEED TO BE A LOT, BUT LET'S JUST BE CLEAR, THEY MET THEIR BURDEN ON THIS.

MR. STEINBERG:  I UNDERSTAND, YOUR HONOR.  THANK YOU.

IN TERMS OF WHEN SHOULD NICKY LAATZ HAVE KNOWN SHE HAD A POTENTIAL BREACH OF CONTRACT CLAIM OR A FRAUD CLAIM AGAINST ZAZZLE, HOW WOULD SHE HAVE POSSIBLY KNOWN THAT SHE HAD A CONTRACT WITH THEM OR A BREACH OF CONTRACT OR A FRAUD CLAIM UNTIL SHE'S PRESENTED WITH A RECEIPT SHOWING THAT THEY MADE A PURCHASE SUCH THAT SHE COULD CHECK THE TERMS AND THEREBY LEARN --

THE COURT:  OKAY.  THIS IS A DIFFERENT ARGUMENT.

SO YOU ARE SAYING THAT THE OWNER OF A BUSINESS DOESN'T

HAVE CONSTRUCTIVE NOTICE OF THE CONTRACTS THAT THEY ISSUE?  YOU ARE SAYING SHE DOESN'T EVEN KNOW THAT SHE HAS A CONTRACT?

MR. STEINBERG:  SHE KNOWS SHE HAS A CONTRACT, BUT LET'S LOOK AT PRECISELY WHAT SHE HAS KNOWLEDGE OF.

THE COURT:  SHE KNOWS EVERYTHING ON THE CONTRACT DOCUMENTS, RIGHT?  IF THE DEFENDANTS ARE BOUND BY THEM THEN SO IS SHE.

MR. STEINBERG:  THAT'S CORRECT, YOUR HONOR.

BUT LET'S LOOK AT WHAT SHE KNOWS ABOUT WHO SHE'S CONTRACTED WITH, THAT'S THE QUESTION I'M GETTING AT.

SO IF WE GET TO SLIDE NUMBER 14, PLEASE.

SEE, THIS IS THE EVIDENCE THAT SHE HAS AVAILABLE TO HER FROM CREATIVE MARKET ABOUT WHO HER LICENSEES ARE.  SHE SOLD HUNDREDS OF THOUSANDS OF LICENSES THROUGH CREATIVE MARKET.

THE COURT:  RIGHT.

MR. STEINBERG:  SHE SOLD THOUSANDS OF LICENSES JUST IN THE SHORT TIME PERIOD --

THE COURT:  THIS IS HER BOOK ENTRY THAT SUMMARIZES HER CONTRACTS.

MR. STEINBERG:  THIS IS THE DATA THAT CREATIVE MARKET PROVIDES TO HER ON WHO HAS BOUGHT A LICENSE.

THE COURT:  THAT'S NOT OUR DEFENDANT'S PROBLEM.  SHE HAS SET UP, THROUGH CREATIVE MARKET, A SERIES OF DOCUMENTS THAT COMPRISE HER CONTRACT.  AND THROUGH CREATIVE MARKET, SHE HAS DESIGNATED THE FIELDS OF INFORMATION THAT A PARTY NEEDS TO FILL

OUT WHEN THEY MAKE THE PURCHASE.  AND THERE IS NO QUESTION THAT ALL THE FIELDS WERE COMPLETED PROPERLY.

MR. STEINBERG:  I WILL DISPUTE THAT, YOUR HONOR.

I THINK THE FIELDS SHOULD HAVE BEEN COMPLETED TO IDENTIFY ZAZZLE AS THE LICENSEE, NOT MR. ALKHATIB.

THE COURT:  WHERE COULD THEY HAVE DONE THAT?

MR. STEINBERG:  IN THE NAME.  AND MS. LAATZ HAS NOTED THAT SOME OTHER COMPANIES HAVE PUT THE COMPANY NAME IN THE NAME.

THE COURT:  IF THEY DON'T HAVE A CREDIT CARD FOR ZAZZLE AND THEY DO IT BY THE NAME -- I MEAN, I BUY THINGS ON THE UNITED STATES CREDIT CARD BUT I DON'T PURCHASE A HOTEL ROOM IN THE NAME OF THE UNITED STATES, I DO IT IN THE NAME OF BETH FREEMAN.

MR. STEINBERG:  I UNDERSTAND, YOUR HONOR.  BUT IF IT WAS BE BEING PURCHASED ON BEHALF OF A COMPANY, YOU COULD USE THE NAME OF THE COMPANY OR --

THE COURT:  IT'S NOT REQUIRED THOUGH.  SEE THAT'S THE POINT, IT'S NOT REQUIRED.  THEY DID WHAT THEY NEEDED TO DO.

MR. STEINBERG:  BUT I'M TALKING ABOUT IN THIS CASE YOU ARE ASKING WHAT EVIDENCE DO WE HAVE OF HER DILIGENCE, RIGHT?  SO THIS IS THE KIND OF DATA THAT SHE HAS ACCESSIBLE TO HER IN TERMS OF WHO HER LICENSEES ARE.  THE IDEA THAT SHE IS OBLIGATED, THAT IT'S REASONABLE TO HAVE HER SCAN THESE LISTS, TRY TO IDENTIFY WHERE EACH PERSON WHO BOUGHT A LICENSE MIGHT

WORK, THEN TRY TO LOOK AT HOW THEY MIGHT BE USING THE LICENSE MATERIAL AND WHETHER IT MIGHT BE IN BREACH OF THE LICENSE TERMS OR WHETHER THEY MIGHT HAVE COMMITTED FRAUD, THE IDEA THAT SHE'S SUPPOSED TO DO THAT FOR ALL OF THE HUNDREDS OF THOUSANDS OF LICENSEES AND SOMEHOW HAVE FOUND MR. ALKHATIB, FOUND THAT HE WORKED AT ZAZZLE, THEN GONE TO INVESTIGATE ZAZZLE, TRIED TO FIGURE OUT IN BURIED MULTIPLE LINKS DEEP WITHIN THEIR SITE, IF YOU COULD USE THE FONTS WITHIN THE DESIGN TOOL.

THE COURT:  WHAT ABOUT HER RECEIVING -- BEING ON INSTAGRAM AND TAGGING ZAZZLE AND OPENING SOME NUMBER OF E-MAILS FROM ZAZZLE ABOUT BLOOMING ELEGANT?

MR. STEINBERG:  SO ALL OF THAT EVIDENCE, ALL OF THAT IS HIGHLY OVERSTATED AND IN SOME CASES EXPRESSLY MISSTATED BY DEFENSE COUNSEL.

AND SO WHY DON'T WE JUMP TO THAT FOR A MOMENT.  SO LET'S GO TO THE ISSUE ON INSTAGRAM -- OR ACTUALLY LETS START WITH MS. LAATZ'S USE OF ZAZZLE ITSELF.

IF WE GO TO SLIDE 20, PLEASE.

SO ONE OF THE THINGS THAT THEY POINT TO AND THAT THEY MENTIONED DURING ORAL ARGUMENT, MR. SCHAPIRO MENTIONED, IS THE FACT THAT NICKY LAATZ USED THE ZAZZLE PLATFORM STARTING IN 2014.

BUT SHE'S TESTIFIED UNDER OATH THAT AFTER TESTING THE PLATFORM AT THAT TIME, SHE ABANDONED HER ACCOUNT AND DIDN'T ACCESS IT AT ANY TIME PRIOR TO AUGUST 2020 AND THAT SHE NEVER

USED THE DESIGN TOOL.

NOT ONLY THAT, WE HAVE FORENSIC ANALYSIS FROM MR. GARRIE, WHO INVESTIGATED HER COMPUTER TO CONFIRM THAT HE COULDN'T FIND ANY EVIDENCE TO THE CONTRARY.  AND ZAZZLE, DESPITE HAVING INFORMATION ON WHO SHE WAS AND WHAT HER ACCOUNT WAS AND EVEN INFORMATION ON IP ADDRESSES THAT SHE USED, THEY DIDN'T PROFFER ANY EVIDENCE TO THE CONTRARY TO SHOW THAT SHE DID ACCESS HER ACCOUNT OR THAT SHE WENT TO THE DESIGN TOOL AT ANY TIME DURING THAT RELEVANT TIME PERIOD.

IF WE TURN NOW TO THE NEXT SLIDE ON INSTAGRAM, THEY MAKE A LOT OF THE FACT THAT SHE USED A ZAZZLE HASHTAG ON INSTAGRAM. THAT DOES NO T MEAN THAT SHE SAW THESE POSTS IN HER FEED OR THAT THEY EVER ACTUALLY APPEARED IN HER FEED.  SHE EXPLAINS THAT SHE DOESN'T RECALL SEEING THESE POSTS.  THE FACT THAT SHE USED THESE HASHTAGS IS MEANT TO BRING OTHER USERS WHO MIGHT BE INTERESTED IN ZAZZLE TOO, AND ALSO HER, TO BRING THEIR ATTENTION TO HER.  IT DOESN'T INDICATE THAT SHE'S GOING AND LOOKING AT ZAZZLE.

AND MR. GARRIE BACKS THIS UP, HE EXPLAINS HOW HASHTAGS WORK AND HE EXPLAINS THAT THAT HAS NO EVIDENTIARY VALUE IN TERMS OF SHOWING THAT SHE MUST HAVE SEEN THE INSTAGRAM POSTS AS A RESULT.  THAT'S COVERED IN BOTH HER TESTIMONY AND HIS TESTIMONY.

IF WE MOVE TO SLIDE 23, PLEASE.

SO NICKY LAATZ, THEY MENTION THE FACT THAT THEY TAGGED

NICKY LAATZ IN AN INSTAGRAM POST ON ONE OCCASION IN SEPTEMBER OF 2018. AGAIN, THAT DOESN'T NECESSARILY MEAN THAT SHE RECEIVED OR SAW THE POST. WE HAVE SWORN TESTIMONY FROM HER SAYING SHE DIDN'T, WE ALSO HAVE THE TESTIMONY FROM MR. GARRIE EXPLAINING HOW INSTAGRAM WORKS.

ALSO NOTABLE, IF YOU LOOK AT TWO SLIDES LATER, SLIDE NUMBER 25, THIS IS THE ACTUAL INSTAGRAM POST THAT THEY ARE TALKING ABOUT THAT TAGS HER NAME, IT SAYS AT NICKY LAATZ. THESE FONTS ARE NOT BLOOMING ELEGANT, NONE OF THESE FONTS ARE THE BLOOMING ELEGANT TRIO, THERE IS NO EVIDENCE THAT ANY OF THESE FONTS ARE EVEN HER FONTS.

AND AGAIN, THERE IS NO EVIDENCE THAT SHE SAW THIS. AND SO EVEN IF SHE HAD SEEN THIS, WHAT WOULD SHE HAVE TAKEN AWAY FROM THIS, CERTAINLY NOT ANY ACTUAL OR CONSTRUCTIVE KNOWLEDGE THAT WOULD BE RELEVANT TO THIS CASE.

MOVING ON TO THE FACT THAT SHE "FOLLOWED" ZAZZLE ON INSTAGRAM, ON THE NEXT SLIDE, PLEASE.

SO THEY CLAIM THE FACT THAT SHE FOLLOWED ZAZZLE CLAIMS SHE MUST HAVE RECEIVED ALL THE POSTS. FRIENDING SOMEONE ON INSTAGRAM IS KIND OF LIKE FRIENDING SOMEONE ON FACEBOOK. YOU MIGHT HAVE A THOUSAND FRIENDS, THAT DOES NOT MEAN IN ANY WAY THAT YOU SEE ALL OF THEIR POSTS OF EVERY SINGLE ONE OF THOSE FRIENDS AT ANY POINT IN YOUR FEED. AS MR. GARRIE EXPLAINS, THERE ARE MANY, MANY FACTORS THAT INFLUENCE WHETHER CONTENT APPEARS IN YOUR FEED, BEYOND JUST WHETHER YOU ARE FOLLOWING

THEM AS ONE OF MANY, MANY PARTIES.  IT CAN BE IMPACTED BY YOUR OTHER ACTIVITY, IT CAN BE IMPACTED BY HOW POPULAR THE POSTS ARE.  SO THOSE POSTS MAY NOT HAVE EVER APPEARED, AND THERE IS NO EVIDENCE THAT THEY DID IN FACT ACTUALLY APPEAR OR THAT SHE DID IN FACT SEE THEM.

LET'S LOOK AT AN EXAMPLE OF ONE OF THOSE POSTS.

THE COURT:  IF I AGREE WITH YOU, THE FACT THAT -- IT'S AT LEAST DISPUTED WHETHER SHE HAD ACTUAL KNOWLEDGE OF THE BREACH, WE HAVE TO GET TO THE NEXT PART, OR SHOULD HAVE WITH REASONABLE DILIGENCE BEEN ABLE TO DISCOVER IT.

SO THE REASONABLE DILIGENCE PART IS REALLY WHERE THIS CASE IS GOING TO PLAY OUT.

MR. STEINBERG:  OKAY.  THANK YOU, YOUR HONOR.

SO WHY DON'T WE SKIP TO -- IF WE LOOK AT -- WELL I JUST WANT TO TALK THROUGH THIS INSTAGRAM POST AND THEN I WILL GET TO THAT.

SO ON THIS PARTICULAR INSTAGRAM POST, THIS IS ANOTHER EXAMPLE OF SOMETHING THEY SAY SHE MUST HAVE SEEN.  IF SHE HAD SEEN THIS, AND THERE IS NO EVIDENCE THAT SHE DID, WHAT WOULD SHE KNOW?  THE BLOOMING ELEGANT IS NOT REFERENCED BY NAME, CONTRARY TO THEIR CLAIM IN THEIR BRIEF AND THEIR ARGUMENT MADE HERE TODAY.  THIS ONE APPARENTLY DEPICTS BLOOMING ELEGANT TRIO AS PART OF THIS TEXT HERE.

WHAT IS SHE TO KNOW FROM THIS POST, EVEN IF SHE HYPOTHETICALLY HAD SEEN IT?  THIS DOES NOT INDICATE THAT THE

FONTS THEMSELVES ARE BURIED WITHIN THE DESIGN TOOL AND AVAILABLE FOR ANY USER ON THE FACE OF THE PLANET TO USE TO CUSTOMIZE TEXT.

WHAT THIS COULD SHOW IS JUST THAT ANY INDIVIDUAL DESIGNER WHO BOUGHT A LICENSE FROM HER IS USING IT LAWFULLY TO CREATE A DESIGN AND UPLOAD IT FOR SALE ON ZAZZLE.  AND AS LONG AS IT IS A STATIC DESIGN, THAT'S WELL WITHIN THEIR RIGHTS, THE INDIVIDUAL DESIGNERS WHO BOUGHT A LICENSE, AS LONG AS THEY ARE NOT ALLOWING OTHER USERS TO THEN GO IN AND CUSTOMIZE AND CREATE THEIR OWN DESIGNS USING THE FONTS.  THAT'S WELL WITHIN THEIR RIGHTS.

SO EVEN IF SHE HAD SEEN ANY OF THESE THINGS, AND THERE'S NO EVIDENCE THAT SHE DID, THAT WOULD NOT HAVE PUT HER ON EITHER ACTUAL OR CONSTRUCTIVE NOTICE OF ANY OF HER CLAIMS.

I THINK YOUR HONOR NOTED THAT THE JANUARY 2020 E-MAIL TO JOHN LAATZ REALLY IS IRRELEVANT GIVEN THE TIMING OF IT, SO I DON'T THINK WE NEED TO BELABOR THE POINT.

