# Exhibit T

ATTORNEYS' EYES ONLY - HIGHLY CONFIDENTIAL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

NICKY LAATZ,                ) Case No.

            Plaintiff,      ) 5:22-cv-04844-

        VS.                 ) BLF-VKD

ZAZZLE, INC., and           )

MOHAMED ALKHATIB,           ) Pages 1-320

            Defendants.     )

_____)

AND RELATED ACTIONS.        )

_____)

ATTORNEYS' EYES ONLY - HIGHLY CONFIDENTIAL

VIDEOTAPED DEPOSITION OF:

        DOMINIC PERSECHINI

        THURSDAY, NOVEMBER 7, 2024

        9:04 A.M.

Reported by:  LINDA NICKERSON

            CSR No. 8746

Page 1

know, besides retirement investments. 09:24:54

Q Right. You consider yourself a 09:24:56 professional expert for purposes of economic 09:24:58 analysis? 09:25:02

A I do. I hold myself out as a damages 09:25:02 expert. 09:25:05

Q You've offered opinions in support of 09:25:06 plaintiffs as well as defendants? 09:25:10

A I have. 09:25:11

Q You've been paid for both categories of 09:25:11 opinions? 09:25:14

A I have. 09:25:14

Q All right. Working for plaintiff, did you 09:25:14 ever -- did a plaintiff ever want to bring a -- 09:25:17 assert a damages theory that you did not support? 09:25:21

A I'm sure it's happened where, you know, 09:25:24 they thought there was a way to get some damages 09:25:26 number, and I said the data doesn't support that. 09:25:28

Q Mindful of privilege and work product, can 09:25:31 you tell me what situation that might be? 09:25:33

A Oh, geez. 09:25:34

MR. ABRAHAM: Don't violate any privileged 09:25:36 communications. 09:25:39

THE WITNESS: Sure. I mean I've worked on 09:25:40 over 150 cases. So I can't give you any specifics 09:25:41

Page 26

anyway, but, you know, there has been a case where a 09:25:44 client will say, hey, could you look at damages this 09:25:47 way or could the data support that. You know, I'll 09:25:50 look at the data and say no and here's why. 09:25:52

BY MR. NOLAN: 09:25:55

Q Just to confirm, do you have any experience 09:25:55 in the font business? 09:25:57

A I'm a user of fonts, but other than that, 09:25:59 no. 09:26:01

Q You haven't created a font? 09:26:02

A I have not. 09:26:04

Q Or licensed a font? 09:26:04

A I have not. 09:26:06

Q For commercial use or personal use? 09:26:07

A I have not. 09:26:09

Q Have you done any economic analysis 09:26:09 specific to fonts or typefaces? 09:26:13

MR. ABRAHAM: Vague and ambiguous, beyond 09:26:15 the damage analysis in this case. 09:26:18

MR. NOLAN. Yes. I'll rephrase. 09:26:20

Q Excluding this case, right, we're going to 09:26:21 be talking about all day, have you done any economic 09:26:25 analysis of fonts or typefaces? 09:26:28

A I have not. 09:26:31

Q All right. So let me ask you some basic 09:26:31

Page 27

questions about the scope of the work on the case. 09:26:38 So you submitted your opening expert report on 09:26:41 September 24th. 09:26:44

You haven't done any other reports or 09:26:45 analysis or declarations or other writings in the 09:26:46 case? 09:26:49

MR. ABRAHAM: Objection; misstates the 09:26:49 evidence. 09:26:50

THE WITNESS: There's been no other written 09:26:50 reports. I submitted a Supplemental 1 Series of 09:26:53 schedules in this case. 09:26:57

BY MR. NOLAN: 09:26:59

Q The supplement you prepared and sent this 09:26:59 week? 09:27:03

A That is correct. 09:27:03

Q No other writings or formal analysis? 09:27:04

A There's not. Nothing else. 09:27:07

Q All right. You prepared for this 09:27:08 deposition of course? 09:27:09

A I did. 09:27:10

Q Have you done any work in this case that's 09:27:12 not reflected in your expert report? 09:27:14

A Just the opinions I hold with respect to 09:27:17 Mr. Kinrich's analysis. 09:27:20

Q Okay. Other than the opinions you express 09:27:22

Page 28

in your report, are there opinions that you intend 09:27:27 to express and present in this case? 09:27:29

A If called as a rebuttal witness, my 09:27:31 opinions about Mr. Kinrich's analysis. 09:27:35

