# REDACTED VERSION
# OF
# EXHIBIT A

# Hearing on Motions to Exclude Experts

*Nicky Laatz v. Zazzle, Inc., et al.*

Hon. Beth Labson Freeman

Case No. 5:22-cv-04844-BLF

Oct. 30, 2025

Dkts. 398, 399, 450, 452, 453, 457, 458

1

# Roadmap

|  | **Defendants** | **Plaintiff** |
|---|---|---|
| **Technical Experts** | Rucinski | Garrie |
| **Damages Experts** | Kinrich | Persechini |
| **Survey Experts** | Shapiro and Swain | Parikh |
| **Font Industry Experts** | - | Sandler |

2

# Christopher Rucinski

# Rucinski — Relief Sought

- Exclude remaining opinions because most of them relate to font-specific issues that go beyond generic computer science knowledge for lack of specialized expertise under Rule 702(a) and *Daubert*

- Also exclude testimony on font-specific issues, including those relating to copyright issues, for lack of relevance under Rules 402/403 given dismissal of copyright claim

- Exclude testimony based on self-created definitions (e.g., "programming language"; "software" vs. "data") for lack of reliability under Rule 702 and relevance under Rules 402/403

- Exclude testimony on design tool as speculative and methodologically unsound

# General Expertise Is Insufficient Under Rule 702(a) and *Daubert*

- Rule 702(a) requires an expert to have "scientific, technical, or other specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue ..."

- Judge Orrick excluded software engineer specializing in audio and music technology because he lacked specialized knowledge of the specific software at issue.

  *SA Music LLC v. Apple, Inc.*, 592 F. Supp. 3d 869, 901 (N.D. Cal. 2022) (cited in Dkt. 399, p. 11)

- Ninth Circuit affirmed exclusion of expert because despite being "extremely qualified" in international finance, he lacked "any training or experience, practical or otherwise, detecting counterfeit securities ... the fact at issue in this case."

  *U.S. v. Chang*, 207 F.3d 1169, 1172-73, n.2 (9th Cir. 2000) (cited in Dkt. 399, p. 11)

5

## Rucinski Conceded He Lacks Qualifications and Experience Re: Fonts, Fonts Software, and Copyright

- No computer science education or training re: fonts or font software.

  Dkt. 399-11, Ex. 10 (Rucinski Dep. Tr.) at 9:24-12:2

- <u>Never</u> worked with font software file types (OTF or VFJ) before this case.

  Dkt. 399-11, Ex. 10 (Rucinski Dep. Tr.) at 10:25-12:2

- Never designed a font or typeface before.

  Dkt. 399-11, Ex. 10 (Rucinski Dep. Tr.) at 12:3-18

- Never used FontLab before this case.

  Dkt. 399-11, Ex. 10 (Rucinski Dep. Tr.) at 145:24-146:1, 162:21-25

- No expertise in copyright law, could provide no specifics on prior review of copyright deposits, and "d[id]n't know what was actually copyrighted."

  Dkt. 399-11, Ex. 10 (Rucinski Dep. Tr.) at 61:9-10, 67:15-70:18

6

# Most of Rucinski's Remaining Testimony Is on Font-Specific Issues, and/or Depends on Font-Specific or Copyright Knowledge

- OpenType features are written in Adobe Font Development Kit for OpenType (AFDKO), which he opines "is not a programming language"

  Dkt. 399-2, Ex. 1 (Rucinski Initial Report) ¶¶ 9(l), 74

- Explanation of terms and file formats specific to font software and/or related to copyright opinions

  Dkt. 399-2, Ex. 1 (Rucinski Initial Report) ¶¶ 15-22

- Description of FontLab software

  Dkt. 399-2, Ex. 1 (Rucinski Initial Report) ¶¶ 20, 30-31

- Analysis of the BE copyright deposits, particularly the VFJ files

  Dkt. 399-2, Ex. 1 (Rucinski Initial Report) ¶¶ 83-86

# Most of Rucinski's Remaining Testimony Is on Font-Specific Issues, and/or Depends on Font-Specific or Copyright Knowledge

- Discussion of BE OTF files, which he opines are "data" not "software"

  Dkt. 399-7, Ex. 6 (Rucinski Rebuttal Report) ¶¶ 9(p-r), 41-49, 51

- Opinions on how OTF files work in Zazzle's design tool as compared to other software

  Dkt. 399-7, Ex. 6 (Rucinski Rebuttal Report) ¶¶ 64, 67-69, 70-75, 81, 84, 86-90, 95-98

- Rucinski's lack of specialized font software training or experience, and copyright experience, justifies exclusion of all such testimony

- Most such testimony is also no longer relevant in light of dismissal of the copyright claim under Rules 402/403

# Rucinski's Testimony Based on Self-Created Definitions Should be Excluded for Lack of Reliability (Rule 702) and Relevance (Rules 402/403)

- Provides self-created definitions, e.g., "computer language" and "programming language," with no citation to any authority, e.g., scholarly literature, industry standards, etc.

  Dkt. 399-2, Ex. 1 (Rucinski Initial Report) ¶¶ 21-22

- Relies on such definitions to support his opinions, e.g., that OpenType features written in AFDKO are "not a programming language"

  Dkt. 399-2, Ex. 1 (Rucinski Initial Report) ¶¶ 9(l), 74

- Such testimony should be excluded as it is:

  - Not based on reliable principles or reliable application of principles under Rule 702(c-d)

  - No longer relevant and would potentially confuse or mislead the jury under Rules 402/403

9

## Rucinski's Testimony Based on Self-Created Definitions Should be Excluded for Lack of Reliability (Rule 702) and Relevance (Rules 402/403) (cont'd)

- Rucinski cites the definition of "software" from Black's Law Dictionary

> "Computer software is a set of instructions that runs on a computer. It does not consist solely of programming language. Rather, from a technical perspective, software is defined as a program and all of the associated information and materials needed to support its installation, operation, repair, and enhancement. It also includes written programs, procedures, rules, and associated documentation pertaining to the operation of a computer system, which are stored on digital medium. Indeed, because computer software instructs a computer how to perform actions, in the broadest sense, it includes everything that is not hardware. Put another way, computers are, in effect, incomplete machines when manufactured and acquire functionality only after being coupled with software." Daniel B. Garrie & Francis M. Allegra, *Plugged In: Guidebook to Software and the Law* § 2.1, at 45–46 (2013).

Dkt. 399-7, Ex. 6 (Rucinski Rebuttal Report) ¶ 45

- Rucinski then expressly ignores that definition to opine that BE OTF files are "data" not "software"

Dkt. 399-7, Ex. 6 (Rucinski Rebuttal Report) ¶¶ 9(p-r), 41-49, 51

## Rucinski's Testimony Based on Self-Created Definitions Should be Excluded for Lack of Reliability (Rule 702) and Relevance (Rules 402/403) (cont'd)

- Such testimony should be excluded as it is:

  - Not based on reliable principles or reliable application of principles under Rule 702(c-d)

  - No longer relevant and would potentially confuse or mislead the jury under Rules 402/403

- Arguments over labeling or taxonomy, whether "programming language," "software" or "data," are irrelevant to the remaining issues in the case concerning whether Defendants breached the BE License and the appropriate damages

11

# Rucinski's Analysis of the Design Tool Is Speculative and Unsound

- Rucinski criticizes Garrie for only analyzing Zazzle's design tool in its current form, but: (1) did no investigation or analysis of how it operated before; (2) did not recall what, if anything, changed; and (3) simply speculates it might have been different.

  Dkt. 399-7, Ex. 6 (Rucinski Rebuttal Report) ¶ 64
  Dkt. 399-11, Ex. 10 (Rucinski Dep. Tr.) at 305:21-309:25

- Purports to refute Garrie for saying Zazzle sends "SVG files," but later admits Garrie never said that – only "SVG data" or "images" – raising questions about the methodology behind his subsequent analysis of how the design tool processes the OTF files and translates them into data sent to users

  Dkt. 399-7, Ex. 6 (Rucinski Rebuttal Report) ¶¶ 67-75, 81,, 84, 86-94
  Dkt. 399-11, Ex. 10 (Rucinski Dep. Tr.) at 310:14-314:25

12

# Daniel Garrie

# Garrie — Still at Issue

- Defendants do not challenge most of Garrie's technical analysis of Zazzle's design tool's operation, user interaction, and file handling, found on pp. 6-36 of his report (Dkt. 398-8, Ex. G (Garrie Report))

- Defendants argue the Court should exclude:

  - Testimony they mischaracterize as opinions on "copyright law," "contract interpretation" and "breach[]," and "statute of limitations" (Dkt. 457 (Defs.' Reply), pp. 4-7)

  - Technical analysis of how Zazzle's design tool and servers enabled users to select and then access and use the BE Trio of fonts (Dkt. 457 (Defs.' Reply), pp. 7-9)

  - Testimony on Zazzle's data on users and designs (Dkt. 457 (Defs.' Reply), pp. 9-10)

14

# No Issue with Use of Legal Terms Per Se



"[A] witness may refer to the law in expressing an opinion without that reference rendering the testimony inadmissible. Indeed, a witness may properly be called upon to aid the jury in understanding the facts in evidence even though reference to those facts is couched in legal terms."

*Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1016–17 (2004) (cited in Dkt. 452 (Opp.) at 7)

# Garrie Does Not Opine on Copyright Law

- Zazzle misstates Garrie's testimony as being "legal opinions about matters of copyright law"

  Dkt. 457 (Defs.' Reply) at 4:27-28

- Reference to "copyright-protected" software simply refers to Laatz's testimony that the BE Software she created and licensed, is what she later registered

  Dkt. 398-8, Ex. G (Garrie Report), p. 2

- References to "derivative work[s]" are from the BE License and the technical processes observed by Garrie

- Garrie quotes the BE License, which states that:
  - A licensee "may modify or manipulate the Item [BE Trio digital content, including the Software], or incorporate it into other content and make a derivative work from it," but "the Shop Owner [in this case, Nicky Laatz] will retain all right, title, and ownership in the Item [BE Trio digital content, including the Software], and the resulting derivative work is subject to the terms of this Standard License."

    Dkt. 398-8, Ex. G (Garrie Report), p. 4

16

# Garrie Does Not Opine on Copyright Law (cont'd)

- Garrie's analysis found in incorporating BE Software into its design tool servers:

  - Zazzle's servers used the software to create SVG data, which is a "derivative work" of the font software, which he explains means it "provide[s] essentially the same functionality as the font software (i.e., instructing computers how to render text in a specific font), but in a different format. … analogous to translating a recipe from one language into another."

  - Zazzle's servers sent the SVG data to the user's device to display text in the BE Trio of fonts

    Dkt. 398-8, Ex. G (Garrie Report), pp. 25, 36-37, 40

- Garrie testified and explained in deposition that by "derivative work" he meant:

  - Zazzle's servers "would access the Blooming Elegant font and then [create] another representation of the Blooming Elegant font … return[] it back and the new representation is a derivative from whatever the original was."

  - He was not using a "copyright law" definition, nor opining that it legally constituted a derivative work under copyright law

    Dkt. 398-9, Ex. H (Garrie Dep. Tr. at 264:7-265:22)

17

# Garrie Does Not Opine on Contract Interpretation or "Breach"

- Zazzle misstates Garrie as opining on "contract interpretation" and that "Zazzle breached the License"

  Dkt. 457 (Defs.' Reply) at 6:6-7, 6:15-25

- Garrie simply quotes from the BE License, including various technical terms

  Dkt. 398-8, Ex. G (Garrie Report), pp. 4-5

  - "Item" is defined based on other provisions of the License Terms, e.g., defining "Installable Items" to include "Fonts" (Zazzle does not dispute that "Item" also includes the BE Software)

- Pages 6 (not raised in Defs.' Mot.), 35, and 40-41 detail portions of Garrie's analysis of Zazzle's design tool, how it functioned including incorporating and using the BE Software on the servers, the access it provided to users, and the lack of protection against extraction

  Dkt. 398-8, Ex. G (Garrie Report), pp. 4-5

- Garrie testified and confirmed in deposition he is not opining on whether these actions constituted a breach

  Ex. H (Garrie Dep. Tr. at 160:6-18)

18

# Garrie Does Not Opine on the Statute of Limitations

- Unclear what opinions or testimony Zazzle originally intended to attack
  - Motion at 11:15-16 cites "Garrie Decl. (Dkt. 342-52) ¶ 19" which was his expert report, and does not directly address the statute of limitations or "notice"

- Reply at 7:1-2 cites "Garrie's assertions in ¶¶ 7-8 and 18-20 of his Declaration," most of which paragraphs were not raised in the Motion
  - Garrie's first Declaration (Dkt. 342-51) was never objected-to by Defendants
  - Analyzes technical evidence from reviewing Laatz's computers, emails, browsing history, and social media for evidence of engagement with Zazzle
  - Most of Garrie's second Declaration (Dkt. 342-49) was also not objected-to by Defendants and/or their prior objections were overruled
  - Analyzes Zazzle's circumstantial evidence re: emails and social media, refutes it on a technical basis, and compares it to the earlier evidence and findings
  - Such testimony is based on his expertise, the cited facts and data, and reliable methods of analysis, and would help the jury understand the evidence
  - No legal conclusions re: the statute of limitations

19

# Garrie's Analysis of & Opinions on Zazzle's Design Tool Are Properly Supported

- Zazzle misstates and plays word games with Garrie's testimony

- Garrie analyzes and explains in detail how Zazzle's design tool and servers functioned, incorporated and used font software including the BE Software, and thereby enabled users to access and use the fonts contained therein
  
  Dkt. 398-8, Ex. G (Garrie Report), pp. 8-37, 40-41

- Garrie explains how users could enter text in a selected font, causing Zazzle's servers to use the BE Software to create SVG data and send it back to the users, thereby rendering text in the selected font on the user's computer, effectively the same as if they were using a local copy
  
  Dkt. 398-8, Ex. G (Garrie Report), pp. 25, 36-37, 40

- All of this is supported by actual testing and analysis of the design tool and the BE Software itself, as well as citations to technical evidence from Zazzle and third-party research materials

20

## Garrie's Analysis of & Opinions on Zazzle's Design Tool Are Properly Supported (cont'd)

- While Zazzle does not challenge his qualifications, Garrie testified that, inter alia:

    - He designed and developed a font and font software as part of his coursework in college

    - He has worked with OTF files since 1999

    - He has significant experience analyzing how font software interacts with other applications

- This is in stark contrast to Rucinski, and to *SA Music LLC v. Apple, Inc.*, 592 F. Supp. 3d 869 (N.D. Cal. 2022), relied on by Zazzle (Dkt. 398 (Mot.) at 9:1-4), where the expert had no experience with and did no technical analysis of the software at issue

# Garrie's Testimony About Zazzle's Data on Users and Designs Is Properly Qualified and Admissible

- Zazzle mischaracterizes the interrogatories and responses

- As Garrie explains, ROG 12 asked for "the number of unique products sold at any time that were designed using UNLICENSED FONT GENERATION," defined as "allowing PERSONS to generate the BLOOMING ELEGANT TRIO ... on ZAZZLE's website <u>through its online design tool</u>."

Dkt. 398-8, Ex. G (Garrie Report), p. 38 (underline added)

- Zazzle responded "approximately 3,300,897."

Id.

- Zazzle's 30(b)(6) witness, Jason Li, could not explain this number or how it was calculated

- Zazzle's counsel's subjective argument about the significance of "unique products" designed using the BE Trio in the design tool goes (at best) to weight, not admissibility

# Garrie's Testimony About Zazzle's Data on Users and Designs Is Properly Qualified and Admissible (cont'd)

- Garrie accurately explains the limits of Zazzle's data based on Mr. Li's testimony, as well as measures it could have taken to better track user activity related to fonts

  Dkt. 398-8, Ex. G (Garrie Report), pp. 35-36

- Garrie accurately <u>quotes</u> Zazzle's interrogatory responses on numbers of users who accessed the design tool and unique product designs using the BE Trio

  Dkt. 398-8, Ex. G (Garrie Report), pp. 37-38

- Garrie accurately opines that based on Zazzle's data and admissions that these numbers do not account for "pending" designs that were not "finalized" or "finished," and only account for about 3 of 5 years the BE Trio was available in the design tool, the actual numbers are unknown but likely higher

  Dkt. 398-8, Ex. G (Garrie Report), pp. 38-40

- All of this is fully supported by citations to and quotations from Zazzle's discovery responses and deposition testimony

23

# Jeffrey Kinrich

# Kinrich — Relief Sought

- **Exclude opinions** on incremental costs (§§ IV.B.4-6) and apportionment (§ IV.B.7) (summarized in ¶ 6a) and Exs. 3-6 as untimely, improper rebuttal, lacking factual support, and being unreliable

- **Exclude opinions** on contract damages based on non-comparable licenses (§ IV.C) (summarized in ¶ 6b) and hypothetical license betw. Laatz and Zazzle to cover its use (§ IV.D and inc. into IV.B.7) (summarized in ¶ 6c) as untimely, improper rebuttal, and for being unreliable, including because violates law where there is an actual license

- **Strike sections** that rely on Shapiro's inadmissible testimony (e.g., ¶¶ 33, 49)

# Persechini's Contract Damages Opinions

Persechini's contract damages opinions are based on two metrics:

(1) "Expectation damages" based on the agreed per-seat price (less the cost Creative Market would have received) multiplied by the number of "users" — i.e., seats, "to whom Zazzle provided unlicensed access to the [BE] Trio"; or alternatively

(2) "Disgorgement of Zazzle's ill-gotten profits" derived from its breach.

