UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| NICKY LAATZ, et al., )<br><br>        Plaintiffs, )<br><br>v. )<br><br>ZAZZLE, INC., and MOHAMED )<br>ALKHATIB, )<br><br>        Defendants. )<br>_____ )<br>ZAZZLE, INC., )<br><br>        Counter-Claimant, )<br><br>v. )<br><br>NICKY LAATZ, )<br><br>        Counter-Defendant. )<br>_____ ) | No.  5:22-CV-04844-BLF-VKD<br><br>October 30, 2025<br><br><br><br><br><br><br>San Jose, California<br><br><br>9:05 a.m. to 10:54 a.m. |

TRANSCRIPT OF PROCEEDINGS

(Daubert Motions)

BEFORE THE HONORABLE BETH LABSON FREEMAN, DISTRICT JUDGE

COURT REPORTER:            AMANDA M. LeGORE
                          (Reporting Remotely)
                          RDR, CRR, CRC, FCRR, CACSR
                          U.S. District Court
                          333 West Broadway, Suite 420
                          San Diego, CA 92101
                          amanda_legore@casd.uscourts.gov

Reported by Stenotype:  Transcribed by Computer

APPEARANCES:

FOR THE PLAINTIFF:          STEPHEN STEINBERG
                           CASEY MATHEWS
                           CHAD DeVEAUX
                           Bartko Pavia LLP
                           1100 Sansome Street
                           San Francisco, CA   94111
                           (415)291-4523
                           ssteinberg@bartkopavia.com
                           cmathews@bartkopavia.com
                           cdeveaux@bartkopavia.com


FOR THE DEFENDANTS:         DANIEL POSNER
                           THOMAS NOLAN III
                           Quinn Emanuel Trial Lawyers
                           865 S. Figueroa Street, 10th Floor
                           Los Angeles, CA   90017
                           (213)443-3220
                           danposner@quinnemanuel.com
                           thomasnolan@quinnemanuel.com

(Thursday, October 30, 2025; 9:05 a.m.)


P R O C E E D I N G S


(Court called into session.)

THE COURT:  Good morning, everyone.  Please be seated.

UNIDENTIFIED ATTORNEY:  Good morning, your Honor.

THE COURT:  Let's call our case and get your appearances.

THE CLERK:  Now calling Case Number 22-CV-04844-BLF, Laatz, et al., v. Zazzle, Inc., et al.

Counsel, will you please state your appearances, starting with plaintiff, please.

ATTORNEY STEINBERG:  Good morning, your Honor.  Steven Steinberg from the law firm of Bartko Pavia, representing the plaintiff, Nicky Laatz.

ATTORNEY MATHEWS:  Good morning, your Honor.  Casey Mathews of the Bartko Pavia law firm, representing the plaintiff, Nicky Laatz.

And with us are our colleagues, Sean McTigue and Chad DeVeaux, also from the Bartko Pavia law firm.

THE COURT:  Thank you.  Thank you all.

Our court reporter is remote.  So I know it's -- it's a little bit different than when the court reporter's in the courtroom.  But thanks for your cooperation.

4

ATTORNEY POSNER:  No problem.

Good morning, your Honor.  I'm Dan Posner from Quinn Emanuel, for defendant Zazzle.

ATTORNEY NOLAN:  Good morning, your Honor.  Thomas Nolan, Quinn Emanuel, for defendants.

THE COURT:  All right.  We have a big job ahead of us today.  Let me just lay out the terms of schedule.

We can go until just about 11 o'clock.  We'll talk a break. We have case management conferences.  We'll come back until noon.  I don't actually think we're going to be done, so I will have you come back this afternoon.

And so if anybody was traveling, you're going to have to cancel your plans or hope for the best because we need -- I only have today to do this.

And I -- I'm certain that we can get this done.

So I -- every time I look at one of these *Daubert* motions, I think of ten more things that I want to discuss with you.

It seems to me that if there was an expert you felt compelled to object to the expert.  And that's not what these motions are for.  So there's a lot of -- there's a lot of garbage here, and I'm really disappointed in that.  And it -- and there are a few issues that I think are really important.

But I think one of the overriding issues that we have to deal with is how the plaintiffs plan to prove that there was a breach of the license.  And I will tell you that neither

Mr. Sandler or Mr. Garrie are going to be your witnesses for breach.

They -- they may have something to say, but they are not witnesses for the breach itself.  They didn't write the contract.  They -- they aren't -- they aren't part of this, and their expertise does not lend itself to whether or not there was a breach.  So some of the opinions are properly -- and especially for damages experts -- based on the assumption that a jury finds liability.  That's all the damages expert can ever do.  And so they -- they define their starting point and go from there.  And if they're -- if that assumption was wrong, those opinions are just not provided to the jury or the jury's instructed to disregard them.

So for the damages experts, we're all understanding that's the position that they're in.  Then we look to see if there's a foundation for the testimony that they do give.

But for these -- for -- and Mr. Garrie has lots to say that is (indiscernible).  I'm not suggesting otherwise.  And Mr. Sandler may have something that he can offer, and I'm not suggesting otherwise.  But we've got, I think, five separate theories of breach that I can identify.

And so I just wanted to lay that out.  It is breach by selling a product with Blooming Elegant used by Zazzle.  It is a finished -- or finalized design that isn't actually purchased.  It is a pending design, which is a mockup, I think.

If I'm wrong on that, you can tell me.

But it is looked at but never -- never bought.  And then there is the some ███████ people who come to the design tool and use the design tool, even if they didn't -- never heard of Blooming Elegant, weren't looking for anything like Blooming Elegant, never went near it.  That's -- that's, I think, the -- the access theory of breach.  I think those are the theories.

And, Mr. Steinberg, am I mistaken on that?

ATTORNEY STEINBERG:  Oh, sorry.

THE COURT:  I'm sorry.  We are dependent on this one computer.  And thank you.

ATTORNEY STEINBERG:  Good morning, your Honor.  And I understand I'm supposed to announce each time.  Steven Steinberg, again, from Bartko Pavia, representing the plaintiff, Nicky Laatz.

Your Honor, that does cover part of it.  There are other issues, such as the license prohibits putting the licensed asset on a server, on a shared drive, incorporating it into a tool.  It requires a licensee to take steps to make sure that they're the only one who use it.  That any other person who has access to it has a license to use it.  Those are just some examples of additional --

THE COURT:  Thank you.

Those -- those are the terms of the contract that they believe have been violated.  Thank you for that.

ATTORNEY STEINBERG:  Yes, your Honor.  So those are some additional terms.

THE COURT:  Yes.  And so I just --

ATTORNEY STEINBERG:  If I may --

THE COURT:  Oh, I beg your pardon.

ATTORNEY STEINBERG:  I was going to say, it also -- it provides a single seat license that is nontransferable.  Meaning it's for one user, one person.  So that the basic issue here, the biggest issue is that Zazzle bought a single seat license for one user that was nontransferable.  And they ultimately transferred that to the world and made it accessible and usable by the world.

THE COURT:  (Indiscerible) what was the act of transfer that constitutes the breach?  And there are a number of different -- and it could be nothing.  And I know -- I don't mean to leave out that the defendants expect to win the case and just as plaintiffs do.  But it is the -- the act of -- the conduct on the part of Zazzle that constitutes the breach.  So it could be the lack of controls.  And, yes, I certainly am aware of that section of the -- of the license.

But it -- it -- placing it on the server is one act of breach that you allege.

ATTORNEY STEINBERG:  On numerous servers, just to be more precise.  I think the total was like over ███████
███████

THE COURT:  That's not my concern.  That's a measure of damages.  It could be.  But like I say, if placing it on the server was the breach, I would send you out in the hallway to settle the case in about ten minutes because you would have 100 breaches, and I know we could come to a conclusion.  So that's not -- it may be what you're left with after the jury finishes, but that's not where you are now.

And then it is the finalized sold products or finished -- I don't know -- you're going to have to do something with "finalized" and "finished."  Because, right now, they're impenetrable, incomprehensible.  And the jury is going to be asleep in one minute.  I spent an hour trying to figure them out, and I still don't know the difference.

There's pending, which is the mockup.  And then there's just access to the room.

ATTORNEY STEINBERG:  That's correct, your Honor.

And to take the server -- you know, what you were saying, if it was just ███████, a hundred copies on the different servers -- or there's probably multiple copies on each one.  But the issue then is that putting it on those servers and incorporating it into the design tool then makes it accessible and usable by everyone.  It's --

THE COURT:  (Indiscernible) breach.  I respect it.  We're not here to -- I'm not going to make a new summary judgment ruling today.  I just wanted to point out, I --

because all of this is strewn through Garrie and Sandler's opinions.  They are not witnesses to the breach.  They rely on the interrogatory responses of Zazzle.

Mr. Garrie did not go into the metadata and determine that ██████████████ users accessed the design tool.  He took that from an interrogatory response.  Which as well he should.  It's an admission.  But he's not a witness to it.  It is a foundation for his later opinions, but he's not a witness to the breach itself.  That's the point I want to make.

And so when I look at these expert reports, I'm looking at them that way.  And so -- so I just wanted to set the stage on that.

ATTORNEY STEINBERG:  If I may just elaborate a little bit on -- but what Mr. Garrie did was he analyzed the software itself.  And then he analyzed the operation of the tool.  Both from testing it and analyzing it himself.  Also looking at testimony from Zazzle's witnesses about how it operated.

He also looked at technical information, documentation from Zazzle, and technical documentation that's publicly available on some of the other tools that both he understood from the testimony were used in the tool and --

THE COURT:  (Indiscernible) what happened when a user clicks on Blooming Elegant?  What happened?

And, as I say -- and no one questions that he's an expert on that.  And he can walk us through the technical aspects of a

user's experience.  And that's what your point is.  You don't need to explain the -- Carizes (phonetic) report.

So -- and he's a witness.  He is an expert on that, those aspects of software.  I don't have any problem with that.  That's not challenged.  But he's not a witness to whether there was breach, and it's not his opinion.

ATTORNEY STEINBERG:  That's correct.  He does not opine that what he observed then constitutes a breach.

THE COURT:  No, I --

ATTORNEY STEINBERG:  He does not make that observation.  That's up to the jury.

THE COURT:  That's right.

You know, the other thing that we'll get to -- and I -- I was surprised that you didn't withdraw it entirely -- is your theory of disgorgement.  So for copyright, of course, it's an express remedy.

ATTORNEY STEINBERG:  Yes, your Honor.

THE COURT:  For breach of contract, I read all of your cases.  I feel it's been adequately briefed.  And I will not allow disgorgement to go forward to the jury, so you can take all of that off of your trial prep.

This is -- you've shown, clearly, that damages are easy to calculate.  In fact, you have an -- an -- you have used mere arithmetic that a fifth grader could -- maybe a third grader, now, could complete.  What is ▮▮▮▮▮▮▮▮▮▮▮.  That's your

measure of damages.  Correct?

ATTORNEY STEINBERG:  Well, if I may, your Honor, the calculation of the ██████ takes some work because --

THE COURT:  No.  (Indiscernible) Number 25, plus the extrapolation for the time period that was not accounting for that number.

