UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

NICKY LAATZ,                          )
                                      )  CV-22-04844 BLF
              PLAINTIFF,              )
                                      )  SAN JOSE, CALIFORNIA
         VS.                          )
                                      )  OCTOBER 30, 2025
ZAZZLE, INC. AND MOHAMED              )
ALKHATIB,                             )  PAGES 1 - 94
                                      )
              DEFENDANTS.             )  1:15 P.M.
_____  )
ZAZZLE INC.,                          )
                                      )
              COUNTER-CLAIMANT,       )
                                      )
         VS.                          )
                                      )
NICKY LAATZ,                          )
                                      )
              COUNTER-DEFENDANT.      )
                                      )
_____  )

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE BETH LABSON FREEMAN
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

FOR THE PLAINTIFF:      BARTKO PAVIA LLP
                        BY: STEPHEN C. STEINBERG
                            P. CASEY  MATHEWS
                            CHAD E. DEVEAUX
                        1100 SANSOME STREET
                        SAN FRANCISCO, CALIFORNIA 94111

         (APPEARANCES CONTINUED ON THE NEXT PAGE.)

OFFICIAL COURT REPORTER:
                        IRENE L. RODRIGUEZ, CSR, RMR, CRR
                        CERTIFICATE NUMBER 8074

A P P E A R A N C E S: (CONT'D)


FOR THE DEFENDANTS:      QUINN EMANUEL URQUHART & SULLIVAN LLP
                         BY: THOMAS D. NOLAN
                         865 SOUTH FIGUEROA STREET
                         10TH FLOOR
                         LOS ANGELES, CALIFORNIA 90017

                         BY: ANDREW SCHAPIRO
                         191 N. WACKER DRIVE, SUITE 2700
                         CHICAGO, ILLINOIS 60606

SAN JOSE, CALIFORNIA                    OCTOBER 30, 2025

P R O C E E D I N G S

(COURT CONVENED AT 1:16 P.M.)

THE COURT:  PLEASE BE SEATED EVERYONE.

WE'RE BACK ON THE RECORD.  AS YOU CAN SEE, I'M PLEASED TO SAY WE HAVE A COURT REPORTER, AND THAT WILL MAKE EVERYTHING A LITTLE BIT EASIER.

BUT I DO LIKE YOU TO APPROACH TO THE PODIUM WHEN YOU'RE MAKING YOUR ARGUMENT.

ALL RIGHT.  LET'S SEE.  MR. NOLAN, YOU WERE STILL MAKING ARGUMENT ON MR. PERSECHINI; CORRECT?

MR. NOLAN:  YES, YOUR HONOR.

THE COURT:  OKAY.

MR. NOLAN:  GOOD AFTERNOON.  TOM NOLAN, QUINN, EMANUEL, FOR THE DEFENDANTS.

YOUR HONOR, I BELIEVE YOU HAVE LEFT OFF WITH YOUR QUESTIONS ABOUT THE APPLICATIONS OF THE BRIEF SURVEY BY MR. PERSECHINI.

THE COURT:  RIGHT.

MR. NOLAN:  I THINK I HAD MADE MOST OF THE POINTS THAT I WANTED TO MAKE IN RESPONSE TO THAT, WHICH ARE THAT THE SURVEY WAS OF ZAZZLE'S -- WAS OF DESIGNERS, AND A VERY SMALL NUMBER OF THEM, AND MR. PERSECHINI HIMSELF MADE NO INTENDED VALUATION OF THE SURVEY AND THE EXTENT OF IT -- AND MADE NO INDEPENDENT ANALYSIS OR VALUATION OF THE SURVEY'S CONTENTS OR

ITS CONCLUSIONS OR CONCLUSIONS THAT COULD BE DRAWN FROM IT, AND SO IT'S NOT A PROPER BASIS TO EXTRAPOLATE A DAMAGES ESTIMATE BY MR. PERSECHINI FOR THOSE REASONS.

THE COURT:  SO THANK YOU.  CIRCLING BACK TO THE -- I'M TRYING TO FIGURE OUT HOW TO DEAL WITH THE DESNY VERSUS WILDER, THAT'S D-E-S-N-Y, ISSUE.  I'M NOT SURE THAT CASE MATTERS IN PARTICULAR.

IF THERE IS LIABILITY FOR BREACH OF CONTRACT, THERE IS SOME VALUE THAT A PLAINTIFF ATTEMPTS TO PROVE IS ASSOCIATED WITH THE BREACH; CORRECT?

MR. NOLAN:  CORRECT.

THE COURT:  STANDARD CONTRACT.  SO I DON'T KNOW THAT THIS IS ANY DIFFERENT.

HOW WOULD YOU ARGUE THIS IS DIFFERENT.

MR. NOLAN:  THAT THE ANALYSIS THAT DESNY PRESENTS -- AND FIRST OF ALL, IT, IN THE CASE OF LICENSE, ARE NOT CONTRACT CASES TO BEGIN WITH, RIGHT?

THE COURT:  CORRECT.

MR. NOLAN:  IT'S AN IDEA SUBMISSION CASE.  THERE IS NO CONTRACT.  SO THAT'S WHY THAT DESNY REMEDY IS REQUIRED.

I AGREE WITH YOUR HONOR'S INITIAL ANALYSIS THAT ASSUMING THERE IS A PARTICULAR FINDING THAT A PARTICULAR COURSE OF CONDUCT CONSTITUTES A BREACH OF A PARTICULAR TERMINATED AGREEMENT, THEN THE PLAINTIFF IS ENTITLED TO TRY TO ASSIGN A VALUE TO THAT, RIGHT?  AND THE QUESTION IS HOW YOU DO THAT,

RIGHT?

THE COURT:  YES.

MR. NOLAN:  AND THE ANALOGY THAT PLAINTIFF ATTEMPTS TO DRAW FROM DESNY IS THAT BECAUSE THE LICENSE PRICE IS $20, WHICH THE PLAINTIFF TOOK HOME $14, THAT EVERY SINGLE TIME THAT ALL OF THOSE ███ PEOPLE WHO MAY OR MAY NOT EVEN HAVE SEEN THE FONT ACCESSED THE DESIGN TOOL, LIKE FOR THAT, THEREFORE, ZAZZLE OWES $14, AND OBVIOUSLY THAT YIELDS A VERY LARGE NUMBER.

BUT DESNY DOESN'T SUPPORT THAT IN THIS BECAUSE THERE'S NO AGREEMENT BETWEEN THE PARTIES ON THAT TERM.  IT'S AN EXPRESS CONTRACT, NOT AN IMPLIED IN FACT CONTRACT.

THE CONTRACT DOES NOT SAY THAT THERE SHALL BE $14 PAID FOR EVERY USER OF THE DESIGN TOOL, AND THE ANALOGY -- PLAINTIFF IS REALLY ATTEMPTING TO ANALOGIZE THIS WITH WHAT THEY LITERALLY QUOTE AS PARABLE FROM PROFESSOR WILLISTON, RIGHT, ABOUT THE SHOPLIFTER, RIGHT?

THE SHOPLIFTER GOES -- THE IDEA IS THAT THE SHOPLIFTER GOES INTO A STORE AND SEES A PAIR OF SUNGLASSES LISTED FOR $10, AND THEY DECIDE IT'S ONLY WORTH 5 AND STEAL IT, AND THEN THEY OWE 10, NOT 5, RIGHT?

BUT THE SHOPLIFTER HERE DIDN'T STEAL 10 OR 11 MILLION SUNGLASSES ONE TIME.  SO USING THAT PARABLE ASSUMES --

THE COURT:  I EVEN WONDER IF THE PROPER WAY TO LOOK AT THIS COMPARED TO DESNY -- IN DESNY IT WAS STEALING THE WIDGET, AND THE WIDGET HAD A PRICE.

HERE -- AND MR. STEINBERG WILL GO THROUGH THIS WITH ME -- I GATHER THEY'RE NOT CLAIMING THE BREACH WAS ACCESSED.  THEY'RE CLAIMING THE BREACH WAS SOMETHING ELSE AND ACCESS WAS THE CONSEQUENCE OF THE BREACH.

MR. NOLAN:  THAT'S ONE THEORY.  IT'S DIFFICULT FOR US TO KNOW EXACTLY WHAT THE BREACH OF CONTRACT THEORIES ARE. THEY'VE CHANGED TO SOME DEGREE OVER THE COURSE OF THE CASE. AND YOUR HONOR'S VERY FIRST QUESTION TODAY, SO WHAT IS IT?

I DON'T THINK IT IS THAT MR. PERSECHINI'S ANALYSIS IS NECESSARILY THAT THE ███████ NUMBER EACH CONSTITUTES AN INDIVIDUAL BREACH.  I DON'T THINK HE NECESSARILY ASSUMES THAT, AND THAT'S ONE OF THE PROBLEMS WITH THE REPORT.

THE COURT:  THAT'S ONE OF THE PROBLEMS.

MR. NOLAN:  THAT'S ONE OF THE PROBLEMS WITH THE REPORT IS THAT ALLOWING HIM TO DO THAT IS NOT SUPPORTED BY THE RECORDS, NOT SUPPORTED BY THE AGREEMENTS, NOT SUPPORTED BY THE LAW, AND IT IS NOT SUPPORTED BY DESNY.  THAT'S ONE OF THE MAIN PROBLEMS AND THE MAIN REASON THAT WE'RE SEEKING TO EXCLUDE THAT FORMULA AND ITS CONSEQUENTIAL RESULT.

THE COURT:  OKAY.  LET ME TURN TO THE PLAINTIFF, AND THEN I'LL PROBABLY CALL YOU BACK UP AFTER WE HAVE OUR CONVERSATION.

MR. NOLAN:  SHALL I RESERVE TIME FOR REBUTTAL?

THE COURT:  LUCKILY, IT'S NOT THAT FORMAL HERE.

MR. NOLAN:  THANK YOU, YOUR HONOR.

MR. STEINBERG:  YOUR HONOR, IS IT POSSIBLE TO CONNECT BACK IN?

THE COURT:  I NEVER HAD ZOOM ON.  MAYBE THAT WAS MY PROBLEM.  MAYBE IF I TURN IT ON, IT WILL WORK.  ZOOM IN THE COURTROOM IS NOT IDEAL.

(DISCUSSION OFF THE RECORD.)

THE COURT:  I HAVE IT.  GOOD.  OKAY.  WHOOPS, I LOST IT.

MR. STEINBERG:  STEPHEN STEINBERG FROM BARTKO PAVIA REPRESENTING THE PLAINTIFF.

THE COURT:  SO, MR. STEINBERG, I'M MISSING IN THE PERSECHINI REPORT HIS EVALUATION OF WHY $14 PER USER IS THE RIGHT VALUATION FOR THE BREACH.

AND WHEN I READ HIS REPORT, IT LOOKS LIKE HE WAS TOLD TO ASSUME THAT, BUT WHO TOLD HIM THAT AND HOW ARE YOU PROVING THAT?

MR. STEINBERG:  WELL, BECAUSE, YOUR HONOR, THAT IS THE STATED PRICE.

THE COURT:  NO, NO, NO.  THAT'S THE STATED PRICE TO LICENSE BLOOMING ELEGANT.

MR. STEINBERG:  THAT'S CORRECT.

THE COURT:  SO WE HAVE A LICENSE THAT WAS ISSUED TO MR. ALKHATIB.  AND YOU TOLD ME, AND MAYBE I MISUNDERSTOOD, THAT THE BREACH WAS PUTTING IT ON THE SERVER AND MAKING IT AVAILABLE.

MR. STEINBERG:  AMONG OTHER THINGS.

THE COURT:  AMONG OTHER THINGS.

SO WHEN WE HAVE A BREACH OF CONTRACT, WE HAVE GOT THE CONDUCT THAT LEADS TO THE BREACH, AND THEN WE'VE GOT THE CONSEQUENCE OF THAT BREACH, AND THE CONSEQUENCE LEADS TO CONSEQUENTIAL DAMAGES.

AND SO I DON'T SEE THE CONNECTION.  I DON'T -- IT SEEMS LIKE IT'S MR. PERSECHINI WHOSE GOT TO DO THE ANALYSIS OF WHY THE BREACH, WHATEVER IT IS, AND HE DOESN'T SEEM TO KNOW WHAT IT IS, HE DOESN'T TELL ME.  HE'S DONE NO ANALYSIS AS TO WHY $14 IS THE VALUE OF EACH ACTIVE ACCESS.

MR. STEINBERG:  SO TO BE FAIR, MR. PERSECHINI IS NOT VALUING IT.  HE'S TAKING THAT PRICE FROM THE LICENSE ITSELF.

THE COURT:  SO WHO IS VALUING IT?

MR. STEINBERG:  LET ME BACK UP TO --

THE COURT:  GO AHEAD.

MR. STEINBERG:  IF I COULD BACK UP TO WHAT ARE YOU GETTING WHEN YOU BUY THAT LICENSE?  WHAT IS BEING OFFERED BY MS. LAATZ AND WHAT, WHEN YOU EITHER DECIDE TO PAY FOR ONE OR WHEN YOU DECIDE TO WRONGFULLY TAKE IT, WHAT DOES IT SAY THAT YOU'RE GETTING?

YOU'RE GETTING A NON-TRANSFERRABLE RIGHT TO USE THE FONTS. YOU CAN INSTALL THEM ON YOUR COMPUTER AND HAVE THEN THEM AVAILABLE IN, LET'S SAY, ADOBE ILLUSTRATOR.

WHETHER YOU DECIDE TO USE THOSE FONTS OR NOT, THEY WILL BE

AVAILABLE TO YOU IN YOUR DROPDOWN MENU.  THE PRICE IS NOT DETERMINED BY WHETHER YOU ULTIMATELY DESIGN 1 PRODUCT, 100 OR NO PRODUCTS WITH IT, BUT TO HAVE IT THERE FOR YOU TO USE, YOU HAVE TO HAVE A LICENSE.

THE COURT:  OKAY.

MR. STEINBERG:  IT'S NOT TRANSFERRABLE.  YOU CANNOT SHARE IT WITH ANY OTHER USER.  IT'S ONE SEAT, ONE PERSON.  IT SAYS YOU CANNOT PUT IT ON A SERVER.  YOU CAN SHARE IT -- YOU CANNOT SHARE IT.

THE COURT:  NO, NO, NO, I DON'T THINK IT SAYS YOU CANNOT PUT IT ON A SERVER.  I THINK IT SAYS IF YOU DO, THERE ARE LIMITATIONS.

MR. STEINBERG:  SO I BELIEVE IT SAYS, YOUR HONOR, IT PROHIBITS A LICENSING FROM, QUOTE, "SUBLICENSING, SHARING, TRANSFERRING, OR OTHERWISE REDISTRIBUTING THE ITEM," WHICH IS SOMETIMES DEFINED AS DIGITAL CONTENT AND SOMETIMES DEFINED AS FONTS, "E.G., AS A STOCK AND A TOOL OR TEMPLATE WITH SOURCE FILES" --

THE COURT:  I'M SORRY, WHICH SECTION ARE YOU READING?

MR. STEINBERG:  I'M SORRY.  THIS IS -- I BELIEVE THIS IS TERM 8.

THE COURT:  OKAY.  THAT'S WHERE I AM, TOO.

MR. STEINBERG:  OKAY.  IT SAYS, FOR EXAMPLE, AS A STOCK AND A TOOL --

THE COURT:  SO WHY ARE YOU MISSING THE -- IT SAYS YOU MAY NOT DISPLAY THE ITEM, A OR B, WITHOUT IMPOSING TECHNICAL OR WRITTEN RESTRICTIONS.

MR. STEINBERG:  THAT'S ANOTHER RESTRICTION, YOUR HONOR.

YOU KNOW, NOTABLY -- AND THIS IS PART OF WHERE THE PHRASE "DERIVATIVE WORK" COMES IN.  IT SAYS THAT TO THE EXTENT THAT YOU DO CREATE A DERIVATIVE WORK, IT IS ALSO SUBJECT TO THE TERMS OF THE LICENSE.

THE COURT:  I'M SORRY.  I'M LOOKING AT PARAGRAPH 8. I DON'T THINK WE ARE LOOKING AT THE SAME THING.

MR. STEINBERG:  I APOLOGIZE, YOUR HONOR.  I MAY HAVE MISSPOKE.

THE COURT:  PARAGRAPH 8 SAYS, "YOU MAY NOT PUBLICLY DISPLAY."

MR. STEINBERG:  I'M SORRY, YOUR HONOR, I MISREAD IT. I BELIEVE IT IS ACTUALLY -- IT MIGHT BE TERM 5 IS THE ONE THAT TALKS ABOUT NOT PUTTING IT -- NOT SHARING IT VIA A TOOL OR TEMPLATE.  AND IT SAYS -- NOTABLY IT SAYS, "NOT EVEN FOR FREE."

SO, AGAIN, THE RATE THAT YOU PAY FOR THIS LICENSE TO HAVE ONE USER, IT DOESN'T MATTER WHETHER YOU CHOOSE TO DESIGN A LOT OF PRODUCTS WITH IT OR NOT.

THE COURT:  SO WHAT IS THE DEFINITION OF AN ITEM?

MR. STEINBERG:  WHAT IS THE DEFINITION OF AN ITEM?

THE COURT:  THE ITEM IS THE SOFTWARE.

MR. STEINBERG:  WELL, THE VARIOUS --

THE COURT:  IT'S NOT THE ARTISTIC REPRESENTATION OF WHAT THE SOFTWARE CREATES.

MR. STEINBERG:  SO I WOULD DISAGREE WITH THAT, YOUR HONOR.

THE COURT:  YOU DO?

MR. STEINBERG:  AT VARIOUS POINTS IN THE LICENSE TERMS ITSELF IT DEFINES "INSTALLABLE ITEM" AS FONTS OR ADD-ONS. SO IT USES THE PHRASE FONTS.  IT DOESN'T SAY FONT SOFTWARE.

ELSEWHERE IT ALSO REFERS TO THE DIGITAL CONTENT, MEANING THE SOFTWARE.

SO FROM OUR PERSPECTIVE IT COVERS BOTH, ALL OF IT.

THE COURT:  I CAN'T INSTALL THIS, CAN I?  AND I'M SHOWING A REPRESENTATION OF BLOOMING ELEGANT THAT WE CREATED YESTERDAY.  ACCESS ON BEHALF OF JUDGE FREEMAN.  I CAN'T INSTALL THAT.  THAT'S NOT AN INSTALLABLE THING.  IT'S JUST A PAGE THAT I'M LOOKING AT.

I THINK YOUR DEFINITION OF ITEM, AND I'M NOT INTERPRETING THE CONTRACT, BUT I'M REALLY STRUGGLING WITH IT, IS REALLY TROUBLING.

SO I -- YOU HAVE CONDUCT THAT YOU WILL TRY TO PROVE IS A BREACH OF THE LICENSE.

MR. STEINBERG:  YES, YOUR HONOR.

THE COURT:  AND THEN THERE ARE CONSEQUENCES OF THAT BREACH.  SO IF YOU'RE PLANNING TO STAND UP BEFORE THE JURY AND

PROVE TO THEM THAT EACH ACCESS TO BLOOMING ELEGANT WAS A SEPARATE BREACH, I COULD UNDERSTAND YOUR $14 MAYBE.

BUT IF YOU'RE TELLING ME THAT IT'S SOMETHING ELSE, THEN THE ACCESS IS THE CONSEQUENCE OF THE BREACH, AND NOT ALL BREACHES HAVE THE SAME VALUE.  SO YOU HAVE TO -- SOMEBODY HAS TO ANALYZE AND PROVIDE AN OPINION ON WHY THE BREACH OF PROVIDING ACCESS IS WORTH $14 TIMES ███████ AND I DON'T SEE THAT.  PERSECHINI HASN'T DONE THAT.

MR. STEINBERG:  SO WE DO CONTEND THAT EACH ACCESS, THAT IS A BREACH.  I MEAN, IT SAYS IN THE LICENSE YOU'RE NOT SUPPOSED TO SHARE IT WITH SOMEONE ELSE, FOR EXAMPLE, AS PART OF A TOOL.

THE COURT:  AND YOU HAVE WITNESSES WHO WILL PRESENT THAT EVIDENCE TO THE JURY?

MR. STEINBERG:  WELL, THAT'S IN THE LANGUAGE OF THE LICENSE ITSELF.

NOW, MR. GARRIE, WHEN HE READS --

THE COURT:  SO YOU'RE GOING TO READ, YOU'RE GOING TO READ -- YOU'RE GOING TO SHOW THE JURY THE CONTRACT AND SAY, THROUGH YOUR ARGUMENT, THAT THIS IS HOW YOU SHOULD DECIDE THE CASE?

MR. STEINBERG:  WELL, MS. LAATZ IS GOING TO TESTIFY ABOUT THE LICENSE ITSELF.

THE COURT:  WHICH SHE DID NOT WRITE.

MR. STEINBERG:  UNDERSTOOD, YOUR HONOR, BUT IT IS

THE LICENSE THAT SHE OFFERED, CHOSE TO OFFER.  IT IS ALSO THE LICENSE THAT ZAZZLE CHOSE TO ACCEPT.

MR. GARRIE IS GOING TO TESTIFY ABOUT WHAT HE FOUND WHEN HE LOOKED AT THE TOOL AND HOW IT ALLOWED EACH INDIVIDUAL USER TO THEN ACCESS.

THE COURT:  THAT'S NOT BREACH.

MR. STEINBERG:  WE WOULD CONTEND THAT IT IS, YOUR HONOR.

THE COURT:  NO, NO, I MISSPOKE.  MR. GARRIE CANNOT TESTIFY ABOUT WHAT BREACH IS.  I TOLD YOU -- WE'VE AGREED ON THAT.

MR. STEINBERG:  AGREED, YOUR HONOR.

BUT HE'S GOING TO TESTIFY ABOUT WHAT THE TOOL ACTUALLY DID IN TERMS OF PROVIDING EACH OF THESE USERS WITH THE ABILITY TO ACCESS AND USE THE FONTS AND USE THE SOFTWARE THROUGH THE, THROUGH THE SERVERS.

THE COURT:  AND SO THIS JURY WILL HAVE TO HAVE SPECIAL QUESTIONS:  DO YOU FIND THAT EACH INCIDENT OF ACCESS CONSTITUTES A SEPARATE BREACH?

MR. STEINBERG:  I SUPPOSE THAT'S ONE WAY TO DO IT, YOUR HONOR.

THE COURT:  AND THEN THEY'RE GOING TO HAVE TO GIVE SEPARATE DAMAGES NUMBERS SO THAT IF ANY OF THESE GET OVERTURNED.  I JUST DON'T SEE --

MR. STEINBERG:  SO I THINK IF WE BACK UP.

YOUR HONOR EARLIER WAS TALKING ABOUT --

THE COURT:  I'M SORRY.  I APOLOGIZE.

MR. PERSECHINI HAS DONE NO ANALYSIS TO VALUE ACCESS AT $14, AND SO I DON'T KNOW HOW THAT'S ADMISSIBLE.

MR. STEINBERG:  SO WHAT THE CASE LAW THAT WE CITED, THE WILLISTON PRINCIPLE, WHICH DESNY EXTENDS TO INTANGIBLE ASSETS, RIGHT, AND DESNY SAYS THAT WHEN IT'S AN ABSTRACT IDEA, IT'S STILL SUBJECT TO THE SAME PRINCIPLE.  THE IDEA IS THAT IF YOU GO INTO A STORE AND YOU ARE TOLD A PRICE, AND MAYBE YOU BUY 1, BUT YOU DECIDE TO STEAL 100 MORE, OR MAYBE YOU JUST DON'T PAY AT ALL AND YOU STEAL 100, AND YOU HAVE TO PAY THE STATED PRICE.