LET'S TALK ABOUT THE E-MAILS BECAUSE YOUR HONOR DID MENTION THOSE.

SO IF WE GO TO SLIDE 33, PLEASE.

SO MR. SCHAPIRO SAID THAT NICKY LAATZ ACTUALLY OPENED AND SAW 48 E-MAILS THAT INCLUDED IMAGES OF PRODUCTS PURPORTEDLY BEARING THE BLOOMING ELEGANT TRIO.  THAT IS ABSOLUTELY FALSE.

SO FIRST OF ALL, ZAZZLE CLAIMS THAT THEY SENT HER AND THAT SHE RECEIVED A TOTAL OF 677 E-MAILS.  THEY SAY 48 OF THEM

INCLUDED PRODUCTS SHOWING THE BLOOMING ELEGANT TRIO.  THEY SAY SHE OPENED ANOTHER 32 E-MAILS THAT THEY PURPORTEDLY CLAIMED TO HAVE EVIDENCE THAT SHE OPENED.

THERE IS NO OVERLAP, IF YOUR HONOR COMPARES IN THE INTERROGATORY RESPONSE, THE E-MAILS THAT SUPPOSEDLY INCLUDED BLOOMING ELEGANT TO THE E-MAILS THAT SHE SUPPOSEDLY OPENED, THERE IS NO OVERLAP BETWEEN THOSE BUCKETS.  SO THAT IS ABSOLUTELY MISSTATED.

THE COURT:  THAT WAS VERY HELPFUL BECAUSE IT READ OTHERWISE.  I APPRECIATE THAT.

MR. STEINBERG:  OKAY.  AND I THINK THAT WAS A MISLEADING WAY TO PUT IT IN THE PAPERS AND IT WAS CERTAINLY MISSTATED HERE TODAY.

BUT I'M NOT SAYING THAT'S INTENTIONAL, I THINK IT WAS JUST PERHAPS AN OVERSIGHT.

THE COURT:  SO I AM JUST REALLY INTERESTED IN WHAT EVIDENCE YOU HAVE OF HER DILIGENCE.

MR. STEINBERG:  SO IF WE GO -- SO HER DILIGENCE, AND I THINK IT'S IMPORTANT IF YOU LOOK AT THE STARZ CASE, THE STARZ CASE TALKS ABOUT THE KIND OF DILIGENCE THAT'S REQUIRED FOR A LICENSEE, RIGHT -- I'M SORRY, FOR A LICENSOR.  AND WHAT IT SAYS IS THAT YOU ARE NOT REQUIRED TO HAVE A LEVEL OF PARANOIA WHERE YOU ARE CONSTANTLY SCOURING THE WORLD.

IN THAT CASE, THE PLAINTIFF KNEW THEY HAD A LICENSE TO THE DEFENDANT, THEY KNEW THAT, AND THE USE WAS PUBLICLY AVAILABLE

ONLINE, IT COULD HAVE BEEN FOUND, HYPOTHETICALLY.  BUT THE COURT ULTIMATELY FOUND THAT IT STILL WOULD HAVE BEEN DIFFICULT FOR THEM TO ASCERTAIN WHETHER THE USE WAS CONSISTENT OR INCONSISTENT WITH THE LICENSE, AND THEREFORE IT STILL WASN'T A CASE WHERE THEY COULD SAY THAT THEY WERE BARRED.

AND IF WE GO TO SLIDE 16, PLEASE.  SO IF WE LOOK AT THE SECOND BULLET POINT HERE, AND THIS IS A CASE FROM -- A QUOTE FROM THE STARZ CASE, THIS EXPLAINS THAT REASONABLE DILIGENCE "DOES NOT CREATE A DUTY TO CONTINUOUSLY MONITOR A LICENSEE TO ENSURE COMPLIANCE WITH ITS OBLIGATIONS, AS THIS PARANOIA WOULD BE UNREASONABLY BURDENSOME TO IMPOSE ON A COPYRIGHT OWNER."

SO A COPYRIGHT OWNER IS NOT OBLIGATED TO GO OUT AND MONITOR EVERY ONE OF THEIR LICENSEES SCRUPULOUSLY TO SEE IF A LICENSE IS BEING BREACHED OR IF THERE MIGHT BE SOME INFRINGEMENT GOING ON AS WELL.

I THINK THAT'S PARTICULARLY TRUE IN THIS CASE WHERE YOU HAVE YOU HAVE HUNDREDS OF THOUSANDS OF LICENSES THAT SHE'S ISSUED.

THE COURT:  WELL YOU TOLD ME WHAT SHE DOESN'T HAVE TO DO, WHAT IT IS THE EVIDENCE OF WHAT SHE DID, SO THAT I CAN LET YOU PASS THROUGH THE GATE OF SUMMARY JUDGEMENT TO TRIAL.

MR. STEINBERG:  SURE.

SO THE EVIDENCE OF WHAT SHE DID IS THAT SHE AND HER HUSBAND BOTH ENGAGED IN REGULAR SEARCHES TO SEE IF HER FONTS ARE BEING OFFERED ON SITES ILLICITLY, AND WHEN THEY FIND THEM

BEING OFFERED, THEY TAKE PROMPT ACTION TO GET THEM TAKEN DOWN. THOSE ARE HER EFFORTS TO ENFORCE.

AND ALSO WHEN SHE GETS REPORTS FROM PEOPLE, SO IN THIS CASE THE FIRST INDICATION THAT SHE HAD THAT THE BLOOMING ELEGANT TRIO OF FONTS WERE AVAILABLE WITHIN THE DESIGN TOOL TO ACTUALLY CUSTOMIZE PRODUCTS WITHIN ZAZZLE'S WEBSITE, WAS WHEN A USER E-MAILED HER ON AUGUST 2020.

THE COURT:  SO YOU ARE LIMITING THIS TO HER AND HER HUSBAND IS JUST SOME GUY OUT THERE WHO IS IRRELEVANT.

MR. STEINBERG:  WELL NO, I'M SAYING HER HUSBAND ENGAGES IN THE SAME PROCESS.  BUT REMEMBER, THE E-MAIL THEY POINT TO TO HER HUSBAND IS IN 2020.

THE COURT:  THAT WOULD STILL BE WITHIN THE LIMITATIONS PERIOD, YOU ARE EXACTLY RIGHT.

MR. STEINBERG:  AND HE TESTIFIED THAT HE DIDN'T KNOW WHAT ZAZZLE WAS AT THE TIME, HE HAD NEVER HEARD OF IT.

THE COURT:  I'M WORRIED ABOUT TIME.

MR. STEINBERG:  YES.

THE COURT:  I THINK IN YOUR PAPERS YOU HAVE GIVEN ME ENOUGH EVIDENCE THAT A JURY SHOULD DECIDE WHETHER SHE WAS REASONABLY DILIGENT.

MR. STEINBERG:  WE AGREE, YOUR HONOR.

THE COURT:  OKAY.

MR. STEINBERG:  ALL RIGHT.  THANK YOU.

THE COURT:  ALL RIGHT.  SO YOU WERE GOING TO GO ON,

YOUR NEXT ISSUE IS THE COPYRIGHT ISSUE.

MR. STEINBERG:  THE COPYRIGHT ISSUE, YES.  SO IF WE CAN GO TO THE BEGINNING OF THE COPYRIGHT SLIDES.

SO LET'S TALK ABOUT THE COPYRIGHT CLAIM HERE.  I THINK MUCH HAY HAS BEEN MADE ABOUT THE DISTINCTION BETWEEN A COMPUTER PROGRAM AND FONT DATA.  AND THE REALITY IS, IS THAT'S A RED HERRING.

WHEN YOU LOOK AT THE COPYRIGHT REGISTRATIONS THAT ARE ATTACHED TO MR. SANDLER'S DECLARATION, WHICH EVIDENCE IS NOT OBJECTED TO, WHAT YOU SEE IS THAT WHEN FONT SOFTWARE IS REGISTERED, THE COPYRIGHT OFFICE HAS DESCRIBED IT IN A MYRIAD OF DIFFERENT WAYS.  THERE ARE EXAMPLES WHERE IT IS STILL DESCRIBED AS A "COMPUTER PROGRAM."  SOMETIMES IT'S DESCRIBED AS FONT DATA.

THE COURT:  WHAT ARE YOU POINTING ME TO?

MR. STEINBERG:  I'M SORRY, YOUR HONOR, THIS IS THE EXHIBITS TO MR. SANDLER'S DECLARATION.

THE COURT:  AND THOSE ARE THE COPYRIGHTS THEMSELVES?

MR. STEINBERG:  YES.

THE COURT:  BUT THE FILE RECORD SHOWS SHE WAS NOT ISSUED A COMPUTER PROGRAMMING COPYRIGHT.

MR. STEINBERG:  THAT'S CORRECT, YOUR HONOR.

WHAT I'M HERE TO TELL YOU IS THAT THE DESCRIPTION IS OF NO MOMENT.  THE QUESTION IS NOT HOW IT WAS DESCRIBED IN THE ULTIMATE CERTIFICATE, THE QUESTION IS WHAT DID SHE ACTUALLY

CREATE AND WHAT IS COVERED BY COPYRIGHT LAW, THAT IS REALLY WHAT AFFECTS IT.

AND IF WE COULD GO TO SLIDE 95, PLEASE.

SO THE QUESTION OF WHETHER IT IS A COMPUTER PROGRAM, FIRST OF ALL, MR. POSNER SAID THAT A COMPUTER PROGRAM HAS TO BE IN SOURCE CODE.  THAT'S NOT HOW IT'S DEFINED IN THE U.S. CODE, THE U.S. CODE DEFINES A COMPUTER PROGRAM AS "A SET OF STATEMENTS OR INSTRUCTIONS TO BE USED DIRECTLY OR INDIRECTLY IN A COMPUTER IN ORDER TO BRING ABOUT A CERTAIN RESULT."

THE COURT:  I THOUGHT IT WAS SAYING THAT IT WAS THE FONT DATA THAT NEEDED TO BE IN SOURCE CODE AND IT WAS HAND-CODED.

MR. STEINBERG:  WHAT I'M SAYING, YOUR HONOR, IS WHEN THEY SAY THIS IS NOT A COMPUTER PROGRAM, THAT'S NOT WHAT SHE ACTUALLY CREATED AND THAT'S NOT WHAT'S REGISTERED.  THAT'S NOT TRUE, THAT IS WHAT SHE CREATED.

THE COURT:  THE EXAMINER MADE IT ABUNDANTLY CLEAR THAT HE WOULD NOT CONSIDER IT AS A COMPUTER PROGRAM.  THAT IS IN THE RECORD.  WHETHER HE WAS RIGHT OR WRONG IS BESIDE THE POINT, HE DID NOT ALLOW THIS TO BE SUBMITTED AS A COMPUTER PROGRAM AND HE FINALLY APPROVED THE REGISTRATION AS FONT DATA.

MR. STEINBERG:  SO LET'S GO TO SLIDE 100, PLEASE.

SO ZAZZLE, AND YOUR HONOR CALLS ATTENTION TO THE COPYRIGHT EXAMINER'S STATEMENT THAT THEY CAN NO LONGER BE REGISTERED AND DESCRIBED AS A COMPUTER PROGRAM AND IT HAS TO BE FONT DATA.

AND ZAZZLE IS ARGUING AND YOUR HONOR SEEMS TO BE ECHOING THAT, WHETHER IT WAS REGISTERED AS FONT DATA VERSUS A COMPUTER PROGRAM IS IMPORTANT.

SO FIRST OF ALL, THAT CONTRADICTS THE 1992 DECISION, IT CONTRADICTS THE COMPENDIUM.  RESPECTFULLY, THE EXAMINER WAS WRONG.  BUT REGARDLESS, AND THIS IS THE SECOND TO LAST BULLET POINT ON THIS PAGE, THE U.S. CODE SAYS THAT ADMINISTRATIVE CLASSIFICATION OF WORKS HAS NO -- I'M SORRY -- HAS NO SIGNIFICANCE WITH RESPECT TO THE SUBJECT MATTER OF COPYRIGHT OR THE EXCLUSIVE RIGHTS PROVIDED BY THE COPYRIGHT ACT.

IN OTHER WORDS, HOW IT'S DESCRIBED DOES NOT HAVE A LOT OF LEGAL SIGNIFICANCE, WHAT MATTERS IS WHAT THE PERSON ACTUALLY CREATED.

AND I THINK THIS IS SUPPORTED BY THE EXHIBITS TO MR. SANDLER'S DECLARATION WHICH ARE EXAMPLES OF COPYRIGHT REGISTRATIONS FOR FONT SOFTWARE.  AND WHAT YOU SEE WHEN YOU LOOK ACROSS THE RANGE OF THOSE IS THAT SOME ARE DESCRIBED AS COMPUTER PROGRAMS, SOME ARE DESCRIBED AS FONT DATA, SOME ARE DESCRIBED AS COMPUTER CODE, SOME ARE DESCRIBED AS FONT CODE.

THESE DIFFERENT DESCRIPTIONS DO NOT CORRESPOND TO --

THE COURT:  SO IF I WERE TO AGREE WITH YOU, YOU ARE GOING TO STAND IN FRONT OF A JURY AND DO THIS, IS THAT WHAT YOU ARE PLANNING TO DO?

MR. STEINBERG:  I'M GOING TO SAY WHAT NICKY LAATZ CREATED IS A COMPUTER PROGRAM, WHAT SHE SUBMITTED TO THE

COPYRIGHT OFFICE IS THE EXPORT OF THE CODE CORRESPONDING TO THE COMPUTER PROGRAM THAT SHE CREATED, EXACTLY AS REQUIRED BY COPYRIGHT OFFICE RULES.

BOTH MR. PHINNEY AND MR. SANDLER HAVE TESTIFIED THAT WHAT THE NORMAL PRACTICE IS WHEN YOU CREATE A COMPUTER PROGRAM, YOU EXPORT IT INTO A HUMAN-READABLE PRINTOUT.  THAT IS WHAT'S REQUIRED AND THAT'S EXACTLY WHAT SHE DID AND THAT'S WHAT SHE SUBMITTED.

HOW THE EXAMINER CHOSE TO DESCRIBE IT HIMSELF, ULTIMATELY DOES NOT IMPACT WHAT DID SHE ACTUALLY CREATE AS A HUMAN BEING, WHAT DOES HER HUMAN AUTHORSHIP COVER.  AND THE SOURCE CODE SHE SUBMITTED AND THE EXECUTABLE FILES THAT SHE CREATED ORIGINALLY ARE PART IN PARCEL OF THE SAME THING.

THE COURT:  SO THE PROBLEM THAT I THINK YOU HAVE IS THAT LET'S ASSUME THE EXAMINER WAS INCORRECT IN NOT ALLOWING HER TO SUBMIT THIS AS A COMPUTER PROGRAM, I WILL JUST TAKE THAT FOR THE SAKE OF ARGUMENT.  SHE GOT HER REGISTRATION, SHE GOT IT AS FONT DATA, AND THE QUESTION IS, IS IT A VALID COPYRIGHT AS FONT DATA?

AND THAT'S THE ARGUMENT.  AND I AGREE WITH THE DEFENSE, I HAVEN'T DECIDED THAT, IF I AGREE WITH THE DEFENSE, I AM NOT GOING TO CONSIDER WHETHER THERE WAS AN ALTERNATE ROUTE FOR THE EXAMINER TO APPROVE IT, BECAUSE SHE SHOULD HAVE BROUGHT THAT TO THE EXAMINER.