Q Okay. And you plan -- you plan to testify 09:27:36 at trial? 09:27:38

A I do. 09:27:39

Q Okay. 09:27:40

A If called. 09:27:40

Q What opinions do you intend to offer at 09:27:41 trial? 09:27:44

A My affirmative opinions are those that are 09:27:44 expressed in my report as of September 24th, 2024, 09:27:48 as well as my supplemental analysis which was sent 09:27:51 this week as well as, again, if I am called in a 09:27:55 rebuttal capacity, my opinions on the analyses of 09:28:00 Mr. Kinrich. 09:28:03

Q In terms of your affirmative opinions, 09:28:04 they're all the opinions that you intend to express, 09:28:08 your affirmative opinions are contained in your 09:28:10 report and the supplement thereto? 09:28:13

A That is correct. 09:28:14

Q You've been retained as an expert by Nicky 09:28:15 Laatz as an individual; is that right? 09:28:18

A I have. 09:28:20

Page 29

8 (Pages 26 - 29)

ATTORNEYS' EYES ONLY - HIGHLY CONFIDENTIAL

Q When were you retained? 09:28:20

A I could look at my engagement letter, but 09:28:22 my recollection is in the July timeframe. 09:28:25

Q Of what year? 09:28:28

A Of this year. I'm sorry. July of 2024. 09:28:28

Q And how were you approached? Who called 09:28:32 you or e-mailed you? 09:28:36

A Mr. Stephen Steinberg reached out to me. I 09:28:37 can't remember if it was by phone or by e-mail. 09:28:41

Q Do you know how Mr. Steinberg got your name 09:28:43 or found you? 09:28:46

A I do. He was -- I was referred to him by a 09:28:46 mutual acquaintance. 09:28:49

Q Who was that? 09:28:50

A Individual by the name of Greg Regan. 09:28:52

Q Okay. Greg Regan? 09:28:55

A Regan. 09:29:03

Q Regan? 09:29:04

A R-e-g-a-n. 09:29:05

Q Got it. He's a mutual acquaintance, 09:29:06 friends of both yours and Mr. Steinberg who 09:29:09 suggested him -- suggested you to him? 09:29:11

A That's correct. 09:29:13

Q Do you have a written agreement that covers 09:29:14 your work in the case? 09:29:17

Page 30

A I do. 09:29:19

Q Who's it with? 09:29:19

A I believe it's with both the Bartko law 09:29:20 firm and Nicky Laatz. 09:29:23

Q Okay. Any other parties to that agreement? 09:29:24

A No. 09:29:27

Q I think you said it was July of this year 09:29:27 that you signed that agreement? 09:29:37

A That's correct. 09:29:38

Q All right. And the outreach in that 09:29:39 agreement were all in that month? 09:29:40

A That's my recollection. 09:29:42

Q Okay. And when did you begin work on the 09:29:44 case? 09:29:46

A I believe the first hour -- the first 09:29:46 time -- I keep my time in tenths of an hour -- was 09:29:50 on July 29th. 09:29:53

Q So you understand this litigation was filed 09:30:00 in 2022? 09:30:02

A I do. 09:30:04

Q Have you heard about the case before you 09:30:04 were hired in 2024? 09:30:06

A I had not. 09:30:07

Q You're being paid 700 an hour for this 09:30:08 case -- $700 an hour for this case? 09:30:17

Page 31

A That's correct, my standard billing rate. 09:30:20

Q Is it the same rate you're paid for all 09:30:22 your work on the case? 09:30:23

A It is. 09:30:24

Q So it's the same rate for your deposition 09:30:24 today as for your report? 09:30:27

A I have just one rate. 09:30:28

Q And generally in your work, are you paid 09:30:29 hourly? 09:30:32

A I am. Actually I bill my time in tenths of 09:30:32 an hour. 09:30:36

Q So do I. Is your -- 700 your hourly rate 09:30:36 for all your work right now? 09:30:40

A I think I have some legacy cases where 09:30:42 engagements were a number of years ago. So they may 09:30:45 be at lower rates. 09:30:48

Q But this is your current rack right now? 09:30:49

A My current standard rate is $700 per hour. 09:30:51

Q You're being paid of course. Who -- where 09:30:54 do your checks come from? 09:31:01

A I get paid by the Bartko law firm who I 09:31:02 invoice. 09:31:06

Q Okay. And I have your invoices which were 09:31:06 just produced to me this morning. I haven't gone 09:31:13 through them in detail. 09:31:17