*Dkt. 399-4*

26

# A Rebuttal Expert May Not Proffer New Theories



"[A] defendant's rebuttal expert is limited to offering opinions rebutting and refuting the theories set forth by plaintiff's expert(s)."

*Clear-View Tech., Inc. v. Rasnick, et al.*, 2015 WL 3509384, at *2 (N.D. Cal. Jun. 3, 2015) (Freeman, J.) (cited in Dkt. 399, pp. 6-7, 10; Dkt. 458 at 2:16-18)

"[R]ebuttal experts, therefore, cannot put forth their own theories; they must restrict their testimony to attacking the theories offered by the adversary's experts."

*Abdo v. Fitzsimmons*, 2020 WL 4051299, at *2 (N.D. Cal. July 20, 2020) (internal quotations omitted) (cited in Dkt. 399, p. 6; Dkt. 458 at 2:21-22)

# Further Guidance on Proper Scope of Rebuttal Expert Testimony



An expert testifying on issues "on which Defendants bear the burden of proof" and/or to "'contradict an expected and anticipated portion of the other party's case-in-chief' … 'is not a rebuttal witness.'"

*Clear-View Tech., Inc. v. Rasnick, et al.*, 2015 WL 3509384, at *2-4 (N.D. Cal. Jun. 3, 2015) (Freeman, J.) (cited in Reply (Dkt. 458) at 1:28-2:3)

"[R]ebuttal witnesses [may] address the initial experts' assertions by questioning their assumptions and methods, not by presenting new facts."

*Matthew Ent., Inc. v. Chrysler Grp. LLC*, 2016 WL 4272430, at *4 (N.D. Cal. Aug. 15, 2016) (Freeman, J.) (cited in Reply (Dkt. 458) at 2:18-19)

- Excluding portions of plaintiff's expert's rebuttal report, including where he applied a different benchmark and new methodology in response to the defendant's expert

28

# Kinrich's Opinions on Incremental Costs and Apportionment (§§ IV.B.4-7 & Exs. 3-6) Are Not Proper Rebuttal

- Defendants bear the burden of proof as to any "costs, expenses, and other deductions" to show net benefit or profit

  *Ctr. for Healthcare Educ. & Res., Inc. v. Int'l Cong. for Joint Reconst., Inc.*, 57 Cal. App. 5th 1108, 1127 (2020)
  *Meister v. Mensinger*, 230 Cal. App. 4th 381, 398-99 (2014)
  (cited in Reply (Dkt. 458) at 1:21-27)

- Thus, Kinrich's testimony on incremental costs and other deductions should have been provided in an initial report, not a rebuttal report

- Kinrich relies on new facts (§ IV.B.4 & Exs. 3-4) not raised in Persechini's report to deduct fixed overhead costs and thereby reduce purported profits

- Kinrich proffers new theories of regression analysis (§ IV.B.5-6 & Exs. 5-6) not raised by Persechini to further reduce purported profits

- Kinrich proffers new theory of hypothetical license (§ IV.D), which he then incorporates into a new apportionment analysis (§ IV.B.7) not raised by Persechini to further reduce profits to just $▮

# Kinrich's Opinions on Apportionment (§ IV.B.7) Also Lack Factual Support and Are Unreliable

- Kinrich's opinions regarding "designers' independent contributions" and non-font "design elements" underlying his apportionment analysis lack evidentiary support and are unreliable.

  Dkt. 397-4 ¶¶ 48-57

- Kinrich cites one paragraph of the FAC showing just a few examples

  Dkt. 397-4 ¶ 49, n.74

- Defendants destroyed and refused to produce the evidence of what all products using the BE Trio **actually** looked like.  *See, e.g.*:

  - Dkt. 263 (Disc. Ltr. Br.) at 6-7 and Dkt. 310-1 ¶¶ 17-20 admitting Zazzle did not preserve webpages for products using the BE Trio, and arguing it should not have to re-generate them or produce underlying data.

- Speculative and unreliable to opine on their elements, independent design value, or lack thereof.

# Kinrich's Opinions on Disgorgement Are Otherwise Inappropriate and Prejudicial

- **Rely on Inadmissible Evidence:** Kinrich's opinions in ¶¶ 33, 49 of his report are based on inadmissible opinions of Ellen Shapiro.

- Withholding testimony on issues on which Defendants' bear the burden of proof and new facts and theories until a rebuttal report is prejudicial because, inter alia, the Court's scheduling order does not permit sur-rebuttal expert opinions

  Dkt. 290 at 4

- Defendants' destruction of evidence that could independently provide grounds to exclude Kinrich's new theories is a further reason for exclusion

  - Court has recognized that Defendants' failure to preserve this evidence is grounds to limit or exclude presentation of their value allocation defense.

    Dkt. 314 at 1:19-24

  - Deprived Laatz of ability to cross-examine or rebut, and a jury from determining whether the small sample Kinrich cites is representative

# Kinrich's Contract Damages Opinions on Non-Comparable Licenses and a Hypothetical License (§§ IV.C-D) Are Improper Rebuttal

- Kinrich's contract damages opinions rely on an amalgamation of non-comparable licenses leading to what he opines is the "fair market value of a hypothetical license granted by Plaintiff [Nicky Laatz] to Zazzle"

  Dkt. 397-4 ¶¶ 68, 74-75, 78-98
  (cited in Reply (Dkt. 458) at 4:6, 4:15)

- But Persechini did not opine on a hypothetical license because that damages measure is *incorrect* where an actual license exists

- *See IBM v. Fasco Indus., Inc.*, 1995 WL 115421, at *3 (N.D. Cal. Mar. 15, 1995) (cited in Reply (Dkt. 458) at 4:8-10)

  - Excluding defendant's rebuttal damages expert from opining on out-of-pocket damages, where plaintiff's damages expert only opined on lost profits

  - "'[R]ebuttal' experts cannot put forth their own theories; they must restrict their testimony to attacking the theories offered by the adversary's experts."

32

# Kinrich's Contract Damages Opinions on Non-Comparable Licenses and a Hypothetical License (§§ IV.C-D) Are Also Unreliable

- Nicky Laatz has *never* licensed or even offered to license the BE Trio for unlimited access and use by millions of users, as sought by Zazzle.

  Dkt. 397-4, ¶¶ 68, 74-75, 78-98; Dkt. 89-1 ¶ 52
  (cited in Reply (Dkt. 458) at 4:6)

- Kinrich's hypothetical license is based on comparison to and amalgamation of other licenses, none of which are comparable, in that they involved different: (1) fonts; (2) parties; and/or (3) scope of rights.

  Dkt. 397-4 ¶¶ 52, 68, 74-75, 78-98; Dkt. 89-1 ¶ 52; Dkt. 399-5 at App'x A
  (cited in Reply (Dkt. 458) at 4:15-16)

- Courts properly exclude expert opinions based on non-comparable licenses as unreliable.

  See *Apple, Inc. v. Samsung Elect. Co., Ltd.*, 2012 WL 2571332, *8 (N.D. Cal. June 30, 2012)
  *Dominion Assets LLC v. Masimo Corp.*, 2018 WL 11452321, * 5-6 (N.D. Cal. Aug. 1, 2018)
  (cited in Reply (Dkt. 458) at 4:16-19)

33

# Kinrich's Contract Damages Opinions Are Unreliable as They Violate the Law



*Daubert* requires exclusion of "expert testimony" concerning damages that "relies upon a legal 'principal' that is not legally acceptable."

*DSU Med. Corp. v. JMS Co., Ltd.,*
296 F. Supp. 2d 1140, 1156 (N.D. Cal. 2003)

(cited in Dkt. 452, pp. 13, 15-16, 18; Dkt. 458, p. 5)

34

# An *Actual* Contract Exists Between the Parties

The Court held that an *actual contract* exists in this case:



> "==The Court … finds that Defendants agreed to the Service Terms==" of Ms. Laatz's offer creating a binding contract that included "both the Service Terms and License Terms…."

*Laatz v. Zazzle, Inc.,*
2023 WL 7003245, at *7 (N.D. Cal. Oct. 23, 2023) (Dkt. 155 at 13:21-24)

35

# Contract Damages Are Usually Measured by the Value Expressed in the Contract



"When the parties have an actual contract" the preferred remedy for breach is to award damages conferring the benefit of the "parties' bargain."