You don't have (indiscernible) for that.  That's pretty straightforward.

ATTORNEY STEINBERG:  Well, no.  But the extrapolating out, using -- using a limited period of sales data, compared to a larger period, then plotting -- I'm sorry.

THE COURT:  (Indiscernible.)

ATTORNEY STEINBERG:  Right.  My only point, your Honor, was what Mr. Persechini does to get to those numbers is not just simple arithmetic.  He plotted out the monthly sales to --

THE COURT:  (Indiscernible) damages.  Not getting disgorgement.

ATTORNEY STEINBERG:  Oh, okay.  I'm sorry, your Honor.

THE COURT:  Since you gave me -- the defendants argued this, too.  Say that disgorgement is rarely used in breach of contract and only for cases where damages are difficult to calculate, like the violation of the confidentiality order.  That was one of the cases you gave me.

So we're done with disgorgement.  I just wanted you to

know.

ATTORNEY STEINBERG:  Okay.  And we won't have the opportunity to argue that here?  I would like to point out another case that we cited, if your Honor would indulge us.

THE COURT:  (Indiscernible.)

ATTORNEY STEINBERG:  It was the *Dr. Dre* case, the *Young* case.  So that was not a violation confidentiality agreement.

THE COURT:  What was it?

ATTORNEY STEINBERG:  Well, that involved his licensing or his -- his music and his old record label as continuing to sell his music.  And that was another case in which the court ultimately said the disgorgement may be an appropriate remedy that she should get to present evidence on.

Interestingly, in that case, the court said that his actual damages may be difficult to show, and that's one reason why it should get to be presented to the court then.

THE COURT:  (Indiscernible.)

ATTORNEY STEINBERG:  Well, your Honor, I don't disagree.

THE COURT:  The jury may not -- may not agree with you, but that's not the point.  You have to quantify -- you've got a very simple calculation on the value of the license.

$20 minus what she would have had to pay Creative Market.  Simple.  $14.

Then you've got -- you've got your evidence on the number for each of the categories of breach so that the jury -- the menu for the jury.  And the extrapolation is simple and usual and common evidence.

So there's just -- we're not going to have a trial on disgorgement.

ATTORNEY STEINBERG:  Understood, your Honor.

THE COURT:  (Indiscernible.)

ATTORNEY STEINBERG:  Okay.  I understand, your Honor.  Thank you.

THE COURT:  It's not on top of.  It would be alternative.

ATTORNEY STEINBERG:  We understand that, your Honor.  I think our concern, in part, was that --

THE COURT:  I bet -- I bet they made less profit on -- on your product than what you hope to prove in actual damages.

ATTORNEY STEINBERG:  That's not necessarily true.  It depends on which of those actual damages figures ultimately gets adopted by the jury.

Mr. Persechini's disgorgement opinion shows that they generated over ███████████ in revenue.  And that when you deduct --

THE COURT:  (Indiscernible.)

ATTORNEY STEINBERG:  On Blooming Elegant alone.  On products using Blooming Elegant alone, generated over ████

███████ of revenue.  That's specific to products that used Blooming Elegant.

When he deducted the incremental costs, meaning the variable costs that vary with each individual sale -- so, for example, if you sell one more wedding invitation, you know, paper costs, you have ink, you might have shipping, something like that.  So he deducted those variable costs.  And he found that their profits ranged between ████████████████ dollars.  That's just for products that use Blooming Elegant alone.  So it's quite substantial.

Now, depending --

THE COURT:  (Indiscernible.)  You can present to the jury other deductions.  We'll get to that one.

ATTORNEY STEINBERG:  Perhaps.  I mean, would argue that deduction of fixed --

THE COURT:  (Inaudible.)

ATTORNEY STEINBERG:  Oh.  Okay.

THE COURT:  (Inaudible.)  You can -- disgorgement can be calculated.  I'm not suggesting otherwise.  Profit minus costs.  But you don't have difficult-to-calculate actual damages, and so it's not an alternative remedy for this simple breach of contract case.

ATTORNEY STEINBERG:  Assuming that Mr. Persechini is able to testify about the various estimates of users that -- I don't disagree with that.

THE COURT:  (Indiscernible.)

ATTORNEY STEINBERG:  I think -- I think the difficulty -- or part of the challenge that we're trying to make sure we address before we necessarily know how it's going to play out is the acknowledgment that Zazzle's data is incomplete and it's imprecise.  And so we will never know the exact precise number of people who either access the tool in general or who use the Blooming Elegant --

THE COURT:  (Indiscernible.)

ATTORNEY STEINBERG:  I think so too, your Honor.

But the other side has challenged us as being an exact -- we can't deny that there is some estimation that has to take place.  And so that's the --

THE COURT:  (Indiscernible) that to the jury.  I don't think that's seriously contested, frankly.

Whether it's credible evidence is an entirely different matter.  And I don't deal in credibility.

ATTORNEY STEINBERG:  If I may suggest one more thing, your Honor.

I think that the amount of revenue and the amount of profits generated by the Blooming Elegant products alone is also an important piece of evidence to challenge Mr. Kinrich, to see if he is able to testify about the basic point about his opinion, which is he says this is economically unreasonable and it just doesn't make sense.  And --

THE COURT:  So rebuttal of what the profit was, in order for impeachment of his testimony using that information is -- can be entirely appropriate.  I'm only talking about a measure of damages to present to the jury.  It doesn't mean that the testimony isn't relevant for a different purpose.  Okay?

ATTORNEY STEINBERG:  Okay.  Thank you, your Honor.

THE COURT:  So I think -- and we need to be clear about that sort of thing, is that -- and when we get to the issue about the comparable licenses theory, it's going to fall the same way.  It may not be admissible for the way it's presented now, but it may be admissible for a different purpose.

So, you know, that's, again, also something quite common in trials.

Okay.  So what I -- thank you, Mr. Steinberg.

ATTORNEY STEINBERG:  Yes.

THE COURT:  I would like to start with --

ATTORNEY STEINBERG:  Shall I sit back down, your Honor?

THE COURT:  Why don't you.  Because I'm going to actually start with the defendants' motions.  I think they're the -- frankly, I think they're the harder ones to get through.  And I think that it then will guide us for the plaintiff's motions.

So, unfortunately, a lot of paper here.  Being organized is -- is a challenge.

So I have available -- I have all of the exhibits.  Thank you for the binders.  They're indispensable to me when I go through this.  And I don't want you to ever think you're spending a fortune on Xeroxing and it just sits on a shelf.  I -- you saw my (indiscernible).  So greatly appreciated.

Who's going to argue on Mr. Sandler?

ATTORNEY POSNER:  I will, your Honor.

THE COURT:  All right.  Mr. Posner.

So I would like to do expert by expert, not your whole motion and then a rebuttal.  Because I think we have to -- we have to talk about each expert and then move on.  I'm going to keep an eye on the clock, and hope that we can do 20 to 30 minutes per expert.  Some of them will be five minutes because there's not a lot to talk about.  Others may need a little longer.  But I need you to keep your comments as minimal as possible.  Let me assure you I've read all of your briefs, and I've read all of these reports.

I think my -- I would like to kind of jump over the things -- the legal opinions because they are excluded.  Here's the tricky thing.  The report's not going into evidence, and there are ways to ask questions that don't actually call for legal opinions.

So I am going to grant your motion on excluding legal

opinions.  I don't think anyone can really argue that -- that Mr. Sandler can't give a legal opinion.  But that -- that doesn't really answer the question.

I will, in my order, go through this paragraph by paragraph.  But I think the more important thing is whether I allow Mr. Sandler to testify about the font industry standards or licensing contracts.

And I know you're telling me that's not a thing.  So if I can hear -- hear your argument on that.

ATTORNEY POSNER:  Sure.  Thank you.  This is Dan Posner from Quinn Emanuel for the defendant.

Well, I think it's hard to divorce the opinions that he makes that are based on industry standards from what your Honor just said are the legal conclusions.

Because I think his primary basis for offering the conclusions that he does is his supposed industry experience. And there surely could be times or places where industry experiences is -- custom or practice within an industry is relevant.  We have a few arguments as to why it's not here.

I think, first and foremost, is that there's no foundation established -- and I don't think this is something that even needs to be tested at trial -- that there is any recognized font industry pursuant to which these standards may have been generated.

Mr. Sandler testified that it is a -- I believe a loose

coalition of font designers.

We point out, and I think it's highly relevant, that his counterpart -- his other font industry co-expert, who's no longer relevant in the case, Mr. Phinney -- also acknowledged that there is no font industry.

And so I think what you'll see in reading Mr. Sandler's report, as I did, is just repeated use of the buzzword, "In my industry experience," "in my industry experience."

THE COURT:  (Indiscernible) took away from your brief is that I don't have any foundation that Creative Marketplace -- whose license this is.  Nicky Laatz didn't write this license.  That Creative Marketplace is part of the font industry or that it ascribes to the font industry standards.

What I really read in his report was, when he wrote the report, there was a fraud claim.  And so the standards in the industry and the standard of care and the standard of conduct might have been relevant.  And that's now gone.

ATTORNEY POSNER:  Right.

THE COURT:  And so I think -- standards of care test, in a sense, ring hollow in a contract case where we're interpreting a contract.

Now, in the -- in the insurance field, we have standard terms that have meanings that are -- that are pretty universal across insurance contracts.  They've been tested in courts.

And I don't think we get, in insurance contract disputes --

we don't get an expert saying, in the industry, we know what this means.  I think what we get is a long line of cases that interpreted those contracts.

ATTORNEY POSNER:  And, certainly, there's no such thing here.

You know, there just simply are no standards about what the terms that Mr. Sandler tries to define are.

The -- the term "single seat" is an important one.  And I believed Mr. Sandler testified that he -- he couldn't recall ever encountering that term elsewhere in his, you know, supposed font industry experience.  So there's not some recognized common way that that term is interpreted and understood.

There is no, you know, writings on it.  There's no meetings or organizations that -- that discuss what that means.

So single seat is really him just interpreting the meaning of the contract the way that he would like to do it, which is -- which is not appropriate.

Another example is -- I believe it's called "the item."  What is the -- what is the licensed item under the Creative Market contract, which is a relevant issue because it's either the -- the font software alone in itself or maybe it includes the typeface.  We don't think it does.  The plaintiffs and Mr. Sandler seem to argue it does.

But the present point, for now, is that Mr. Sandler has no

basis to offer an opinion on that one way or the other.  He's simply reading the language of the contract like you and I are.

THE COURT:  "Contract" is not ambiguous.  And these terms have their plain meaning.  You're going to argue to the jury what the plain meaning is?

ATTORNEY POSNER:  Yes.  We'll argue what our client's understanding --

THE COURT:  (Indiscernible) doesn't interpret the contract.  They apply it.

ATTORNEY POSNER:  Well, then your Honor can make that conclusion in this circumstances.

THE COURT:  When was I going to do that?

ATTORNEY POSNER:  If it wasn't done, it was done in some sense on summary judgment, when you interpreted parts of the contract and said, for example, "The frequently asked questions, which offers an explanation, is not part of it anymore."