SO IN THIS CASE THE STATED PRICE IS $20 AND WHAT MS. LAATZ --

THE COURT:  I'M GOING TO STICK WITH DESNY.  I'M A THIEF.  I WALK INTO YOUR STORE.  YOU HAVE 10,000 TCHOTCHKES IN YOUR STORE.  I STEAL ONE.  YOU'RE GOING TO CHARGE ME FOR THE OTHER 9,999 BECAUSE I COULD HAVE STOLEN THEM?

THAT'S THE ANALOGY WITH DESNY.  IS THAT WHAT YOU'RE ARGUING?

MR. STEINBERG:  SO LET ME BACK UP TO YOUR ANALOGY, AND I WILL TWEAK IT A LITTLE BIT MORE TO BE MORE COMPARABLE TO THE SITUATION.  LET'S GO BACK TO A MACY'S OR A DEPARTMENT STORE, RIGHT?  THEY DON'T NORMALLY CHARGE PEOPLE TO TRY SOMETHING ON.

BUT LET'S SAY A HIGH END COMPANY, A HERMES SAID IF YOU WANT TO HAVE THIS HANDBAG, YOU CAN PAY US $20 FOR ONE PERSON, WHETHER IT'S AN EMPLOYEE OR A CUSTOMER, ONE PERSON TO TRY IT ON.

DO YOU WANT TO DO THAT?

THE COURT:  THAT'S YOUR PENDING SALE.

MR. STEINBERG:  AND THEY SAY I'LL TAKE IT.

THE COURT:  THAT'S YOUR PENDING SALE.

MR. STEINBERG:  OKAY.  THEY GET THE $20.

NOW THEY ALLOW ANYONE COMING IN TO TRY ON THE BAG.  AND BEYOND THAT, THERE'S SOME NUMBER OF ADDITIONAL PEOPLE WHO ARE COMING IN AND THEY'RE LOOKING AT IT AND MAYBE THEY DON'T TRY IT ON OR MAYBE THEY DO, BUT THEY'RE GAINING VALUE BY HAVING THAT AVAILABLE TO EVERYONE WHO IS COMING IN.

THE COURT:  YOU KNOW, THAT'S JUST NOT WORKING BECAUSE IF YOU DON'T -- IN THIS ANALOGY I THINK YOU MOVED INTO PENDING DESIGNS BECAUSE YOU'VE GOT THE TRYING IT ON PART.  SO THE CUSTOMER IS ENGAGED WITH THE ITEM.

MR. STEINBERG:  YES.

THE COURT:  I'M NOT TALKING ABOUT THAT.

MR. STEINBERG:  OKAY.

THE COURT:  I'D LIKE TO TALK ABOUT YOUR ACCESS THEORY WHERE YOU'RE SAYING THAT THEY HAD THE OPPORTUNITY TO LOOK AT BLOOMING ELEGANT.  SO THAT'S MY STORE WITH 10,000 ITEMS, AND THE THIEF COMES IN AND STEALS A DIFFERENT ITEM THAN

ONE THAT YOU OWN.

MR. STEINBERG:  SO LET'S THINK ABOUT IT IN THE SOFTWARE CONTEXT.

THE COURT:  NO.  I WOULD LIKE YOU TO ANSWER MY ANALOGY.

MR. STEINBERG:  WELL, I'M NOT SURE THAT IT QUITE -- IT QUITE WORKS.  IT'S MORE LIKE, YOU KNOW, BECAUSE IN THIS CASE, IN ORDER TO EVEN HAVE IT AVAILABLE FOR PEOPLE TO SEE AND MAYBE TRY ON, OR MAYBE NOT, YOU HAVE TO HAVE A LICENSE FOR EACH SUCH PERSON.

THE LICENSE ITSELF DOES NOT DEPEND -- IF YOU WANT TO HAVE IT ON YOUR COMPUTER, LET'S SAY, WE'RE GOING BACK TO LIKE LOCAL SOFTWARE, BUT WHETHER YOU WANT TO HAVE IT ON YOUR COMPUTER OR WHETHER YOU WANT TO ACCESS IT ON THE CLOUD, WHETHER OR NOT YOU DECIDE TO ULTIMATELY USE IT IN DESIGN DOES NOT DETERMINE THE PRICE.  TO EVEN HAVE IT AVAILABLE IN YOUR MENU OF FONTS ON YOUR COMPUTER OR HERE IN YOUR MENU OF FONTS ONLINE, YOU HAVE TO HAVE A LICENSE.

THE COURT:  I THINK YOUR ACCESS THEORY, IF IT SURVIVES AT ALL, WILL ONLY SURVIVE UNDER PARAGRAPH 8.  YOU MAY NOT PUBLICLY DISPLAY.

BECAUSE IN PARAGRAPH 5 WE'RE TALKING ABOUT YOU MAY NOT SHARE -- BECAUSE WE'RE NOT -- WE DIDN'T -- THERE'S NO SUBLICENSE -- LET'S SKIP THE RESALE BECAUSE I KNOW THERE ARE SALES OF BLOOMING ELEGANT AND THAT'S A SEPARATE.

"YOU MAY NOT SHARE OR OTHERWISE REDISTRIBUTE THE ITEM, E.G., AS STOCK, IN A TOOL OR TEMPLATE WITH SOURCE FILES AND/OR NOT INCORPORATED INTO AN END PRODUCT UNDER ANY CIRCUMSTANCES."

I DON'T SEE SHARING OF THE SOFTWARE.  I DON'T SEE SHARING OF THE SOFTWARE.  I SEE LOOKING AT THE RESULTS OF WHAT THE SOFTWARE CAN DO.

SO I NEED AN EXPERT WHO CAN VALUE THE ACCESS AT THE FULL LICENSE PRICE.  WHY IS THAT BREACH WORTH THE SAME AS SELLING -- AS ZAZZLE SELLING A PRODUCT USING BLOOMING ELEGANT?

MR. STEINBERG:  SO, AGAIN, THOUGH, YOUR HONOR, THE LICENSE DOESN'T DEPEND ON WHAT YOU ULTIMATELY SELL A PRODUCT FOR OR WHETHER YOU SELL ANY PRODUCT AT ALL.

THE LICENSE SAYS THAT TO EVEN HAVE THE RIGHT TO USE, FOR ONE PERSON TO USE THIS IN ANY WAY, WHETHER THEY ULTIMATELY DO OR NOT, YOU HAVE TO PAY THE STATED PRICE.  AND THEY ACCEPTED THAT BOTH FOR THE ONE THAT THEY PAID FOR AND FOR ALL OF THE ADDITIONAL SEATS THAT THEY CHOSE UNILATERALLY TO GIVE OUT.

IF WE THINK ABOUT THE SOFTWARE CONTEXT, YOU KNOW, WHEN YOU BUY A COMPUTER, THERE MIGHT BE CERTAIN SOFTWARE PRE-INSTALLED ON IT, AND PRESUMABLY THE MANUFACTURER OF THE COMPUTER HAS PAID FOR THOSE LICENSES.  AND YOU, TO SOME EXTENT, WHEN YOU BUY THE COMPUTER ARE PAYING FOR THEM.

WHETHER YOU USE THAT SOFTWARE OR NOT, TO EVEN HAVE IT ON THERE, YOU HAVE TO PAY FOR IT OR YOU MAY HAVE A COMPUTER THAT HAS A PRE-INSTALLED LICENSE TO CLOUD SOFTWARE.

THE COURT:  SO I'M WITH YOU, TO EVEN HAVE IT ON THE ZAZZLE SERVER.

MR. STEINBERG:  THAT'S CORRECT, YOUR HONOR.

THE COURT:  AND THEY DIDN'T USE IT.  THEY HAD TO HAVE A LICENSE.  I THINK YOU HAVE -- THERE'S SUPPORT IN THE RECORD FOR YOU TO PRESENT THAT TO THE JURY.  REMEMBER, I'M NOT BUYING OR YOU'RE NOT BUYING ANY OF THIS.

WHAT WE'RE FOCUSSING ON IS THAT -- IS THIS IDEA THAT IT'S ON THE SERVER.  THAT'S FOR THE SAKE OF ARGUMENT CALLED PLACING IT ON THE SERVER, NOT ALLOWED UNDER THE LICENSE.  IT'S THAT EACH USER WHO COMES TO THE DESIGN TOOL IS CAUSING A FULL $14 LICENSE EVENT.  THEY'RE NOT INSTALLING IT.  THESE ARE PEOPLE WHO DON'T EVEN LOOK AT BLOOMING ELEGANT.  THESE ARE THE PEOPLE WHO DON'T EVEN SEE IT.  THAT'S THE PROBLEM I'M SEEING.

I HAVE NO ANALYSIS FROM MR. PERSECHINI AS TO HOW THAT IS VALUED AT $14.  HE -- AND HE, IN MY VIEW, IN HIS WHAT HE CALLS DAMAGES FRAMEWORK, HE IS SIMPLY RECEIVING THIS AS DETERMINED.  AND ONCE THAT IS DETERMINED, HE RUNS THE NUMBERS AND DOES THE EXTRAPOLATION, DOES THINGS THAT AS AN ECONOMIST HE'S HIGHLY QUALIFIED TO DO.

BUT WE HAVE THIS GAP THAT HE HAS NO FOUNDATION ON WHICH TO BASE HIS $14.  THAT'S THE PROBLEM WITH HIS TESTIMONY.

MR. STEINBERG:  SO I GUESS, YOUR HONOR, I WOULD GO BACK TO HE'S ACCEPTING THE BASIC LEGAL PRINCIPLE THAT WHERE YOU HAVE AN ACTUAL CONTRACT, WHETHER THE ONE THAT YOU ACTUALLY --

THE COURT:  HE WAS TOLD TO.

MR. STEINBERG:  CORRECT, AND AS HE MUST.

THE COURT:  YES.

MR. STEINBERG:  BUT THERE'S A STATED PRICE, AND HE'S USING THAT ACROSS DIFFERENT METRICS TO TRY TO ESTIMATE HOW MANY PEOPLE ACTUALLY USED THE BLOOMING ELEGANT FONTS AND HOW MANY PEOPLE ACTUALLY ACCESSED THE TOOLS.

YOU KNOW, IF WE GO BACK IN TIME AND THINK ABOUT WHAT WOULD ZAZZLE HAVE HAD TO DO TO BE PERMITTED TO DO WHAT IT DID, RIGHT? WHAT COULD IT HAVE DONE BACK IN THE DAY?

WELL, THEY COULD HAVE BOUGHT A LICENSE FOR EVERY USER THAT THEY WANTED TO MAKE THE FONTS AVAILABLE TO IN THEIR DESIGN TOOL, AND THAT WOULD HAVE SAVED THEM FROM THIS.

BUT THEY CHOSE NOT TO DO THAT.

THE COURT:  OH, NO, NO, NO, THAT WOULD HAVE COST THE SAME AMOUNT AS GOING TO A JURY.

MR. STEINBERG:  I UNDERSTAND.

THE COURT:  IT WOULDN'T HAVE SAVED THEM ANYTHING.

MR. STEINBERG:  BUT IT'S NOT FAIR TO -- THE CONCEPT OF THE WILLISTON PRINCIPLE AND TSAKOS AND DESNY AND OTHER CASES LIKE DONAHUE AND BLAUSTEIN, THE IDEA THAT YOU CAN'T ACCEPT THE PRICE AND THEN WHEN YOU GET CAUGHT STEALING LATER SAY, WELL, IT'S NOT WORTH THAT MUCH.  I WOULD HAVE GOTTEN SOME KIND OF A VOLUME DISCOUNT OR I KNOW THEY WERE CHARGING, I DON'T KNOW, TENS OF THOUSANDS OF DOLLARS FOR A HERMES BAG, BUT IT'S NOT

REALLY WORTH THAT MUCH.  IT'S JUST ALL HYPE.  IT'S JUST A PIECE OF LEATHER, RIGHT?

IF YOU KNOW THE PRICE, THE STATED PRICE AND YOU AGREE TO PAY IT FOR ONE UNIT, AND THEN YOU ACCEPT THE OFFER BY TAKING IT FOR A BUNCH MORE SEATS, YOU CAN'T THEN COMPLAIN AND SAY, WELL, IT'S NOT REALLY WORTH WHAT YOU SAID IT WOULD COST AND WHAT I BASICALLY ACCEPTED BY MY CONDUCT.  THAT'S THE CONCEPT OF THE WILLISTON PRINCIPLE AND THE CASE LAW WE CITE.

THE COURT:  SO YOU ARE -- YOU ARE ARGUING THAT -- WOW.  I'M SO STRUGGLING WITH THIS BECAUSE, FRANKLY, I FIND THE THEORY OF ACCESS SO UNBELIEVABLE THAT I'M REALLY STRUGGLING, AND MAYBE I HAVE TO LET A JURY DECIDE THAT.  BUT YOU ARE SAYING THAT IT IS THE CUSTOMER WHO USES BLOOMING ELEGANT AND BUYS A PRODUCT WITH IT, CAUSES THE SAME DAMAGE TO NICKY LAATZ AS THE PERSON WHO USES THE DESIGN TOOL AND NEVER, NEVER, NEVER COMES IN CONTACT WITH BLOOMING ELEGANT.  YOU'RE SAYING IT'S THE SAME VALUE.

I THINK THAT IS ABSURD.

MR. STEINBERG:  SO WHAT I'M SAYING IS THAT PER STATED PRICE IS THE SAME REGARDLESS.

THE COURT:  SO --

MR. STEINBERG:  AND I SHOULD SAY I THINK THERE'S ANOTHER GROUND, TOO, FOR WHY THIS IS RELEVANT.

SO EVEN IF YOUR HONOR FEELS, AS I UNDERSTAND YOU DO, THAT REALLY IT SHOULD BE FOCUSSED ONLY ON THE PEOPLE WHO ACTUALLY

ENGAGED WITH BLOOMING ELEGANT IN SOME WAY.

ONE OF THE PROBLEMS THAT WE HAVE IS THAT WE DON'T KNOW WHAT THAT NUMBER IS.  WE KNOW IT'S BIGGER THAN WHAT ZAZZLE HAS ADMITTED TO, BUT WE DON'T KNOW EXACTLY WHAT THAT NUMBER IS BECAUSE THEY DIDN'T PRESERVE DATA OF PENDING DESIGNS AND THEY ALSO DON'T HAVE THE FULL --

THE COURT:  WE'RE NOT EVEN TALKING ABOUT PENDING DESIGNS.

MR. STEINBERG:  BUT I THINK IT'S IMPORTANT.  THESE ARE PEOPLE --

THE COURT:  I DO UNDERSTAND THAT THERE'S NO PRESERVED DATA ON THAT.

MR. STEINBERG:  SO PART OF WHAT I THINK MR. PERSECHINI IS ALSO TRYING TO GET AT IS WHERE I HAVE DATA ON FINISHED DESIGNS, IT'S INCOMPLETE.  THERE'S A SUM NUMBER OF ADDITIONAL PEOPLE WHO ACTUALLY ENGAGED WITH AND USED THE SOFTWARE AND USED THE FONTS, BUT I DON'T KNOW HOW MANY THOSE ARE.

AND NOTABLY, WHEN PEOPLE ENGAGE WITH THAT IN A DESIGN, IT COULD BE THAT THEY TRIED BLOOMING ELEGANT AND THEY SWITCHED TO SOMETHING ELSE, OR MAYBE THEY STARTED -- BUT THEY CAN ALSO ON THE TOOL DOWNLOAD THE DESIGN AND USE IT ANYWHERE ELSE THEY WANT.  THEY CAN USE THE DESIGN TOOL LIKE A PIECE OF LOCAL SOFTWARE, RIGHT?

SO THESE ARE PEOPLE WHO ACTUALLY USED IT.  WE DON'T KNOW

HOW MANY OF THOSE ARE. AND THE REASON WE DON'T --

THE COURT: MR. STEINBERG, I USED THE SOFTWARE YESTERDAY BY GOING ON TO SEVERAL OTHER SITES. I USED IT. I CREATED MY OWN CUSTOMIZED WORDS. I COULD -- I DIDN'T EVEN NEED TO TAKE A SCREENSHOT OF IT, AND I GOT THAT OFF OF ALL OF THE OTHER SITES, AND I DIDN'T HAVE TO -- NO ONE ASKED ME TO PAY ANYTHING.

SO WHAT ARE YOU TALKING ABOUT? I'VE GOT TO PAY FOR SOMETHING? ZAZZLE HAS TO PAY FOR THIS WHEN NOBODY ELSE ON THE UNIVERSE HAS TO PAY FOR IT?

MR. STEINBERG: I'M NOT SURE WHICH SITES YOUR HONOR IS REFERRING TO, BUT MY GUESS IS IF THEY'RE LICENSED TO ACTUALLY BE OFFERED --

THE COURT: THIS IS FONTSPRING.

MR. STEINBERG: OKAY. I DON'T KNOW THE CURRENT STATUS OF THAT.

THE COURT: WELL, THIS IS TWO DAYS AGO.

MR. STEINBERG: AND SO ARE YOU SAYING THAT YOU HAD THE FULL FUNCTIONALITY TO, LIKE, DO FULL DESIGNS AND ORDER THEM FROM FONTSPRING FOR FREE? I MEAN --

THE COURT: NO. SO IN THE REPORT HE SAYS ONE OF THE PROBLEMS HERE IS THAT A GOOD -- A CLEVER PERSON COULD TAKE A SCREENSHOT AND THEN CREATE BLOOMING ELEGANT.

WELL, I DIDN'T HAVE TO TAKE A SCREENSHOT. I WAS ABLE TO PRINT IT OUT MYSELF. I COULD CUSTOMIZE IT. I DIDN'T JUST COPY

WHAT IS OFFERED ON FONTSPRING.

AND SO THE PROBLEM OF ACCESS, THE PROBLEM HE IDENTIFIES OF PENDING DESIGNS IS NOT A PROBLEM BECAUSE IT'S FREE.  THIS IS AVAILABLE FOR SOMEONE WHO MIGHT WANT TO CONSIDER BUYING THE LICENSE.  I CAN SEE WHAT IT LOOKS LIKE BEFORE I BUY IT.

MR. STEINBERG:  BUT MY GUESS IS, YOUR HONOR, THAT WHATEVER TOOL YOU WERE USING DID NOT OFFER THE FULL RANGE OF ABILITIES THAT THE ZAZZLE TOOL OFFERED IN TERMS OF BEING ABLE TO DO COMPLETE DESIGNS OF ALL DIFFERENT KINDS OF PRODUCTS WITH COMPLETE CUSTOMIZATION, ADJUSTING THE FONT, ADJUSTING THE SIZE, THE ARRANGEMENT, ALL OF THAT.

THE COURT:  THAT'S ZAZZLE'S DESIGN TOOL.

MR. STEINBERG:  YES.

THE COURT:  AND NICKY LAATZ OWNED NOTHING ON THAT.

MR. STEINBERG:  NO, SHE DOESN'T.  BUT THE LICENSE MAKES CLEAR THAT IF YOU WANT TO INCORPORATE YOUR SOFTWARE INTO A TOOL LIKE THAT, THAT IS STILL SUBJECT TO THE LICENSE TERMS.

THE COURT:  AGREED.  IT IS PUTTING IT INTO DESIGN TOOLS.  AND THE CONSEQUENCE, WHICH NO ONE HAS PROVED THE VALUE OF, IS THAT PEOPLE CAN CREATE THEIR OWN PRODUCTS AND MOCK THEM UP.

MR. STEINBERG:  THAT IS ONE OF THE CONSEQUENCES, YOUR HONOR.

THE COURT:  IT'S A CONSEQUENCE, AND NO ONE HAS VALUED THAT.  THAT'S THE PROBLEM THAT I'M HAVING.

I DON'T HAVE -- MR. PERSECHINI IS YOUR DAMAGES EXPERT, AND HE HAS NOT VALUED THAT. HE HAS DONE NO -- HE TELLS ME HE'S DONE NO ANALYSIS. NOT EVERY BREACH HAS THE SAME VALUE. HE HASN'T, HE HASN'T VALUED THAT.

THE JURY HAS -- THE JURY HAS NO WAY TO VALUE THESE VARIOUS DIFFERENT TYPES OF BREACH.

MR. STEINBERG: SO WHAT HE HAS VALUED IS, FIRST OF ALL, HE TAKES THE ACCEPTED PER USER STATED PRICE, RIGHT, THE LICENSE PRICE, AND THEN WHAT HE IS TRYING TO FIGURE OUT IS, WELL, HOW MANY MORE SEATS, HOW MANY MORE USERS DID THEY ALLOW TO EXIST, DID THEY CREATE BY VIRTUE OF THIS RANGE OF BREACHES OF THE CONTRACT, AND HE COMES UP WITH THREE DIFFERENT WAYS TO DO THAT BECAUSE WE DON'T HAVE PRECISE DATA IN FRONT OF US.

ONE OF THE PROBLEMS -- THIS PENDING DESIGN ISSUE IS A REAL ISSUE. THESE ARE PEOPLE WHO ENGAGED WITH THE FONTS AND USED THE FONTS. THERE'S NO DISPUTE THAT THERE'S SOME ADDITIONAL NUMBER OF PEOPLE WHO WERE ABLE TO DO THAT, AND WE ARE NOT ABLE TO KNOW WHAT THAT IS BECAUSE OF THE HOLES IN THE DATA.

THE COURT: SO THE REMEDY FOR NOT HAVING DOCUMENTATION IS NOT TO BUMP UP TO ALL USERS WHO DIDN'T EVEN LOOK AT THE DESIGN. THAT'S NOT THE REMEDY.

MR. STEINBERG: THIS IS NOT ALL USERS. THIS IS ALL -- WHAT HE HAS DONE IS HE HAS DONE ALL USERS WHO USE THE DESIGN TOOL AND GOT TO THE POINT OF A FINISHED DESIGN.

IT STILL DOESN'T INCLUDE PENDING DESIGNS BEYOND THAT.

BUT THIS IS WHERE THE PARIKH SURVEY COMES IN.  SO ANOTHER WAY THAT HE TRIES TO GET TO IT IS --

THE COURT:  OKAY.  WE CAN MOVE TO PARIKH, I'M GLAD TO DO THAT.

MR. STEINBERG:  OKAY.  SO THE PARIKH SURVEY -- SO ONE OF THE QUESTIONS WOULD BE, OKAY, LET'S TAKE ALL OF THE PEOPLE WHO WENT TO THE DESIGN TOOL AND CREATED A FINISHED DESIGN, HOW MANY OF THEM USED BLOOMING ELEGANT?  HOW MANY OF THEM USED BLOOMING ELEGANT, RIGHT?  AND WE HAVE INCOMPLETE DATA ON THAT.

SO ONE WAY TO DO THAT IS HE TAKES PARIKH'S SURVEY.  ONE OF HER QUESTIONS WAS HAVE YOU USED BLOOMING ELEGANT BEFORE?  AND THIS IS TO PEOPLE WHO ARE REGULARLY ON ZAZZLE.  I SHOULD SAY THEY'RE NOT ALL PROFESSIONAL DESIGNERS BECAUSE BRONZE LEVEL PEOPLE ARE, I WOULD CHARACTERIZE THEM AS AMATEURS, RIGHT?  THEY DON'T HAVE TO SELL THAT MUCH TO HAVE A BRONZE LEVEL STORE.