THAT'S OUTSIDE MY AUTHORITY, AND I CAN'T EVALUATE WHETHER

IT WAS -- WOULD HAVE BEEN VALID UNDER A DIFFERENT SET OF CRITERION.

SO YOU CAN'T WIN THAT HERE.

MR. STEINBERG:  BUT THE QUESTION ON VALIDITY, YOUR HONOR, IS NOT HOW DID THE EXAMINER CHOOSE TO DESCRIBE IT, AND WHAT WE HAVE SHOWN IS THAT THE COPYRIGHT OFFICE IS COMPLETELY INCONSISTENT IN HOW THEY DESCRIBE THESE THINGS AND THE U.S. CODE SAYS --

THE COURT:  IF THAT'S THE CASE THEN I WILL SEND YOU BACK TO THE COPYRIGHT OFFICE.  THIS IS NOT AN ISSUE FOR A DISTRICT COURT TO DECIDE THE WAY YOU HAVE TEED IT UP.  YOU ARE ASKING ME TO BE A COPYRIGHT EXAMINER, AND NOW TO PULL ALL THE COMPENDIUM AND THE 1992 DECISION AND DECIDE WHETHER SHE CAN BE ISSUED A COPYRIGHT AS A COMPUTER PROGRAM, AND THAT'S NOT FOR ME TO DO.

MR. STEINBERG:  SO I'M NOT ASKING YOU TO DECIDE WHETHER THE ISSUANCE OR WHETHER THE LANGUAGE WAS PRECISE ON THE CERTIFICATE ITSELF, BUT WHEN YOU ARE LOOKING AT DID SHE EXERCISE THE NECESSARY LEVEL OF HUMAN AUTHORSHIP TO HAVE COPYRIGHTS IN THIS SOFTWARE, IT NEEDS --

THE COURT:  BUT THIS IS WHAT YOU ARE IGNORING, WE'VE GOT THE DIVIDE BETWEEN THE CRITERION FOR FONT DATA TO BE COPYRIGHTED VERSUS THE CRITERION FOR A COMPUTER PROGRAM TO BE COPYRIGHTED.  AND I UNDERSTAND THEY ARE DIFFERENT, THAT'S WHY YOU ARE FIGHTING THIS SO MUCH.

MR. STEINBERG:  WE RESPECTFULLY DISAGREE.

THERE IS NO PHRASE "FONT DATA" IN THE COMPENDIUM, THAT PHRASE DOESN'T EXIST IN THE COMPENDIUM, "FONT DATA" DOES NOT EXIST.  IT DOESN'T EXIST IN THE 1992 REGULATION AND DECISION, IT DOESN'T EXIST IN THE ADOBE CASE.

THE PHRASE "FONT DATA" IS AMBIGUOUS AND CREATED PERHAPS FROM WHOLE CLOTH BY THIS EXAMINER.  AND THE EVIDENCE OF THESE OTHER REGISTRATIONS SAYS THAT DIFFERENT EXAMINERS DESCRIBE FONT DATA -- FONT SOFTWARE IN DIFFERENT WAYS.

SO IT'S NOT LIKE THERE IS A SECTION OF THE COMPENDIUM THAT SAYS HERE'S HOW YOU REGISTER FONT DATA VERSUS A SECTION THAT SAYS HERE'S HOW YOU REGISTER COMPUTER PROGRAMS.  WHAT IT SAYS IS WHEN YOU HAVE CREATED A PIECE OF SOFTWARE THAT GENERATES A TYPEFACE, HERE IS WHAT YOU DO.  AND THE 1992 REGULATION AND DECISION --

THE COURT:  SHE DIDN'T CREATE SOFTWARE THOUGH.

MR. STEINBERG:  SHE DID.

THE COURT:  SHE IS A GRAPHIC DESIGNER, SHE HAND DRAWS THINGS.  DO YOU HAVE ANY EVIDENCE THAT SHE'S AN ENGINEER AND CAN WRITE CODE?  NOTHING.

MR. STEINBERG:  WELL SHE DID -- PART OF HER TESTIMONY IS THAT SHE DID WRITE PART OF THE CODE.  AND WHEN I SAY WRITE IT, I MEAN SHE MANUALLY TYPED PARTS IT.

LET'S TALK ABOUT WHAT SHE DID.

CAN WE GO TO THE SLIDE THAT DESCRIBES IN SOME DETAIL WHAT

SHE DID?

THE COURT:  I JUST THINK THIS IS A WHOLE RED HERRING ARGUMENT.  I JUST THINK YOUR WHOLE ARGUMENT ON ME DECIDING WHETHER THIS WAS PROPERLY -- THAT COPYRIGHT IS VALID BECAUSE IT QUALIFIED AS A COMPUTER PROGRAM WHEN THE EXAMINER -- WE KNOW THE EXAMINER DID NOT ANALYZE IT AS A COMPUTER PROGRAM BECAUSE HE SAID THAT.

AND YOU ARE ASKING ME TO DO SOMETHING THAT THE COURT IS NOT -- DOES NOT DO.  THIS IS A COPYRIGHT OFFICE JOB, AND SHE SHOULD HAVE CONTESTED NOT BEING ALLOWED, AND MAYBE SHE STILL CAN YEARS LATER, I DON'T KNOW WHAT SHE CAN DO.

MR. STEINBERG:  SO WE THINK THAT IT IS THE PROVINCE OF THE COURT TO DECIDE WHETHER --

THE COURT:  OKAY.  I NEED A CASE, AND IT'S NOT ADOBE, THAT TELLS ME THAT.

MR. STEINBERG:  WELL ADOBE TALKS --

THE COURT:  ADOBE IS NOT IT.  I NEED A CASE THAT TELLS ME THAT I CAN VALIDATE A COPYRIGHT UNDER A COMPLETELY DIFFERENT THEORY OF REGISTRATION THAN WHAT THE EXAMINER APPROVED IT ON.  THAT'S WHAT I'M LOOKING FOR.  ADOBE IS NOT THAT CASE.

MR. STEINBERG:  SO I THINK MAYBE THIS IS WHERE WE RESPECTFULLY DISAGREE.

THE COURT:  OKAY.

MR. STEINBERG:  THERE ISN'T THIS COMPLETELY DIFFERENT

THEORY UNDER WHICH YOU CAN REGISTER IT, FONT DATA IS NOT A SEPARATE CATEGORY OF COPYRIGHT REGISTRATION.  WE ARE TALKING HERE ABOUT FONT SOFTWARE THAT IS USED TO GENERATE A TYPEFACE OR A FONT, AND THE COMPENDIUM AND THE 1992 REGULATION EXPLAINED WHAT LEVEL OF HUMAN AUTHORSHIP, PARTICULARLY THE 1992 DECISION AND --

THE COURT:  I CAN'T WAIT TO HEAR THIS ARGUMENT BEFORE A JURY.

MR. STEINBERG:  OKAY.  BUT LET ME TALK FOR A MOMENT ABOUT WHAT MS. LAATZ DID IN ORDER TO CREATE THIS, BECAUSE I THINK IT IS VERY IMPORTANT BECAUSE IT'S BEEN MISSTATED BY THE DEFENDANTS AND I THINK IT'S IMPORTANT WE SPEND A LITTLE BIT OF TIME ON IT.

SHE SPENT WEEKS AND OVER A HUNDRED HOURS CREATING THESE FONTS.  SHE CREATED OVER 600 --

THE COURT:  OKAY.  SHE'S AN ARTIST.  I MEAN, THAT'S PERFECTLY CREDIBLE.  AND SHE -- I MEAN, SHE'S CREATED SOMETHING THAT'S ABSOLUTELY BEAUTIFUL AND IT'S BEEN VERY SUCCESSFUL.  I DON'T MEAN TO DIMINISH THE QUALITY OF HER ARTISTIC ABILITY.  SO THE QUESTION IS HOW SHE MADE IT ON THE COPYRIGHTABLE WORK.

MR. STEINBERG:  YES.  LET'S TALK ABOUT THAT.

IT'S NOT JUST ILLUSTRATING THE CHARACTERS AND PLUGGING IT INTO FONTLAB AND THEN FONTLAB DOES ALL THE WORK, FAR FROM IT.  WHAT THE EVIDENCE SHOWS IS THAT AFTER THESE CHARACTERS -- SOME OF THEM WERE DRAWN OUTSIDE FONTLAB, SOME WERE DRAWN INSIDE

FONTLAB.  THEN SHE SPENT PAINSTAKING HOURS SETTING AND ADJUSTING THE ON-CURVE POINTS AND THE OFF-CURVE POINTS TO MAKE SURE THAT EACH OF THESE GLYPHS WOULD RENDER PROPERLY TOGETHER. AND WHEN YOU ARE TALKING ABOUT THE HANDWRITTEN FONT, THE FACT THAT THE LETTERS FIT TOGETHER IS VERY IMPORTANT.

THE COURT:  YES, OF COURSE.

MR. STEINBERG:  SHE ALSO TOOK TIME TO ADJUST POINTS TO MAKE SURE -- TO HEIGHTEN THE APPEARANCE OF HAND-DRAWN, TO THICKEN THE DOWNSTROKES.  THIS IS THE CONCEPT THAT WHEN YOU'RE WRITING WITH A PEN OR PENCIL, YOU PRESS HARDER WHEN YOU ARE MOVING DOWN THE PAGE THAN YOU DO UP THE PAGE.

SHE TOOK TIME TO ADJUST THE POINTS SO THAT THE DOWNSTROKES ARE THICKER THAN THE UPSTROKES, AND NOT IN A UNIFORM WAY, SO IT'S VARIED FROM CHARACTER TO CHARACTER.

SHE TOOK TIME TO CREATE STYLISTICS ALTERNATIVES AND SET THE POINTS FOR THOSE, SUCH THAT THE SAME LETTER COULD RENDER TWO OR MAYBE THREE DIFFERENT WAYS IF APPEARING NEXT TO EACH OTHER OR IN THE SAME WORD, AGAIN TO HEIGHTEN THE APPEARANCE OF HAND DRAWING.

SHE ALSO CREATED LIGATURES.  THESE ARE PAIRS OF LETTERS THAT, WHEN USED NEXT TO EACH OTHER, IT WOULD LOOK WEIRD IF THEY WERE IDENTICAL OR MAYBE THEY NEED TO BE CLOSER TOGETHER, BECAUSE WHEN PEOPLE WRITE THEM, THEY GO CLOSER TOGETHER.  SO SHE TOOK TIME TO ADJUST POINTS ON THE LETTERS TO MAKE SURE THAT WHEN THEY ARE USED TOGETHER, THEY WOULD FLOW THE RIGHT WAY.

SO ALL OF THIS PROCESS OF SETTING THE POINTS, CHOOSING WHICH POINTS TO SET, AND THEN MANIPULATING THEM PAINSTAKINGLY, THEN TESTING.  SHE TESTIFIED THAT WHAT SHE WOULD DO IS COMPILE IT, TEST IT, SEE HOW IT WORKED TOGETHER, COME BACK AND ADJUST POINTS FURTHER SO THAT ALL OF THE GLYPHS WORK TOGETHER.

IT'S AN ENORMOUS AMOUNT OF WORK AND IT'S CONSISTENT WITH WHAT'S DESCRIBED IN BOTH THE 1992 DECISION AND THE ADOBE DECISION AS WELL.

SHE ALSO CODED INSTRUCTIONS FOR HOW THE GLYPHS APPEAR NEXT TO EACH OTHER, FOR WHAT HAPPENS WHEN YOU HAVE THESE PAIRS OF LETTERS OR THE SAME LETTER NEXT TO EACH OTHER.

SHE TESTIFIED THAT SHE TYPED CERTAIN OPEN-TYPE FEATURE CODE TO HELP IMPLEMENT THESE THINGS LIKE LIGATURES AND STYLISTIC ALTERNATIVES, SO THAT'S WHERE THE MANUAL TYPING COMES IN.

BUT AGAIN, OF ALL OF THESE METHODS ARE BY HAND AND WE THINK ARE WELL WITHIN THE SCOPE OF WHAT'S COVERED UNDER BOTH THE 1992 DECISION, THE ADOBE DECISION AND THE COMPENDIUM AS WELL.

THE COURT:  THE COMPENDIUM, YOU RELY ON SECTION 723; IS THAT RIGHT?

MR. STEINBERG:  THAT'S CORRECT, YOUR HONOR.

I THINK I DO WANT TO SPEND A LITTLE BIT OF TIME ON INFRINGEMENT.

IF WE GO TO SLIDE 106, PLEASE.

SO THIS IS ANOTHER IMPORTANT POINT HERE.

MR. MATHEWS:  MR. STEINBERG, BEFORE WE GO FURTHER, THIS SLIDE DOES HAVE CONFIDENTIAL INFORMATION ON IT.

MR. STEINBERG:  THANK YOU, MR. MATHEWS.

YOUR HONOR, THIS NEXT SLIDE DOES INCLUDE ONE INSTANCE OF INFORMATION THAT WAS DESIGNATED AS CONFIDENTIAL.

THE COURT:  JUST GIVE ME THE HARD COPY.  WILL THAT TAKE CARE OF IT?

MR. STEINBERG:  SO MAYBE DON'T SHOW IT ON THE PUBLIC SCREEN.

MR. MATHEWS:  I CAN NOT SHOW IT ON THE PUBLIC SCREEN, IF THAT WORKS.  I DON'T THINK WE HAVE A HARD COPY PRINTED OUT.

THE COURT:  YOU DIDN'T BRING A HARD COPY FOR ME?

MR. MATHEWS:  I'M SORRY, YOUR HONOR, THE HARD COPY HAS ATTORNEY NOTES ON IT.

THE COURT:  YOU CAN SEND IT TO ME.  BECAUSE OTHERWISE --

MR. POSNER:  YOUR HONOR, IF IT'S ONLY COURT STAFF IN THE COURTROOM --

THE COURT:  I ONLY HAVE COURT STAFF IN THE COURTROOM. IS THERE ANYONE ELSE THAT WOULD BE EXCLUDED?

MR. POSNER:  I THINK THERE'S ONLY COURT STAFF.

SO THAT'S OUR CLIENT FROM ZAZZLE, AND I ASSUME THE INFORMATION HE'S ABOUT TO DISCLOSE IS ZAZZLE'S CONFIDENTIAL INFORMATION, SO WE ARE OKAY WITH HIM PROCEEDING.

THE COURT:  MR. MATHEWS, ARE WE OKAY?

MR. MATHEWS:  YES, THAT'S CORRECT, YOUR HONOR.

THE COURT:  DO WE NEED THIS SHORT PORTION OF THE RECORD TO BE SEALED?

MR. SCHAPIRO:  CAN WE DECIDE AFTERWARDS WHEN WE SEE WHAT IT IS?

THE COURT:  YES.  SO I JUST WANT TO MARK IT FOR THE COURT REPORTER.

THE COURT:  SO I WILL ORDER THAT THIS NEXT SEGMENT OF THE TRANSCRIPT IS TO BE PROVISIONALLY SEALED AS HAVING CONFIDENTIAL INFORMATION AND THE PARTIES CAN REVIEW IT LATER AND DETERMINE WHETHER THEY WANT TO REQUEST THE SEALING.  AND WHEN WE ARE DONE WITH THIS SECTION, LET ME KNOW SO I CAN -- WE WILL MARK IT AGAIN SO THAT WE CAN LIFT THE SEALING.