Page 32

Roughly speaking, how many hours have you 09:31:17 billed in this case? 09:31:19

A Through October 31st of this year, I've 09:31:20 personally billed 124.6 hours. 09:31:22

Q Is that your personal hourly billings? 09:31:25

A That's my personal time. 09:31:29

Q And your staff has worked on the case as 09:31:31 well? 09:31:33

A That is correct. 09:31:33

Q How many staff and how many hours have they 09:31:34 billed? 09:31:36

A I don't have their number of hours 09:31:36 committed to memory. My engagement manager is an 09:31:38 individual by the name of Eugene Hensen. He's been 09:31:42 my case project manager on the case. Also assisting 09:31:45 me is my colleague Jonathan Salin, S-a-l-i-n. 09:31:49

Q Roughly speaking, do you know how many 09:31:52 hours they billed, 10, 20, 30? 09:31:57

A I don't. No, it would be in excess of the 09:31:59 124.6 that I billed. 09:32:02

Q More than yours? 09:32:03

A More than mine. 09:32:03

Q Okay. And do you remember their rates? 09:32:04

A Yes, their billing rates are the same. 09:32:06 They're $420 per hour. 09:32:09

Page 33

9 (Pages 30 - 33)

Q   So by my notes, I'm counting around ten or so hours preparing for the deposition. The balance of that -- the vast majority would be work on the report?

A   Of my work?

Q   Yes.

A   Yeah, that's right. Ten to 15 hours preparing for the dep, and the 124.6, that was -- that was through October 31st. That would be, you know, work on this report, reviewing Mr. Kinrich's opinions, things of that nature.

Q   The nature of that work is that you wrote the documents by yourself or were you communicating with others or both?

A   Both.

Q   And communicating with others, meaning your staff?

A   That's correct.

Q   Okay. Did you communicate with anybody outside of your staff about the report?

A   I had communications with attorneys at the Bartko law firm.

Q   Okay. Did you have communications with anyone else?

A   No.

Page 34

Q   Is there any other work on the case that you're being paid for that we haven't discussed yet?

A   No, there's not.

Q   Are you expected to do any more after -- after today?

A   I do.

Q   What do you expect to be doing?

A   I may -- if asked, I may help attorneys for Bartko prepare for the Kinrich deposition. Sometimes my clients ask me or my staff to attend an expert deposition, and if this case goes to trial as scheduled, I'm sure there will be preparation that I'll do in preparation for testifying at trial as well as testifying at trial.

Q   Do you plan to prepare any additional written reports or written submissions?

A   I do not.

Q   Okay. You mentioned you expect to testify at trial and your affirmative opinions are set forth in your report.

Is there anything else that you plan to testify at trial about?

MR. ABRAHAM:  Misstates the testimony.

THE WITNESS:  Again, just my rebuttal opinions with respect to Mr. Kinrich's analysis, if

Page 35

I am called in that capacity.

BY MR. NOLAN:

Q   Are those opinions formed now?

A   They are.

Q   Okay. Are they documented anywhere?

A   They are not. There is no scheduling for like a surrebuttal reply report in this case.

Q   Okay. Do you have any personal knowledge about this case outside of the documents you have reviewed that have been provided to you by the Bartko firm?

A   I think I've also -- there's probably some documents in here where we, you know, researched -- you know, web research, but other than what's contained in this report or, you know, what I reviewed in Mr. Kinrich's report, that represents all that I've considered as part of my work.

Q   You don't know John and Nicky Laatz personally?

A   I do not.

Q   Did you know anything about Creative Market, the marketplace, before this case?

A   I did not.

Q   Or font or font licensing?

A   I was aware of fonts. I expect that there

Page 36

would be font licensing, but I can't -- I've looked at a lot of licenses in my day. I may -- somewhere maybe saw a font license before, but I couldn't recall outside of this case.

Q   That wasn't a very formal -- sitting here today, you can't recall seeing a font license before this case?

A   I would agree with that.

Q   Okay. All right. You mentioned I think that you reviewed the expert reports of Thomas Phinney, Stuart Sandler, and Dr. Parikh; is that right?

A   That's right. Also Mr. Garrie, I believe.

Q   And Mr. Garrie. Do you disagree -- and you've reviewed the expert report of Jeff Kinrich?

A   I have.

Q   Okay. Have you reviewed the expert reports of Ellen Shapiro?

A   I have not.

Q   Or Chris Rucinski?

A   I have not.

Q   Or Scott Swain?