*Hedging Concepts, Inc. v. First Alliance Mortg. Co.*, 41 Cal. App. 4th 1410, 1419-20 (1996)

(cited in Dkt. 458, p. 5)

The measure of such damages is the "==value as expressed in the parties' agreement.=="

*Cazares v. Saenz*, 208 Cal. App. 3d 279, 290 (1989)

(cited in Dkt. 458, p. 5)

36

# Alternatively, Contract Damages Can Be Measured by the Breacher's Ill-Gotten Profits



As an alternative to benefit-of-the-bargain damages, "a defendant's unjust enrichment can satisfy the 'damages' element of a breach of contract claim, such that disgorgement is a proper remedy."

*Foster Poultry Farms, Inc. v. SunTrust Bank*, 377 Fed. Appx. 665, 669 (9th Cir. 2010)

(cited in Dkt. 452, p. 19, Dkt. 458, p. 5)



Such damages are appropriate where the existence of damages is certain but benefit-of-the-bargain damages "are difficult to prove."

*Young v. Wideawake Death Row Ent., LLC*, 2011 WL 13371881, at *2 (C.D. Cal. May 15, 2011)

(cited in Dkt. 458, p. 5)

# Persechini's Contract Damages Opinions Comply With Contract Law

Persechini's contract damages opinions are based on two metrics:

(1) "Expectation damages" based on the agreed per-seat price (less the cost Creative Market would have received) multiplied by the number of "users" — i.e., seats, "to whom Zazzle provided unlicensed access to the [BE] Trio"; or alternatively

(2) "Disgorgement of Zazzle's ill-gotten profits" derived from its breach.

*Dkt. 399-4*

# Kinrich's Contract Damages Opinions Are Incompatible With Basic Contract Law

- Kinrich bases his damages figure on the "fair market value" that a hypothetical buyer like Zazzle would pay for "a hypothetical license" from Laatz.

- He claims an award based on the value expressed in the parties' agreement or Zazzle's ill-gotten profits would be "economically unreasonable" and "at odds with economic reality."

*Dkt. 397-4, ¶ 90 at 63; Dkt. 453 at 6:18-27*
*(cited in Reply (Dkt. 458) at 5)*

39

# Kinrich's Contract Damages Opinions Are Incompatible With Basic Contract Law



Damages based on "the going rate … that a hypothetical willing buyer would pay a hypothetical willing seller" if neither was "under compulsion to buy or sell"—is a "quasi-contractual remedy."

*Long Beach Mem. Med. Ctr. v. Kaiser Found. Health Plan, Inc.*, 71 Cal. App. 5th 332, 338, 344 (2021)
(cited in Dkt. 452, p. 15; Dkt. 458, p. 5)

This "'quasi-contractual'" theory of compensation only "operates without an actual agreement of the parties…."

*Maglica v. Maglica*, 66 Cal. App. 4th 442, 455 (1998)
(cited in Dkt. 452, p. 15; Dkt. 458, p. 6)

"Quasi-contract" damages are barred when "the parties have an actual agreement"

*Klein v. Chevron U.S.A., Inc.*, 202 Cal. App. 4th 1342, 1388 (2012)
(cited in Dkt. 458, p. 6)

40

# Laatz's Damages Are Based on the License's Unit Price



The bedrock maxim of contract law is that "==[t]he offeror is the master of his [or her] offer==."

*Lang v. Gates*, 36 F.3d 73, 75 (9th Cir. 1994)

(cited in Dkt. 458, p. 6)



When "an offeree, knowing that an offer has been made" has "accepted [it] by [the offeree's] conduct," it is bound by "whatever terms the offer contains."

*Windsor Mills, Inc. v. Collins & Aikman Corp.*, 25 Cal. App. 3d 987, 993 (1972)

(cited in Dkt. 452, p. 13; Dkt. 458, p. 6)

# Laatz's Damages Are Based on the License's Unit Price

- Through the Creative Market website, Laatz offered to sell licenses to her BE Trio for a unit price of $20.

- And she only offered them on "a one seat per license" basis.

Dkt. 49 at 2:25-26; Dkt. 89-41 at 1
(cited in Reply (Dkt. 458) at 6)

42

# A Thief Who Steals an Article From a Seller Must Pay the Seller's Offered Price



One "who goes into a shop and asks and is given … the price of an article, cannot take it" and later "say 'I decline to pay the price you ask, but will take it at its fair value.' He will be liable … not simply as a converter for the fair value of the property, but as a buyer for the stated price."

*Desny v. Wilder*, 46 Cal. 2d 715, 736 (1956) (quoting Samuel **Williston**, *Mutual Assent in the Formation of Contracts*, 14 Ill. L. Rev. 85, 90 (1919)), (cited in Dkt. 452, pp. 13, 15-16, 18; Dkt. 458, p. 6)

# A Thief Who Steals an Article From a Seller Must Pay the Seller's Offered Price

- Laatz's offering page told Zazzle the unit price for the BE Trio was $20 per seat.

  Dkt. 49 at 2:25-26; Dkt. 89-41 at 1 (cited in Reply (Dkt. 458) at 6)

- Zazzle had its employee, Alkhatib, buy a single-seat license.

- Zazzle then stole and distributed millions of "seats" for its users after being told the unit price was $20 per seat.

- As Prof. Williston's parable shows, Zazzle's theft constituted acceptance, creating "an 'implied-in-fact' contract" to pay "the stated price" for each seat it stole.

44

# A Thief Who Steals an Article From a Seller
# Must Pay the Seller's Offered Price Minus Costs Avoided



Contract damages are "'measured by the loss in value'" suffered by the nonbreaching party "'less any expenses saved … by the nonbreacher.'"

*New Investments Inc. v. Altanatural Corp.*, 780 Fed. App'x 426, 429-30 (9th Cir. 2019)
(cited in Dkt. 458, p. 7)



When a buyer breaches, the loss in value is the amount that it "agreed to pay."

*Perth v. Davis*, 2009 WL 10695050, at *4 (N.D. Cal. April 20, 2009)
(cited in Dkt. 458, p. 7)



Costs avoided are "expenses saved" by the nonbreacher "in consequence of the … breach."

*Green Wood Indus. Co. v. Forceman Int'l Dev. Group, Inc.*, 156 Cal. App. 4th 766, 773 (2007)
(cited in Dkt. 452, p. 12; Dkt. 458, p. 7)

## A Thief Who Steals an Article From a Seller
## Must Pay the Seller's Offered Price Minus Costs Avoided

- Laatz's "loss in value" is $20 for each "seat" (or user) Zazzle allowed to access the BE Trio.

- Creative Market charges her $6 for each license sold through its site, which was avoided for each of the misappropriated seats.

- She is entitled to at least $14 for each misappropriated seat.

Reply (Dkt. 458) p. 7

46

# Defendants' Mischaracterize Prof. Williston's Parable

- Defendants argue Williston's shoplifter parable:

    1. "applies only in the absence of an *enforceable* contract"

    2. and is exclusive to the "entertainment industry."

    Dkt at 453 at 23:8-9 (emphasis in original)

- Both contentions are false.

47

# Contracts Effectuated by Theft Are *Real* Contracts



One who steals articles from a seller after being told the expected per-unit "price" creates an "implied-in-fact" contract to pay the seller "the stated price" for each article he stole.

Contracts "implied-in-fact" are *real* contracts and "on their breach the normal measure of damages is applied."

*Desny v. Wilder*, 46 Cal. 2d 715, 736 (1956)
(cited in Dkt. 452, pp. 13, 15-16, 18; Dkt. 458, p. 6)

# Prof. Williston's Parable Applies Outside the Entertainment Industry

- In explaining the acceptance-by-theft rule, Prof. Williston discussed "articles."

- *Desny* merely confirmed this rule applies to intangible property — which *can* arise in the entertainment industry.

  46 Cal. 2d at 736

- *Arcade Cnty. Water Dist. v. Arcade Fire Dist.*, 6 Cal. App. 3d 232 (1970) applied Prof. Williston's rule to a contract to buy water.

49

## *Arcade Cnty. Water Dist. v. Arcade Fire Dist.*, 6 Cal. App. 3d 232 (1970)

- A water district offered to sell water from fire hydrants to the defendant-fire departments for "$4 per hydrant per month."

- The defendants verbally rejected this offer but continued taking water from the plaintiff's hydrants.

- By taking the water, the defendants "stated to [the plaintiff] 'we decline to pay the rates you ask, but must take your hydrant service.'"