THE COURT:  (Indiscernible) You know, interpret or define "single seat" or "item."

ATTORNEY POSNER:  Yeah.  Well, I don't know that -- that the Court needs to define it.  The contract says what it says, and the jury can interpret its meaning based on the evidence that it hears.

THE COURT:  That -- so that circles back to why the plaintiff is offering Mr. Sandler to give some context for what

these terms -- how these terms are used when we're talking about font licenses.

So -- and, in fact, you make the point for the plaintiffs, here, that the jury -- I mean, an item, to most jurors, is something physical; like this box of coughdrops.

So when you're talking about software or print that magically appears on my screen in -- in this beautiful cursive as an item, they don't have any context for it.

So that becomes not in the form Mr. Sandler's written in his report, but it becomes something where someone like Mr. Sandler -- who's certainly qualified as a -- as an expert in font design, font -- I am not going to use the word "font industry."  But to -- to talk about what these things are and how they're used.  Because licenses are an integral part of the -- of the business model.

ATTORNEY POSNER:  Well, a couple of things.  First of all, I don't -- we don't take the position that there's an ambiguity.  And simply because there are one or more different interpretations or arguments about what a term means doesn't mean there's an ambiguity.  The jury can decide it.

There are explanations within the contract about what "item" means.  There are references within there, including that it refers to "digital content."  And so -- but -- but -- so there's that point.  That, really, there's no need for any expert to weigh in on this.

But, also, Mr. Sandler again -- I mean, he's never encountered this term or this -- this license.  There's no indication -- well, he's never encountered it other than the analysis that he did in this case.  He's never used it before.

THE COURT:  (Indiscernible) said he had never encountered the word "seat license."  (Indiscernible) not recall.

ATTORNEY POSNER:  We asked him that question at his deposition.  And he said -- it's in our papers.  I don't have the cite handy.  I could grab it at the table.

But he answered, I believe, that, you know, I'm not -- I'm not a -- it's not a memory.  I just can't remember anything now.  He certainly couldn't provide anything at his deposition that supported a fundamental opinion that he went on -- on about at quite length in his report.

And so the -- the record before your Honor, through his report, through his deposition, is that he has not encountered that term in the font industry.  Assuming there even were some industry -- I know there's the next step.  But even if he had encountered that term, is there really some industry meaning for it?  And there's just no evidence in the record that there is.

So it is -- you know, I don't want to say it too pejoratively.  But it's sort of junk science for somebody to say, "I've been in the font industry, and here's what this term

means."  That's the definition of the type of expert opinion that shouldn't be allowed here.  No ambiguity that either side is arguing.  No font industry to support his industry standard definition of these key terms.

The jury will be exposed to the language of the contract.  The jury will be exposed to evidence about how the parties performed under the contract.  And we'll have plenty to work with to decide what that term means.

THE COURT:  (Indiscernible) but not (indiscernible) as to what Zazzle thought it meant.

Because then the -- that's -- that's not how we interpret a contract.

ATTORNEY POSNER:  Yeah.  Well, I mean, that maybe remains to be seen, what types of foundation is laid.

There are -- if -- if -- there are opportunities for your Honor to provide legal guidance about the meaning of a contract in the course of jury instructions.  Maybe these issues will be addressed in pretrial motions.  But I don't know that there needs to be any instruction on it.

The question is, what does the contract mean?  Is this the language of the contract?  The jury's going to hear evidence about course of performance and what the parties did.  And they can read the plain language, too, and decide what's -- so you don't have to --

THE COURT:  "Seat license" is a pretty common term?

ATTORNEY POSNER:  And not one that needs a font industry -- somebody who says this is -- you know, if you look at all of the references that he made to the font industry in his report, he's likely to do the same when he testifies.  And that might carry some undue weight with the jury because there's no foundation behind it.

And for him to simply say, "In the font industry, as I've been in there for 20 years, this is what everyone understands seat license to mean or single seat to mean.  There's no support from that.

He -- there's no evidence that he's encountered that term before.  And he really shouldn't get up there with the imprimatur of an expert and tell the jury what he thinks this contract term means.  And -- and I'll just comment, having reread his report recently -- as it sounds like your Honor has too -- the parties have focused quite a bit on "single seat" and "item."  But, really, over the course of his report, he gives a freewheeling interpretation of the contract.  He goes through all sorts of parts of it.

THE COURT:  (Indiscernible.)

ATTORNEY POSNER:  And says, this is what this means, this is what that means.  And so it's sort of facially, I think, an improper report in the way that he does that.  But there's no reason why his opinions about the meaning of "single seat" or "item" should be treated any differently from anything

else.  Because he hasn't encountered the contract.  He wasn't a party to the license.  He didn't draft it.

And so, really, these are foundationless speculative opinions that -- that we submit do not withstand *Daubert* scrutiny.  And it would be prejudicial to have somebody who can say, "I've been a type designer and I've registered all of these fonts for 20 years," to be able to say, "This is what 'single seat' means," when the jury will have other ways to figure out what that means.

So we -- we think those opinions should go by the wayside.

And, really, anything where he's telling the jury what words in the contract mean -- I mean, this includes terms like derivative work.  He is explaining what that means.

THE COURT:  Because I don't have a copyright claim.  I don't know why you're clinging to it.

ATTORNEY POSNER:  Yeah.

THE COURT:  Or why the plaintiff is.

But the jury's not going to hear that word.

ATTORNEY POSNER:  Well, it's -- it's in the license. But the license must be requiring to a copyrighted work that -- for -- but, you know, that's the only type of work that can have a derivative work.  And so when they're -- under the law, even if knowledge is that in a footnote that there's a copyright -- so who is Mr. Sandler to say this is what -- and Mr. Garrie does the same thing, to say that derivative work

means something different than the contract.  It's not relevant anymore.

In addition to these opinions that he's offered about meanings of specific terms in the license, he goes further than that.

And I'm fairly sure, based on your Honor's comments, that you won't be allowing him to do this.  But, you know, he goes on to offer opinions that Zazzle violated the license.

And -- and that, you know, is fairly egregious to say in my -- based on the font industry, Zazzle violated -- you know, did things that are, quote, expressly forbidden by the license.  Things that are prohibited by the license, contrary to its purpose.  That's just improper.  And we -- we certainly hope your Honor will be preventing him from offering those opinions, too.

And so when you exclude his interpretation of terms in the contract and his opinions about breach, there's not much.  We don't think there's anything left for him to talk about on the Blooming Elegant license, in particular.

He's not the right person to do it.  He doesn't have the foundation to do it.  It's otherwise improper expert testimony for a number of reasons, and it could be quite prejudicial and misleading to the jury if he's allowed to present it.

THE COURT:  So, Mr. Mathews, I'm just going to go through some of these things.

In paragraphs -- 22, talks about what the Blooming Elegant license was intended to do.  He can't testify about that.

Paragraph 25, "that nontransferable right means" -- he can't interpret it.

Paragraph 27, "consistent with industry usage BE license, Blooming Elegant license permitted," and exclude something.

Every one of these paragraphs -- paragraph 29, "This means."

Paragraph 32, "Any usage is a derivative work of the font software."

Paragraph 33, "The meaning of a derivative work."

Paragraph 36, "What a derivative work is."

Paragraph 38, an opinion that -- that the defendant put Blooming Elegant on more than a hundred servers.  He's -- he's not a witness to that.  And his opinion, based on his experience that defendant shared, transferred, and redistributed -- maybe Mr. Garrie could do that, but Mr. Sandler can't.

Paragraph 39, "Zazzle's conduct is expressly forbidden by the license."

Paragraph 40, "Conduct prohibited by the license."

Paragraph 42, "Zazzle's conduct violated the license."

Number 47, "The number of total users is understated." There's no foundation for that.

Number 49, "How to comply with the license terms."

Paragraph 56, "The intent of the licensors."

Paragraph 54 to 58, "Comparison of the meaning of various corporate licenses and Zazzle's license."

Every one of these is excludable because he can't give a legal opinion.

ATTORNEY MATHEWS:  Your Honor, I understand your ruling, and I listened to your earlier statement this morning. And I think you got it on -- you hit the nail on the head, which is that the report will not be presented at trial.  And, obviously, we understand your -- your position regarding his legal opinions and ultimate issue opinions well.

And we don't intend to elicit that testimony at trial, but I think that does still leave substantial body of evidence and opinions in Mr. Sandler's report that are admissible and are relevant, and it will be beneficial to the jury.

THE COURT:  He offers opinions based on the standards of the font industry but he has no foundation for that.  He -- he acknowledges that there's no organization that gathers. There's never -- he doesn't identify any industry-wide debate, discussion of -- of what standards there ought to be.  It's -- it's the standards according to me.  Which is just what you say about Ms. Shapiro, the graphic designer.  And you -- you want me to exclude her testimony because it's -- it's as-I-see-the-world testimony.  But that's what he's -- that's what he's giving me as well.

ATTORNEY MATHEWS:  Your Honor, I don't think that's quite an accurate representation of what his opinions are or of some of his testimony as well.

He did testify, as Mr. Posner acknowledged, that the font industry is comprised of a loose coalition of people.  But he also, in that same testimony, went on to explain that there are a number of professional font design organizations that he's a member of, that he participates in.  That information was also identified in his CV at the beginning of his report as well.  There are formal font industry organizations.

THE COURT:  On this organizational understanding about how the industry, in quotes, should use them?

ATTORNEY MATHEWS:  I think that's, again, not quite accurate.  And there are a couple of misrepresentations in defendants' initial opening motion that I think are worth pointing out here.

So defendants first asserted that Thomas Phinney, one of our experts who we withdrew, denied -- this is a quote from their opening motion.  He denied that there's an industry standard for font licensing.  But what Thomas Phinney actually said is that he doesn't think there's a single standard for font license rates.  He's talking about pricing of font licenses.  Not anything about whether there's industry standards for font license terms, and how they're used and understood in the font industry; understand standard custom

usage and practice.

Defendants similarly asserted -- and this is another quote from their opening brief.  That Sandler, quote, further acknowledged that there are no memorialized set of rules or standards for the font industry.  And they cited to a portion of his testimony -- of his deposition testimony for that proposition.

I would like to read it for the Court because it's completely opposite of what defendants represent it to be.

"Sandler testified" -- and this is from page 59, lines 3 to 19 of his deposition.

"Question:  Okay.  And understanding there's not a singular document, are there various guidelines written about font industry standards?"

Mr. Sandler testified and responded:

"Answer:  Yes, I believe there are.  I would direct counsel to review mon -- MyFonts' websites.  They have published lots of articles around the subject matter that speaks to what they interpret as standards and expected practices, trends in font industry.  And I think as the largest font licensers and distributors, they have -- they have a representation in providing education to folks in the font industry.  And so I think many would look to those documents and publications as guidance."

So defendants did ask him about this in trial -- in deposition, and he did identify them.  He relied on his experience and his --

THE COURT:  (Indiscernible) this -- this cite.  He didn't rely on articles of the font licensing.