BUT THESE ARE PEOPLE WHO USE IT FREQUENTLY, AND THESE ARE THE PEOPLE WHO THEN DETERMINE THE UNIVERSE OF PRODUCTS THAT OTHER USERS ARE OFTEN THEN USING AS A STARTING POINT.

THE COURT:  OKAY.  BUT THE PURPOSE OF THE SURVEY WAS NOT TO QUANTIFY HOW MANY PEOPLE OF THE ███████ USERS TO ZAZZLE USED BLOOMING ELEGANT.  THAT WASN'T THE FOCUS OF HER SURVEY, AND THERE'S NO REASON TO BELIEVE THAT DR. PARIKH WOULD HAVE ASKED THIS SINGLE THIN QUESTION TO PROVE WHAT YOU'RE TRYING TO PROVE.

AND MR. PERSECHINI DOES NOT GIVE ME ANY FOUNDATION FOR WHY THIS IS A RELIABLE NUMBER.  THERE'S THAT HUGE GAP.  AND, IN FACT, SHE HAS ONLY USED THIS NUMBER TO REACH HER FINAL CONCLUSIONS THAT IT IS -- THAT THERE IS AN AWARENESS AND USAGE OR -- THAT AWARENESS IS HIGH FOR ALL OF THEM, THAT -- LET'S SEE.  THAT IT'S UNIQUE.  I LOVE HER -- I'M NOT SURE WHAT VERY UNIQUE AND SOMEWHAT UNIQUE ARE.  I MEAN, HER LANGUAGE IS SO BAD HERE.  UNIQUE IS ONE OF A KIND.  THERE'S NO GRADATION OF ONE OF A KIND.  SO HER SURVEY USES LANGUAGE THAT IS IMPENETRABLE.

AND HER ULTIMATE CONCLUSION IS THAT IT IS IMPORTANT AND POPULAR, NOT THAT I HAVE DETERMINED TO A LEVEL OF MATHEMATICAL CERTAINTY THAT 54 PERCENT OF THE TRAFFIC ON THE DESIGN TOOL HAVE USED BLOOMING ELEGANT.  THAT WAS NOT HER GOAL.  AND THAT ONE LITTLE QUESTION, MR. PERSECHINI WOULD HAVE NEEDED TO GIVE ME A FULL ANALYSIS OF WHY THAT ONE LITTLE THIN QUESTION IS ENOUGH FOR HIM TO THEN TAKE IT THAT IT'S THE GOD'S HONEST TRUTH THAT 54 PERCENT OF THE USERS USE BLOOMING ELEGANT.  HE CAN'T DO THAT.  THERE'S NO FOUNDATION.

MR. STEINBERG:  WELL, THIS IS THE LARGEST SUBSET OF ZAZZLE USERS THAT WE HAVE AVAILABLE TO US.  IT'S A QUESTION THAT WAS ASKED TO THEM.

THE COURT:  I'M SORRY, 136 PEOPLE IS?

MR. STEINBERG:  IN TERMS OF DOING THE SURVEY, AND SHE DID THE SURVEY BEFORE THE LAWSUIT WAS FILED, BEFORE ANYBODY HAS HEARD OF IT.

THE COURT:  SO SHE TOOK THE 136 WHO ARE A SUBSET OF THOSE SHE ASKED TO PARTICIPATE FROM A GROUP OF HIGH USERS OF ZAZZLE, FREQUENT USERS.  I DON'T KNOW WHAT YOU --

MR. STEINBERG:  I MIGHT SAY REGULAR USERS.

THE COURT:  REGULAR IS FINE.

MR. STEINBERG:  IDENTIFIABLE USERS.  SO PART OF THE ISSUE WAS, YOU KNOW, PEOPLE WHO HAVE A SHOT TYPICALLY CAN FIGURE OUT WHO THEY ARE SO YOU MAKE SURE YOUR UNIVERSE -- YOU'RE STARTING FROM THE RIGHT PLACE AND NOT JUST CASTING OUT IN THE DARK TO TRY TO FIND PEOPLE WHO MAY OR MAY NOT HAVE USED ZAZZLE EVER IN THE PAST.

THESE ARE PEOPLE WHO USE THE SITE REGULARLY, AND THEY ARE PEOPLE WHO DETERMINE WHAT ARE THE UNIVERSE OF DESIGNS THAT ARE THEN PRESENTED TO USERS WHEN THEY COME TO THE SITE.  THEY'RE VERY IN TOUCH WITH WHAT IS MOST POPULAR BECAUSE WHAT GETS YOU TRAFFIC TO YOUR SHOP IS HAVING MORE POPULAR DESIGNS THAT MOVE UP THE SEARCH RESULTS.

SO THIS IS ONE SAMPLE OF PEOPLE, AND 54 PERCENT HAD USED BLOOMING ELEGANT AND 46 PERCENT HAD NOT.

SO IN THE ABSENCE OF MORE PRECISE DATA FROM ZAZZLE ABOUT HOW MANY PEOPLE USED THE FONT, WHETHER IN A 5 INCH OR PENDING DESIGN, MR. PERSECHINI TAKES THIS DATA AND THEN APPLIES IT TO THAT LARGER NUMBER.

YOU KNOW, WHERE THE --

THE COURT:  SO I WILL JUST NOTE -- AND THIS IS A

SURVEY SPECIALIST ISSUE.  SHE WENT TO THIS GROUP OF REGULAR USERS, AND SHE QUANTIFIED THAT TOTAL AS ABOUT 1600 USERS WHO SHE COMMUNICATED WITH THROUGH EMAIL AND CLICKING A LINK, AND SHE GOT 136 OUT OF 1600.  SO SHE'S NOT SURVEYING ALL OF THESE HIGH USERS.  SHE'S JUST SURVEYING THOSE WHO ARE WILLING TO PARTICIPATE, AND SHE KNOWS NOTHING ABOUT THEIR PARTICULAR IDENTITIES, EXCEPT THAT THEY WERE WILLING TO TAKE A SURVEY.

MR. STEINBERG:  WELL, LIKE ANY SURVEY, YOU HAVE TO START WITH THE UNIVERSE AND YOU HAVE TO FIGURE OUT HOW YOU CAN CONTACT PEOPLE.

THE COURT:  SURE.

MR. STEINBERG:  SO PART OF IT WAS WHO ARE MORE REGULAR USERS OF ZAZZLE SITE, THAT WOULD BE SHOP OWNERS, AND CAN YOU FIND CONTACT INFORMATION?  YOU KNOW, SHE DIDN'T HAVE CONTACT INFORMATION FOR EVERY SINGLE SHOP OWNER.  NOT EVERYONE MAKES IT AVAILABLE.

SO THE STARTING POINTS WERE PEOPLE WHO HAVE SHOPS GOING ALL OF THE WAY DOWN TO I THINK IT WAS THE BRONZE LEVEL IF I RECALL, BUT MR. MATHEWS KNOWS MORE ABOUT THE DETAILS THERE, AND PEOPLE WHO HAD CONTACT INFORMATION THAT COULD BE CONTACTED.

OF COURSE, IN ANY SURVEY YOU'RE GOING TO HAVE SOME NUMBER OF PEOPLE WHO CHOOSE TO PARTICIPATE AND SOME WHO DON'T.

BUT CERTAINLY THE PEOPLE WHO CHOSE TO PARTICIPATE, THEY WEREN'T SCREENED BY WHETHER THEY WERE FAMILIAR WITH BLOOMING ELEGANT BEFOREHAND OR NOT.  YOU KNOW, NOTABLY THE SURVEY WAS

DONE BEFORE THIS LAWSUIT WAS FILED, BEFORE THERE WAS ANYTHING IN THE NEWS ABOUT BLOOMING ELEGANT OR ANY DISCUSSION AMONGST DESIGNERS ABOUT THIS LAWSUIT.  YOU KNOW, PROBABLY UNDERSTANDABLY, A LOT OF THE ZAZZLE DESIGNERS NOW, PEOPLE WHO HAVE USED ZAZZLE ARE FAMILIAR WITH THE LAWSUIT.  SO I THINK IT WOULD BE HARDER TO TRY TO GET UNBIASSED DATA AT THIS POINT.

THE COURT:  SURE.

MR. STEINBERG:  SO, YOU KNOW, SHE DOES THAT.  IT'S ONE WAY -- IT'S ANOTHER WAY THAT WE HAVE TO SURVEY THE UNIVERSE OF ZAZZLE USERS AND TRY TO FIGURE OUT WHAT PERCENTAGE WERE ENGAGED WITH BLOOMING ELEGANT IN SOME WAY BECAUSE WE DIDN'T GET ALL OF THE DATA FROM ZAZZLE.

YOU KNOW, WE CITED CASE LAW IN OUR BRIEFING THAT WHERE THE DIFFICULTY IN CALCULATING DAMAGES WITH PRECISION IS DUE TO THE DEFENDANTS' FAILURE TO PRODUCE EVIDENCE OR PRESERVE EVIDENCE. THAT SHOULDN'T BE HELD AGAINST THE PLAINTIFF, THE FACT THAT YOU CAN'T COME UP WITH THE EXACT NUMBER.

THE COURT:  NO, IT'S NOT.  I'M LOOKING AT IT DIFFERENTLY THAN THAT.

YOU'RE TAKING A SURVEY THAT WAS SEEKING TO VALIDATE A DIFFERENT SET OF ISSUES THAN WHAT MR. PERSECHINI ISSUES IT FOR. THIS SURVEY WAS NOT INTENDED TO QUANTIFY THE NUMBER OF DESIGN TOOL USERS WHO USE BLOOMING ELEGANT.  THAT'S NOT WHAT -- AND SO THEN WHAT I'M LOOKING FOR IS MR. PERSECHINI'S ANALYSIS AS TO WHY HE CAN USE IT FOR THAT PURPOSE, AND I HAVE CRICKETS ON

THAT.  HE JUST TOOK IT.  HE JUST USED IT AND ASSUMED IT WAS VALID FOR HIS PURPOSES, AND I HAVE NO ANALYSIS OF THAT, SO HE HAS NO FOUNDATION.

MR. STEINBERG:  BUT I THINK AS HE NOTES, YOU KNOW, ONE OF THE THINGS THAT IS UNIQUE ABOUT ZAZZLE'S SITE IS THAT THEY HAVE THESE DIFFERENT SHOPS, RIGHT?  IT'S NOT ITS OWN MARKETPLACE.  IT HAS THESE OTHER INDIVIDUAL MARKETPLACES.

IT'S NOT UNREASONABLE TO ACCEPT THAT IF 54 PERCENT OF THE SHOP OWNERS HAVE USED BLOOMING ELEGANT, AND THEN THE LARGER UNIVERSE OF USERS ARE BEING FUNNELED INTO THOSE SHOPS, THAT THAT'S A REASONABLE APPROXIMATION OF HOW MANY OF THEM HAVE INTERACTED.

THE COURT:  I WOULD BE GLAD TO READ THAT IN HIS REPORT.  I MUST HAVE MISSED IT.  TELL ME WHERE HE DID THAT. I'VE GOT IT RIGHT HERE.

MR. STEINBERG:  WELL, I MEAN, I DON'T THINK HE GOES INTO A WHOLE LOT OF DETAIL ABOUT MS. PARIKH'S SURVEY.

THE COURT:  NO, NO.  THE SURVEY SAYS WHAT IT SAYS. IT'S ACTUALLY VERY COMPLETE IN EXPLAINING STEP BY STEP.

HE TOOK ONE NUMBER FROM IT, BUT SHE DOESN'T REALLY TALK ABOUT IT THAT MUCH, AND APPLIES IT TO A GENERAL PRINCIPLE ABOUT APPEAL OR SAYS IT HAS HIGH USAGE.

SHE'S NOT CONCLUDING ANYTHING ABOUT THE 54 PERCENT EXCEPT HER REPORT, THIS IS WHAT MY SURVEY REVEALED AS RAW DATA.

HE'S TAKING IT FOR A DIFFERENT PURPOSE, AND I HAVE NO

FOUNDATION IN HIS REPORT FOR THE VALIDITY OF USING IT THE WAY HE'S USING IT, AND THAT'S WHY IT LACKS FOUNDATION.

MR. STEINBERG:  OKAY.  I UNDERSTAND.

THE COURT:  SO CIRCLING BACK TO THIS -- I'M GOING TO TAKE THE PENDING DESIGNS OUT.  IT'S THE ACCESS, THE ███████. I NEED TO KNOW HOW YOU'RE GOING TO PROVE THAT AND WHY IT CAN BE SEPARATED FROM THE DAMAGES EXPERT WHO MERELY ACCEPTS IT AS A FINDING THAT EVERY USER WHO HAS ACCESS TO BLOOMING ELEGANT IS CAUSING A $14 DAMAGE TO MS. LAATZ.

MR. STEINBERG:  SO -- AND I'M SORRY IF I'M REPEATING MYSELF, BUT IT'S GOING BACK TO -- IT'S NOT SO MUCH LOOKING AT HOW IT'S CAUSING HER HARM, THAT SHE'S SUFFERING IN SOME WAY. IT'S THAT SHE OFFERED IT -- BUT IT IS.  SHE OFFERED HER LICENSE FOR THIS PRICE PER SEAT PER USER.

AND IF ZAZZLE WANTED TO PROVIDE IT TO ████████ USERS ON THE FRONT END, THEY COULD HAVE COME TO HER AND SAID BUY █ ██████ SEATS.

THE COURT:  THEN THE JURY IS GOING TO BE ASKED TO ANSWER THAT QUESTION AS THE SOLE QUESTION FOR BREACH TO REACH ███████.

DO YOU FIND THAT EACH AND EVERY USER ON THE DESIGN TOOL WHO ENTERED THE DESIGN TOOL, WHETHER OR NOT THEY EVEN SAW BLOOMING ELEGANT BREACH THE -- CAUSED A BREACH OF THE LICENSE THAT ZAZZLE IS RESPONSIBLE FOR?  THAT'S WHAT YOU WANT THE JURY TO ANSWER.

MR. STEINBERG:  I THINK SOMETHING SIMILAR TO THAT, BUT I THINK ALSO BECAUSE WHERE ZAZZLE FAILED TO PRESERVE AND PRODUCE EVIDENCE OF HOW MANY PEOPLE USED THE FONTS --

THE COURT:  YOU'VE SKIPPED.  STAY WITH THE ACCESS.

MR. STEINBERG:  I AM, YOUR HONOR, I AM.

THE COURT:  YOU ARE NOT.  YOU'RE MOVING TO PENDING DESIGNS.

MR. STEINBERG:  BUT IT'S A PROXY FOR THAT IN SOME WAYS AS WELL, BECAUSE WE DON'T HAVE ANY PENDING DESIGN DATA. THEY CHOSE NOT TO PRESERVE AND PRODUCE IT.

THE COURT:  SO LET'S --

MR. STEINBERG:  SO, SO --

THE COURT:  YOU CAN'T SAY THAT EVERYBODY LOOKED AT BLOOMING ELEGANT.  IT'S NICE, BUT COME ON, IT'S NOT UNIVERSAL.

MR. STEINBERG:  SO LET ME GIVE YOU ANOTHER ANALOGY. IF YOU GO TO A MUSEUM AND YOU PAY $5 TO GET IN, AND IT DOESN'T MATTER IF YOU LOOK AT NO PAINTINGS OR YOU LOOK AT EVERY SINGLE PAINTING IN THE MUSEUM, OR MAYBE YOU JUST GO TO THE BATHROOM AND YOU LEAVE, BUT YOU HAVE TO PAY $5 TO GET IN.

BUT YOU GO TO THE BACK DOOR AND YOU OPEN IT UP AND YOU LET 100 MILLION MORE PEOPLE INTO THE MUSEUM WITHOUT PAYING AND --

THE COURT:  THE LICENSE --

MR. STEINBERG:  -- YOU KNEW THE PRICE WAS $5.

THE COURT:  NO.  THE LICENSE IS FOR ACCESS TO THE WHOLE MUSEUM, NOT ACCESS -- WHAT YOU'RE REALLY SAYING IS THAT

FOR THE USERS, YOU PAY A LICENSE FOR BLOOMING ELEGANT, AND I'M GOING TO PUT A HOOD OVER YOUR HEAD AND TAKE YOU INTO THE MUSEUM UNTIL I GET TO THE BLOOMING ELEGANT PICTURE FRAME, BECAUSE YOU CAN'T LOOK AT ANYTHING ELSE.

MR. STEINBERG:  BUT LET'S SAY SOMEONE SAID I'LL GIVE YOU -- I'LL LET YOU SHOW MY PAINTING, BUT YOU'VE GOT TO GIVE ME A DOLLAR FOR EVERY ADMISSION FEE REGARDLESS OF WHETHER THEY STOP AND LOOK AT IT, RIGHT?

THE COURT:  OKAY.  WE'RE GOING IN CIRCLES.  OKAY.  I THINK WE'VE COVERED THIS.

MR. STEINBERG:  OKAY.  I'M SORRY, YOUR HONOR.

THE COURT:  AND I HAVE TO FIGURE OUT WHETHER THIS, WHETHER THIS GOES OUT HERE FOR LACK OF FOUNDATION OR WHETHER WE'VE GOT A LOT OF WORK TO DO ON THIS ISSUE OF YOUR THEORIES OF BREACH BECAUSE IT'S NOT ADDING UP TO ME.  IT'S NOT ADDING UP.

MR. STEINBERG:  I HOPE WE HAVE THE OPPORTUNITY TO CLARIFY THAT FOR YOU, YOUR HONOR.

THE COURT:  WELL, WE DON'T HAVE MUCH TIME.

MR. STEINBERG:  I MEAN, I THINK WE'VE --

THE COURT:  BECAUSE I THINK YOU'VE GOT SOME EXTRAORDINARY GAPS IN YOUR ANALYSIS, AND YOU'RE USING THIS DESNY CASE THAT I THINK YOU'RE NOT USING CORRECTLY ON THE ACCESS PART.

ON THE PENDING DESIGNS, THAT'S A -- I'M STRUGGLING WITH THAT IN A DIFFERENT WAY.  THAT'S WHY ACCESS IS NOT A PROXY FOR

THE PENDING DESIGNS.

BEING IN THE ROOM IN THE STORE WITH 10,000 OBJECTS IS NOT THE SAME AS PICKING UP THE SNOW GLOBE AND WALKING OUT WITH IT, OR PICKING IT UP AND MANIPULATING IT AND PUTTING IT BACK.

MR. STEINBERG:  BUT WHERE THE STORE OWNER BASICALLY DECIDES TO LOOK THE OTHER WAY AND SAYS I CAN'T TELL YOU HOW MANY PEOPLE ACTUALLY PICKED IT UP, I CAN'T TELL YOU HOW MANY PEOPLE ACTUALLY EVEN TOOK IT BECAUSE I HAVE INCOMPLETE RECORDS. WE'RE NOT EVEN --

THE COURT:  THAT, I'M NOT ALLOWING INTO EVIDENCE. THAT HAS NO BASIS TO SAY THIS SUBSET OF PENDING DESIGNS, LET'S SAY IT'S ONE -- LET'S SAY IT'S ███████████████  I'M NOT GOING TO GIVE YOU THE OPPORTUNITY TO TELL THE JURY.  SO BECAUSE THERE'S NO EVIDENCE HERE, WE'RE JUST GOING TO ASSUME THAT EVERYBODY LOOKED AT IT.

MR. STEINBERG:  BUT ISN'T IT FOR THE JURY TO DECIDE WHERE TO COME DOWN IN THE IN BETWEEN THE SORT OF INCOMPLETE NUMBERS THAT WE HAVE?

THE COURT:  NO, YOU'RE SPECULATING.  YOU'RE ASKING THE JURY TO SPECULATE OF HOW MANY MARKED UP BLOOMING ELEGANT.

MR. STEINBERG:  SO IT'S NOT JUST SPECULATION, THAT'S WHY WE'VE HAD -- THAT'S WHY MR. PERSECHINI HAS OFFERED A FEW DIFFERENT WAYS TO TRY TO GET AT IT.  AMONG OTHER THINGS, HE'S LOOKED AT THE NUMBER OF PEOPLE WHO ACCESS THE TOOL TO GET TO A FINISHED DESIGN.  THAT'S STILL INCOMPLETE.  THAT DOESN'T

INCLUDE AN ADDITIONAL HUNDRED PEOPLE.

THE COURT:  I UNDERSTAND.

MR. STEINBERG:  HE ALSO HAS TRIED TO USE MS. PARIKH'S DATA TO TRY TO COME UP WITH ANOTHER ESTIMATE, WELL, HOW MANY PEOPLE ACTUALLY USE BLOOMING ELEGANT?

THE COURT:  I'M NOT GOING TO ALLOW THAT.

MR. STEINBERG:  AND I KNOW YOUR HONOR HAS CONCERNS ABOUT THAT.

SO IT'S NOT MERE SPECULATION.  HE'S TRYING HIS BEST TO COME UP WITH DIFFERENT WAYS THAT WE MIGHT GET CLOSER TO THE REALITY.

THE COURT:  SO HE'S NOT SPECULATING THAT ███ PEOPLE HAD ACCESS TO THE DESIGN TOOL.

MR. STEINBERG:  THAT'S TRUE.

THE COURT:  AND I KNOW THAT NUMBER MAY BE IN CONTENTION.  THAT'S NOT MY POINT.

HE'S NOT SPECULATING ON THAT.  HE'S ASKING THE JURY TO FANTASIZE THAT ALL OF THEM LOOKED AT BLOOMING ELEGANT.  LIKE I SAID, IT'S NICE, BUT COME ON, IT'S NOT UNIVERSAL.

AND WHAT ARE THERE, 1,000 FONTS ON ZAZZLE?  YOU KNOW, NOT EVERYBODY SCROLLS THROUGH ALL OF THEM.

SO THAT'S THE PROBLEM.  IT'S THAT THAT'S THE GAP.  YOU'RE TRYING TO REMEDY A LACK OF EVIDENCE.  I DON'T EVEN KNOW WHAT IS GOING TO HAPPEN WITH PENDING DESIGNS, BECAUSE, AGAIN, THAT DEPENDS ON WHAT THE JURY DEFINES AS A BREACH ALLOWING THE

PENDING -- THE MOCK-UP, IS THAT A BREACH?

IF YOU DEFINE THE BREACH OR IF THEY ONLY DEFINE THE BREACH AS PUTTING IT ON THE SERVER, THEN WE'RE RIGHT BACK INTO THE BUCKET OF WHAT IS THE CONSEQUENCE OF PUTTING IT ON THE SERVER AND WHAT IS THE VALUE, AND YOU HAVE NO EVIDENCE ON THAT.

MR. STEINBERG:  YOUR HONOR, I WOULD GO BACK TO THE CONTRACT.  AGAIN, THE LICENSE THAT WAS OFFERED AND ACCEPTED HERE DOES NOT DEPEND ON WHETHER A LICENSEE ACTUALLY DECIDES TO --

THE COURT:  SO YOU'RE GOING TO HAVE TO ASK THE JURY IF EACH OF THOSE SCENARIOS IS A BREACH.  AND IF YOU ONLY COME UP WITH PLACING IT ON THE SERVER AS A BREACH, THEN WE'RE GOING -- THEN YOU DON'T HAVE EVIDENCE THAT THE VALUE OF THE ACCESS IS EQUAL TO THE VALUE OF CREATING THE FINISHED PRODUCT.

MR. STEINBERG:  IT'S -- BUT THE LICENSE, IF YOU PUT IT ON THE SERVER AS OPPOSED TO ON A LOCAL MACHINE, AND YOU THEREBY PROVIDE SOME NUMBER OF ADDITIONAL USERS, WHETHER IT'S A MILLION OR ████████ --

THE COURT:  PROVIDE WHAT IS ALREADY FREE.