**\*(THE FOLLOWING PORTION WAS SEALED.)\***

MR. STEINBERG:  THANK YOU, YOUR HONOR.

SO IF WE SHOW SLIDE 106, PLEASE, THE EXCLUSIVE RIGHTS OF COPYRIGHTED WORKS INCLUDE NOT ONLY THE RIGHT TO REPRODUCTION BUT ALSO THE RIGHT OF DERIVATIVE WORKS AND TO DISTRIBUTE TO THE PUBLIC.

SO THE ISSUE OF COPYING IS REALLY NOT DISPUTED, ZAZZLE ███████████████████████████████████ ███████████████████████████████████ INTERROGATORY RESPONSE AND ALSO DISCUSSED BY MR. GARRIE IN HIS DECLARATION IN HIS REPORT.

BUT BEYOND THAT, WHAT MR. GARRIE TESTIFIED ABOUT FROM HIS ANALYSIS OF THE ZAZZLE DESIGN TOOL, IS THAT IN DOING SO, IN LOADING THIS SOFTWARE ONTO ZAZZLE'S SERVERS, INCORPORATING IT INTO THE DESIGN TOOL, ZAZZLE THEREBY GENERATED A DERIVATIVE WORK OF THE BLOOMING ELEGANT SOFTWARE AND DISTRIBUTED IT TO EACH USER'S COMPUTER EVERY TIME A USER USED THE BLOOMING ELEGANT TRIO IN THE DESIGN TOOL.

SO EVERY TIME SOMEONE WAS ACCESSING THE DESIGN TOOL THEN DEPICTING TEXT USING THE BLOOMING ELEGANT TRIO, THAT IS ANOTHER INSTANCE OF INFRINGEMENT, AND THAT CONTINUED RIGHT UP UNTIL MARCH OF 2023, EVEN AFTER THE FILING OF THIS CASE.

SO IT'S NOT JUST A QUESTION OF WHEN THE SOFTWARE WAS COPIED --

THE COURT:  THIS IS A TECHNICAL ISSUE THAT MR. POSNER WENT OVER BECAUSE HE WAS TRYING TO CABIN WHAT'S THE COPYRIGHTED WORK AS THE OTF FILE, OR MAYBE IT'S THE VF -- I'M LOSING THE LAST INITIAL.

MR. POSNER:  J.

THE COURT:  HE SAYS THE VFJ FILE IS THE COPYRIGHTED WORK.  THEY DIDN'T EVEN RECEIVE THE COPYRIGHTED WORK, THEY RECEIVED THE --

MR. POSNER:  OTF.

THE COURT:  OTF FILE.  SO THEY NEVER EVEN HAD THE COPYRIGHTED WORK.

THEN MR. POSNER ALSO TOLD ME THAT ZAZZLE DOESN'T GIVE THE

OTF FILE TO THE USER, THE USER ACCESSES THE OTF FILE ON ZAZZLE'S SERVER.  SO THEY CERTAINLY CREATE -- THE USER CREATES A WORK FROM WHAT'S RESIDING ON THE ZAZZLE SERVER THOUGH.  THAT'S ALL YOU ARE TALKING ABOUT.

MR. STEINBERG:  THAT'S WHAT I'M TALKING ABOUT, BUT THEN MR. GARRIE FURTHER EXPLAINS IN SOME DETAIL HOW THE PROCESS OF USING THE SOFTWARE ON THE ZAZZLE SERVERS CREATES A DERIVATIVE WORK OF THE BLOOMING ELEGANT SOFTWARE AND THEN DISTRIBUTES THAT, ITSELF, TO EACH OF THE USERS' COMPUTERS WHEN THEY ARE ENGAGING IN THAT PROCESS.

SO IT MEETS THE STANDARDS OF THE OTHER RIGHTS THAT ARE COVERED BY COPYRIGHT, NOT JUST REPRODUCTION.  SO WE ARE NOT DISPUTING THAT EACH OF THESE USERS ISN'T GETTING A COMPLETE COPY OF THE OTF FILES BUT THEY ARE BEING PROVIDED WITH DERIVATIVE WORKS AND IT'S BEING DISTRIBUTED OUT TO THEM, SO IT INFRINGES THESE OTHER RIGHTS AS WELL.

IF WE GO TO THE NEXT SLIDE.  SO YES, ZAZZLE'S COUNTER-ARGUMENT IS THAT IT NEVER HAD THE VFJ FILES AND THEREFORE IT CAN'T BE LIABLE FOR INFRINGEMENT.  BUT THE REASON FOR THE SUBMISSION OF THE PDF HUMAN READABLE PRINTOUTS IS SIMPLY BECAUSE OF COPYRIGHT OFFICE RULES REQUIRE THAT THAT'S WHAT YOU SUBMIT, THEY DON'T ALLOW YOU TO SUBMITTED OBJECT CODE OR INSTALLABLE FILES, YOU HAVE TO SUBMIT THE HUMAN READABLE PRINTOUTS.

BUT WHAT THE CASE LAW, BOTH IN THE COMPENDIUM ITSELF AND

THEN ALSO THE GCA CASE WHICH IS CITED IN OUR PAPERS SAYS, IS THAT SOURCE CODE AND OBJECT CODE ARE TWO REPRESENTATIONS OF THE SAME WORK.  AND THE COPYRIGHT REGISTRATION COVERS BOTH.  WHETHER YOU'VE REGISTERED THE OBJECT CODE OR THE SOURCE CODE, THE REGISTRATION IS GOING TO COVER BOTH, THEY ARE REPRESENTATIONS OF THE SAME THING.

AND ULTIMATELY, THE EXAMINER GOT COPIES OF BOTH.  WHAT WAS SUBMITTED FIRST WAS THE COPIES OF THE VFJ FILES, THE HUMAN READABLE PRINTOUTS, AS REQUIRED BY COPYRIGHT OFFICE RULES.  BUT ULTIMATELY THE REGISTRATION COVERS BOTH.

AND THIS IS ADDRESSED IN THE GCA CASE AND THEN ALSO IN THE CASE THAT'S DISCUSSED, DATA GENERAL IS THE OTHER CASE THAT DISCUSSES THIS.  AND IN THOSE CASES, THE DEFENDANTS WERE MAKING THE EXACT SAME ARGUMENTS ZAZZLE MAKES HERE, WHICH IS HEY, WE COPIED THE OBJECT CODE BUT NOT THE SOURCE CODE, OR THE SOURCE CODE BUT NOT THE OBJECT CODE AND THEREFORE WE ARE NOT LIABLE.

AND WHAT THOSE CASES MAKE CLEAR IS THAT THAT IS WRONG, THEY ARE REPRESENTATIONS OF THE EXACT SAME WORK.

MS. LAATZ TESTIFIED THE WAY THOSE VFJ FILES WERE CREATED WAS SIMPLY BY EXPORTING INTO A HUMAN READABLE PRINTOUT FROM THE OTF FILES WHICH WERE HER ORIGINAL CREATION.  SO THERE IS NO DIFFERENCE BETWEEN THE TWO WHEN IT COMES TO QUESTION OF INFRINGEMENT.

**\*(THE FOLLOWING PORTION WAS UNSEALED.)\***

I WANT TO TALK BRIEFLY ABOUT INVALIDITY AND THEN I WILL

HAND IT OFF TO MR. MATHEWS.

IF WE GO TO SLIDE 111, PLEASE.

SO ZAZZLE SKIPS PAST SOME OF THE REQUIREMENTS TO PROVE COPYRIGHT INVALIDITY HERE. SO THERE ARE THREE MAIN REQUIREMENTS. ZAZZLE HAS TO SHOW THERE WAS AN INACCURACY IN THE REGISTRATION APPLICATION. THEY HAVE TO SHOW THAT NICKY LAATZ KNEW THAT IT FAILED TO COMPLY WITH THE REQUISITE LEGAL REQUIREMENTS, AND THEY HAVE TO SHOW THAT THE INACCURACIES WERE MATERIAL TO THE REGISTRATION DECISION.

AND WHAT THE UNICOLORS CASE LAW MAKES CLEAR IS THAT IF YOU LACK KNOWLEDGE OF EITHER FACTUAL OR LEGAL INACCURACY, THEN YOU CAN'T PROVE UP THIS DEFENSE. AND WE SUBMIT THEY HAVE NOT MET THEIR BURDEN HERE.

SO IF WE GO TO THE NEXT SLIDE, PLEASE.

WAS NICKY LAATZ'S APPLICATION ACCURATE?

SO THEY ARGUE TWO INACCURACIES, THEY SAY SHE FALSELY REPRESENTED SHE HAND-CODED, AND BY THAT THEY MEAN MANUALLY TYPED THE BLOOMING ELEGANT SOFTWARE CODE AND CONCEALED HER USE OF A FONT EDITING PROGRAM.

SO WHAT NICKY LAATZ EXPLAINS, FIRST OF ALL, SHE DIDN'T SAY I HAND-CODED, SHE SAID "I HAND-CODED THE DESIGNS AND INSTRUCTIONS," THAT'S A QUOTATION, "IN THE FONT DATA THAT WE SUBMITTED AS A PDF FILE." AND SHE EXPLAINED THAT WHAT SHE MEANT BY THAT IS ALL THE METHODS THAT WE TALKED ABOUT, USING THE STYLUS BY HAND TO MANIPULATE THE VARIOUS ON-CURVE AND

OFF-CURVE REFERENCE POINTS, IT'S MANUALLY TYPING SOME OF THE CODE, IT'S SELECTING SOME OF THE FONT-WIDE VARIABLES, IT'S ALL OF THE STEPS SHE MEANT BY SAYING "I HAND-CODED THE DESIGNS AND INSTRUCTIONS."

SHE ALSO --

THE COURT:  HAVE WE GOTTEN PAST THE PART TO SEAL?

MR. STEINBERG:  OH, YES, WE HAVE.  I'M SORRY, YOUR HONOR.  THANK YOU FOR REMINDING ME.

IT'S ALSO NOTABLE THAT IN THE CORRESPONDENCE WITH THE COPYRIGHT EXAMINER, WHEN THERE WAS DISCUSSION ABOUT SUBMITTING BOTH THE OTF INSTALLABLE FILES AND THE VFJ FILES AS WELL WHICH WERE ALREADY IN FRONT OF HIM, IT WAS STATED TO THE EXAMINER THAT "THE PDF FILE SHE INITIALLY SUBMITTED WAS GENERATED BY A FONT PROGRAM IN A SENSE BUT IT ALSO REFLECTS PLAINTIFF'S ORIGINAL CREATIVE WORK."

SO HE KNEW WELL AND GOOD THAT IT HAD BEEN GENERATED BY A FONT PROGRAM IN SOME WAY.  AND THEN WHEN WE LOOK AT THE QUESTION OF WELL, DOES IT MATTER WHICH FRONT PROGRAM, AS MR. POSNER WAS TALKING ABOUT, THE DEPOSITS THEMSELVES ACTUALLY STATE IN THE CODE TOWARDS THE END THAT THEY WERE GENERATED BY FONTLAB.

SO NEITHER NICKY LAATZ NOR THE EXAMINER EVER EXPLAINED WHAT WAS AMEND BY "HAND-CODED."  SHE NEVER SAID, I MANUALLY TYPED EVERY CHARACTER THAT WAS IN THOSE FILES.  AND SO WE SUBMIT THERE IS NO INACCURACY.

BUT EVEN IF YOU WERE TO FIND THAT THERE IS SOMETHING INACCURATE THERE, AND LET'S GET TO THE NEXT SLIDE, PLEASE, THIS TALKS ABOUT THE KNOWLEDGE REQUIREMENT.  ZAZZLE WOULD HAVE TO SHOW THAT IT WAS BOTH FACTUALLY INACCURATE AND THAT SHE KNEW IT FAILED TO COMPLY WITH THE GOVERNING LAW CONCERNING COPYRIGHTABILITY.  AND THEY CAN'T SHOW EITHER ONE.

AS NICKY LAATZ HAS TESTIFIED, SHE BELIEVED HER DESIGN PROCESS WAS ACCURATELY DESCRIBED, IN SAYING SHE HAND-CODED THE DESIGNS AND INSTRUCTIONS THAT WERE SUBMITTED, AND SHE BELIEVED IT WAS CONSISTENT WITH HER UNDERSTANDING OF THE LEGAL REQUIREMENTS BASED ON THE 1992 DECISION.

THE COURT:  OKAY.  AND I'M NOT CONFLICTED ABOUT THIS.

MR. STEINBERG:  OKAY.  THANK YOU, YOUR HONOR.

AND WE ALSO THINK THEY CAN'T SHOW IT'S MATERIAL TO THE DECISION.  IF WE CAN GO TO THE NEXT SLIDE, BECAUSE THIS BEARS ON BOTH THE SCOPE OF THE COPYRIGHTS BUT ALSO THIS INVALIDITY DEFENSE.

AND HERE WE HAVE SOME CITATIONS TO, IN THIS LAST BULLET POINT, MR. SANDLER CONFIRMED THAT NICKY LAATZ'S PROCESS WAS CONSISTENT WITH HIS OWN AND INDUSTRY PRACTICES IN FONT SOFTWARE THAT THE COPYRIGHT OFFICE HAS PREVIOUSLY REGISTERED.

AND I DON'T DISAGREE WITH MR. POSNER IN THAT THE REGISTRATIONS THAT ARE ATTACHED TO MR. SANDLER'S DECLARATION DON'T SPECIFICALLY IDENTIFY FONTLAB.  HOWEVER, AT PAGES 3, 5, 15 AND 44, THERE ARE EXAMPLES OF REGISTRATIONS THAT EXPRESSLY

DISCLOSE THAT THIS FONT SOFTWARE WAS CREATED WITH THE USE OF "THIRD PARTY SOFTWARE" AND NEVERTHELESS THOSE REGISTRATIONS WERE ISSUED.

SO THE FACT THAT SOMEONE USED A THIRD PARTY SOFTWARE PROGRAM TO ASSIST IN CREATING IT IS DEFINITELY NOT A REASON TO -- WOULD NOT AUTOMATICALLY INVALIDATE A REGISTRATION, SO THEY CAN'T SHOW IT WAS MATERIAL.

SO I THINK YOUR HONOR, IF YOU DON'T HAVE ANY OTHER QUESTIONS ON THE COPYRIGHT CLAIM, I CAN HAND IT OFF TO MR. MATHEWS.

THE COURT:  ALL RIGHT.  THANK YOU.

MR. STEINBERG:  THANK YOU.

THE COURT:  IT WAS A VERY COMPLICATED ISSUE, MR. STEINBERG.  THANK YOU.

GOOD MORNING, MR. MATHEWS.

MR. MATHEWS:  GOOD MORNING, YOUR HONOR -- GOOD AFTERNOON, YOUR HONOR.

THE COURT:  IT JUST HIT AFTERNOON.

MR. MATHEWS:  IF I MAY, YES, I'M GOING TO CONTROL MY OWN SLIDE SHOW FOR A MOMENT.

THE COURT:  AND WHAT ISSUES ARE YOU GOING TO COVER?