A   I have not.

Q   Regarding Mr. Kinrich, do you disagree with anything Mr. Kinrich said?

Page 37

10 (Pages 34 - 37)

ATTORNEYS' EYES ONLY - HIGHLY CONFIDENTIAL

A   I do.   09:36:07

Q   What's that and on what basis?   09:36:09

A   Sure.   09:36:11

MR. ABRAHAM:  Vague and ambiguous as to   09:36:12 scope.   09:36:14

THE WITNESS:  So I disagree with Mr. Kinrich's criticisms of my analysis.  I also disagree with Mr. Kinrich's rebuttal analysis in terms of how he gets to costs that should be deducted as a part of a disgorgement calculation.   09:36:31

I also disagree with Mr. Kinrich's kind of hypothetical, like, framework that would even be appropriate in this case, as well as his eventual conclusion as to the value of a hypothetical license.  Those are kind of the big picture.   09:36:44

BY MR. NOLAN:   09:36:49

Q   Did anything Mr. Kinrich wrote cause you to change your opinions in any way?   09:36:51

A   I noticed in Mr. Kinrich's report that he references a document -- what I'll call a mapping document that I did not have available to me at the time that I issued my report on September 24th, and that caused me to issue the supplemental series of schedules that I issued.   09:37:09

Q   Anything else?   09:37:11

Page 38

A   That's it.   09:37:11

Q   I think you mentioned you haven't spoken with Thomas Phinney or Stuart Sandler; is that right?   09:37:28

A   That is correct.   09:37:28

Q   Did you do any independent research about the fonts, font industry, or font licensing as part of your work?   09:37:34

MR. ABRAHAM:  Vague and ambiguous.   09:37:34

THE WITNESS:  Anything I did is reflected in my September 24th report.   09:37:36

BY MR. NOLAN:   09:37:39

Q   Do you -- do you consider anything reflected in your report as independent research into the font industry?   09:37:43

A   I believe I looked at -- like, I was doing kind of, you know, what is a glyph, you know, specific terms of art.   09:37:52

Q   What did you do to look those things up?   09:37:53

A   I or my staff did web searches.   09:37:59

THE REPORTER:  I'm sorry.  I?

THE WITNESS:  I or my staff did web searches.

BY MR. NOLAN:   09:38:05

Q   Okay.  For -- I think you mentioned glyph?   09:38:05

Page 39

A   Glyph.   09:38:07

Q   What else?   09:38:08

A   You know, I think -- I think I went to Creative Market.  I went to the Minted on the website.  I went to the Spoken Bride website.  It would be kind of publicly available web researching.   09:38:19

Q   Did you review any literature about the font industry?   09:38:24

A   No.   09:38:25

Q   No academic studies or industry publications?   09:38:29

A   Not that I recall.   09:38:30

Q   Did you speak to anyone who's involved in the font industry directly?   09:38:35

A   I do not.   09:38:36

Q   Okay.  So let's officially go back to the exhibit that I introduced that I haven't asked you about, the exhibit marked 246, the Persechini expert report.   09:38:54

Do you recognize this document?   09:38:55

A   I do.   09:38:56

Q   What is it?   09:38:56

A   So this appears to be Volume 1 of my expert report, and Volume 1, tab 1 is my -- what I'll call the written report.  Tab 2 are my schedules or my   09:39:06

Page 40

damages analysis without the supplement.  Tab 3 was my CV as of the date of this report, and tab 4 is my list of documents considered.   09:39:18

Q   And I'll represent to you that's what that is.  I understand it's the first of the six volumes.  I have a hard copy of this as well for your reference which I could give -- I notice you have one yourself, but --   09:39:27

A   Yeah, I have an annotated version of just what is tab 1, just the written report.  I don't know if you plan to -- I'm happy to take your copy.   09:39:35

Q   That's fine.   09:39:37

A   Okay.   09:39:38

Q   As long as we're all on the same page, it's your report which I'm sure we are.   09:39:41

A   It is, and unannotated, unmarked.   09:39:44

Q   Can I direct your attention please to paragraph 6.   09:39:49

A   I see that.   09:39:53

Q   All right.  You say --   09:39:54

THE REPORTER:  Slowly.   09:40:00

MR. NOLAN:  Sure.   09:40:01

Q   "I understand that disgorgement of Zazzle's profits attributable to its copyright infringement is the statutory remedy for such claim"; is that   09:40:14

Page 41

11 (Pages 38 - 41)

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127