Arcade, 6 Cal. App. 3d at 236 n.3, 237
(cited in Dkt. 452, pp. 13, 15; Dkt. 458, p. 7)

50

# *Arcade Cnty. Water Dist. v. Arcade Fire Dist.*, 6 Cal. App. 3d 232 (1970)



An "'implied-in-fact' contract … is a true contract despite the possible absence of a simultaneous 'meeting of the minds.'"

*Arcade*, 6 Cal. App. 3d at 236)

(cited in Reply (Dkt. 458) at 8)

51

# *Arcade Cnty. Water Dist. v. Arcade Fire Dist.*, 6 Cal. App. 3d 232 (1970)

- *Arcade* held that the defendants were "presumptively" required to pay the per-unit price of "$4 per month per hydrant."

- But it remanded to the trial court because the California Water Code limits the price water districts can charge for water by prescribing "criteria for fixing the rates."

- Review was required to determine whether the district's offered price complied with these criteria.

*Arcade,* 6 Cal. App. 3d at 236
(cited in Reply (Dkt. 458) at 8:2-4)

# *Arcade Cnty. Water Dist. v. Arcade Fire Dist.*, 6 Cal. App. 3d 232 (1970)



> The defendants' act of taking water constituted acceptance creating "an implied-in-fact contract."

*Alameda Water & Sanitation Dist. v. Bancroft Fire Prot. Dist.*, 544 P.2d 979, 981 (Colo. 1976)
(citing *Arcade*, 6 Cal. App. 3d at 236)
(cited in Dkt. 458, pp. 7-8)

# Unlike the Water District, Laatz Was Free to Name Her Price



The freedom of contract dictates that a *private party* is free to "name the price on which [she] is willing to sell, and to refuse to accede to any other."

*Front Line Motor Cars v. Webb,* 35 Cal. App. 5th 153, 165 (2019)

# Zazzle Cannot Use Its Failure to Preserve Evidence to Reduce Its Liability

- Zazzle claims Kinrich's quasi-contractual measure applies because Laatz cannot prove the exact numbers of unlicensed users Zazzle allowed to access and/or use the BE Trio.

  *See* Dkt. 453 at 23:12-24:3

- Zazzle's failure to preserve and produce evidence of the precise numbers of people who had access to and/or actually used the BE Trio during the relevant time caused any uncertainty.



> "[W]hen a party frustrates proof of damages, either by withholding facts or through inaccurate record-keeping, any doubts about the actual assessment of damages will be resolved against that party, and the fact-finder may calculate damages at the highest reasonable ascertainable value."

*Truong Giang Corp. v. Twinstar Tea Corp.*, 2008 WL 11515375, at *2 (N.D. Cal. April 2, 2008) (cited in Dkt. 458, p. 8)

# Zazzle Cannot Use Its Failure to Preserve Evidence to Reduce Its Liability

- Even if Laatz's damages based on the actual license cannot be proven with sufficient precision, disgorgement of Zazzle's profits — not Kinrich's hypothetical license — would prescribe the remedy:



> Disgorgement of profits is an appropriate remedy when benefit-of-the-bargain damages "are difficult to prove."

*Young v. Wideawake Death Row Ent., LLC*, 2011 WL 13371881, at *2 (C.D. Cal. May 15, 2011)

(cited in Dkt. 458, p. 5)

# Dominic Persechini

# Persechini's Contract Damages Opinions Comply With Contract Law

Persechini's contract damages opinions are based on two metrics:

(1) "Expectation damages" based on the agreed per-seat price (less the cost Creative Market would have received) multiplied by the number of "users" — i.e., seats, "to whom Zazzle provided unlicensed access to the [BE] Trio"; or alternatively

(2) "Disgorgement of Zazzle's ill-gotten profits" derived from its breach.

*Dkt. 399-4*

# Contract Damages Principles

- A defendant who is told the price of something and then takes it, or who otherwise accepts an offer by conduct, is liable for the stated price and bound by the terms of the offer.

  *Williston*
  *Desny*, 46 Cal. 2d at 736
  *Windsor Mills, Inc.*, 25 Cal. App. 3d at 992
  (cited in Dkt. 452, p. 13)

- "It is standard contract doctrine that when a benefit is offered subject to stated conditions, and the offeree makes a decision to take the benefit with knowledge of the terms of the offer, the taking constitutes acceptance of the terms, which accordingly become binding on the offeree."

  *Cairo, Inc. v. Crossmedia Servs., Inc.*, 2005 WL 756610, at *5 (N.D. Cal. April 1, 2005)
  (cited in Dkt. 452, p. 13)

- Contract damages are "measured by the loss in value," i.e., the amount the buyer "agreed to pay," "less any expenses saved … by the nonbreacher."

  *New Investments*, 780 Fed. App'x at 429-30
  *Perth*, 2009 WL 10695050, at *4
  *Green Wood*, 156 Cal. App. 4th at 773
  (cited in Dkt. 452, p. 12; Dkt.458, p. 7)

59

# Persechini — Application of Contract Damages Principles

- Having been offered (and in this case purchased) a license for $20 for one user, and then provided access to the BE Trio to millions of users, Zazzle accepted the offer and terms and is liable for the stated price, less the $6 to Creative Market that Laatz saved, for each such person.

- Persechini attempts to calculate these numbers in three ways, given the incomplete data preserved and produced by Zazzle

# Persechini — Application of Contract Damages Principles

1.) Zazzle claimed at least ███████ people used its design tools between April 1, 2020 – March 13, 2023, but this is an undercount because:

- Only covers half the relevant time period (Oct. 2017-March 2023); and

- Only includes users who used the tools and created "finished designs," not users who only created pending designs.

Persechini:

- Used the aforementioned number

- Used sales revenue over corresponding period (Apr. 2020-March 2023) as compared to relevant time period (Oct. 2017-March 2023)

- To extrapolate number of people over that period, who used the design tools thru a "finished design," and thereby were provided with unlicensed access to the BE Trio = ████████ **persons**

Dkt. 398-16, pp. 29-37, Schedules 2.1A, 2.2-2.4, 2.6-2.7

61

# Persechini — Application of Contract Damages Principles

2. Zazzle claimed it delivered "vector paths to render" the BE Trio to at least ██████ users from March 10, 2021 – March 13, 2023, but again, this is an undercount because:

- Covers less than half relevant time period (Oct. 2017-March 2023); and
- Only includes users who used the tools and created "finished designs," not users who only created pending designs.

Persechini:

- Used the aforementioned number
- Used sales revenue over corresponding period (March 2021-March 2023) as compared to relevant time period (Oct. 2017-March 2023)
- To extrapolate number of people over that period who were delivered data for the BE Trio only in a "finished design" = ████████ **persons**

Dkt. 398-16 at 37-39, Schedules 2.1C, 2.5, 2.8

# Persechini — Application of Contract Damages Principles

3. To further attempt to calculate number of people who actually used the BE Trio through Zazzle's design tool, Persechini:

- Took data from Dr. Parikh's survey showing that 54% of respondents had used the BE Trio; and

- Applied it to his calculation of the total number of individuals who used Zazzle's design tools thru a "finished design" during the relevant time period ( ███████████ persons) = ███████████ **people**

Dkt. 398-16 at 40-41, Schedule 2.1B

63

# Uncertainty in Numbers of Users Who Actually Used the BE Trio Is Attributable to Zazzle

- Zazzle admitted it continued deleting design data, particularly regarding "pending" designs, after being put on notice of this dispute

  Dkt. 396-7 ¶¶ 17-19, 61, 64, 80
  Dkt. 396-3 at 39-40, nn. 110-112
  Dkt. 264-7 (Li Dep.) at 105, 219-220
  Dkt. 299-2 (Li Dep.) at 92-93, 219-222
  (cited in Dkt. 452, p. 12 n.1)

- Zazzle refused to produce its backup database that contained at least six months of pending design data.

  Dkt. 300, 299-2, 300-18 (Laatz's Mot. to compel production of backup database and supporting testimony)
  Dkt. 310 (Defendants' Opp.).
  (cited in Dkt. 452, p. 12 n.1)

# Zazzle's Counterarguments on License Fees Fail

- Zazzle argues Persechini's damages opinions:
  - Are based on "'hypothetical' license fees" that are not comparable; and
    Dkt. 398, pp. 18, 21
  - Cannot rely on *Desny* or Williston re: "implied-in-fact" contracts where there was an actual contract
    Dkt. 457, pp. 10-11)

- Persechini's damages opinions are based on $20/seat price accepted by Zazzle <u>both</u> by its purchase thru Alkhatib <u>and</u> conduct in stealing millions more "seats" by providing unlicensed access to all users

- "Implied-in-fact" contracts are "true" contracts to which "the normal measure of damages is applied."
  *Desny*, 46 Cal. 2d at 736
  *Arcade*, 6 Cal. App. 3d at 236
  (cited in Dkt. 452, pp. 13, 15-16, 18; Dkt. 458, p. 6, 8)

- In *Arcade*, defendant fire districts agreed to pay $0.75 cents/month, then when water districts set new rate of $4/hydrant and billed for it, defendants stopped paying but kept using the hydrants

# Disgorgement of the Breacher's Ill-Gotten Profits Is a Permissible Remedy



"A defendant's unjust enrichment can satisfy the 'damages' element of a breach of contract claim, such that disgorgement is a proper remedy," e.g., "where actual damages are difficult to prove."