ATTORNEY MATHEWS:  That's correct.  Because he has ample in font licensing.  And so Mr. Sandler also testified and provided his CV, which demonstrates his ample experience --

THE COURT:  (Indiscernible) font -- font something -- this is how I interpret these -- these terms.

ATTORNEY MATHEWS:  That is --

THE COURT:  (indiscernible.)  But that's --

ATTORNEY MATHEWS:  But he's also -- he's launched nine unique font foundries since 1996.  He manages a library of over 1400 fonts.  He runs a company called FontBros, which contacts and works with independent font foundries and licenses their fonts on behalf of them.

He's extensively involved in font licensing.  He's a leader in developing terms for OEM font licensing.  That's Original Equipment Manufacture licensing.  This is also in his report.  OEM licenses are licenses that are tied to the original equipment that a font or a piece of software is installed on, rather than an individual.  He's led the industry in developing standards for those types of fonts.  This is all in his report.

So --

THE COURT:  So (indiscernible) --

ATTORNEY MATHEWS:  Sorry.  No, for the font licenses. I misspoke, your Honor.

THE COURT:  (Indiscernible.)

ATTORNEY MATHEWS:  I believe that's paragraphs 1 through 4 of his report.  This is docket 398-6.

THE COURT:  I am not satisfied that he has provided to me sufficient foundation for an industry standard meaning of terms.

I think that he's -- he's an expert -- I don't even know what you called him.  An expert in what?

ATTORNEY MATHEWS:  We would describe him as an expert in font licensing, your Honor.  He -- this is his business, is selling font licenses professionally.  Drafting, negotiating, and selling them to companies who -- to a wide variety of sources.  Including companies like Marvel and Disney.  These are large --

THE COURT:  (Indiscernible.)  They use the term "single seat license for item."  Those are the terms that Mr. Posner just identified.

His testimony, in his report, seems divorced from his specific experience.  So that -- that's telling me there's no foundation for what he's telling.  He may be qualified, but I need a foundation for the opinions he offers.

And I don't see a foundation or the industry recognizing

"single seat license means."  Because he's just -- he's not saying in these five contracts, it was used this way.  And it was -- and -- and he doesn't even show me that.

ATTORNEY MATHEWS:  Well, your Honor, I think -- you know, as I stated, it is based on his prior experience and his ample experience as a font licenser.

I think to the extent that there's a lack of, you know, specific instances, that wasn't something the defendants identified in their opening papers.  There's a lack of specific --

THE COURT:  Maybe it was in the reply.

ATTORNEY MATHEWS:  If that's the case, that may be so, your Honor.  But I don't think that the lack of identification of specific other font licenses negates his experience and his knowledge about how font licenses are used and developed and drafted within the font industry and what terms typically means.

THE COURT:  Something that he could testify to and I think would aid the jury.  And I think he's got plenty of that.  And the jury may not understand the need for that.

And he can generally -- as -- based on his expertise, he can certainly testify about what might -- a font designer needs and would want a font license.  And what protection could be obtained.

Whether it was obtained in this license is a separate

matter.  I don't think he can testify -- I'm not going to allow him to testify about what the terms in this license meant.  He hasn't even testified that Creative Market was part of this font industry.

ATTORNEY MATHEWS:  Your Honor, I think that's --

THE COURT:  To say that the Creative Market license was -- was developed with the font industry standards in mind.

ATTORNEY MATHEWS:  Your Honor, I think the text of the license itself negates that suggestion.  The text of the license itself --

THE COURT:  (Indiscernible) this is an important (indiscernible) standards of font industry?

ATTORNEY MATHEWS:  No.  The license does explicitly contemplate that it covers and addresses fonts.  Defendants have made hay of the fact that Creative Market sells licenses to other material as well.  But Creative Market is a font licensing company, similar to MyFonts, Monotype.

THE COURT:  But just because Creative Market is a font licensing platform doesn't mean they ascribe to the loose affiliation of font people and their standards that aren't written down anywhere.  That's the problem.

So Mr. Sandler may know of this amorphous group of professionals.  He never says, "And Creative Market has participated in it."  And since it's not written down and not -- and there are no conferences where this is talked about,

he can't say Creative Market has participated in discussions where a consensus was reached that this is what these terms mean and how they're used.

So just because Creative Market is a font licensing platform doesn't mean that anything he's talking about applies to this contract.  That's the lack of foundation.

And that's why -- not because he's not an expert.  He is an expert.  But because he can't -- he has no foundation for ascribing meaning to the terms used in this contract.

ATTORNEY MATHEWS:  I understand your Honor's position on that.

I think there is one other point related to the terms in the contract I would just like to -- I heard defense counsel raise, that I would like to point out, which is the issue of derivative work.

Obviously, copyright is out of the case.  We understand that.  We're not trying to relitigate that issue at this point in time.

The word "derivative work" is a term in the contract itself though.  And --

THE COURT:  (indiscernible.)  It's a contract word.  But if it's -- the contract's very short, so I'm not asking you to cut anything out.  And if you want to use it, you know, look at (indiscernible) the final pretrial conference.  A lot of this will become -- will be left on the cutting board floor

because of the time constraints.  So if you want to spend time describing to the jury what a derivative work is, that's fine. It's in the contract.  And I -- I agree.

ATTORNEY MATHEWS:  Understood, your Honor.

THE COURT:  It just -- I know when these reports were written it was because of the importance of that term under the copyright law.

ATTORNEY MATHEWS:  Well, your Honor, actually it was included specifically because of the term in the contract and because all derivative works are subject to the same license terms.  So if that means any derivative works the defendants created --

THE COURT:  (Indiscernible.)

ATTORNEY MATHEWS:  Or the design tool, which incorporated and used the Blooming Elegant software itself. That itself was a derivative work, subject to the same license terms, because it was incorporated in.

THE COURT:  Thank you.

ATTORNEY MATHEWS:  Thank you, your Honor.

THE COURT:  So let's move on to the motion in regard to Mr. Garrie.

So Mr. Garrie offers an important opinions about how the design tool works.  And that is integral to the plaintiff's case.

And I don't think there's any question that he is an expert

in software and that -- and that he can offer his testimony, his opinions about how that design tool works.

But that's not really what the -- the subject of this motion is. It -- we're, again, dealing with legal opinions, and we're dealing with -- let's see. So on the legal opinions, it looks like it's really sort of the same thing that we had in the first discussion.

Isn't that right, Mr. Nolan?

ATTORNEY NOLAN: Yes. For the record, it's Thomas Nolan for Quinn Emanuel. Yeah, that is exactly right, your Honor.

THE COURT: I hate wasting the time on going through these, each one.

An opinion -- Mr. Garrie can't say Zazzle breached the contract when. That's a legal opinion. They can't say that -- and he -- in the -- page 7, note 27, he talks about Zazzle knew it violated the license. Well, he's not clairvoyant. He's not in the head of Zazzle. He doesn't know what they know, when they knew it. So those kinds of things are certainly excluded.

And, you know, testimony about what -- what it is -- well, I guess we're not going to be doing this -- anything on copyright. We don't need to be worried about that.

The whole section on notice, whether this last was on notice of the -- of the breach at any time, he can't give testimony about what she knew and when she knew it.

We've got a -- sort of a little semantic thing about whether Zazzle users used and accessed the font data.  We'll get to that.

But I think -- I don't think -- I don't know.  I don't think there's a lot of (indiscernible) testimony that's going to be excluded.

So, Mr. Nolan, why don't you help me out there.

ATTORNEY NOLAN:  Sure.  Our motion was focused on -- on what your Honor has addressed already.  Just legal conclusions, interpretation of the licenses, and things like what is a derivative work?  Whether Zazzle -- what Zazzle knew.  What the license means.  Whether -- whether the plaintiff was on notice for things -- for the statute of limitations.  So most of -- most of our motion is focused on those things, and I think that there's no need to belabor that further.

We additionally moved to exclude Mr. -- Mr. Garrie's opinions about the user interface description of things.  And the reason for that is it -- it will be confusing -- prejudicial for the jury.

THE COURT:  This gives me a good moment to raise this issue, Mr. Nolan.  Thank you.

ATTORNEY NOLAN:  Sure.

THE COURT:  I'm here to decide *Daubert* issues, and I will decide, on all of them, reliability and relevance.

You raise other issues.  Jury confusion is not a *Daubert*

issue.  Nor is Rule 26.  And we'll get to that.

If I rule on any of these non*Daubert* issues, it will reduce your motions in limine by one for each, and you will only get five.

So we could zero out our final pretrial conference pretty easily, which I would be happy to do.  But I don't think you would.  And so probably some of these issues are going to be left on the side because they're not *Daubert*.  Because you -- with only five motions in limine, that would never be your -- one of your five.

ATTORNEY NOLAN:  All points taken, your Honor.  Right.

On these interface -- let me rephrase my -- what I was about to say.

The -- the -- the -- Mr. Garrie doesn't have a foundation to testify as an expert in user experience.  So we're on board with your Honor that Mr. Garrie has some technical qualifications, would be entitled to present opinions of technical issues.  But the --

THE COURT:  Wait.  Mr. Nolan, I suppose you could be right.  But I think, as a software engineer, I think he's qualified to say, when it's inside the black box, this is what's going on.  But let me tell you what it's like -- what it's like on the outside of the black box and what you see on the screen.  That's -- that part of the user experience I think he can testify to.

I think that is an expert taking this complicated technology and explaining to the jury: This is what's going on, and this is what you see. And so I -- I mean, we can quibble with maybe a little bit of what he says. But, frankly, I have to do that when he's on the witness stand, and hear the context. But I -- I'm not -- I'm not with you on the user experience in the way I think he's trying to provide it.

ATTORNEY NOLAN: Yeah. So that's exactly the rub, your Honor. It's dangerous -- our -- it's dangerous to allow a technical expert with the aura of the technical knowledge that he has and will -- will present to say, essentially, that doesn't really matter. Because when you're -- where the bits are going behind the scenes, inside -- behind the black box, isn't really that important. Because as -- as -- as a subjective user experience, it looks a certain way.

So the concern is that he'll be able to -- that the -- his technical expertise will allow him to not just explain what he views as is going on in terms of software but also explain how that doesn't really -- that's not the important issue, it doesn't really matter. And Zazzle could be held liable for what it feels like to a user subjectively. So that's the concern with those issues.

THE COURT: Yes. They're the same (indiscernible). When -- when you have a conversation with Mr. Garrie (indiscernible) to prepare an expert report without numbered

paragraphs.

UNIDENTIFIED SPEAKER:  Yes, your Honor.

THE COURT:  And in your firm, you might want to say, "Note to self, maybe change it."  Because -- and thank you for -- you -- I got the highlighted version.  You had to send me the supplement because I have no idea what you were referring to.  But -- I'm going to turn to page (indiscernible) and see the highlighted portion.  And it's the paragraph that starts out, "From a practical perspective."

ATTORNEY NOLAN:  Yes, your Honor.  Our apologies with burdening the Court with another motion to seal on that same filing.