MR. STEINBERG:  SO, YOUR HONOR, I DON'T KNOW THE CIRCUMSTANCES OF THAT PARTICULAR LICENSE.  I ASSUME THAT FONTSPRING WITH -- YOU KNOW, PRESUMABLY FONTSPRING IS PROPERLY LICENSED TO OFFER WHATEVER IT IS OFFERING.  I DON'T KNOW IF THAT'S THE CASE, YOUR HONOR.

THE COURT:  I HAVE NO REASON TO DOUBT THAT EITHER.

MR. STEINBERG:  BUT I'M NOT SURE.

THE COURT:  BUT I GOT THIS FOR FREE IS ALL I'M SAYING.

MR. STEINBERG:  I UNDERSTAND.

THE COURT:  I GOT THIS FOR FREE.

MR. STEINBERG:  BUT WHAT WE HAVE TO LOOK AT HERE, TO GO BACK TO THE ANALOGIES, THE FACT THAT SOMEONE ELSE MAY HAVE STOLE IT TOO OR IS GIVING IT AWAY FOR FREE OR THE FACT THAT SOMEBODY ELSE IS CHARGING A DOLLAR INSTEAD OF $14 DOESN'T ABSOLVE YOU IF YOU DECIDE TO ACCEPT THAT STATED PRICE AND GIVE IT OUT TO SOME NUMBER OF USERS.

AGAIN, YOU CAN'T, AS THE PERSON WHO ACCEPTED IT, BOTH FOR THE ONE YOU ACTUALLY PAID FOR AND FOR THE ADDITIONAL ONES, YOU CAN'T THEN COME BACK AND SAY, WELL, HOLD ON A SECOND, I COULD HAVE GOTTEN IT DOWN THERE CHEAPER OR THEY COULD HAVE GOTTEN IT CHEAPER.

THE COURT:  WE'LL GET TO THAT IN YOUR MOTIONS.

MR. STEINBERG:  AND THE LICENSE SAYS THAT YOU CAN'T MAKE IT AVAILABLE TO OTHERS, NOT EVEN FOR FREE.

THE COURT:  SO IF AT ALL, YOU HAVE TO PROVE THIS IN LIABILITY BECAUSE MR. PERSECHINI IS NOT YOUR WITNESS ON THIS.

MR. STEINBERG:  UNDERSTOOD, YOUR HONOR.

THE COURT:  HE IS NOT A WITNESS ON -- HE'S NOT AN EXPERT WITH OPINIONS ON THE VALUE OF THE BREACHES.  HE IS ONLY A WITNESS FOR THE ARITHMETIC OF IF YOU, JURY, FIND, THAT IT WAS

EACH OF THE ████████ USERS WERE CAUSED A SEPARATE BREACH OF THE LICENSE, THEN HIS TESTIMONY COMES IN.

MR. STEINBERG: WELL, AND JUST TO SORT OF PUT A FINER POINT ON IT, IT'S NOT THAT EACH OF THEM CAUSED IT, IT'S THAT ZAZZLE CAUSED THE BREACH AND THAT EACH ONE OF THOSE PEOPLE MADE IT AVAILABLE TO.

THE COURT: AND I'M RIGHT BACK TO THAT'S THE CONSEQUENCE OF ZAZZLE'S BREACH. EITHER EACH OF THE USERS CAUSED THE BREACH -- NOT THAT THEY'RE LIABLE FOR IT, BUT THEIR CONDUCT CAUSED THE BREACH BY ENTERING THE DESIGN TOOL, OR IT WAS PUTTING IT ON THE SERVER, WHICH IS A SINGLE BREACH, THAT HAS A CONSEQUENCE IN VALUE.

ALL RIGHT. I'M GOING TO HEAR FROM MR. NOLAN TO WRAP THIS ONE UP SO WE CAN MOVE ON.

MR. STEINBERG: ARE THERE ANY OTHER POINTS YOUR HONOR WANTED ME TO ADDRESS?

THE COURT: NO, THAT WAS IT. I THINK IT WAS THOSE TWO THEORIES.

MR. STEINBERG: OKAY. I DID WANT TO MAKE, YOU KNOW, ONE MORE POINT. YOU KNOW, I THINK THIS DERIVATIVE WORK LANGUAGE IS IMPORTANT, TOO. THE DESIGN LANGUAGE IS A DERIVATIVE WORK.

SO WHAT THE LICENSE SAYS IS THAT IF YOU USE IT TO CREATE A DERIVATIVE WORK, THAT IS SUBJECT TO LICENSE. IN OTHER WORDS, ALL OF THOSE TERMS LIKE SINGLE SEAT, ONE USER, NOT MAKING IT

AVAILABLE TO OTHERS NOT EVEN FOR FREE, ET CETERA.

SO THE FACT THAT THE SOFTWARE WAS INCORPORATED INTO A DESIGN TOOL MADE INTO THIS DERIVATIVE WORK AND THAT THAT NOW IS WHAT IS BEING OFFERED ONLINE OR BEING OFFERED ON THE SERVERS DOESN'T SOMEHOW MAKE IT NO LONGER SUBJECT TO ALL OF THOSE SAME LIMITATIONS, AND THAT'S PART OF WHY THAT --

THE COURT:  AGAIN, THAT'S ONE BREACH, PUTTING IT ON THE DESIGN TOOL.

THE VALUE OF THAT BREACH, THE CONSEQUENCE OF THE BREACH IS ALL THE PEOPLE THAT USED IT.

SO IF ZAZZLE IN FACT ONLY HAD ██████ USERS, THERE WOULD BE LESS DAMAGES THAN THE ██████ YOU ARE GOING FORWARD WITH.

MR. STEINBERG:  OF COURSE, YOUR HONOR.

THE COURT:  RIGHT.  AND, OF COURSE, THE USERS DIDN'T DO ANYTHING WRONG, BUT THEY ARE THE ONES WHO TRIGGERED EACH OF WHAT YOU CALL ARE BREACHES AND WHAT IT'S REALLY LOOKING LIKE IS THAT ITS PLACEMENT OF THE SOFTWARE ON THE DESIGN TOOL, WHICH IS A SINGLE ACT, MAYBE MULTIPLIED BY SERVERS.  I DON'T KNOW THAT PART OF IT.

SO THAT'S WHERE I SEE THIS AS A BIG HOLE IN THE CASE.

OKAY.  MR. NOLAN, WOULD YOU LIKE TO FINISH UP?

MR. NOLAN:  THANK YOU, YOUR HONOR.

I'M LARGELY JUST GOING TO REITERATE YOUR QUESTIONS, BUT DON'T LET ME GO ON TOO LONG.

THE COURT:  WELL, MAYBE I BUNDLED YOUR CASE FOR YOU.

MR. NOLAN:  NO, I DON'T THINK SO AT ALL.  I THINK IT'S BEEN AN ELUCIDATING EXCHANGE BETWEEN YOU AND PLAINTIFF'S COUNSEL.  WHAT THEY ARE REALLY -- IT'S BECOME VERY CLEAR, MORE SO THAN EVER BEFORE, THAT WHAT THEY'RE ASKING FOR IS $14 PER ACCESS, PER USER PER ACCESS, RIGHT, WITH NO BASIS OF ESTABLISHING WHAT THE VALUE OF EACH OF THOSE ACCESSES ARE.  THAT'S JUST -- WE WANT $14 FOR EVERY SINGLE ONE, RIGHT?

AND DESNY DOESN'T SAY THAT.  THE CASES THAT DESNY CITES DO NOT SAY THAT, RIGHT?  AND THE CASES THAT FOLLOW DESNY DON'T SAY THAT EITHER.

BUT THE CASES DO SAY, AND WE CITE MANY IN OUR BRIEF, IS THAT CONTRACT DAMAGES CAN'T BE A WINDFALL, RIGHT?  AND THE DICTIONARY DEFINITION OF A WINDFALL WOULD BE CHARGING $14 FOR EVERY SINGLE PERSON TO ACCESS THE DESIGN TOOL.

BLOOMING ELEGANT IS A FONT, ONE OF HUNDREDS OF FONTS IN THE DESIGN TOOL.  BLOOMING ELEGANT DOES NOT GET TO CHARGE THE ADMISSION FOR THE DESIGN TOOL FOR EVERY SINGLE USER INTO THE DESIGN TOOL.  THERE'S NO BASIS IN THE RECORD FOR THAT, THERE'S NO BASIS IN DESNY FOR THAT, AND IT RUNS CONTRARY TO ALL OF THE CASES THAT WE CITE IN OUR PAPERS THAT WE RELY ON THAT SAY CONTRACT DAMAGES CAN'T BE A WINDFALL.

AND WHAT COUNSEL SAID IS ONE OF THE WAYS THAT ZAZZLE COULD HAVE AVOIDED ALL OF THIS IS PAY THOSE $20, $14 FOR EVERY SINGLE USER.

SO THAT'S -- I SUPPOSE THEY COULD HAVE AVOIDED THE LAWSUIT

BY PAYING ███████ AT THE OUTSET.

THE COURT:  SO YOU CONTEND THAT THIS IS A DAMAGES ISSUE ON VALUATION?

MR. NOLAN:  THAT'S RIGHT, THAT'S RIGHT.  AND THERE IS NO BASIS IN MR. PERSECHINI'S REPORT TO SAY THAT ALL ACCESS OF -- THAT EVERY SINGLE ACCESS BY EVERY USER OF ZAZZLE, WHETHER THEY LOOKED AT BLOOMING ELEGANT OR NOT, COSTS NICKY LAATZ THE SAME.

IN FACT, COUNSEL CAME DANGEROUSLY CLOSE TO SAYING THAT NICKY LAATZ WAS NOT ACTUALLY HARMED IN THAT AMOUNT BY EVERY SINGLE POINT BEFORE WALKING IT BACK AND SAYING, WELL, ACTUALLY WE SHOULD TALK ABOUT DESNY AND THE $14 PRICE AS STATED IN THE CONTRACT.

THERE'S NO BASIS FOR A DAMAGES EVALUATION OF $14 FOR EVERY ACCESS TO THE DESIGN TOOL FOR EVERY TIME, FOR THE ENTIRE TIME THAT BLOOMING ELEGANT WAS ON THERE.

THE COURT:  OKAY.

MR. NOLAN:  SECOND POINT.

THE COURT:  YESTERDAY.

MR. NOLAN:  THE LICENSED ASSET HERE IS THE ITEM, WHICH IS THE SOFTWARE.  IT IS NOT THE OUTPUT OF THE SOFTWARE. THE OUTPUT OF THE SOFTWARE IS NOT COPYRIGHTABLE.  IT'S IN THE CFR.  IT'S A FONT.

THE ITEM LICENSED IS THE THING THAT YOU GET WHEN YOU BUY THE LICENSE, WHICH IS THE SOFTWARE.  THAT SOFTWARE ZAZZLE PUT

ON ZAZZLE SERVERS, AND WE CAN DISCUSS WHETHER THAT'S A BREACH OF A LICENSE OR NOT, WE THINK IT'S NOT, BUT IT IS NOT TRUE FACTUALLY IN TERMS OF THE ACTUAL SOFTWARE THAT USERS WHO ACCESSED THE DESIGN TOOL ACCESSED THE PARTICULAR SOFTWARE THAT ZAZZLE DOWNLOADED FROM CREATIVE MARKET AND THEN INSTALLED. THEY JUST DID NOT.

AND ZAZZLE DOES NOT DISTRIBUTE THAT SOFTWARE.  NO ONE IS SENDING THAT FILE TO ANYBODY ELSE WHO IS USING ZAZZLE'S DESIGN TOOL.  THOSE PEOPLE ARE ALL USING DESIGN TOOL AS A PORTAL.

THE COURT:  SO LET ME JUST MOVE YOU TO THE PENDING DESIGN ISSUE, WHICH I THINK IS VERY DIFFERENT THAN THE ACCESS ONE.  I WANT TO PUT THE ACCESS -- BECAUSE I'M ASSUMING ACCESS IS REALLY ABOUT PEOPLE WHO REALLY NEVER SAW BLOOMING ELEGANT.

PENDING DESIGN IS PEOPLE WHO ACTUALLY MOCK SOMETHING UP. THEY JUST --

MR. NOLAN:  RIGHT.

THE COURT:  -- DIDN'T LIKE IT.

MR. NOLAN:  RIGHT.  THEY TRIED IT OUT.  GO TO MACY'S, TRYING ON THE PANTS, THEY DON'T FIT, YOU MOVE ON, RIGHT?

AND I THINK THE PIECE OF PAPER THAT YOUR HONOR JUST HELD UP FROM FONTSPRING, IT TELLS THAT STORY.  LIKE, THAT'S WHAT A PENDING DESIGN IS.  YOU CAN GO ON FONTSPRING AND DO IT FOR FREE.  YOU DO NOT HAVE TO PAY $14 TO ACCESS FONTSPRING. FONTSPRING DOES NOT PAY $14 TO NICKY LAATZ FOR EVERYONE WHO

DOES.

THE COURT:  I DON'T THINK MR. PERSECHINI SEPARATELY VALUES PENDING DESIGNS.

MR. NOLAN:  HE DOES NOT.  HE SAYS HE DOESN'T HAVE TO BECAUSE DESNY SAYS SO.  DESNY DOESN'T SAY THAT.

BUT HE SAYS I DON'T HAVE TO DO THAT.  THIS WAS THE FRAMEWORK THAT WAS GIVEN TO ME BY COUNSEL AND THAT I UNDERSTAND TO BE ALLOWED BY CALIFORNIA CASE LAW, WHICH IT DOES NOT AS A MATTER OF LAW, AND HE DOES NOT DO HIS OWN INDEPENDENT VALUATION OF HOW MUCH THAT IS WORTH.

THE COURT:  OKAY.  SO THERE MAY BE -- IF THE JURY REJECTS ACCESS, THERE'S NO EVIDENCE ON PENDING DESIGNS.

AND MUCH TO -- MR. STEINBERG IS RIGHT, THERE WAS NO EVIDENCE, NO DOCUMENTATION THAT YOU PRESERVED THAT YOU COULD GIVE THEM.

OKAY.  THEN I THINK THE LAST THING WAS THE USE OF THE 54 PERCENT NUMBER FROM THE PARIKH SURVEY.

MR. NOLAN:  YES, AND I WILL JUST REST ON MY EARLIER COMMENTS THAT THE 54 PERCENT NUMBER DOES NOT TRACK ACCESS TO ALL OF THE ■■■■■ USERS AT ALL.  IT WASN'T INTENDED TO.

PARIKH DID NOT MEAN THE SURVEY TO BE USED FOR THAT PURPOSE.  MR. PERSECHINI DID NOT REPURPOSE THE SURVEY OR DO AN ANALYSIS WITH THE INFORMATION FOR THAT PURPOSE EITHER.  THERE'S NO FOUNDATION TO APPLY.

THE COURT:  HE JUST DIDN'T ANALYZE WHY IT WAS

TRANSFERRABLE.

MR. NOLAN:  RIGHT.

THE COURT:  OKAY.  I THINK WE'VE NOW CONCLUDED THE MOTIONS THAT YOU BROUGHT; IS THAT RIGHT, MR. NOLAN?

MR. STEINBERG:  YOUR HONOR, MAY I RESPOND ON JUST ONE NEW POINT THAT JUST CAME UP FROM YOUR HONOR?

THE COURT:  I'M SORRY.  LET ME JUST GET THE ANSWER TO THIS.  WE'VE BEEN THROUGH ALL OF THE EXPERTS THAT YOU'VE CHALLENGED?

MR. NOLAN:  YES.

MR. STEINBERG:  YES.

THE COURT:  OKAY.  AND THEN, MR. STEINBERG, YOU HAVE ONE MORE POINT?

MR. STEINBERG:  YES, YOUR HONOR.  I DON'T WANT TO REPEAT MYSELF, BUT I JUST -- THERE WAS ONE POINT THAT JUST CAME UP ABOUT THE EVIDENCE OF PENDING DESIGN.

SO IT'S NOT ONLY -- THERE WAS SOME EVIDENCE THAT COULD HAVE BEEN PRODUCED, AND WE TALKED ABOUT -- WE CITE THIS IN OUR PAPERS.

SO WHAT ZAZZLE'S WITNESS TESTIFIED THAT ███████

███████████████████████████████████████████████

███████████████████████████████  HE COULDN'T BE QUITE PRECISE ABOUT HOW MUCH IT WAS.

███████████████████████

███████████████████████████

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

AND MR. GARRIE, I BELIEVE, IN HIS DECLARATION EXPLAINED, AND ZAZZLE ADMITTED, THAT THERE MIGHT BE SOME ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ THAT COULD HAVE BEEN GLEANED IN THIS CASE, BUT THEY RESISTED EFFORTS TO PRODUCE THAT, AND THAT WAS PART OF WHY --

THE COURT: AND THEY WON THAT MOTION, DIDN'T THEY?

MR. STEINBERG: THEY DID, YOUR HONOR.

THE COURT: THEN WE'RE DONE. THEN WE'RE DONE. IF THEY -- YOU WANTED IT PRODUCED, AND JUDGE DEMARCHI SAID IT IS NOT RELEVANT.

MR. STEINBERG: WELL, YOUR HONOR, IT'S NOT SO MUCH THAT IT WASN'T RELEVANT, IT WAS THAT THE BURDEN WAS TOO MUCH.

THE COURT: OKAY. WHATEVER IT WAS, YOU CAN'T -- THEY HAVE A JUDICIAL ORDER PROTECTING THEM FROM PRODUCING WHATEVER THAT WAS.

MR. STEINBERG: BUT MY POINT SIMPLY, YOUR HONOR, IS THAT WHERE A DEFENDANT -- IT'S NOT JUST THAT THEY DON'T HAVE IT AND IT NEVER EXISTED, BUT PARTICULARLY IF THE DEFENDANT COULD HAVE PRODUCED ADDITIONAL EVIDENCE THAT WOULD PROVIDE MORE CERTAINTY, IT'S NOT FAIR TO HOLD THAT AGAINST THE PLAINTIFF.

THE COURT: YOU TRIED TO GET IT, AND THE JUDGE SAID NO. SO YOU CAN'T NOW ARGUE THAT THEY WERE THE BAD GUYS. THAT'S THE END OF THAT.

MR. STEINBERG: OKAY. THANK YOU, YOUR HONOR.

THE COURT: ALL RIGHT. THANK YOU. I REALLY DO BELIEVE THESE NEXT ONES WILL BE QUICKER. THEY HAVE TO BE.

ALL RIGHT. I'M GOING TO STRUGGLE A LITTLE TO GETTING THROUGH MY PAPERS THROUGH NO FAULT OF ANYONE. THE ONE REASON IS THIS BINDER IS SEPARATED, AND I'M A LITTLE SLOW IN MOVING THE PAGES, AND I WANT YOU TO UNDERSTAND WHY I CAN'T MOVE THEM EASILY.

OKAY. SO LET'S START WITH THE FIRST MOTION YOU BRING IN REGARD TO JEFFERY KINRICH, K-I-N-R-I-C-H. SO I AGREE WITH THE PLAINTIFF THAT AN ALTERNATE THEORY OF CONTRACT DAMAGES IS NOT A HYPOTHETICAL NEGOTIATION BORROWED FROM THE PATENT SPHERE.

I'M NOT PREPARED TO MAKE NEW LAW ON THAT. I JUST DON'T THINK IT'S A PROPER MEASURE OF CONTRACT DAMAGES.

HOWEVER, I DO THINK THAT MR. KINRICH CAN TESTIFY ABOUT WHAT HE CONSIDERS COMPARABLE LICENSES TO SHOW THE ECONOMIC UNREASONABLENESS OF THE DAMAGES THAT PLAINTIFF IS SEEKING ON THE CONCEPT OF CONSEQUENTIAL DAMAGES ARE NOT ALLOWED TO BE A WINDFALL.

SO IT'S -- BUT I THINK IT'S A VERY SIGNIFICANT DISTINCTION, AND I AGREE WITH THE PLAINTIFF. I'LL HEAR FURTHER ARGUMENT ON IT, BUT THAT'S HOW I'M LOOKING AT THIS.

NOW, MR. STEINBERG, FOR MR. KINRICH, YOU ALSO ARGUE THAT THE REBUTTAL REPORT WAS UNTIMELY AND IMPROPER REBUTTAL. IF YOU WOULD LIKE ME TO RULE ON THOSE, I AM GLAD TO, AND I'LL DOCK YOU A MOTION IN LIMINE IN ORDER TO RULE ON IT NOW BECAUSE IT'S

NOTHING TO DO WITH DAUBERT.

MR. STEINBERG:  YOUR HONOR, I THINK WE WOULD LIKE THAT ISSUE TO BE RULED ON.

THE COURT:  OKAY.  I'M GLAD TO DO THAT, AND I'LL HEAR ARGUMENT ON IT.

SO NOW YOU'RE DOWN TO FOUR MOTIONS IN LIMINE THAT YOU'RE ALLOWED, AND AS I SAY, I'M GLAD TO DO IT NOW OR LATER, BUT THIS ISN'T -- DAUBERT DOESN'T MEAN EVERY OBJECTION YOU HAVE TO AN EXPERT.

OKAY.  SO, MR. -- I DON'T KNOW WHETHER IT'S MR. MATHEWS OR YOU, MR. STEINBERG, WHO IS GOING TO ARGUE THIS ONE.  I MEAN, YOU HAVE LARGELY WON IT, SO THAT WILL SHORT CIRCUIT SOME OF WHAT YOU'RE GOING TO SAY.

MR. STEINBERG:  THAT WOULD BE ME AGAIN, YOUR HONOR. CAN YOU CONNECT THAT UP.

THE COURT:  WILL YOU BE ABLE TO LEAVE OR SEND A COPY OF YOUR SLIDES TO ME?

MR. STEINBERG:  ABSOLUTELY, YOUR HONOR.

THE COURT:  I APPRECIATE THAT.

MR. STEINBERG:  AND THE OTHER THING IS WE HAVE EXTRA USB STICKS.

THE COURT:  I ONLY LOOK AT THEM IN PAPER.

MR. STEINBERG:  YOU WANT THEM ON PAPER?

THE COURT:  I DO.  I WOULD LIKE YOU TO PUT THEM ON THE DOCKET SO IT'S CLEAR THAT THEY'VE BEEN PART OF THE RECORD.

MR. STEINBERG:  YES, YOUR HONOR.

THE COURT:  BUT YOU CAN SEND THAT TO ME.

MR. STEINBERG:  WE CAN DO PAPER COPY.

WOULD YOU LIKE A DIGITAL COPY AS WELL EMAILED TO CHAMBERS AS WELL OR ON A USB STICK?

THE COURT:  DO YOU WANT THAT?  YES, THAT WOULD BE GREAT.

MR. STEINBERG:  OKAY.  WE CAN DO THAT AT THE CONCLUSION OF THE PRESENTATION TODAY BEFORE WE LEAVE, AND THEN WE'LL MAKE SURE TO FILE IT AS WELL.

THE COURT:  I APPRECIATE THAT.