MR. MATHEWS:  YOUR HONOR, I WILL BE COVERING THE FRAUD ISSUE WHICH I KNOW YOUR HONOR HAS SOME QUESTIONS ABOUT AS WELL AS THE BREACH OF CONTRACT CLAIM, AND IF THE COURT PERMITS IT AND WE HAVE TIME, I WOULD ALSO LIKE TO ADDRESS THE

EVIDENTIARY OBJECTIONS, PROVIDED OPPOSING COUNSEL GETS THE OPPORTUNITY --

THE COURT:  YOU HAD SOME EVIDENTIARY QUESTIONS YOURSELF, DID YOU WANT TO ARGUE YOUR OWN OR JUST RESPOND TO --

MR. MATHEWS:  BOTH, YOUR HONOR.  IF WE HAVE TIME.  I AM MINDFUL OF THE COURT'S SCHEDULE.

THE COURT:  IT WILL BE BRIEF.  YEAH.

SO I'M GOING TO GIVE YOU ABOUT TEN MINUTES.

MR. MATHEWS:  YES, YOUR HONOR.

SO YOUR HONOR, I WOULD LIKE TO FIRST ADDRESS DEFENDANT'S SUGGESTION THAT NICKY LAATZ'S THEORY OF FRAUD IN THIS CASE WOULD TURN ANY SINGLE BREACH OF CONTRACT CLAIM INTO A FRAUD CASE.  THAT'S SIMPLY NOT TRUE.

AND I THINK THERE IS AN IMPORTANT POINT TO BE MADE HERE WHICH IS WHAT THE CALIFORNIA SUPREME COURT HAS SAID ABOUT A PROMISSORY FRAUD CASE.  IN ANY INSTANCE WHERE A PARTY ENTERS INTO A CONTRACT, THERE IS AN IMPLIED STATEMENT OF FACTS WHICH IS THE PARTY INTENDS TO COMPLY WITH THE TERMS OF THAT CONTRACT.  THAT IMPLIED STATEMENT OF FACTS CAN BE THE BASIS FOR AN ACTIONABLE FRAUD CLAIM.

THAT SAME CASE IN WHICH THE CALIFORNIA SUPREME COURT MADE THIS ASSERTION, THEY ALSO STATED THAT A FALSE REPRESENTATION THAT IS MADE RECKLESSLY AND WITHOUT REGARD FOR THE TRUTH OF THAT STATEMENT IN ORDER TO INDUCE ANOTHER PARTY TO ACT, THAT IS THE EQUIVALENT OF A FALSE REPRESENTATION AS WELL.

SO WHAT MATTERS HERE IS NOT DID ZAZZLE AT SOME POINT BREACH THE CONTRACT THAT THEY ENTERED INTO, AND WE WILL ADDRESS THAT LATER, BUT THE EVIDENCE FROM OUR PERSPECTIVE IS CLEAR THAT THEY DID, THE QUESTION IS --

THE COURT:  WHAT EVIDENCE DO YOU HAVE THAT EITHER MR. ALKHATIB OR ZAZZLE INTENDED NOT TO COMPLY WITH THE LICENSE WHEN IT WAS ENTERED INTO?

MR. MATHEWS:  SO, YOUR HONOR, THE ISSUE IS NOT JUST WHETHER THEY INTENDED, IT'S WHETHER THEY ACTED WITH RECKLESS DISREGARD FOR THEIR INTENT TO COMPLY WITH THE TERMS OF THE LICENSE AS WELL.

THAT'S WHAT THE ANGELA CASE FROM THE CALIFORNIA SUPREME COURT STATES.

THE COURT:  WHAT EVIDENCE DO YOU HAVE?  BECAUSE ALL I READ WAS THEIR SELF SERVING STATEMENT SHOULD NOT BE CONSIDERED.  BUT THAT'S NOT WHAT WE DO AT SUMMARY JUDGEMENT.  I NEED TO KNOW WHAT EVIDENCE -- IF YOU WANT TO GET THROUGH THE HOOP ON THIS, I NEED TO KNOW WHAT EVIDENCE YOU HAVE THAT THEY KNEW WHAT THEY DID WAS WRONG.

MR. MATHEWS:  YOUR HONOR, I WOULD BE HAPPY TO ADDRESS THAT.

THE COURT:  THAT'S ALL I CARE ABOUT.

MR. MATHEWS:  I THINK THERE ARE TWO INITIAL QUESTIONS TO ASK IS WHAT WAS THEIR INTENT BEFORE THEY ENTERED INTO THE LICENSE, OR AT THE TIME THEY ENTERED INTO THE LICENSE, WHAT WAS

THEIR INTENT IN HOW THEY PLANNED TO USE THE BLOOMING ELEGANT SOFTWARE THEY WERE PURCHASING A LICENSE TO?  AND THE SECOND QUESTION IS WHAT DID THEY KNOW OR ACTIVELY DISREGARD ABOUT THE TERMS OF THE LICENSE THAT THEY WERE PURCHASING AT THAT TIME?

AND ZAZZLE HAS THE ADMITTED, THEIR OWN CORPORATE REPRESENTATIVE ADMITTED THAT AT THE TIME THEY PURCHASED THE BLOOMING ELEGANT LICENSE, THE INTENT WAS TO PURCHASE THE LICENSE SO THEY COULD ATTAIN THE SOFTWARE AND INCORPORATE IT INTO THEIR DESIGN TOOL SO THEIR USERS CAN ACCESS AND USE THE SOFTWARE.

THAT WAS WHAT THEY PLANNED TO DO AT THE TIME THAT HE PURCHASED THE LICENSE.  ZAZZLE CAN'T GET AWAY FROM THIS EVIDENCE.

NOW ZAZZLE CLAIMS THAT THE ONLY EVIDENCE OR THE ONLY TERMS OF THE BLOOMING ELEGANT LICENSE THAT THEY WERE AWARE OF WERE THE THREE TERMS THAT WERE ON THE OFFERING PAGE; NAMELY THAT ALLOWED UNLIMITED NUMBER OF PROJECTS, UNLIMITED NUMBER OF END PRODUCTS FOR SALE AND COMMERCIAL USE.

THIS CLAIM IS NOT SUPPORTED BY THE EVIDENCE THAT THEY SUBMITTED AND IT IS DIRECTLY CONTRADICTED BY THE EVIDENCE THAT NICKY LAATZ SUBMITTED IN HER OPPOSITION.

THE COURT:  I NEED YOU TO TELL ME WHAT EVIDENCE YOU HAVE.  I DON'T WANT TO KNOW WHAT THEY HAVE, THEY MET THEIR BURDEN, LETS MOVE ON.  IF YOU WANT TO GO TO TRIAL, JUST TELL ME WHAT THE EVIDENCE IS.  IT'S EASY TO WIN -- TO DEFEAT SUMMARY

JUDGEMENT IF YOU TELL ME THE EVIDENCE.

MR. MATHEWS:  YOUR HONOR, I WOULD BE HAPPY TO.  AND THIS IS AN EXCERPT FROM THE TESTIMONY OF ZAZZLE'S CORPORATE REPRESENTATIVE.

SHE TESTIFIED THAT BEFORE ZAZZLE PURCHASED THE BLOOMING ELEGANT LICENSE, SHE READ THE TERMS ON THE BLOOMING ELEGANT OFFERING PAGE.  AND THAT OFFERING PAGE CONTAINED THE TERMS THAT THEY HAVE REFERENCED, COMMERCIAL USE ALLOWED, UNLIMITED NUMBER OF SALES, UNLIMITED PROJECTS, WITH ONLY A FEW EXCEPTIONS, FOLLOWED BY A LINK THAT SAYS "SEE" AND THEN A LINK TO THE LICENSE FAQ.

ZAZZLE TESTIFIED THROUGH ITS CORPORATE REPRESENTATIVE UNDER OATH THAT SHE SAW THAT LANGUAGE SAYING THAT THOSE THREE TERMS THEY WERE AWARE OF HAD EXCEPTIONS AND SHE SAW THAT THERE WAS A LINK TO THE LICENSE FAQ PAGE.

SO AT A BARE MINIMUM, ZAZZLE WASN'T JUST AWARE OF THOSE THREE TERMS, THEY WERE ALSO AWARE AT THE TIME THEY PURCHASED THE LICENSE, THAT THOSE TERMS HAD EXCEPTIONS TO THEM.

SO THIS CREATES A QUESTION FOR THE JURY TO RESOLVE.  DID ZAZZLE ACT RECKLESSLY WITH REGARD TO ITS INTENT TO COMPLY WITH THE TERMS OF THE LICENSE, KNOWING THAT THERE WERE EXCEPTIONS THAT THEY VOLUNTARILY OR WILLFULLY IGNORED?  OR IS THERE ANOTHER POSSIBILITY THAT ZAZZLE PERHAPS IN FACT DID READ THE LICENSE FAQ AND THE LICENSE TERMS AND KNEW THAT THE LICENSE THEY WERE PURCHASING DIDN'T COVER THEIR USE?

THE COURT: YOU DON'T HAVE ANY EVIDENCE TO DEFEAT SUMMARY JUDGEMENT ON THAT SPECULATION THAT THEY ACTUALLY READ IT AND ARE LYING. YOU DON'T HAVE THAT EVIDENCE.

SO WHAT YOU'VE JUST QUOTED TO ME IS EVIDENCE THAT SHE TESTIFIED SHE READ THIS AND READ THE PHRASE WITH ONLY A FEW EXCEPTIONS. THAT'S EVIDENCE.

MR. MATHEWS: YES, YOUR HONOR, BUT THERE IS ACTUALLY EVIDENCE THAT THEY DID IN FACT READ THE LICENSE TERMS. THERE IS 404(B) PATTERN AND PRACTICE, PLAN AND INTENT EVIDENCE THAT I WILL GO THROUGH IN JUST A MOMENT THAT SHOWS AS PART OF THE SAME PROJECT ON THE SAME DAY THAT MOHAMED ALKHATIB PURCHASED THE BLOOMING ELEGANT LICENSE, HE ALSO PURCHASED EIGHT OTHER LICENSES. AND AT LEAST FOR ONE OF THOSE, HE CONFIRMED IN WRITING THAT HE WENT OUT OF HIS WAY TO REVIEW THE LICENSE TERMS BEFORE HE PURCHASED IT, AND HE ALSO CONFIRMED IN WRITING THAT THE LICENSE HE PURCHASED DID NOT COVER ZAZZLE'S INTENDED USE.

SO AS PART OF THE SAME PROJECT, ONE OF THE OTHER EIGHT FONTS MR. ALKHATIB PURCHASED ON THAT DAY, HE PURCHASED A LICENSE KNOWING THAT IT DID NOT COVER ZAZZLE'S INTENDED USE.

AND IF YOUR HONOR WOULD LIKE, I WOULD LIKE TO GO THROUGH THAT EVIDENCE.

THE COURT: BUT IF I FIND THE FAQ'S WERE NOT PART OF THE CONTRACT THEN NOTHING THAT YOU JUST QUOTED TO ME WOULD SHOW -- WOULD PROVE YOUR POINT.

MR. MATHEWS: YOUR HONOR, REGARDLESS OF WHETHER THE

LICENSE FAQ'S ARE A PART OF THE CONTRACT, THEY ARE ALSO ADMISSIBLE PAROL EVIDENCE FOR UNDERSTANDING AND INTERPRETING THE LICENSE.

THE COURT:  I HAVEN'T FOUND THAT IT'S AMBIGUOUS.

MR. MATHEWS:  YOUR HONOR, I UNDERSTAND THAT.

AT THIS POINT IN TIME THOUGH, DEFENDANTS DO --

THE COURT:  UNTIL I FIND THAT, I AM NOT LOOKING AT PAROLE EVIDENCE, AND YOU DIDN'T ASK ME TO FIND THAT IT WAS AMBIGUOUS.

MR. MATHEWS:  BUT REGARDLESS OF WHETHER IT IS AN ACTUAL PART OF THE CONTRACT ITSELF, THE LICENSE FAQ DO DESCRIBE WHAT THE CONTRACT PERMITS, THEY DESCRIBE THE TERMS OF THE LICENSE AND THE LIMITS ON WHAT THE USE ALLOWED OF THE LICENSE IS.

THE COURT:  THEN YOU HAVE TO SHOW THAT THEY ACTUALLY READ IT, AND YOU DON'T HAVE THAT EVIDENCE.

MR. MATHEWS:  THEY HAD KNOWLEDGE AND THEY HAD NOTICE OF THOSE LICENSE FAQ TERMS.

BUT THERE IS -- YOUR HONOR, I THINK GOING BACK TO MOHAMED ALKHATIB'S PURCHASE ON THE DAY OF MAY 4TH, 2017 --

THE COURT:  I JUST DON'T THINK THIS IS A FRAUD CASE.

YOU MIGHT SQUEAK THROUGH BECAUSE I HAVE A STANDARD I HAVE TO APPLY, AND I WILL, BUT THIS IS NOT A FRAUD CASE, THIS IS A CONTRACT CASE, AND YOU HAVE DRESSED IT UP IN SO MANY DIFFERENT WAYS THAT YOU BROUGHT ON A COPYRIGHT CASE.  YOU BROUGHT THAT ON

YOURSELVES.

MR. MATHEWS:  YOUR HONOR, MAY I ADDRESS THE EVIDENCE OF MR. ALKHATIB'S PURCHASE?  BECAUSE I THINK THAT IF WE DISCUSS IT, IT WILL PERHAPS CHANGE YOUR HONOR'S MIND OR BECOME CLEARER WHAT OUR EVIDENCE IS OF FRAUD HERE AND WHAT MR. ALKHATIB DID ON MAY 4TH, 2017.

BEFORE I DO, THE EVIDENCE THAT WE ARE SHOWING IS MARKED CONFIDENTIAL.

THE COURT:  ALL RIGHT.  WE WILL MARK THIS PORTION OF THE TRANSCRIPT SO THAT YOU CAN LOOK AT IT LATER AND DECIDE WHETHER IT NEEDS TO BE SEALED.

**\*(THE FOLLOWING PORTION WAS SEALED.)\***

MR. MATHEWS:  SO FIRST, ZAZZLE PRODUCED A SPREADSHEET WHICH IS EXCERPTED IN THE SLIDE IN FRONT OF YOU.  THAT SPREADSHEET WAS USED BY ZAZZLE'S EMPLOYEES TO TRACK THE LICENSES THAT THEY WERE CONSIDERING PURCHASING ON MAY 4TH, 2017.

ONE OF THOSE LICENSES WAS TO A FONT CALLED BEYOND THE MOUNTAINS, THAT'S A FONT THAT MR. ALKHATIB DID PURCHASE A LICENSE TO ON THAT DAY.

WHEN ZAZZLE ORIGINALLY PRODUCED THIS SPREADSHEET, THEY WRONGFULLY REDACTED THE COST OF THE LICENSE OF BEYOND THE MOUNTAINS AS ATTORNEY-CLIENT PRIVILEGED.  JUDGE DEMARCHI CORRECTLY NOTED THAT'S NOT PRIVILEGED INFORMATION AND ORDERED IT TO BE REPRODUCED WITHOUT IT REDACTED.

THAT EVIDENCE SHOWS THAT THEY WERE CONSIDERING PURCHASING

WHAT THEY WERE CONSIDERING PURCHASING BEFORE THEY ACTUALLY MADE THEIR PURCHASE ON MAY 4TH.

UNLIMITED LICENSE EXPRESSLY SAYS THAT IT ALLOWS INSTALLATION ON AN UNLIMITED NUMBER OF DEVICES AND THE POSSIBILITIES TO REDISTRIBUTE THE FONT TO RELATED BUSINESSES.