*Foster Poultry Farms, Inc. v. SunTrust Bank*, 377 Fed. Appx. 665, 669 (9th Cir. 2010)
*Young v. Wideawake Death Row Ent.*, LLC, 2011 WL 13371881, at *2 (C.D. Cal. May 15, 2011)
(cited in Dkt. 452, p. 19, Dkt. 458, p. 5)



"In measuring the amount of the defendant's unjust enrichment, the plaintiff may present evidence of the total or gross amount of the benefit, or a reasonable approximation thereof, and then the defendant may present evidence of costs, expenses, and other deductions to show the actual or net benefit the defendant received."

*Meister v. Mensinger*, 230 Cal. App. 4th 381, 398-99 (2014)
(cited in Reply (Dkt. 458) at 1:21-27)

66

# Persechini's Disgorgement Opinions Follow the Law

- Persechini calculates Zazzle's revenue from sales of products that used the BE Trio = $ █████████ **revenue**

Dkt. 398-16, pp. 19-20, Schedules 1.1, 1.8

- Persechini deducts all expenses and costs that were incremental to sales of the products that used the BE Trio to calculate resulting profits = **betw. $** █████████ **and $** █████████ **profits***

Dkt. 398-16, pp. 20-25, Schedules 1.2-1.9

* This range is narrower than in Persechini's initial report as he refined his calculations and produced supplemental schedules at his deposition

# Defendants' Counterarguments on Disgorgement Fail

- Defendants' argument that Persechini should have deducted fixed overhead costs (Dkt. 398, pp. 18-20) fails because:

    - It is based on copyright law, which is no longer relevant, and it contradicts California law on unjust enrichment

    - Proper calculation of profits (e.g., which costs are appropriately deducted) goes to weight, not admissibility
      See, e.g., *Mid–America Tablewares, Inc. v. Mogi Trading Co.*, 100 F.3d 1353, 1362-63 (7th Cir.1996)
      (cited in Dkt. 452, p. 20)

68

# Defendants' Counterarguments on Disgorgement Fail

- Defendants' argument that disgorgement is inappropriate because actual damages are not difficult to prove here (Dkt. 457, pp. 12-13) fails because:

  - Defendants ignore their own challenges to the accuracy of Persechini's calculations of users and resulting license fees

- Defendants' efforts to distinguish *Foster Poulty* and *Young* (Dkt. 457, pp. 12-13) fail

  - *Foster Poulty* – found the plaintiff "suffered intangible harm[s]" that were detailed, and not only lost the "benefit of the bargain" but the defendant misused confidential info "*for its own profit*"

  - *Young* – denying exclusion because the plaintiff's "actual damages" may be "difficult to prove," and regardless, "defendant's profits may be relevant to compute plaintiff's damages"

69

# Ellen Shapiro

# Sections of Shapiro's Report
# That Mention Dr. Parikh, Her Report, or the Survey She Conducted

**Executive Summary** 3

I have been asked by counsel for the Defendants to offer opinions on the Blooming Elegant Trio and other typefaces from the perspective of a graphic and product designer with expertise in typography.

This report is a rebuttal to the November 2022 expert report by Sara Parikh ("the Willow Report") on behalf of Plaintiff Nicky Laatz. In particular, this report responds to, and disagrees with, the findings in the Willow Report that Blooming Elegant would be "difficult to substitute" with another font, and that Blooming Elegant is more "unique," "appealing," or "important" than other fonts the survey asked about.

IV. The Willow Report does not compare similar fonts 29

**Two of the three single fonts in the Willow Report are not in the same general category.**

IV. The Willow Report does not compare similar fonts 28

**The Willow Report compares the Blooming Elegant Trio to two other font sets that are not in the same category.**

Dr. Parikh only gave respondents the opportunity to rate the Blooming Elegant Trio in comparison to Freehand and Courier, which would be used in entirely different applications.

71

# Sections of Shapiro's Report
# With **No** Mention of the Parikh Report or Survey



**I. Blooming Elegant and its alternatives** 7
The Blooming Elegant Trio is a set of three fonts formerly available to designers who create products on Zazzle. ✗

**I. Blooming Elegant and its alternatives** 8
Many handwriting-style script typefaces are similar in look and feel to Blooming Elegant. ✗

**I. Blooming Elegant and its alternatives** 9
Here are more typefaces similar in look and feel to Blooming Elegant. ✗

**I. Blooming Elegant and its alternatives** 10
Many casual handwriting-style script typefaces in the Zazzle Design Tool are similar in look and feel to Blooming Elegant. ✗

**I. Blooming Elegant and its alternatives** 11
At least 17 alternatives to Blooming Elegant are in the Zazzle Design Tool. ✗

**I. Blooming Elegant and its alternatives** 12
New fonts are added often, and Zazzle designers and users can choose among a large selection of handwriting-style scripts. ✗

**I. Blooming Elegant and its alternatives** 13
Many typefaces are similar to Blooming Elegant Hand. ✗

**I. Blooming Elegant and its alternatives** 14
And many typefaces are similar to Blooming Elegant Sans. ✗

**I. Blooming Elegant and its alternatives** 15
Here's how another trio could work together just as effectively. ✗

**I. Blooming Elegant and its alternatives** 16
Offering a group of typefaces selected to work together is not unique. ✗

**I. Blooming Elegant and its alternatives** 17
Duos and trios created by the same designer are common in the industry. ✗

**I. Blooming Elegant and its alternatives** 18
On Zazzle's Design Tool, some fonts are grouped to work together as sets. ✗

**I. Blooming Elegant and its alternatives** 19
For fonts to function like Blooming Elegant, the script must have a glyph set with alternative characters with ligatures and swashes. ✗

**I. Blooming Elegant and its alternatives** 20
Like Blooming Elegant, these casual scripts have swashes and tails. ✗

**I. Blooming Elegant and its alternatives** 21
No two fonts are (or should be) identical. They are called type*faces* for a reason. ✗

**II. Replacing fonts** 22
In existing designs on Zazzle, Blooming Elegant was replaced by Morgana. ✗

**II. Replacing fonts** 23
When working with existing files, font substitutions aren't automatic, but they are not difficult. ✗

**II. Replacing fonts** 24
The Zazzle Design Tool makes it easy to switch fonts or create a new design with any font. ✗

**III. How fonts affect marketability** 25
For the kinds of customized, print-on-demand products sold on Zazzle, the typeface is usually not the key factor in a buyer's decision. ✗

**III. How fonts affect marketability** 26
Color, pattern, and illustration style can be more important than typeface in selecting a design. ✗

**III. How fonts affect marketability** 27
When designed with similar fonts available in the Zazzle Design Tool, products can be equally appealing, stylish, and marketable. ✗

# Shapiro — Not a Survey Expert

18. Further, Shapiro admits that her opinions are "from a different point of view" and "[n]ot from the point of view of a survey designer, or survey expert, or a survey analyst, but from the point of view of someone who works with typefaces … ." *Id.* at 198:23-199:4. Thus, even Shapiro herself

Dkt. 399 (Pltf's Daubert) (Shapiro Dep. 198:23–199:4) at 25

# Shapiro's Opinions Are Not Based on Sufficient Facts or Data



An expert's opinions are unreliable where they are based on "mere subjective beliefs or unsupported speculation."

*Claar v. Burlington N. R.R. Co.*, 29 F.3d 499, 502 (9th Cir. 1994)

# Shapiro Admitted Numerous Times to Her Lack of Relevant Expertise

**Q.** Did you do any coursework related to survey design?
**A.** Not at all.
**Q.** Did you do any coursework related to how to conduct a survey?
**A.** No.
**Q.** Did you do any coursework related to how to analyze results?
**A.** I did not.
**Q.** Did you do any coursework related to how to interpret survey results for marketing purposes?
**A.** No.
**Q.** Have you had any postgraduate training that you received since graduating from UCLA in 1970?
**A.** Postgraduate training? Not in a formal way.