THE COURT:  So, you know, Mr. Nolan, I -- (indiscernible) see from the various testimony is really different.  Because I had understood you're arguing that breach occurs when there's an interface or an interaction with a software.  And so what the user sees is irrelevant to that issue.  It's a relevance issue.  But I don't think it's appropriate under *Daubert*.  There's no foundation.

I think he's got a perfect foundation.  I just don't know what this is relevant to.  So that's why I draw this distinction and why, in the context of the trial, this may be unimportant.

I don't -- so because we're applying a license and it's a technical application, this -- this user experience may not be

relevant.

ATTORNEY NOLAN:  Right.  I -- I think -- I characterize our argument as really both of those, your Honor.

There's -- it's a *Daubert* issue in the sense that -- that Mr. Garrie, while he may be a technical expert, is not an expert in subjective user experience of using software.

THE COURT:  If he would say -- if his testimony was, the user would have as much fun playing a video game, one way or the other, that -- I would agree with you -- -- he couldn't testify to.  But -- but I -- I said it before.  I actually see him saying that what's going -- the technical things that are going on under the surface are experienced by the user in -- in these ways.

This is an expert saying, "When I then load up my computer, turn it on, and -- and call up Blooming Elegant, this is what I'm seeing."  The user doesn't know what's going on underneath. It's just -- it's just a factual statement about what's -- what the user sees, not how the user feels about it.  That's -- that, we don't have.

So -- and I don't have a problem.  I -- at trial, you can claim it's not relevant, but I have to see how and when it's offered and what the context --

ATTORNEY NOLAN:  Yeah.  And we'll be happy to take it up at trial as needed.

But if I may, your Honor, I would just like to flag that

the -- the concern with allowing an expert to say that -- right? -- is if -- if all we're concerned about is what the user sees, then there's no need for expert testimony about that.  He's not an expert in what the user sees or the user experiences.  And your Honor focused very clearly at the beginning about what's a breach.  Right?

And the -- analytically, it matters what's happening in that black box.  Right?  And the concern that we have with -- with Mr. Garrie testifying about that is that he will -- if -- the --

THE COURT:  (Indiscernible.)  I agree it's an issue. (Indiscernible.)  That that -- that -- its relevance and it -- that, I think, could confuse a juror.  But we're not -- I'm not deciding that now.

You know, I made a very technical point that he -- Garrie is talking about.  And I would exclude his statements that the user directly accessed or used the Blooming Elegant font data. Because in his deposition, he admitted it, "No, they're not directly using or accessing."

So -- and I think -- I think the plaintiffs have -- have -- have conceded that that -- no, that he'll stick to what he testified to.  But -- but the -- but this page 37, that you want to exclude, I'm not going to exclude it on *Daubert*.  I'm going to limit his testimony to what the user actually accessed and used.  Directly accessed and uses the black box stuff.  Not

what it looked like when it came up on the screen.  And I think they concede that.

And, you know, it -- again, it's how the question is termed.  User perception is something an expert can't testify to.  But what a -- what someone sees on the screen is -- is not inappropriate.

I mean, these are -- I'm looking at a report that's never going into evidence.  And I've got to slice and dice it.  That's the best I can do.

ATTORNEY NOLAN:  And we're doing the same, your Honor.

THE COURT:  Yes, you are.

Okay.  Was there -- you asked me to exclude the factual narratives.  You're right.

And if -- if the testimony -- I mean, my order will say if the testimony were verbatim, this five pages, I would exclude it.  And I'll have to wait and see what's actually offered, why it's offered.  Some background is appropriate.

Mr. Garrie wants to say, "This was the information I was given, on which I was asked to base my opinions."  He can, in small bites, give us that.  But, again, it's a report.  I'm not going to go through it.  I'm going to grant it because, generally, factual narratives are not allowed.  And it will be subject to presentation at trial.  I mean, you know, I think we all understand that.  Okay?

Did I -- did we cover everything on Mr. Garrie?

ATTORNEY NOLAN:  The last point is -- is Mr. Garrie's opinions on the number of users who have --

THE COURT:  (Indiscernible.) It's not the one who extrapolated from the numbers, given the interrogatory answers --

ATTORNEY NOLAN:  That's right.  It's largely a prophylactic motion in that regard, your Honor.  He's not doing an independent analysis of the numbers.  Our -- the purpose of this portion of our motion is to exclude him from offering testimony about those numbers being either accurate or insufficient or inclusive or noninclusive; other things that they don't include.  I agree.

THE COURT:  So what I've got strung through these expert reports is experts reciting the facts of the case as though they discovered them when, in fact, they're just repeating them from somebody else without -- with -- with little footnotes attributing them.  And so, at trial, they're going to be -- they're not going to be able to give the narratives of that background.

If they have an opinion, an expert can testify:  The basis of the opinion was I reviewed the survey report of Dr. Paren (phonetic).  Or that I relied upon Mr. Garrie's software expertise in describing how the software is engaged when Blooming Elegant is used.  Those are -- that's appropriate.

But Mr. Garrie is not -- as I said, he didn't -- he didn't

go through the metadata and collect the number of users.  He's just taking it from other sources.

ATTORNEY NOLAN:  That's -- that's correct, your Honor.

THE COURT:  (Indiscernible.)

ATTORNEY NOLAN:  And as identified in our -- I don't think I need to belabor the point.  But we believe he misapplied and misquoted some of the numbers.  Those interrogatory responsive were numbers that were responsive to very specific questions and given in a very specific way.

THE COURT:  Well, I think -- you know, again, I agree with your point on that.  He's not the witness for how many users there were for any (indiscernible).  It may be the basis of part of his opinion.  I'm not sure that it is.  (Indiscernible) will (indiscernible).

Let me hear the opposition on this one.

(Indiscernible.) Mr. Steinberg.

ATTORNEY STEINBERG:  Thank you, your Honor.

And, your Honor, may I -- if I may, I would like to connect, to show some slides on these issues from Mr. Garrie, with your Honor's permission.

I'm not just showing -- there are quotations from his report, but there's also some points about our arguments, citations to law, citations to his report.

And so I believe if I do this, it should appear.

Okay.  Thank you.

So, your Honor, addressing the points that you raised in -- in turn.  The first point that your Honor raised was the issue of whether Mr. Garrie is providing legal opinions, and we respectfully submit that he is not.

The -- the defendants have mischaracterized his opinions here.  He's not opining on copyright law.  Nowhere does he opine on copyright law.

THE COURT:  (Indiscernible.)

ATTORNEY STEINBERG:  We agree.  We agree, your Honor.  The stray reference to copyright protected software was simply citing this --

THE COURT:  (Inaudible.)

ATTORNEY STEINBERG:  That's correct, your Honor.

I would like to address derivative work briefly.  That's a term that appears in the Blooming Elegant license.  Mr. Garrie uses the term in a couple of spots.  One, he quotes from the license itself, and he notes its use.

THE COURT:  (Inaudible.)

ATTORNEY STEINBERG:  Yes, your Honor.  It's on page 4.  On page 4 of his report, he just -- it's actually pages 4 to 5, I believe, where he has a list of quotations from the license.

THE COURT:  (Inaudible.)

ATTORNEY STEINBERG:  I understand, your Honor.

I'm only pointing out that his reference to derivative work

there is just simply quoting from the license itself.  And he's acknowledging that that's part of the materials that he considered when he then did his technical analysis.

THE COURT:  (Inaudible.)

ATTORNEY STEINBERG:  Yes.  And, your Honor, I'm not saying that he's going to be the sponsoring witness.  Just simply that after the -- there will presumably already have been testimony about this is the license, these are the terms. He may say, I reviewed the license among other materials, and I did see these phrases and these terms.  And that informed my --

THE COURT:  (Inaudible.)

ATTORNEY STEINBERG:  That's correct, your Honor.

Now, when we get to "later" in the report, what does he mean when he uses the phrase "later"?

And this is on pages 25, 36 to 37, and 40.

So what he explains in his report, he explains that incorporating the Blooming Elegant software into its design tool servers, what ██████████████████████████████ ████████████████████████████████████████ ██████████████████, which is a derivative work of the original font software.

And he explains --

THE COURT:  (Inaudible.)

ATTORNEY STEINBERG:  Sure, your Honor.

So I believe the quotation -- if I can go get my binder,

really quick.  But I believe it's from page 25.

(Pause.)

ATTORNEY STEINBERG:  And I apologize for not pushing Mr. Garrie to number his paragraphs.  I will certainly relay that information to him.  That -- that is our standard practice, but we also try not to --.

THE COURT:  (Inaudible.)

ATTORNEY STEINBERG:  So I'm reading on page 25.

So he explains there --

THE COURT:  (Inaudible) SVG?  Are you there?  Or above that?

ATTORNEY STEINBERG:  It's above that, your Honor.

THE COURT:  Thank you

ATTORNEY STEINBERG:  And it starts with the second sentence.

THE COURT:  SVG data --

ATTORNEY STEINBERG:  Yes.

THE COURT:  Is that a (indiscernible) -- okay.

ATTORNEY STEINBERG:  So -- so he says, quote:

██████████████████████████████████████████

████████████  --

I'm sorry.  I'll start over.

He writes in his report, quote:

██████████████████████████████████████████

█████████████████████████  are derivative

works of the font software and provide essentially the same functionality as the font software; i.e., instructing computers how to render text in a specific font but in a different format.

Continuing with the recipe book analogy" --

And I'll just interlude here to say this is something he had raised earlier in his analysis, when he was explaining how software instructions can be similar to a recipe.  So he uses that as a tool to help explain his analysis.

And then he goes on:

███████████████████████████████████████████

████████████████████████████████████████████████

██████████  is analogous to translating a recipe from one language into another," close quote.

So -- and he repeats portions of this or variations of this on pages 36 to 37 and 40 of his report.

Now, in his deposition defendants asked him about this a couple of times, and we've cited to some of the relevant testimony.  But they ask him what he means by that.  Right? How is he using that phrase?

And he said that ██████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████

And then later he goes on to say:

██████████████████████   And the new representation is derivative from whatever the original was."

They asked him then a number of different times:

"Are you using it in a copyright law sense?"

And he said, "No."

They're asking, "Are you opining that it's -- legally constitutes a derivative work under copyright law?"

He said:

"No, I'm not talking about copyright law.  I'm just talking about what I mean as a computer engineer, and what I saw in my analysis."

THE COURT:  (Indiscernible) testimony.  That as a computer software engineer, this is what derivative work means, then he's (indiscernible).  Then he absolutely can do that.

ATTORNEY STEINBERG:  Okay.

THE COURT:  That's what I said.  His -- the objection to leading conclusions from Mr. Garrie's report were they were right on the line.  And I -- and so I didn't really see excluding them but listening carefully at trial.  As compared to Mr. Sandler, who was just naked in his legal opinions offered on the meanings.

So I think -- well, I'm going to -- in terms of this motion, Mr. Steinberg, the most I can do is to, again, repeat that an expert -- a software engineer expert cannot give legal -- cannot give legal opinions to the jury.

These identified opinions -- I think I am going to say -- are along the line and are clearly outside of the scope of his expertise.  And at trial, the defense is free to object should the testimony elicited cross the line.

It's the most I can do.  That's not news to you, on -- you know, you can walk that line.