MR. STEINBERG:  SO WITH REGARD TO MR. KINRICH, AND YOU CAN GO AHEAD AND ADVANCE THE SLIDES, THERE ARE A FEW DIFFERENT ISSUES HERE.  I'LL START WITH THE ISSUE OF TIMELINESS.  YOU KNOW, WE WOULD LIKE YOUR HONOR TO EXCLUDE HIS OPINIONS ON INCREMENTAL COSTS AND APPORTIONMENT, FOR BEING IMPROPER AND UNTIMELY REBUTTAL, AND IT ALSO LACKS SUPPORT AND RELIABILITY AND HIS OPINIONS ON CONTRACT DAMAGES BASED ON HIS NON-COMPARABLE LICENSES WHICH HE THEN FEEDS INTO HIS HYPOTHETICAL LICENSE.

AND THAT IS ACTUALLY ALSO FED BACK INTO HIS APPORTIONMENT OPINION.  SO IT KIND OF INFECTS ALL OF IT.

THE COURT:  SO WE'RE NOT DEALING WITH APPORTIONMENT.

MR. STEINBERG:  THANK YOU, YOUR HONOR.

THE COURT:  WE'RE NOT DOING DISGORGEMENT.

MR. STEINBERG:  SO THAT'S OUT.  OKAY.  WE APPRECIATE IT, YOUR HONOR.  THANK YOU.

AND THOSE ARE ALSO IMPROPER REBUTTAL, UNTIMELY.

THE COURT:  WHY IS IT IMPROPER REBUTTAL?

MR. STEINBERG:  SO, YOUR HONOR, IF WE GO TO SLIDE NUMBER 27, PLEASE.

SO THE CLEAR-VIEW CASE HOLDS THAT A DEFENDANTS' REBUTTAL EXPERT, AND YOUR HONOR IS PROBABLY WELL FAMILIAR WITH THIS, IS LIMITED TO OFFERING OPINIONS FOR REBUTTING --

THE COURT:  WELL, THE CONTEXT OF THAT RULING -- YOU HAD TO LIVE THROUGH THAT TRIAL TO KNOW THAT CITING THIS CASE CAUSES ME TO LAUGH, BUT THE CONTEXT THERE WAS THAT EXPERT NUMBER 1 WAS TRYING TO GET IN THE OPINION OF EXPERT NUMBER 2 WHO HAD NOT BEEN DISCLOSED, AND HE WHOLESALE WANTED TO SAY AND MY GOOD FRIEND, MR. MCKEWAN, PROVIDED THIS OPINION.  THAT'S WHAT WAS GOING ON IN CLEAR-VIEW.

MR. STEINBERG:  SO, YOUR HONOR, I'LL GIVE YOU ANOTHER EXAMPLE, THE I.B.M. VERSUS FASCO CASE THAT IS CITED IN OUR PAPERS, THAT STATES THE SAME PRINCIPLE, THAT A REBUTTAL EXPERT CAN'T PUT FORTH THEIR OWN THEORIES.

IN THAT CASE THE PLAINTIFF PROFFERED A DAMAGES EXPERT TO TESTIFY ABOUT LOST PROFITS.  THE DEFENDANT CAME BACK AND PROFFERED A REBUTTAL DAMAGES EXPERT TO TESTIFY ABOUT OUT-OF-POCKET DAMAGES, AND THE COURT SAID THAT'S NOT PROPER REBUTTAL.

THE COURT: BUT THIS IS LIMITED, THOUGH. I GUESS THIS GETS TIED UP INTO I'M NOT GOING TO ALLOW EVIDENCE OF A HYPOTHETICAL NEGOTIATION PRODUCING A DAMAGES FIGURE, A HYPOTHETICAL LICENSE. I'M NOT ALLOWING THAT BECAUSE IT'S NOT KNOWN IN CONTRACT LAW.

I AM ALLOWING IT TO REBUT THE REASONABLENESS OF YOUR EXPERT'S DAMAGES NUMBER.

AND THEN THE LICENSES DON'T EVEN NEED TO BE COMPARABLE BECAUSE YOU CAN RECROSS HIM ON THAT. WE'RE NOT ADOPTING WHOLESALE THE PATENT LAW REQUIREMENTS.

MR. STEINBERG: WELL, THERE HAS TO BE A BASELINE FOR IT TO BE RELEVANT AND PROPER FOR AN EXPERT TO PRESENT.

THE COURT: DID YOU PROVIDE ME THE OTHER LICENSES TO DETERMINE COMPARABILITY?

MR. STEINBERG: WELL, WHAT WE PROVIDED YOUR HONOR, I BELIEVE SOME OF THEM ARE DESCRIBED IN MR. KINRICH'S REPORT AND THEN THERE'S --

THE COURT: SO WHEN I DO PATENT CASES AND I'M ASKED TO LOOK AT COMPARABLE LICENSES, I READ THE LICENSES. I DON'T BELIEVE -- DID I MISS THEM? I'M SORRY IF I DID.

MR. STEINBERG: I DON'T BELIEVE WE ATTACHED ALL OF THEM TO OUR PAPERS, YOUR HONOR.

WE DID INCLUDE MR. SANDLER'S REPORT, S-A-N-D-L-E-R, WHO EXPLAINS EACH OF THOSE LICENSES IN DETAIL, AND HE EXPLAINS HOW THEY ARE DIFFERENT THAN THE LICENSE THAT IS POTENTIALLY AT

ISSUE HERE, AND HE EXPLAINS SOME OF THE REASONS WHY MR. KINRICH IS ON BASE ON THIS, INCLUDING THINGS LIKE THEY ADDRESS DIFFERENT FONTS.  THEY ARE WITH DIFFERENT --

THE COURT:  YOU HAVEN'T GIVEN ME ANYTHING TO LOOK AT.

IT IS JUST NOT -- I DON'T -- I THINK WHETHER THEY'RE COMPARABLE OR NOT, BECAUSE WE'RE NOT IN A HYPOTHETICAL NEGOTIATION, AND IT JUST GOES TO THE REASONABLENESS MEANS THAT YOU CAN CROSS-EXAMINE HIM ON WHY THE BASIS IS NOT APPROPRIATE, BUT I DON'T THINK THEY ARE -- I DON'T HAVE ANY EVIDENCE THAT THEY'RE NOT COMPARABLE BECAUSE I DON'T HAVE THE LICENSES.

SO I JUST -- THAT'S JUST NOT SOMETHING THAT I CAN RULE IN YOUR FAVOR ON.

MR. STEINBERG:  WELL, YOUR HONOR, IF YOU WOULD LIKE US TO SUBMIT ADDITIONAL.

THE COURT:  NO, I'M DONE.

MR. STEINBERG:  OKAY.  UNDERSTOOD.

THE COURT:  ARE YOU KIDDING?

MR. STEINBERG:  ALL RIGHT.  I AM SORRY.  ALL RIGHT.

WELL, I GUESS I SHOULD FOCUS ON THIS CONCEPT OF WHETHER MR. KINRICH SHOULD GET TO TALK ABOUT A HYPOTHETICAL LICENSE AT ALL AND WHETHER THAT'S PROPER REBUTTAL.

YOU KNOW, MR. PERSECHINI OBVIOUSLY DID NOT OPINE ON A HYPOTHETICAL LICENSE BECAUSE THAT DAMAGES MEASURE IS NOT RELEVANT WHERE AN ACTUAL --

THE COURT:  AND I AGREE WITH YOU.

MR. STEINBERG:  -- WHERE AN ACTUAL LICENSE EXISTS.

SO MR. KINRICH SHOULD NOT HAVE THE OPPORTUNITY TO COME BACK AND PRESENT A WHOLESALE NEW THEORY.

THE COURT:  SO IT'S NOT A NEW THEORY IN MY VIEW BECAUSE WHAT HE SAYS IN HIS REPORT IS THAT PERSECHINI'S DAMAGES AMOUNT IS UNREASONABLE BECAUSE IT BEARS NO RELATIONSHIP TO ECONOMIC REALITY.

AND LET ME -- THE FOUNDATION FOR MY STATEMENT THAT'S IT'S UNREASONABLE IS THESE OTHER SIMILAR LICENSES.

MR. STEINBERG:  BUT HE ALSO ASSUMES INCORRECTLY THAT THERE IS NO ACTUAL LICENSE THAT IS AT ISSUE HERE THAT ZAZZLE WOULD HAVE ACCEPTED OR WOULD HAVE COVERED EACH OF THESE ADDITIONAL USERS.

THE COURT:  YOU CAN CROSS-EXAMINE HIM ON THAT.

AS I SAY, I AGREE WITH YOU THAT IT'S NOT PROPER REBUTTAL FOR MR. KINRICH TO GIVE A SEPARATE THEORY OF CONTRACT DAMAGES BASED ON A HYPOTHETICAL NEGOTIATION.  HE WASN'T DISCLOSED FOR THAT.  THAT WOULD BE AFFIRMATIVE.  I AGREE WITH YOU RIGHT DOWN THE LINE ON THAT.  HE WASN'T DISCLOSED FOR THAT PURPOSE AS AN AFFIRMATIVE EXPERT, AND IT'S NOT A THEORY KNOWN IN CONTRACT LAW.

AND BORROWING IT FROM PATENT LAW, I'M JUST NOT PREPARED, ESPECIALLY ON THESE MOTIONS, TO DECLARE A NEW THEORY OF LAW.

BUT -- AND SO IT WILL NOT COME IN FOR THAT PURPOSE BASED

ON THE FAILURE TO -- UNDER RULE 26 AND THE SCOPE OF REBUTTAL. I'M WITH YOU.

I AM GOING TO ALLOW IT COUCHED ONLY IN TO SHOW THE UNREASONABLENESS OF YOUR EXPERT'S THEORY OF DAMAGES.  I'M LIMITING IT TO THAT.

MR. STEINBERG:  SO IF I UNDERSTAND CORRECTLY THEN, MR. KINRICH WOULD NOT BE PERMITTED TO TESTIFY ABOUT HIS ULTIMATE OPINION AND CONCLUSION OF WHAT A HYPOTHETICAL LICENSE WOULD BE, THE NUMBERS.

THE COURT:  ABSOLUTELY, HE WILL NOT.

MR. STEINBERG:  HE WILL NOT.

THE COURT:  CORRECT.

MR. STEINBERG:  SO IT'S REALLY JUST, IF I UNDERSTAND YOUR HONOR CORRECTLY, AND I KNOW YOU NEED TO GO BACK AND PERHAPS CONFIRM ABOUT THE SECTIONS, BUT IT'S REALLY SECTION 4(C) THAT POTENTIALLY STILL COMES IN --

THE COURT:  WELL --

MR. STEINBERG:  -- AND NOT 4(D).

THE COURT:  -- BECAUSE THIS BINDER IS SO DIFFICULT -- YOU KNOW, WE'VE ALL HAD IT.  THESE BIG BINDERS ARE DIFFICULT.

MR. STEINBERG:  AND THIS ONE HAS MORE THAN ONE COPY OF EACH REPORT WHEN IT WAS SUBMITTED.

THE COURT:  AND EXHIBIT 7, I JUST CAN'T GET MY EYES ON IT THE WAY I LIKE TO WITHOUT TAKING TEN MINUTES TO MOVE

THESE DOCUMENTS.  MAYBE I SHOULD.

MR. STEINBERG:  YOUR HONOR, I'M LOOKING AT --

THE COURT:  IT'S EXHIBIT 7?

MR. STEINBERG:  I AM AT EXHIBIT 7.

THE COURT:  I'M GETTING THERE.

MR. STEINBERG:  I'M ON PAGE 39.

THE COURT:  OKAY.  I'M ASKING YOUR COURTESY IN LETTING ME GET THERE.

MR. STEINBERG:  SO I'M SKIPPING PAST THE APPORTIONMENT AND INCREMENTAL COST BECAUSE YOUR HONOR SAID THAT'S OUT.

THE COURT:  OKAY.  I'M ON PAGE 39.

MR. STEINBERG:  SO THIS SECTION STARTS WITH THE HEADING C AND IT GOES FROM PARAGRAPH 58.  I BELIEVE, IF I UNDERSTAND YOU CORRECTLY, THAT THIS IS THE SECTION THAT YOU'RE TALKING ABOUT WHERE HE COMPARES IT TO CERTAIN PAST LICENSES THAT YOU'RE SAYING SHOULD STILL BE IN?

THE COURT:  YES.

MR. STEINBERG:  HOWEVER, THE SECTION D, WHICH STARTS ON PAGE 53.

THE COURT:  LOST PROFITS AS FAIR VALUE, THAT WOULD BE OUT.

MR. STEINBERG:  OKAY.  I UNDERSTAND, YOUR HONOR.  THEN I WON'T BELABOR THE POINT ON THAT ON IMPROPER REBUTTAL.

THE COURT:  SO I THINK YOU -- I MEAN, I THINK REALLY

YOU GOT WHAT YOU CAME FOR HERE.

MR. STEINBERG:  THAT'S FINE, YOUR HONOR.  THANK YOU.

THE COURT:  AND IT'S -- YES.  I MEAN, FOR AN OPPOSING PARTY TO OFFER THEIR OWN SEPARATE VALUE OF DAMAGES, I THINK THAT'S NOT REBUTTAL AND NOT -- AND I'M NOT GOING TO ALLOW A HYPOTHETICAL NEGOTIATION IN ANYWAY.

I MEAN -- SO MR. POSNER, MR. NOLAN, WHO IS GOING TO ARGUE THIS ONE?

MR. POSNER:  MR. NOLAN.

THE COURT:  OKAY.

MR. STEINBERG:  IF THERE'S ANYTHING ELSE YOUR HONOR WOULD LIKE US TO ADDRESS?

THE COURT:  IF THERE'S A LAST WORD, I'LL LET YOU KNOW.

MR. STEINBERG:  ALL RIGHT.  THANK YOU.

THE COURT:  MR. NOLAN, THE HYPOTHETICAL NEGOTIATION JUST ISN'T GOING TO FLY.

MR. NOLAN:  I TRY TO MAKE IT NOT A PRACTICE TO WALK INTO BUZZ SAWS.

THE COURT:  RIGHT.

MR. NOLAN:  SO I WILL GIVE YOU A CASE, THOUGH, THAT DOES HAVE SOME PRECEDENT.  AS YOU KNOW, A LOST LICENSE ANALYSIS IS A VERY COMMON MEASURE OF DAMAGES IN PATENT CASES, AND IT'S ALSO TRUE IN COPYRIGHT CASES.  THERE IS A CASE IN THE NINTH CIRCUIT APPLYING THIS IN A CONTRACT CLAIM WITHOUT --

THE COURT:  IS THAT IN YOUR BRIEF?  I'M SORRY, I DIDN'T READ IT.

MR. NOLAN:  IT'S NOT IN OUR BRIEF.  I'M GIVING IT TO YOU NOW.  IT'S NOT AN ISSUE THAT WE THOUGHT WOULD ARISE.

THE COURT:  OH.

MR. NOLAN:  IT'S 935 F.SUPP. 2D 1038, AND THEN AFFIRMED 583 FEDERAL APPENDIX 624.

THE COURT:  OH, I'M SORRY.  THE 935 IS F.SUPP. 2D?

MR. NOLAN:  YEAH, F.SUPP. 2D.

THE COURT:  AND IT WAS AFFIRMED AT 583 F.3D --

MR. NOLAN:  FEDERAL APPENDIX.

THE COURT:  OH, FEDERAL APPENDIX.

MR. NOLAN:  UNPUBLISHED, 624.

THE COURT:  I'LL LOOK AT IT, BUT I JUST DON'T SEE. I THINK YOU DIDN'T DISCLOSE HIM AS AN AFFIRMATIVE EXPERT, AND THAT'S THE SECOND GROUND.

MR. NOLAN:  WE DID NOT DISCLOSE HIM AS AN AFFIRMATIVE EXPERT, WE DISCLOSED HIM AS A REBUTTAL EXPERT.  OUR UNDERSTANDING AND OUR REASONING FOR DOING THAT IS THAT WE STILL BELIEVE HE'S A REBUTTAL EXPERT.  HE'S NOT A DIFFERENT KIND OF EXPERT.

THE COURT:  I THINK YOU LOOK AT THAT TOO NARROWLY.

SO I WILL LET YOU -- I WILL LET HIM USE THE VERY SAME INFORMATION COUCHED AS REBUTTING THE REASONABLENESS OF THE DAMAGES ESTIMATES OR OPINIONS GIVEN BY MR. PERSECHINI.

SO THE JURY WILL HEAR IT.  THEY JUST WON'T HEAR YOUR NUMBER OF WHAT IT SHOULD HAVE BEEN OR WHAT IT COULD HAVE BEEN.

MR. NOLAN:  SURE.  I UNDERSTAND THE RULING, AND I THINK IT'S VERY CLOSE TO WHAT WE INTENDED TO PRESENT TO THE JURY ALREADY.

THE COURT:  OKAY.

MR. NOLAN:  TO PUT A LITTLE MEAT ON THE BONES OF THAT -- OF YOUR CALLING IT A HYPOTHETICAL LICENSE, IT'S IN FACT BASED DIRECTLY ON TWO LICENCES THAT ARE IN THE RECORD THAT PLAINTIFF ACTUALLY ISSUED FOR HER OWN FONTS, RIGHT?

THE COURT:  SURE.

MR. NOLAN:  AND ONE TO SPOKEN RIDE, SPOKEN RIDE, TO PUT THE FONT AND SOFTWARE ON THE SERVER AND CREATE CUSTOM DESIGNS FOR $1200 AND ONE THROUGH MINTED WHICH ALLOWED DESIGNERS TO USE THE FONT TO CREATE DESIGNS, SO THEY PAID 20 BUCKS PER DESIGNER.

AND IF YOU ADD THOSE UP, THE NUMBER THAT RESULTS FROM THAT IS ABOUT          , WHICH IS WHAT MR. KINRICH WOULD PRESENT AS AN APPRAISAL OF WHAT, IF LIABILITY IS FOUND, A FAIR DAMAGES NUMBER IN THIS CASE SHOULD BE.

THE COURT:  SO THAT'S WHAT HE'S NOT GOING TO BE ABLE TO DO.

MR. NOLAN:  NOT ABLE TO DO THAT.  HE'S NOT.  AND WE BELIEVE OUR EXPOSURE IS STILL ZERO DOLLARS, AND THAT'S OKAY.

THE COURT:  AND OF COURSE YOU HAVE OTHER FACTUAL

INFORMATION ABOUT THE REVENUE THAT NICKY LAATZ HAS RECEIVED FROM LICENSING BLOOMING ELEGANT TO THE REST OF THE WORLD.

MR. NOLAN:  THAT'S RIGHT, THAT'S RIGHT.  THERE'S EVIDENCE OF OTHER LICENSES ISSUED BY NICKY LAATZ IN THE MARKETPLACE, AND TYPICALLY HIS LICENSE IS $20, AND THERE'S SOME LICENSES FOR A FEW HUNDRED DOLLARS, THERE ARE A COUPLE OF LICENSES FOR A THOUSAND DOLLARS, MAYBE A FEW THOUSAND DOLLARS.  THERE'S NOT A LICENSE ANYWHERE APPROACHING BY MULTIPLE ORDERS OF MAGNITUDE BY --

THE COURT:  BUT EVEN IF YOU ADDED UP ALL OF THE $20 SHE'S COLLECTED FROM BLOOMING ELEGANT, IT PROBABLY WOULDN'T BE ██████████ .

MR. NOLAN:  NO, IT WOULD BE QUITE A BIT LESS THAN THAT, EVEN ALL TOLD FOR HER ENTIRE CAREER.

THE COURT:  I MEAN, YOU PUT THAT IN YOUR PAPERS.

MR. NOLAN:  YES, THAT'S RIGHT.

THE COURT:  ORDERS OF MAGNITUDE DIFFERENT.

MR. NOLAN:  YEAH.

THE COURT:  AS I SAY, I THINK YOU HAVE SOMETHING THAT YOU CAN USE, BUT I REALLY THINK MR. STEINBERG WAS PROPER IN BRINGING THIS MOTION ON BOTH GROUNDS.

AND SO I THINK WE CAN MOVE ON.  WE'RE NOW GOING TO NOW MOVE ON TO RUCINSKI.  LET ME MOVE ALL OF MY PAPERS BACK.

(PAUSE IN PROCEEDINGS.)

THE COURT:  SORRY.

SO MY CONCERN WITH THIS MOTION IS THAT -- WHICH ATTACKS MR. RUCINSKI'S QUALIFICATIONS PRIMARILY -- LET ME JUST -- I THINK, ALTHOUGH YOU'RE TRYING TO PRESERVE THE OBJECTIONS, THEY REALLY HAD TO DO WITH THE COPYRIGHT ISSUE.

SO I -- HE'S A COMPUTER SCIENTIST, AND I JUST DON'T THINK HE REALLY IS OUTSIDE OF HIS EXPERTISE.

IT ALSO SEEMED TO ME THAT THE REPLY BRIEF SEEMED TO ADDRESS DIFFERENT OBJECTIONS THAN THE OPENING BRIEF.

AND I KNOW WE HAD A BIG HIATUS IN THE BRIEFING, BUT I'M NOT GOING TO CONSIDER ANYTHING NEWLY ADDRESSED IN THE REPLY BRIEF.  IT SEEMED LIKE THERE WERE DIFFERENT SECTIONS OF RUCINSKI THAT WERE BEING QUESTIONED IN THE REPLY.

SO, FOR EXAMPLE, THE SOFTWARE VERSUS DATA DISTINCTION AT PAGE 11, I DON'T THINK THAT WAS IN THE OPENING BRIEF.

AND I KNOW YOU QUESTION THE USE OF HIS OWN DEFINITIONS OF TERMS, BUT I DIDN'T REALLY SEE THE ONES THAT ARE REMAINING RELEVANT TO THE CONTRACT CASE AS REALLY BEING AT ISSUE.

I WILL ADMIT THAT AS TO PARAGRAPH 9(L) AND PARAGRAPH 74, I DON'T ACTUALLY KNOW WHAT THE RELEVANCE OF THE AFDKO LANGUAGE IS NOW.  I DON'T KNOW WHAT -- I DON'T EVEN KNOW WHY I'M CONCERNED ABOUT THAT.

SO WHY DON'T YOU HELP WALK ME THROUGH THIS.

MR. STEINBERG:  STEPHEN STEINBERG AGAIN REPRESENTING THE PLAINTIFF.

SO, YOUR HONOR, IF I MAY START WITH THE FIRST ISSUE, THE

QUESTION OF MR. RUCINSKI'S QUALIFICATIONS.

AND IF WE COULD GO TO SLIDE NUMBER 5, PLEASE.

SO CERTAINLY, YOUR HONOR, A LOT OF WHAT MR. RUCINSKI WAS PREVIOUSLY TALKING ABOUT, ABOUT FONT SOFTWARE AND COPYRIGHT ISSUES, IS OUT OF THE CASE.

THE COURT:  YES.

MR. STEINBERG:  BUT A LOT OF HIS REMAINING OPINIONS STILL RELATE TO FONT-SPECIFIC ISSUES, AND SOME OF THEM STILL SEEM TO US TO BE RELATED EVEN TO THE COPYRIGHT ISSUES THAT ARE OUT.  THE SOFTWARE VERSUS DATA QUESTION SEEMS LIKE IT'S STILL PART OF HIS QUESTION OF WHETHER NICKY LAATZ CREATED A COMPUTER PROGRAM OR SOFTWARE AT ALL, WHETHER SHE WAS --

THE COURT:  WELL, THAT BECOMES RELEVANT.

MR. STEINBERG:  THAT'S ONE OF THE ISSUES WITH IT.

THE COURT:  WELL, I'M NOT CONSIDERING RELEVANCE TODAY.

MR. STEINBERG:  OKAY.  I UNDERSTAND, YOUR HONOR.