SO THAT'S THE LICENSE THAT ZAZZLE WAS ORIGINALLY CONSIDERING PURCHASING TO THE BEYOND THE MOUNTAINS FONT ON MAY 4TH, 2017.

THE COURT:  AND YOU DON'T OFFER THIS KIND OF LICENSE?

MR. MATHEWS:  NO, YOUR HONOR.

THE COURT:  OKAY.

MR. MATHEWS:  BUT MR. ALKHATIB CONFIRMED IN WRITING TO ZAZZLE'S CHIEF TECHNOLOGY OFFICER BEFORE PURCHASING THE

WRITING TO ZAZZLE'S IN-HOUSE COUNSEL AND ZAZZLE'S CHIEF

INSTALLATION ON TEN DEVICES.  THIS IS CRITICAL EVIDENCE BECAUSE MR. ALKHATIB IS THE PARTY WHO WAS RESPONSIBLE FOR DOWNLOADING THE SOFTWARE AND OVERSEEING THE INSTALLATION OF THE SOFTWARE ON ZAZZLE'S SERVERS.  AND AS ZAZZLE HAS ADMITTED, THEY INSTALL

SEPARATE SERVERS.

SO MR. ALKHATIB KNEW WHEN SHE WAS PURCHASING THIS LICENSE THAT ONLY ALLOWED INSTALLATION ON TEN DEVICES, AND HE KNEW

SHOWS THAT AT LEAST WITH RESPECT TO THE BEYOND THE MOUNTAINS FONT LICENSE THAT HE PURCHASED ON THAT DAY, HE KNEW THAT THE FONT LICENSE THAT HE PURCHASED DIDN'T COVER THEIR INTENDED USE AND HE USED IT ANYWAY.  THAT IS PROMISSORY FRAUD IN A NUT SHELL.

THE COURT:  BUT OF COURSE BEYOND THE MOUNTAINS IS NOT HERE.

MR. MATHEWS:  YES, YOUR HONOR.

BUT FROM THIS, GIVEN THAT MR. ALKHATIB CONFIRMED THAT HE AT LEAST REVIEWED THE TERMS OF ONE LICENSE, A REASONABLE JURY COULD INFER FROM THIS, THIS CLASSIC 404(B) EVIDENCE, COULD INFER THIS WAS PART OF ZAZZLE'S PLAN AND INTENT AND THEY WANTED TO PURCHASE CHEAPER LICENSES THAT DIDN'T COVER THEIR INTENDED USE IN ORDER TO SAVE COSTS.  THIS HERE, ALONE, IS ENOUGH TO

SUBMIT TO A JURY AND NOT GRANT SUMMARY JUDGEMENT.

THE COURT:  OKAY.  SO I'M GOING TO GIVE YOU ANOTHER MINUTE OR TWO.  DID YOU WANT TO TALK ABOUT BREACH OF CONTRACT?

MR. MATHEWS:  YES, YOUR HONOR.

I WILL BE VERY BRIEF ABOUT BREACH OF CONTRACT.  I THINK THERE ARE TWO POINTS THAT I WOULD LIKE TO ADDRESS.  ONE IS WHETHER OR NOT THE CONTRACT ITSELF COVERS BOTH THE FONT SOFTWARE AND THE FONT ITSELF.

NOW WE HAVE CONFLICTING TESTIMONY ON THIS.  MR. SANDLER, WHO IS AN EXPERT IN FONT LICENSING, HE'S PERSONALLY OVERSEEN THOUSANDS AND THOUSANDS OF FONT LICENSES, HE MANAGES A PORTFOLIO FOR OTHER FONT FOUNDRIES, HE TESTIFIED THAT THE LICENSE ITSELF COVERS BOTH THE FONT SOFTWARE AND THE FONT LICENSE.

AND THIS MAKES INTUITIVE SENSE -- FORGIVE ME, THE FONT SOFTWARE AND THE TYPEFACE.  THIS MAKES INTUITIVE SENSE BECAUSE IF THE LICENSE ONLY COVERED THE SOFTWARE, WE'VE ALREADY ESTABLISHED THAT THE TYPEFACE ISN'T COPYRIGHTABLE, SO IF SOMEONE PURCHASED A LICENSE TO A PIECE OF FONT SOFTWARE, THEY COULD EXTRACT IMAGES OF THE TYPEFACE AND REVERSE ENGINEER THEIR OWN FONT SOFTWARE OR USE THAT TYPEFACE IN A MANNER THAT IS COMPLETELY INCONSISTENT WITH THE TERMS OF THE LICENSE.  NO FONT DESIGNER WOULD ENTER INTO THAT.

THE COURT:  SO -- AND OF COURSE THERE WASN'T A COPYRIGHT UNTIL 2021, BUT ONE CAN LICENSE SOMETHING THAT'S NOT

COPYRIGHTED.

MR. MATHEWS:  CORRECT, YOUR HONOR.  EXACTLY.

I WOULD ALSO LIKE TO ADDRESS THE ISSUE OF BREACH OF CONTRACT.  WE OBVIOUSLY HAVE -- AND I DON'T WANT TO BEAT A DEAD HORSE, I UNDERSTAND YOUR HONOR SEES THAT THERE IS A TRUE MEANINGFUL DISPUTE OF MATERIAL FACT HERE.

THE COURT:  OH, I THINK THERE IS, YES.  I THINK THIS -- I THINK YOUR CLIENT HAS A TRIABLE CASE.  I JUST DON'T THINK IT'S AS BROAD AS YOU HAVE MADE IT, THAT'S ALL.

I DON'T WANT YOU TO WALK OUT THINKING THAT YOU DON'T HAVE A VIABLE CASE BECAUSE I THINK YOU DO.

MR. MATHEWS:  YES, YOUR HONOR.  I WOULD LIKE TO POINT OUT OR RESPOND TO SOMETHING THE DEFENDANTS MADE OR A POINT THEY MADE IN THEIR REPLY.  THEY STATE THAT THEY DIDN'T ACTUALLY BREACH THE LICENSE BECAUSE THE FONT SOFTWARE -- THE FONT SOFTWARE RESIDED EXCLUSIVELY ON ZAZZLE'S SERVERS, SO NO USER WAS ACTUALLY USING THE FONT SOFTWARE.

THIS IS A DISTINCTION WITHOUT A DIFFERENCE.  IT'S AKIN TO SAYING, I'M NOT USING MICROSOFT WORD IF I HAVE A MICROSOFT WORD CLOUD SUBSCRIPTION, OR I'M NOT USING GOOGLE DOCS WHEN I ACCESS GOOGLE DOCS VIA MY INTERNET SOFTWARE.  I'M STILL USING THE SOFTWARE REGARDLESS OF WHETHER IT RESIDES ON MY COMPUTER OR ON THE COMPANY'S COMPUTERS OR SERVERS SOMEWHERE ELSE.

THE COURT:  OKAY.

SO I HAVE AN ATTORNEY FOR ZAZZLE WHO HAS COME TO MAKE AN

ARGUMENT AND I WOULD LIKE TO GIVE HER THAT CHANCE.  SO I'M NOT GOING TO -- YOU SAID YOU WANTED TO TALK ABOUT SOME OF THE EVIDENTIARY OBJECTIONS.  YOU HAVE OBJECTIONS TO THE REPLY EVIDENCE.

MR. MATHEWS:  YES, YOUR HONOR.

THE COURT:  I WILL GIVE YOU A MINUTE OR TWO TO TELL ME ABOUT THAT.

MR. MATHEWS:  THE REPLY OBJECTIONS OR DEFENDANT'S EVIDENTIARY OBJECTIONS OR BOTH?

THE COURT:  OH, YOU CAN CERTAINLY DO BOTH, YES.

MR. MATHEWS:  SO FOR THE EVIDENTIARY OBJECTIONS TO DEFENDANT'S REPLY EVIDENCE, I THINK IT'S PRETTY STRAIGHTFORWARD, YOUR HONOR.  THE EVIDENCE THAT WAS ADMITTED, THESE ARE COPYRIGHT CORRESPONDENCE FILES, DEFENDANTS HAD EVERY OPPORTUNITY TO OBTAIN AND SUBMIT THOSE WITH THEIR OPENING BRIEF.  THEY FAILED TO DO SO.

COURTS IN THIS DISTRICT REGULARLY DISREGARD AND DISMISS SUCH UNTIMELY REPLY EVIDENCE.

I THINK THERE IS ANOTHER POINT THAT'S WORTH MAKING HERE WHICH IS MR. SANDLER IDENTIFIED 49 COPYRIGHT REGISTRATIONS BETWEEN 2020 AND THE PRESENT DATE FOR FONT SOFTWARE.  THEY SUBMITTED THE CORRESPONDENCE FILES FOR JUST FOUR OF THOSE 49 COPYRIGHT REGISTRATIONS INSTEAD OF ALL OF THEM.  THEY SUBMITTED THAT TO SUGGEST THAT THE COPYRIGHT OFFICE IS BEING CONSISTENT TO HOW IT APPLIES ITS STANDARDS TO MS. LAATZ.

THAT'S CHERRY PICKED EVIDENCE, THAT'S NOT RELEVANT TO THE ISSUE AT HAND HERE.

THE COURT:  SO CHERRY PICKED EVIDENCE GOES TO THE WEIGHT, IT DOESN'T GO TO THE ADMISSIBILITY.

MR. MATHEWS:  YES, YOUR HONOR.

AS TO DEFENDANT'S EVIDENTIARY OBJECTIONS, I THINK I WILL TRY TO BE AS BRIEF AS POSSIBLE.

DEFENDANTS PAINT IN BROAD STROKES EVERY SINGLE DECLARATION THAT WE SUBMITTED AS CONTAINING IMPROPER LEGAL ARGUMENT OR CONTAINING IMPROPER LEGAL CONCLUSIONS, BUT IF THE COURT ACTUALLY LOOKS IN MOST OF THOSE PARAGRAPHS FROM THE DECLARATIONS THAT WE SUBMITTED, NONE OF THEM CONTAINED A TRACE OF LEGAL ARGUMENT OR LEGAL CONCLUSIONS.

FOR INSTANCE, THEY SAY THAT PARAGRAPH 2 OF PATRICK RYAN'S DECLARATION CONTAINS IMPROPER LEGAL ARGUMENT.  IT'S QUOTED HERE FOR THE COURT TO SEE, IT CONTAINS NO LEGAL ARGUMENT, IT'S A FACTUAL DESCRIPTION OF A BACK AND FORTH EXCHANGE BETWEEN THE PARTIES PRIOR TO FILING THIS LAWSUIT AND THEN IT ATTACHES AND AUTHENTICATES ONE OF THE LETTERS THAT WAS EXCHANGED.

AND I DON'T WANT TO BELABOR THE POINT AND GO THROUGH EVERY SINGLE PIECE OF EVIDENCE, BUT I THINK OUR POSITION IS THAT NONE OF THIS EVIDENCE CONTAINS LEGAL CONCLUSIONS.  I THINK THERE ARE TWO VERY BRIEF POINTS I WOULD LIKE TO MAKE ABOUT THE DECLARATIONS OF THOMAS PHINNEY AND THE DECLARATION OF DANIEL GARRIE.

THEY OBJECTED TO LARGE SWATHS OF BOTH DECLARATIONS.  I WOULD LIKE TO POINT OUT THE DEFENDANTS THEMSELVES ATTACHED WITH THEIR OPENING BRIEF, PRIOR DECLARATIONS AND THE EXPERT REPORTS OF THOMAS PHINNEY IN SUPPORT OF THEIR MOTION.  THEY CONTAIN MUCH OF THE EXACT SAME EVIDENCE THAT THEY ARE NOW OBJECTING TO.

SIMILARLY, DANIEL GARRIE ATTACHED, IN ADDITION TO THE PARAGRAPHS IN HIS DECLARATION THAT DEFENDANTS OBJECTED TO, HE ALSO ATTACHED HIS OWN PRIOR DECLARATIONS AND HIS OWN EXPERT REPORT, BOTH OF WHICH ALSO CONTAIN MUCH OF THE SAME EVIDENCE THAT DEFENDANTS NOW OBJECT TO, AND THEY FAILED TO OBJECT THERE.

THE COURT:  THANK YOU VERY MUCH.

MR. MATHEWS:  THANK YOU, YOUR HONOR.

THE COURT:  ARGUMENT BY THE DEFENSE ON THE EVIDENTIARY OBJECTIONS?

MS. HULKA:  GOOD MORNING, YOUR HONOR.

THANK YOU FOR LETTING ME BE HEARD TODAY.  SINCE WE ARE SHORT ON TIME, I JUST WANT TO BE REALLY BRIEF.  AND YOU HAVE OUR PAPERS ON OUR EVIDENTIARY OBJECTIONS, I THINK THEY ARE WELL LAID OUT THERE AND YOUR HONOR IS PERFECTLY CAPABLE OF ANALYZING THE DECLARATIONS AND DETERMINING FOR YOURSELF WHAT THOSE CONTAIN IMPROPER LEGAL ARGUMENTS, WE SUBMIT THEY DO.

I JUST BRIEFLY WANT TO ADDRESS THE EVIDENCE THAT PLAINTIFFS CHALLENGE THAT WE SUBMITTED IN REPLY, MOST IMPORTANT OF WHICH I BELIEVE IS THE FOUR COPYRIGHT CORRESPONDENCE FILES.

THEY MAKE A NUMBER OF OBJECTIONS ABOUT WHY SUBMITTING

THESE WAS IMPROPER AND I WILL JUST BRIEFLY GO THROUGH THEM. BUT FIRST I WILL JUST NOTE THAT WE ARE SIMPLY ASKING THE COURT TO TAKE JUDICIAL NOTICE OF THESE RECORDS, WHICH IS ENTIRELY PROPER, THEY ARE PUBLIC RECORD AND THE COURT HAS PREVIOUSLY TAKEN JUDICIAL NOTICE OF SUCH RECORDS.

AND I WOULD NOTE THAT IF THE COURT DOES THAT, THAT TAKES CARE OF ANY HEARSAY OBJECTIONS AUTOMATICALLY, AS YOU WON'T BE TAKING THEM FOR THE TRUTH OF THE MATTER ASSERTED.

THE COURT:  THAT'S RIGHT.

MS. HULKA:  THEY MADE A TIMELINESS ARGUMENT, WE SHOULD HAVE SUBMITTED THEM WITH OUR OPENING BRIEFS.  WE COULD NOT HAVE DONE THAT BECAUSE WE REQUESTED THEM AS SOON AS THEY WERE IDENTIFIED TO US AND THAT WAS IN TWO PHASES.  WE RECEIVED THE FIRST SET OF RESPONSES FROM THE COPYRIGHT OFFICE ON DECEMBER 5TH.  WE SUBMITTED OUR MSJ BRIEF ON THE LAST DATE AVAILABLE TO US ON NOVEMBER 21ST.  SO THAT WOULD NOT HAVE BEEN POSSIBLE, WE SUBMITTED THEM TO YOU AS SOON AS WE HAD THEM.

IT'S ALSO NOT NEW EVIDENCE BECAUSE NEW EVIDENCE -- EVIDENCE THAT IS SUBMITTED IN DIRECT RESPONSE TO EVIDENCE RAISED IN AN OPPOSITION IS NOT NEW.  THAT'S WHAT WAS DONE HERE, AND THAT ALSO APPLIES TO MS. LAATZ'S DEPOSITION TESTIMONY.  I WILL NOTE JUST BRIEFLY THAT ONE LINE OF HER DEPOSITION TESTIMONY THAT WAS SUBMITTED TO MAKE THE POINT THAT SHE DIRECTLY CONTRADICTS HERSELF AND IS NOT ABLE TO RAISE A TRIABLE ISSUE, IT WAS BASED ON SUBMITTING A DECLARATION THAT

CONTRADICTS PRIOR DEPOSITION TESTIMONY.