Dkt. 399-12 (Shapiro Depo.) 39:8-25

**Q.** Have you published anything related to designing or conducting surveys?
**A.** No, but I'm not a survey expert.

Dkt. 399-12 (Shapiro Depo.) 88:17-20

**Q.** Did you conduct any survey of Zazzle designers or users to see if they agree with that opinion?
**A.** Again, I'm not a survey expert and I did not conduct any surveys.

Dkt. 399-12 (Shapiro Depo.) 127:5-9

75

# Shapiro's Report Is Based on Inadmissible Subjective Opinion, Not Sufficient Facts or Data

Q. Do you have any data to support that opinion?

A. What do you mean by data?

Q. Well, what's that opinion based on?

A. It's based on a search I did online for other trios of typefaces that included a script, a handwritten type, all-caps typeface.

Dkt. 399-12 (Shapiro Depo.) 121:22-122:6

Q. [...] So because Blooming Elegant was no longer on the website, you weren't actually able to try switching from Blooming Elegant to any other font on Zazzle's website, correct?

A. Not on Zazzle's website.

Q. So when you did experiments on the website, you were switching from the Morgana font to something else, correct?

A. When I did experiments on Zazzle's website, I tried a lot of experiments with different script typefaces and switching them out for other ones to see what happened.

Q. But none of those fonts that you were testing that with were Blooming Elegant, correct?

A. Not -- I do not think so. Not on Zazzle's website.

Dkt. 399-12 (Shapiro Depo.) 126:4-22

# Shapiro Conducted No Survey of Her Own

**Q.** Did you speak with any Zazzle designers or users to see if they agree with your opinion that the Blooming Elegant Trio is not unique?

**A.** No, I did not. And I was not asked to. And I don't know any.

**Q.** Okay. Did you conduct a survey of any Zazzle designers or users to see if it would support your opinion that the Blooming Elegant Trio is not unique?

**A.** No, I did not.

Dkt. 399-12 (Shapiro Depo.) 123:4-15

# Shapiro's Opinions Are Not Proper Rebuttal



Rebuttal experts can only be disclosed where their testimony is "intended solely to contradict or rebut evidence on the same subject matter identified by an initial expert witness."

*Clear-View Techs., Inc. v. Rasnick*, 2015 WL 3509384 at *2 (N.D. Cal. Jun. 3, 2015) (Freeman, J.)



An expert who is "not a survey expert … is unqualified" to rebut the opinions of a survey expert.

*Navarro v. Procter & Gamble Co.*, 2021 WL 868586 at *23-34 (S.D. Ohio Mar. 8, 2021)

# Scott Swain

# Scott Swain — Relief Sought

- Strike ¶¶72 & 75–76 as improper conduit for Shapiro's inadmissible opinions

- Experts cannot act as mouthpieces when 'soundness' of the underlying expert's judgment is at issue

# Swain — No Expert-as-Conduit

Defendants quote with this: "There are limits to this general rule, however. Where the 'soundness of the underlying expert judgment is an issue,' *the testifying expert cannot merely act as a conduit for the underlying expert's opinion*." *Id.* at 1066. This is consistent with *In re Cathode*

Dkt. 458 (Reply) (quoting *Toyota*, 978 F. Supp. 2d at 1066)

# Dr. Sara Parikh

# Parikh — Sample & Universe

the group she surveyed constituted most of Zazzle's sales." Mot. at 15:27-28. **Not so. Dr. Parikh**

expressly stated that she chose the sample group because it "would constitute the most active

designers on Zazzle," which Dr. Parikh determined "was a really good representation of graphic

designers who were selling their products on Zazzle." Dkt. 398-14 at 111:20-112:1. *Next,*

Dkt. 452 (Opp.) (citing Parikh Dep. 111:20–112:1) at 21

# Parikh — Controls Not Required

Dr. Parikh explained during her deposition—testimony that Defendants misleadingly omit and ignore—her survey in this case was "an attitude and usage survey, and they *typically do not need controls because you are describing behavior and attitudes among a particular population* … ."

Dkt. 452 (Opp.) (Parikh Tr. 178:21–24; 179:2–4)

84

# Parikh — Absolute Measures

- 90 percent    …    very or somewhat appealing,

- 82 percent    …    very or somewhat unique,

- 77    …    very or somewhat important …

- 61 percent    …    very or somewhat difficult to substitute.

Dkt. 452 (Opp.) (citing Parikh Report ¶12) at 23

85

# Stuart Sandler

# Defendants Improperly Insert New Arguments in Reply

- Defendants previously attempted to withdraw their prior *Daubert* motion so that they could submit new motions with new arguments. Dkt. 446.
- The Court ***expressly rejected Defendants' motion***.
  - "[T]he Court expects that the parties made their strongest arguments in their original filings when the scope of the issues in the case was wider." Dkt. 448 at 2:9-10.
- Despite this admonition, Defendants insert two new arguments related to Stuart Sandler's opinions that did not appear in their initial motion.

# Defendants Improperly Insert New Arguments in Reply

- *First*, Defendants argue for the first time on reply that Sandler's opinions about "pending designs" should be excluded as duplicative of Daniel Garrie's opinions. Dkt. 457 at 3-4.
  - *Defendants did not raise this argument in their initial motion.*
  - Defendants instead argued in their initial motion that Sandler's opinions were duplicative of the expert opinions of Thomas Phinney. Dkt. 398 at 6-7.
    - All of the purportedly duplicative opinions of Thomas Phinney to which Defendants referred have been withdrawn.
- Defendants also argue his opinions on "pending designs" are inadmissible because Sandler does not have the expertise to "offer competent opinions about how many users accessed the Design Tool."
  - Sandler offers no such opinions about the number of people who actually accessed the design tool.

88

# Sandler — Pending Designs

Mr. Sandler opines, based on his experience in the font industry, that "the number of total users Zazzle allowed to access the Zazzle design tool containing the Blooming Elegant Trio is likely substantially understated" to the extent it includes "only 'finished' or 'finalized' designs". Dkt. 398-6, ¶ 47. This is because that number *excludes* users who accessed the design tool and only created "what Zazzle referred to as a 'pending' design"—i.e., where "all of the designing occurs before the pending design is 'finished' or 'finalized'." *Id.*

Dkt. 452 (Opp.) at Section B.2 (quoting Sandler ¶47) at 4

89

# Sandler — Basis for Pending-Designs View

Mr. Sandler explains the precise basis for this opinion in his report by stating "users of Zazzle's design tools can use the designs they download and/or capture from Zazzle's design tools for virtually any purpose, without limitation on how the designs they create may be used." Dkt. 398-6 ¶¶ 46-47. As. Mr. Sandler explained, he reached this conclusion based on his review of "the expert

Dkt. 452 (Opp.) (quoting Sandler ¶¶46–47) at 4

# Defendants Improperly Insert New Arguments in Reply

- **Second**, Defendants argue for the first time on reply that "Plaintiff fails to refute … that there are, in fact, no recognized or relevant 'font industry standards' that would inform the meaning of the License." Dkt. 457 at 8-9.
  - Defendants made no such argument in their opening brief for Nicky Laatz to refute.
  - Defendants instead argued that "there is no recognized **field of expertise** in 'font industry standards." Dkt. 398 at 9.
  - Nicky Laatz refuted this argument and Defendants' own evidence (which Defendants misrepresent) disproves their own argument.

# Sandler Established the Existence of the Font Industry and Standards

- Defendants assert that Thomas Phinney "denied that there is an industry 'standard' for font licensing." *Id.* at 9:17-18.
  - But Phinney's testimony was that he "do[esn't] think there's a single standard" for "font license *rates*." Dkt. 398 at 9:18-19. This is a separate issue relating to the price of font licenses, not the terms and their meaning.
- Defendants similarly assert that Sandler "further acknowledged that there are no memorialized set of rules or standards for [the font industry]." Dkt. 398 at 9:16-17.
  - This misrepresents Sandler's testimony.

92

# Sandler Established the Existence of the Font Industry and Standards

- Sandler testified:
  - "**Q.** Okay. And understanding there's not a singular document, are there various guidelines written about font industry standards?
  - **A.** Yes, I believe there are. I would direct counsel to review Monotype, MyFonts website, they have published lots of articles around subject matter that speaks to what they interpret as standards and expected practices, trends in the font industry. And I think as the largest font licensors and distributors, they have … They have a reputation in providing education to folks in the font industry. And so I think many would look to those documents and publications as guidance."
    - Dkt. 398-5 at 59:3-19.