ATTORNEY STEINBERG:  Of course, your Honor.

THE COURT:  But I think the way -- and, you know -- and for you, you're going to need to ask a question that clearly shows you're asking for his opinion as a software engineer, what is a derivative report.  You can argue to the jury that's what's meant to the contract.  But that's (indiscernible) to be separated.

ATTORNEY STEINBERG:  Understood, your Honor.

THE COURT:  So --

ATTORNEY STEINBERG:  On -- on the question of the contract and the breach -- and maybe I don't need to belabor this point.  But nowhere does Mr. Garrie say that -- that his analysis shows breach or that he concludes that what Zazzle did is a breach.  He quotes the license itself, again, as part of his introductory materials.  And then he goes on to --

THE COURT:  7, though -- you know, (indiscernible) not that it's complete (indiscernible) in detail in the order.  But --

ATTORNEY STEINBERG:  You're talking there about

footnote 27?

THE COURT:  That and (indiscernible) On the design tool for at least two years, where he -- not a witness to that, knowing that Zazzle's use violated the license.  He can't say that.

ATTORNEY STEINBERG:  But -- the latter part, about knowing it violated the license, I don't -- I don't disagree with that.

THE COURT:  (Indiscernible.)

ATTORNEY STEINBERG:  Well, except the first part is talking about when the software was available in the tool and what was happening.

So I would just qualify it by saying I think he can testify about here's what I observed on the site, and from reviewing the testimony and from the technical documentation, my understanding is that this is how it worked during this relevant time period.

THE COURT:  (Indiscernible) answer.  He gives an answer within the field of his expertise, he can use some of this information as the foundation for it.  But he is not a witness to the fact that Zazzle did anything.  Okay?  That's the distinction I'm drawing.

These reports are written -- I don't know -- for settlement conferences.  I don't know what they're listed (phonetic) for. But, you know, this causes a lot of work for judges, and they

will never see the light of day.

ATTORNEY STEINBERG:  In terms of his analysis of the Zazzle design tool, he simply details his analysis of what -- what he was doing in the tool.  So both externally, what is the user doing, what was he doing?  Selecting, typing, et cetera.  And then he goes into detail about what's happening inside the black box.

THE COURT:  (Indiscernible.)  Page 6.  "(Indiscernible.) but for Zazzle (indiscernible) Blooming Elegant Trio digital content, including software on the Zazzle system.  Zazzle would not have been able to give unlicensed users access."

He can't say that.

ATTORNEY STEINBERG:  I understand, your Honor.

THE COURT:  Okay.  So it's not clean, and there are problems with it.  But -- and --

ATTORNEY STEINBERG:  I see the point that he's trying to make.

THE COURT:  (Indiscernible) I'm -- I'm not sure you'll have my order before trial.  (Indiscernible.)

ATTORNEY STEINBERG:  I understand, your Honor.

THE COURT:  So do I need to babysit you on all of this, to tell you what you can and can't do?  Is that so obvious that he can't say that?

ATTORNEY STEINBERG:  No, we understand, your Honor.

I'm focused more on other parts of the report about his overall analysis of the design tool.

There's quibbling over him allegedly saying that there's direct access.  That word "direct" or "directly" doesn't appear.

THE COURT:  (Indiscernible.)

ATTORNEY STEINBERG:  He'll stick to what he actually wrote in his report and testified to, and it's not direct access.  What he's talking about, essentially, your Honor -- I think -- I think to -- to make it a little bit simpler, you can think of running software on your machine; on your local machine, on a local copy.  And, nowadays, it's very common to run software in the cloud.  So you access software, you use software, but it is hosted on a server somewhere else.  You can do that with Microsoft Office.

And -- and what he is really explaining is that he's analyzed the Blooming Elegant software; both as local copies and then also looked at the design tool and looked at how it allowed users to access and use the fonts in the same way in the cloud.  Okay.

THE COURT:  When he uses words like "user perceives," that's -- that's where he goes -- crosses the line.  Because he can't get in the head of the user.  But as a software engineer, he can say, "You see this screen?  This is what you're seeing. Let me tell you what's going on behind it."  That, he can do.

That's where his expertise is.  I have no problem with that.

ATTORNEY STEINBERG:  Yes, your Honor.  And I don't think he talks about perception in that way in his report. He's really talking about what he's observing or any user would observe in terms of selecting a font, seeing it rendered on the screen, and then explaining what's happening on the back end.

I do want to address a little bit this argument about --

THE COURT:  I think (indiscernible).

Go ahead.

ATTORNEY STEINBERG:  So the paragraph on 37, this is really sort of comparing what -- how the software operates in a local version when you install it on a machine and how it operates in the cloud.  When you were -- at least in the past --

THE COURT:  (Indiscernible.)

ATTORNEY STEINBERG:  I understand.  But it's not -- it's not an issue of his qualifications to say that.  Because he's looked at that.

In terms -- I do want to address a little bit about the statute of limitations.

So Mr. Garrie doesn't opine on the statute of limitations, and he's not going to testify about concluding what the evidence shows about notice or whether it shows that that part or some part of the claim is barred by the statute of limitations.

What he does -- and I would note that the motion is unclear as to exactly what's challenged here because --

THE COURT:   (Inaudible.)

ATTORNEY STEINBERG:   Yes.  And it's unclear which one. So I want to talk a little bit about the two of them.

THE COURT:   (Indiscernible.)

ATTORNEY STEINBERG:   So there are two declarations, and we summarized that a little bit here.

One -- the first one is Docket number 342-51.  That is the first declaration that we submitted.  It's 342-51.  That declaration was not objected to by defendants.

In that declaration, what Mr. Garrie discusses is he analyzes technical evidence from reviewing Ms. Laatz's computer systems, her emails, her browsing history, and her social media history for evidence of engagement with Zazzle; whether it's having received or opened an email; whether it's having --

THE COURT:   (Inaudible.)

ATTORNEY STEINBERG:   Well, he's -- he's interpreting the technical information on her computer.

So -- so Ms. Laatz will testify that she didn't receive and open emails from Zazzle during the relevant time period.  He's now dug into her computer system to figure out, is there technical evidence that either supports or undermines that claim?  He's looking --

THE COURT:   (Inaudible.)

ATTORNEY STEINBERG:  Both the receipt and the opening.  Was the email actually received?  Is there evidence that it was actually opened?  You know, Ms. Laatz testified that she had an email filtering rule that sent spam to the trash immediately, without having reviewed it.  So --

THE COURT:  (Inaudible.)

ATTORNEY STEINBERG:  That's correct.  But it's based on technical analysis of metadata on her computer.

THE COURT:  (Inaudible.)

THE COURT:  So I looked at it online because I (indiscernible) paragraph 19 and not 18, of the objection.  The objection was in paragraph 18, 19.  I don't have it here because I didn't copy it.

ATTORNEY STEINBERG:  And I think, your Honor, are you talking about Docket number 342-49?

THE COURT:  Maybe.

ATTORNEY STEINBERG:  Okay.  So that's Mr. Garrie's second declaration.  So assuming that is what was referenced here -- and, again, it was a little bit unclear to us -- I have paragraphs 18 and 19 in front of me.

But let me talk a little bit, at a high level, about what this declaration does, the second declaration.

What Mr. Garrie does in this declaration is he's analyzing circumstantial evidence that Zazzle produced regarding emails and social media.  And he's looking at it on a technical basis,

and then refuting whether or not it shows -- he compares it to the earlier data that he looked at.  And in some cases he's refuting whether the circumstantial evidence shows what Zazzle says it shows.

THE COURT:  (Inaudible.)

ATTORNEY STEINBERG:  Well, your Honor, we're --

THE COURT:  (Inaudible.)

ATTORNEY STEINBERG:  I'm sorry?

THE COURT:  (Inaudible) 19.

ATTORNEY STEINBERG:  Well, I'm talking at a high level.  But I'll focus on -- so paragraph 18, for example, he says, quote:

"Thus, Jason Li's claim that 32 emails sent to Ms. Laatz's email returned an open event notification does not mean that Ms. Laatz opened the emails and does not support the claim that Ms. Laatz was aware that Zazzle was using the Blooming Elegant fonts."

So --

THE COURT:  Based on his review of the metadata on (indiscernible) 18, I wasn't going to exclude it.

ATTORNEY STEINBERG:  Thank you, your Honor.  And the reason -- and the reason there --

THE COURT:  (Inaudible.)

ATTORNEY STEINBERG:  Okay.  Thank you, your Honor.

Paragraph 19, he says, quote:

"Moreover, Jason Li's declaration does not state that these 32 emails contain any references to the Blooming Elegant Trio of fonts.  So even if Ms. Laatz had opened them, she would not have been put on notice that Zazzle was using the Blooming Elegant Trio fonts."

THE COURT:  (Inaudible) read the content of the emails -- it doesn't take a software engineer to read an email, and can decide what it tells her or what it does not.

That's why 19 is out.

ATTORNEY STEINBERG:  I understand, your Honor.

I would note that those 32 emails, themselves, I don't -- I don't think they were actually produced.  It was just testimony from Mr. Li about what was in them.

THE COURT:  He doesn't get to sit -- so I think it's pretty obvious.  The software engineer doesn't come in and say, "In my opinion, reading 32 -- all emails, that he wasn't put on notice is a legal issue, it's a factual issue, and it's for the jury.  And software engineers are irrelevant to that conversation.

ATTORNEY STEINBERG:  That -- understood, your Honor.

What we're focused on is the paragraphs that lead up to it, where he explains what does an email receipt show, things like that.  He does similar things with -- with regard to social

media.

THE COURT:  (Inaudible.)

ATTORNEY STEINBERG:  Okay.  Is there anything else you want me to address in the declaration?

THE COURT:  (Inaudible.)  On the number of -- on the number of designs depicting Blooming Elegant or the number of the unique designs created or any of the numbers, he's not a witness to those.  That's not his opinion.

ATTORNEY STEINBERG:  Well, so if I may, your Honor, what Mr. Garrie does there is -- is he explains the limitations of the data that Zazzle provided.  So -- and -- and the limitations of their system.

So he talks a little bit about the website.  He talks about what tools are installed on the website to track user activity. He notes that they could have installed tools to better track user activity and, therefore, be able to say with more precision how many users actually accessed the tool or how many users actually used the Blooming Elegant Trio at any given time.  So he talks a little bit about that.  And then he notes -- he quotes from the interrogatory response and the number there.

You know, what they really argue in their motion is that he's misinterpreting what that number means.

THE COURT:  (Inaudible) to the jury what the answers to interrogatories mean.  That's not within his -- in the

realm.  I'm looking at pages 37 to 38, where he's -- Section 5: "It is likely that more the ██████████████████████ " -- (indiscernible) "users accessed data source."

He did not go into the computers to find the number of user (phonetic).  He's basing it on Interrogatory 25, that gives the ██████████ number.  And says it was at least that number.

ATTORNEY STEINBERG:  So, your Honor, it's important to take into account the earlier parts of his report, where he's not just citing to the interrogatory response.  He's also citing to testimony from Mr. Li about how the tool worked, how the website worked.