IN TERMS OF HIS QUALIFICATIONS, IF WE GO TO SLIDE NUMBER 6, YOU KNOW, MR. RUCINSKI -- WE DON'T DENY THAT HE'S A COMPUTER SCIENCE -- A COMPUTER ENGINEER, BUT HE ADMITTED HE HAD NO EDUCATION OR TRAINING RELATED TO FONT OR FONT SOFTWARE.  HE HAD NEVER WORKED WITH THE FONT SOFTWARE FILE LIKE AN OTF FILE.

THE COURT:  BUT THE CASE YOU'RE NOT MAKING FOR ME IS ON THE BREACH OF CONTRACT CLAIM, WHY IS THAT DISTINCTION SO SIGNIFICANT?

WHAT IS -- I AGREE HE DOESN'T HAVE ANY TRAINING IN FONT SOFTWARE, BUT I CAN'T TELL THAT THAT'S NECESSARY NOW.  FOR THE COPYRIGHT CLAIM, IT WOULD HAVE BEEN ABSOLUTELY NECESSARY.  I THINK YOU WOULD HAVE HAD A WINNING MOTION.  WHEN YOU WROTE IT, I THINK YOU HAD A WINNING MOTION.

NOW, BECAUSE ALL OF THOSE ISSUES ARE OUT, I THINK A LOT OF WHAT YOU'RE CONCERNED ABOUT IS NOT EVEN RELEVANT.  YOU KNOW, THE DEFENSE DOESN'T WANT TO GIVE UP ANYTHING AT THIS POINT, BUT I DON'T REALLY THINK THAT THOSE ARE ISSUES GOING TO THE JURY.

MR. STEINBERG:  SO I DON'T NECESSARILY DISAGREE, YOUR HONOR.  I GUESS WHAT WE'RE FOCUSSED ON IS WHAT ARE THE OPINIONS THAT WE STILL SAY THAT MR. RUCINSKI IS GOING TO PRESENT, AND SOME OF THEM STILL ARE ON FONT-SPECIFIC ISSUES.

YOUR HONOR HIGHLIGHTED ONE EXAMPLE, IF WE CAN GO TO SLIDE NUMBER 7, WHICH IS THE OPINION ABOUT OPENTYPE FEATURES AND WHETHER THEY ARE WRITTEN IN A PROGRAMMING LANGUAGE.  I'M NOT SURE HOW THAT'S RELEVANT, BUT CERTAINLY SOMEBODY WHO HAS NO TRAINING OR EXPERIENCE WORKING WITH FONTS OR FONT SOFTWARE, INCLUDING THE SPECIFIC FILE TYPES AT ISSUE IN THIS CASE, OTF FILES, MR. RUCINSKI ACKNOWLEDGED HE NEVER ENCOUNTERED ONE BEFORE THIS CASE.

CONTRAST THAT WITH MR. GARRIE WHO SAID HE HAD FIRST USED OTF FILES BACK IN 1999 AND SINCE.  HE HAS DESIGNED THE FONT HIMSELF, THE FONT SOFTWARE HIMSELF.  HE PREVIOUSLY LOOKED AT HOW FONT SOFTWARE INTERACTS WITH OTHER COMPUTER APPLICATIONS,

SO UNDERSTANDABLY THEY DON'T CHALLENGES HIS QUALIFICATIONS.

MR. RUCINSKI DOESN'T HAVE ANY OF THAT.

THEY ALSO MAINTAIN A NUMBER OF PARAGRAPHS.  THIS IS IN HIS INITIAL REPORT PARAGRAPHS 15 THROUGH 22.  MOST OF THOSE PARAGRAPHS ARE EXPLANATIONS OF TERMS AND FILE FORMATS SPECIFIC TO FONT SOFTWARE, LIKE OTF FILES AND BFJ FILES THAT HE ACKNOWLEDGED HE HAD NO EXPERIENCE DEALING WITH.

HE STILL OFFERS A DESCRIPTION OF THE FONTLAB SOFTWARE. AGAIN, I AM NOT SURE HOW THAT'S STILL RELEVANT, BUT THE POINT HERE IS THAT HE ADMITTED HE NEVER USED THE FONTLAB BEFORE THIS CASE, AND SO HE SHOULDN'T REALLY BE TESTIFYING ABOUT IT NOW.

PARAGRAPHS 83 TO 86 OF HIS INITIAL REPORT, THESE ARE A DETAILED ANALYSIS OF THE BLOOMING ELEGANT COPYRIGHT DEPOSIT FILES, THE BFJ FILES.  I'M NOT SURE HOW THAT IS STILL RELEVANT, BUT DEFENDANTS STILL INTEND TO PRESENT IT.  AND HE ADMITTED HE NEVER WORKED WITH THOSE FILE TYPES BEFORE.  HE ALSO SAID IN TERMS OF HIS COPYRIGHT EXPERIENCE, HE'S NOT A COPYRIGHT EXPERT.

THE COURT:  I DON'T CARE ABOUT THAT ANYMORE.

MR. STEINBERG:  I AGREE, YOUR HONOR.  BUT IN TERMS OF HIM BEING ABLE TO EXPLAIN THE CONTENTS OF A COPYRIGHT DEPOSIT FILE OF A FILE TYPE HE'S NEVER ENCOUNTERED, HE DOESN'T HAVE ANY REAL FAMILIARITY WITH COPYRIGHT DEPOSITS AND PROCEDURES, SO WE DON'T THINK HE SHOULD BE PERMITTED TO TESTIFY ABOUT THAT, BOTH BECAUSE IT'S NOT RELEVANT BUT ALSO BECAUSE HE LACKS THE EXPERTISE.

IF WE GO TO HIS REBUTTAL REPORT AND WE GO TO THE NEXT SLIDE.

MR. MATHEWS, THANK YOU.

IN HIS REBUTTAL REPORT THERE'S AN EXTENSIVE DISCUSSION OF THE BLOOMING ELEGANT OTF FILES.  AGAIN, A FILE TYPE THAT HE HAD NO EXPERIENCE WITH UNTIL THIS CASE.  AND HE SPENDS ALMOST TEN PARAGRAPHS, I THINK, IN 41 TO 49 AND 51 AND THEN THIS IS SUMMARIZED IN 9(P) THROUGH (R), OPINING THAT THEY'RE DATA, NOT SOFTWARE.

BUT HE'S NEVER ENCOUNTERED THIS FILE TYPE BEFORE.  SO THAT'S ANOTHER EXAMPLE.

AND I'M NOT QUITE SURE HOW DEFENDANTS CONTEND --

THE COURT:  SO I THOUGHT YOUR DATA VERSUS SOFTWARE ISSUE ONLY CAME UP IN YOUR REPLY BRIEF.

MR. STEINBERG:  I DON'T -- IF YOU'RE REFERRING, YOUR HONOR, TO THE ARGUMENT ABOUT THE SELF-CREATED DEFINITIONS OF SOFTWARE, THAT MIGHT BE THE ISSUE THAT YOU'RE REFERRING TO.

THE COURT:  LET ME JUST LOOK.

MR. STEINBERG:  BUT WE DID RAISE ISSUES WITH HIS SELF-CREATED DEFINITIONS BEFORE.

THE COURT:  SO HE REDEFINES TECHNICAL TERMS INTO LITIGATION DRIVEN CATEGORIES.  THIS IS PAGE 11 OF YOUR REPLY. HIS SOFTWARE VERSUS DATA DISTINCTION IS UNTETHERED FROM ANY RECOGNIZED STANDARD.

SO THAT'S WHAT YOUR REPLY BRIEF SAYS.  I DON'T THINK YOU

BRIEFED THAT.

YOU DID GENERALLY TALK ABOUT TERMS.

MR. STEINBERG:  WE DID, YOUR HONOR.  IN OUR ORIGINAL MOTION THERE WAS A SECTION ABOUT HIS SELF-CREATED DEFINITIONS IN GENERAL.  WE GAVE A COUPLE OF EXAMPLES.

THE COURT:  WELL, YOU CAN'T -- NO, IT'S NOT BY GIVING ME A COUPLE OF EXAMPLES.  YOU HAVE TO TELL ME WHICH ONES.  THAT'S WHY I NEEDED YOU TO ANNOTATE THE BRIEF TO TELL ME WHICH PARAGRAPHS.  I CAN'T JUST GENERALLY EXCLUDE THINGS.  I HAVE TO EXCLUDE WHAT HE WROTE.

SO I'M LOOKING AT THE -- WHAT YOU ARGUED WERE THE SELF-CREATED DEFINITIONS.  LET ME GO TO PAGE 17 OF YOUR BRIEF.

SO YOU ARGUED IN YOUR OPENING BRIEF THAT THE SELF-CREATED DEFINITIONS WERE HAND CODED, HAND CODING, AND COMPUTER PROGRAM, AND I DIDN'T SEE ANY OTHERS YOU WERE CHALLENGING.

AND THEN IN YOUR REPLY BRIEF YOU CHALLENGED, YOU CHALLENGED THE SOURCE CODE VERSUS DATA -- OR SOFTWARE VERSUS DATA.

MR. STEINBERG:  SO I THINK THAT PORTION OF HIS OPINION IS CITED ALSO UNDER SOME OF THE OTHER SECTIONS OF THE MOTION.  THAT SORT OF FEEDS INTO HIS OPINION ABOUT HAND CODING WHERE HE TALKS ABOUT THE DIFFERENCE --

THE COURT:  SO HAND CODING IS OUT OF THE CASE.

MR. STEINBERG:  I UNDERSTAND, BUT IN TERMS OF WHETHER THIS WAS AT ISSUE IN THE ORIGINAL MOTION OR NOT.  THOSE

PARAGRAPHS ARE ALSO COVERED, YOU KNOW, I THINK, AND I CAN'T READ DEFENDANTS' MINDS, BUT I THINK THAT THAT --

THE COURT:  I'M JUST LOOKING AT SOMETHING REALLY SIMPLE.  I DON'T SEE THAT YOU BRIEFED THE ISSUE.

MR. STEINBERG:  OKAY, YOUR HONOR.

THE COURT:  AND WE'RE NOT DISCUSSING IT.  IT HAS TO BE IN YOUR OPENING BRIEF.

MR. STEINBERG:  OKAY, YOUR HONOR.

THE COURT:  I MEAN, I CERTAINLY MISS THINGS.  WHEN I READ THIS, BECAUSE I'M LEARNING AS I GO, BUT I DON'T SEE THAT THOSE ARE TERMS THAT YOU SAID SHOULD BE EXCLUDED BECAUSE HE MADE THEM UP.

MR. STEINBERG:  I UNDERSTAND.  SO LEAVING --

THE COURT:  SO LET ME JUST BE CLEAR, YOU ARE WELCOME TO CROSS-EXAMINE HIM ON IT, AND IF THERE'S NO FOUNDATION, ASK TO STRIKE HIS TESTIMONY DURING TRIAL.

BUT YOU JUST DIDN'T RAISE THE ISSUE.

MR. STEINBERG:  SO THEN I WOULD GO BACK TO THAT SAME SECTION THOUGH.  IT'S NOT JUST AN ISSUE OF THE DEFINITIONS OF SOFTWARE VERSUS DATA.  IT'S A QUESTION OF WHAT IS HE ANALYZING IN THAT SECTION, AND WHAT HE'S ANALYZING IS THE BLOOMING ELEGANT OTF FILES, A FILE TYPE HE HAS NO TRAINING OR EXPERIENCE DEALING WITH UNTIL THIS CASE.

SO ON THAT BASIS WE DON'T THINK THAT HE SHOULD BE PERMITTED TO TESTIFY BECAUSE HE DOESN'T HAVE THE SPECIALIZED

EXPERTISE.

THE COURT:  SO I GUESS THE QUESTION TO YOU IS, NOW THAT WE'RE NOT IN THE COPYRIGHT SPHERE WHERE I THINK THAT EXPERTISE WOULD HAVE BEEN CRITICAL, I'M NOT REALLY FINDING THAT IT'S SO SIGNIFICANT THAT HE'S NOT QUALIFIED TO OFFER THESE MUCH DIFFERENT TYPES OF OPINIONS THAT ARE NOW LEFT IN THE CASE. THAT'S ALL I'M SAYING IS THAT WHEN YOU WROTE YOUR MOTION, I THINK YOU WERE SPOT ON ON THE COPYRIGHT ISSUE, AND I PROBABLY WOULD HAVE EXCLUDED HIM.

BUT NOW I ONLY HAVE A BREACH OF CONTRACT CASE.  HE'S A QUALIFIED COMPUTER SCIENTIST, AND I THINK THAT THE ISSUES THAT HE'S DISCUSSING DO NOT REQUIRE THE SAME EXPERTISE THAT MR. GARRIE HAS.

YES, MR. GARRIE HAS THOSE QUALIFICATIONS.  I JUST DON'T SEE IT AS BEING NECESSARY.

SO --

MR. STEINBERG:  SO, YOUR HONOR, I WILL CONCEDE THAT NOT ALL OF THE PARAGRAPHS PARTICULARLY IN HIS REBUTTAL REPORT ARE ON FONT-SPECIFIC ISSUES, BUT WHERE HE IS ADDRESSING THESE FONT-SPECIFIC FILES THAT HE'S NEVER DEALT WITH BEFORE, WHETHER IT'S PARAGRAPHS 41 TO 49 AND 51 WHERE HE'S TALKING ABOUT THE BLOOMING ELEGANT OR THE OTF FILES, OR WHETHER IT'S SUBSEQUENT PARAGRAPHS IN BETWEEN LIKE 64 AND 75 WHERE HE'S TALKING ABOUT HOW THE OTF FILES ACTUALLY FUNCTION, AND, AGAIN, THIS IS A FILE TYPE HE HAS NEVER DEALT WITH BEFORE.

WE THINK THAT THAT IS STILL IMPACTED BY HIS LACK OF SPECIALIZED EXPERTISE AND EXPERIENCE DEALING WITH THESE FILE TYPES AT ANY TIME IN THE PAST.

THE COURT:  OKAY.

MR. STEINBERG:  SO CERTAINLY WHERE HE'S TALKING ABOUT OTHER KINDS OF GENERAL COMPUTER SCIENCE TECHNOLOGY, IF HE'S TALKING ABOUT OTHER FILE TYPES THAT HE'S ACTUALLY DEALT WITH OR THINGS THAT HE'S ACTUALLY DONE, THAT'S FAIR GAME.

BUT A LOT OF HIS REBUTTAL REPORT THAT IS STILL BEING MAINTAINED, WHILE I CAN'T ALWAYS DEFINE HOW IT'S RELATED STILL TO A BREACH OF CONTRACT CASE, HE IS STILL TALKING ABOUT THESE FONT-SPECIFIC FILE FORMATS, HE'S TALKING ABOUT WHETHER HE CONSIDERS THEM TO BE SOFTWARE, AND HOW THEY FUNCTION IN A VERY DETAILED WAY, BUT IT'S NOT SOMETHING THAT HE HAS EVER DEALT WITH BEFORE, BUT WE THINK THAT STILL SHOULD BE EXCLUDED FOR HIS LACK OF EXPERIENCE.

ON THE SELF-CREATED DEFINITIONS, I UNDERSTAND.  I WON'T GO BACK INTO THE SOFTWARE VERSUS DATA, I UNDERSTAND THAT.

THE DEFINITIONS OF COMPUTER LANGUAGE AND PROGRAMMING LANGUAGE THAT HE PUTS FORTH IN HIS INITIAL REPORT, AND THEN THAT'S WHAT HE USES TO SUPPORT HIS OPINIONS IN 9(L) AND 74, THAT OPENTYPE FEATURES ARE NOT IN A PROGRAMMING LANGUAGE.  I'M NOT SURE HOW THAT'S RELEVANT, BUT, AGAIN, NOT --

THE COURT:  I'LL ASK MR. POSNER AND MR. NOLAN THIS. AND IT'S -- I DON'T KNOW WHY YOU DIDN'T GIVE UP SOME OF THIS

STUFF BECAUSE IT'S JUST NOT RELEVANT.

SO IT'S COMPLICATED, BUT YOU'RE ALWAYS AFRAID JUST IN CASE YOU NEED IT OR JUST IN CASE A RULING SEEMS TOO BROAD, BUT I FEEL LIKE WE MAY BE WASTING SOME TIME HERE.  AND IT'S WASTING YOUR TIME AS WELL BECAUSE I DON'T THINK THESE THINGS ARE GOING TO COME UP.

MR. STEINBERG:  OKAY.  I'LL SKIP TO THE ONE REMAINING ISSUE, AND THIS IS ON SLIDE 12, WHICH IS THAT AT LEAST PORTIONS OF MR. RUCINSKI'S ANALYSIS OF THE DESIGN TOOL IS SPECULATIVE AND UNSOUND.

FIRST, IN PARAGRAPH 64 HE CRITICIZES MR. GARRIE FOR ONLY ANALYZING ZAZZLE'S DESIGN TOOL FOR WHAT HE CALLS IS 32 PERCENT OF THE TIME PERIOD.  SO HE IMPLIES THAT THERE WAS SOME KIND OF A CHANGE OR SOME KIND OF A DIFFERENCE IN HOW THE DESIGN TOOL FUNCTIONED AT THE TIME MR. GARRIE ANALYZED IT VERSUS OTHER TIMES.

BUT IN DEPOSITION HE ADMITTED HE HAD DONE NO INVESTIGATION OR ANALYSIS OF HOW IT OPERATED BEFORE, WHETHER IT HAD EVEN CHANGED OR NOT.

AND MR. GARRIE CITED TESTIMONY THAT IT HADN'T CHANGED IN A MEANINGFUL WAY.

MR. RUCINSKI IMPLIES THAT IT HAS BUT HE ADMITS --

THE COURT:  ON PARAGRAPH 64.  ARE YOU AT THE REBUTTAL OR ARE YOU IN THE MAIN REPORT?

MR. STEINBERG:  I'M IN THE REBUTTAL REPORT.

THE COURT: OKAY. GOOD. BECAUSE 64 OF THE MAIN REPORT WASN'T TRACKING.

MR. STEINBERG: I'M SORRY, YOUR HONOR. I HAD IT ON THE SLIDE, BUT I DIDN'T READ IT OUT.

I AM ON PARAGRAPH 64 OF THE REBUTTAL REPORT.

THE COURT: THANK YOU.

MR. STEINBERG: SO WHAT WE SEE THERE IS MR. RUCINSKI IS CRITICIZING AND SUGGESTING THAT MR. GARRIE'S OPINION ON HOW THE DESIGN TOOL WORKED ARE NOT VALID BECAUSE HE SAYS IT ONLY APPLIES TO 32 PERCENT OF THE TIME.

AND WHAT HE'S REALLY SAYING IS THAT MR. GARRIE LOOKED AT THE TOOLS AND OPERATED IT AT THE TIME OF HIS ANALYSIS, AND HE'S IMPLYING THAT IT MUST HAVE CHANGED OR WORKED DIFFERENTLY SOME TIME IN THE PAST.

BUT WHEN WE ASKED HIM ABOUT THIS IN DEPOSITION, HE ADMITTED THAT HE HADN'T DONE ANY INVESTIGATION OR ANALYSIS OF HOW IT WORKED BEFORE, HE COULDN'T RECALL IF ANYTHING HAD CHANGED, OR IF SOMETHING HAD CHANGED, WHAT IT MIGHT HAVE BEEN. HE WAS SIMPLY SPECULATING THAT IT MIGHT HAVE BEEN DIFFERENT IN THE PAST. AND THAT'S -- FOR AN EXPERT TO SUGGEST THAT IT WAS DIFFERENT BUT HAD NO BASIS OR FOUNDATION OR EVIDENCE TO RELY ON IS NOT PROPER UNDER DAUBERT.

AND THE SECOND ONE I DO WANT TO HIGHLIGHT IS IN THE REBUTTAL REPORT, HE SPENDS SOME TIME STARTING AT PARAGRAPH 67, SO THAT'S ON THE FOLLOWING PAGE, 32, HE SPENDS SEVERAL PAGES

CRITICIZING MR. GARRIE FOR SUGGESTING THAT THE DESIGN TOOL ███ ██████████, AND HE SUGGESTS THAT THAT SOMEHOW IS INACCURATE.

BUT IN DEPOSITION HE ADMITTED, WELL -- BECAUSE WE ASKED HIM TO LOOK AT MR. GARRIE'S REPORT AND IDENTIFY WHERE MR. GARRIE SAID THAT SUPPORTED THIS CRITICISM.

AND THEN HE HAD TO ADMIT, WELL, I GUESS HE DOESN'T REALLY SAY THAT, HE JUST SAYS ████.

SO, IN OTHER WORDS, HE'S RAISING A QUESTION ABOUT THE PURPORTED METHODOLOGY, BUT HE DOESN'T -- YOU KNOW, HE'S CREATING A STRAW MAN WHICH RAISES QUESTIONS ABOUT HIS ANALYSIS THAT IS PRESENTED HERE IF HE'S PRESENTING THIS STRAW MAN THAT HE SUPPOSEDLY IS ATTACKING.

THE COURT:  AND IS THIS PARAGRAPH 67 THAT YOU'RE --

MR. STEINBERG:  IT'S AT LEAST 67 TO 69 I WOULD SAY, YOUR HONOR.

THE COURT:  OKAY.

MR. STEINBERG:  THOSE ARE THE ONES THAT ADDRESS IT DIRECTLY.

THE COURT:  OKAY.

MR. STEINBERG:  I WOULD SUGGEST THAT THAT UNDERCUTS, EXCUSE ME, SOME OF THE SUBSEQUENT ANALYSIS PARTICULARLY IN PARAGRAPH 70 TO 75.

AND WE'VE CITED IN THE SLIDE HERE SOME OF HIS DEPOSITION TESTIMONY ON THIS POINT WHERE HE ADMITS THAT, OKAY, I GUESS

MR. GARRIE DIDN'T REALLY SAY ████████, HE SAID ████████.

THE COURT: OKAY.

MR. STEINBERG: AND WITH THAT, YOUR HONOR, I THINK THAT'S THE ONLY OTHER REMAINING ISSUE WITH MR. RUCINSKI THAT I WANTED TO HIGHLIGHT.

THE COURT: I APPRECIATE THAT. OKAY. THANK YOU. WE ALL HAVE BIG BINDERS, DON'T WE?

WHO'S GOING TO TAKE THIS FOR THE DEFENSE?

MR. POSNER: MR. NOLAN.

THE COURT: MR. NOLAN, YOU HAVE THE HEAVY LIFT TODAY.

MR. NOLAN: I DON'T HAVE A BINDER.

THE COURT: MR. NOLAN, I CERTAINLY APPRECIATE THAT IT'S HARD TO GIVE UP SOMETHING BECAUSE YOU MIGHT NEED IT LATER, BUT WE REALLY NEED TO BE REALISTIC. I MEAN, THERE'S NOTHING REALISTIC ABOUT THESE MOTIONS. THESE ARE THE MOST ABSURD SET OF DAUBERTS THAT I HAVE EVER SEEN.

BUT I DON'T KNOW -- I DON'T ACTUALLY KNOW WHAT THE -- LET'S SEE -- WHAT THE AFDKO LANGUAGE IS AND WHETHER IT HAS ANYTHING TO DO WITH THE CASE FOR BREACH OF CONTRACT.

MR. NOLAN: YES, WE ACTUALLY TRIED TO GIVE THAT UP.

THE COURT: OKAY. AND YOU'RE GIVING IT UP?

MR. NOLAN: NO. WE COULDN'T, WE COULDN'T. THE PLAINTIFF SAID WE COULDN'T BECAUSE THEY WOULDN'T AGREE -- I CAN READ THE MEET AND CONFER EMAILS WITH COUNSEL.