LET ME JUST MAKE SURE -- THE CHERRY PICKING ARGUMENT, YOUR HONOR, I WILL SAY DEFENDANTS ARE NOT REQUIRED TO SUBMIT ALL OF THE EVIDENCE OR AUTHORITY THAT WE HAVE IN SUPPORT OF OUR MOTION --

THE COURT:  IT LOOKS LIKE YOU DID.

MS. HULKA:  AND IN THE INTEREST OF KEEPING OUR PAPERS SUCCINCT, YOUR HONOR, WE DID NOT ADMIT ALL OF THEM, BUT WE ARE HAPPY TO IF YOU WOULD LIKE TO SEE THEM.

I BELIEVE THAT, YOU KNOW, EITHER PLAINTIFF DIDN'T ACTUALLY LOOK AT THE FULL FACTS UNDERLYING THE EVIDENCE THAT SHE SUBMITTED THAT SHE PUT BEFORE YOU AS EVIDENCE OF A POSITION OR SHE DID, AND KNOWING THAT THEY SUPPORTED DEFENDANT'S POSITION, ELECTED NOT TO PUT THEM BEFORE THE COURT AND THEN HAD THE AUDACITY TO CHALLENGE OUR SUBMISSION BEFORE THEM ON COMPLETENESS GROUNDS.

I ALREADY ADDRESSED THEY ARE NOT HEARSAY, BUT THEY ARE NOT SUBMITTED FOR THE TRUTH OF THE MATTER.

I'M HAPPY TO ANSWER ANY QUESTIONS YOU HAVE ON OTHER EVIDENTIARY OBJECTIONS.

THE COURT:  ALL RIGHT.  I APPRECIATE THAT.  THANK YOU.

ALL RIGHT.  I'M GOING TO WRAP THIS UP, I HAVE A FEW THINGS I WANTED TO GO OVER.

MR. SCHAPIRO:  JUDGE, DOES THAT MEAN WE ARE NOT GOING

TO GET FIVE MINUTES EACH, MR. POSNER AND I, JUST TO RESPOND, BECAUSE IT'S OUR MOTION, AND IF I COULD HAVE FIVE MINUTES JUST TO IDENTIFY SOME CASES?

THE COURT:  THAT'S FINE.  OKAY.

MR. SCHAPIRO:  I WILL START -- THANK YOU, YOUR HONOR. THANK YOU TO THE COURT REPORTER AND YOUR STAFF.

SO ON STATUTE OF LIMITATIONS, WHICH I WILL JUST SAY AGAIN, IS A SIMPLE AND I THINK ENTIRELY DEFENSIBLE WAY FOR YOUR HONOR TO RESOLVE THIS CASE AND NOT EVEN HAVE TO DIG INTO SOME OF THIS COPYRIGHT QUESTIONS OR QUESTIONS ABOUT WHAT A LICENSE ACTUALLY IS, I THINK YOU IDENTIFIED CORRECTLY THAT OPPOSING COUNSEL WAS TRYING TO BURDEN SHIFT, BUT YOU ASKED MULTIPLE TIMES, WHAT IS THE EVIDENCE OF DILIGENCE?  WHAT IS THE EVIDENCE OF DILIGENCE?

AND THE ANSWERS YOU KEPT GETTING WERE, WELL HOW WOULD SHE KNOW?  OR AN OWNER DOESN'T HAVE TO POLICE EVERYTHING ON THE INTERNET.  WHAT YOU DIDN'T HEAR WAS ANYTHING -- ANY EVIDENCE OF DILIGENCE.

SO AT THE VERY END, AT THE VERY END, MR. MATHEWS SAID WELL, YOU KNOW, I THINK IT'S IN OUR PAPERS THAT THEY POLICED THAT.

I INVITE THE COURT TO LOOK AT THE PAPERS FOR ACTUAL EVIDENCE OF DILIGENCE AND I DON'T THINK THE COURT WILL FIND IT.

I WANT TO DIRECT THE COURT'S ATTENTION TO FOUR CASES, JUST QUICKLY, THAT I THINK WILL SUPPORT US ON THIS.  THESE ARE ALL CITED IN OUR BRIEFS.  I WILL JUST GIVE THE NAMES RATHER THAN

THE ACTUAL CITES.  ONE IS JAMES V. J2.  THAT CASE LAYS OUT THE STANDARD AND SAYS THAT SUMMARY JUDGEMENT IS APPROPRIATE WHERE THE UNCONTESTED FACTS FAIL TO SHOW DILIGENCE ON THE PART OF THE PLAINTIFF.

SECOND IS THE NBC UNIVERSAL CASE.  IT'S VERY CLOSE TO THIS ONE, IT INVOLVED A TELEVISION SHOW CALLED GHOST HUNTERS, THAT SOMEONE SAYS THE IDEA WAS MINE AND THEN YOU STOLE IT, AND THIS SHOWED UP ON THE SYFY CHANNEL.  AND PUBLIC DISCLOSURE TO EVEN A LIMITED AUDIENCE, THE COURT SAID WAS ENOUGH TO TRIGGER THE DISCOVERY RULE AND THAT THE FACT THAT THE SUPPOSED OWNER OF THE WORK WAS NOT PREVENTED FROM VIEWING IT, EVEN THOUGH IT'S A SCI FI, AND IT'S NOT THE SYFY CHANNEL WE ARE USED TO, IT'S S-Y-F-Y, OBSCURE CHANNEL, THAT WAS ENOUGH TO KNOCK IT OUT UNDER SUMMARY JUDGEMENT UNDER THE DISCOVERY RULE.

THE THIRD OF MY FOUR CASES IS THE ROMO CASE WHICH SAID THERE IS NO DISCOVERY RULE EXCEPTION WHERE THE INDIVIDUAL DIDN'T LOOK AT CERTAIN MONTHLY STATEMENTS.  AND A LOT OF US DON'T LOOK AT MONTHLY STATEMENTS, BUT THE COURT SAID WELL YOU DIDN'T LOOK AT THEM, YOU ARE OUT.

AND THEN FINALLY, A CASE CALLED SHINDE WHICH EMPHASIZED AGAIN THE CONSTRUCTIVE KNOWLEDGE POINT THAT YOUR HONOR WAS ZEROING IN ON, IF YOU HAVE THE OPPORTUNITY TO OBTAIN KNOWLEDGE FROM SOURCES OPEN TO YOUR INVESTIGATION AND YOU DIDN'T, YOU ARE OUT UNDER THE DISCOVERY RULE.

IN THAT CASE, THERE WERE SOME DESCRIPTIONS OF THE THING

THAT THE PERSON COMPLAINED ABOUT ON SOME RECEIPTS.  AND THE PLAINTIFF SAID YES, BUT I ASKED SOMEONE ABOUT THAT AND HE MISLEAD ME, HE TOLD ME TO IGNORE THEM.  AND THE COURT SAID THAT'S NOT ENOUGH.

ON THE STARZ CASE WHICH I THINK IS THE ONLY CASE I BELIEVE THAT THE PLAINTIFFS TRY TO RELY, AND IT'S IMPORTANT TO BEAR IN MIND THAT THAT WAS A MOTION TO DISMISS CASE, AND AT THE END OF THAT CASE, THE COURT SAID -- THAT'S THE ONE WHERE SOME MUSIC -- OH, IT WAS ABOUT BILL AND TED'S EXCELLENT ADVENTURE.  AND IT SAYS AT THE MOTION TO DISMISS STAGE, THE COURT SAID, I CAN'T FIND THAT YOU ARE OUT ON STATUTE OF LIMITATIONS HERE, BUT THE COURT SAID, OF COURSE PRECISELY WHEN A CLAIM ACCRUES IS A QUESTION OF FACT AND THEREFORE THE PARTIES ARE FREE TO PURSUE DISCOVERY TO TEST THE ACCURACY OF THE PLEADINGS.

WE HAVE PURSUED DISCOVERY HERE AND THE DISCOVERY SHOWS THAT THERE IS -- THERE WAS NOTHING PARTICULARLY DIFFICULT ABOUT DISCOVERING THESE CLAIMS NOR WAS THERE ANYTHING THAT YOU COULD CALL DUE DILIGENCE BY THE PLAINTIFFS HERE.

ON FRAUD -- AND HERE, I'M GOING TO INVITE MS. HULKA UP AGAIN IN A MOMENT BECAUSE SHE'S THE PERSON WHO IS MOST FAMILIAR WITH THIS POINT ABOUT BEYOND THE MOUNTAIN FONT, BECAUSE I REALLY THINK WE HEARD A MISCHARACTERIZATION THERE.

OH, RIGHT, ALSO AS A POINT OF PERSONAL PRIVILEGE, I HAD NOT STOOD UP HERE, AND THE TRANSCRIPT WILL REFLECT THIS, AND SAID THAT SHE OPENED E-MAILS THAT SHOWED BLOOMING ELEGANT.  I

SAID, IN FACT I PREDICTED, THAT THE PLAINTIFFS WERE GOING TO SAY, OH, WELL SHE DIDN'T OPEN THOSE.  AND THAT'S WHERE I COMPARED IT TO THE ECF AND SAID OKAY, THAT'S FINE, BUT YOU OPENED A LOT OF YOUR E-MAILS FROM US, THE FACT THAT YOU DIDN'T HAPPEN TO OPEN THOSE THAT HAD BLOOMING ELEGANT, DOESN'T HELP YOU WHEN THE TEST IS, WAS IT DISCOVERABLE?

ON FRAUD, I WILL JUST DIRECT THE COURT TO A FEW CASES HERE, BECAUSE I WAS SLIGHTLY CONCERNED WHEN YOU SEEMED TO BE SMILING OR NODDING ABOUT THAT FINAL POINT ABOUT THE MOUNTAIN, THREE CASES HERE THAT I THINK ARE NOT SUBSTANTIALLY DIFFERENT FROM THIS ONE BUT THAT FALL INTO THE -- THIS WOULD BE EVERY CASE IN WHICH SOMEONE VIOLATES A CONTRACT.

NUMBER ONE IS CALLED GRAND FABRIC.  THE SECOND ONE IS CALLED HSU WHICH SAYS THE PLAINTIFF MUST POINT TO FACTS SHOWING INTENT TO DEFRAUD.

AND RESPECTFULLY, THIS INFERENCE UPON INFERENCE, 404(B), BEYOND THE MOUNTAINS DOESN'T GET OVER THE HILL ON THAT ONE.

AND FINALLY A CASE CALLED RICHARDSON BY JUDGE BREYER, AGAIN SAYING THE PLAINTIFF NEEDS TO SHOW FACTS SHOWING THAT THE STATEMENT WAS FALSE WHEN IT WAS MADE.

I WOULD LIKE TO TAKE ONE MINUTE TO ASK MS. HULKA TO EXPLAIN WHAT WAS ACTUALLY GOING WITH THAT BEYOND THE MOUNTAINS, BECAUSE WHAT YOU HEARD WAS NOT CORRECT.

MS. HULKA:  AND YOUR HONOR, IN THE INTEREST OF TIME, I'M HAPPY TO DO THAT FROM HERE.

I WILL JUST DIRECT THE COURT'S ATTENTION TO EXHIBIT B2 TO THE NOLAN DECLARATION SUBMITTED WITH OUR MOTION FOR SUMMARY JUDGEMENT.  THAT'S AN E-MAIL THREAD IN WHICH THE SAME MESSAGE THAT MONICA MCGHIE SENT TO MS. LAATZ VIA CREATIVE MARKET, SHE SENT TO OTHER DESIGNERS, IT'S ONE OF THOSE THREADS TO ANOTHER DESIGNER, THE DESIGNER, BEYOND THE MOUNTAINS, WHO RESPONDED AND CONFIRMED THAT THE STANDARD LICENSE AFTER MS. MCGHIE DESCRIBED THE EXACT SAME, WE NEED TO CIRCULATE THIS, ET CETERA, RESPONDED AND SAID THE STANDARD LICENSE MEETS YOUR NEEDS.

SO IN FACT, YOU KNOW --

THE COURT:  I'M SORRY, I COULDN'T HEAR THAT, THE STANDARD LICENSE?

MS. HULKA:  THE STANDARD LICENSE MEETS YOUR NEEDS. THE STANDARD LICENSE WHICH YOU SAW IN PLAINTIFF'S COUNSEL'S SLIDES IS A $39 LICENSE.

MR. ALKHATIB DID NOT ENGAGE IN ANY FRAUD, HE -- NOT KNOWING ABOUT THIS, IT WAS NOT SHARED WITH HIM BY MS. MCGHIE, THIS THREAD ELECTED TO ACTUALLY PAY MORE FOR A LICENSE THAN THE DESIGNER HAS CONFIRMED THEY NEED.

SO THAT IS NOT EVIDENCE OF FRAUD.  THANK YOU.

THE COURT:  MR. POSNER.

MR. POSNER:  MAY I?  THANK YOU, YOUR HONOR.

THANK YOU, YOUR HONOR, AND TO THE STAFF FOR INDULGING US.

I KNOW THESE ARE TRICKY ISSUES AND I WILL JUST CLOSE OUT ON THE COPYRIGHT.  MR. STEINBERG STARTED HIS ARGUMENT BY SAYING

THAT DESCRIPTION IS OF NO MOMENT, COMPUTER PROGRAM, FONT DATA, IT DOESN'T MATTER, BUT THEN WENT ON TO ARGUE WHY IT'S VERY CRITICAL FOR THEM TO ARGUE THE EXACT COMPUTER REGISTRATION WHICH THEY DO NOT HAVE.

WE PUT IT ALL IN OUR PAPERS, IT WAS IN THE OUTLINES TOO, THIS IS NOT SOURCE CODE, THIS IS NOT A COMPUTER PROGRAM, AND I REALLY THINK ON COPYRIGHT, THE MOST IMPORTANT DOCUMENT IS EXHIBIT BB, THE EXCHANGE OF CORRESPONDENCE.

THE COURT:  IS THAT EE?

MR. POSNER:  B, AS IN BOY, THAT'S THE CORRESPONDENCE FILES.

ALL OF THESE POINTS, MR. STEINBERG, HE TRIED TO SEPARATE HIMSELF FROM MS. LAATZ, BUT HE WAS THE ONE COMMUNICATING WITH THE COPYRIGHT OFFICE, HE REFERRED THE EXAMINER TO THE SAME AUTHORITIES, THE 1992 REGULATION, THE EXAMINER SAID OVER AND OVER, WE CANNOT REGISTER THIS AS A COMPUTER PROGRAM BECAUSE IT DOES NOT CONSTITUTE SOURCE CODE, WE DON'T DO THAT ANYMORE.

YOUR HONOR MIGHT HAVE MENTIONED POTENTIALLY STAYING THE CASE TO SEE WHAT THE COPYRIGHT OFFICE THINKS ABOUT THAT, BUT HERE'S WHAT THE COPYRIGHT OFFICE THINKS ABOUT THAT, IT'S RIGHT IN EXHIBIT BB, THAT ISSUE IS RESOLVED AND THE COPYRIGHT OFFICE COULD NOT HAVE BEEN MORE CLEAR ABOUT THAT.