# Sandler Established His Credentials As An Expert on Font Licensing

- Mr. Sandler established:
    - He has launched nine unique font foundries since 1996
    - He manages a library of over 1,400 fonts
    - He has introduced font licensing concepts and terminology that have been adopted industry wide.
    - He is a manager of one of the largest font distributors worldwide.
    - He co-founded Font Bros, which is a distributor of high-quality typefaces from independent font foundries throughout the world that specializes in OEM (Original Equipment Manufacturer) licensing and retail font license sales.
        - Dkt. 398-6 ¶¶1-4.

94

# Sandler — Industry Practice

> Mr. Sandler opines that Zazzle's licensing practices "violated standard font industry practices." Dkt. 398-6, ¶¶ 12-61. Defendants contend that this opinion should be excluded because

Dkt. 452 (Opp.) (citing Sandler Report ¶¶12–6) at 21

# Sandler — Law & Gatekeeping

- Industry experience & custom are proper bases for expert opinions (Rule 702)

- "An opinion is not objectionable just because it embraces an ultimate issue." (FRE 704)

# Nicky Laatz Will Not Elicit Testimony Addressing the Ultimate Issue

- To the extent that any of the opinions in Mr. Sandler's report reach the ultimate issue of whether Defendants breached the Blooming Elegant License, Nicky Laatz will not elicit that testimony at trial.

- But the vast majority of Mr. Sandler's opinions do not reach this conclusion.

- Instead, Mr. Sandler's opinions address how certain terms within the BE License are interpreted and understood within the font industry. These are admissible opinions.

# Mr. Sandler's Opinions Provide Valuable Evidence on the Meaning of the BE License

- Defendants assert that the opinions on how to interpret the license are not necessary because "Defendants' consistent position has been that the License is *unambiguous*." Dkt. 457 at 2:9-10.

- This is incorrect. Defendants stated in reply to Nicky Laatz's RFA on the issue:
  - "Zazzle admits that LICENSE as Plaintiff defines it is ambiguous, but the license as Zazzle defines it is not ambiguous."
    - Dkt. 342-3 at 86:9-11.

- Nicky Laatz does not and has never asserted that the BE License is ambiguous, but to the extent Defendants maintain that Nicky Laatz's definition of the license renders it ambiguous, Sandler's testimony on industry custom and usage is admissible to resolve any ambiguities.

# Mr. Sandler's Opinions Provide Valuable Evidence on the Meaning of the BE License

- Even if both parties assert that the license is not ambiguous, there is express disagreement between Nicky Laatz and Defendants regarding what the meaning of the license terms are.

- Sandler's opinions on industry custom and usage are admissible to help resolve this dispute.

# The Parties Disagree on the Meaning of License Terms

- For instance, in their MSJ, Defendants argued:
  - "Mr. Alkhatib licensed BE on Zazzle's behalf. Zazzle (*including its employees acting on its behalf*) holds the licensee and is entitled to access and use the licensed asset."

- This interpretation is directly contradicted by Mr. Sandler's opinions on industry custom and usage for single-seat, non-transferrable licenses:
  - "Consistent with licensing practices in the font industry ... even when a single-seat non-transferrable license is purchased on behalf of an organization or entity, the licensed font and font software can only be used by a single named individual within the organization or entity."

- The vast majority of Sandler's opinions provide this much needed context on how certain terms are understood and used in the font industry.

100

# Paragraph 4 — Modifications & Derivative Works; Ownership Retained

## Quoted Language (Verbatim)

"You may modify or manipulate the [Item], or incorporate it into other content and make a derivative work from it. As between you and the Shop Owner, the Shop Owner will retain all right, title, and ownership of the [Item], and the resulting derivative work is subject to the terms of this Standard License." — ¶31

"any usage that displays the stylized text output derived from the [Item], including the font software, is considered a "derivative work"." — ¶32

"a design tool that permits a user … to create and modify text within a design would be considered a "derivative work" of the font and font software." — ¶33

## Industry Standards & Application

- Derivative outputs (including dynamic renderings) remain subject to the license and do not transfer ownership.

- Industry treats editable templates and design tools that expose the font as derivative works, which remain constrained by the license terms.

## Paragraph 5 — No Sharing/Transfer/Redistribution (Incl. Tools/Templates)

### Quoted Language (Verbatim)

"may not … share, transfer, or otherwise redistribute the [Item]," — ¶37

"for example "in a tool or template" or "not incorporated into an End Product."" — ¶37

"not even for free." — ¶37

### Industry Standards & Application

- Industry practice bars passing font software (or exposing it via a tool/template) to third parties outside the licensed seat(s).

- Whether monetized or not is immaterial; redistribution violates the license.

# Paragraph 6 — No Digital Asset Management System/Shared Drive/Servers

## Quoted Language (Verbatim)

"may not make the [Item] available on a digital asset management system, shared drive, or the like for the purposes of sharing or transferring the [Item] … ." — ¶41

"the terms … include servers, as servers allow for multiple users to access and use the same digital content via multiple separate computerized devices." — ¶42

## Industry Standards & Application

- Servers/DAMs enable access beyond the licensed user and are treated as prohibited redistribution channels in industry practice.

- Server-side availability for many users is understood as sharing the Item.

103

# Paragraph 8 — Public Display Only With Anti-Misuse Controls

## Quoted Language (Verbatim)

"may not publicly display the [Item]: … in any digital format without imposing technical or written instructions to prevent the unauthorized use of the [Item], by third parties." — ¶43

"take all commercially reasonable steps to prevent third parties from accessing and/or duplicating the [Item], including the font software," — ¶48

"a user can download a copy of the design … [and] take a screenshot … Zazzle's website and mobile app impose no technical restrictions that prevent … unlicensed users …" — ¶44

## Industry Standards & Application

- Industry norm requires meaningful technical/written barriers (e.g., license verification, access controls) when fonts are exposed digitally.

- Allowing downloads or screenshots without controls enables unauthorized duplication and contravenes this clause.

## Paragraph 11 — Immediate Removal Upon Shop Owner's Request

### Quoted Language (Verbatim)

"'[u]pon the Shop Owner's request … shall immediately remove the Item from any unauthorized location or use.'" — ¶51

### Industry Standards & Application

- Industry expectation is prompt takedown from any unauthorized location (e.g., servers, shared systems, tools) upon request.

- This obligation is independent of the underlying usage terms that may have been violated.

## Context — What Font Software Provides to End Users

### Quoted Language (Verbatim)

"the purpose of a font or font software is to allow a user to create stylized text in any application they use for personal or commercial uses to generate designs or stylize layouts containing the font." — ¶27

"a licensee typically pays for the ability to access the font and font software, not the actual use of the font or font software." — ¶15

### Industry Standards & Application

- Industry licenses monetize access to font software that renders stylized text across applications.

- Any platform that gives users the same rendering capability effectively substitutes for a local license unless each user is licensed.

## Context — Zazzle's Design Tool as a Substitute for Local Font Licensing

### Quoted Language (Verbatim)

"Zazzle's design tools permitted individuals to access and use the [Item], including the font software, to generate designs and stylize layouts ... without purchasing a license ... ." — ¶27

"Microsoft Direct Write then calls on the font software to generate "vector paths," ... [which] are delivered ... to the user's device ... which then displays the user's text in the selected font." — ¶34

"a user can download a copy of the design ... [or] take a screenshot ... and then use this screenshot elsewhere." — ¶44

### Industry Standards & Application

- Server-side rendering (vector paths or rasterized images) exposes the functional output of the font software to unlicensed end users.

- Because users can download or screenshot the final design for use elsewhere, the tool operates as a practical substitute for acquiring the font locally.

# Sandlers Opinions Will Help the Jury Understand Industry Specific Terms

- Even if both parties agree the license is unambiguous and agree on what the license terms mean, Sandler's industry custom and usage testimony is admissible to explain non-common usages of certain words.

- *U.S. Fid. & Guar. Co v. Ulbricht*, 576 F. Supp. 3d 850 (W.D. Wash. 2021) confirms this principal.

- ii.  There, the court permitted expert testimony on how the contractual terms "objective" and "timely" were used and understood in the insurance industry, where they had specialized meaning.

- 1.  The court there found that "while the jury may understand the meaning of 'objective' or 'timely' in common usage, the court will not presume they understand those terms as they are used by the

108

# *U.S. Fid. & Guar. Co v. Ulbricht*

- In *Ulbricht* , the court permitted expert testimony on how the contractual terms "objective" and "timely" were used and understood in the insurance industry, where they had specialized meaning.

- "[W]hile the jury may understand the meaning of 'objective' or 'timely' in common usage, the court will not presume they understand those terms as they are used by the insurance industry. Because [the expert's] testimony is aimed at educating the jury in that manner, the court finds his testimony to be relevant and reliable."

  576 F. Supp. 3d 850, 861-62 (W.D. Wash. 2021)