THE COURT:  (Inaudible) testimony.  (Inaudible) evidence.

He's relying -- I'm looking at his footnote, 103.  He bases it on "It was likely" -- so he's guessing -- "that some users accessed the design tool but did not create or customize at least one finished or finalized design."

He's -- that has nothing to do with software.  He's guessing about what the user experiences.

"Second, the number provided by Zazzle only covers a portion of the time that Blooming Elegant was made available." That's correct.  Again, he's not come -- who's not saying that based as a software engineer.  He's taking that from somewhere else.  He is -- he is not applying his expertise as a software engineer.  He's not a witness to those numbers in any way.

ATTORNEY STEINBERG:  He's not a witness to those numbers, but he's --

THE COURT:  (Inaudible) he's stating an opinion on -- (inaudible).  Mr. Persechini did that.  Didn't he -- isn't he the one that ran the numbers and did the extrapolations?

ATTORNEY STEINBERG:  So Mr. Persechini is the one who extrapolates based on the time period -- on the full time period.  Where Mr. Garrie comes in, though, is this concept of what's happening on the website when someone creates a design that may be only pending, and then they close it out.

Or they create a design that's pending using Blooming Elegant Trio.  Then they change to a different font, and they say it was a finalized design.  So part of what he --

THE COURT:  (Inaudible).  He's not a witness for the numbers.

ATTORNEY STEINBERG:  But -- we understand, your Honor. But in terms of -- in terms of saying whether those numbers actually cover all users, given the limitations of the data on Zazzle's system and what it tracks, how it operates --

THE COURT:  (Inaudible) so the (inaudible) about why those numbers are not complete is fine.  But that's not really what he says in footnote 103 as the reason he questioned the number.

"That it's likely higher for two reasons.  First, it's likely that some users accessed the design

tool but did not create or customize at least one finished or finalized design."

He hasn't gone into the -- to Zazzle's software to learn that. He is just saying.

And then, second, the number of -- when he says the number provided by Zazzle is only a part of the -- of the time period, that is complete -- that's true, but he's not a witness to it. Has nothing to do with his expertise. He's not allowed to sponsor that testimony.

ATTORNEY STEINBERG: And we don't dispute that on the number itself. But part of -- yes, that footnote, he makes that statement. But what's also cited around that is testimony of Mr. Li about how the website operated. And, also, earlier -- a couple of pages earlier, on pages 35 to 36, he talks about technical measures on Zazzle's site to track user activity that they did or could have installed and the limitations of those.

So his statement that it's likely undercounted is based not only on just reading the interrogatory response and then surmising it from the time period or -- it's -- it's really --

THE COURT: (Inaudible) understated because it's only for part of the time period?

ATTORNEY STEINBERG: That -- that is self-evident.

THE COURT: (Indiscernible.)

ATTORNEY STEINBERG: But the issue -- the issue that I

think where he comes into play is this concept of pending versus finalized designs, what was tracked on Zazzle's site. So what could have been encompassed in that number and what wasn't, based on his review of the site itself; and, also, Mr. Li's testimony on how it operated.

THE COURT:  That's fine.  It comes down to the numbers (indiscernible).  I think that's -- I guess -- (indiscernible.)

ATTORNEY STEINBERG:  Thank you, your Honor.

THE COURT:  And the factual narrative, we're clear on that?

ATTORNEY STEINBERG:  Yes.  Understood, your Honor. He's not going to be the sponsoring witness on any of that. It's really just a matter of what he -- what facts he relied on.

THE COURT:  (Inaudible.)

ATTORNEY STEINBERG:  Okay.  And with that, your Honor, do you want me to address anything more on Mr. Garrie?

THE COURT:  (Inaudible.)

ATTORNEY STEINBERG:  Okay.

THE COURT:  (Inaudible.)

ATTORNEY STEINBERG:  I'm going to stop the sharing now, if that's okay.

THE COURT:  Yes.

I don't know that we'll finish this one.  We'll have to stop at 11:00 to get to (inaudible).

So I'm really wrestling with whether your survey expert is the one to doing the heavy lifting on this or whether it's -- things are actually excludable.

I -- I'm actually more concerned with how Mr. Persechini uses her data.  You are, too, I know.  But I -- I don't -- I'm not sure -- I'm not sure there's anything I can actually exclude from this.

I -- I -- let me just (indiscernible) on this (indiscernible).

ATTORNEY POSNER:  Sure.  Thank you.  This is Mr. Posner from Quinn Emanuel for the defendant Zazzle.

We do think this survey doesn't meet the appropriate standards to be excluded, although we do argue that if not excluded, it should be limited.

And if it's limited in the ways that we think it should be, then it's sort of useless to plaintiff.  Because, you pointed out, the way that they try to use this in Mr. Persechini's report, by extrapolating her very narrow survey findings -- which we think are flawed, for reasons we've expressed -- to argue that the total -- total Zazzle -- to argue about what total Zazzle users think or believe about the Blooming Elegant typeface.

THE COURT:  (Inaudible) for why she found the (indiscernible) representative.  These are -- these are frequent users of Zazzle, and they represent the preferences of

all of their customers, who are like the -- the other users to the Zazzle site.

So I thought she gave rational reasons for it. And I don't think you came back to tell me that in -- that it's, that the survey is not reliable because the sample was so tiny, 136 users out of ▮▮▮▮▮▮. That -- I don't think you gave me anything that would say, on its face, that that's excludable.

ATTORNEY POSNER: Yeah. So I think the important point to make on that is that -- and there's a disagreement about this. That her survey is really framed and her findings are really limited to relative terms. It's Blooming Elegant versus the handful of other typefaces that she chose to include in her survey. And we have critiques from Ms. Shapiro and Mr. Swain about why those are nonrepresentative samples. But if her survey is framed in relevant terms, then it's really of little to any use to the plaintiffs. And I think that's why they say, well, it actually is intended to capture in absolute terms simply what Blooming Elegant -- how people feel about Blooming Elegant.

But, if I may -- and --

THE COURT: (Inaudible) is that the survey clearly asks the participants to rank Blooming Elegant in regard to the other five. And -- and nowhere does it say your experience, generally, in the font industry.

ATTORNEY POSNER: Yeah. And I think, in reading back

on this report, I would want to focus your Honor to paragraphs 11 and 12 of the Parikh report, or the Willow survey.

THE COURT: Let me just turn to that, please.

ATTORNEY POSNER: Sure.

And I think this is really the -- the conclusive point on that issue.

And so paragraph 11, you know, didn't -- Ms. Parikh provided six different fonts or sets of fonts to the respondents. And they were -- the survey was introduced as you were going to be asked questions about multiple different fonts. And so then in paragraph 11 she said they're all familiar with these various fonts.

And in paragraph 12, she says:

"Graphic designers rate Blooming Elegant Trio higher than all other fonts asked about in terms of its appeal and its uniqueness. Graphic designers who use the font also rate Blooming Elegant Trio higher than all other fonts asked about, in terms of its importance to their work and how difficult it would be to substitute."

And then she goes on and says:

"Based on these results, it is my opinion that Blooming Elegant Trio is important and popular."

It's sort of, by definition, the way she set it up. And what she concedes here, that this is a relative survey

comparing Blooming Elegant to the handful of other typefaces or fonts that she includes in her survey.  And so, in that respect, it's limited to that.  And that provides very limited information.  Certainly, it doesn't provide -- we think it doesn't support the conclusion she reached in paragraph 14.  Nor does it support the way Mr. Persechini tried to present this information.

And, you know, some of -- maybe some of what she asked for -- now, she presented the survey in a relative way, by presenting multiple fonts and asking the respondents what they think about it.  But I think an example of why this can't simply be an absolute result but it really is relative is -- in particular, in her question about substitution.  Because she's asking how easy it is to substitute one for the other.

These are graphic designers who use fonts in a different way from consumers.  So they have a totally different need to substitute.

For a graphic designer, the question of substitution -- and, again, Ms. Shapiro explained this -- turns on how difficult it is to swap out one typeface that's already being used for another.  And there can be technical reasons why it's hard.  The width of the -- the glyphs, so on and so forth.

But for total Zazzle -- Zazzle consumers, they don't care about that.  They're just going onto the site and picking any number of a variety of different typefaces.

THE COURT:  (Inaudible) a group of people to a birthday party is not at all the language that I text onto my card.  And if it doesn't fit, it doesn't fit.

ATTORNEY POSNER:  But you're not substituting a previously made design for another, which presents -- a previously made design using an existing typeface, Blooming Elegant, with another, which presents issues that designers face and they complain about, but the average consumer does not.

THE COURT:  Cross-exam (inaudible).  That kind of -- down in the weeds.  I am concerned, and I think you make a solid point, that her opinions have to be limited to what she tested in paragraphs 11 and 12 may be the proper limitation.  These are results based on the fonts as to that.

ATTORNEY POSNER:  Yes, in relative terms.

THE COURT:  In relative terms.

And, I mean, it has consequences down the line with other experts.  But -- but the -- the question -- question 41 had problems, anyway, on the 54 percent number.

ATTORNEY POSNER:  Yes.  And so if your Honor is not inclined to exclude -- and we certainly can cross-examine on some of the points that Mr. Swain made.

We haven't gotten to Ms. Shapiro yet.  But if she doesn't get excluded for these reasons -- that Parikh survey, that I think it's all the more important.  And we can explain why,

later, why Ms. Shapiro's opinions are very important and relevant.  Because they explain, for example, the substitution issue and why her opinion -- her survey -- that was relative only as to five other fonts -- really isn't of much evidentiary weight because it's limited to five very different fonts.  And so, you know --

THE COURT:  (Inaudible.)

ATTORNEY POSNER:  Yeah, we can get there when we talk to Ms. Shapiro, though, about -- because they're moving to exclude her, and we'll argue that later.

So if your Honor doesn't have more questions about the specific critiques we've made, the lack of the control, we do think this is a survey like any survey, where a control -- I mean, to have no control can be a grounds for exclusion.

And, here, she said, "Well, this is not the type of survey that you need a control."

THE COURT:  (Inaudible.)

ATTORNEY POSNER:  Yeah.

THE COURT:  I think the real issue, here, is limiting her ultimate conclusion, pulling it back to what she tested for.

ATTORNEY POSNER:  Yes.  Which is both graphic designers -- and maybe my point wasn't clear.  And I do think it's a little complicated.  I was thinking how to frame it simply.

It's important that she's limited to graphic designers --

THE COURT:  (Inaudible.)  You want to tell the jury that, you can.  But she hasn't described, in a reasonable way to me, from her expert experience as a -- in surveys, is that this is a representative group because they sell to ultimate customers, and they would have their -- their finger on the pulse of that larger community.  It's only on the comparative to the other five fonts.

ATTORNEY POSNER:  Then, very briefly -- just because I don't think I said it well.  But the substitution point -- I'll just say it again.  It is different.  If you're a graphic designer that has made a preexisting design that's supposed to fit in a certain way, and then you need to swap out that typeface for a different one that might fit differently, that's different from you or I getting onto Zazzle and saying --

THE COURT:  I think that -- I don't actually agree with you.  Maybe in terms of degree.  But I think that normal customers do the same thing.