THE COURT:  TELL ME WHY YOU'RE NOT GIVING IT UP.

MR. NOLAN:  WELL, WE ARE KEEPING RUCINSKI IN THIS CASE LARGELY FOR REBUTTAL PURPOSES, TO REBUT THINGS THAT WE THINK DANIEL GARRIE MIGHT SAY ABOUT SOFTWARE, ABOUT DATA, ABOUT ███████, ABOUT HOW THINGS WORK INSIDE THE BLACK BOX.  THAT'S WHY HE'S AROUND.

THE COURT:  OKAY.

MR. NOLAN:  ALL OF THE HAND CODING OPINIONS, WE LEFT THOSE BEHIND.

THIS PARTICULAR COMPUTER LANGUAGE YOU'RE SPEAKING OF, THAT WOULD COME UP IF THE POSITION IS TAKEN THAT THAT LANGUAGE IS A COMPUTER PROGRAMMING LANGUAGE TO WRITE IN SOURCE CODE.

MR. RUCINSKI SAYS THAT IT IS NOT.  MR. GARRIE MAY TESTIFY THAT IT IS.  IF HE DOES, WE'RE GOING TO WANT TO HAVE MR. RUCINSKI EXPLAIN THAT IT IS NOT.

WHY WOULD THAT STILL BE RELEVANT?  THAT WAS RELEVANT FOR THE CONTRACT CLAIM.  ALL RIGHT.

THE COURT:  THEN WHY WOULD MR. GARRIE BE EVEN TELLING US ABOUT THAT?

MR. NOLAN:  YOU CAN ASK PLAINTIFF'S COUNSEL THAT, AND I'M SURE YOU WILL SHORTLY, AND HE PROBABLY WILL HAVE AN ANSWER.  MY SUSPICION IS THAT IS BECAUSE THEY HAVE -- ONE OF THE VERY FIRST THINGS THAT WE TALKED ABOUT TODAY WAS THE LICENSE MENTIONED THE TERM DERIVATIVE WORK, SO THERE MIGHT BE SOME DEBATE ABOUT --

THE COURT:  I'M NOT GOING TO RULE ON THE AFDKO ISSUE UNTIL YOU'RE AT TRIAL AND YOU TELL ME IT'S RELEVANT.  IT WOULD TAKE ME TOO LONG TO EVEN FIGURE OUT WHAT IT IS.  I'M JUST GOING TO DEFER RULING ON IT.  I DON'T EVEN KNOW WHAT IT IS.

MR. NOLAN:  THAT IS FAIR ENOUGH, YOUR HONOR.

THE COURT:  SO LET'S JUST TALK GENERALLY ABOUT MR. RUCINSKI'S QUALIFICATIONS.  HE CLAIMS TO BE A COMPUTER SCIENTIST, AND HE IS.

I QUESTION MR. STEINBERG AS TO WHETHER, FOR THE BREACH OF CONTRACT, WE ACTUALLY NEED A FONT SOFTWARE SPECIALIST, AND SO I DON'T -- YOU KNOW, AND THE CLAIM IS THAT MR. RUCINSKI LEARNED ABOUT OTF FILES FOR THIS CASE, BUT I DON'T KNOW ANYTHING ABOUT OTF FILES.

DO YOU REALLY NEED TO BE A FONT SOFTWARE EXPERT TO UNDERSTAND THEM IF YOU'RE A COMPUTER SCIENTIST?

MR. NOLAN:  THE ANSWER IS NO.  IT'S A FILE TYPE. THERE ARE THOUSANDS OF FILE TYPES.  A COMPUTER SCIENTIST DOES NOT NEED TO HAVE TRAINING IN EACH INDIVIDUAL FILE TYPE.

A COMPUTER SCIENTIST CAN TALK ABOUT A PDF OR A PDFX, YOUR HONOR.  YOU DON'T NEED SPECIALIZED TRAINING TO -- AS A COMPUTER SCIENTIST TO OPINE ABOUT HOW DIFFERENT FILE TYPES WORK, AND HIS OPINIONS ABOUT THESE ARE NOT SPECIALIZED TO FONT SOFTWARE, EITHER.  HIS OPINIONS ARE THAT THESE ARE FILE TYPES, LIKE OTHERS, AND PLAY BY THE SAME RULES AS OTHER COMPUTER FILE TYPES.

THE COURT: YES.

MR. NOLAN: SO THAT IS HIS OPINION, RIGHT? IT'S NOT ANYTHING PARTICULAR ABOUT HOW THIS PARTICULAR SOFTWARE INTERACTS OR WITH SUBSYSTEMS OR ANYTHING SPECIALIZED OR PARTICULAR TO THAT KNOWLEDGE. HE'S SIMPLY SAYING AS A COMPUTER SCIENTIST, WHICH HE UNQUESTIONABLY IS, THESE ARE FILE TYPES THAT WORK ON COMPUTERS IN THE SAME WAY THAT OTHER FILE TYPES WORK ON COMPUTERS.

THE COURT: I THINK IN TERMS OF THE QUALIFICATIONS, THAT IT GOES TO THE WEIGHT OF THE EVIDENCE, AND I THINK HE'S CERTAINLY QUALIFIED FOR THE REMAINING OPINIONS HE'LL BE ASKED TO GIVE.

I AM CONCERNED, THOUGH, ABOUT THE REBUTTAL REPORT REGARDING PARAGRAPH 64 WHERE IT APPEARS THAT THE DEPOSITION TESTIMONY OF MR. RUCINSKI MIGHT REALLY HAVE CAUSED MR. RUCINSKI TO CORRECT HIS REPORT THAT HE MISSTATED WHAT HE HAD ATTRIBUTED TO MR. GARRIE.

MR. NOLAN: YEAH, THERE ARE TWO ISSUES THAT -- TWO RELATED ISSUES IN THAT REGARD. THERE'S THE VERSIONS AND THERE'S ███████████████████████.

THE COURT: RIGHT.

MR. NOLAN: I JUST REFER YOUR HONOR TO PAGE 20 OF PLAINTIFF'S MOTION WHERE THEY MAKE THE SAME EXACT ARGUMENTS ABOUT MR. GARRIE.

THE COURT: THEY DO.

MR. NOLAN:  IT'S THE SAME ARGUMENTS:  MR. GARRIE DIDN'T LOOK AT THE RIGHT VERSION, THE RIGHT DATE OR MR. GARRIE'S USE OF THE TERMS ███████████████ ARE NOT WHAT WE HAD CLAIMED THAT THEY WERE.

SO THESE ARE REALLY MORE REBUTTAL ARGUMENTS FOR MR. RUCINSKI ABOUT WHAT MR. GARRIE SAYS.  THEY'RE NOT NEW, AND THEY'RE NOT PARTICULAR TO HIS REPORT ON AN AFFIRMATIVE BASIS.

THE COURT:  SO I DO THINK -- AND I MISCITED.  THAT WAS PARAGRAPH 67 TO 69 REGARDING THE ██████.

AND ON PARAGRAPH 64 THE ARGUMENT IS THAT THE OPINION INSINUATES THAT MR. GARRIE MADE AN INADEQUATE OR INCORRECT ANALYSIS OF THE DESIGN TOOL BECAUSE HE DID NOT EVALUATE HOW IT EXISTED FOR THE ENTIRE PERIOD OF TIME, BUT SINCE MR. RUCINSKI DIDN'T REVIEW IT EITHER.  HE DOESN'T KNOW THAT IT CHANGED, BUT HE'S SUGGESTING A DEFICIENCY BY MR. GARRIE THAT HE HAS NO BASIS TO CRITICIZE.

I THINK THAT'S VALID.

MR. NOLAN:  ONE CRITICISM APPLIES TO THE OTHER WOULD BE MY RESPONSE.  IF MR. RUCINSKI DOESN'T HAVE A BASIS, THEN NEITHER DOES MR. GARRIE.

THE COURT:  RIGHT.  SO I THINK ON PARAGRAPH 64 I'M GOING TO GRANT THE MOTION TO EXCLUDE THAT BECAUSE THERE'S NO FOUNDATION TO SAY THAT LOOKING AT A SHORTER PERIOD OF TIME MISREPRESENTS THE DESIGN TOOL.  THE DESIGN TOOL AS IT EXISTED FOR A SPECIFIC PERIOD OF TIME, WHICH IS NOT OUR ENTIRE TIMELINE

HERE, WAS ALL THAT MR. GARRIE REVIEWED.

MR. NOLAN:  RIGHT.  I UNDERSTAND THAT, YOUR HONOR.

THE COURT:  AND THAT'S A FACT, AND THAT'S ALL THAT MR. RUCINSKI REVIEWED, TOO.

AND THERE'S NO EVIDENCE BY MR. RUCINSKI THAT THERE WAS -- THAT THE -- THAT MR. GARRIE'S ANALYSIS IS INADEQUATE BECAUSE OF A CHANGE IN THE DESIGN TOOL.

SO HIS REBUTTAL ON THAT HAS NO FOUNDATION.

MR. NOLAN:  OKAY.  I UNDERSTAND THAT, YOUR HONOR.

THE COURT:  IT'S SUCH A SIMPLE -- LET'S MOVE ON.

MR. NOLAN:  I WOULD REQUEST ANY RULING ON THAT APPLIES BOTH WAYS.

THE COURT:  YES, OF COURSE IT DOES.  OKAY.  AND I ACTUALLY THINK THAT FOR THE FINE POINT OF KEEPING THE LANGUAGE ACCURATE ON WHETHER IT'S ███████████████, IT MAKES A DIFFERENCE, AND SO MR. RUCINSKI CAN'T TESTIFY ABOUT SENDING FILES WHEN HE MEANT DATA.

AND SO I WILL GRANT THE MOTION TO EXCLUDE FOR THOSE PARAGRAPHS, BUT HE CAN CERTAINLY TESTIFY CONSISTENT WITH HIS DEPOSITION ON THE DATA IF THAT WOULD BE CORRECT.

MR. NOLAN:  THE SALIENT DISTINCTION THERE IS WHAT --

THE COURT:  FILES VERSUS DATA.

MR. NOLAN:  WHAT IS TRANSMITTED BEHIND THE SCENES IN THE BLACK BOX, RIGHT?

THE COURT:  YES.

MR. NOLAN:  SO THE PURPOSE OF HAVING MR. RUCINSKI OPINE ABOUT THOSE ISSUES WOULD BE TO REBUT ANYTHING THAT WE DISAGREE WITH OR WE THINK IS INCORRECT AND ABOUT WHAT MR. GARRIE SAYS ABOUT THOSE PRECISE THINGS.

THE COURT:  ARE YOU GOING TO BE OFFERING -- YOU DON'T HAVE TO ANSWER THIS.  YOU MAY NOT KNOW.

DO YOU INTEND TO OFFER HIM IN YOUR CASE-IN-CHIEF OR IS THAT NO LONGER --

MR. NOLAN:  I DON'T THINK WE'VE MADE A FINAL DECISION ON THAT.  I THINK MY INITIAL REACTION NOW IS THAT HE'S LIKELY A REBUTTAL ONLY, BUT THAT DEPENDS ON WHAT HAPPENS OVER THE NEXT SEVERAL WEEKS.

THE COURT:  I'M NOT ASKING FOR A DECISION.

OKAY.  I THINK WE'RE DONE WITH MR. RUCINSKI.

MR. NOLAN:  THANK YOU, YOUR HONOR.

MR. STEINBERG:  YOUR HONOR, MAY I RESPOND ON JUST TWO QUICK POINTS?

THE COURT:  YOU WON EVERYTHING.  DO YOU NEED TO RESPOND?  REALLY?  I DON'T THINK YOU LOST ANYTHING.

MR. STEINBERG:  ON THE QUALIFICATIONS, YOUR HONOR?

THE COURT:  NO, I'VE HEARD PLENTY.

MR. STEINBERG:  OKAY.

THE COURT:  THANK YOU.

MR. STEINBERG:  AND THEN THERE WAS ONE ISSUE ABOUT WHAT GARRIE'S TESTIMONY ABOUT THE AFDKO FEATURE.

THE COURT:  I'M JUST DEFERRING ON THAT.

MR. STEINBERG:  THANK YOU.

STEPHEN STEINBERG FROM BARTKO PAVIA REPRESENTING THE PLAINTIFF.

IF I UNDERSTOOD MR. NOLAN CORRECTLY, HE WAS EXPLAINING THAT PARAGRAPHS 9(L) AND 74 OF MR. RUCINSKI'S INITIAL REPORT WERE BEING PRESERVED BECAUSE THEY MIGHT BE NEEDED TO RESPOND TO MR. GARRIE SAYING THAT THESE OPENTYPE FEATURES ARE IN A PROGRAM LANGUAGE.  HE DOESN'T SAY THAT --

THE COURT:  GOOD.

MR. STEINBERG:  -- ANYWHERE IN HIS REPORT, SO I'M NOT SURE HOW THAT IS RELEVANT.

THE COURT:  I DON'T THINK IT IS EITHER, AND I'M NOT GOING TO WASTE MY TIME ON SOMETHING THAT I THINK IS OUT OF THE CASE.  THAT'S ALL I'M SAYING.

MR. STEINBERG:  OKAY.

THE COURT:  I'M PRESERVING IT, I'M RESERVING IT. I'M NOT CUTTING ANYTHING OUT HERE.  I KNOW YOU'RE NOT WINNING ON THAT, BUT I JUST DON'T THINK THAT IT'S GOING TO COME UP.

MR. STEINBERG:  I DON'T THINK SO EITHER, YOUR HONOR.

THE COURT:  SO, YOU KNOW, IT'S LIKE OBJECTING TO EACH OF A THOUSAND EXHIBITS, BUT THE JURY ONLY GETS TEN OF THEM.  REALLY, I'M NOT WASTING MY TIME ON THE OTHERS.

MR. STEINBERG:  OKAY.  AND, YOUR HONOR, WITH REGARD TO THE QUALIFICATIONS, I WOULD JUST REFER YOU BACK TO THE

SA MUSIC CASE WHICH LOOKED AT THE GENERAL COMPUTER SCIENCE ENGINEER WHO HAD EXPERTISE EVEN IN A SPECIALTY BUT DIDN'T HAVE EXPERTISE OR EXPERIENCE WITH A PARTICULAR PROGRAM THAT WAS AT ISSUE IN THAT CASE, AND IN THAT CASE JUDGE ORRICK EXCLUDED THE EXPERT FROM TESTIFYING ABOUT IT.

THE COURT:  AND I THINK FOR THE PURPOSES THAT IS NEEDED HERE, THAT SPECIFIC EXPERTISE IS NOT A DEAL BREAKER.  I THINK IT WILL BE, IT WILL BE RIPE FOR CROSS-EXAMINATION.

MR. STEINBERG:  THANK YOU, YOUR HONOR.

THE COURT:  ALL RIGHT.  I'M TRYING TO GET MYSELF BACK TO THE SHAPIRO.

ALL RIGHT.  LET'S MOVE ON TO ELLEN SHAPIRO.

SO MS. SHAPIRO IS NOT BEING OFFERED AS AN EXPERT IN SURVEY DESIGN, BUT SHE'S OFFERED TO REBUT THE SURVEY EXPERT, AND THERE'S A LOT IN HER REPORT THAT IS JUST HER OWN PERSONAL VIEW OF BLOOMING ELEGANT AND SOME OF THE OTHER FONTS.

SO I THINK THOSE ARE NOT ADMISSIBLE.

THE ONE THAT I THINK IS PROBABLY ADMISSIBLE IS HER OPINION ON THE COMPARATORS THAT WERE USED; THAT THE FIVE OTHER FONTS OR FONT FAMILIES WERE NOT REASONABLE COMPARISONS TO BLOOMING ELEGANT.  I THINK THAT GOES TO THE ACCURACY OR APPROPRIATENESS OF THE DESIGN OF THE SURVEY, AND AS AN EXPERT IN GRAPHIC DESIGN, I THINK SHE CAN GIVE TESTIMONY ON THAT.

I ALSO HAVE AN OBJECTION THAT THIS WAS IMPROPER UNDER RULE 26.

AND AGAIN, IF YOU WANT ME TO RULE ON THAT, I WOULD REDUCE YOUR MOTIONS IN LIMINE AGAIN.  IT'S YOUR CHOICE.

MR. MATHEWS:  YOUR HONOR, WE WOULD NOT -- I'M SORRY. CASEY MATHEWS OF BARTKO PAVIA FOR THE PLAINTIFF.

WE WOULD NOT LIKE YOU TO RULE ON THE RULE 26 IMPROPER REBUTTAL ISSUE.  IT'S SOLELY ON THE DAUBERT ISSUE FOR MS. SHAPIRO.

THE COURT:  AND I'M GLAD TO DO THAT.

SO WITH THOSE THOUGHTS IN MIND, MR. MATHEWS, WOULD YOU LIKE TO START?

MR. MATHEWS:  YES, YOUR HONOR.

YOUR HONOR, WITH THE CONTEXT YOU JUST PROVIDED, I THINK THERE'S SOME IMPORTANT -- WHEN WE ARE EVALUATING WHETHER OR NOT MS. SHAPIRO IS QUALIFIED TO OFFER THE OPINIONS THAT SHE IS OFFERING, I THINK IT'S IMPORTANT TO UNDERSTAND THE OPINIONS THAT SHE IS TRYING TO REBUT, AND, THAT IS, DR. PARIKH'S SURVEY. DR. PARIKH IS A SURVEY EXPERT.  SHE WAS NOT OFFERING OPINIONS ABOUT FONTS THEMSELVES.  HER OPINIONS RELATE SOLELY TO THE DESIGN, CONDUCT, METHODOLOGY, AND INTERPRETATION OF THE RESULTS OF THE SURVEY THAT DR. PARIKH CONDUCTED.

ELLEN SHAPIRO ADMITTED REPEATEDLY IN HER DEPOSITION SHE IS NOT A SURVEY EXPERT, SHE HAS NO EXPERTISE IN DESIGNING SURVEYS, SHE HAS NO QUALIFICATIONS WHATSOEVER TO OPINE ON WHETHER OR NOT A PARTICULAR SURVEY WAS PROPERLY CONDUCTED OR PROPERLY INSTRUCTED IN ORDER TO OBTAIN THE OPINIONS THAT DR. PARIKH

REACHED.

THE COURT:  SO THAT'S THE PROBLEM I HAVE WITH IT, THOUGH, IS WHEN A SURVEY IS CONSTRUCTED, THE CONTENT OF EACH QUESTION HAS TO BE PROPERLY PRESENTED TO GET AN UNBIASSED OR ACCURATE RESULT.  AND I'M PUTTING ASIDE THE CONTROL ISSUE, BECAUSE I PASSED OVER THAT.  I DECIDED SHE GAVE ME ENOUGH REASON.

BUT HERE IT GOES DIRECTLY TO CHALLENGING THE FIVE COMPARATORS, AND AS A GRAPHIC DESIGNER WHO UNDERSTANDS THIS -- THE FIELD, SHE'S SAYING THAT THE SURVEY EXPERT PICKED THE WRONG COMPARATORS AND THAT THAT SKEWED THE RESULTS.

SO I THINK SHE'S GOT THE PROPER EXPERTISE FOR THE LIMITED QUESTIONS SHE'S ANSWERING, THE LIMITED PORTION OF THE SURVEY THAT I WOULD ALLOW HER TO CHALLENGE.

MR. MATHEWS:  YOUR HONOR, EVEN IF THAT WERE THE CASE THAT SHE HAS THE PROPER EXPERTISE, HER OPINIONS IN THIS CASE WERE NOT BASED ON SUFFICIENT FACTS OR DATA.

WHAT ELLEN SHAPIRO TESTIFIED SHE DID WAS GO ON GOOGLE OR ONLINE AND CONDUCT SOME INTERNET SEARCHES TO FIND FONTS AND FONT TRIOS THAT SHE PERSONALLY CONSIDERED IN HER SUBJECTIVE OPINION TO BE BETTER, COMPARABLE FONTS OR MORE LIKE THE BLOOMING ELEGANT TRIO, BUT HER TESTIMONY WAS ALSO THAT SHE NEVER CONFIRMED WHETHER OR NOT THOSE FONTS WERE ACTUALLY AVAILABLE ON ZAZZLE AT THE TIME THAT THE SURVEY WAS CONDUCTED.

NOW, DR. PARIKH'S SURVEY SPECIFICALLY WAS AND USED FONTS

THAT WERE AVAILABLE ON ZAZZLE AT THE TIME AND WAS CONDUCTED OF MEMBERS OF ZAZZLE'S COMMUNITY, ZAZZLE DESIGNERS WHO HAD STORES AND WERE FAMILIAR WITH THE FONTS ON ZAZZLE'S DESIGN TOOLS BECAUSE THEY WERE INDIVIDUALS WHO HAD SOLD PRODUCTS THERE, DESIGNED THEIR OWN PRODUCTS AND SOLD THEM.

SO I THINK THAT'S ONE POINT IS THAT THERE'S NOT SUFFICIENT FACTS OR DATA BECAUSE SHE'S COMPARING APPLES AND ORANGES. SHE WENT OUT AND TRIED TO FIND HER OWN FONTS RATHER THAN LIMIT IT TO THE UNIVERSE OF FONTS THAT WERE AVAILABLE SPECIFICALLY ON ZAZZLE AT THE TIME OF ZAZZLE'S ALLEGED BREACH OF THE BLOOMING ELEGANT LICENSE AND AT THE TIME THAT THE BLOOMING ELEGANT TRIO WAS AVAILABLE ON ZAZZLE'S DESIGN TOOL.

AND THERE'S ANOTHER POINT HERE WHICH UNDERMINES THE CREDIBILITY OF HER OPINIONS, WHICH IS IF YOU GO BACK TO DR. PARIKH'S ACTUAL SURVEY AND YOU LOOK AT APPENDIX B OF HER REPORT, AND THIS IS THE SURVEY QUESTIONNAIRE THAT WAS ACTUALLY PROVIDED, THE VERY FIRST PIECE OF INFORMATION THAT DR. PARIKH PROVIDED OR ONE OF THE VERY FIRST PIECES OF INFORMATION THAT DR. PARIKH PROVIDED TO THE SURVEY RESPONDENTS WAS WELCOME TO OUR SURVEY, AND THIS IS A QUOTE, "WE WANT TO ASSURE YOU THAT WE'RE INTERESTED" -- ACTUALLY, I APOLOGIZE, I'M ON THE WRONG PAGE.

THIS IS THE SECOND PAGE OF THE APPENDIX B, THE QUESTIONNAIRE. THE TEXT READS, "IT IS VERY IMPORTANT THAT YOU DO NOT REFER TO OR LOOK UP ANY INFORMATION ON THE INTERNET OR

USE REFERENCE MATERIALS THAT YOU MAY HAVE AVAILABLE WHILE YOU ARE TAKING THE SURVEY.  MAKE SURE ANY OTHER APPLICATIONS ON YOUR COMPUTER ARE CLOSED.  PLEASE ANSWER THE QUESTIONS ON YOUR OWN WITHOUT DISCUSSING THEM WITH ANYONE ELSE."

SO THE PURPOSE OF THE SURVEY WAS TO TEST THE INDEPENDENT KNOWLEDGE OF ZAZZLE'S DESIGNERS AT THE TIME WITHOUT REFERENCE TO EXTERNAL SOURCES.