AND AGAIN, THE REASON WHY THEY NEED A COMPUTER PROGRAM REGISTRATION -- WELL TWO-FOLD.  ONE, THEY CAN'T MEET THE HAND-CODING REQUIREMENT, THEY USED A FONT PROGRAM, SO WHAT THEY

HAVE IS INVALID.  BUT THE SECOND ONE IS INFRINGEMENT.  AND ON INFRINGEMENT, THEIR ENTIRE ARGUMENT, IT WAS BRIEF, BUT IT ASSUMES THAT THE COPYRIGHTED WORK IS THE OTF FILE THAT WE RECEIVED.

AND YOU CAN AGAIN SEE IT IN EXHIBIT BB, THE CORRESPONDENCE FILES, HE TRIED OVER AND OVER TO SUBMIT THE OTF FILE.  AND I THOUGHT IT WAS KIND OF CUTE WHEN HE SAID, WELL THE EXAMINER GOT THEM BOTH, HE GOT THE OTF AND HE GOT THE VFJ, AND TO BE SURE, THEY TRIED VERY HARD TO MAKE SURE THAT THE EXAMINER HAD THE OTF FILE, BUT THE EXAMINER KEPT SAYING, I CAN'T TAKE THAT, IT IS NOT AN ACCEPTABLE DEPOSIT.  THIS IS WHAT HE SAYS IN THE JUNE 2, 2021 E-MAIL, THE PDF CONTAINS THE FONT DATA THAT WE CAN REGISTER.  THAT'S THE VFJ FILE.  HE REJECTED THE OTF FILE OVER AND OVER.  ALL THEIR ARGUMENTS ON INFRINGEMENT FALL APART WHEN THE COPYRIGHTED WORK IS PROPERLY CONSTRUED.

AND FINALLY ON BREACH OF CONTRACT, THE ONLY COMMENT I WOULD HAVE IS ON THE RESPONSE OF THE IDENTITY OF THE LICENSED WORK.  COUNSEL SAID THAT IT MAKES INTUITIVE SENSE THAT THE LICENSED WORK WOULD EXCLUDE THE TYPEFACE INCLUDE IN ADDITION TO THE SOFTWARE OR THE DATA FILES.  IT REALLY DOESN'T.  EVERYONE AGREES EVERYBODY CAN GO AND COPY A TYPEFACE, GO AND DO WITH IT IF IT'S PUBLICLY AVAILABLE.  THE IMPORT OF THEIR ARGUMENT IS THAT IF SOMEONE ENTERS INTO A LICENSE, HAS FEWER RIGHTS TO ENTER INTO A TYPEFACE THAN ANY ONE OF US THAT GOES ON TO A WEBSITE.  THAT'S NOT INTUITIVE.  THE LICENSED WORK IS NOT THE

TYPEFACE.

AND AGAIN, I HOPE WHEN YOUR HONOR LOOKS AT THEIR BREACH ARGUMENTS AGAIN EXCLUDING THE FAQ AND PROPERLY LIMITING THE LICENSED WORK TO THE OTF FILE THAT WE RECEIVED, THEIR BREACH ARGUMENTS FALL APART.

AND WITH THAT, THANK YOU VERY MUCH, YOUR HONOR.

THE COURT:  OKAY.

MR. STEINBERG:  YOUR HONOR, MAY WE RESPOND BRIEFLY?

THE COURT:  NO, YOU MAY NOT.

MR. STEINBERG:  TO THE ARGUMENTS THEY --

THE COURT:  I SAID YOU MAY NOT.

MR. STEINBERG:  OKAY.  THANK YOU, YOUR HONOR.

THE COURT:  I WOULD LIKE PLAINTIFF TO PUT ON THE DOCKET THE SLIDES THAT YOU USED TODAY, AND IF SOME OF THEM ARE GOING TO BE UNDER SEAL, THEN YOU WILL HAVE TO DEAL WITH THAT, BUT I WOULD LIKE TO SEE THEM.  AND THANK YOU FOR THE EFFORT ON THEM, I KNOW THAT'S A LOT OF WORK.

MR. STEINBERG:  YOUR HONOR, WOULD YOU ALSO LIKE, WE CAN PUT A DIGITAL COPY ON A USB STICK AND I CAN LEAVE THAT WITH YOUR HONOR?

THE COURT:  I READ PAPER.  I NEED PAPER.  YOU ARE GOING TO SEND ME A HARD COPY OF THEM.  THE DOCKET NEEDS TO BE COMPLETE, BUT IF YOU SEND TO ME IN ANY DIGITAL WAY YOU WANT, THEY ARE USELESS.

FOR THE DEFENSE, I'M SURE NONE OF YOU WERE THE ONES

UPLOADING THIS MASSIVE AMOUNT OF MATERIAL TO ECF, BUT WHEN I WENT TO READ YOUR DOCUMENTS, I HAVE A LONG LIST OF EXHIBITS, EXHIBIT BLANK, EXHIBIT BLANK, EXHIBIT BLANK, I COULDN'T FIND ANYTHING.

THEN WHEN YOU HAD -- I FINALLY SCROLLED AND FOUND AN EXHIBIT, I OPENED IT AND IT SAID "FILED UNDER SEAL."  THEN WHEN I WENT TO YOUR ADMIN MOTION TO FIND THE THINGS THAT WERE UNDER SEAL, YOU RENUMBERED THE EXHIBITS.  THEN WHEN YOU SENT ME THE MASSIVE PAPERS, YOU SENT ME REDACTED COPIES.

MY STAFF, MY LAW CLERKS SPENT OVER EIGHT HOURS TRYING TO REASSEMBLE THIS FOR ME.  PLEASE TALK TO YOUR TEAM ABOUT WHAT YOU ARE DOING.  DON'T EVER, EVER, SUBMIT A DOCUMENT UNDER SEAL AND GIVE IT A NEW NAME WHEN YOU FILE THE ADMIN MOTION, IT'S LIKE IT DOESN'T EXIST.

I KNOW NONE OF YOU SAT DOWN AND WORKED THIS OUT, IT'S REALLY IMPORTANT BECAUSE -- AND I REQUIRE THE PAPER, BECAUSE I SPENT 20 MINUTES TRYING TO FIND AN EXHIBIT, AND I COULDN'T. THAT'S WHY I GET THE PAPER BECAUSE IT'S QUICKER, EXCEPT THEN MY LAW CLERKS HAD TO GO THROUGH IT, SO PLEASE HELP ME OUT.

OKAY.  THE OTHER THING IS AT SUMMARY JUDGEMENT I ALWAYS ORDER YOU TO FURTHER SETTLEMENT.  DID YOU HIRE A MEDIATOR IN THIS CASE?

MR. SCHAPIRO:  YOUR HONOR, WE MET SOME TIME AGO WITH A MEDIATOR.

THE COURT:  OKAY.

UNITED STATES COURT REPORTERS

MR. SCHAPIRO:  WE WOULD BE OPEN ALSO TO HAVING A MAGISTRATE JUDGE, WE ARE WILLING TO TAKE ANOTHER RUN AT IT.

THE COURT:  GOOD.

MR. SCHAPIRO:  I WILL HOLD MY FIRE.  YES, WE ARE WILLING TO TAKE ANOTHER RUN AT IT, AND PERHAPS WITH A MAGISTRATE JUDGE AS WELL.

THE COURT:  MR. STEINBERG, WHAT'S YOUR VIEW?

MR. STEINBERG:  YES, YOUR HONOR.

OUR MEDIATOR WAS RETIRED JUDGE WARREN WHO DID A NICE JOB, BUT DESPITE HIS BEST EFFORTS, WE ARE OBVIOUSLY NOT ABLE TO RESOLVE IT.  IT HAPPENED A YEAR AND A HALF AGO, BUT CERTAINLY WE ARE NOT OPPOSED TO TAKING ANOTHER RUN AT IT, EITHER THROUGH JUDGE WARREN OR THROUGH A MAGISTRATE JUDGE.

I THINK GIVEN JUDGE WARREN'S PRIOR FAMILIARITY OF THE CASE, WE WOULD PROBABLY BE INCLINED TO GO BACK TO HIM, BUT OBVIOUSLY THE PARTIES CAN DISCUSS.

THE COURT:  OKAY.  SO I BELIEVE THAT IT IS IMPORTANT FOR THE PARTIES TO DECIDE THE MOST EFFECTIVE FORUM FOR SETTLEMENT.  SO I DON'T JUST SEND YOU TO A MAGISTRATE JUDGE, IF YOU BELIEVE YOUR PRIVATE MEDIATOR WILL DO A BETTER JOB AT TRYING TO SETTLE THE CASE, THAT'S FINE, BUT I WILL ORDER YOU TO FURTHER SETTLEMENT.

IF YOU CHOOSE JOINTLY -- WELL, IT NEEDS TO BE A JOINT DECISION, I NEVER REQUIRE YOU TO GO TO A PRIVATE MEDIATOR, SO IF YOU DON'T BOTH AGREE TO GO TO A MEDIATOR, I WILL SEND YOU TO

A MAGISTRATE, BECAUSE I NEVER REQUIRE YOU TO PAY, IT'S JUST A HARD AND FAST RULE, BUT SOME MEDIATORS ARE JUST THE MOST EFFECTIVE AND SOMETIMES THEY HAVE DONE EVERYTHING THEY CAN AND A NEW FACE IS BETTER, NO REFLECTION ON THEM, BUT A LOT HAS HAPPENED IN THIS CASE.

YOUR TAKEAWAY FROM TODAY SHOULD BE SOME PART OF THIS CASE IS GOING TO TRIAL, I THINK I'VE MADE THAT CLEAR.  AND YOU WILL GET THIS ORDER ON THE HEELS OF YOUR FINAL PRETRIAL CONFERENCE BECAUSE THIS IS TOO COMPLICATED AND THERE IS TOO MUCH EVIDENCE AND I'M NOT GOING TO RUSH IT, SO THAT'S THE WAY IT GOES.  SO GET READY FOR TRIAL AND GO TO SETTLEMENT.

SO BY NEXT FRIDAY, I WOULD LIKE YOU TO SEND ME A JOINT STATEMENT TELLING ME THAT YOU JOINTLY AGREE TO RETURN TO YOUR PRIVATE MEDIATOR.  YOU DON'T JOINTLY AGREE ON WHO SHOULD DO IT OR YOU JOINTLY AGREE TO A MAGISTRATE JUDGE.  I HOPE YOU CAN AGREE ON THIS.

MR. SCHAPIRO:  I'M SURE WE WILL BE TABLE TO, YOUR HONOR.

THE COURT:  IF YOU GO TO A MAGISTRATE JUDGE, YOU HAVE SOME CHOICES.  SO I THINK YOU SAID JUDGE DEMARCHI DID SETTLEMENT.  SOMETIMES THAT'S A GREAT PERSON TO GO BACK TO, OTHER TIMES IT'S BEEN TOO CONTENTIOUS.  WE DON'T ASK QUESTIONS.  IF YOU WOULD LIKE A DIFFERENT MAGISTRATE JUDGE, YOU HAVE TWO MORE CHOICES -- IT'S LIKE A DECISION TREE HERE -- I CAN SIMPLY REASSIGN IT RANDOMLY, THAT MEANS IT WOULD BASICALLY GO TO

JUDGE COUSINS OR JUDGE VAN KEULEN, OR YOU CAN MEET AND CONFER AND IF YOU CAN SELECT A MAGISTRATE JUDGE ANYWHERE IN OUR DISTRICT, OAKLAND, SAN FRANCISCO, I WILL HONOR THAT, OKAY?

SO BY NEXT FRIDAY, BECAUSE THEY ARE VERY BUSY, AND IF I NEED THEM TO JUMP INTO THIS CASE, I WANT TO GIVE THEM TIME.

SO BY MARCH 7TH, YOU WILL SEND ME THAT JOINT STATEMENT.

MR. STEINBERG?

MR. STEINBERG:  JUST TO CLARIFY, YOUR HONOR, JUDGE DEMARCHI WAS NOT ASSIGNED FOR SETTLEMENT PURPOSES IN THE PAST, WE JUST DID THE PRIVATE MEDIATION WITH JUDGE WARREN, AS I RECALL.

THE COURT:  WHO DID YOUR DISCOVERY DISPUTES?

MR. SCHAPIRO:  JUDGE DEMARCHI, I THINK, DID THE DISCOVERY DISPUTES.

THE COURT:  SOMETIMES DISCOVERY DISPUTES ARE SO CONTENTIOUS THAT THE PARTIES DON'T THINK THAT IS THE BEST PLACE TO GO FOR SETTLEMENT.

MR. STEINBERG:  I SEE, YOUR HONOR.

THE COURT:  BUT I DON'T ASK QUESTIONS, YOU JUST NEED TO THINK ABOUT IT.  YOU MAY WANT HER TO DO IT BECAUSE SHE KNOWS THE CASE OR YOU MAY NOT.

MR. SCHAPIRO:  WE WILL MAKE SURE TO GET BACK TO YOU BY FRIDAY ON THAT.

YOUR HONOR, I THINK IF THE COPYRIGHT AND FRAUD CAUSE OF ACTION DISAPPEAR, WE COULD SETTLE THIS PRETTY EASILY.

MR. STEINBERG:  I'M NOT SURE I AGREE, YOUR HONOR, BUT --

THE COURT:  WELL YOU ARE SAYING IF I INVALIDATE THE COPYRIGHT, IT CAN SETTLE EASILY.

MR. SCHAPIRO:  THE EXPOSURE CHANGES A LOT WITH COPYRIGHT AND FRAUD OUT.  I THINK THE ASPIRATIONS OF THE PLAINTIFFS COULD CHANGE.  I DON'T WANT TO INVOLVE THE COURT IN THESE THINGS, I PROBABLY OVERSTEPPED TOO FAR.

MR. STEINBERG:  THAT'S NOT ACCURATE, BUT IN ANY CASE, AS I SAID, WE ARE CERTAINLY OPEN TO PARTICIPATING IN THE PROCESS.

THE COURT:  AND I'M NOT MAKING THE FINAL DECISION NOW, BUT YOU TOOK THREE HOURS TO DO SUMMARY JUDGEMENT, YOU ARE GOING TO GET TWO WEEKS FOR TRIAL, YOU ARE GOING TO GET ABOUT 15 HOURS EACH.  IT'S NOT A COMPLICATED CASE.  SO YOU NEED TO THINK ABOUT HOW YOU CAN DO ALL OF THAT TOO.  I JUST GIVE YOU THAT AS GUIDANCE BUT NOT A FINAL DECISION ON YOUR TRIAL TIME BECAUSE YOU NEED TO KNOW, OKAY?

THANK YOU ALL FOR REALLY AN EXCELLENT JOB ON THE ARGUMENT. I WILL LOOK FORWARD TO GETTING THOSE SLIDES.  PLEASE SEND ME A HARD COPY AS WELL.  AND I WILL AT LEAST SEE YOU AT THE FINAL PRETRIAL.

MR. SCHAPIRO:  THANK YOU, YOUR HONOR.

MR. STEINBERG:  THANK YOU, YOUR HONOR.

(THE PROCEEDINGS WERE CONCLUDED AT 12:38 P.M.)

**CERTIFICATE OF REPORTER**

I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY CERTIFY:

THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

_____

SUMMER A. FISHER, CSR, CRR
CERTIFICATE NUMBER 13185

DATE:  3/4/25