ATTORNEY POSNER:  But it's a different concern.  It's which one do you like better?  That's all you're think about.

THE COURT:  I really like Blooming Elegant, but I put so much text into my invitations that it just doesn't fly.  But I have to tell them when, and don't bring gifts, and this is the address, and here's my email, and -- and all of this other information.  And it's your picture I want on here.  So

Blooming Elegant, I love you, but you're for another day.  It's the same thing.

ATTORNEY POSNER:  Then, perhaps, we can have Ms. Shapiro testify to why there might be differences in substitutability from the different perspectives, and the jury can decide what they feel about that.

THE COURT:  (Inaudible.)

ATTORNEY MATHEWS:  Your Honor?

THE COURT:  That's (inaudible) the only thing I'm concerned about here is paragraphs 11, 12, and 14.

ATTORNEY MATHEWS:  I understood that, your Honor. And, for the record, Casey Mathews of Bartko Pavia, on behalf of plaintiffs -- or plaintiff.

Your Honor, I'm not going to look a gift horse in the mouth.  I understand your ruling that defendants' arguments primarily go to weight.  And I think we agree with that as well.  Defendants are welcome to cross-examine Ms. Parikh on the stand.  Make those points themselves, and let the jury decide --

THE COURT:  (Inaudible) this ultimately.  So let's see what the jury says.

ATTORNEY MATHEWS:  Of course, your Honor.  But I would like to, I think, address one specific point the defendants raise and your Honor raised as well, which is that this is a comparative survey.  I think that's a misrepresentation, and a

misunderstanding of how Dr. Parikh conducted the survey itself. And we submitted Dr. Parikh's testimony on this point. She did not show all six fonts to the survey respondents at the same time and then ask them questions. She showed each font, in succession, one at a time. Then asked them a series of questions about that font. Independently about that font. Not in comparison to the other five fonts that were being asked about.

So the data that she pulled, these are absolute numbers about the font itself, in isolation. Not about that font compared with the other five.

She also controlled for the --

THE COURT: (Inaudible), so that I can kind of wrap my head around that. Because that's an interesting point.

ATTORNEY MATHEWS: I believe the full set of questions is Appendix B to her report.

(Pause.)

THE COURT: I guess I didn't actually understand how the question -- so I'm looking at 3A. So each font -- for each font, asks, "How unique is this font," then?

ATTORNEY MATHEWS: Exactly, your Honor. So she wasn't asking how unique is this font compared to the other five that you're going to be asked about later? It's how unique is this front in isolation? How important is this font in isolation to your work? Are you familiar with this font? Have you used it

in your work before?  How easily could you substitute it?

So defendants' suggestion that it should be limited to just the comparison between Blooming Elegant Trio and the other five fonts and font trios that were asked about misrepresents how Dr. Parikh conducted her survey.

These are absolute numbers about -- in isolation about how each respondent felt about each individual font separately. And Dr. Parikh also provided testimony that she rotated the order in which the fonts were asked about amongst each respondent to control for primacy, recency.  So that, you know, it wasn't the same order of fonts for every single respondent.

THE COURT:  (Inaudible.)  Well, that puts this in a different light.

ATTORNEY POSNER:  May I respond on that issue when he's finished later, your Honor?  Because I do have a point to make.

THE COURT:  (Inaudible) very helpful point.

ATTORNEY MATHEWS:  Your Honor, I think that is the -- the entirety of the issue here.  Which is that the defendants don't understand how -- or are misrepresenting how the survey was conducted.  These are absolute numbers.

THE COURT:  (Inaudible) reconcile paragraphs 11 and 12.  Graph -- I'm reading from 12.

"Graphic designers rate Blooming Elegant higher
        than all other fonts asked about in terms of its

appeal."

So it -- it begs the question of how would they rate the ones they weren't asked about.

ATTORNEY MATHEWS:  It does, your Honor.  But what this survey does -- it provides both the absolute numbers about how respondents feel about Blooming Elegant, as well as a variety of data points about other fonts that were also available on Zazzle at the time.  And, again, keep in mind, these were specifically Zazzle users and Zazzle graphic designers who were asked about it.  So these are fonts that they would be familiar with through use of the Zazzle design tool.  Right?

And so her -- her conclusions -- especially paragraph 12 -- it is framed in the context of it was more popular than the other ones that were asked about.  But her ultimate conclusion is that Blooming Elegant Trio is an important and popular set of fonts on Zazzle.  That's supported by the absolute numbers that are provided as a result of her survey.

THE COURT:  (Inaudible) I -- I think about the answer.

So these (indiscernible) graphic designers are users on the Zazzle site?

ATTORNEY MATHEWS:  Correct.  They're users who have their own shops.

THE COURT:  (Inaudible) they use it multiple times?

ATTORNEY MATHEWS:  They're -- they're users who have specifically set up shops on Zazzle to design products and sell

them on Zazzle itself.  So they're the creators of graphic design that Zazzle then prints onto products.

THE COURT:  (Inaudible.)

ATTORNEY MATHEWS:  Correct, your Honor.

THE COURT:  Okay.  So -- and that's what I had understood.

Now, I'm trying to understand -- so for one of these graphic designers who set up shop, is that one of the ▮▮▮▮▮▮▮ number that you're offering?

ATTORNEY MATHEWS:  No.  I think the ▮▮▮▮▮▮ number -- I don't want to speak out of turn.  Mr. Steinberg will address the Persechini report.  But I believe the ▮▮▮▮▮▮ number is the number of people who accessed or used the design tool itself at any point in time.

So they do -- so they are a subset of that population.

THE COURT:  (Inaudible.)

ATTORNEY MATHEWS:  Correct.  That's right.

THE COURT:  (Inaudible.)  They -- they have -- to bring in -- they -- they bring in the most revenue relative to the others.  Correct?

ATTORNEY MATHEWS:  Correct.

THE COURT:  So they're the high users.  They still -- that diamond (indiscernible) is still one of the ▮▮▮▮▮▮?

ATTORNEY MATHEWS:  That's correct, your Honor.

THE COURT:  That's -- okay.  That's how I read it,

finally, and I just wanted to make sure that I understood.

Okay.  So it's -- I don't -- thank you.

I -- I want to return to Mr. Posner on this point.

ATTORNEY MATHEWS:  Thank you, your Honor.

THE COURT:  And then we'll take our break.

ATTORNEY POSNER:  Thank you.  Mr. Posner again.

And, you know, we certainly didn't misrepresent anything. She set up the survey the way she did.  She started by telling the respondents that they would be exposed to multiple different typefaces.  So that was sort of the premise.  And then she went one at a time and asked questions about them.

But her ultimate conclusion, as counsel just alluded to, is not that Blooming Elegant is recognized by -- whatever it is -- 90 percent of the people.  Her ultimate conclusion is framed in relative terms.  And so her ultimate opinion that they want her to testify to and that they think would be influential and that Mr. Persechini picks up on is in paragraph 14.  And that's a relative finding.

So she asked about them one at a time, and she obtained data about them one at a time, after letting them know that they would be exposed to six.  But to come up with her conclusion that it's important and popular, she did that by comparing those six.

And she had to do that, really, because had she only tested Blooming Elegant -- which she could have done if she really

only wanted an absolute number -- that wouldn't have meant much.  Because if Blooming Elegant was known by 80 percent of people, maybe every other typeface on there is known by 90 percent.  And so she had to do this relative to come up with the punchline of her report in paragraph 14.  That's the key there.

And she says this explicitly --

THE COURT:  (Inaudible) survey that would cause me to limit or exclude paragraph 14.  I'm just not seeing --

ATTORNEY POSNER:  The flaw might not be in the survey, other than she didn't use a representative sampling to come up with this relative -- the flaw is in the conclusion that she reached.  It's a conclusion that is rel -- that is based on a comparison of six unrepresentative and dissimilar typefaces.  And that's the important point.

They're using her as the foundation to get up there -- in who knows how many ways.  Mr. Persechini and others.  And say, Blooming Elegant is very important, very popular, and difficult to substitute.

And she explains, quite clearly here -- and it really goes back to paragraphs, you know, 8, 9, and 10 as well.  That she did that by evaluating six typefaces in relative terms.

She didn't simply say, well, Blooming Elegant has 80 percent and so, therefore, it is popular and important.

She said -- and she says this right here, in her own words:

"As compared to these other five I asked about, is popular -- is popular and important."

THE COURT:  (Indiscernible.)  So this is such a fine point of interpreting her results that I'm going to have to let this go to cross-examination.  This -- I can't exclude it.

You're making a -- you're making an interesting point.  But when I see the structure of the survey in Exhibit B, and I see that they were shown each of the five in isolation and asked about that typeface and not asked as compared to the other five, "do you like it," as -- the question was not, as -- and the question wasn't, you see five typefaces in front of you.  Which one is the most appealing to you?  Those weren't the questions.

So the -- so this -- I'm not even sure I agree with you now, that -- and I appreciate that I -- that it has been pointed out to me as to how it was presented.  But I'm not going to grant that limiting either.

ATTORNEY POSNER:  But that's her conclusion.

And so if she certainly did it that way, if all she wanted to do is what they say, then all she should have done is shown Blooming Elegant, gotten the numbers, and testified to the numbers.  But for her to get up here and say it's an important, popular, and difficult-to-substitute set of fonts, she's only saying that because of the comparison.

THE COURT:  (Inaudible.)

ATTORNEY POSNER:  Well, that's another argument.

THE COURT:  (Inaudible) whether it's important.  But maybe there are a thousand important fonts.  I don't know.  It doesn't tell me that.  It just tells me -- but, frankly, your sales numbers will tell that story too.

ATTORNEY POSNER:  Yeah.  And as does Ms. Shapiro.  Yeah.

THE COURT:  It's not only the testimony that tells this story.  And there's a lot of factual evidence that is in the record that tells the story of how graphic designers and users go to that Blooming Elegant.  But, you know, Zazzle is inexperienced with other (indiscernible) they had products they actually sold with it.  You all know that, and the jury will know it.  But that tells the story.

So I -- I'm going to actually -- I'm going to deny this. I'm not going to grant the limiting because I'm satisfied that it's -- it's -- you can cross-examine on it, but that's not a reason to exclude.

ATTORNEY POSNER:  Okay.  Thank you, your Honor.

THE COURT:  Okay.  Thank you.  All right.

Well, we still have one more -- I was hoping to finish these by 11:00, but we didn't.

Let's take a break until about 11:15.

For our court reporter, thank you.  I'm going to do case management, which is not recorded.  So you can take your break

as well.

(Pause, conferring.)

(Recess taken at 10:54 a.m.)

--oOo--

I certify, by signing below, that the foregoing is a correct stenographic transcript of the oral proceedings had in the above-entitled matter this 10th day of November, 2025.  A transcript without an original signature or conformed signature is not certified.  I further certify that the transcript fees and format comply with those prescribed by the Court and the Judicial Conference of the United States.

/S/ Amanda M. LeGore

AMANDA M. LeGORE, RDR, CRR, CRC, FCRR, CACSR 14290