SO WHEN THE SURVEY WAS ASKING HOW UNIQUE IS THIS FONT? HOW DIFFICULT WOULD IT BE TO SUBSTITUTE THIS FONT?  THEY WERE PROHIBITED AS SURVEY RESPONDENTS FROM GOING OUT AND LOOKING AS ELLEN SHAPIRO DID, LOOKING AT THE ENTIRE UNIVERSE OF FONTS THAT WAS AVAILABLE OUT THERE AND SAYING, OH, THERE ARE ALL OF THESE OTHER ONES THAT LOOK SIMILAR TO, I THINK THAT THOSE --

THE COURT:  ELLEN SHAPIRO IS NOT TESTIFYING AS IF SHE IS A SURVEY PARTICIPANT.  SHE'S TALKING ABOUT THE CONSTRUCTION OF THE SURVEY TO GET A FAIR RESULT FROM THE PARTICIPANTS.

SO I HAVE TO TELL YOU, I MEAN -- THIS IS, THIS IS KIND OF A CLASSIC.  YOU ARE WAY TOO YOUNG TO REMEMBER RICHARD PRYOR.

MR. MATHEWS:  I AM NOT, YOUR HONOR.  I APPRECIATE IT.

THE COURT:  HE WAS AN AFRICAN AMERICAN COMEDIAN WHO DID A SKIT ON A POLICE LINEUP.  SO RICHARD PRYOR WALKS OUT INTO THE LINEUP, AFRICAN AMERICAN MAN, AND HE WAS FOLLOWED BY A DUCK, A REFRIGERATOR, AND A NUN.  AND THE WITNESS OBVIOUSLY IS

ASKED TO SAY, WHICH ONE OF THESE ASSAULTED YOU, MADAM?

THAT'S WHAT SHE'S SAYING HERE.  THESE ARE NOT FAIR COMPARATORS.

MR. MATHEWS:  I UNDERSTAND THE REFERENCE, AND I UNDERSTAND THE ANALOGY THAT YOUR HONOR IS MAKING.  I THINK LOOKING AT THE ACTUAL FONTS THAT DR. PARIKH PICKED OUT, I THINK THAT ANALOGY SORT OF FALLS APART BECAUSE DR. PARIKH SPECIFICALLY CHOSE AMONGST THE FONTS THAT SHE DEMONSTRATED TO THE RESPONDENTS, FONTS THAT ZAZZLE ITSELF ADMITTED WERE THE MOST POPULAR HANDWRITING TYPE SCRIPT TYPE FONTS ON ITS WEBSITE AT THE TIME.

THE COURT:  SO WE'RE NOT DECIDING WHO IS RIGHT.  THE QUESTION IS CAN ELLEN SHAPIRO OFFER THIS AS REBUTTAL TO KNOCK AT THE CREDIBILITY OF THE SURVEY?

AND THE JURY MIGHT DISREGARD WHAT SHAPIRO SAYS, BUT THE QUESTION IS, IS SHE QUALIFIED AND DOES SHE HAVE A PROPER FOUNDATION?

SO YOU DO RAISE AN INTERESTING POINT ABOUT THE ZAZZLE UNIVERSE AND THAT WE SHOULD BE LIMITED TO THE ZAZZLE UNIVERSE.

MR. MATHEWS:  EXACTLY, YOUR HONOR.  SHE DID NO INVESTIGATION OF HER OWN TO CONFIRM WHETHER OR NOT THE FONTS SHE WAS SAYING WERE ACCURATE OR COMPARABLE FONTS WERE ACTUALLY AVAILABLE OR WHETHER OR NOT THE RESPONDENTS WOULD HAVE BEEN FAMILIAR WITH THOSE FONTS OR NOT AS WELL.

THE COURT:  OKAY.  ANYTHING ELSE?

MR. MATHEWS:  NOTHING ON THAT POINT, YOUR HONOR, UNLESS THERE'S ANY OTHER STICKING POINTS WITH MS. SHAPIRO'S OPINION THAT YOU WOULD LIKE TO DISCUSS.

THE COURT:  ALL RIGHT.  MR. POSNER OR MR. NOLAN.

SO I THINK THAT'S A GOOD POINT ABOUT SHAPIRO TRYING TO REBUT THE SURVEY BY USING FONTS THAT ARE OUTSIDE OF ZAZZLE.

MR. POSNER:  WELL, I DON'T THINK THE PARIKH -- THIS IS DANIEL POSNER FOR THE DEFENDANT.

I MEAN, THE PARIKH SURVEY DIDN'T SAY ANYTHING ABOUT ZAZZLE.  IT PRESENTED SIX FONTS.  AND WHAT MS. SHAPIRO DOES IS RESPOND REALLY IN TWO WAYS, BUT TO THE RELATIVE OPINIONS THAT MR. PARIKH OFFERED OR DR. PARIKH OFFERED.

AND WE DISCUSSED EARLIER AND YOUR HONOR SAID, WELL, SOME OF HER OPINIONS ARE ABSOLUTE BUT SOME OF THEM ARE RELATIVE, RELATIVE TO OTHER FONTS.

AND WHAT MS. SHAPIRO IS SIMPLY POINTING OUT IS THAT THERE IS A FAR BROADER ARRAY OF POTENTIALLY COMPARATORS TO USE OTHER THAN THE FIVE THAT DR. PARIKH USED IN HER SURVEY.

THE FACT THAT SOME OF THESE MIGHT NOT HAVE BEEN AT ZAZZLE AT THE TIME -- AND BY THE WAY, DR. PARIKH DID HER SURVEY BEFORE THE LAWSUIT WAS FILED.

MS. SHAPIRO DIDN'T HAVE THE LUXURY OF DOING THAT.  SHE DID HERS, YOU KNOW, SEVERAL MONTHS AGO.  MAYBE THAT'S AN ISSUE FOR CROSS-EXAMINATION, AND THEY CAN ASK ABOUT THAT, BUT I DON'T SEE WHY THAT PRECLUDES HER FROM OFFERING HER OPINION THAT THERE ARE

MANY MORE, MUCH MORE SIMILAR COMPARATORS THAT COULD BE USED.

AND ON THIS POINT, YOU KNOW, MS. SHAPIRO IS NOT ONLY RESPONDING TO THE SURVEY DESIGN AS YOUR HONOR HAS SAID AND THE CHOICE THAT THE COMPARATORS USED, SHE'S ALSO RESPONDING MORE GENERALLY TO THE ULTIMATE CONCLUSION THAT DR. PARIKH OFFERED, AND I FEEL LIKE THAT'S GETTING LOST HERE.

THE COURT:  I THINK THAT SHE REALLY STANDS IN THE SHOES OF JUST ONE MORE SURVEY TAKER, AND THAT'S WHY IT'S NOT PROPER REBUTTAL.

YOU KNOW, THE SURVEY REFLECTS THAT SOME PEOPLE THOUGHT IT WAS IMPORTANT AND SOME DIDN'T.  SO ALL ELLEN SHAPIRO IS DOING IS SAYING COUNT ME IN THE NEGATIVE ZONE.  THAT'S THE PROBLEM WITH IT.

BUT THE SURVEY REPRESENTS THAT.  THE SURVEY SAYS, IT IS NOTHING -- I THINK THERE WAS MAYBE ONE QUESTION WHERE THERE WAS 100 PERCENT RECOGNITION OF ONE OF THE FONTS, BUT OTHERWISE THERE WERE SURVEY TAKERS ON BOTH SIDES OF EVERY QUESTION.

MR. POSNER:  AND WE HAVE A SURVEY DESIGN REBUTTAL EXPERT, DR. SWAIN, AND HE'S GOING TO TALK ABOUT THE DESIGN, BUT REMEMBER, DR. PARIKH'S CONCLUSION IS THAT THIS IS AN IMPORTANT, POPULAR, DIFFICULT-TO-SUBSTITUTE TYPE FIX.

AND IT IS PROPER REBUTTAL.  WE CITED CASES.  AND I'M REFERRING RIGHT NOW TO THE MATTHEW ENTERTAINMENT CASE.  THE PROPER FUNCTION OF REBUTTAL EVIDENCE IS TO CONTRADICT, IMPEACH, OR DIFFUSE THE IMPACT OF A REBUTTED EXPERT'S OPINIONS.

DR. PARIKH'S ULTIMATE OPINION, TAKING HER SURVEY DESIGN, IS THAT THIS IS IMPORTANT, POPULAR, AND DIFFICULT TO SUBSTITUTE.  AND MS. SHAPIRO IS SIMPLY PROVIDING A RESPONSE TO THAT TO PROVIDE PERSPECTIVE AND OFFER AN ALTERNATIVE REVIEW THAT REBUTS THAT ULTIMATE OPINION THAT THEY ARE GOING TO PRESENT.

THERE'S NOTHING IN THE CASE LAW OR LOGIC THAT SAYS THAT SHE MUST BE A SURVEY DESIGNER HERSELF TO DO SO.  THEY CITE THESE CASES SAYING, WELL, SHE'S NOT ON THE SAME SUBJECT MATTER AS DR. PARIKH, BUT THE SUBJECT MATTER OF DR. PARIKH'S SURVEY IS NOT SURVEY, IT'S THE POPULARITY, IMPORTANCE, AND SUBSTITUTABILITY OF THE BLOOMING ELEGANT TYPE FACE, AND THAT'S WHAT MS. SHAPIRO OFFERS A DIFFERENT PERSPECTIVE ON THAT IS WELL WITHIN HER QUALIFICATIONS AND EXPERIENCE.  AND SHE DOES IT BY SHOWING THAT THERE ARE MANY OTHER EXAMPLES OF COMPARABLE FONTS THAT WORK TOGETHER THAT CAN BE SUBSTITUTED.

THE COURT:  SO THAT ONE, AND THAT ONE I'M INCLINED TO ALLOW, BUT FOR HER TO TESTIFY, WELL, I DON'T THINK IT'S DIFFICULT TO SUBSTITUTE, THAT'S REALLY JUST LIKE SHE IS LIKE THE 137TH RESPONDENT TO THE SURVEY.  AND THAT'S WHY -- FRANKLY, SHAPIRO MAY ACTUALLY -- AND I THINK SHE WOULD QUALIFY AS AN EXPERT IN GRAPHIC DESIGN, BUT THESE SHOP OWNERS MIGHT NOT BE FAR BEHIND HER IN THEIR QUALIFICATIONS.

SO I JUST THINK THAT SHE DOESN'T GET -- SHE WANTS HER TESTIMONY TO BE ON THE SAME WEIGHT AS ALL 136 RESPONDENTS, AND

I THINK THAT IS IMPROPER.

MR. POSNER:  I THINK SHE'S ACTUALLY DOING SOMETHING DIFFERENT THOUGH, AND THIS GOES BACK TO THE POINT THAT I UNSUCCESSFULLY TRIED TO MAKE BEFORE, THAT THE PARIKH SURVEY IS TESTING SUBSTITUTABILITY FROM THE PERSPECTIVE OF GRAPHIC DESIGNERS WHO USE A FONT IN A DESIGN AND THEN THEY HAVE DIFFICULTY SUBSTITUTING IT OUT.

IT'S AN ENTIRELY DIFFERENT QUESTION IF I GOT ON TO ZAZZLE AND SAID I WANT A SCRIPT FONT TO MAKE A WEDDING INVITATION AND I'M GOING TO PICK 1 OF 50 OPTIONS THAT ARE AVAILABLE, AND YOUR HONOR HAS ALLUDED TO THIS TODAY, MOST OF THEM ARE OF VERY MARGINAL THIS DIFFERENCE, AND ONE COULD SAY IF BLOOMING ELEGANT IS NOT AVAILABLE, I CAN USE THIS ONE.

WE DON'T WANT THEM TO MISLEAD THE JURY INTO BELIEVING THAT SUBSTITUTABILITY MEANS THAT BLOOMING ELEGANT IS THE BE-ALL AND END-ALL TYPE FACE, AND THAT'S WHAT MS. SHAPIRO CAN DO.

THE COURT:  I DON'T THINK THE SURVEY PROFESSES TO SAY THAT IT'S A FACT THAT BLOOMING ELEGANT IS HARD TO SUBSTITUTE.

I THINK THE SURVEY SAYS THAT AMONG ZAZZLE USERS WHO ARE FREQUENT USERS, THEIR VIEW IS THAT IT'S DIFFICULT.  THEIR EXPERIENCE -- I DON'T REMEMBER THE EXACT WORD.  IT HAS TO DO WITH THE -- HOW IS BLOOMING ELEGANT AND THESE OTHER FIVE FONTS, HOW ARE THEY PERCEIVED BY THEIR USERS?

NOT IS IT -- MAYBE THE PEOPLE WHO FIND IT DIFFICULT TO

SUBSTITUTE ARE ACTUALLY WRONG, BUT THAT'S NOT THE POINT.

MR. POSNER:  THEY'RE NOT JUST USERS.  I KNOW WE'VE TALKED ABOUT THAT TODAY.  THERE ARE 136 OUT OF THE ███████ USERS.  THESE ARE DESIGNERS.

THE COURT:  YES.

MR. POSNER:  AND IT IS A DIFFERENT THING.  AND MS. SHAPIRO CAN TALK ABOUT THIS, AND I BELIEVE IT'S IMPORTANT. AGAIN, I SAID THIS, BUT IT'S A DIFFERENT THING FROM THE PERSPECTIVE OF SOMEONE WHO HAS MADE A DESIGN, THEY MIGHT HAVE DIFFICULTY CHANGING IT OUT BECAUSE THAT WILL REQUIRE BROADER CHANGES TO WHAT THEY'VE MADE THAN JUST A REGULAR USER LIKE YOU OR ME WHO IS SELECTING IN THE FIRST INSTANCE.

THE COURT:  SO ANOTHER THING THAT CAN HAPPEN HERE, AND I THINK MR. SWAIN DOES THIS, HE CAN INCORPORATE AS PART OF THE FOUNDATION OF HIS OPINIONS WHAT HE'S LEARNED FROM A HIGHLY QUALIFIED GRAPHIC DESIGNER.

MR. POSNER:  WELL, THAT TAKES CARE OF THE SWAIN MOTION THEN I THINK BECAUSE THAT BASICALLY -- -

THE COURT:  YES.

MR. POSNER:  THAT'S THE ENTIRETY OF THE CHALLENGE TOO.

THE COURT:  AND I JUST DON'T THINK THAT SHAPIRO CAN OFFER HER VIEW ON HOW SHE WOULD HAVE OFFERED THE SURVEY AND GIVE THAT -- AND SHE'S ATTEMPTING TO GIVE THAT EQUAL WEIGHT TO ALL OF THE OTHER SURVEY RESPONDENTS.  I DON'T THINK SO.

I THINK ATTACKING THE STRUCTURE OF QUESTION ON THE COMPARATORS, ON HOW THE COMPARATORS WERE SELECTED, I THINK THAT'S DISTINCTLY DIFFERENT.

I THINK COMING AT IT FROM THE PERSPECTIVE OF A GRAPHIC DESIGNER IS APPROPRIATE, AND I'M SURE SHE'LL SAY TEN TIMES, I'M NOT A SURVEY EXPERT, BUT I AM A GRAPHIC DESIGN EXPERT, AND I KNOW THAT THESE AREN'T COMPARABLE.  SO THE SURVEY HAS A PROBLEM.  I THINK THAT'S PROPER REBUTTAL, AND I AM GOING TO LET YOU DO THAT, BUT NOT ANY OF THE OTHERS.

MR. POSNER:  OKAY.  I'M A LITTLE UNCLEAR OF WHAT IS COMING IN AND COMING OUT, BUT WHAT I HEAR THE COURT SAYING IS THAT MS. SHAPIRO CAN QUESTION AND CHALLENGE THE RELIABILITY OF THE SURVEY DESIGN BECAUSE OF THE CHOICE OF COMPARATORS.

THE COURT:  NO, ONLY ON THE CHOICE OF COMPARATOR ISSUE.  ALL OF THE REST OF IT IS OUT.  THAT'S THE ONLY TOPIC THAT SHE CAN TESTIFY TO AS REBUTTAL.

MR. POSNER:  YES.  AND THE CHOICE OF COMPARATOR ISSUE, THOUGH, INCLUDES A NUMBER OF ISSUES THAT MS. SHAPIRO ADDRESSED, INCLUDING THE ABILITY OF OTHER FONTS THAT LOOK MORE SIMILAR TO BLOOMING ELEGANT, THE NUMBER OF THEM, THE SIMILARITIES BETWEEN THEM, THE WAY TRIOS WORK TOGETHER.

THE COURT:  THAT'S HER FOUNDATION FOR WHY SHE THINKS THE SURVEY WAS INCORRECTLY CONSTRUCTED.

MR. POSNER:  YES.

THE COURT:  I DON'T HAVE A PROBLEM WITH THAT.

MR. POSNER: OKAY. ALL RIGHT. I'M UP HERE. I'M NOT SURE IF YOU WANT TO HEAR FROM THEM FIRST. I DON'T KNOW IF THERE'S NOTHING TO SAY.

THE COURT: SO LET ME LOOK AT SWAN.

MR. POSNER: SWAIN.

THE COURT: SWAIN, I'M SORRY.

SO I -- WELL, LET ME HEAR FROM THE PLAINTIFF FIRST. IT'S THEIR MOTION. BUT WHEN I READ MR. SWAIN'S REPORT, I DID NOT -- IT DOES NOT READ AS THOUGH HE IS SIMPLY THE CONDUIT FOR SHAPIRO'S OPINIONS, AND I WOULDN'T LET HIM DO THAT.

SO IF IT READ THAT WAY, I WOULD AGREE COMPLETELY. BUT IT DOESN'T READ THAT WAY.

HE HAS GIVEN HIS OPINION ON THE -- I MEAN, HE -- IT'S REALLY A VERY THOROUGH REPORT. HE TALKS ABOUT THE EXISTENCE OF CONTEXT EFFECTS IN PARAGRAPH 61 AND CONTRAST EFFECT.

AND THEN HE USES -- HE SHOWS WHAT HE BELIEVES IS THE FALLACY IN THE PARIKH SURVEY AND RELIES ON AS SUPPORT FOR HIS VIEW THE SHAPIRO OPINIONS.

I THINK THAT'S COMPLETELY APPROPRIATE.

SO COMMENTS ON THIS? I JUST -- I MEAN, OBVIOUSLY -- SHOULD HE GET ON THE WITNESS STAND AND START JUST PARROTING SHAPIRO, IT WOULD BE A VALID OBJECTION. BUT I DON'T SEE -- I DON'T READ THE REPORT THAT WAY.

MR. MATHEWS: YOUR HONOR, MAY I APPROACH?

THE COURT: YES, MR. MATHEWS.

MR. MATHEWS:  MAY I BRIEFLY RESPOND TO SOMETHING OPPOSING COUNSEL SAID REGARDING ELLEN SHAPIRO BEFORE I PROCEED WITH DR. SWAIN'S REPORT?

THE COURT:  OKAY.

MR. MATHEWS:  OPPOSING COUNSEL MENTIONED THAT WE HAVE TO UNDERSTAND IT IN THE CONTEXT OR ELLEN SHAPIRO'S REPORT IN THE CONTEXT OF WHAT DR. PARIKH, WHAT HER OPINIONS WERE, THE CONCLUSIONS SHE DREW.

IN PARAGRAPH PHOTOGRAPH 14 OF DR. PARIKH'S REPORT READS, "BASED ON THE RESULTS OF THE SURVEY IT IS MY OPINION THAT THE BLOOMING ELEGANT TRIO IS AN IMPORTANT AND POPULAR SET OF FONTS ON ZAZZLE."

"IMPORTANT AND POPULAR SET OF FONTS ON ZAZZLE."

SHE COUCHED HER OPINIONS AND HER CONCLUSIONS IN TERMS OF WHAT WAS AVAILABLE ON THE ZAZZLE PLATFORM ITSELF.

SO DOCTOR -- EXCUSE ME, ELLEN SHAPIRO'S FAILURE TO CONSIDER OR INVESTIGATE WHETHER OR NOT THE COMPARABLE FONTS THAT SHE THINKS SHOULD HAVE BEEN USED AS THE COMPARABLE -- AS COMPARISONS IN SURVEY, THE FACT THAT SHE FAILED TO CONSIDER WHETHER OR NOT THOSE WERE AVAILABLE ON ZAZZLE AT THE TIME IS FATAL AND DISPOSITIVE OF WHETHER OR NOT THAT TESTIMONY HAS A SUFFICIENT BASIS AND FACTS OR DATA UNDER RULE 702 AND 703.

THE COURT:  WELL, I'LL GIVE THAT SOME THOUGHT.  I'M NOT SURE I AGREE.  BUT THANK YOU.  I APPRECIATE THAT.

SO LET'S MOVE ON TO SWAIN.

AND YOU INDICATE THAT HE RELIED ENTIRELY ON THE SHAPIRO EVIDENCE.  AND I DON'T THINK HE DOES.  I THINK THAT'S AN UNFAIR CHARACTERIZATION OF HIS REPORT.

MR. MATHEWS:  I UNDERSTAND YOUR POSITION ON THAT, YOUR HONOR.

AND TO THE EXTENT THAT DR. SWAIN IS MERELY USING HER REPORT TO INFORM HIS OPINIONS, I THINK WE WOULD SUBMIT ON THE PAPERS.

THE COURT:  OKAY.

MR. MATHEWS:  BUT AS YOUR HONOR SAID, TO THE EXTENT THAT HE DOES ATTEMPT TO PARROT OR REPEAT THE ACTUAL CONTENTS OF ELLEN SHAPIRO'S OTHERWISE INVISIBLE OPINIONS ON THE STAND, THAT WILL BE THE ISSUE THAT WE HAVE HERE, THAT IT IS BEING USED AS A BACKDOOR CONDUIT TO GET IN OTHERWISE INADMISSIBLE --

THE COURT:  AND IT WOULDN'T BE -- SO, I MEAN, FOR ALL OF YOU, THESE ARE JUST THE RULES OF THE -- THAT WE ALL ABIDE BY IS THAT USING ANOTHER EXPERT'S CONCLUSIONS AS A FOUNDATION FOR A SEPARATE SET OF OPINIONS IS APPROPRIATE, BUT NOT JUST AS A CONDUIT.

LET ME TELL YOU WHAT MY GOOD FRIEND SAID -- NO, THAT DOESN'T WORK.

OKAY.  I THINK WE'VE CONCLUDED THIS THEN.

I'M GOING TO DENY THE MOTION IN REGARD TO DR. SWAIN AND, OF COURSE, IT GOES WITHOUT SAYING THAT DR. SWAIN AND NO OTHER EXPERT CAN SIMPLY SERVE AS A CONDUIT FOR EXCLUDED OPINIONS OF

ANOTHER EXPERT, BUT THEY MAY PROPERLY BE USED AS PART OF THE FOUNDATION FOR THE OPINIONS OFFERED.

MR. MATHEWS:  YES, YOUR HONOR.

THE COURT:  OKAY.  THANK YOU.

ALL RIGHT.  WE'RE DONE.  IT'S BEEN A LOT TO GET THROUGH.

I THINK THAT'S EVERYTHING THAT WE NEED FOR THE RECORD.

OKAY.  LET'S GO OFF THE RECORD.

(COURT CONCLUDED AT 3:26 P.M.)

CERTIFICATE OF REPORTER

I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE
UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO
HEREBY CERTIFY:

THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS
A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE
ABOVE-ENTITLED MATTER.

_____
IRENE RODRIGUEZ, CSR, RMR, CRR
CERTIFICATE NUMBER 8074


DATED:  NOVEMBER 12, 2025

UNITED STATES COURT REPORTERS